1  William N. Lobel, State Bar No. 93202
   wlobel@lwgfllp.com
2  Alan J. Friedman, State Bar No. 132580
   afriedman@lwgfllp.com
3  Beth E. Gaschen, State Bar No. 245894
   bgaschen@lwgfllp.com
4  Christopher J. Green, State Bar No. 295874
   cgreen@lwgfllp.com
5  **LOBEL WEILAND GOLDEN FRIEDMAN LLP**
   650 Town Center Drive, Suite 950
6  Costa Mesa, California 92626
   Telephone   714-966-1000
7  Facsimile    714-966-1002

8  Proposed Attorneys for
   Debtors and Debtors-in-Possession

9

   **UNITED STATES BANKRUPTCY COURT**
10
   **CENTRAL DISTRICT OF CALIFORNIA**
11
   **SANTA ANA DIVISION**
12  In re                                    Case No. 8:15-bk-15311-MW

13  FREEDOM COMMUNICATIONS, INC., a          Chapter 11
    Delaware corporation, *et al.*,[1]
14                                           (Jointly Administered with Case Nos.
              Debtors and                    8:15-bk-15312-MW; 8:15-bk-15313-MW;
15            Debtors-in-Possession.         8:15-bk-15315-MW; 8:15-bk-15316-MW;
                                             8:15-bk-15317-MW; 8:15-bk-15318-MW;
16  Affects:                                 8:15-bk-15319-MW; 8:15-bk-15320-MW;
                                             8:15-bk-15321-MW; 8:15-bk-15322-MW;
17  ☒  All Debtors                           8:15-bk-15323-MW; 8:15-bk-15324-MW;
                                             8:15-bk-15325-MW; 8:15-bk-15326-MW;
18  ☐  Freedom Communications, Inc., a       8:15-bk-15327-MW; 8:15-bk-15328-MW;
    Delaware corporation, ONLY               8:15-bk-15329-MW; 8:15-bk-15330-MW;
19                                           8:15-bk-15332-MW; 8:15-bk-15337-MW;
    ☐  Freedom Communications Holdings,      8:15-bk-15339-MW; 8:15-bk-15340-MW;
20  Inc., a Delaware corporation, ONLY       8:15-bk-15342-MW; 8:15-bk-15343-MW)

21  _____

22      [1] The last four digits of the Debtors' federal tax identification numbers are as follows: Freedom
    Communications, Inc. (0750); Freedom Communications Holdings, Inc. (2814); Freedom Services, Inc.
23  (3125); 2100 Freedom, Inc. (7300); OCR Community Publications, Inc. (9752); Daily Press, LLC (3610);
    Freedom California Mary Publishing, Inc. (4121); Freedom California Ville Publishing Company LP (7735);
24  Freedom Colorado Information, Inc. (7806); Freedom Interactive Newspapers, Inc. (9343); Freedom
    Interactive Newspapers of Texas, Inc. (8187); Freedom Newspaper Acquisitions, Inc. (4322); Freedom
25  Newspapers (7766); Freedom Newspapers, Inc. (3240); Freedom Newspapers of Southwestern Arizona,
    Inc. (5797); OCR Information Marketing, Inc. (7983); Odessa American (7714); Orange County Register
26  Communications, Inc. (7980); Victor Valley Publishing Company (6082); Victorville Publishing Company
    (7617); Freedom SPV II, LLC (8253); Freedom SPV VI, LLC (8434); Freedom SPV I, LLC (3293); Freedom
27  SPV IV, LLC (8500); and Freedom SPV V, LLC (9036).  The Debtors' mailing address is 625 N. Grand
    Avenue, Santa Ana, California 92701.

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1

2  ☐ Freedom Services, Inc., a Delaware corporation, ONLY

3  ☐ 2100 Freedom, Inc., a Delaware corporation, ONLY

4

5  ☐ OCR Community Publications, Inc., a California corporation, ONLY

6  ☐ Daily Press, LLC, a California limited liability company, ONLY

7

8  ☐ Freedom California Mary Publishing, Inc., a California corporation, ONLY

9  ☐ Freedom California Ville Publishing Company LP, a California limited
10 partnership, ONLY

11 ☐ Freedom Colorado Information, Inc., a Delaware corporation, ONLY

12

13 ☐ Freedom Interactive Newspapers, Inc., a California corporation, ONLY

14 ☐ Freedom Interactive Newspapers of Texas, Inc., a Delaware corporation, ONLY

15

16 ☐ Freedom Newspaper Acquisitions, Inc., a Delaware corporation, ONLY

17 ☐ Freedom Newspapers, a Texas general partnership, ONLY

18

19 ☐ Freedom Newspapers, Inc., a Delaware corporation, ONLY

20 ☐ Freedom Newspapers of Southwestern Arizona, Inc., a California corporation,
21 ONLY

22 ☐ OCR Information Marketing, Inc., a California corporation, ONLY

23

24 ☐ Odessa American, a Texas general partnership, ONLY

25 ☐ Orange County Register Communications, Inc., a California
26 corporation, ONLY

27 ☐ Victor Valley Publishing Company, a California corporation, ONLY

28

**DEBTORS' MOTION FOR ENTRY OF: (I) INTERIM ORDER (A) AUTHORIZING DEBTORS TO (1) UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (2) PROVIDE ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (3) AND GRANT RELATED RELIEF, AND (B) SETTING FINAL HEARING; AND (II) FINAL ORDER AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362 AND 364, (B) UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (C) PROVIDE ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (D) REPAY CERTAIN PREPETITION SECURED DEBT, AND (E) GRANT RELATED RELIEF; DECLARATION OF ADAM MEISLIK OF GLASSRATNER ADVISORY & CAPITAL GROUP, LLC IN SUPPORT THEREOF**

**[FIRST DAY DECLARATION OF CHRIS D. DAHL FILED CONCURRENTLY HEREWITH]**

1  ☐  Victorville Publishing Company, a
California limited partnership, ONLY

2

3  ☐  Freedom SPV II, LLC, a Delaware
limited liability company, ONLY

4  ☐  Freedom SPV VI, LLC, a Delaware
limited liability company, ONLY

5

6  ☐  Freedom SPV I, LLC, a Delaware
limited liability company, ONLY

7  ☐  Freedom SPV IV, LLC, a Delaware
limited liability company, ONLY

8

9  ☐  Freedom SPV V, LLC, a Delaware
limited liability company, ONLY

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

28669118.1 1044619.1

3

FINANCING AND CASH COLLATERAL
MOTION

1
2

## Table of Contents

I.   RELIEF REQUESTED ...................................................................................10

II.  MATERIAL TERMS OF THE INTERIM ORDER .......................................13

III. MATERIAL TERMS OF THE FINANCING .................................................18

IV.  BACKGROUND .........................................................................................28

    A.   Jurisdiction and Venue ......................................................................28

    B.   The Debtors and the Chapter 11 Filings ...........................................29

    C.   The Debtors' Prepetition Secured Indebtedness ...............................29

        1.   The Prepetition Senior Liens .................................................29

        2.   PBGC Liens ...........................................................................36

        3.   McEachen/Stern Lien ............................................................37

        4.   Other Secured Creditors........................................................38

    D.   Retention of GlassRatner as Financial Advisors to the Debtors ...............39

    E.   The Debtors' Need for Immediate Access to Cash Collateral...................39

    F.   The Debtors' Additional Liquidity Needs.............................................41

    G.   Efforts to Obtain Postpetition Financing ...........................................41

    H.   Overview of the DIP Facility ..............................................................43

V.   LEGAL BASIS FOR RELIEF REQUESTED..........................................................44

    A.   Use of Cash Collateral Under the Interim Order and Final
        Order Should be Approved.............................................................................44

    B.   The Proposed Adequate Protection Should Be Authorized.......................45

    C.   Authority to Grant Priming Liens and Superpriority Claims in
        Connection with the DIP Facility Should Be Granted .................................49

    D.   The DIP Facility's Refinancing Feature is Appropriate .............................52

    E.   The Scope of the Carve-Out is Appropriate..............................................54

    F.   The DIP Agent and DIP Lenders are Entitled to the Protections
        Afforded to a Good Faith Lender Under Section 364(e) ...........................55

    G.   The Automatic Stay Should Be Modified on Limited Basis.......................56

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

H.   Approval of the Interim Order Should Be Granted, and a Final
Hearing Set on Approval of the Final Order...............................................56

I.   Waiver of Bankruptcy Rules 6004(a) and (h)...........................................57

VI.   NOTICE ...........................................................................................................57

VII.   CONCLUSION ...............................................................................................58

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Lobel Weiland Golden Friedman LLP**
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

28669118.1 1044619.1

FINANCING AND CASH COLLATERAL
MOTION

# Table of Authorities

## **CASES**

Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.),
789 F.2d 1085 (4th Cir. 1986) ................................................................. 50

Computer Sales Int'l Inc. v. Fed. Mogul Global, Inc. (In re Fed. Mogul Global, Inc.),
293 B.R. 124, 126 (D. Del. 2003) ........................................................... 52

In re 495 Central Park Ave. Corp.,
136 B.R. 626 (Bankr. S.D.N.Y. 1992) ..................................................... 50

In re 499 W. Warren St. Assocs., Ltd. P'ship,
142 B.R. 53 (Bankr. N.D.N.Y. 1992) ...................................................... 45

In re Abbotts Dairies, Inc.,
788 F.2d 143 (3d Cir. 1986) ................................................................... 51

In re Ames Dep't Stores, Inc.,
115 B.R. 34 (Bankr. S.D.N.Y. 1990) ....................................................... 49

In re Appleseed's Intermediate Holdings LLC, et al.,
Case No. 11-10160 (Bankr. D. Del. Jan. 20, 2011) ............................... 52

In re Aqua Assocs.,
123 B.R. 192, 197 (Bankr. E.D. Pa. 1991) ............................................ 50

In re Cardinal Indus. Inc.,
118 B.R. 971 (Bankr. S.D. Ohio 1990) ................................................... 45

In re Cent. Park Avenue Corp.,
136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) ............................................ 45

In re Champion Enters., Inc.,
2010 WL 2723820 (Bankr. D. Del. 2010) .............................................. 52

In re Continental Airlines, Inc.,
154 B.R. 176 (Bankr. D. Del. 1993) ....................................................... 44

In re Dayton Superior Corp.,
Case No. 09-10785 (Bankr. D. Del. Apr. 19, 2009) .............................. 52

In re Defender Drug Stores,
126 B.R. 76 (Bankr. D. Ariz. 1991) ........................................................ 49

In re Delta Res., Inc., 54 F.3d 722, 730 (11th Cir. 1995) ............................. 45

6

FINANCING AND CASH COLLATERAL MOTION

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

In re Ellingsen MacLean Oil Co.,
    834 F.2d 599 (6th Cir. 1987) ................................................................. 49

In re Foamex Int'l Inc.,
    Case No. 09-10560 (Bankr. D. Del. Feb. 20, 2009) ............................ 52

In re Furniture Brands Int'l, Inc., et al.,
    Case No. 13-12329 (Bankr. D. Del. Oct. 11, 2013) ............................ 52

In re Futures Equity L.L.C.,
    2001 Bankr. LEXIS 2229 (Bankr. N.D. Tex. April 11, 2001). ............... 50

In re George Ruggiere Chrysler-Plymouth, Inc.,
    727 F.2d 1017 (11th Cir. 1984) ............................................................. 44

In re Hilex Poly Co. LLC,
    Case No. 08-10890 (Bankr. D. Del. May 7, 2008) ................................ 53

In re Holley Performance Prods. Inc.,
    Case No. 08-10256 (Bankr. D. Del. Feb. 12, 2008) ............................ 53

In re Integrated Res., Inc.,
    147 B.R. 650 (S.D.N.Y. 1992) .............................................................. 52

In re L.A. Dodgers LLC,
    457 B.R. 308 (Bankr. D. Del. 2011) ...................................................... 49

In re Monroe Park,
    17 B.R. 934 (D. Del. 1982) .................................................................... 45

In re Pac. Energy Res., Ltd.,
    Case No. 09-10785 (Bankr. D. Del. Mar. 10, 2009) ............................ 52

In re Shaw Indus., Inc.,
    300 B.R. 861, 865 (Bankr. W.D. Pa. 2003) ......................................... 44

In re Simasko Production Co.,
    47 B.R. 444 (D. Colo. 1985) ................................................................. 49

In re Source Interlink Cos. Inc.,
    Case No. 09-11424 (Bankr. D. Del. Apr. 29, 2009) ............................ 52

In re Stanley Hotel, Inc.,
    15 B.R. 660 (D. Colo. 1981) ................................................................. 50

In re Swedeland Dev. Group, Inc.,
    16 F.3d 552 (3d Cir. 1994) .................................................................... 45

In re Wrecclesham Grange, Inc.,
    221 B.R. 978 (Bankr. M.D. Fla. 1997) .................................................. 45

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

L.A. Dodgers,
    457 B.R. at 313 ............................................................................. 50

MNBank Dallas, N.A. v. O'Connor (In re O'Connor),
    808 F.2d 1393 (10th Cir. 1987) ....................................................... 44

Smith v. Van Gorkom,
    488 A.2d 858 (Del. 1985) ................................................................ 52

Weinstein, Eisen, Weiss LLP v. Gill (In re Cooper Common, LLC),
    424 F.3d 963 (9th Cir. 2005). .......................................................... 55

## STATUTES

11 U.S.C. § 105 ....................................................................................... 9

11 U.S.C. § 361 .................................................................................. 9, 44

11 U.S.C. § 362 ....................................................................................... 9

11 U.S.C. § 363 ................................................................................ passim

11 U.S.C. § 364 ................................................................................ passim

11 U.S.C. §§ 101 .................................................................................... 9

26 U.S.C. § 6321 ................................................................................... 35

28 U.S.C. § 1334 ................................................................................... 27

28 U.S.C. §§ 1408 ................................................................................. 27

28 U.S.C. §§ 157 ................................................................................... 27

28 U.S.C. §1409 .................................................................................... 27

I.R.C. § 412 .......................................................................................... 35

I.R.C. § 430 .......................................................................................... 35

## RULES

Bankruptcy Rule 4001(b)(1)(B)(i) ......................................................... 13

Bankruptcy Rule 4001(b)(1)(B)(ii) ........................................................ 13

Bankruptcy Rule 4001(b)(1)(B)(iii) ..................................... 13, 15, 16, 17

Bankruptcy Rule 4001(b)(1)(B)(iv) ....................................................... 13

Bankruptcy Rule 4001(c)(1)(B)(iii) ................................................. 14, 16

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Fed. R. Bankr. P. 4001 .................................................................. 9, 12, 17, 55

Fed. R. Bankr. P. 2002 ........................................................................ 9, 56

Fed. R. Bankr. P. 9014 ............................................................................... 9

Local Bankruptcy Rule 4001-2 ............................................................ 9, 12, 17

Local Bankruptcy Rule 9075-1 ............................................................... 56

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1

2      Freedom Communications, Inc., a Delaware corporation ("Freedom

3  Communications") and its related debtors and debtors-in-possession in the above-

4  captioned chapter 11 cases (the "Debtors" and each a "Debtor"), hereby file this motion

5  (the "Motion"), pursuant to sections 105, 361, 362, 363 and 364 of title 11 of the United

6  States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code"), Rules

7  2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the

8  "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Procedure of the

9  United States Bankruptcy Court for the Central District of California (the "Local Rules"),

10 seeking (A) entry of an order (the "Interim Order"), in substantially in the form attached

11 hereto as Exhibit A, authorizing the Debtors to utilize cash collateral and scheduling a final

12 hearing on the Motion (the "Final Hearing"), and (B) entry of a final order (the "Final

13 Order"), pursuant to the Final Hearing, substantially in the form attached hereto as Exhibit

14 B, authorizing the Debtors to continue to utilize cash collateral and to obtain postpetition

15 financing in the form of the DIP Facility (as defined hereinbelow), as such relief is more

16 particularly described in Section I hereinbelow.

17      In support of this Motion, the Debtors submit the Declaration of Chris D. Dahl (the

18 "First Day Declaration") and the Declaration of Adam Meislik of GlassRatner Advisory &

19 Capital Group, LLC (the "GlassRatner Declaration"), with respect to the Debtors' use of

20 cash collateral and the proposed DIP financing.  In further support of the Motion, the

21 Debtors respectfully state as follows:

22

23 **I.      RELIEF REQUESTED**

24      By the Motion, the Debtors seek relief in two phases:

25      *First*, entry of the Interim Order, substantially in the form attached hereto as Exhibit

26 A, the terms of which have been agreed to by the Debtors and their senior secured

27 creditors, Silver Point Finance, LLC, as agent (the "Prepetition Agent"), and SPCP Group,

28 LLC and SPCP Group VI, LLC (the "Prepetition Lenders" and, together with the

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  Prepetition Agent, the "<u>Prepetition Loan Parties</u>"), and the Pension Benefit Guaranty

2  Corporation (the "<u>PBGC</u>"), (a) pursuant to which the Debtors are authorized to utilize, for a

3  period of thirty (30) days from the Petition Date (unless further extended pursuant to the

4  terms thereof), Cash Collateral (as defined in the Interim Order), upon the terms and

5  conditions set forth therein, (b) granting adequate protection to the Prepetition Loan

6  Parties and the PBGC with respect to such use of Cash Collateral; (c) modifying the

7  automatic stay as necessary to effectuate all of the terms and provisions of the Interim

8  Order; (d) prescribing the form and manner of notice and setting the time for the Final

9  Hearing on the Motion; and (e) granting related relief.

10      *Second*, by the Motion, the Debtors seek entry of the Final Order, substantially in

11  the form attached hereto as <u>Exhibit B</u>, granting the following relief:

12      (i)    Authorization for Debtors Freedom Communications and Freedom
Communications Holdings, Inc. ("<u>Freedom Holdings</u>"), as "<u>Borrowers</u>," to
obtain postpetition financing consisting of a senior secured term loan credit
facility in the principal amount of $3 million in new capital, plus the amount
necessary for the Refinancing (as defined herein), in the amount of
approximately $19,461,205 (plus certain accrued but unbilled fees, costs,
and expenses) (the "<u>DIP Facility</u>") from Silver Point Finance, LLC, as agent
(in such capacity, the "<u>DIP Agent</u>"), and the lenders party thereto from time
to time, currently contemplated to be SPCP Group, LLC and SPCP Group
VI, LLC (the "<u>DIP Lenders</u>");[2]

    (ii)    authorization for the non-Borrower Debtors in these chapter 11 cases
(collectively, the "<u>Guarantors</u>") to unconditionally guarantee on a joint and
several basis the Borrowers' obligations arising under the DIP Facility;

    (iii)    authorization for the Debtors to execute and enter into the DIP Documents
(as defined in the Final Order) to which they are a party and to perform such
other and further acts as may be necessary or appropriate in connection
therewith;

    (iv)    authorization for the Borrowers to use the proceeds of the DIP Facility (a) for
working capital and general corporate purposes in accordance with the
Approved Budget (as defined in the Final Order) and (b) to refinance in full

---

[2] The DIP Agent and the DIP Lenders, respectively, are the same entities as the Prepetition Agent and
the Prepetition Lenders, respectively.

all obligations outstanding under the Prepetition Credit Agreement (as defined in the Final Order), including all principal, interest, fees, make-whole amounts, expenses and other charges accrued through the date of payment (the "Refinancing");

(v)     authorization for the Debtors to use Cash Collateral (as defined in the Final Order) pursuant to sections 361, 362 and 363 of the Bankruptcy Code as provided therein;

(vi)    authorization for the Debtors to provide adequate protection to the Prepetition Secured Parties (i.e., the Prepetition Loan Parties and the Other Secured Creditors) (as defined in the Final Order), on the terms set forth in therein;

(vii)   authorization to grant first priority superpriority claims to the DIP Agent and the DIP Lenders and first priority liens in favor of the DIP Agent for the benefit of the DIP Lenders on all prepetition and postpetition property of the Debtors' estates and all proceeds thereof, excluding a lien on Avoidance Actions (as defined in the Final Order) but including a lien on any Avoidance Proceeds (as defined in the Final Order);

(viii)  a waiver by the Debtors of any right to surcharge against the DIP Collateral or Prepetition Collateral (as each are defined in the Final Order) pursuant to section 506(c) of the Bankruptcy Code or otherwise;

(ix)    modification of the automatic stay set forth in section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Documents and the Final Order;

(x)     a waiver of any applicable stay with respect to the effectiveness and enforceability of the Final Order (including under Bankruptcy Rule 6004); and

(xi)    granting related relief.

The relief sought by way of this Motion is consensual and is the result of good faith, arm's-length negotiations between and among the Debtors and their senior secured creditors – notably, the Prepetition Agent on behalf of the Prepetition Loan Parties and the PBGC (with respect to the Interim Order). All Secured Creditors (including the Other Secured Creditors, as such term is defined in the Interim Order and Final Order) have

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1 either consented[3] to the relief sought in this Motion, are deemed to consent pursuant to

2 applicable pre-petition agreements with the Prepetition Agent, and/or are provided with

3 adequate protection of their respective interests as set forth herein.

4

5 **II.     MATERIAL TERMS OF THE INTERIM ORDER**

6     As set forth above, it is contemplated that the provisions of the Interim Order will

7 control only until such time as the Final Order is entered, at which time the financing and

8 cash collateral provisions of the Final Order will control.  The material terms of the Interim

9 Order are set forth in this Section II.  The material terms of the Final Order are set forth in

10 Section III hereinbelow.

11     Pursuant to and in accordance with Bankruptcy Rule 4001(b)(1)(B) and Local Rule

12 4001-2, the material provisions of the Interim Order, and the location of such provisions

13 therein, are as follows:[4]

14

15

16

17

18

19

20

21

22

23 _____

24 [3] As of the filing of this Motion, the consent of the PBGC is with respect to the agreed-to Interim Order only.  The Other Secured Creditors have not yet indicated whether they will consent to the DIP Facility and

25 use of Cash Collateral pursuant to the Final Order.

26 [4] This summary is qualified in its entirety by the terms of the Interim Order, attached to the Motion as Exhibit A.  To the extent anything in this Motion is inconsistent with the Interim Order, the terms of the

27 Interim Order shall control.  Capitalized terms used but not otherwise defined in this summary shall have the meaning ascribed to them Interim Order.

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

| | |
|---|---|
| ***Parties with an Interest in Cash Collateral***<br>*Bankruptcy Rule 4001(b)(1)(B)(i)* | SPCP Group, LLC and SPCP Group VI, LLC, as Prepetition Lenders, and Silver Point Finance, LLC, as Prepetition Agent of the Prepetition Lenders under the Prepetition Credit Agreement.<br><br>The PBGC with respect to a PBGC Prior Lien (as defined in the Interim Order), if any.<br><br>Other Secured Creditors, including the PBGC (as defined in the Interim Order and as set forth on <u>Schedule 1</u> thereto).<br><br>(Interim Order ¶¶ 5(K) and (T), Schedule 1). |
| ***Purposes for Use of Cash Collateral***<br>*Bankruptcy Rule 4001(b)(1)(B)(ii)* | The Debtors require the use of Cash Collateral to pay their operating expenses prior to approval of the DIP Facility (final approval of which is requested pursuant to this Motion and the Final Order).  Upon approval of the Interim Order, the Debtors will be authorized to use Cash Collateral in accordance with the terms, conditions and limitations set forth in the Budget attached as Exhibit "A" to the Interim Order (subject to and including any permitted variances thereunder).<br><br>(Interim Order ¶¶ 6-8, 12(B), 27). |
| ***Duration and Use of Cash Collateral - Termination Date***<br>*Bankruptcy Rule 4001(b)(1)(B)(iii)* | The Debtors' right to use Cash Collateral under the Interim Order shall expire and terminate on the date that is thirty (30) days following the Petition Date (the "<u>Termination Date</u>"), unless (i) further extended in accordance with the terms thereof, or (ii) superseded and replaced by the Final Order approving the DIP Facility.<br><br>(Interim Order ¶¶ 19, 20, 22). |
| ***Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral***<br>*Bankruptcy Rule 4001(b)(1)(B)(iv) Local Bankruptcy Rule 4001-2(b)(4)* | ***<u>Adequate Protection to Prepetition Loan Parties</u>***.  As adequate protection for the Prepetition Loan Parties' interests in the Pre-Petition Collateral and the Debtors' use of their Cash Collateral pursuant to the Interim Order, the Prepetition Loan Parties shall be entitled to the following:<br><br>***<u>Payment of Interest, Fees and Tax Refund Monies</u>***.  The Prepetition Loan Parties shall receive monthly payments of interest pursuant to the terms of the Prepetition Credit Agreement and reimbursement of the Prepetition Agent's fees (including legal, consultancy and financial advisory fees) on a monthly basis.  The Prepetition Loan Parties will also be entitled to any and all tax refund monies received by the Debtors (which shall be applied to the Debtors' obligations under the Prepetition Credit Agreement pursuant to the terms thereof).  (Interim Order ¶ 13(i)). |

***Post-Petition Liens and Super-Priority Claims***.  The Prepetition Loan Parties shall receive first priority replacement liens (collectively, "<u>PLP Post-Petition Liens</u>") in and to any and all post-petition assets of Debtors' estates *other than* avoidance actions (collectively, the "<u>Post-Petition Collateral</u>"); and (ii) an allowed priority claim superior to all administrative expenses or priority claims of any kind (the "<u>PLP Super-Priority Claim</u>").  The PLP Post-Petition Liens and PLP Super-Priority Claim shall be subject and subordinate only to (a) the Carve-Out (as defined in the Interim Order); and (b) all other valid, perfected and unavoidable senior liens existing as of the Petition Date, including the PBGC Prior Lien, if any. (Interim Order ¶ 13(iii)).

***Adequate Protection to the PBGC***.  As adequate protection for the PBGC's interests in the Pre-Petition Collateral and the Debtors' use of Cash Collateral, the PBGC shall receive replacement liens (collectively, "<u>PBGC Post-Petition Liens</u>") in and to the Post-Petition Collateral (other than as set forth in the Interim Order, the PBGC Post-Petition Liens will be subject to priming only by liens securing obligations under debtor in possession financing provided by the DIP Loan Parties); and (ii) an allowed priority claim superior to all administrative expenses or priority claims of any kind (the "<u>PBGC Super-Priority Claim</u>").  The PBGC Post-Petition Liens and PBGC Super-Priority Claim shall be subject and subordinate only to (a) the Carve-Out (as defined in the Interim Order); (b) the PLP Post-Petition Liens and PLP Super-Priority Claim; <u>provided</u> that the Prepetition Agent Post-Petition Liens and Prepetition Agent Super-Priority Claim shall be subordinate to the PBGC Post-Petition Liens and PBGC Super-Priority Claim to the extent necessary for adequate protection with respect to collateral subject to any PBGC Prior Lien; and (c) all other valid, perfected and unavoidable senior liens existing as of the Petition Date, including the Prepetition Agent's senior prepetition liens (Interim Order ¶ 14).

***Stipulations of the Debtors; Waivers***
*Bankruptcy Rule 4001(c)(1)(B)(iii), (x) and (d)(1)(B); Local Bankruptcy Rule 4001- and* **Error! Bookmark not defined.**(3)

Subject to the Challenge Deadline (as defined in the Interim Order), the Interim Order contains certain stipulations and releases by the Debtors, including as to the amount and validity of the claims and liens of the Prepetition Loan Parties and the PBGC.  The stipulations, releases and admissions by the Debtors contained in the Interim Order are binding upon the Debtors in all circumstances.  (Interim Order ¶¶ 5(A)-(T), 9).

The Debtors' "exclusivity" to file a plan(s) of reorganization is automatically terminated as to the Prepetition Loan Parties and the PBGC in the event exclusivity is terminated earlier as to any other party.  (Interim Order ¶ 21).

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

**Lobel Weiland Golden Friedman LLP**
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

The Debtors agree to file a motion to approve debtor-in-possession financing provided by and on terms acceptable to the Prepetition Agent on or about the Petition Date and to obtain a final order approving same by the Bankruptcy Court by no later than thirty (30) days following the Petition Date unless further extended by agreement of the Prepetition Agent.  (Interim Order ¶ 22).

The Debtors agree not to file, or take any action to support, any plan of reorganization (or liquidation) which: (i) is inconsistent with the Interim Order to the extent that the provisions are still in effect at the time of filing such plan, or (ii) does not have the approval of the Prepetition Agent.  (Interim Order ¶ 28).

The Debtors shall not use any of the Prepetition Loan Parties' Cash Collateral to challenge the Prepetition Loan Parties with respect to the Pre-Petition Collateral or the Post-Petition Collateral.  (Interim Order ¶ 29).

The Debtors waive their rights to surcharge pursuant to Bankruptcy Code § 506(c) with respect to the Pre-Petition Collateral or the Post-Petition Collateral.  (Interim Order ¶ 24).

The Debtors waive their rights under Bankruptcy Code § 552(b) with respect to the extension of the Prepetition Agent's liens.  (Interim Order ¶ 25).

The Debtors waive their rights under Bankruptcy Code § 364(d) or otherwise to grant any liens senior to or *pari passu* with those of the Prepetition Loan Parties.  (Interim Order ¶ 26).

The Debtors are prohibited from selling any Pre-Petition Collateral outside of the ordinary course of business without the consent of the Prepetition Agent and the PBGC (except no such consent is required if the Prepetition Loan Parties or the PBGC (as applicable) are or will be indefeasibly paid in full in cash on account of its claim).  (Interim Order ¶ 12(iii), 18).

Except to the extent of the PBGC Prior Lien, if any, the Prepetition Loan Parties shall have the right to credit bid all or a portion of their respective claims in connection with a sale of the Debtors' assets under Bankruptcy Code § 363 or under a plan of reorganization.   (Interim Order ¶ 32).

***Challenge Deadline***
*Bankruptcy Rule 4001(b)(1)(B)(iii)*

An Official Committee has 60 days from its appointment, and other parties-in-interest have 60 days from the Petition Date, to commence, with requisite standing, any action seeking to challenge the Prepetition Debt, the Pre-Petition Liens, the PBGC Liens or the PBGC Lien Amount.

The Prepetition Loan Parties' Cash Collateral cannot be used to

raise a challenge against the Prepetition Loan Parties; provided that advisors to the Official Committee, if any, may investigate claims and issues with respect to the liens granted pursuant to the Prepetition Loan Documents prior to the Committee Challenge Deadline at an aggregate expense for such investigation, but not litigation, prosecution, objection or challenge thereto, not to exceed $25,000.

(Interim Order ¶¶ 10, 29)

**Modifications of the Automatic Stay**
*Bankruptcy Rule 4001(c)(1)(B)(iii)*

The automatic stay is modified to permit the Prepetition Agent to: (a) implement and enforce the terms of the Interim Order; (b) receive and apply any amounts paid by Debtors to the Prepetition Loan Parties; (c) file any financing statements or other instruments and documents necessary to maintain the Prepetition Loan Parties' Pre-Petition Liens and Post-Petition Liens.

(Interim Order ¶ 13(ii)).

**Professional Fees and Carve-Out**
*Bankruptcy Rule 4001(c)(1)(B)(iii) and (d)(1)(B)*
*Local Bankruptcy Rule 4001-2(b)(6)*

The Pre-Petition Liens, Post-Petition Liens and the Super-Priority Claims of the Prepetition Loan Parties and the PBGC shall be subject and subordinate to a carve-out (the "Carve-Out") for: (a) the payment of the Budget's line item expense and amount for legal fees and costs of the Debtors' professionals (provided, however, that to the extent available, the Debtors shall first use unencumbered funds to pay such professionals prior to using Cash Collateral to pay professional fees); and (b) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court. The Carve-Out shall not include, and none of the Prepetition Loan Parties' Cash Collateral can be used to challenge the rights of the Prepetition Loan Parties; provided that advisors to the Official Committee, if any, may investigate claims and issues with respect to the liens granted pursuant to the Loan Documents until the Committee Challenge Deadline at an aggregate expense for such investigation, but not litigation, prosecution, objection or challenge thereto, not to exceed $25,000. (Interim Order ¶ ¶ 12(i), (vi), (vii), 29).

The Carve-Out shall not be reduced by the amount or application of any retainer or other payment made to Debtors' professionals prior to the commencement of the Debtors' bankruptcy cases. However, before Debtors' professionals can utilize the Carve-Out, such professionals must first exhaust any and all pre-petition retainers. (Interim Order ¶ 36).

**Events of Default**
*Bankruptcy Rule 4001(b)(1)(B)(iii)*

The Debtors' right to use Cash Collateral shall immediately (subject to the applicable notice and cure periods) cease and terminate upon certain customary Events of Default enumerated in the Interim Order, including non-performance of its terms. (Interim Order ¶ 16).

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

FINANCING AND CASH COLLATERAL MOTION

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

| *Remedies*<br>*Bankruptcy Rule*<br>*4001(b)(1)(B)(iii)* | Upon the occurrence of an Event of Default, the Prepetition Loan Parties may seek relief from the automatic stay. Upon termination of the automatic stay, the Prepetition Loan Parties may seek certain customary remedies, including under Article 9 of the Uniform Commercial Code, the Freedom II Deed of Trust, the Freedom VI Deed of Trust and applicable California law with respect to the foreclosure and may pursue its remedies with respect to the Pre-Petition Collateral and Post-Petition Collateral. The Prepetition Loan Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of its Pre-Petition Collateral or Post-Petition Collateral or otherwise. (Interim Order ¶ 17). |

## III.    MATERIAL TERMS OF THE FINANCING

Upon entry of the Final Order, the provisions of the Final Order providing for DIP financing and use of cash collateral in connection therewith will control over the provisions of the Interim Order (which provisions were summarized in Section II hereinabove).

Pursuant to and in accordance with Bankruptcy Rule 4001(b)(1)(B) and (c)(1)(B) and Local Rule 4001-2, the material provisions of the DIP Facility, and the location of such provisions in the relevant source documents, are as follows:[5]

| *Borrowers*<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | Freedom Communications Holdings, Inc. and Freedom Communications, Inc.<br><br>The other Debtors and any parties specified in the DIP Facility shall serve as Guarantors. |

---

[5] This summary is qualified in its entirety by the terms of the Final Order and DIP Credit Agreement, attached to the Motion as <u>Exhibit B</u>. To the extent anything in this Motion is inconsistent with the Final Order and/or DIP Credit Agreement, the terms of the Final Order and the DIP Credit Agreement shall control. In the event of an inconsistency between the terms of the Final Order and the DIP Credit Agreement, the terms of the Final Order shall control. Capitalized terms used but not otherwise defined in this summary shall have the meaning ascribed to them Final Order and/or DIP Credit Agreement, as applicable.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

| | |
|---|---|
| ***DIP Lender***<br>*Bankruptcy*<br>*Rule*<br>*4001(c)(1)(B)* | Silver Point Finance, LLC, as agent (in such capacity, the "DIP Agent"), and the lenders party thereto from time to time, currently contemplated to be SPCP Group, LLC and SPCP Group VI, LLC (the "DIP Lenders"). [6] |
| ***Commitment***<br>*Bankruptcy*<br>*Rule*<br>*4001(c)(1)(B)*<br>*Local Rule 4001-2(c)* | Term loan credit facility in an aggregate principal amount of $3 million, plus the amount necessary to consummate the Refinancing of the Prepetition Debt owing to the Prepetition Loan Parties under the Prepetition Credit Agreement, in the amount of approximately $19,461,205 (plus certain accrued but unbilled fees, costs, and expenses). (Final Order, p. 1, ¶ 9(a); DIP Credit Agreement § 2.1). |
| ***Interest Rates***<br>*Bankruptcy*<br>*Rule*<br>*4001(c)(1)(B)*<br>*Local Rule 4001-2(c)* | *Non-Default Interest Rate*: 10% (DIP Credit Agreement § 2.7)<br><br>*Default Interest Rate*: 3% above the contract rate (DIP Credit Agreement § 2.8). |
| ***Term/Maturity***<br>*Bankruptcy Rule*<br>*4001)((c)(1)(B)*<br>*Local Rule*<br>*4001-2(c)* | The DIP Facility will mature the earlier of: (i) 12 months after the Closing Date (with an extended maturity date of 18 months if certain conditions set forth in the DIP Credit Agreement are satisfied), (ii) the DIP Facility otherwise becomes due and payable under the terms of the DIP Credit Agreement; and (iii) substantial consummation of a confirmed plan in the Debtors' cases. (DIP Credit Agreement p. 24). |
| ***Use of DIP Loan; Refinancing***<br>*Bankruptcy*<br>*Rule*<br>*4001(c)(1)(B)*<br>*Local Rule*<br>*4001-2(c)* | In accordance with the Budget, the proceeds of the DIP Facility shall be used by the Debtors to repay the Prepetition Indebtedness in full (*e.g.,* the Refinancing) and for working capital and other corporate purposes during the pendency of the Debtors' cases. (Final Order ¶ 9(g), 16; DIP Credit Agreement, §§ 2.5, 5.12, 6.7). |
| ***Borrowing Limits***<br>*Bankruptcy*<br>*Rule*<br>*4001(c)(1)(B)* | The DIP Credit Agreement contains negative covenants, including restrictions on incurrence of certain indebtedness, the incurrence of liens, and the making of certain investments. (DIP Credit Agreement § 6). |

---

[6]  As noted above, the DIP Agent and the DIP Lenders, respectively, are the same entities as the Prepetition Agent and the Prepetition Lenders, respectively.

**Lobel Weiland Golden Friedman LLP**
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| ***Borrowing Conditions*** *Bankruptcy Rule 4001(c)(1)(B) Local Bankruptcy Rule 4001-2(c)...* | The DIP Credit Agreement contains usual and customary conditions precedent to extensions of credit, including compliance with the Interim Order and entry of the Final Order within 30 days of the Petition Date (unless otherwise extended by the DIP Agent).  (DIP Credit Agreement § 3). |
| ***Interest and Fees*** *Bankruptcy Rule 4001(c)(1)(B)* | The DIP Credit Agreement provides for the payment of interest on a monthly basis and payment of the reasonable fees and out-of-pocket expenses of the DIP Agent and the DIP Lenders, including an upfront fee of $90,000, an annual administration fee of $50,000 and pre- and post-petition professional fees. (Final Order ¶ 9(c), (d), 19; DIP Credit Agreement § 2.9). |
| ***Approved Budget*** *Bankruptcy Rule 4001(c)(1)(B)* | So long as the DIP Obligations and any commitments under the DIP Facility remain outstanding, the Debtors must operate within a budget (the "Budget"),[7] subject to the permitted variances.  (Final Order ¶ 19, DIP Credit Agreement § 6.7). |
| ***Other Covenants*** | The DIP Credit Agreement contains usual and customary affirmative and negative covenants.  (DIP Credit Agreement §§ 5-6). |
| | The DIP Credit Agreement provides that the Debtors shall diligently pursue the sale of the Freedom SPV II Property.  (DIP Credit Agreement § 5.14). |

---

[7]   A copy of the Initial Budget (an initial 13-week budget commencing the week of the Petition Date) is attached to the Final Order as Exhibit A.

*Liens and Priorities*
*Bankruptcy Rule 4001(c)(1)(B)(i), (xi)*
*Local Rule 4001-2(c)*

**DIP Liens**:  Subject to the Carve-Out, the DIP Obligations shall be secured by the following liens (the "DIP Liens"):

- *First Lien on Unencumbered Property*.  A first priority lien pursuant to section 364(c)(2) of the Bankruptcy Code on all Unencumbered Property of the Debtors and their estates.  (Final Order, ¶ 11(a)).

- *Priming Liens on Prepetition Collateral*.  A first priority, priming lien pursuant to section 364(d)(1) of the Bankruptcy Code on all pre- and post-petition property of the Debtors, including all Prepetition Collateral securing the Prepetition Debt and/or Other Secured Debt; senior in all respects to the liens of the Prepetition Secured Parties (including, without limitation, the Contingent Liens, the Prepetition Senior Liens (including the PBCG Prior Lien, if any), the Prepetition Junior Liens, and the Adequate Protection Liens (all as defined in the Final Order)).  (Final Order, ¶ 11(b)).

- *Liens Junior to Certain Other Liens*.  A junior lien pursuant to section 364(c)(3) of the Bankruptcy Code on all property of the Debtors and their estates that is subject and subordinate to Permitted Priority Liens.  (Final Order, ¶ 11(c)).

- *Liens Senior to Certain Other Liens*.  The DIP Liens shall not be subject or subordinate to any lien avoided under section 551 of the Bankruptcy Code or any post-petition lien not expressly permitted under the DIP Documents.  (Final Order, ¶ 11(d)).

- *Lien on Avoidance Action Proceeds*.  The DIP Liens do not include a lien on Avoidance Actions, but do include a lien on Avoidance Action Proceeds.  (Final Order, ¶ 11(e)).

**DIP Superpriority Claims**:  Pursuant to section 364(c)(1) of the Bankruptcy Code, and subject to the Carve-Out, the DIP Obligations will be entitled to superpriority administrative expense claim status in the chapter 11 cases (the "Superpriority Claims").  (Final Order ¶ 10).

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

| 1 | ***Use of Cash Collateral*** | Upon entry of the Final Order, the Debtors are authorized to use Cash Collateral subject to the terms of the Final Order and the Budget.  Use of Cash Collateral under the Final Order is governed solely by the terms of the Final Order and not the Interim Order, except as expressly provided by the Final Order.  (Final Order ¶ 7). |

*Bankruptcy Rule 4001(b)(1)(B)(ii)*

*Local Rule 4001-2(c)*

The Final Order provides for the use of Cash Collateral through the earlier of (i) the Maturity Date of the DIP Facility, or (ii) the Termination Date.  (Final Order ¶ 7).

**Lobel Weiland Golden Friedman LLP**
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

28669118.1 1044619.1

FINANCING AND CASH COLLATERAL MOTION

**Lobel Weiland Golden Friedman LLP**
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

***Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral***
*Bankruptcy Rule 4001(b)(1)(B)(iv)*
*Local Rule 4001-2(c)*

The Final Order provides as "<u>Adequate Protection</u>" for the Prepetition Secured Parties as follows:

***Adequate Projection of Prepetition Loan Parties***:  Until the Refinancing has been consummated and the Challenge Period has expired or a challenge has been resolved in favor of the Prepetition Loan Parties, the Prepetition Loan Parties are entitled to the following (the "<u>Senior Adequate Protection Provisions</u>"):

(i) "<u>Senior Adequate Protection Liens</u>":  The Prepetition Loan Parties are granted (a) a replacement lien upon all the DIP Collateral (the "<u>Senior Adequate Protection Liens</u>"), and (b) the Contingent Liens to secure any Contingent Debt (as such terms are defined in the Final Order).  The Senior Adequate Protection Liens and Contingent Liens are subject and subordinate to the DIP Liens, the Permitted Priority Liens, the PBGC Prior Lien and the Carve-Out.  The Contingent Prepetition Debt shall be junior and subordinate in right of payment to all DIP Obligations and the Carve-Out.  Until such time as all of the DIP Obligations are indefeasibly paid in full, the Prepetition Loan Parties shall have no right to enforce the Contingent Prepetition Debt, the Contingent Liens or the Senior Adequate Protection Liens.  Upon the Refinancing being consummated and the Challenge Period having expired or a challenge being resolved in favor of the Prepetition Loan Parties, and the full payment to the Prepetition Loan Parties, the Contingent Liens and the Senior Adequate Protection Liens shall automatically terminate and be released.  (Final Order ¶ 12(a)).

(ii) "<u>Sections 503(b) and 507(b) Claim</u>":  The Prepetition Loan Parties are granted, subject to the Carve-Out, a superpriority claim, as provided for in sections 503(b) and 507(b) of the Bankruptcy Code immediately junior to the Superpriority Claims and any other claims under section 364(c)(1) of the Bankruptcy Code held by the DIP Agent and the DIP Lenders.  (Final Order ¶ 12(b)).

(iii) "<u>Adequate Protection Payments</u>":  The Debtors shall pay to the Prepetition Loan Parties all reasonable pre- or post-petition fees, costs, expenses and disbursements of the Prepetition Loan Parties' legal and financial advisors, and any other consultants retained in accordance with the Prepetition Loan Documents.  (Final Order ¶ 12(c)).

28669118.1 1044619.1

23

FINANCING AND CASH COLLATERAL MOTION

**Lobel Weiland Golden Friedman LLP**
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

***Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral***

*(cont.)*

**__Adequate Projection of Other Prepetition Creditors__**:  On account of their respective Other Secured Debt, the Other Prepetition Creditors are entitled to the following:

(i) "__Junior Adequate Protection Liens__":  The Other Prepetition Creditors are granted, in the same order of priority of their Prepetition Junior Liens, (a) a replacement lien upon all the DIP Collateral (the "__Junior Adequate Protection Liens__").  The Junior Adequate Protection Liens are subject and subordinate to the Prepetition Senior Liens and the Contingent Liens (if necessary), the DIP Liens, the Carve-Out, any Permitted Priority Liens and the PBGC Prior Liens, and the Senior Adequate Protection Liens.  Until such time as all of the DIP Obligations are indefeasibly paid in full in cash, the Other Prepetition Creditors shall have no right to seek or exercise any enforcement rights or remedies in connection with the Junior Adequate Protection Liens or their Prepetition Junior Liens.  (Final Order ¶ 13(a)).

(ii) "__Sections 503(b) and 507(b) Claim__":  In the same order of priority as the Junior Adequate Protection Liens, the Other Prepetition Creditors are granted a superpriority claim, as provided for in sections 503(b) and 507(b) of the Bankruptcy Code, that is subject to or subordinate to the Superpriority Claims, the DIP Obligations, the Prepetition Debt, any other claims under section 364(c)(1) of the Bankruptcy Code held by the DIP Agent and the DIP Lenders, the Senior Adequate Protection Claim and the Contingent Debt.  (Final Order ¶ 13(b)).

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

| | | |
|---|---|---|
| ***Carve-Out***<br>*Local Rule 4001-2(b)(6) and (c)* | | The DIP Liens and the Superpriority Claims and the Senior Adequate Protection Claims, shall each be subject and subordinate to the payment of the following Carve-Out: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) and 31 U.S.C. § 3717 (as to the U.S. Trustee, in such amount as agreed to by the U.S. Trustee or Order of the Court); (ii) all reasonable fees and expenses incurred by a trustee appointed under section 701 of the Bankruptcy Code in an amount not to exceed $25,000; and (iii) to the extent allowed at any time, but subject in all respects to the Budget and the terms of the Final Order, all accrued and unpaid fees, disbursements, costs and expenses ("Professional Fees") (other than any monthly fee, restructuring fee, sale fee or other success fee of any investment bankers or financial advisors of the Debtors), incurred by professionals or professional firms retained by either the Debtors or the Creditors' Committee, if any, whose retention has been approved by the Court during these Cases pursuant to sections 327 and 1103 of the Bankruptcy Code (collectively, "Professional Persons"), at any time before or on the first business day following delivery by any DIP Agent of a Carve-Out Trigger Notice (as defined in the Final Order), to the extent such Professional Fees are provided for in the Budget and are allowed by the Bankruptcy Court whether prior to or after delivery of a Carve Out Trigger Notice (the foregoing being defined as the "Carve-Out Cap").   (Final Order ¶ 10(b)) |
| ***Determination Regarding Prepetition Claim; Stipulations of the Debtors, Waivers***<br>*Bankruptcy Rule 4001(c)(1)(B)(iii), (viii)* | | Subject to the Challenge Period (as defined in the Final Order), the Final Order provides stipulations and releases of the Prepetition Loan Parties, and provides for the incorporation of the stipulations and releases by the Debtors in the Interim Order with respect to, among other things, the amount of the Prepetition Debt owing to the Prepetition Loan Parties and the validity, extent, perfection, priority, and enforceability of the Prepetition Senior Liens, including priority over Other Secured Debt (excepting only any PBGC Prior Lien).  (Final Order ¶¶ 5, 27). |

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

| ***Challenge Period*** *Bankruptcy Rule 4001(b)(1)(B)(iii)* | The Creditors' Committee has 60 days from its appointment, and other parties-in-interest have 60 days from the Petition Date, to commence, with requisite standing, any action seeking to challenge the Prepetition Debt or the Prepetition Liens.  (Final Order ¶ 27) |
| | No party may use borrowings under the DIP Facility, Prepetition Collateral, Cash Collateral, DIP Collateral, the Carve-Out, the Carve-Out Cap or any portion or proceeds of the foregoing in connection with any challenge to the obligations reflected by the Prepetition Loan Documents or the DIP Documents; provided, however, that advisors to the Creditors' Committee, if any, may investigate claims and issues with respect to the liens granted pursuant to the Prepetition Loan Documents during the Challenge Period at an aggregate expense for such investigation, but not litigation, prosecution, objection or challenge thereto, not to exceed $25,000.  (Final Order, ¶ 28). |
| ***Waiver or Modification of the Automatic Stay*** *Bankruptcy Rule 4001(c)(1)(B)(iv)* | The Final Order provides that, upon the occurrence of an Event of Default and the occurrence of the Termination Date, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to permit the DIP Agent and the DIP Lenders to exercise all rights and remedies provided for in the DIP Documents and the Final Order.  (Final Order ¶ 18(a)). |

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

| | |
|---|---|
| ***Release, Waivers or Limitation on any Claim or Cause of Action*** *Bankruptcy Rule 4001(c)(1)(B)(viii) Local Rule 4001-2(b)(3)* | Except to the extent of the Carve-Out, no expenses of administration of the Chapter 11 Cases or any future proceeding, including a case under chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or otherwise. In no event shall the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders be subject to (i) the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code or (ii) the equitable doctrine of "marshaling" or any other similar doctrine with respect to the Prepetition Collateral or the DIP Collateral.  (Final Order ¶ 20, 14(b)).

The Debtors shall not have the right to contest the enforcement of the remedies set forth in the Final Order and the DIP Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth in the Final Order or in the applicable DIP Documents.  (Final Order ¶ 18(a)).

Upon the Termination Date, the Debtors waive any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Agent and the DIP Lenders set forth in the Final Order and in the DIP Documents.  (Final Order, ¶ 18(a)).

Except as otherwise expressly set forth in the Final Order or in the DIP Documents, the Debtors irrevocably waive any right, without the prior written consent of the DIP Agent, (a) to grant liens in any DIP Collateral, or (b) to modify or affect any of the rights of the DIP Agent or the DIP Lenders under the Final Order or the DIP Documents.  (Final Order, ¶ 18(c)).

The DIP Agent and the DIP Lenders have the right to credit bid all or a portion of their respective claims in connection with a sale of the Debtors' assets under section 363 of the Bankruptcy Code or under a plan of reorganization.  The Prepetition Loan Parties shall also have the right to credit bid a portion of or all of their respective claims in connection with a sale of the Debtors' assets under section 363 of the Bankruptcy Code or under a plan of reorganization.  (Final Order, ¶ 23). |
| ***Events of Default*** *Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(c)* | The DIP Credit Agreement and the Final Order contain usual and customary Events of Default, including non-performance of the terms thereof.  (DIP Credit Agreement § 8; Final Order ¶ 25(b)) |

28669118.1 1044619.1

FINANCING AND CASH COLLATERAL
MOTION

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

| | | |
|---|---|---|
| 1 | ***Remedies*** | If the Termination Date occurs, the DIP Agent shall have the |
| 2 | *Bankruptcy* *Rule* | right, as if it were a Debtor, to file a motion(s) with the Court seeking approval of the sale(s) of any and all of the DIP |
| 3 | *4001(c)(1)(B)* *Local Rule* | Collateral, including a motion under section 363 of the Bankruptcy Code, including a credit bid sale to the DIP Agent |
| 4 | *4001-2(c)* | or DIP Lenders under a stalking horse agreement, and any right of the Debtors to object thereto are waived.  (Final |
| 5 | | Order, ¶ 17(b)). |
| 6 | | Upon the Termination Date, the DIP Agent may terminate the DIP Facility, declare the DIP Obligations to be immediately |
| 7 | | due and payable, and exercise all rights and remedies available to it under the Final Order, under the DIP |
| 8 | | Documents, or under applicable law.  In addition, the Debtors' authority to use Cash Collateral pursuant to the |
| 9 | | Final Order shall cease.  (Final Order, ¶ 18(a)). |
| 10 | | |
| 11 | | |
| 12 | ***Indemnification;*** ***Exculpation*** | The Debtors shall indemnify the DIP Agent and DIP Lender, and related parties, from and against any and all Indemnified |
| 13 | *Bankruptcy Rule* *4001(c)(1)(B)(ix)* | Liabilities (as defined in the DIP Credit Agreement) related to the DIP Facility, <u>provided</u>, no obligor shall have any obligation |
| 14 | | to any Indemnitee to the extent such Indemnified Liabilities arise solely from the gross negligence or willful misconduct of |
| 15 | | that Indemnitee.  (DIP Credit Agreement § 11.3). |
| 16 | | The DIP Agent, DIP Lender, Prepetition Agent and any Prepetition Lender have no liability for any claims arising from |
| 17 | | the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their |
| 18 | | restructuring efforts, or related to their Collateral, except as to gross negligence or willful misconduct by such party.  (Final |
| 19 | | |
| 20 | | |

21    **IV.    BACKGROUND**

22        **A.    Jurisdiction and Venue**

23        This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and

24    1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2).  The Debtors consent to the

25    entry of a final order by the Court in connection with this Motion to the extent it is later

26    determined that the Court, absent consent of the parties, cannot enter final orders or

27    judgments consistent with Article III of the United States Constitution.  Venue of these

28    cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

**B.    The Debtors and the Chapter 11 Filings**

On November 1, 2015 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate and manage their affairs as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner and no committee has yet been appointed or designated in these chapter 11 cases, although the Debtors anticipate that one or more official committees of unsecured creditors may be appointed (each, a "<u>Committee</u>").  The Debtors' request for joint administration of these chapter 11 cases for procedural purposes only is currently pending.

The Debtors, headquartered in Santa Ana, California, are a privately owned information and entertainment company consisting of print publications and interactive businesses.  The Debtors' portfolio includes daily and weekly newspapers, magazines and other specialty publications.  In addition, the Debtors operate an interactive business which offers website complements, as well as digital and mobile products, to their print publications.  The Orange County Register is the Debtors' flagship newspaper.  The Debtors also operate the Riverside Press-Enterprise and Unidos (a Spanish language newspaper), and own real property in Santa Ana and Riverside, California.

Additional information regarding the Debtors, including their business, assets, capital structure and the events precipitating the filing of these chapter 11 cases, is set forth in detail in the First Day Declaration, which is being filed contemporaneously with this Motion and is incorporated by reference herein.

**C.    The Debtors' Prepetition Secured Indebtedness**

**1.    The Prepetition Senior Liens**

As of November 21, 2013, (i) Freedom Holdings and Freedom Communications, as borrowers, (ii) Freedom SPV II, LLC ("<u>Freedom SPV II</u>"), Freedom SPV VI , LLC ("<u>Freedom SPV VI</u>") and others, as guarantors, (iii) SPCP Group, LLC and SPCP Group VI, LLC, as lenders (the "<u>Prepetition Lenders</u>"), and (iv) Silver Point Finance, LLC, as

1  administrative agent and collateral agent (the "Prepetition Agent" and, together with the

2  Prepetition Lenders, the "Prepetition Loan Parties;" also from time to time referred to

3  herein as "Silver Point"), entered into that Credit Guaranty Agreement, dated as of

4  November 21, 2013 (the "Original Credit Agreement") with respect to a $26,000,000 credit

5  facility to Freedom Holdings and Freedom Communications.

6      The Original Credit Agreement, and the terms thereof, were amended pursuant to:

7  (i) *Amendment to Credit and Guaranty Agreement,* dated as of December 10, 2013, (ii)

8  *Second Amendment and Waiver to Credit and Guaranty Agreement,* dated as of January

9  24, 2014, (iii) *Third Amendment and Waiver to Credit and Guaranty Agreement,* dated as

10  of February 28, 2014, (iv) *Fourth Amendment and Waiver to Credit and Guaranty*

11  *Agreement,* dated as of April 21, 2014, and (v) *Fifth Amendment and Waiver to Credit and*

12  *Guaranty Agreement*, dated as of May 28, 2014.  The Original Credit Agreement, as

13  amended by any and all of the foregoing amendments, is hereinafter referred to as the

14  "Credit Agreement."

15      Concurrently with the execution of the Original Credit Agreement, (i) Freedom

16  Holdings, Freedom Communications, Freedom SPV II, Freedom SPV VI and other related

17  and affiliated entities, as grantors, and (ii) the Prepetition Agent, as collateral agent of the

18  Prepetition Lenders, entered into that *Pledge and Security Agreement*, dated as of

19  November 21, 2013 (the "Security Agreement").  Pursuant to the Security Agreement,

20  Freedom Holdings, Freedom Communications, Freedom SPV II, Freedom SPV VI and the

21  other grantors set forth therein granted to the Prepetition Agent, as collateral agent of the

22  Prepetition Lenders, a first priority security interest in all of Freedom Holdings', Freedom

23  Communications', Freedom SPV II's, Freedom SPV VI's and the other grantor parties'

24  personal property assets, including those personal property assets itemized therein,

25  including without limitation all of their equipment, inventory, accounts, contract rights,

26  chattel paper, instruments, tax refunds, general intangibles and all proceeds of the

27  foregoing, and the proceeds thereof, to secure all of the obligations of such parties to the

28  Prepetition Agent.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1    On November 22, 2013, in accordance with the Credit Agreement and the Security

2  Agreement, the Prepetition Agent, as (i) beneficiary and collateral agent of the Prepetition

3  Lenders and (ii) "Secured Party," recorded, in the Delaware Department of State, UCC 1

4  Financing Statements against Freedom Communications, Freedom Holdings, Freedom

5  SPV II and Freedom SPV VI, as debtors, designated as filing numbers 2013 4616570,

6  2013 4616620, 2013 4617107 and 2013 4617271 (collectively, the "UCC 1"), which

7  identified the collateral as "all assets, whether now owned or hereafter acquired."  The

8  UCC 1 was recorded as a first priority position lien and is superior to and has priority over

9  all other UCC 1 financing statements and liens with respect to the property identified in the

10  UCC 1, except to the extent (and only to the extent) that the statutory liens of The

11  Retirement Plan of Freedom Communications, Inc. (the "Pension Plan"), as perfected on

12  the Pension Plan's behalf by the Pension Benefit Guaranty Corporation ("PBGC") under

13  26 U.S.C. § 430(k), if any, have priority over the Prepetition Agent's liens pursuant to 26

14  U.S.C. § 6321, 6323, et. seq. and applicable law (to such extent, the "PBGC Prior Lien").[8]

15    Concurrently with the execution of the Credit Agreement, Freedom SPV II, as

16  trustor, made, executed and delivered to the Prepetition Agent, as beneficiary and

17  collateral agent of the Prepetition Lenders, that *Deed of Trust, Security Agreement,*

18  *Assignment of Rents and Leases and Fixture Filing*, dated as of November 19, 2013 (as

19  amended, the "Freedom SPV II Deed of Trust"), with respect to the vacant real property of

20  approximately 16 acres in Santa Ana, California described therein (the "Freedom SPV II

21  Property").  The Freedom SPV II Deed of Trust was recorded on November 25, 2013, in

22  the Orange County Recorder's Office as document no. 2013000644091.  The Freedom

23  SPV II Deed of Trust is a first priority lien against the Freedom SPV II Property and

24

25  [8] As discussed herein, pursuant to § 430(k)(5), the PBGC filed lien notices against each Debtor on
   August 13, 2014 perfecting statutory liens on behalf of The Retirement Plan of Freedom Communications,
26  Inc. (the "PBGC Liens").  As of September 15, 2015, the amount of the PBGC Liens against each Debtor
   totaled $15,458,715 (such amount, including all prepetition accruals after September 15, 2015, the "PBGC
27  Lien Amount").  None of the relief requested by this Motion is meant to or will alter the priority of the PBGC
   Liens, the PBGC Prior Lien and the Prepetition Agent's liens.

28

1  secures all "obligations and liabilities" of the borrowers and guarantors under the Credit

2  Agreement and related loan documents, including the obligations of Freedom Holdings,

3  Freedom Communications, Freedom SPV II, Freedom SPV VI.  The Freedom SPV II

4  Property is the sole material asset of Freedom SPV II and generates the gross income of

5  Freedom SPV II.

6       As of May 28, 2014, Freedom SPV II and the Prepetition Agent, as beneficiary and

7  collateral agent of the Prepetition Lenders, entered into that *Modification Agreement to*

8  *Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing*

9  (the "Freedom SPV II Amendment to Deed of Trust").  The Freedom SPV II Amendment

10  to Deed of Trust was recorded on May 29, 2014, in the Orange County Recorder's Office

11  as document no. 2014000208267.

12       Concurrently with the execution of the Credit Agreement, Freedom SPV VI, as

13  trustor, made, executed and delivered to the Prepetition Agent, as beneficiary and

14  collateral agent of the Prepetition Lenders, that *Deed of Trust, Security Agreement,*

15  *Assignment of Rents and Leases and Fixture Filing*, dated as of November 19, 2013 (as

16  amended, the "Freedom SPV VI Deed of Trust"), with respect to the real property

17  commonly known as 3512 14th Street, Riverside, California (the "Freedom SPV VI

18  Property").  The Freedom SPV VI Deed of Trust was recorded on November 27, 2013, in

19  the Riverside County Recorder's Office as document no. 2013-0558068.  The Freedom

20  SPV VI Deed of Trust is a first priority lien against the Freedom SPV VI Property and

21  secures all "obligations and liabilities" of the borrowers and guarantors under the Credit

22  Agreement and related loan documents, including the obligations of Freedom Holdings,

23  Freedom Communications, Freedom SPV II, Freedom SPV VI.  The Freedom SPV VI

24  Property is the sole material asset of Freedom SPV VI and generates the gross income of

25  Freedom SPV VI.

26       As of May 28, 2014, Freedom SPV VI and the Prepetition Agent, as beneficiary and

27  collateral agent of the Prepetition Lenders, entered into that *Modification Agreement to*

28  *Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing*

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  (the "Freedom SPV VI Amendment to Deed of Trust").  The Freedom SPV VI Amendment
2  to Deed of Trust was recorded on May 29, 2014, in the Riverside County Recorder's
3  Office as document no. 2014-0196911.

4  The Credit Agreement, Security Agreement, the Freedom SPV II Deed of Trust, the
5  Freedom SPV VI Deed of Trust, the UCC 1 and all other agreements, documents and
6  opinions signed and/or delivered by the parties to such agreements in connection or
7  furtherance thereof shall be hereinafter referred to as the "Loan Documents."

8  The collateral and security interests provided to the Prepetition Agent by Debtors,
9  and each of them, whether pursuant to the Security Agreement, Freedom SPV II Deed of
10  Trust, the Freedom SPV VI Deed of Trust, the UCC 1 or any other Loan Document with
11  respect to any of Debtors' property and rights shall collectively be referred to as the "Pre-
12  Petition Collateral."

13  On July 11, 2014, the Prepetition Agent, as beneficiary and collateral agent of the
14  Prepetition Lenders, provided and delivered to Freedom Holdings and Freedom
15  Communications a "Notice of Default" which, among other things, set forth therein certain
16  of the defaults of Freedom Holdings and Freedom Communications under the Credit
17  Agreement and thereafter accelerated all sums outstanding plus all fees, costs and
18  charges due under the Credit Agreement.

19  On September 16, 2014, as a result of the default of Freedom Holdings and
20  Freedom Communications under the Credit Agreement, the Prepetition Agent, as
21  beneficiary and collateral agent of the Prepetition Lenders, caused to be recorded in the
22  Orange County Recorder's Office, with respect to the Freedom SPV II Deed of Trust and
23  Freedom SPV II Property, that *Notice of Default and Election to Sell Under Deed of Trust*
24  (the "Freedom SPV II NOD") thereby commencing a nonjudicial foreclosure proceeding
25  against the Freedom SPV II Property.  The Freedom SPV II NOD was recorded in the
26  Orange County Recorder's Office as document no. 2014000373433.

27  On September 16, 2014, as a result of the default of Freedom Holdings and
28  Freedom Communications under the Credit Agreement, the Prepetition Agent, as

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  beneficiary and collateral agent of the Prepetition Lenders, caused to be recorded in the

2  Riverside County Recorder's Office, with respect to the Freedom SPV VI Deed of Trust

3  and Freedom SPV VI Property, that *Notice of Default and Election to Sell Under Deed of*

4  *Trust* (the "Freedom SPV VI NOD") thereby commencing a nonjudicial foreclosure

5  proceeding against the Freedom SPV VI Property.  The Freedom SPV VI NOD was

6  recorded in the Riverside County Recorder's Office as document no. 2014-0349859.

7         On April 16, 2015, the Prepetition Agent, as beneficiary and collateral agent of the

8  Prepetition Lenders, caused to be recorded in the Orange County Recorder's Office, with

9  respect to the Freedom SPV II Deed of Trust, Freedom SPV II Property, and Freedom

10  SPV II NOD, that *Notice of Trustee's Sale* ("Freedom SPV II NOS") setting and scheduling

11  the nonjudicial foreclosure sale of the Freedom SPV II Property for May 15, 2015.  The

12  Freedom SPV II NOS was recorded in the Orange County Recorder's Office as document

13  no. 2015000194160.  The foreclosure sale of the Freedom SPV II Property has been

14  postponed to November 3, 2015.

15         On April 16, 2015, the Prepetition Agent, as beneficiary and collateral agent of the

16  Prepetition Lenders, caused to be recorded in the Riverside County Recorder's Office,

17  with respect to the Freedom SPV VI Deed of Trust, Freedom SPV VI Property, and

18  Freedom SPV VI NOD, that *Notice of Trustee's Sale* ("Freedom SPV VI NOS") setting and

19  scheduling the nonjudicial foreclosure sale of the Freedom SPV VI Property for May 15,

20  2015.  The Freedom SPV VI NOS was recorded in the Riverside County Recorder's Office

21  as document no. 2015-0152616.  The foreclosure sale of the Freedom SPV VI Property

22  has been postponed to November 3, 2015.

23         On June 10, 2015, the Prepetition Agent, through counsel, and as beneficiary and

24  collateral agent of the Prepetition Lenders, sent a letter to the Debtors advising the

25  Debtors that various defaults still exist under the Credit Agreement and Loan Documents,

26  that all previous "notices of default" and/or "events of default" and/or acceleration of the

27  debts and obligations under and pursuant to the Credit Agreement and Loan Documents

28  were still in effect and effective, and that the debts and obligations of the Debtors, and

1   each of them, under the Credit Agreement and Loan Documents were accelerated and

2   immediately due and payable.

3        As of the Petition Date (except where otherwise noted), and pursuant to the Credit

4   Agreement and the Loan Documents, the Prepetition Agent asserts a secured claim

5   against the Debtors in the principal sum of not less than $12,007,790, plus accrued and

6   accruing interest, charges, fees, including attorney's fees, and costs, including protective

7   advances/reimbursable expenses (such fees, costs, and expenses, as of October 31,

8   2015, in the sum of $2,168,623 plus any accrued but unbilled amounts) plus the "Make-

9   Whole Amount" presently (as of October 31, 2015) in the sum of $5,284,907 (the "Make-

10  Whole Amount") due pursuant to Section 2.14(g) of the Credit Agreement (collectively, the

11  "Debt Amount").

12       The Prepetition Agent and the PBGC assert, and the Debtors believe, that all

13  revenue, rents, issues, profits, proceeds, refunds and collections of and with respect to

14  the Pre-Petition Collateral (which includes, without limitation, all personal property of the

15  Debtors, the Freedom SPV II Property and the Freedom SPV VI Property), including all

16  cash, negotiable instruments, documents of title, securities, deposit accounts, tax refunds

17  of any of the Debtors and all other cash equivalents, constitute and are the Prepetition

18  Loan Parties' cash collateral pursuant to 11 U.S.C. § 363(a); provided that to the extent

19  (and only to that extent, if at all) that there is a PBGC Prior Lien on any of such collateral,

20  the Prepetition Agent, PBGC, and the Debtors agree that such collateral constitutes and is

21  the Pension Plan's cash collateral pursuant to 11 U.S.C. § 363(a) (the "Cash Collateral").

22       As discussed further hereinbelow, to the extent the Debtors have obligations (the

23  "Other Secured Debt") outstanding to each of the creditors identified on Schedule 1 to the

24  Interim Order, including the Pension Plan (collectively, the "Other Prepetition Creditors"),

25  such Other Secured Debt was secured by the Pre-Petition Collateral as described on said

26  schedule (the "Prepetition Junior Liens").  The Debtors believe that the Prepetition Junior

27  Liens, other than the PBGC Prior Lien, if any, are junior and subordinate to the Prepetition

28  Agent's liens on the Pre-Petition Collateral (the "Prepetition Senior Liens") to the extent

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1   provided by applicable law and/or as reflected in certain intercreditor and subordination

2   agreements executed by the applicable Other Prepetition Creditor in favor of the

3   Prepetition Agent prior to the Petition Date.

4              **2.   PBGC Liens**

5          The PBGC, on behalf of The Retirement Plan of Freedom Communications, Inc.

6   (the "Pension Plan"), has filed with the California Secretary of State various Notices of

7   Federal Lien Under I.R.C. § 412(n) and/or § 430(k) (together, the "PBGC Personal

8   Property Liens"), to secure obligations (the "PBGC Obligations") allegedly owed by the

9   Debtors to the PBGC based on missed Pension Plan contributions (including interest

10  thereon) in the total amount of $15,458,715, as of September 15, 2015 (such amount,

11  including all prepetition accruals after September 15, 2015 to the extent included by

12  applicable non-bankruptcy law), referred to herein as the "PBGC Lien Amount").  Pursuant

13  to 26 U.S.C. § 6321, et seq. and applicable law, certain PBGC Personal Property Liens

14  may take priority over the Prepetition Senior Liens on certain personal property, such as

15  Cash Collateral and, in such event (but only in such event and to such extent), would be

16  considered a PBGC Prior Lien.

17         In addition, the PBGC has filed various Notices of Federal Lien Under I.R.C. §

18  412(n) and/or § 430(k) against real property owned by the Debtors (defined hereinabove

19  as the Freedom SPV II Property and the Freedom SPV VI Property) to secure the PBGC

20  Obligations (the "PBGC Real Property Liens" and, together with the PBGC Personal

21  Property Liens, referred to herein as the "PBGC Liens").  The PBGC Real Property Liens

22  against the Freedom SPV II Property and the Freedom SPV VI Property are junior in

23  priority to the liens against such real property asserted by the Prepetition Agent and, in the

24  case of the Freedom SPV II Real Property, as discussed directly below, are also junior to

25  the McEachen/Stern Lien.

26         No relief requested by this Motion is meant to or should be construed to alter the

27  priority of the PBGC Liens, the PBGC Prior Lien and the Prepetition Loan Parties' liens.

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

### 3.    McEachen/Stern Lien

Mark McEachen and Mitchell Stern ("McEachen/Stern") and Freedom Holdings
were parties to an arbitration proceeding before JAMS in Los Angeles, entitled *Stern, et
al. v. Freedom Communications Holdings, Inc.* (JAMS Ref. No. 1210031089) (the
"Arbitration").  On April 23, 2014, in an ancillary proceeding to the Arbitration, the Los
Angeles Superior Court issued a Right to Attach Order (the "RAO") in an action entitled
*Stern, et al. v. Freedom Communications Holdings, Inc.* (L.A. Super. Ct. No. BS144990).
On May 2, 2014, McEachen/Stern recorded a Writ of Attachment pursuant to the RAO, as
well as Notice(s) of Attachment in the Orange County Recorder's Office, as Instrument
Nos. 2014000171656, 2014000171657, 2014000178276, 2014000242766 and
2014000263156, against the Freedom SPV II Property and certain personal property of
Freedom Holdings.

Pursuant to a settlement reached among the parties, on July 31, 2014, the Los
Angeles Superior Court entered a Stipulated Judgment in the amount of $4.150 million in
favor of McEachen/Stern, and jointly and severally against Freedom Holdings and
Freedom SPV II, and dismissing the counterclaims against McEachen/Stern.  On August
4, 2014, McEachen/Stern recorded the Stipulated Judgment in the Orange County
Recorder's Office, as Instrument No. 2014000312355 (together with the Notice(s) of
Attachment, the "McEachen/Stern Lien").

As provided therein, the Stipulated Judgment would only be enforced according to
the terms set forth in that certain Amended and Restated Standstill Agreement dated July
28, 2014, by and among McEachen/Stern, Freedom Holdings, Freedom SPV II and the
Prepetition Agent (the "McEachen/Stern Standstill Agreement").  Pursuant to the
McEachen/Stern Standstill Agreement (and an earlier Subordination Agreement),
McEachen/Stern specifically acknowledged and agreed that, subject to certain caps as set
forth therein, the McEachen/Stern Lien was subordinate to the Prepetition Senior Liens
and agreed to forbear from exercising their enforcement rights and remedies as to the
Stipulated Judgment based on the terms of the McEachen/Stern Standstill Agreement.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 • Fax 714-966-1002

1       The McEachen/Stern Standstill Agreement (Section 3(b)(iii)(A)) further provided

2  that collateral for the McEachen/Stern Lien consisted only of real property assets of

3  Freedom Holdings and/or Freedom SPV II upon which the McEachen/Stern Lien attached,

4  and that "for the avoidance of doubt, no personal property, deposit accounts, securities

5  account(s), account(s) receivable, or other personal property or liquid assets constitute

6  [McEachen/Stern's] [c]ollateral."  In addition, the McEachen/Stern Standstill Agreement

7  (Section 3(b)(iv)) provided that McEachen/Stern "shall not object to any debtor-in-

8  possession financing (or use of cash collateral) in connection with any proceedings

9  naming Freedom [Holdings], [Freedom] SPV II or any of their respective subsidiaries or

10 affiliates as a debtor under title 11 of the United States Code, the terms of which are

11 satisfactory to the [Prepetition] Agent, and shall consent (or be deemed to have

12 consented) to the priming of its liens in connection with such debtor-in-possession

13 financing or such use of cash collateral."  Based on these provisions, the Debtors

14 preliminarily do not believe that McEachen/Stern holds any enforceable security interest in

15 Cash Collateral and, in any event, to the extent the Prepetition Agent has agreed to the

16 Debtors' use of the Cash Collateral and the terms of the DIP Facility, McEachen/Stern is

17 also deemed to consent thereto, including as to the priming of the McEachen/Stern Lien.

18         **4.**    **Other Secured Creditors**

19      The Debtors believe that the only secured creditors (excepting tax obligations),

20 asserting liens against the Freedom SPV VI Property are the Prepetition Loan Parties and

21 the PBGC.  The Freedom SPV VI Property does not generate any Cash Collateral.  The

22 following additional creditors, however, assert junior liens against the Freedom SPV II

23 Property: (a) OC Media Tower L.P in the amount of $2,145,239.20; and (b) Angelo,

24 Gordon Management, LLC, in the amount of $10 million.  The Freedom SPV II Property

25 does generate Cash Collateral in the approximate amount of $8,000 per month.  As set

26 forth in the Interim Order, the Debtors will segregate this amount and such funds will be

27 held in a separate bank account with any Prepetition Liens attaching thereto with the

28 same validity, priority and extent as existed as of the Petition Date.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

**D.    Retention of GlassRatner as Financial Advisors to the Debtors**

In M 2015, the Debtors retained GlassRatner to act as their financial advisor and investment banker to assist the Debtors in connection with a potential restructuring of their financial affairs.  Following its retention by the Debtors, GlassRatner assisted the Debtors' management team in analyzing the Debtors' cash position to determine the amount of liquidity necessary to support the Debtors' operational needs in these chapter 11 cases. In addition, as discussed below and in the GlassRatner Declaration, the Debtors and their advisors engaged in a marketing process designed to attract financing for the Debtors to meet their liquidity needs in these chapter 11 cases.

**E.    The Debtors' Need for Immediate Access to Cash Collateral**

After exploring their options, the Debtors reached a determination that a sale of their business pursuant to a competitive bidding process in these chapter 11 cases would maximize value for their stakeholders and inure to the benefit of all parties in interest. Critical to the success of the Debtors' cases will be the Debtors' ability to continue to operate in the ordinary course pending the contemplated sale of substantially all of their assets.

Recognizing the need to access cash, the Debtors and their advisors engaged in discussions with their primary secured creditor asserting an interest in the Debtors' Cash Collateral – Silver Point, as Prepetition Agent of the Prepetition Lenders – regarding the terms of the Debtors' consensual continued use of Cash Collateral.  In addition, as discussed in further detail below, the Debtors engaged in discussions with Silver Point regarding the terms of debtor-in-possession financing to allow the Debtors to operate pending the contemplated sale of their business.  The Debtors also engaged in discussions with the PGGC relative to its interests in the Debtors' cases.  The Debtors, Silver Point, and the PBGC reached an agreement, the terms of which are described herein and set forth in the proposed Interim Order (Exhibit A hereto), and the Debtors and Silver Point reached an agreement, the terms of which hare described herein and set forth in the proposed Final Order (Exhibit B hereto).  The Interim Order provides for a short-

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

term (30 days, unless otherwise extended by agreement) "bridge" use of cash collateral,

pending the approval of the DIP Facility (and concurrent use of cash collateral) provided

for in the Final Order.

The Debtors' access to Cash Collateral during the interim period (and thereafter) is

absolutely necessary to preserve and maximize value for the Debtors' stakeholders.  The

Debtors use Cash Collateral in the ordinary course of business to procure goods and

services from vendors, pay their employees, and satisfy other working capital needs.

Absent approval of the Interim Order (and, thereafter, use of cash collateral and authority

to obtain debtor-in-possession financing pursuant to the Final Order), the Debtors will be

effectively unable to generate revenue, operate their businesses, or pay the hundreds of

individuals who report to work each day, in addition to funding their reorganization

process.  These chapter 11 estates will be immediately and irreparably harmed if this

were to occur.  Thus, the Debtors respectfully request authority to continue to use Cash

Collateral, on a short-term basis and subject to the terms and conditions set forth in the

Interim Order and, thereafter, in connection with the DIP financing, on a longer-term basis

pursuant to the Final Order.

Among other things, the Interim Order and Final Order provide adequate protection

to the Prepetition Loan Parties in the form of replacement liens and superpriority claims

against any diminution in value arising from the Debtors' use of Cash Collateral or the

imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, as well

as the payment of certain postpetition fees and costs and interest payments to the

Prepetition Agent.  In addition, junior replacement liens and superpriority claims are

provided to the Other Prepetition Creditors, including the PBGC, as adequate protection of

their interests.  The Debtors propose to make disbursements in these cases pursuant to

an agreed-to budget annexed to the Interim Order (and Final Order) as <u>Exhibit A</u> (the

"<u>Budget</u>"), subject to permitted variances and the Carve-Out (as defined in the Interim

Order and Final Order, respectively).

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1      Access to Cash Collateral, on an interim basis pursuant to the Interim Order and

2  thereafter in connection with the DIP financing, along with the proceeds of the DIP Facility,

3  will provide the Debtors with the liquidity necessary to continue operations and fund these

4  chapter 11 cases.  Without access to liquidity, the Debtors' ability to operate and

5  ultimately to sell their business as a going concern or otherwise will be jeopardized, all to

6  the detriment of the Debtors' stakeholders.  As a result, the Debtors have an immediate

7  need to continue to access the Cash Collateral (and to utilize the proceeds of the DIP

8  Facility) to ensure sufficient liquidity throughout the pendency of these chapter 11 cases.

9      **F.**    **The Debtors' Additional Liquidity Needs**

10      In addition to the continuing use of Cash Collateral, the Debtors are in need of an

11  immediate additional infusion of liquidity to, among other things, pay employee wages and

12  benefits, procure goods and services integral to the Debtors' ongoing business

13  operations, fund certain operational expenses, maintain ordinary course relationships with

14  vendors, suppliers, and customers, and satisfy working capital needs in the ordinary

15  course.  As of the Petition Date, the Debtors have only approximately $1,043,733 in cash

16  on hand with which to operate their businesses and fund these chapter 11 cases.

17  Therefore, together with their advisors, the Debtors undertook an analysis of the

18  incremental liquidity that would be necessary to maintain operations in connection with the

19  filing of these chapter 11 cases.  Based on the Debtors' 26-week cash flow forecast, the

20  Debtors determined that they will have additional net cash needs of approximately $3

21  million in the first 26-weeks of these chapter 11 cases.

22      **G.**    **Efforts to Obtain Postpetition Financing**

23      After careful review, the Debtors, in their business judgment, determined that a

24  chapter 11 process premised on the sale of substantially all of their assets would provide

25  the best means to maximize value to all stakeholders.  In anticipation of the

26  commencement of the chapter 11 cases, the Debtors identified the Prepetition Loan

27  Parties as the most likely sources of postpetition financing, given their liens on

28  substantially all of the Debtors' assets, involvement over the past several months with the

1    Debtors' restructuring efforts, and support for an expedited chapter 11 sale process.  To

2    that end, in July 2015, the Debtors and GlassRatner initiated a dialogue with Silver Point

3    (among other potential lenders) regarding the possibility of providing debtor-in-possession

4    financing to the Debtors.  Silver Point expressed a willingness to provide the financing and

5    advised the Debtors that the Prepetition Loan Parties would not consent to being primed

6    by a third-party lender.  In the weeks that followed, the Debtors and Silver Point

7    negotiated in good faith and at arm's-length with respect to the terms and conditions of the

8    financing.  These negotiations ultimately resulted in the DIP Facility for which the Debtors

9    are currently seeking approval.

10          As set forth in the GlassRatner Declaration, before agreeing to the terms of the DIP

11    Facility, GlassRatner, on behalf of the Debtors, engaged in a marketing process designed

12    to attract financing from a focused set of lenders with the sophistication and capacity to

13    provide the Debtors with financing in a relatively short period of time.  The process also

14    was geared towards promoting competition and obtaining financing on the best terms

15    available to fund the Debtors' anticipated needs, given the Debtors' capital structure and

16    operating results.  The third parties solicited comprised institutions with experience

17    providing debtor-in-possession and special situations financing similar to the needs of the

18    Debtors.

19          Through discussions with the potential third-party lenders, however, it became

20    readily apparent that the Debtors' existing capital structure, including the Debtors' level of

21    secured debt (relative to asset value) and lack of unencumbered assets, foreclosed any

22    opportunities for the Debtors to access unsecured or administrative credit.  Further, in the

23    absence of a successful priming fight, any debtor-in-possession loan provided by parties

24    other than the Prepetition Lenders would have required the consent of the Prepetition

25    Lenders, which they indicated they would not be willing to provide.

26          In addition, as detailed in the GlassRatner Declaration, the terms of the DIP Facility

27    are more favorable than (or at least on par with) all other proposals received by the

28    Debtors, in terms of interest rate (10% under the DIP Facility vs. 12% or higher under

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1    other proposals), fees (relatively modest upfront and administrative fees under the DIP

2    Facility vs. fees of 3% or higher under other proposals) and maturity date (12 month, with

3    6-month extension subject to conditions under the DIP Facility on par with most favorable

4    other proposal having an 18 month maturity).

5        As a result of the foregoing, the Debtors determined that the DIP Facility

6    represented the best financing option available to the Debtors and their businesses

7    because of its favorable terms, as well as allowing the Debtors to avoid the need to

8    engage in a costly and time-consuming priming fight at the outset of these chapter 11

9    cases, and avoiding the risk associated with a transaction with a new lender (including

10   any timing and due diligence constraints).

11       **H.    Overview of the DIP Facility**

12       The DIP Facility consists of a senior secured term loan credit facility in the amount

13   of $3 million of new funding, plus the amount necessary for the Refinancing, in the amount

14   of approximately $19,461,205 (plus certain accrued but unbilled fees, costs, and

15   expenses).  Subject to the Carve-Out, the DIP Facility will be secured by the DIP Liens

16   (consisting of a first lien on Unencumbered Property, priming liens on Prepetition

17   Collateral, liens junior to Permitted Priority Liens, liens senior to avoidable liens or those

18   not expressly permitted under the DIP Documents, and a lien on Avoidance Action

19   Proceeds, but not Avoidance Actions) and the DIP Superpriority Claims.  The DIP Facility

20   also provides for a Refinancing whereby the Debtors will satisfy the Prepetition

21   Indebtedness under the Prepetition Credit Agreement through the proceeds of the DIP

22   Facility.

23       The DIP Facility contemplates that the Prepetition Secured Parties will receive

24   adequate protection in accordance with sections 361 and 363(e) of the Bankruptcy Code

25   for any postpetition diminution in value of their interests in the Prepetition Collateral, the

26   priming of their respective liens pursuant to the DIP Facility, and the imposition of the

27   automatic stay pursuant to section 362 of the Bankruptcy Code.  The Final Order provides

28   adequate protection to the Prepetition Loan Parties through the Senior Adequate

*Lobel Weiland Golden Friedman LLP*
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1   Protection Liens, the granting of the Sections 503(b) and 507(b) Claim, and the Adequate

2   Protection Payments.  The Final Order provides adequate protection to the Other Secured

3   Creditors through the Junior Adequate Protection Liens and the granting of a Junior

4   Sections 503(b) and 507(b) Claim.

5        In addition, parties in interest, including any Committee, are provided with 60 days

6   from the Petition Date or appointment, respectively, in order raise any challenge with

7   respect to the Prepetition Debt or the Pre-Petition Liens.

8        The Debtors require the financing provided under the DIP facility and access to

9   Cash Collateral for the operation of their businesses, to preserve their going concern

10  value, to pay vendors, suppliers and customers, to satisfy payroll obligations, to

11  consummate the Refinancing, to pay for certain costs and expenses related to the

12  Debtors' chapter 11 cases and to satisfy the Debtors' other working capital and

13  operational needs.  Access to sufficient working capital and liquidity made available

14  through the DIP Facility and the use of Cash Collateral as requested by this Motion is vital

15  to the preservation and maintenance of the Debtors' going concern value and to the

16  Debtors' successful reorganization.

17

18  V.    **LEGAL BASIS FOR RELIEF REQUESTED**

19       A.    **Use of Cash Collateral Under the Interim Order and Final Order Should**

20              **be Approved**

21       The Debtors' use of property of their estates, including "cash collateral," is

22  governed by section 363 of the Bankruptcy Code.[9]  Pursuant to section 363(c)(2) of the

23  _____

24       [9] The Bankruptcy Code defines "cash collateral" as follows:

25      Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents
     whenever acquired in which the estate and an entity other than the estate have an interest and includes the
26  proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments
     for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties
27  subject to a security interest as provided in section 552(b) of this title, whether existing before or after the
     commencement of a case under this title.

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an

2  interest in such cash collateral consents; or (B) the court, after notice and a hearing,

3  authorizes such use sale, or lease in accordance with the provisions of this section."  11

4  U.S.C. § 363(c)(2).  In this case, the Prepetition Secured Parties have either consented to

5  the use of Cash Collateral on the terms described herein, are deemed to have consented,

6  or are otherwise provided with sufficient and reasonable adequate protection of their

7  interests in the Prepetition Collateral.

8  **B.    The Proposed Adequate Protection Should Be Authorized**

9       Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that

10 has an interest in property used . . . or proposed to be used by a debtor in possession, the

11 court . . . shall prohibit or condition such use . . . as is necessary to provide adequate

12 protection of such interest."  11 U.S.C. § 363(e).  Section 361 of the Bankruptcy Code

13 delineates the forms of adequate protection, which include periodic cash payments,

14 additional liens, replacement liens and other forms of relief.  11 U.S.C. § 361.

15      Adequate protection can be provided in various forms.  See e.g., In re Continental

16 Airlines, Inc., 154 B.R. 176, 180-181 (Bankr. D. Del. 1993) (courts have discretion to in

17 determining what form of adequate protection to grant).  Although the Bankruptcy Code

18 does not define the term "adequate protection," it provides a non-exhaustive list of types

19 of adequate protection, including lump sum or periodic cash payments, replacement liens,

20 administrative priority claims and "other relief" resulting in the "indubitable equivalent" of

21 the secured creditor's interest in such property.  See 11 U.S.C. § 361.  What constitutes

22 adequate protection is determined on a case-by-case basis.  See e.g., MNBank Dallas,

23 N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396–97 (10th Cir. 1987); Martin v.

24 U.S. (In re Martin), 761 F.2d 472, 474 (8th Cir. 1985); In re George Ruggiere Chrysler-

25 Plymouth, Inc., 727 F.2d 1017, 1019 (11th Cir. 1984) (recognizing that there must be "an

26 individual determination" of whether a secured creditor's interest in cash collateral is

27 adequately protected); In re Shaw Indus., Inc., 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003).

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1    The essential purpose of adequate protection is to protect against the diminution of

2  a secured creditor's collateral during the period when such collateral is being used by the

3  debtor in possession. See In re Delta Res., Inc., 54 F.3d 722, 730 (11th Cir. 1995)

4  ("creditor's interest in property which must be adequately protected encompasses the

5  decline in the value of the collateral only, rather than perpetuating the ratio of the collateral

6  to the debt."); In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("The

7  whole purpose of adequate protection for a creditor is to insure that the creditor receives

8  the value for which he bargained prebankruptcy"); In re Cent. Park Avenue Corp., 136

9  B.R. 626, 631 (Bankr. S.D.N.Y. 1992) ("The goal of adequate protection is to safeguard

10  the secured creditor from diminution in value of its interest during the chapter 11

11  reorganization."); In re Monroe Park, 17 B.R. 934 (D. Del. 1982) (adequate protection

12  requires a debtor to propose some form of relief that will preserve the secured creditor's

13  interest in collateral during the case).

14    Courts recognize that the preservation of the going concern value of secured

15  lenders' collateral constitutes adequate protection of such secured lenders' interest in

16  such collateral.  See, e.g., In re Wrecclesham Grange, Inc., 221 B.R. 978, 981 (Bankr.

17  M.D. Fla. 1997) ("as long as the debtor generates a continuous income stream, the

18  debtor's use of the rental income does not diminish the value of the collateral."); In re 499

19  W. Warren St. Assocs., Ltd. P'ship, 142 B.R. 53, 56 (Bankr. N.D.N.Y. 1992) (finding a

20  secured creditor's interest in collateral adequately protected when cash collateral was

21  applied to normal operating and maintenance expenditures on the collateral property); In

22  re Cardinal Indus. Inc., 118 B.R. 971, 981 (Bankr. S.D. Ohio 1990) (ruling that secured

23  lenders were adequately protected by debtor's use of funds to maintain and manage

24  encumbered properties).

25    In this case, as adequate protection for the Prepetition Loan Parties' interests in the

26  Pre-Petition Collateral and the Debtors' use of Cash Collateral pursuant to the Interim

27  Order, the Prepetition Loan Parties will be entitled to receive monthly payments of interest

28  under the terms of the Prepetition Credit Agreement and reimbursement of the Prepetition

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  Loan Parties' professional fees on a monthly basis, as well as any tax refund monies

2  received by the Debtors (which would be applied to the Debtors' obligations under the

3  Prepetition Credit Agreement pursuant to the terms thereof).  In addition, the Prepetition

4  Loan Parties will be granted the PLP Post-Petition Liens on all post-petition assets of the

5  Debtors' estates other than avoidance actions (the "Post-Petition Collateral"), and the PLP

6  Super-Priority Claim, subject only to the Carve-Out and any pre-petition lien senior to the

7  Prepetition Loan Parties, including the PBGC Prior Lien, if any.  As adequate protection

8  for its interests in the Pre-Petition Collateral and the Debtors' use of Cash Collateral

9  pursuant to the Interim Order, the PBGC will be entitled to the PBGC Post-Petition Liens

10 on the Post-Petition Collateral and the PBGC Super-Priority Claim, subject only to the

11 Carve-Out, the PLP Post-Petition Liens and PLP Super-Priority Claim (except to the

12 extent necessary for adequate protection of any PBGC Prior Lien), and any pre-petition

13 lien senior to the PBGC Liens, including the Prepetition Agent's senior prepetition liens.[10]

14         In exchange for the Debtors' use of Cash Collateral pursuant to the Final Order, the

15 Prepetition Loan Parties will be entitled to receive the Senior Adequate Protection Liens

16 (including the Contingent Liens to secure any Contingent Debt), the Sections 503(b) and

17 507(b) Claim, and the Adequate Protection Payments (consisting of the reasonable fees

18 and expenses of counsel, financial advisor and consultants to the Prepetition Loan

19 Parties), subject only to the DIP Liens, the Permitted Priority Liens, the PBGC Prior Lien

20 and the Carve-Out.  The Other Secured Creditors are provided adequate protection under

21 the Final Order through the Junior Adequate Protection Liens and the granting of a junior

22 Sections 503(b) and 507(b) Claim, subject only to the Prepetition Senior Liens and the

23 Contingent Liens (if necessary), the DIP Liens, the Carve-Out, any Permitted Priority

24 Liens, the PBGC Prior Lien, and the Senior Adequate Protection Liens.

25

26  _____

27  [10] Other than as set forth in the Interim Order, the PBGC Post-Petition Liens will be subject to priming
only by liens securing obligations under debtor in possession financing provided by the DIP Loan Parties

28

1    The Debtors submit that the foregoing protections, as well as the fact that the use

2  of Cash Collateral will enable the Debtors to preserve value by maintaining their

3  properties and businesses, adequately protect the Prepetition Secured Parties from any

4  diminution in value.  Hence, the Debtors' requested use of Cash Collateral and the

5  protections afforded the Prepetition Secured Parties are reasonable and appropriate

6  under the circumstances.

7    In addition, the terms of the Interim Order and Final Order are consensual and

8  were negotiated in good faith and at arm's-length, with all relevant parties represented by

9  experienced counsel, and are fair and reasonable.  Accordingly, the Prepetition Secured

10  Parties should be provided with the benefit and protection of section 363(m) of the

11  Bankruptcy Code, such that if any provision of the orders approving the use of Cash

12  Collateral are later modified, vacated, stayed or terminated by subsequent order of this or

13  any other court, such reversal, stay, modification or vacatur shall not affect: (i) the validity,

14  priority or enforceability of any adequate protection granted by way of such orders arising

15  or incurred prior to the date of the entry of an order granting such reversal, stay,

16  modification or vacatur; or (ii) the validity, priority or enforceability of the liens securing

17  such adequate protection.

18    In sum, the Debtors, together with the assistance of their financial and legal

19  advisors, have concluded in the sound exercise of their business judgment that the use of

20  Cash Collateral as contemplated by this Motion will help preserve the Debtors' value as a

21  going concern pending the contemplated sale of substantially all assets of their estates.

22    For the foregoing reasons, the Debtors submit that the requested use of Cash

23  Collateral and the proposed protections afforded to the Prepetition Secured Parties in the

24  Interim Order and the Final Order are reasonable and appropriate and in the best interests

25  of the Debtors, their estates and creditors, and therefore should be authorized and

26  approved by this Court.

27

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1

**C.    Authority to Grant Priming Liens and Superpriority Claims in**

2

**Connection with the DIP Facility Should Be Granted**

3        The DIP Facility requires the Debtors to provide the DIP Liens, including first-

4  priority priming liens, and the DIP Superpriority Claims pursuant to section 364(c) and (d)

5  of the Bankruptcy Code.  Section 364(c) of the Bankruptcy Code provides, among other

6  things, that, if a debtor is unable to obtain unsecured credit allowable as an administrative

7  expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the

8  debtor to obtain credit or incur debt (i) with priority over any and all administrative

9  expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (ii) secured by

10  a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a

11  junior lien on property of the estate that is subject to a lien.  11 U.S.C. § 364(c).

12        Section 364(d) of the Bankruptcy Code, in turn, allows a debtor to obtain credit

13  secured by a senior or equal lien on property of the estate that is subject to a lien, after

14  notice and a hearing, provided that (i) the debtor is unable to obtain such credit otherwise,

15  and (ii) there is adequate protection of the interest of the holder of the lien on the property

16  of the estate on which such senior or equal lien is proposed to be granted.  11 U.S.C. §

17  364(d).

18        As discussed above and in the GlassRatner Declaration, despite the efforts of the

19  Debtors and their advisors, the Debtors have been unable to (i) procure sufficient

20  financing (a) in the form of unsecured credit allowable under section 503(b)(1), (b) as an

21  administrative expense under section 364(a) or (b), (c) in exchange for the grant of a

22  superpriority administrative expense claim pursuant to section 364(c)(1), or (d) without

23  granting limited priming liens pursuant to section 364(d), or (ii) obtain postpetition

24  financing or other financial accommodations from any alternative prospective lender or

25  group of lenders on more favorable terms and conditions than those for which approval is

26  sought herein.

27        Having determined that financing is available only under sections 364(c) and (d) of

28  the Bankruptcy Code, the Debtors commenced arm's-length negotiations with the DIP

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  Agent, on behalf of the DIP Lenders, over the DIP Facility.  The DIP Agent and DIP

2  Lenders were only willing to provide the DIP Facility upon the Debtors, among other

3  things, granting first-priority priming liens on the DIP Collateral and the Superpriority

4  Claims.

5          Provided that a debtor's business judgment does not run afoul of the provisions of,

6  and policies underlying, the Bankruptcy Code, courts grant a debtor considerable

7  deference in acting in accordance therewith.  See, e.g., In re L.A. Dodgers LLC, 457 B.R.

8  308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business

9  judgment of a debtor in the selection of the lender."); In re Ames Dep't Stores, Inc., 115

10  B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion

11  under section 364 is to be utilized on grounds that permit reasonable business judgment

12  to be exercised so long as the financing agreement does not contain terms that leverage

13  the bankruptcy process and powers or its purpose is not so much to benefit the estate as

14  it is to benefit parties in interest."); In re Simasko Production Co., 47 B.R. 444, 448-49 (D.

15  Colo. 1985) (authorizing interim financing agreement where debtor's best business

16  judgment indicated financing was necessary and reasonable for benefit of estate).

17  Further, as indicated above, section 364(c) of the Bankruptcy Code enumerates certain

18  incentives that a bankruptcy court may grant to postpetition lenders.  Such incentives are

19  not exhaustive.  Bankruptcy courts frequently have authorized the use of inducements not

20  specified in the statute.  See e.g., In re Ellingsen MacLean Oil Co., 834 F.2d 599 (6th Cir.

21  1987) (affirming financing order that prohibited any challenges to the validity of already

22  existing liens); In re Defender Drug Stores, 126 B.R. 76 (Bankr. D. Ariz. 1991) (authorizing

23  enhancement fee to postpetition lender), aff'd, 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992)

24  ("[b]ankruptcy courts . . . have regularly authorized postpetition financial arrangements

25  containing lender incentives beyond the explicit priorities and liens specified in section

26  364"); In re Antico Mfg. Co., 31 B.R. 103 (Bankr. E.D.N.Y. 1983) (authorizing lien on

27  prepetition collateral to secure postpetition indebtedness).

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

28669118.1 1044619.1                    50                    FINANCING AND CASH COLLATERAL
                                                                                      MOTION

1    Section 364 of the Bankruptcy Code does not require that a debtor seek alternative

2  financing from every possible lender; rather, the debtor simply must demonstrate sufficient

3  efforts to obtain financing without the need to grant a senior lien.  Bray v. Shenandoah

4  Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986)

5  (demonstrating that credit was unavailable absent the senior lien by establishment of

6  unsuccessful contact with other financial institutions in the geographic area); L.A.

7  Dodgers, 457 B.R. at 313 (citing Ames Dep't Store, 115 B.R. at 37**Error! Bookmark not**

8  **defined.** (noting the court "may not approve any credit transaction under subsection (c) [of

9  section 364] unless the debtor demonstrates that it has attempted, but failed, to obtain

10  unsecured credit under section 364(a) or (b)"); In re 495 Central Park Ave. Corp., 136

11  B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to

12  procure financing from various sources, explaining that "most banks lend money only in

13  return for a senior secured position"); In re Aqua Assocs., 123 B.R. 192, 197 (Bankr. E.D.

14  Pa. 1991) (debtor adequately established that some degree of priming loan was

15  necessary if debtor were to obtain funding); In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D.

16  Colo. 1981) (section 364(d)(1)(A) of the Bankruptcy Code satisfied where two banks

17  refused to provide unsecured credit to debtor).

18    Furthermore, a debtor may borrow money under section 364(d)(4) of the

19  Bankruptcy Code if it meets its burden of establishing that the holder of the lien to be

20  primed is adequately protected.  In re Futures Equity L.L.C., 2001 Bankr. LEXIS 2229 *14

21  (Bankr. N.D. Tex. April 11, 2001).  The transaction "should provide the pre-petition

22  secured creditor with the same level of protection it would have had if there had not been

23  post-petition superpriority financing."  Id. at *15 (internal citations omitted).  The debtor

24  also has the burden of demonstrating that (i) the credit transaction is necessary to

25  preserve the estate and (ii) the terms of the transaction are fair and reasonable given the

26  circumstances.  Id.

27    In this case, substantially all of the Debtors' assets are encumbered and, despite

28  the diligent efforts of Debtors and GlassRatner, working capital for these chapter 11 cases

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1  was not available absent the proposed DIP Liens and DIP Superpriority Claims.

2  Accordingly, the Debtors believe that they were required to obtain financing under

3  sections 364(c) and (d) of the Bankruptcy Code and, accordingly, the DIP Facility reflects

4  the exercise of the Debtors' sound business judgment.  The DIP Lenders were unwilling to

5  extend financing on terms more favorable to the Debtors, and the Debtors were not able

6  to obtain alternative sources of financing upon more favorable terms.  The Debtors' ability

7  to continue to operate their business pending a sale pursuant to section 363 of the

8  Bankruptcy Code and to maximize value to all stakeholders depends upon their ability to

9  obtain the DIP Facility.  Without the proposed financing, the Debtors would not have

10  sufficient funds to operate, jeopardizing the successful sale of substantially all of their

11  assets, thereby diminishing recoveries for their stakeholders.

12      The DIP Facility, together with use of Cash Collateral, will enable the Debtors to

13  operate their business in the ordinary course and sell substantially all of their assets

14  during these chapter 11 cases.  The Debtors believe that this will preserve and enhance

15  the value of their estates for the benefit of all parties in interest.

16      **D.**   **The DIP Facility's Refinancing Feature is Appropriate**

17      By this Motion, the Debtors also seek authority, pursuant to section 363(b) of the

18  Bankruptcy Code, to use proceeds from the DIP Facility to repay their obligations to the

19  Prepetition Lenders under the Prepetition Credit Agreement.

20      Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease

21  property, other than in the ordinary course of business, with court approval.  11 U.S.C. §

22  363(b).  Section 363 does not set forth a standard for determining when it is appropriate

23  for a court to authorize the use of a debtor's property prior to confirmation of a plan,

24  however, it is well settled that transactions should be approved when they are supported

25  by a sound business purpose.  See e.g., In re Abbotts Dairies, Inc., 788 F.2d 143 (3d Cir.

26  1986)**Error! Bookmark not defined.** (holding that a court should approve a debtor's use

27  of assets outside the ordinary course of business under section 363(b) if the debtor can

28  demonstrate a sound business justification for the proposed transaction); Computer Sales

1   Int'l Inc. v. Fed. Mogul Global, Inc. (In re Fed. Mogul Global, Inc.), 293 B.R. 124, 126 (D.

2   Del. 2003) (same); In re Champion Enters., Inc., 2010 WL 2723820, at *4 (Bankr. D. Del.

3   2010) (noting that criteria for approval of a transaction under 363(b) is whether the debtor

4   has demonstrated "good, sufficient and sound business purpose justifications").  Once the

5   debtor articulates sound business reasons, "[t]he business judgment rule 'is a

6   presumption that in making a business decision the directors of a corporation acted on an

7   informed basis, in good faith, and in the honest belief that the action taken was in the best

8   interests of the company.'"  In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992)

9   (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

10       Repayment of prepetition debt a common feature in debtor-in-possession financing

11   arrangements and courts have approved such repayment in a variety of cases.  See, e.g.,

12   In re Furniture Brands Int'l, Inc., et al., Case No. 13-12329 (Bankr. D. Del. Oct. 11, 2013)

13   (authorizing up to $140 million in debtor-in-possession financing that included roll-up of

14   approximately $91 million prepetition debt pursuant to interim order); In re Appleseed's

15   Intermediate Holdings LLC, et al., Case No. 11-10160 (Bankr. D. Del. Jan. 20, 2011)

16   (authorizing up to $140 million in debtor-in-possession financing that included roll-up of

17   approximately $48 million prepetition debt pursuant to interim order); In re Source Interlink

18   Cos. Inc., Case No. 09-11424 (Bankr. D. Del. Apr. 29, 2009) (authorizing up to $385

19   million in debtor-in-possession financing that included roll-up of approximately $149

20   million prepetition debt pursuant to interim order); In re Dayton Superior Corp., Case No.

21   09-10785 (Bankr. D. Del. Apr. 19, 2009) (authorizing up to $165 million in debtor-in-

22   possession financing that included roll-up of approximately $109.8 million prepetition debt

23   pursuant to interim order); In re Pac. Energy Res., Ltd., Case No. 09-10785 (Bankr. D.

24   Del. Mar. 10, 2009) (authorizing up to $183 million in debtor-in-possession financing that

25   included roll-up of approximately $143 million prepetition debt pursuant to interim order);

26   In re Foamex Int'l Inc., Case No. 09-10560 (Bankr. D. Del. Feb. 20, 2009) (authorizing

27   approximately $95 million in debtor-in-possession financing that included full roll-up of

28   approximately $39 million prepetition debt pursuant to interim order); In re Hilex Poly Co.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  LLC, Case No. 08-10890 (Bankr. D. Del. May 7, 2008) (authorizing up to $140 million in

2  debtor-in-possession financing that included roll-up of approximately $51 million

3  prepetition debt pursuant to interim order); In re Holley Performance Prods. Inc., Case No.

4  08-10256 (Bankr. D. Del. Feb. 12, 2008) (authorizing approximately $60 million in debtor-

5  in-possession financing that included roll-up of approximately $40 million prepetition debt

6  pursuant to interim order).

7       After careful consideration of the terms of the DIP Facility, the Debtors determined

8  that the refinancing aspect thereof was appropriate and necessary under the

9  circumstances.  This feature was a critical component of the willingness of the DIP

10  Lenders to commit to provide funding under the DIP Facility.  Indeed, the DIP Lenders

11  would not have agreed to provide the DIP Facility without a repayment of the Prepetition

12  Debt of the Prepetition Lenders.  The financing contemplated under the DIP Credit

13  Agreement will offer the Debtors much-needed funds to continue operating their business

14  and effectuate the sale process during these chapter 11 cases.  Therefore, the Debtors

15  believe that the Refinancing is a necessary component to the DIP Facility and will ensure

16  the Debtors' access to sufficient liquidity for working capital and general corporate

17  purposes to fund day-to-day operations during these chapter 11 cases.

18       **E.      The Scope of the Carve-Out is Appropriate**

19       The proposed DIP Facility subjects the security interests and administrative

20  expense claims of the DIP Lender to the Carve-Out, as do the provisions relating to the

21  provision of adequate protection to the Prepetition Secured Creditors.  Such carve-outs for

22  professional fees have been found to be reasonable and necessary to ensure that a

23  debtor's estate and any statutory committee can retain assistance from counsel.  See

24  Ames Dep't Stores, 115 B.R. at 40.  Neither the Final Order nor the Interim Order directly

25  or indirectly deprive the Debtors' estates or other parties in interest of possible rights and

26  powers by restricting the services for which professionals may be paid in these cases.  Id.

27  at 38 (observing that courts insist on carve-outs for professionals representing parties-in-

28  interest because "[a]bsent such protection, the collective rights and expectations of all

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1  parties-in-interest are sorely prejudiced").  In addition, subject to the Budget, the Carve-

2  Out ensures that proceeds of the DIP Facility and Cash Collateral may be used for the

3  payment of U.S. Trustee fees and professional fees of the Debtors and any future

4  Committee notwithstanding the grant of superpriority and administrative liens and claims

5  under the DIP Facility.

6      **F.    The DIP Agent and DIP Lenders are Entitled to the Protections Afforded**

7          **to a Good Faith Lender Under Section 364(e)**

8          Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect

9  on loans extended to a debtor, and its right in any lien securing those loans, even if the

10 authority of the debtor to obtain such loans or grant such liens is later reversed or

11 modified on appeal.  Specifically, section 364(e) provides that:

12         The reversal or modification on appeal of an authorization under this section
           [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant
13         under this section of a priority or a lien, does not affect the validity of any
           debt so incurred, or any priority or lien so granted, to an entity that extended
14         such credit in good faith, whether or not such entity knew of the pendency of
           the appeal, unless such authorization and the incurring of such debt, or the
15         granting of such priority or lien, were stayed pending appeal.
           11 U.S.C. § 364(e).

16

17         In this case, the DIP Documents are the result of (i) the Debtors' reasonable and

18 informed determination that the DIP Lenders offered the most favorable terms available

19 on which to obtain needed postpetition financing, and (ii) are the product of extended

20 arm's-length, good faith negotiations between and among the Debtors, the DIP Agent and

21 the DIP Lenders.  The terms and conditions of the DIP Documents are fair and reasonable

22 under the circumstances, reflect the Debtors' exercise of prudent business judgment

23 consistent with their fiduciary duties, are supported by reasonably equivalent value and

24 fair consideration, and are in the best interests of the Debtors, their estates and creditors.

25 The proceeds under the DIP Facility will be used only for purposes that are permissible

26 under the Bankruptcy Code, no consideration is being provided to any party to the DIP

27 Documents other than as described herein and the DIP Agent and DIP Lenders extended

28 the DIP Facility in reliance upon the protections offered by section 364(e) of the

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1   Bankruptcy Code.  Section 364(e) provides a lender with a presumption of good faith.

2   Weinstein, Eisen, Weiss LLP v. Gill (In re Cooper Common, LLC), 424 F.3d 963, 969 (9th

3   Cir. 2005).  Accordingly, the Debtors request that the Court find that the DIP Agent and

4   DIP Lenders have acted as a "good faith" lender within the meaning of section 364(e) of

5   the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

6           **G.      The Automatic Stay Should Be Modified on Limited Basis**

7           The relief requested herein contemplates a modification of the automatic stay (to

8   the extent applicable) to permit the Debtors to grant the security interests, liens, and

9   superpriority claims described above and to perform such acts as may be requested to

10  assure the perfection and priority of such security interests and liens.  In addition, the

11  Final Order provides for the modification of the automatic stay to allow for the enforcement

12  of rights and remedies by the DIP Agent and DIP Lenders under the DIP Documents upon

13  the occurrence of an Event of Default or the Termination Date.

14          Stay modifications of this kind are ordinary and standard features of postpetition

15  debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair

16  under the present circumstances.

17          **H.      Approval of the Interim Order Should Be Granted, and a Final Hearing**

18                   **Set on Approval of the Final Order**

19          Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use

20  cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen

21  (14) days after the service of such motion.  Upon request, however, the Court is

22  empowered to conduct a preliminary expedited hearing on the motion and authorize the

23  use of cash collateral (and the obtaining of credit, if applicable) to the extent necessary to

24  avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

25          In this case, pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request

26  that the Court conduct an expedited preliminary hearing on this Motion and (i) authorize

27  the Debtors to use Cash Collateral pursuant to the Interim Order in order to (a) maintain

28  the ongoing operations of the Debtors and (b) avoid immediate and irreparable harm and

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1   prejudice to their estates and all parties in interest, and (ii) schedule the Final Hearing, at

2   which time approval of the DIP Facility and use of Cash Collateral pursuant to the Final

3   Order will be sought.

4        Absent authorization from the Court to obtain use of Cash Collateral, as requested

5   by way of the Interim Order, on a short-term basis pending the Final Hearing and approval

6   of the Final Order, the Debtors will be immediately and irreparably harmed.  Accordingly,

7   the relief requested is critical to preserving and maintaining the value of the Debtors'

8   estates and facilitating their sale efforts.

9        **I.     Waiver of Bankruptcy Rules 6004(a) and (h)**

10       To implement the foregoing successfully, the Debtors request that the Court enter

11  an order providing that notice of the relief requested herein satisfies Bankruptcy Rule

12  6004(a) and that the Debtors have established cause to exclude such relief from the 14-

13  day stay period under Bankruptcy Rule 6004(h) and any other applicable Bankruptcy

14  Rule.

15

16  **VI.    NOTICE**

17       The Debtors will provide notice of this Motion to: (a) the Office of the United States

18  Trustee for the Central District of California – Santa Ana Division, (b) counsel to the DIP

19  Agent and the DIP Lenders; (c) counsel to the Prepetition Lenders and the Prepetition

20  Agent; (d) the PBGC; (e) United States Securities and Exchange Commission; (f) the

21  Internal Revenue Service; (g) the Office of the United States Attorney for the Central

22  District of California; (h) the parties included on the Debtors' consolidated list of thirty (30)

23  largest unsecured creditors; (i) all other known parties asserting a lien against the

24  Debtors' assets; and (j) any parties that have filed with the Court requests for notice of all

25  matters in accordance with Bankruptcy Rule 2002.  To the extent necessary, the Debtors

26  request that the Court waive compliance with Local Bankruptcy Rule 9075-1 and approve

27  service (in addition to the means of service set forth in such Local Bankruptcy Rule) by

28  overnight or electronic delivery.  In the event that the Court grants the relief requested by

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1  the Motion, the Debtors shall provide notice of the entry of the order granting such relief

2  upon each of the foregoing parties and any other parties-in-interest as the Court directs.

3  The Debtors submit that such notice is sufficient and that no other or further notice be

4  given.

5

6  **VII.    CONCLUSION**

7       WHEREFORE, the Debtors respectfully request that the Court: (a) enter the Interim

8  Order in substantially the form attached hereto as Exhibit A approving the short-term use

9  of Cash Collateral and scheduling the Final Hearing forthwith, and (b) after the Final

10  Hearing, entering the Final Order, substantially in the form attached hereto as Exhibit B,

11  and (c) grant such other or further relief as is just and proper.

12                                    Respectfully submitted,

13  Dated:  November 2, 2015           LOBEL WEILAND GOLDEN FRIEDMAN LLP

14

15                                    By: _____

16                                        WILLIAM N. LOBEL
                                          ALAN J. FRIEDMAN
17                                        BETH E. GASCHEN
                                          CHRISTOPHER J. GREEN
18                                        Proposed Attorneys for
                                          Debtors and Debtors-in-Possession

19

20

21

22

23

24

25

26

27

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

## DECLARATION OF ADAM MEISLIK

I, Adam Meislik, declare as follows:

1.      I am a Senior Managing Director of GlassRatner Advisory & Capital Group, LLC ("GlassRatner") and Co-President of GlassRatner Securities LLC, the proposed financial advisor for Freedom Communications, Inc. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The matters set forth herein are within my own personal knowledge, and, if called upon as a witness, I could and would competently testify thereto.

2.      This Declaration is submitted in support of the *Debtors' Motion For Entry Of: (I) Interim Order (A) Authorizing Debtors To (1) Utilize Cash Collateral Pursuant To 11 U.S.C. § 363, (2) Provide Adequate Protection To Prepetition Secured Parties, (3) And Grant Related Relief, And (B) Setting Final Hearing; And (II) Final Order Authorizing Debtors To (A) Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362 And 364, (B) Utilize Cash Collateral Pursuant To 11 U.S.C. § 363, (C) Provide Adequate Protection To Prepetition Secured Parties, (D) Repay Certain Prepetition Secured Debt, And (E) Grant Related Relief* (the "Motion").[11]

3.      Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge of the Debtors' operations and finances gleaned during the course of my engagement with the Debtors, my discussions with the Debtors' senior management, other members of the GlassRatner team, the Debtors' other advisors and my review of relevant documents and/or my opinion based upon my experience.  If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, discussions, review of documents and/or opinion.

---

[11] Capitalized terms utilized herein that are not otherwise defined shall have the meanings ascribed to such terms in the Motion.

Weiland Golden LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

**Qualifications**

4.      GlassRatner in a restructuring and investment banking firm founded in 2001 with multiple offices located throughout the United States.  An affiliate of GlassRatner, GlassRatner Securities, LLC, is a registered broker-dealer with the United States Securities and Exchange Commission.  GlassRatner and its professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings.

5.      I personally have extensive experience with chapter 11 proceedings, with approximately twenty years of experience in restructuring and corporate finance.  During this time, I have served in various roles, including as financial advisor, investment banker, chief restructuring officer and expert witness, and I have worked with numerous clients, including companies, bank lenders and other secured and unsecured creditors, buyers, sellers, bankruptcy counsel and litigators, all in the context of workouts, insolvency proceedings, fund raisings, mergers and acquisitions, and litigation.

6.      In May 2015, the Debtors retained GlassRatner as their financial advisor and investment banker in connection with the Debtors' restructuring efforts.  Additionally, GlassRatner has worked closely with the Debtors' management and other professionals retained by the Debtors with respect to these chapter 11 cases and has become well-acquainted with the Debtors' capital structure, liquidity needs and business operations.

**The Debtors' Need for Immediate Access to Cash Collateral**

7.      It is my understanding that, through these chapter 11 cases, the Debtors will seek to effectuate a sale of their business pursuant to a competitive bidding process in an effort to maximize value for their stakeholders and for the benefit of all parties in interest. Critical to the success of the Debtors' cases will be the Debtors' ability to continue to operate in the ordinary course pending the contemplated sale of substantially all of their assets.

8.      Recognizing the need to access cash, the Debtors, GlassRatner and the Debtors' other advisors engaged in discussions with the Debtors' primary secured

Weiland Golden LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1    creditors asserting an interest in the Debtors' Cash Collateral – Silver Point Finance, LLC

2    ("Silver Point"), as Prepetition Agent of the Prepetition Lenders, and the Pension Benefit

3    Guaranty Corporation (the "PBGC") – regarding the terms of the Debtors' consensual

4    continued use of Cash Collateral.  In addition, as discussed below, the Debtors and their

5    advisors engaged in discussions with Silver Point regarding the terms of debtor-in-

6    possession financing to allow the Debtors to operate pending the contemplated sale of

7    their business.  The Debtors, Silver Point and the PBGC reached an agreement, the terms

8    of which are described in detail in the Motion and set forth in the proposed Interim Order

9    (Exhibit A to the Motion), and the Debtors and Silver Point reached an agreement, the

10   terms of which are described in detail in the Motion and set forth in the proposed Final

11   Order (Exhibit B to the Motion).  The Interim Order provides for a short-term (30 days,

12   unless otherwise extended by agreement) "bridge" use of cash collateral, pending the

13   approval of the DIP Facility (and concurrent use of cash collateral) provided for in the

14   Final Order, all in accordance with the terms of the Budget.

15       9.      I believe that the Debtors' access to Cash Collateral during this

16   approximately 30-day interim period (and thereafter) is absolutely necessary to preserving

17   and maximizing value for the Debtors' stakeholders.  The Debtors will use Cash Collateral

18   in the ordinary course of business to procure goods and services from vendors, pay their

19   employees, and satisfy other working capital needs.  Absent approval of the Interim Order

20   (and, thereafter, use of cash collateral and authority to obtain debtor-in-possession

21   financing pursuant to the Final Order), the Debtors will be effectively unable to generate

22   revenue, operate their businesses, or pay the hundreds of individuals who report to work

23   each day, in addition to funding their reorganization process.  These chapter 11 estates

24   will be immediately and irreparably harmed if this were to occur.

25       10.     Access to Cash Collateral, on an interim basis pursuant to the Interim Order

26   and thereafter in connection with the DIP financing, along with the proceeds of the DIP

27   Facility available for operations, will provide the Debtors with the liquidity necessary to

28   continue operations and fund these chapter 11 cases.  Without access to liquidity, the

Weiland Golden LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1  Debtors' ability to operate and ultimately to sell their business as a going concern or

2  otherwise will be jeopardized, all to the detriment of the Debtors' stakeholders.  As a

3  result, the Debtors have an immediate need to continue to access the Cash Collateral

4  (and, as discussed below, to access the proceeds of the DIP Facility) to ensure sufficient

5  liquidity throughout the pendency of these chapter 11 cases.

6  **The Debtors' Additional Liquidity Needs**

7       11.     In addition to the continuing use of Cash Collateral, the Debtors are in need

8  of an immediate additional infusion of liquidity.  As of the Petition Date, the Debtors have

9  only approximately $1,043,733 in cash on hand with which to operate their businesses

10  and fund these chapter 11 cases.  Together with the Debtors' management, GlassRatner

11  and the Debtors' other advisors analyzed the incremental liquidity that would be

12  necessary to maintain operations in connection with these chapter 11 cases.  Among

13  other things, this necessary additional liquidity is required to pay employee wages and

14  benefits, procure goods and services integral to the Debtors' ongoing business

15  operations, fund certain operational expenses (as set forth in the Budget), maintain

16  ordinary course relationships with vendors, suppliers, and customers, and satisfy working

17  capital needs in the ordinary course.

18       12.     As part of this process, GlassRatner and the Debtors' advisors reviewed and

19  analyzed the 26-week cash flow forecast that the Debtors created with the assistance of

20  GlassRatner.  The Debtors' 26-week cash flow forecast takes into account anticipated

21  cash receipts and disbursements during the projected period and considers a number of

22  factors, including the effect of the chapter 11 filings on the operations of the business,

23  fees and interest expense associated with the proposed debtor-in-possession financing,

24  professional fees and required vendor payments.  It is my understanding, based on my

25  review of the 26-week cash flow forecast prepared by management, that the Debtors are

26  forecasting net cash needs of approximately $3 million in the first 26-weeks of these

27  chapter 11 cases.

28

Weiland Golden LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

28669118.1 1044619.1

MEISLIK DECLARATION

**The Debtors' Efforts to Obtain Post-Petition Financing**

13.    In July 2015, GlassRatner professionals commenced a marketing process designed to attract financing from a focused set of lenders with the sophistication and capacity to provide the Debtors with necessary financing in a relatively short period of time.  GlassRatner solicited lenders for both pre-petition and post-petition financing.  This process also was geared towards promoting competition and obtaining financing on the best terms available to fund the Debtors' anticipated needs, given the Debtors' capital structure and operating results.  In particular, the Debtors and GlassRatner sought proposals from 11 potential financing sources, which included Silver Point (as agent of the Prepetition Lenders) and 10 third-party lenders (the "Third Party Lenders" and, together with Silver Point, the "Potential Financing Parties").  The Third Party Lenders were institutions with experience providing debtor-in-possession and special situations financing similar to the needs of the Debtors.

14.    GlassRatner structured its marketing efforts in light of GlassRatner's preliminary assessment of the Debtors' existing capital structure and their anticipated financing needs.  To that end, in addition to identifying the Prepetition Lenders as the most likely sources of postpetition financing (given their liens on substantially all of the Debtors' assets, involvement over the past several months with the Debtors' restructuring efforts, and support for an expedited chapter 11 sale process), GlassRatner approached the Third Party Lenders with the message that the Debtors were willing to enter into flexible loan structures.

15.    GlassRatner and the Debtors' other advisors worked diligently with the Potential Financing Parties to obtain financing proposals for the Debtors.  Throughout this process, the Debtors' management was kept informed of the status of these discussions, and was involved at various stages where necessary and appropriate.

16.    Upon review of the Debtors' capital structure and financing needs, none of the Potential Financing Parties were willing to make a pre-petition loan to the Debtors without assurances of the Debtors proceeding with a chapter 11 restructuring.

**Weiland Golden LLP**
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1   Furthermore, several of the Potential Financing Parties expressed their unwillingness to

2   make a post-petition loan to the Debtors due to their concern over the possibility of a non-

3   consensual priming fight with the Prepetition Lenders (who indicated they would not

4   consent to such priming), and none of the Potential Financing Parties were willing to make

5   a post-petition loan to the Debtors solely on an unsecured or administrative basis.

6   Therefore, given the magnitude of the financing required and the immediacy of the

7   Debtors' financing needs, the Debtors determined that it would not be productive to solicit

8   interest for unsecured, administrative expense financing from additional lenders.

9        17.    Concurrently with their active attempts to attract post-petition financing

10  proposals from Third Party Lenders (which resulted in several proposals that were

11  considered by the Debtors and their advisors), the Debtors also were aggressively

12  pursuing a consensual restructuring with Silver Point, as agent of the Prepetition Lenders.

13  It became clear during these negotiations that, as part of a global restructuring deal, the

14  Prepetition Lenders would be willing to provide post-petition financing to meet the Debtors'

15  funding needs as the Debtors proceeded toward a consensual sale of substantially all of

16  their assets in these chapter 11 proceedings.  It also became clear during these

17  negotiations that, as discussed below, the terms offered by the Prepetition Lenders were

18  superior those offered by the Third Party Lenders that did submit financing proposals to

19  the Debtors.

20       18.    Ultimately, in late October 2015, the Debtors reached an agreement with

21  Silver Point that is reflected by the DIP Facility.  The DIP Facility provides for a refinancing

22  or roll-up of the Prepetition Lender's approximately $19.46 million of secured debt (plus

23  certain accrued but unbilled fees, costs, and expenses), which debt is secured by the

24  majority of the value of the Debtors' assets, as well as an additional $3 million in new

25  capital to provide for the Debtors' liquidity needs in the chapter 11 cases.

26

27

28

**Weiland Golden LLP**
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

**The Terms of the DIP Facility Are More Advantageous to the Debtors Than Other**

**Proposals Available Under Current Conditions**

19.     After having engaged in discussions with the potential Third-Party Lenders and being a party to the negotiations of the DIP Facility, I believe the terms of the DIP Facility are more advantageous to the Debtors than other proposals available under current conditions and are in the best interests of the Debtors' estates.

20.     Specifically, in comparing the Third-Party Lender proposals to the proposal from Silver Point, the Debtors, informed by the advice of their advisors, determined that the DIP Facility was superior to the proposals of the Third Party Lenders for the following reasons:

a.     Silver Point offers financing at a rate of 10% per annum paid monthly whereas the lowest rate proposed by a Third Party Lender was 12% per annum.

b.     Third Party Lenders typically requested both upfront fees as well as exit fees.  The lowest fees offered from Third Party Lenders were 2% due upfront and 1% upon exit, whereas Silver Point is offering financing terms which provide for relatively modest upfront and administrative fees, and no exit fee.

c.     Silver Point has provided a maturity of 12-months with the potential for an additional 6-month extension (subject to a minimum EBITDA of $2 million and provisions that the Debtors' Santa Ana real estate shall be under contract to be sold).  This is in line with the best final maturity term proposal of 18 months received from Third Party Lenders.

21.     Thus, in addition to satisfying the Debtors' liquidity needs, the DIP Facility provides substantial benefits specific to the Debtors' bankruptcy cases.

**Good Faith**

22.     Based on the information available to me and my observations during the course of negotiations over the DIP Facility, it is my opinion that the terms and conditions of the DIP Facility were negotiated by the parties in good faith and at arm's-length and are

///

Weiland Golden LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1   more advantageous to the Debtors than other proposals available under current

2   conditions and are in the best interests of the Debtors' estates.

3          I declare under penalty of perjury that the foregoing is true and correct.

4          Executed on this 2nd day of November, 2015, at Irvine, California.

5

6   _____

7   Adam Meislik
    Senior Managing Director
8   GlassRatner Advisory &
    Capital Group, LLC
9   Proposed Financial Advisors to the
    Debtors and Debtors-in-Possession

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Weiland Golden LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

28669118.1 1044249.1

MEISLIK DECLARATION

EXHIBIT "A"

1  William N. Lobel, State Bar No. 93202
   wlobel@lwgfllp.com
2  Alan J. Friedman, State Bar No. 132580
   afriedman@lwgfllp.com
3  Beth E. Gaschen, State Bar No. 245894
   bgaschen@lwgfllp.com
4  Christopher J. Green, State Bar No. 295874
   cgreen@lwgfllp.com
5  **LOBEL WEILAND GOLDEN FRIEDMAN LLP**
   650 Town Center Drive, Suite 950
6  Costa Mesa, California 92626
   Telephone    714-966-1000
7  Facsimile    714-966-1002

8  Proposed Attorneys for
   Debtors and Debtors-in-Possession

9

10                **UNITED STATES BANKRUPTCY COURT**

11                **CENTRAL DISTRICT OF CALIFORNIA**

                        **SANTA ANA DIVISION**

12 | In re | Case No.:  8:15-bk-8:15-bk-15311
   |       | Chapter 11
13 | FREEDOM COMMUNICATIONS, INC., a
   | Delaware corporation, *et al.*,[1] | (Jointly Administered with Case Nos.
14 |                      | 8:15-bk-15312-MW; 8:15-bk-15313-MW;
   |        Debtors and   | 8:15-bk-15315-MW; 8:15-bk-15316-MW;
15 |        Debtors-in-Possession. | 8:15-bk-15317-MW; 8:15-bk-15318-MW;
   |                      | 8:15-bk-15319-MW; 8:15-bk-15320-MW;
16 | Affects:            | 8:15-bk-15321-MW; 8:15-bk-15322-MW;
   |                      | 8:15-bk-15323-MW; 8:15-bk-15324-MW;
17 | ☒  All Debtors      | 8:15-bk-15325-MW; 8:15-bk-15326-MW;
   |                      | 8:15-bk-15327-MW; 8:15-bk-15328-MW;
18 | ☐  Freedom Communications, Inc., a | 8:15-bk-15329-MW; 8:15-bk-15330-MW;
   | Delaware corporation, ONLY | 8:15-bk-15332-MW; 8:15-bk-15337-MW;
19 |                      | 8:15-bk-15339-MW; 8:15-bk-15340-MW;
   | ☐  Freedom Communications Holdings, | 8:15-bk-15342-MW; 8:15-bk-15343-MW)
20 | Inc., a Delaware corporation, ONLY |

21  _____

22      [1] The last four digits of the Debtors' federal tax identification numbers are as follows: Freedom
    Communications, Inc. (0750); Freedom Communications Holdings, Inc. (2814); Freedom Services, Inc.
23  (3125); 2100 Freedom, Inc. (7300); OCR Community Publications, Inc. (9752); Daily Press, LLC (3610);
    Freedom California Mary Publishing, Inc. (4121); Freedom California Ville Publishing Company LP (7735);
24  Freedom Colorado Information, Inc. (7806); Freedom Interactive Newspapers, Inc. (9343); Freedom
    Interactive Newspapers of Texas, Inc. (8187); Freedom Newspaper Acquisitions, Inc. (4322); Freedom
25  Newspapers (7766); Freedom Newspapers, Inc. (3240); Freedom Newspapers of Southwestern Arizona,
    Inc. (5797); OCR Information Marketing, Inc. (7983); Odessa American (7714); Orange County Register
26  Communications, Inc. (7980); Victor Valley Publishing Company (6082); Victorville Publishing Company
    (7617); Freedom SPV II, LLC (8253); Freedom SPV VI, LLC (8434); Freedom SPV I, LLC (3293); Freedom
27  SPV IV, LLC (8500); and Freedom SPV V, LLC (9036).  The Debtors' mailing address is 625 N. Grand
    Avenue, Santa Ana, California 92701.

28

EXHIBIT "A"
Page 61

1

2 ☐ Freedom Services, Inc., a Delaware corporation, ONLY

3 ☐ 2100 Freedom, Inc., a Delaware corporation, ONLY

4

5 ☐ OCR Community Publications, Inc., a California corporation, ONLY

6 ☐ Daily Press, LLC, a California limited liability company, ONLY

7

8 ☐ Freedom California Mary Publishing, Inc., a California corporation, ONLY

9 ☐ Freedom California Ville Publishing Company LP, a California limited
10 partnership, ONLY

11 ☐ Freedom Colorado Information, Inc., a Delaware corporation, ONLY

12

13 ☐ Freedom Interactive Newspapers, Inc., a California corporation, ONLY

14 ☐ Freedom Interactive Newspapers of Texas, Inc., a Delaware corporation, ONLY

15

16 ☐ Freedom Newspaper Acquisitions, Inc., a Delaware corporation, ONLY

17 ☐ Freedom Newspapers, a Texas general partnership, ONLY

18

19 ☐ Freedom Newspapers, Inc., a Delaware corporation, ONLY

20 ☐ Freedom Newspapers of Southwestern Arizona, Inc., a California corporation,
21 ONLY

22 ☐ OCR Information Marketing, Inc., a California corporation, ONLY

23

24 ☐ Odessa American, a Texas general partnership, ONLY

25 ☐ Orange County Register Communications, Inc., a California
26 corporation, ONLY

27 ☐ Victor Valley Publishing Company, a California corporation, ONLY

28

**INTERIM ORDER (A) AUTHORIZING DEBTORS TO (1) UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (2) PROVIDE ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, AND (3) GRANT RELATED RELIEF, AND (B) SETTING FINAL HEARING**

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

28658107.3 1038674.2

2

INTERIM ORDER

EXHIBIT "A"
Page 62

☐  Victorville Publishing Company, a California limited partnership, ONLY

☐  Freedom SPV II, LLC, a Delaware limited liability company, ONLY

☐  Freedom SPV VI, LLC, a Delaware limited liability company, ONLY

☐  Freedom SPV I, LLC, a Delaware limited liability company, ONLY

☐  Freedom SPV IV, LLC, a Delaware limited liability company, ONLY

☐  Freedom SPV V, LLC, a Delaware limited liability company, ONLY

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (each, a "Debtor" and collectively, the "the Debtors") in the above-captioned chapter 11 cases (the "Cases" or "Chapter 11 Cases"), pursuant to sections 105, 361, 362 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Procedure of the United States Bankruptcy Court for the Central District of California (the "Local Rules"), seeking entry of an Interim Order agreed to by and among the Debtors, Silver Point Finance, LLC, as agent (the "Prepetition Agent"), and SPCP Group, LLC and SPCP Group VI, LLC (the "Prepetition Lenders" and, together with the Prepetition Agent, the "Prepetition Loan Parties"), and the Pension Benefit Guaranty Corporation (the "PBGC"), (a) pursuant to which the Debtors are authorized to utilize, for a period of thirty (30) days from the Petition Date (unless further extended pursuant to the terms hereof), Cash Collateral (as defined herein), upon the terms and conditions set forth herein, (b) granting adequate protection to the Prepetition Loan Parties and to the PBGC

---

[2] Capitalized terms utilized in this Interim Order that are not otherwise defined, shall have the meanings ascribed to such terms in the Motion.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 • Fax 714-966-1002

1    with respect to such use of Cash Collateral; (c) modifying the automatic stay as necessary

2    to effectuate all of the terms and provisions of this Interim Order; (d) prescribing the form

3    and manner of notice and setting the time for the Final Hearing on the Motion; and (e)

4    granting related relief.

5         A preliminary expedited hearing (the "Preliminary Hearing") on the Motion having

6    being held by this Court on November __, 2015, and based upon all of the pleadings filed

7    with this Court in respect of the Motion; and based upon the record made by the Debtors

8    at the Preliminary Hearing; and it appearing that the relief granted in this Interim Order is

9    in the best interests of the Debtors and the Debtors' estates and creditors; the Debtors

10   having given notice of the Motion and it appearing that no further notice need be given;

11   and after due deliberation and consideration and sufficient cause appearing therefor;

12        **IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED**, that:

13        1.    Jurisdiction.  This Court has core jurisdiction over these chapter 11 cases,

14   the Motion, and the parties and property affected hereby under 28 U.S.C. §§ 157(b) and

15   1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

16        2.    Notice.  The notice given by the Debtors of the Motion and the Preliminary

17   Hearing was given to: (a) the Office of the United States Trustee for the Central District of

18   California – Santa Ana Division, (b) counsel to the DIP Agent and the DIP Lenders; (c)

19   counsel to the Prepetition Lenders and the Prepetition Agent; (d) the PBGC; (e) United

20   States Securities and Exchange Commission; (f) the Internal Revenue Service; (g) the

21   Office of the United States Attorney for the Central District of California; (h) the parties

22   included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (i) all

23   other known parties asserting a lien against the Debtors' assets; and (j) any parties that

24   have filed with the Court requests for notice of all matters in accordance with Bankruptcy

25   Rule 2002.  To the extent necessary, the Court waives compliance with Local Bankruptcy

26   Rule 9075-1 and approves service (in addition to the means of service set forth in such

27   Local Bankruptcy Rule) by overnight or electronic delivery.  Such notice constitutes due

28   and appropriate notice under the circumstances and complies with Bankruptcy Rules

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1 │ 4001(b) and applicable Local Rules.  No further notice of the relief sought at the

2 │ Preliminary Hearing is necessary or required.

3 │       3.    <u>Final Hearing</u>.  A Final Hearing on the Motion shall be held before this Court

4 │ on [_____], 2015, at [_____].  Notice of the Final Hearing shall be given by

5 │ the Debtors, within 2 business days of the entry of this Interim Order, to the parties set

6 │ forth in Paragraph 2 hereof and any other parties directed by the Court.  Such parties shall

7 │ also be served with a copy of this Interim Order.  Any objection to the relief sought by the

8 │ Motion at the Final Hearing shall be filed and served by no later than [_____],

9 │ 2015, and served on counsel to the Debtors, counsel to the Prepetition Agent and

10 │ Prepetition Lenders, counsel to the DIP Agent and the DIP Lenders, the PBGC, the Office

11 │ of the United States Trustee, and any other parties directed by the Court.  Any replies to

12 │ any objections shall be filed and served on any objecting party by no later than

13 │ [_____], 2015.

14 │       4.    <u>Creditors' Committee Formation</u>.  No statutory committee of unsecured

15 │ creditors has yet been appointed in the chapter 11 cases (a "<u>Committee</u>").

16 │       5.    <u>The Debtors' Stipulations</u>.  Subject to the rights of other parties in interest as

17 │ set forth in paragraph 10 below, the Debtors admit, stipulate and agree that, and such

18 │ admissions, stipulations and agreements are hereby incorporated by reference into this

19 │ Interim Order, as follows:

20 │       A.    The Debtors, headquartered in Santa Ana, California, are a privately owned

21 │ information and entertainment company consisting of print publications and interactive

22 │ businesses.  The Debtors' portfolio includes daily and weekly newspapers, magazines

23 │ and other specialty publications.  In addition, the Debtors operate an interactive business

24 │ which offers website complements, as well as digital and mobile products, to their print

25 │ publications.  The Orange County Register is the Debtors' flagship newspaper.  The

26 │ Debtors also operate the Riverside Press-Enterprise and Unidos (a Spanish language

27 │ newspaper), and own real property in Santa Ana and Riverside, California.  The Debtors

28 │ filed voluntary petitions pursuant to chapter 11 of the Bankruptcy Code on November 1,

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  2015 (the "<u>Petition Date</u>").  The Debtors are operating their businesses as debtors-in-

2  possession in accordance with sections 1107(b) and 1108 of the Bankruptcy Code.

3      B.      As of November 21, 2013, (i) Freedom Communications Holdings, Inc.

4  ("<u>Freedom Holdings</u>") and Freedom Communications, Inc. ("<u>Freedom Communications</u>"),

5  as borrowers, (ii) Freedom SPV II, LLC ("<u>Freedom SPV II</u>"), Freedom SPV VI, LLC

6  ("<u>Freedom SPV VI</u>") and others, as guarantors, (iii) the Prepetition Lenders, and (iv) the

7  Prepetition Agent, as administrative agent and collateral agent, entered into that *Credit*

8  *Guaranty Agreement*, dated as of November 21, 2013 (the "<u>Original Credit Agreement</u>")

9  with respect to a $26,000,000 credit facility to Freedom Holdings and Freedom

10  Communications.

11      C.      The Original Credit Agreement, and the terms thereof, were amended

12  pursuant to: (i) *Amendment to Credit and Guaranty Agreement*, dated as of December 10,

13  2013, (ii) *Second Amendment and Waiver to Credit and Guaranty Agreement*, dated as of

14  January 24, 2014, (iii) *Third Amendment and Waiver to Credit and Guaranty Agreement*,

15  dated as of February 28, 2014, (iv) *Fourth Amendment and Waiver to Credit and Guaranty*

16  *Agreement*, dated as of April 21, 2014, and (v) *Fifth Amendment and Waiver to Credit and*

17  *Guaranty Agreement*, dated as of May 28, 2014.  The Original Credit Agreement, as

18  amended by any and all of the foregoing amendments, shall be hereinafter referred to as

19  the "<u>Credit Agreement</u>."

20      D.      Concurrently with the execution of the Original Credit Agreement, (i)

21  Freedom Holdings, Freedom Communications, Freedom SPV II, Freedom SPV VI and

22  other related and affiliated entities, as grantors, and (ii) Prepetition Agent, as collateral

23  agent for the Prepetition Lenders, entered into that *Pledge and Security Agreement*, dated

24  as of November 21, 2013 (the "<u>Security Agreement</u>").  Pursuant to the Security

25  Agreement, Freedom Holdings, Freedom Communications, Freedom SPV II, Freedom

26  SPV VI and the other grantors set forth therein granted to Prepetition Agent, as agent, and

27  for the benefit, of the Prepetition Lenders, a first priority security interest in all of Freedom

28  Holdings', Freedom Communications', Freedom SPV II's, Freedom SPV VI's and the

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  other grantor parties' personal property assets, including those personal property assets

2  itemized therein, including without limitation all of their equipment, inventory, accounts,

3  contract rights, chattel paper, instruments, tax refunds, general intangibles and all

4  proceeds of the foregoing, and the proceeds thereof, to secure all of the obligations of

5  such parties to the Prepetition Loan Parties.

6       E.     On November 22, 2013, in accordance with the Credit Agreement and the

7  Security Agreement, the Prepetition Agent, as (i) beneficiary and collateral agent of the

8  Prepetition Lenders and (ii) "Secured Party," recorded, in the Delaware Department of

9  State, UCC 1 Financing Statements against Freedom Communications, Freedom

10  Holdings, Freedom SPV II and Freedom SPV VI, as debtors, designated as filing numbers

11  2013 4616570, 2013 4616620, 2013 4617107 and 2013 4617271 (collectively, the "UCC

12  1"), which identified the collateral as "all assets, whether now owned or hereafter

13  acquired."  The UCC 1 was recorded as a first priority position lien and is superior to and

14  has priority over all other UCC 1 financing statements and liens with respect to the

15  property identified in the UCC 1, except to the extent (and only to the extent) that the

16  statutory liens of The Retirement Plan of Freedom Communications, Inc. (the "Pension

17  Plan"), as perfected on the Pension Plan's behalf by the PBGC under 26 U.S.C. § 430(k),

18  if any, have priority over the Prepetition Agent's liens pursuant to 26 U.S.C. § 6321, 6323,

19  et. seq. and applicable law (to such extent, the "PBGC Prior Lien").  Pursuant to §

20  430(k)(5), the PBGC filed lien notices against each Debtor on August 13, 2014 perfecting

21  statutory liens on the Pension Plan's behalf (the "PBGC Liens").  As of September 15,

22  2015, the amount of the PBGC Liens against each Debtor totaled $15,458,715 (such

23  amount, including all prepetition accruals after September 15, 2015 (to the extent included

24  by applicable non-bankruptcy law), the "PBGC Lien Amount").

25       F.     Concurrently with the execution of the Credit Agreement, Freedom SPV II,

26  as trustor, made, executed and delivered to the Prepetition Agent, as beneficiary and

27  collateral agent of the Prepetition Lenders, that *Deed of Trust, Security Agreement,*

28  *Assignment of Rents and Leases and Fixture Filing*, dated as of November 19, 2013 (as

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  amended, the "<u>Freedom SPV II Deed of Trust</u>"), with respect to the vacant real property of

2  approximately 16 acres in Santa Ana, California described therein (the "<u>Freedom SPV II</u>

3  <u>Property</u>").  The Freedom SPV II Deed of Trust was recorded on November 25, 2013, in

4  the Orange County Recorder's Office as document no. 2013000644091.  The Freedom

5  SPV II Deed of Trust is a first priority lien against the Freedom SPV II Property and

6  secures all "obligations and liabilities" of the borrowers and guarantors under the Credit

7  Agreement and related loan documents, including the obligations of Freedom Holdings,

8  Freedom Communications, Freedom SPV II, Freedom SPV VI.  The Freedom SPV II

9  Property is the sole material asset of Freedom SPV II and generates the gross income of

10  Freedom SPV II.

11      G.      As of May 28, 2014, Freedom SPV II and the Prepetition Agent, as

12  beneficiary and collateral agent of the Prepetition Lenders, entered into that *Modification*

13  *Agreement to Deed of Trust, Security Agreement, Assignment of Rents and Leases and*

14  *Fixture Filing* (the "<u>Freedom SPV II Amendment to Deed of Trust</u>").  The Freedom SPV II

15  Amendment to Deed of Trust was recorded on May 29, 2014, in the Orange County

16  Recorder's Office as document no. 2014000208267.

17      H.      Concurrently with the execution of the Credit Agreement, Freedom SPV VI,

18  as trustor, made, executed and delivered to the Prepetition Agent, as beneficiary and

19  collateral agent of the Prepetition Lenders, that *Deed of Trust, Security Agreement,*

20  *Assignment of Rents and Leases and Fixture Filing*, dated as of November 19, 2013 (as

21  amended, the "<u>Freedom SPV VI Deed of Trust</u>"), with respect to the real property

22  commonly known as 3512 14th Street, Riverside, California (the "<u>Freedom SPV VI</u>

23  <u>Property</u>").  The Freedom SPV VI Deed of Trust was recorded on November 27, 2013, in

24  the Riverside County Recorder's Office as document no. 2013-0558068.  The Freedom

25  SPV VI Deed of Trust is a first priority lien against the Freedom SPV VI Property and

26  secures all "obligations and liabilities" of the borrowers and guarantors under the Credit

27  Agreement and related loan documents, including the obligations of Freedom Holdings,

28  Freedom Communications, Freedom SPV II, Freedom SPV VI.  The Freedom SPV VI

1  Property is the sole material asset of Freedom SPV VI and generates the gross income of

2  Freedom SPV VI.

3        I.      As of May 28, 2014, Freedom SPV VI and the Prepetition Agent, as

4  beneficiary and collateral agent of the Prepetition Lenders, entered into that *Modification*

5  *Agreement to Deed of Trust, Security Agreement, Assignment of Rents and Leases and*

6  *Fixture Filing* (the "<u>Freedom SPV VI Amendment to Deed of Trust</u>").  The Freedom SPV

7  VI Amendment to Deed of Trust was recorded on May 29, 2014, in the Riverside County

8  Recorder's Office as document no. 2014-0196911.

9        J.      The Credit Agreement, Security Agreement, the Freedom SPV II Deed of

10  Trust, the Freedom SPV VI Deed of Trust, the UCC 1 and all other agreements,

11  documents and opinions signed and/or delivered by the parties to such agreements in

12  connection or furtherance thereof shall be hereinafter referred to as the "<u>Loan</u>

13  <u>Documents</u>."

14        K.      The collateral and security interests provided to the Prepetition Loan Parties

15  by the Debtors, and each of them, whether pursuant to the Security Agreement, Freedom

16  SPV II Deed of Trust, the Freedom SPV VI Deed of Trust, the UCC 1 or any other Loan

17  Document with respect to any of the Debtors' property and rights shall collectively be

18  referred to as the "<u>Pre-Petition Collateral</u>."

19        L.      On July 11, 2014, the Prepetition Agent, as beneficiary and collateral agent

20  of the Prepetition Lenders, provided and delivered to Freedom Holdings and Freedom

21  Communications a "Notice of Default" which, among other things, set forth therein certain

22  of the defaults of Freedom Holdings and Freedom Communications under the Credit

23  Agreement and thereafter accelerated all sums outstanding plus all fees, costs and

24  charges due under the Credit Agreement.

25        M.      On September 16, 2014, as a result of the default of Freedom Holdings and

26  Freedom Communications under the Credit Agreement, the Prepetition Agent, as

27  beneficiary and collateral agent of the Prepetition Lenders, caused to be recorded in the

28  Orange County Recorder's Office, with respect to the Freedom SPV II Deed of Trust and

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  Freedom SPV II Property, that *Notice of Default and Election to Sell Under Deed of Trust*

2  (the "Freedom SPV II NOD") thereby commencing a nonjudicial foreclosure proceeding

3  against the Freedom SPV II Property.  The Freedom SPV II NOD was recorded in the

4  Orange County Recorder's Office as document no. 2014000373433.

5       N.     On September 16, 2014, as a result of the default of Freedom Holdings and

6  Freedom Communications under the Credit Agreement, the Prepetition Agent, as

7  beneficiary and collateral agent of the Prepetition Lenders, caused to be recorded in the

8  Riverside County Recorder's Office, with respect to the Freedom SPV VI Deed of Trust

9  and Freedom SPV VI Property, that *Notice of Default and Election to Sell Under Deed of*

10  *Trust* (the "Freedom SPV VI NOD") thereby commencing a nonjudicial foreclosure

11  proceeding against the Freedom SPV VI Property.  The Freedom SPV VI NOD was

12  recorded in the Riverside County Recorder's Office as document no. 2014-0349859.

13       O.     On April 16, 2015, the Prepetition Agent, as beneficiary and collateral agent

14  of the Prepetition Lenders, caused to be recorded in the Orange County Recorder's

15  Office, with respect to the Freedom SPV II Deed of Trust, Freedom SPV II Property, and

16  Freedom SPV II NOD, that *Notice of Trustee's Sale* ("Freedom SPV II NOS") setting and

17  scheduling the nonjudicial foreclosure sale of the Freedom SPV II Property for May 15,

18  2015.  The Freedom SPV II NOS was recorded in the Orange County Recorder's Office

19  as document no. 2015000194160.  The foreclosure sale of the Freedom SPV II Property

20  has been postponed to November 3, 2015.

21       P.     On April 16, 2015, the Prepetition Agent, as beneficiary and collateral agent

22  of the Prepetition Lenders, caused to be recorded in the Riverside County Recorder's

23  Office, with respect to the Freedom SPV VI Deed of Trust, Freedom SPV VI Property, and

24  Freedom SPV VI NOD, that *Notice of Trustee's Sale* ("Freedom SPV VI NOS") setting and

25  scheduling the nonjudicial foreclosure sale of the Freedom SPV VI Property for May 15,

26  2015.  The Freedom SPV VI NOS was recorded in the Riverside County Recorder's Office

27  as document no. 2015-0152616.  The foreclosure sale of the Freedom SPV VI Property

28  has been postponed to November 3, 2015.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

EXHIBIT "A"
Page 70

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1    Q.    On June 10, 2015, the Prepetition Agent, through counsel, and as

2  beneficiary and collateral agent of the Prepetition Lenders, sent a letter to the Debtors

3  advising the Debtors that various defaults still exist under the Credit Agreement and Loan

4  Documents, that all previous "notices of default" and/or "events of default" and/or

5  acceleration of the debts and obligations under and pursuant to the Credit Agreement and

6  Loan Documents were still in effect and effective, and that the debts and obligations of the

7  Debtors, and each of them, under the Credit Agreement and Loan Documents were

8  accelerated and immediately due and payable.

9    R.    As of the Petition Date (except where otherwise noted), and pursuant to the

10  Credit Agreement and the Loan Documents, the Prepetition Loan Parties assert a secured

11  claim against the Debtors in the principal sum of not less than $12,007,790, plus accrued

12  and accruing interest, charges, fees, including attorney's fees, and costs, including

13  protective advances/reimbursable expenses (such fees, costs, and expenses, as of

14  October 31, 2015, in the sum of $2,168,623 plus any accrued but unbilled amounts) plus

15  the "Make-Whole Amount" presently (as of October 31, 2015) in the sum of $5,284,907

16  (the "Make-Whole Amount") due pursuant to Section 2.14(g) of the Credit Agreement

17  (collectively, the "Debt Amount").

18    S.    The Prepetition Loan Parties, the PBGC and the Debtors agree that all

19  revenue, rents, issues, profits, proceeds, refunds and collections of and with respect to

20  the Pre-Petition Collateral (which includes, without limitation, all personal property of the

21  Debtors, the Freedom SPV II Property and the Freedom SPV VI Property), including all

22  cash, negotiable instruments, documents of title, securities, deposit accounts, tax refunds

23  of any of the Debtors and all other cash equivalents, constitute and are the Prepetition

24  Loan Parties' cash collateral pursuant to 11 U.S.C. § 363(a); provided that to the extent

25  (and only to that extent, if at all) that there is a PBGC Prior Lien on any of such collateral,

26  the Prepetition Loan Parties, PBGC, and the Debtors agree that such collateral constitutes

27  and is the Pension Plan's cash collateral pursuant to 11 U.S.C. § 363(a).

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-866-1000 · Fax 714-866-1002

1    T.    To the extent the Debtors have obligations (the "Other Secured Debt")

2    outstanding to each of the creditors identified on Schedule 1 hereto, including the Pension

3    Plan (collectively, the "Other Prepetition Creditors"), such Other Secured Debt was

4    secured by the Pre-Petition Collateral as described on said schedule (the "Prepetition

5    Junior Liens").  The Debtors acknowledge and agree that the Prepetition Junior Liens,

6    other than the PBGC Prior Lien, if any, are junior and subordinate to the Prepetition Loan

7    Parties' liens on the Pre-Petition Collateral (the "Prepetition Senior Liens") to the extent

8    provided by applicable law and/or as reflected in certain intercreditor and subordination

9    agreements executed by the applicable Other Prepetition Creditor in favor of the

10   Prepetition Loan Parties prior to the Petition Date.

11   6.    Cash Collateral.  For purposes of this Interim Order, the term "Cash

12   Collateral" shall mean and have the same definition as given to it by Bankruptcy Code

13   § 363(a).

14   7.    Use of Cash Collateral.  In order to facilitate the orderly continuation of the

15   Debtors' business operations, the Debtors are hereby authorized, with the agreement of

16   the Prepetition Agent and the PBGC, and pursuant to the terms and conditions set forth

17   herein, to use Cash Collateral, to and through the date that is thirty (30) days following the

18   Petition Date (or such later date as agreed to in writing by Prepetition Agent), to pay only

19   those ordinary course expenses set forth on the Budget attached hereto as Exhibit "A"

20   (the "Budget") and incorporated herein by this reference on the terms set forth herein;

21   provided, however, that, pending further Court order upon adequate notice to all parties

22   who have liens on property owned by Freedom SPV II, which shall, in no circumstance, be

23   less than ten (10) business days, the Debtors shall not utilize any Cash Collateral

24   generated by Freedom SPV II (the "Freedom SPV II Cash Collateral").  The Freedom SPV

25   II Cash Collateral shall be segregated and held in a separate DIP Account (as defined

26   herein) from all other Cash Collateral with any prepetition liens attaching to the funds in

27   such DIP Account with the same validity, priority and extent as existed as of the Petition

28   Date.

1         8.    <u>Findings Regarding Use of Cash Collateral</u>.

2         (a)    Good cause has been shown for the entry of this Interim Order.

3         (b)    The Debtors have a need to have access to Cash Collateral pending the

4    Final Hearing and entry of the Final Order for the operation of their businesses, to

5    preserve their going concern value, to pay vendors, suppliers and customers, to satisfy

6    payroll obligations, to pay for certain costs and expenses related to the chapter 11 cases

7    and to satisfy the Debtors' other working capital and operational needs.  Use of Cash

8    Collateral as provided hereunder is vital to the preservation and maintenance of the

9    Debtors' going concern value and to the Debtors' successful reorganization.  Without the

10    use of the Prepetition Loan Parties' and the Pension Plan's Cash Collateral, the Debtors

11    would have great difficulty in continuing their respective business operations.

12         (c)    The use of Cash Collateral and the provision of adequate protection, as

13    authorized hereunder, have been negotiated at arm's length and in good faith among the

14    Debtors, the Prepetition Loan Parties, and the PBGC, and are fair and reasonable under

15    the circumstances, reflect the Debtors' exercise of prudent business judgment consistent

16    with their fiduciary duties, are supported by reasonably equivalent value and fair

17    consideration, and are in the best interests of the Debtors, their estates and creditors.

18         (d)    This Court concludes that entry of this Interim Order is in the best interests

19    of the Debtors and their estates and creditors as its implementation will, among other

20    things, allow the Debtors to facilitate their chapter 11 goals and maximize the value of

21    their assets.

22         9.    <u>Findings Regarding Prepetition Debt and Prepetition Liens</u>.

23         (a)    The Debtors' warrant, represent and agree and, subject to the Challenge

24    Deadline, the Court finds and holds that:

25            (i)    the UCC 1, and the liens, encumbrances and security interests

26    created thereby, are in first priority position, valid, perfected and unavoidable and attach to

27    all of the Debtors', and each of their, personal property (subject only to the PBGC Prior

28    Lien, if any);

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1         (ii)     the Freedom SPV II Deed of Trust recorded against the Freedom

2 SPV II Property and the Freedom SPV VI Deed of Trust recorded against Freedom SPV

3 VI Property and each of their rents, issues, product and proceeds are in a first priority

4 position, valid, perfected and unavoidable and attach to all of the Debtors' interest in said

5 properties;

6         (iii)    the Debt Amount is presently and immediately due and payable;

7         (iv)    the Make-Whole Amount is presently and immediately due and

8 payable;

9         (v)     the Make-Whole Amount is a valid and unavoidable debt that is now

10 due and cannot be cured and/or decelerated;

11         (vi)    the PBGC Liens are valid, perfected, and unavoidable, and attach to

12 all of Debtors', and each of their personal property;

13         (vii)   the PBGC Liens recorded against Freedom II Property and the PBGC

14 Liens recorded against Freedom VI Property, and each of their rents, issues, product, and

15 proceeds are valid, perfected and unavoidable and attach to all of Debtors' interest in said

16 properties; and

17         (viii)  the PBGC Lien Amount is valid, unavoidable, and presently and

18 immediately due and payable.

19     (b)     Notwithstanding anything herein to the contrary, the Debtors, and each of

20 them, hereby waive and relinquish their respective rights (i) to challenge, in any manner in

21 any proceeding, contested matter, adversary proceeding, or lawsuit, the accuracy of any

22 of the contentions contained in Paragraph 5.A through T, inclusive, of this Interim Order or

23 the Debt Amount or the Make-Whole Amount or the PBGC Liens or the PBGC Lien

24 Amount; or (ii) to commence any avoidance claim actions, adversary proceedings,

25 contested matters, lawsuits or any proceeding, including, but not limited to avoidance

26 claim actions, adversary proceedings, contested matters, lawsuits or any other proceeding

27 under 11 U.S.C. §§ 502, 544, 545, 547, 548, 549, 550, and 552 and other similar

28 provisions of the Bankruptcy Code, as to the liens (including, but not limited to, such liens'

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  validity, scope, perfection, priority and amount), claims and collateral of the Prepetition

2  Loan Parties, the Debt Amount and/or the Make-Whole Amount, the PBGC Liens and/or

3  the PBGC Lien Amount.

4        10.   <u>Challenge Deadline</u>.

5        (a)   Any Official Committee of Unsecured Creditors or any other official

6  committee (collectively, the "<u>Official Committee</u>") shall have 60 days from the date the

7  Official Committee is appointed (the "<u>Committee Challenge Deadline</u>"), and any other

8  party in interest (other than the Debtors, or any of them) shall have 60 days from the

9  Petition Date (the "<u>Other Challenge Deadline</u>"), to obtain authority to commence any

10  adversary proceedings, contested matters, lawsuits or any other action or proceeding to

11  challenge and to commence any adversary proceedings, contested matters, lawsuits,

12  actions or proceedings (any such adversary proceeding, contested matter, lawsuit, action

13  or proceeding, a "<u>Challenge</u>") by the Committee Challenge Deadline or Other Challenge

14  Deadline, as applicable:

15        (1)  to challenge (i) the accuracy of any of the statements set forth in

16        Paragraphs 5.A through T, inclusive, of this Interim Order, or (ii) the accuracy of

17        any of the facts, statements and conclusions established in paragraph 9 of this

18        Interim Order, including the Debt Amount, the Make-Whole Amount, the PBGC

19        Liens, or the PBGC Lien Amount; and/or

20        (2)  under 11 U.S.C. §§ 502, 544, 545, 547, 548, 549, 550, and 552 and

21        other similar provisions of the Bankruptcy Code, as to the liens (including, but not

22        limited to, such liens' validity, scope, perfection, priority and amount), claims and

23        collateral of the Prepetition Loan Parties, the Debt Amount, the Make-Whole

24        Amount, the PBGC Liens and/or the PBGC Lien Amount.

25        (b)   If neither the Official Committee nor any other party-in-interest have

26  obtained derivative standing to commence a Challenge and actually commenced a

27  Challenge by the Committee Challenge Deadline or Other Challenge Deadline, as

28  applicable: (i) such Paragraph 5.A through T, inclusive, of this Interim Order and the facts,

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1   statements and conclusions established in paragraph 9 of this Interim Order, including the

2   Debt Amount, the Make-Whole Amount and the PBGC Lien Amount, shall be deemed

3   true, accurate and uncontested for purposes of the Debtors', and each of their respective

4   bankruptcy cases and any objections or Challenge to the same shall be deemed forever

5   waived, (ii) the Debt Amount, the Make-Whole Amount and the PBGC Lien Amount

6   (including all prepetition accruals after September 15, 2015 to the extent included by

7   applicable non-bankruptcy law) shall be conclusively allowed as secured claims for all

8   purposes in the Debtors' respective bankruptcy case, and (iii) all avoidance claim actions,

9   adversary proceedings, contested matters, lawsuits or any proceeding, including, but not

10  limited to under 11 U.S.C. §§ 502, 544, 545, 547, 548, 549, 550, and 552 and other

11  similar provisions of the Bankruptcy Code, as to the liens (including, but not limited to,

12  such liens' validity, scope, perfection, priority and amount), claims and collateral of the

13  Prepetition Loan Parties and the Pension Plan, and both the Debt Amount and/or the

14  Make-Whole Amount and the PBGC Lien Amount, are forever waived and barred.

15          (c)     If the Official Committee and any party in interest shall not have commenced

16  a challenge by the Committee Challenge Deadline or Other Challenge Deadline, as

17  applicable: (a) the Prepetition Loan Parties shall be deemed to have an allowed secured

18  claim against the Debtors, and each of them, in the Debt Amount as provided above

19  together with all other outstanding obligations under the Loan Documents, including

20  without limitation, the outstanding principal balance of $12,007,790, the Make-Whole

21  Amount and all accrued and accruing but unpaid interest, including default interest,

22  thereon, charges, fees and costs; (b) the Credit Agreement is, and all obligations

23  thereunder and related thereto are, and continue to be, secured by a duly perfected first

24  priority liens on the collateral identified in the Loan Documents, Security Agreement, the

25  Freedom SPV II Deed of Trust, the Freedom SPV VI Deed of Trust, the Freedom SPV II

26  Amendment to Deed of Trust, the Freedom SPV VI Amendment to Deed of Trust, the

27  UCC 1 and any proceeds, rents, issues and profits assigned thereunder; (c) all rights,

28  remedies and claims of the Prepetition Loan Parties with respect to the Credit Agreement,

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  UCC 1, the Security Agreement, the Freedom SPV II Deed of Trust, the Freedom SPV VI

2  Deed of Trust, the Freedom SPV II Amendment to Deed of Trust and the Freedom SPV VI

3  Amendment to Deed of Trust are not subject to any defenses, offsets, disputes,

4  objections, challenges, contingencies, counterclaims or other deductions of any kind or

5  nature whatsoever; (d) subject to the automatic stay, the Prepetition Loan Parties have

6  the right to immediately pursue all of their rights and remedies at law and at equity against

7  the Debtors, and each of them, under the Credit Agreement, the Security Agreement, the

8  UCC 1, the Freedom SPV II Deed of Trust, the Freedom SPV VI Deed of Trust, the

9  Freedom SPV II Amendment to Deed of Trust and the Freedom SPV VI Amendment to

10 Deed of Trust; and (e) the Prepetition Loan Parties are entitled to payment of late fees,

11 interest at the default rate set forth in the Loan Documents, and the Prepetition Loan

12 Parties are entitled to all of their fees and costs incurred with respect to the Loan

13 Documents, including without limitation, reasonable professional fees and costs.

14        (d)        If the Official Committee and any party in interest shall not have commenced

15 a challenge by the Committee Challenge Deadline or Other Challenge Deadline, as

16 applicable: (a) the Pension Plan shall be deemed to have an allowed secured claim

17 against the Debtors, and each of them, in the PBGC Lien Amount; (b) the PBGC Liens are

18 valid, perfected, and unavoidable, and attach to all of Debtors', and each of their personal

19 property; (c) the PBGC Liens recorded against Freedom SPV II Property and the PBGC

20 Liens recorded against Freedom SPV VI Property, and each of their rents, issues,

21 product, and proceeds are valid, perfected and unavoidable and attach to all of Debtors'

22 interest in said properties; (d) all rights, remedies and claims of the Pension Plan with

23 respect to the PBGC Liens are not subject to any defenses, offsets, disputes, objections,

24 challenges, contingencies, counterclaims or other deductions of any kind or nature

25 whatsoever; and (e) subject to the automatic stay, PBGC, on behalf of the Pension Plan,

26 has the right to immediately pursue all of the Pension Plan's rights and remedies at law

27 and at equity against the Debtors, and each of them, with respect to the PBGC Liens.

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

28658107.3 1038674.2

17

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

11.   <u>Use of DIP Accounts; Accounting</u>.  Starting on the Petition Date and

continuing through the term of this Interim Order, the Debtors, and each of them, shall

continue to deposit all revenue, receipts, income and cash into their existing bank

accounts (the "Existing Accounts"), except to the extent that new bank accounts are

required to be opened pursuant to the Bankruptcy Court's cash management order to be

obtained by the Debtors, which shall be reasonably acceptable to the Prepetition Agent

and the PBGC (the "New Accounts," and together with the Existing Accounts, the "<u>DIP</u>

<u>Accounts</u>").  The Prepetition Loan Parties and any holder of a Prepetition Junior Lien shall

have and are hereby granted (without the need for any further action) liens in the New

Accounts with the same validity, priority and extent as such liens in the Existing Accounts.

The Debtors shall enter into account control agreements with the Prepetition Loan Parties

with respect to the New Accounts.  All parties, including PBGC, are hereby barred from

asserting that the Prepetition Loan Parties' liens on the New Accounts are of a lesser

priority than their liens in the Existing Accounts or that the PBGC Prior Lien or PBGC Lien

Amount has any different or additional priority in the New Accounts than it has in the

Existing Accounts.  The Debtors shall deposit all post-petition money, revenue, receipts,

cash and income earned or obtained by the Debtors, and each of them, and their

affiliates, together with any funds on deposit as of the Petition Date in any pre-petition

bank accounts of the Debtors, and each of them, and their affiliates (collectively, the

"<u>Deposits</u>") in the DIP Accounts.  The DIP Accounts shall contain funds for the general

operating expenses of the Debtors as expressly permitted under this Interim Order.  The

Debtors may continue to use any payroll accounts, tax accounts and such other accounts

as approved by the Bankruptcy Court's cash management order.  The Prepetition Agent

and the PBGC shall have the right to object to any motion related to the Debtors' cash

management to the extent that said motion and request for a cash management order is

inconsistent with this Interim Order or seeks to impair any rights and interests of the

Prepetition Loan Parties or the PBGC.  The Debtors shall at all times maintain the ability

to trace all monies entering and removed from the DIP Accounts and all other accounts in

1  use that are approved by the cash management order.  The Debtors shall provide and

2  deliver to the Prepetition Agent an accounting of all money deposited and withdrawn from

3  the DIP Accounts and the relevant documents which show and track the tracing of all

4  money and funds deposited and withdrawn from the DIP Accounts.

5         12.    <u>Terms and Conditions of Use of Cash Collateral; Budget; Reporting; Carve-

6  Out</u>.  Commencing as of the Petition Date and continuing to and through and including the

7  earlier of an Event of Default or the Termination Date (as described below), each of the

8  Debtors is authorized to use the Prepetition Loan Parties' Cash Collateral and the Pension

9  Plan's Cash Collateral (if any) subject to each and every Debtors' compliance at all times

10  with each of the following express terms and conditions:

11         (i)    So long as there is no Event of Default under the terms of the

12  Interim Order and commencing on the date of entry of the Interim Order (the

13  "<u>Effective Date</u>"), the Debtors, and each of them, are authorized to use the

14  Prepetition Loan Parties' Cash Collateral and the Pension Plan's Cash Collateral (if

15  any) only in accordance with the line items and line item amounts set forth in the

16  Budget, which, with respect to any "professional" other than a PLP Professional (as

17  defined below), must separately itemize and identify, by line item and line item

18  amount, each and every professional.  Notwithstanding anything contained in this

19  Interim Order to the contrary, the Debtors, and each of them, shall, before using

20  any of the Prepetition Loan Parties' Cash Collateral and the Pension Plan's Cash

21  Collateral (if any) to pay any "professional", including the Debtors' Court approved

22  general reorganization counsel, Lobel Weiland Golden Friedman, LLP, and

23  financial advisor, GlassRatner Advisory & Capital Group, LLC, and tax

24  advisor/accountant, Squar Milner, and noticing/claims agent, Donlin Recano &

25  Company, Inc., first use any available "unencumbered" funds or cash which is not

26  subject to the Prepetition Loan Parties' security interest to pay such "professionals."

27         (ii)    Absent further Court order or stipulation signed by the Debtors,

28  and each of them, and the Prepetition Agent and the PBGC, the Debtors' collective

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

actual expenditures of the Prepetition Loan Parties' Cash Collateral and the Pension Plan's Cash Collateral (if any) are expressly limited, on a line-item by line-item basis, to the specific dollar amounts and exclusively for the categories set forth in the Budget, subject to the remainder of this subparagraph (ii). Other than with respect to amounts budgeted for PLP Professionals (as defined below), the Debtors are in violation of the Interim Order if for any four week period: (a) on a line-item by line-item basis, the actual expenditures exceed the budgeted expenditures for such period on the Budget by fifteen percent (15%) or more, or (b) the entire Budget total for such period is exceeded by ten percent (10%) or more. Unused line item budgeted amounts in any given period cannot be carried over to any future period.

(iii)    During the term of the Interim Order, none of the Debtors shall sell or otherwise transfer any Pre-Petition Collateral or any assets related to or connected with the Pre-Petition Collateral outside of the ordinary course of the Debtors', or any of their, business without the express prior written consent of the Prepetition Agent and the PBGC (except such consent is not required if such sale or transfer would result in the Prepetition Loan Parties or the PBGC (as applicable) being indefeasibly paid in full in cash on account of its claim or after the Prepetition Loan Parties or the PBGC (as applicable) has been indefeasibly paid in full in cash on account of its claim).

(iv)    During the entire term of this Interim Order, on the Wednesday of every other calendar week during which the Debtors are permitted to use the Prepetition Loan Parties' Cash Collateral and the Pension Plan's Cash Collateral (if any) hereunder, the Debtors shall deliver to the Prepetition Agent and the PBGC the following:  (a) a written Budget Reconciliation Report in form and detail acceptable to the Prepetition Agent, which report shall compare and show on a line-item by line-item basis the Debtors' actual cash, revenue, receipts, income, expenditures and cash flow versus the amounts for such cash, revenue, receipts,

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

income, expenditures and cash flow projected by and in the Budget; and (b) any other financial reports reasonably requested by the Prepetition Agent or the PBGC.

(v)    There shall exist no Event of Default under this Interim Order or any other post-petition agreement entered into between any of the Debtors and the Prepetition Loan Parties.

(vi)    Other than with respect to the PLP Professionals, except for the Budget's line item expense and amount for the payment of professional fees and costs, as set forth herein, each of the Prepetition Agent and the PBGC expressly does not consent to the Debtors' use of the Prepetition Loan Parties' Cash Collateral for the payment of any payment of legal fees or expenses incurred by any professional or person employed at the expense of the Debtors', and each of their, bankruptcy estates.  Notwithstanding anything contained in this Interim Order to the contrary, the Debtors, and each of them, shall, before using any of the Prepetition Loan Parties' Cash Collateral and the Pension Plan's Cash Collateral (if any) to pay any "professional", including the Debtors' Court approved general reorganization counsel, shall first use any available "unencumbered" funds or cash which is not subject to the Prepetition Loan Parties' security interest to pay such "professionals."

(vii)    Notwithstanding any other provision of this Interim Order or the Loan Documents to the contrary, the Prepetition Loan Parties' pre-petition claims, rights, liens and security interests in connection with the Pre-Petition Collateral, as well as the PLP Post-Petition Liens and the PLP Super-Priority Claim (each as defined below), and the PBGC Post-Petition Liens and the PBGC Super-Priority Claim (each as defined below) shall be subject and subordinate to a carve-out (the "Carve-Out") for: (a) the payment of the Budget's line item expense and amount for legal fees and costs of the Debtors' Bankruptcy Court approved general reorganization counsel, and accountant/financial advisor, and noticing/claims agent, provided however, that notwithstanding anything contained in this Interim

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Order to the contrary, the Debtors, and each of them, shall, before using any of the Prepetition Loan Parties' Cash Collateral or the Pension Plan's Cash Collateral (if any) to pay any "professional", including the Debtors' Court approved general reorganization counsel, and accountant/financial advisor, and noticing/claims agent, shall first use any available "unencumbered" funds or cash which is not subject to the Prepetition Loan Parties' or Pension Plan's security interest to pay such "professionals"; and (b) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court; provided, however, the Carve-Out shall not include and shall exclude, and none of the Prepetition Loan Parties' Cash Collateral can be used or spent or disbursed in connection with investigating, researching, prosecuting or asserting any adversary proceeding, contested matter, claims, rights or causes of action against the Prepetition Loan Parties; provided that advisors to the Official Committee, if any, may investigate claims and issues with respect to the liens granted pursuant to the Loan Documents until the Committee Challenge Deadline at an aggregate expense for such investigation, but not litigation, prosecution, objection or challenge thereto, not to exceed $25,000.  So long as no Event of Default nor the Termination Date (as defined below) shall have occurred hereunder, the Debtors shall be permitted to use the Prepetition Loan Parties' Cash Collateral to pay, pursuant to the Budget and the terms and conditions of this Interim Order, fees and expenses of its general reorganization counsel allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable; provided, however, that the Prepetition Agent shall at all times retain the right to object to all fees, costs and compensation to the Debtors' professionals on any ground or for any reason.

13.  <u>Adequate Protection to Prepetition Loan Parties</u>.  As adequate protection for, *inter alia*, the Debtors' use of the Prepetition Loan Parties' Cash Collateral during the term of the Interim Order,

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

22

INTERIM ORDER

EXHIBIT "A"
Page 82

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

(i)     The Debtors collectively shall (a) on the first calendar day of each month, pay Prepetition Agent, as beneficiary and collateral agent of the Prepetition Lenders, the sum of interest due pursuant to Sections 2.7 and 2.8 of the Credit Agreement (and Prepetition Agent shall provide Debtors with an invoice for such interest no later than the 10th day of each calendar month), (b) each calendar month, reimburse the Prepetition Agent, within three days after receipt of notice from the Prepetition Agent of the amount of fees incurred by the Prepetition Loan Parties' legal and financial advisors and consultants (the "PLP Professionals") in these cases in the prior month, the professional fees of the PLP Professionals for the prior month, (c) within one business day of receipt by Debtors, or any of them, of any and all tax refunds, give written notice, by email and overnight mail, to the Prepetition Agent of the amount of such tax refund received along with a copy of the check, direct deposit documents or wire transfer documents evidencing the receipt, date and amount of such tax refund payment, and (d) with respect to such tax refund payments received, Debtors, and each of them, shall within five calendar days of receipt by Debtors, or any of them, of any and all such tax refunds, pay to the Prepetition Agent, as beneficiary and collateral agent of the Prepetition Lenders, all tax refund monies received, which shall be applied to the Debtors' obligations under the Credit Agreement and Loan Documents pursuant to the terms thereof.  Notwithstanding anything herein to the contrary, PLP Professional fees shall not be capped by the amount set forth in the Budget.  The Office of the United States Trustee shall be provided with the monthly invoices of the PLP Professionals and shall have an opportunity to object within ten (10) days of service thereof.

(ii)     All amounts due to the Prepetition Loan Parties hereunder shall be distributed to the Prepetition Loan Parties free and clear of any cost, claim, charge, assessment or liability including, without limitation, any such cost, claim or charge arising out of or based on, directly or indirectly, California Code of Civil

INTERIM ORDER

EXHIBIT "A"
Page 83

1   Procedure sections 726, 580(a) and/or 580(d), or sections 506(c) or 552(b) of the

2   Bankruptcy Code or otherwise.  The receipt and application of any money or

3   benefits by the Prepetition Loan Parties as a result of this Interim Order shall not be

4   considered an "action" for purposes of California Code of Civil Procedure sections

5   726, 580(a) and/or 580(d).  The automatic stay contained in Bankruptcy Code

6   Section 362 is hereby modified to permit the Prepetition Loan Parties to: (a)

7   implement and enforce the terms of this Interim Order; (b) receive and apply any

8   amounts agreed to be paid by, and paid by, the Debtors to the Prepetition Loan

9   Parties; (c) file any financing statements or other instruments and documents

10  necessary to maintain and/or continue their pre-petition security interests in, rights

11  to, and liens on the Pre-Petition Collateral; and (d) file any financing statements or

12  other instruments and documents, if any, evidencing the Prepetition Loan Parties'

13  security interests in, rights to, and liens on the Post-Petition Collateral (as defined

14  below).

15          (iii)      During the term of this Interim Order and as additional

16  adequate protection for the Prepetition Loan Parties' interests in the Pre-Petition

17  Collateral and Debtors' use of the same and the Prepetition Loan Parties' Cash

18  Collateral, the Prepetition Loan Parties shall have and are hereby granted (without

19  the necessity of the execution by the Debtors, or filing, of security agreements,

20  pledge agreements, mortgages, financing statements or otherwise), in accordance

21  with sections 361(2), 363(e) and 507(b) of the Bankruptcy Code: (i) valid, choate,

22  binding, enforceable, unavoidable and perfected first priority replacement

23  mortgages, liens and security interests (collectively, "PLP Post-Petition Liens") in

24  and to any and all post-petition assets of Debtors' estates other than causes of

25  action arising under sections 105, 506(c), 542, 543, 544, 545, 547, 548, 549, 550,

26  551, 552, and 553 of the Bankruptcy Code (collectively, the "Post-Petition

27  Collateral"); and (ii) an allowed priority claim superior to all administrative expenses

28  or priority claims of any kind, including those claims specified in, or ordered

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

pursuant to, sections 105, 326, 327, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or 1114 of the Bankruptcy Code, including, without limitation, administration expenses arising in connection with any superseding proceeding under chapter 7 of the Bankruptcy Code (the "PLP Super-Priority Claim").  Except as otherwise set forth herein (including in paragraph 14 below), the PLP Post-Petition Liens and the PLP Super-Priority Claim granted herein shall at all times: (i) not be subject to priming, subordination or being *pari passu* with any other claim or any other challenge; (ii) pursuant to sections 361(2), 363 and 364 of the Bankruptcy Code, be senior and superior to all other mortgages, liens, claims and security interests existing on the Petition Date, including, without limitation, mortgages, liens and security interests, if any, in favor of any governmental authority for any liability under federal or state environmental laws or regulations or for damages arising from or costs incurred by such governmental authority in response to a release or threatened release of a hazardous or toxic waste, substance or constituent, or other substance into the environment or otherwise, subject and subordinate only to: (a) the Carve-Out; and (b) all other valid, perfected and unavoidable security interests and liens existing as of the Petition Date to the extent such security interests and liens were senior to the pre-petition security interests and liens held by the Prepetition Loan Parties, including the PBGC Prior Lien, if any.  The PLP Post-Petition Liens shall be deemed perfected as of the commencement of the Debtors' chapter 11 cases and no notice or filing or recordation shall be required to effect such perfection and such PLP Post-Petition Liens shall not be subordinated to or made *pari passu* with any other lien or security interest (other than as specified in this Paragraph 13).

14.     Adequate Protection to PBGC.  During the term of this Interim Order and as additional adequate protection for the PBGC Liens on the Pre-Petition Collateral and Debtors' use of the same and the Pension Plan's Cash Collateral (if any), the Pension Plan shall have and is hereby granted (without the necessity of the execution by the

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1    Debtors, or filing, of security agreements, pledge agreements, mortgages, financing

2    statements or otherwise), in accordance with sections 361(2), 363(e) and 507(b) of the

3    Bankruptcy Code, (i) valid, choate, binding, enforceable, unavoidable and perfected

4    replacement mortgages, liens and security interests (the "PBGC Post-Petition Liens") in

5    and to the Post-Petition Collateral; and (ii) an allowed priority claim superior to all

6    administrative expenses or priority claims of any kind, including those claims specified in,

7    or ordered pursuant to, sections 105, 326, 327, 328, 330, 331, 503(b), 506(c), 507(a),

8    507(b), 726 or 1114 of the Bankruptcy Code, including, without limitation, administration

9    expenses arising in connection with any superseding proceeding under chapter 7 of the

10    Bankruptcy Code (the "PBGC Super-Priority Claim").  Except as otherwise set forth

11    herein, the PBGC Post-Petition Liens and the PBGC Super-Priority Claim granted herein

12    shall at all times: (i) not be subject to priming, subordination or being pari passu with any

13    other claim or any other challenge other than being primed (pursuant to a further order of

14    the court, subject to objection by the PBGC) by the liens securing and obligations under

15    debtor in possession financing provided by the Prepetition Loan Parties as contemplated

16    in the Motion; (ii) pursuant to sections 361(2), 363 and 364 of the Bankruptcy Code, be

17    senior and superior to all other mortgages, liens, claims and security interests existing on

18    the Petition Date, including, without limitation, mortgages, liens and security interests, if

19    any, in favor of any governmental authority for any liability under federal or state

20    environmental laws or regulations or for damages arising from or costs incurred by such

21    governmental authority in response to a release or threatened release of a hazardous or

22    toxic waste, substance or constituent, or other substance into the environment or

23    otherwise, subject and subordinate only to: (a) the Carve-Out; (b) the PLP Post-Petition

24    Liens and the PLP Super-Priority Claim; provided that the PLP Post-Petition Liens and

25    PLP Super-Priority Claim shall be subordinate to the PBGC Post-Petition Liens and PBGC

26    Super-Priority Claim to the extent necessary for adequate protection with respect to

27    collateral subject to any PBGC Prior Lien; and (c) all other valid, perfected and

28    unavoidable security interests and liens existing as of the Petition Date to the extent such

1  security interests and liens were senior to the Pension Plan's pre-petition statutory liens,

2  including the Prepetition Loan Parties' pre-petition liens.  The PBGC Post-Petition Liens

3  granted to the Pension Plan herein shall be deemed perfected as of the commencement

4  of the Debtors' chapter 11 cases and no notice or filing or recordation shall be required to

5  effect such perfection and the PBGC Post-Petition Liens shall not be subordinated to or

6  made pari passu with any other lien or security interest (other than as specified in this

7  Paragraph 14).

8         15.    <u>No Impairment of Rights</u>.  Nothing contained in this Interim Order shall limit,

9  impair or in any way affect (i) the Prepetition Loan Parties' rights at any time to seek relief

10 from the automatic stay to enforce any of their remedies under the Loan Agreement, the

11 Collateral Documents or applicable law; and (ii) the Debtors' right to seek additional use of

12 Cash Collateral.  Nothing herein is meant to, does, will, or shall be construed to, alter the

13 priority of the PBGC Liens, the PBGC Prior Lien and the Prepetition Loan Parties' liens.

14 Notwithstanding the expiration of any Challenge Period hereunder, the Prepetition Loan

15 Parties and the PBGC reserve all rights with respect to the relative priority of their

16 prepetition liens and the extent and amount of any PBGC Prior Lien.

17         16.    <u>Events of Default</u>.  Notwithstanding any other provision contained in this

18 Interim Order, the Debtors', and each of their, rights to use the Prepetition Loan Parties'

19 Cash Collateral and the Pension Plan's Cash Collateral (if any) pursuant to the terms and

20 conditions of this Interim Order shall immediately (subject to the three (3) business day

21 period referred to in the last sentence of this Paragraph 16) cease and terminate if any

22 one of the following events occurs (the date of any such events set forth above is referred

23 to in this Interim Order as an "<u>Event of Default</u>"):

24              (i)     Non-compliance by any of the Debtors with any of the terms or

25         provisions of this Interim Order, and such non-compliance remains uncured for a

26         period of five (5) calendar days following the date of written notice of such default

27         provided to the Debtors (however, such written notice and cure period does not

28         apply to the deadlines set forth in Paragraph 19 below);

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

(ii)    Entry of an order by the Bankruptcy Court converting or dismissing any of the Debtors' bankruptcy cases;

(iii)    Entry of an order by the Bankruptcy Court appointing a chapter 11 Trustee, chapter 7 Trustee, or an examiner with enlarged powers in any of the Debtors' bankruptcy cases;

(iv)    Other than as provided or allowed by this Interim Order, the existence of any claims or charges, or the entry of an order of the Bankruptcy Court authorizing any claims or charges, entitled to super-priority administrative claim status against any Debtor that are pari passu with or senior to the PLP Super-Priority Claim or the existence of any lien on the Post-Petition Collateral having a priority senior to or pari passu with the PLP Post-Petition Liens;

(v)    The Bankruptcy Court (or any appellate level court) orders the reversal, vacatur, stay, amendment, supplementation or other modification of this Interim Order (without the Prepetition Agent's consent);

(vi)    Entry of an order by the Bankruptcy Court granting the Prepetition Loan Parties or any other party in interest relief from the automatic stay with respect to the Pre-Petition Collateral or the Post-Petition Collateral, and such order is not vacated or stayed within three (3) business days of the entry thereof;

(vii)    Entry of an order by the Bankruptcy Court confirming any plan of reorganization (or liquidation) of the Debtors', or any of them, and the occurrence of the "Effective Date" of such plan;

(viii)    any person or entity obtains an order permitting the use of the Prepetition Loan Parties' Cash Collateral, Pre-Petition Collateral and Post-Petition Collateral without the Prepetition Agent's express written consent;

(ix)    any person or entity obtains an order permitting the use of the Pension Plan's Cash Collateral, Pre-Petition Collateral and Post-Petition Collateral, if any, without the PBGC's express written consent; and

1   (x) (a) provision to affected parties of a notice of intent to terminate

2   the Pension Plan under 29 U.S.C. § 1341(c) or (b) termination of the Pension Plan

3   under 29 U.S.C. § 1342.

4   The Debtors authorization to use the Prepetition Loan Parties' Cash Collateral

5   and the Pension Plan's Cash Collateral (if any) hereunder shall terminate upon the

6   Prepetition Loan Parties' filing of a declaration setting forth the facts evidencing the

7   occurrence of one of the above described Events of Default, unless the Debtors, or any of

8   them, have, no later than three (3) business days from the filing of the Prepetition Agent's

9   declaration, filed an evidentiary declaration(s) containing admissible evidence that rebuts

10  that an Event of Default has occurred.  Nothing herein shall preclude the Debtors from

11  seeking to obtain continued use of Cash Collateral provided that all rights, remedies, and

12  objections available to the Prepetition Loan Parties and the PBGC are fully preserved.

13  17.   Remedies.  Upon the occurrence of any of the events described in

14  paragraph 16, the Prepetition Loan Parties may also seek relief from the automatic stay.

15  Upon termination of the automatic stay as to the Prepetition Loan Parties:

16  (i)   The Prepetition Loan Parties may exercise their rights and

17  pursue their remedies under Article 9 of the Uniform Commercial Code, the

18  Freedom SPV II Deed of Trust, the Freedom SPV VI Deed of Trust and applicable

19  California law with respect to the foreclosure (whether judicial or nonjudicial) of real

20  property and personal property and may pursue its remedies with respect to the

21  Pre-Petition Collateral, including, without limitation, the Freedom SPV II Property

22  and the Freedom SPV VI Property, and the Post-Petition Collateral;

23  (ii)   The Prepetition Loan Parties may take any and all actions and

24  remedies which the Prepetition Loan Parties may deem appropriate, in good faith

25  and in a commercially reasonable manner, to proceed against and realize upon the

26  Post-Petition Collateral, including, but not limited to, all rights and remedies allowed

27  by all applicable laws of the United States or any state thereof and the Uniform

28  Commercial Code (and any applicable notice of foreclosure requirements under the

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Uniform Commercial Code including, but not limited to, the notice of sale requirements in order to hold a public or private sale or other disposition of collateral of § 9-504, or otherwise are waived);

(iii)    The Debtors, and each of them, and any chapter 11 or chapter 7 trustee or trustees appointed by the Bankruptcy Court shall, and by this Interim Order are each hereby directed to, cooperate with the Prepetition Loan Parties in the exercise of such rights and remedies held by the Prepetition Loan Parties; and

(iv)    The Prepetition Loan Parties shall be entitled to apply the payments or proceeds of the Pre-Petition Collateral and Post-Petition Collateral in accordance with the provisions of the Loan Documents, and in no event shall the Prepetition Loan Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of their Pre-Petition Collateral or Post-Petition Collateral or otherwise.

18.    <u>Implied Covenant of Good Faith and Fair Dealing</u>.  In order to secure the benefits hereunder, the Debtors' implied covenant of good faith and fair dealing shall be deemed to include that none of the Debtors shall support any action or take any action which could result in: (a) the use or disposition of the Prepetition Loan Parties' Cash Collateral, Pre-Petition Collateral and Post-Petition Collateral without the Prepetition Agent's express written consent, except with respect to a sale or other disposition of any of the foregoing that results in the Prepetition Loan Parties being indefeasibly paid in full in cash on account of its claim ; (b) expenditures different (whether in amount or line item expense) than as set forth in the Budget (other than with respect to the PLP Professionals); or (c) the "marshalling", "surcharge", or similar rights against the Prepetition Loan Parties pursuant to Bankruptcy Code section 506(c) and/or 552.

19.    <u>Termination Date</u>.  Notwithstanding any other provision contained herein, each of the Debtor's right to use the Prepetition Loan Parties' Cash Collateral and the Pension Plan's Cash Collateral (if any), pursuant to the terms and conditions of this Interim Order, shall expire and terminate on the date that is thirty (30) days following the

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1 Petition Date (the "Termination Date"), unless (i) further extended by one or more written

2 agreements between the Debtors, on the one hand, and the Prepetition Agent and the

3 PBGC, on the other hand, in accordance with Paragraph 38 below or (ii) superseded and

4 replaced by the Final Order (as defined below).  This Interim Order does not prohibit the

5 Debtors from filing any motion to use cash collateral after this Interim Order expires, or

6 prohibit the Prepetition Loan Parties or the PBGC, at any time, from seeking additional

7 adequate protection of their interests in the Pre-Petition Collateral or relief from or

8 modification of the automatic stay under section 362 of the Bankruptcy Code.

9       20.     Occurrence of Event of Default or Termination Date.  Upon the occurrence

10 of either an Event of Default or the Termination Date:

11             (i)      The Debtors', and each of their, rights to continue to use the

12 Prepetition Loan Parties' Cash Collateral and the Pension Plan's Cash Collateral (if

13 any) shall cease and terminate, pursuant to the terms and conditions of this Interim

14 Order, unless such use of the Prepetition Loan Parties' Cash Collateral and the

15 Pension Plan's Cash Collateral (if any) is expressly consented to by the Prepetition

16 Agent or the PBGC (as applicable) in writing or the Court orders otherwise;

17             (ii)     Each of the Prepetition Loan Parties and the PBGC may seek

18 to enforce their rights hereunder including by obtaining termination of the automatic

19 stay in the Debtors' cases, and each of them, to exercise their rights and remedies;

20             (iii)    The Prepetition Loan Parties, upon obtaining relief from the

21 automatic stay, may provide written notice by email, facsimile or overnight mail to

22 the Debtors, the Debtors' counsel, and any Committee counsel and upon the fifth

23 (5th) business day following the date of such notice, which notice shall be deemed

24 sufficient notice by the Prepetition Loan Parties to exercise their rights and pursue

25 its remedies under Article 9 of the Uniform Commercial Code, the Freedom SPV II

26 Deed of Trust, the Freedom SPV VI Deed of Trust and applicable California law

27 with respect to the foreclosure (whether judicial or nonjudicial) of real property and

28 personal property, the automatic stay shall be immediately vacated without any

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1   further order of the Bankruptcy Court to allow the Prepetition Loan Parties to

2   pursue its remedies with respect to the Pre-Petition Collateral, including, without

3   limitation, the Freedom SPV II Property and the Freedom SPV VI Property, and the

4   Post-Petition Collateral;

5          (iv)    The Prepetition Loan Parties, upon obtaining relief from the

6   automatic stay, is hereby authorized, in its discretion and without any further order

7   of the Bankruptcy Court, to take any and all actions and remedies which the

8   Prepetition Loan Parties may deem appropriate, in good faith and in a commercially

9   reasonable manner, to proceed against and realize upon the Post-Petition

10  Collateral, including, but not limited to, all rights and remedies allowed by all

11  applicable laws of the United States or any state thereof and the Uniform

12  Commercial Code (and any applicable notice of foreclosure requirements under the

13  Uniform Commercial Code including, but not limited to, the notice of sale

14  requirements in order to hold a public or private sale or other disposition of

15  collateral of § 9-504, or otherwise are waived);

16         (v)     The Debtors, and each of them, and any chapter 11 or chapter

17  7 trustee or trustees appointed by the Bankruptcy Court shall, and by this Interim

18  Order are each hereby directed to, cooperate with the Prepetition Loan Parties in

19  the exercise of such rights and remedies held by the Prepetition Loan Parties; and

20         (vi)    The Prepetition Loan Parties, upon obtaining relief from the

21  automatic stay, shall be entitled to apply the payments or proceeds of the Pre-

22  Petition Collateral and Post-Petition Collateral in accordance with the provisions of

23  the Loan Documents, and in no event shall the Prepetition Loan Parties be subject

24  to the equitable doctrine of "marshaling" or any other similar doctrine with respect

25  to any of their Pre-Petition Collateral or Post-Petition Collateral or otherwise.

26  21.    Exclusivity.  The Debtors' "exclusivity" to file a plan(s) of reorganization is

27  automatically terminated as to the Prepetition Loan Parties and the PBGC in the event

28  exclusivity is terminated earlier as to any other party.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

22.    <u>Final Order</u>.  The Debtors, and each of them shall have filed a motion to approve debtor-in-possession financing provided by and on terms acceptable to the Prepetition Agent on or about the Petition Date and to obtain a final order (the "<u>Final Order</u>") approving same by the Bankruptcy Court by no later than the date that is thirty (30) days following the Petition Date unless further extended by one or more written agreements between the Debtors, on the one hand, and the Prepetition Agent, on the other hand.  Notwithstanding anything to the contrary contained herein, in the event that any of the deadlines set forth in this paragraph are not complied with, the Debtors' right to use the Prepetition Loan Parties' Cash Collateral and the Pension Plan's Cash Collateral (if any) shall terminate upon the filing of a declaration by the Prepetition Agent setting forth the facts proving noncompliance with the deadlines of this paragraph unless the Debtors, or any of them, have, no later than three (3) business days from the filing of the Prepetition Agent's declaration, filed an evidentiary declaration(s) containing admissible evidence that rebuts the facts evidencing the noncompliance with the deadlines of this paragraph.  Nothing herein shall preclude the Debtors from seeking to obtain the continued use of Cash Collateral provided that all rights, remedies, and objections available to the Prepetition Loan Parties and the PBGC are fully preserved.

23.    <u>Preservation of Rights and Remedies</u>.  Unless otherwise set forth herein, all of the rights, remedies, benefits and protections provided to the Prepetition Loan Parties and the Pension Plan under this Interim Order shall survive the Termination Date, an Event of Default and the dismissal or conversion of these cases.

24.    <u>Section 506(c) Waiver</u>.  As further adequate protection to the Prepetition Loan Parties and the Pension Plan, the Debtors, and each of them, hereby waive and relinquish their respective rights to, and they, and each of them, shall not take any action or file any motion or application to, seek and obtain a surcharge pursuant to the provisions of Bankruptcy Code § 506(c) or any other similar provision or law with respect to any of the Pre-Petition Collateral, the Post-Petition Collateral or the proof(s) of claim filed or to be filed by the Prepetition Loan Parties or the PBGC.

25.   Section 552(b) Waiver.  As further adequate protection to the Prepetition Loan Parties, the Debtors, and each of them, hereby waive and relinquish their respective rights under and pursuant to Bankruptcy Code § 552(b), and they, and each of them, shall not take any action or commence any proceeding, adversary proceeding or contested matter to prevent the extension of the Prepetition Loan Parties' or the Pension Plan's liens, security interests, encumbrances and interests from extending to the proceeds, products, offspring or profits of the Prepetition Loan Parties' or the Pension Plan's collateral and security acquired after the commencement of these bankruptcy cases.

26.   Section 364(d) Waiver.  As further adequate protection to the Prepetition Loan Parties, the Debtors, and each of them, hereby waive and relinquish their respective rights to, and they, and each of them, shall not take any action to grant, and shall not grant and are prohibited and enjoined from granting any mortgages, security interests, liens or encumbrances, including liens created under section 364(d) of the Bankruptcy Code or otherwise, which are senior to or on a parity with the Prepetition Loan Parties' pre-petition security interests or liens in the Pre-Petition Collateral and the Prepetition Loan Parties' post-petition security interests or liens in the Post-Petition Collateral, and the Debtors expressly waive the right to seek such relief without first obtaining the written consent of the Prepetition Agent.

27.   Restriction on Payments.  Except as authorized by this Interim Order and the Budget or any other order of the Bankruptcy Court, no payments of any kind to any person or entity holding a lien, security interest or encumbrance on the Pre-Petition Collateral or the Post-Petition Collateral which is junior to the interests, liens, security interests or encumbrances of the Prepetition Loan Parties, or to any pre-petition unsecured creditors of the Debtors, or any of them, shall be made.

28.   Plan Consistent With Interim Order.  The Debtors shall not file, or take any action to support, any plan of reorganization (or liquidation) which: (i) is inconsistent with the Interim Order to the extent that the provisions hereof are still in effect at the time of filing such plan, or (ii) does not have the approval of the Prepetition Agent.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

29.    <u>Restrictions on Investigation; Funding</u>.  Notwithstanding anything contained in this Interim Order to the contrary or the Budget, the Debtors, and each of them, are each prohibited and enjoined from using, and shall not use, any of the Prepetition Loan Parties' Cash Collateral to pay for or finance any investigation, contested matter, avoidance action (or other litigation), or the commencement and prosecution of any matter or proceeding concerning, relating to or against Prepetition Agent, whether individually or as the beneficiary and collateral agent of the Prepetition Lenders, the Prepetition Lenders, or any of them, and/or the amounts due under the Credit Agreement, or any of the liens, encumbrances, security interests and interests of the Prepetition Loan Parties with respect to the Pre-Petition Collateral or the Post-Petition Collateral; provided that advisors to the Official Committee, if any, may investigate claims and issues with respect to the liens granted pursuant to the Loan Documents prior to the Committee Challenge Deadline at an aggregate expense for such investigation, but not litigation, prosecution, objection or challenge thereto, not to exceed $25,000.

30.    <u>Reporting Requirements</u>.

(i)    No later than ten (10) calendar days following a written request from the Prepetition Agent or the PBGC, the Debtors, and each of them, shall provide access to and deliver to the Prepetition Agent and the PBGC such financial and operating information as representatives of the Prepetition Agent and the PBGC shall reasonably request from time to time including, without limitation, all books and records relating to business operations and dealings of the Debtors, and each of them, and their subsidiaries, the Freedom SPV II Property and the Freedom SPV VI Property, which requests shall be made no more frequently than once every thirty (30) calendar days.  Further, the Prepetition Agent, and its representatives and agents, shall, within ten (10) calendar days following a written request from the Prepetition Agent, be allowed to visit, during normal business hours, and inspect the Freedom SPV II Property and the Freedom SPV VI Property; however, if any such real property leased to a tenant other than one of

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

the Debtors or any of their subsidiaries, such visit and inspection shall be made and conducted at the reasonable convenience of said tenant within fifteen (15) days from the Prepetition Agent's above referenced written notice to the Debtors. In connection with any such visit or inspection, the Prepetition Agent shall be entitled to have its appraiser, environmental inspector, or any third party inspector visit the Freedom SPV II Property and the Freedom SPV VI Property to appraise and inspect such property, and the Debtors, and each of them, shall reasonably cooperate in providing said appraiser, environmental inspector or other inspector full access to such property, and copies of any leases or other financial data concerning such property as the Prepetition Agent may reasonably request.

(ii)    During the term of this Interim Order, each of the Debtors shall provide to the Prepetition Agent and the PBGC, concurrently with their delivery/filing to the Office of the United States Trustee and/or the United States Bankruptcy Court, copies of each the Debtors' operating reports and all other papers and documents delivered to or filed with the Office of the United States Trustee and/or the United States Bankruptcy Court, including the Debtors' respective "7 Day Package."  Each of the Debtors also shall use reasonable efforts to deliver to Prepetition Agent and the PBGC as soon as available but no later than one (1) business day prior to filing, copies of all proposed pleadings, motions, applications, orders, financial information, and other documents to be filed by or on behalf of any Debtor with the United States Bankruptcy Court, or distributed by or on behalf of any Debtor to any official or unofficial committee appointed or appearing in these cases or any other party in interest.

31.    Cooperation; Allowance of Fees and Expenses of Prepetition Loan Parties. The Debtors' officers and employees shall each cooperate with the Prepetition Agent and the PBGC in all reasonable respects regarding any inquiry into any transactions occurring at any time.  All actual and reasonable fees and expenses of the Prepetition Loan Parties' representatives, auditors, financial consultants, accountants, appraisers and attorneys

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  shall constitute part of the Prepetition Loan Parties' allowed secured claim in the Debtors'

2  estates.  Nothing contained herein shall constitute a waiver by any of the Debtors or any

3  other party to challenge the reasonableness of said fees and expenses.

4      32.    Credit Bid Rights.  Except to the extent of the PBGC Prior Lien, if any, the

5  Prepetition Loan Parties shall have the right to credit bid a portion of or all of their

6  respective claims in connection with a sale of the Debtors' assets under section 363 of the

7  Bankruptcy Code or under a plan of reorganization.

8      33.    Binding on Third Parties; Survival.  The terms and conditions of the Interim

9  Order shall be binding upon, and inure to the benefit of the Prepetition Loan Parties,

10  PBGC and the Debtors, and their respective professionals, successors and assigns

11  (including but not limited to any trustee or trustees (or examiner with expanded powers)

12  hereafter appointed or elected under any chapter or section of the Bankruptcy Code as a

13  representative of any of the Debtors' estates).  The provisions of the Interim Order and

14  any actions taken pursuant hereto shall survive entry of any order including, without

15  limitation, orders:  (a) confirming any plan(s) of reorganization; (b) appointing a trustee in

16  these chapter 11 cases; (c) converting any of these chapter 11 cases from chapter 11 to

17  chapter 7; or (d) dismissing any of these cases, and the terms and provisions of the

18  Interim Order, as well as the priorities in payment, liens and security interests granted

19  pursuant to the Interim Order shall continue in full force and effect notwithstanding the

20  entry of such other order, until all of the obligations owing to the Prepetition Loan Parties,

21  the PBGC and professionals under the Interim Order are indefeasibly satisfied and

22  discharged in accordance with their terms.

23      34.    Enforceability of Interim Order.  If any or all of the provisions of this Interim

24  Order are hereafter reversed, modified, vacated or stayed by subsequent order of the

25  Bankruptcy Court or any other Court, such reversal, stay, modification or vacatur shall not

26  affect the validity and enforceability of any obligation, debt or claim incurred, or any

27  priority, security interest or lien that is or was incurred or granted pursuant to this Interim

28  Order.  Notwithstanding any stay, reversal, modification or vacatur of this Interim Order,

1   any obligations owing to the Prepetition Loan Parties or the Pension Plan arising prior to

2   the effective date of such stay, reversal, modification or vacatur, shall be governed in all

3   respects by the provisions of this Interim Order.  The Prepetition Loan Parties and the

4   Pension Plan shall be entitled to all of their respective rights, privileges and benefits

5   hereunder including, without limitation, the liens, security interests, priorities and collection

6   rights granted herein and therein to or for their benefit with respect to all obligations owing

7   to the Prepetition Loan Parties and the Pension Plan, all collateral securing same and the

8   priority granted therefor under Bankruptcy Code sections 363 and 364.

9       35.    No Waiver of Rights and Remedies; Consent.  The Prepetition Loan Parties

10  have not waived any of the Prepetition Loan Parties' rights or remedies contained in the

11  Credit Agreement and the Loan Documents, nor any other rights or remedies provided in

12  the Bankruptcy Code and the law pursuant thereto, including but not limited to, the

13  Prepetition Loan Parties' right to seek relief from the automatic stay or dismissal of these

14  chapter 11 cases.  Further, the Prepetition Loan Parties have not waived any of the

15  Prepetition Loan Parties' rights or remedies with respect to the Debtors', and each of their,

16  use of the Prepetition Loan Parties' funds and/or disposition of the Prepetition Loan

17  Parties' Pre-Petition Collateral, and proceeds thereof, prior to the Petition Date.

18  Notwithstanding anything to the contrary herein, all references to the consent of the

19  Prepetition Agent or the PBGC shall relate only to actions with respect to collateral in

20  which they have a senior interest, or in which the priority of their interest is undetermined.

21

22      36.    Impact of Prepetition Retainers on Carve-Out.  Notwithstanding anything to

23  the contrary herein or otherwise, in no event shall the Carve-Out be reduced by the

24  amount or application of any retainer or other payment made to the Debtors' court

25  approved general reorganization counsel, and accountant/financial advisor, and

26  noticing/claims agent prior to the commencement of the of the Debtors' bankruptcy cases.

27  However, before the Debtors' court approved general reorganization counsel, and

28  accountant/financial advisor, and noticing/claims agent can take, collect or apply the

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  Carve-Out, or any portion thereof, the Debtors' court approved general reorganization

2  counsel, and accountant/financial advisor, and noticing/claims agent must first exhaust

3  any and all the pre-petition retainers.

4      37.   <u>Notices</u>.  All notices required to or permitted to be given to the  Prepetition

5  Loan Parties under this Interim Order shall be addressed as follows:

6

7      Silver Point Finance, LLC
    Attention: Taylor Montague and Andrew Scott

8      Two Greenwich Plaza
    Greenwich, CT 06830

9      Fax: (203) 542-4124
    <u>ascott@silverpointcapital.com</u> and tmontague@silverpointcapital.com

10

11      Munger, Tolles & Olson LLP
    355 South Grand Avenue

12      Los Angeles, CA 90071
    Fax:  (213) 687-3702

13      <u>thomas.walper@mto.com</u> and seth.goldman@mto.com

14
    All notices required to or permitted to be given to the Debtors under the Interim

15  Order shall be addressed as follows:

16

17      Freedom Communications, Inc., *et al.*
    Attn: Rich Mirman

18      625 Grand Avenue
    Santa Ana, CA 92701

19      Email: rmirman@freedom.com

20      and

21      Lobel Weiland Golden Friedman LLP
    Attn:   William N. Lobel and Alan J. Friedman

22      650 Town Center Drive, Suite 950
    Costa Mesa, CA  92626

23      Fax No.:  (714) 966-1002
    Email: wlobel@wgllp.com and afriedman@wgllp.com

24

25      All notices required to or permitted to be given to the PBGC under the Interim Order

26  shall be addressed as follows:

27      Pension Benefit Guaranty Corporation
    Office of the Chief Counsel

28      Attn: Marc S. Pfeuffer

*(left margin, vertical)* **Lobel Weiland Golden Friedman LLP**
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1200 K Street, N.W., Suite 340
Washington, D.C. 20005-4026

With a copy to:

Pension Benefit Guaranty Corporation
Corporate Restructuring & Finance Department
1200 K Street, N.W., Suite 270
Washington, D.C. 20005-4026

The above addresses may be changed effective upon receipt of a notice of a new address. Except as expressly set forth otherwise herein, any notice required herein or permitted to be given shall be in writing and be personally served or sent by facsimile (upon confirmation of receipt) or email.  All notices and reports required to be given/delivered hereunder shall also be sent to counsel for any Official Committee, if one is appointed.

38.    <u>Modification of Interim Order</u>.  This Interim Order may be further modified or expanded by mutual agreement of the Debtors, and each of them, and the Prepetition Agent and the PBGC without the necessity of a further court order, and any such modified Interim Order shall have full force and effect for the specified term.  In addition, as set forth above, the Termination Date of the Interim Order and the Budget attached hereto may be modified and/or extended, as the case may be, by one or more written agreements between the Debtors, on the one hand, and the Prepetition Agent and the PBGC, on the other hand, without the need for any further order of the Court.  This Interim Order may not be modified without the express written consent of the Debtors, and each of them, and the Prepetition Agent and the PBGC or a court order.

39.    <u>No Waiver of Rights; Cumulative Remedies</u>.  No delay or failure of either the Debtors, or any of them, and the Prepetition Loan Parties in exercising any right, power or privilege, or any single or partial exercise thereof, or any abandonment or discontinuance of steps to enforce such a right, power, or privilege, shall be deemed to be a waiver of any right, power, or privilege.  The rights and remedies of the parties to this Interim Order are cumulative and not exclusive.  Any waiver, permit, consent or approval of any kind by

1  either party to this Interim Order of any breach or default hereunder, or any such waiver of

2  any provision or condition hereof, or further extension of time, or modification or

3  amendment hereof, must be in writing and shall be effective only to the extent set forth in

4  writing.

5      40.    Additional Documentation.  The Debtors, and each of them, and the

6  Prepetition Agent, at their expense, will execute, acknowledge, and deliver, or cause to be

7  executed, acknowledged and delivered, all such additional instruments and documents

8  which are reasonably necessary to effectuate the intent of the parties as specifically set

9  forth in this Interim Order.

10     41.    Independent Approval of Terms.  The Debtors, and each of them, and the

11  Prepetition Loan Parties and the PBGC have been involved in the negotiation, review, and

12  approval of the terms of this Interim Order, and each has had the opportunity to receive

13  independent legal advice from attorneys of its choice with respect to the advisability of

14  approving the terms of this Interim Order.  In the event of any dispute or controversy

15  regarding this Interim Order, the parties hereto shall be considered to be the joint authors

16  of this terms hereof, and no provision of this Interim Order shall be interpreted against a

17  party hereto because of authorship.

18     42.    Final Agreement.  Except as expressly provided herein, this Interim Order is

19  the final written expression and complete and exclusive statement of all of the

20  agreements, conditions, promises and covenants between the parties with respect to the

21  subject matter hereof and supersedes all prior or contemporaneous agreements,

22  negotiations, representations, understandings and discussions between the parties and/or

23  their respective counsel with respect to the subject matter covered hereby.  Any

24  amendment or modification to this Interim Order, in order to be legally binding, must be in

25  writing specifically referring to the Interim Order and signed by the Debtors, and each of

26  them, the Prepetition Loan Parties, and the PBGC.

27

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1    43.    <u>No Third Party Beneficiaries</u>.  Except for the Pension Plan, no rights are

2  intended to be created hereunder for the benefit of any third party or creditor or any direct

3  or indirect incidental beneficiary except as specifically provided for in this Interim Order.

4    44.    <u>Effectiveness</u>.  This Interim Order shall constitute findings of fact and

5  conclusions of law and shall take effect immediately upon execution hereof, and there

6  shall be no stay of execution of effectiveness of this Interim Order.

7                                   ###

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Lobel Weiland Golden Friedman LLP**
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-866-1000 · Fax 714-866-1002

EXHIBIT "A"
Page 102

SCHEDULE I

OTHER SECURED CREDITORS

| Debtor | Creditor | Amount |
|---|---|---|
| FCI | PBGC | $15,458,715 |
| FCHI | PBGC | $15,458,715 |
| FCHI | Stern/McEachen | $4,000,000 |
| SPV II | PBGC | $15,458,715 |
| SPV II | Stern/McEachen | $4,000,000 |
| SPV II | Caribou/OC Media | $2,145,239 |
| SPV II | Angelo Gordon | $10,000,000 |
| SPV VI | PBGC | $15,458,175 |
| 2100 Freedom | PBGC | $15,458,715 |
| Daily Press | PBGC | $15,458,715 |
| Freedom Colorado Information | PBGC | $15,458,715 |
| Freedom Newspaper Acquisition | PBGC | $15,458,715 |
| Freedom Newspapers | PBGC | $15,458,715 |
| Freedom Newspapers, Inc. | PBGC | $15,458,715 |
| Freedom Services, Inc. | PBGC | $15,458,715 |
| SPV I | PBGC | $15,458,715 |
| SPV IV | PBGC | $15,458,715 |
| SPV V | PBGC | $15,458,715 |
| OCR Community Publications, Inc | PBGC | $15,458,715 |
| Orange County Register Communications | PBGC | $15,458,715 |
| Victor Valley Publishing Company | PBGC | $15,458,715 |
| Victorville Publishing Company | PBGC | $15,458,715 |

EXHIBIT A

TO

INTERIM ORDER (A) AUTHORIZING DEBTORS TO (1) UTILIZE CASH COLLATERAL; (2)
PROVIDE ADEQUATE PROTECTION TO PREPETION SECURED PARTIES, AND (3)
GRANT RELATED RELIEF, AND (B) SETTING FINAL HEARING

Weekly Cash Flows Projection - 2015

Back To
INDEX

>>> 2016 >>>

| | Fcst 11/06/15 | Fcst 11/13/15 | Fcst 11/20/15 | Fcst 11/27/15 | Fcst 12/04/15 | Fcst 12/11/15 | Fcst 12/18/15 | Fcst 12/25/15 | Fcst 01/01/16 | Fcst 01/08/16 | Fcst 01/15/16 | Fcst 01/22/16 | Fcst 01/29/16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Accounts** | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | |
| Operating | 3,395,554 | 3,316,414 | 3,341,414 | 3,393,054 | 3,519,976 | 3,427,596 | 3,285,217 | 3,285,217 | 3,537,476 | 3,522,712 | 3,361,724 | 3,361,724 | 3,465,212 |
| Other (including Inter Account Transfers In) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Receipts | 3,395,554 | 3,316,414 | 3,341,414 | 3,393,054 | 3,519,976 | 3,427,596 | 3,285,217 | 3,285,217 | 3,537,476 | 3,522,712 | 3,361,724 | 3,361,724 | 3,465,212 |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Payroll & Benefits | 340,200 | 2,035,000 | 305,700 | 2,520,000 | 655,200 | 2,035,000 | 305,700 | 2,520,000 | 655,200 | 2,075,700 | 555,000 | 2,325,700 | 272,500 |
| Paper & Ink | 574,500 | 582,500 | 574,500 | 642,500 | 574,500 | 582,500 | 574,500 | 642,500 | 642,000 | 526,000 | 531,000 | 526,000 | 541,000 |
| Purchased Content | 33,011 | 32,911 | 32,911 | 32,911 | 32,911 | 33,030 | 33,050 | 33,050 | 33,050 | 32,137 | 31,984 | 31,984 | 31,984 |
| Outside Services | 756,000 | 987,000 | 851,000 | 969,000 | 756,000 | 987,000 | 804,000 | 1,016,000 | 736,000 | 731,000 | 1,036,000 | 731,000 | 1,036,000 |
| Operating Supplies & Materials | 88,242 | 75,454 | 75,454 | 75,454 | 75,454 | 79,805 | 80,530 | 80,530 | 80,530 | 82,075 | 82,333 | 82,333 | 82,333 |
| Repairs & Maintenance | 51,982 | 49,188 | 49,188 | 49,188 | 49,188 | 51,543 | 51,936 | 51,936 | 51,936 | 49,977 | 49,651 | 49,651 | 49,651 |
| Promotion and Marketing | 42,291 | 46,206 | 46,206 | 46,206 | 46,206 | 41,317 | 40,502 | 40,502 | 40,502 | 40,376 | 40,355 | 40,355 | 40,355 |
| Postage, Office Supplies, Dues, and Subscriptions | 22,083 | 20,495 | 20,495 | 20,495 | 20,495 | 26,536 | 27,543 | 27,543 | 27,543 | 19,697 | 18,390 | 18,390 | 18,390 |
| Travel, Meals, and Entertainment | 13,198 | 14,187 | 14,187 | 14,187 | 14,187 | 18,719 | 19,475 | 19,475 | 19,475 | 31,138 | 31,416 | 31,416 | 31,416 |
| Training, Seminars, Events, and Communications | 1,514 | 1,441 | 1,441 | 1,441 | 1,441 | 1,288 | 1,263 | 1,263 | 1,263 | 1,131 | 1,109 | 1,109 | 1,109 |
| Insurance | 0 | 0 | 0 | 0 | 130,500 | 0 | 0 | 0 | 130,500 | 0 | 0 | 0 | 0 |
| Utilities, Rent, and Lease | 157,000 | 29,000 | 607,100 | 180,000 | 32,000 | 29,000 | 557,100 | 180,000 | 36,000 | 25,000 | 10,000 | 682,100 | 77,000 |
| Taxes (non-income) | 75,000 | 75,000 | 50,000 | 50,000 | 50,000 | 626,974 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| Total Operating Disbursements | 2,155,020 | 3,948,381 | 2,628,181 | 4,601,381 | 2,438,080 | 4,512,714 | 2,545,599 | 4,662,799 | 2,503,999 | 3,664,232 | 2,437,237 | 4,570,037 | 2,231,737 |
| **Capital Expenditures and Income Taxes** | | | | | | | | | | | | | |
| Capital Expenditures | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Income Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Capital Expeditures and Income Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Debt, Financing & Other Disbursements** | | | | | | | | | | | | | |
| Interest Payments | 0 | 0 | 0 | 193,750 | 0 | 0 | 0 | 0 | 193,750 | 0 | 0 | 0 | 187,500 |
| Principal Payments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bank Fees and Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Debt related disbursements | 0 | 0 | 0 | 193,750 | 0 | 0 | 0 | 0 | 193,750 | 0 | 0 | 0 | 187,500 |
| Other Misc Disbursements | 0 | 0 | 0 | 0 | 500,000 | 500,000 | 500,000 | 500,000 | 0 | 0 | 0 | 0 | 0 |
| Restructuring Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Lobel, Weiland & Golden, LLP | 0 | 0 | 0 | 0 | 300,000 | 0 | 0 | 0 | 275,000 | 0 | 0 | 0 | 375,000 |
| GlassRatner Advisory & Capital Group | 0 | 0 | 0 | 65,000 | 0 | 65,000 | 0 | 0 | 0 | 0 | 65,000 | 0 | 0 |
| Donlin Recano | 0 | 0 | 15,000 | 0 | 0 | 0 | 15,000 | 0 | 0 | 0 | 0 | 15,000 | 0 |
| Squar Milner | 0 | 0 | 10,000 | 0 | 0 | 0 | 10,000 | 0 | 0 | 0 | 0 | 10,000 | 0 |
| Silver Point Counsel | 0 | 0 | 0 | 250,000 | 0 | 0 | 0 | 0 | 250,000 | 0 | 0 | 0 | 250,000 |
| Rutan | 0 | 0 | 0 | 25,000 | 0 | 0 | 0 | 25,000 | 0 | 0 | 0 | 0 | 25,000 |
| US Trustee Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 48,000 |
| Counsel - Creditors Committee | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 50,000 | 0 | 0 | 50,000 | 0 | 0 |
| InterAccount Transfers Out | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Disbursements - Total** | 2,155,020 | 3,948,381 | 2,653,181 | 5,135,131 | 3,238,080 | 5,077,714 | 3,120,599 | 5,187,799 | 3,222,749 | 3,664,232 | 2,552,237 | 4,595,037 | 3,117,237 |
| Cash - Beginning | 1,043,733 | 2,284,267 | 1,652,301 | 2,340,535 | 598,457 | 3,880,353 | 2,230,236 | 2,394,853 | 492,271 | 806,998 | 665,478 | 1,474,965 | 241,651 |
| **DIP Facility (single draw)** | | | | | 3,000,000 | | | | | | | | |
| Change in Cash | 1,240,534 | (631,966) | 688,234 | (1,742,077) | 281,896 | (1,650,117) | 164,617 | (1,902,583) | 314,727 | (141,520) | 809,486 | (1,233,314) | 347,975 |
| **Operating Cash - Ending** | 2,284,267 | 1,652,301 | 2,340,535 | 598,457 | 3,880,353 | 2,230,236 | 2,394,853 | 492,271 | 806,998 | 665,478 | 1,474,965 | 241,651 | 589,626 |

EXHIBIT "B"

William N. Lobel, State Bar No. 93202
wlobel@lwgfllp.com
Alan J. Friedman, State Bar No. 132580
afriedman@lwgfllp.com
Beth E. Gaschen, State Bar No. 245894
bgaschen@lwgfllp.com
Christopher J. Green, State Bar No. 295874
cgreen@lwgfllp.com
**LOBEL WEILAND GOLDEN FRIEDMAN LLP**
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Telephone   714-966-1000
Facsimile    714-966-1002

Proposed Attorneys for
Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

| In re | Case No. 8:15-bk-15311-MW |
|---|---|
| FREEDOM COMMUNICATIONS, INC., a Delaware corporation, *et al.*,[1] | Chapter 11 (Jointly Administered with Case Nos. 8:15-bk-15312-MW; 8:15-bk-15313-MW; 8:15-bk-15315-MW; 8:15-bk-15316-MW; 8:15-bk-15317-MW; 8:15-bk-15318-MW; 8:15-bk-15319-MW; 8:15-bk-15320-MW; 8:15-bk-15321-MW; 8:15-bk-15322-MW; 8:15-bk-15323-MW; 8:15-bk-15324-MW; 8:15-bk-15325-MW; 8:15-bk-15326-MW; 8:15-bk-15327-MW; 8:15-bk-15328-MW; 8:15-bk-15329-MW; 8:15-bk-15330-MW; 8:15-bk-15332-MW; 8:15-bk-15337-MW; 8:15-bk-15339-MW; 8:15-bk-15340-MW; 8:15-bk-15342-MW; 8:15-bk-15343-MW) |
| Debtors and Debtors-in-Possession. | |
| Affects: | |
| ☒  All Debtors | |
| ☐  Freedom Communications, Inc., a Delaware corporation, ONLY | |

[1] The last four digits of the Debtors' federal tax identification numbers are as follows: Freedom Communications, Inc. (0750); Freedom Communications Holdings, Inc. (2814); Freedom Services, Inc. (3125); 2100 Freedom, Inc. (7300); OCR Community Publications, Inc. (9752); Daily Press, LLC (3610); Freedom California Mary Publishing, Inc. (4121); Freedom California Ville Publishing Company LP (7735); Freedom Colorado Information, Inc. (7806); Freedom Interactive Newspapers, Inc. (9343); Freedom Interactive Newspapers of Texas, Inc. (8187); Freedom Newspaper Acquisitions, Inc. (4322); Freedom Newspapers (7766); Freedom Newspapers, Inc. (3240); Freedom Newspapers of Southwestern Arizona, Inc. (5797); OCR Information Marketing, Inc. (7983); Odessa American (7714); Orange County Register Communications, Inc. (7980); Victor Valley Publishing Company (6082); Victorville Publishing Company (7617); Freedom SPV II, LLC (8253); Freedom SPV VI, LLC (8434); Freedom SPV I, LLC (3293); Freedom SPV IV, LLC (8500); and Freedom SPV V, LLC (9036).  The Debtors' mailing address is 625 N. Grand Avenue, Santa Ana, California 92701.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1 ☐ Freedom Communications Holdings, Inc., a Delaware corporation, ONLY

2

3 ☐ Freedom Services, Inc., a Delaware corporation, ONLY

4 ☐ 2100 Freedom, Inc., a Delaware corporation, ONLY

5

6 ☐ OCR Community Publications, Inc., a California corporation, ONLY

7 ☐ Daily Press, LLC, a California limited liability company, ONLY

8

9 ☐ Freedom California Mary Publishing, Inc., a California corporation, ONLY

10 ☐ Freedom California Ville Publishing Company LP, a California limited

11 partnership, ONLY

12 ☐ Freedom Colorado Information, Inc., a Delaware corporation, ONLY

13

14 ☐ Freedom Interactive Newspapers, Inc., a California corporation, ONLY

15 ☐ Freedom Interactive Newspapers of Texas, Inc., a Delaware corporation, ONLY

16

17 ☐ Freedom Newspaper Acquisitions, Inc., a Delaware corporation, ONLY

18 ☐ Freedom Newspapers, a Texas general partnership, ONLY

19

20 ☐ Freedom Newspapers, Inc., a Delaware corporation, ONLY

21 ☐ Freedom Newspapers of Southwestern

22 Arizona, Inc., a California corporation, ONLY

23 ☐ OCR Information Marketing, Inc., a California corporation, ONLY

24

25 ☐ Odessa American, a Texas general partnership, ONLY

26 ☐ Orange County Register

27 Communications, Inc., a California corporation, ONLY

28 ☐ Victor Valley Publishing Company, a

**FINAL ORDER AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362 AND 364, (B) UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (C) PROVIDE ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (D) REPAY CERTAIN PREPETITION SECURED DEBT AND (E) GRANT RELATED RELIEF**

California corporation, ONLY

☐ Victorville Publishing Company, a California limited partnership, ONLY

☐ Freedom SPV II, LLC, a Delaware limited liability company, ONLY

☐ Freedom SPV VI, LLC, a Delaware limited liability company, ONLY

☐ Freedom SPV I, LLC, a Delaware limited liability company, ONLY

☐ Freedom SPV IV, LLC, a Delaware limited liability company, ONLY

☐ Freedom SPV V, LLC, a Delaware limited liability company, ONLY

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (each, a "Debtor" and collectively, the "the Debtors") in the above-captioned chapter 11 cases (the "Cases" or "Chapter 11 Cases"), pursuant to sections 105, 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Procedure of the United States Bankruptcy Court for the Central District of California (the "Local Rules"), seeking:

(I)     authorization for Debtor Freedom Communications Holdings, Inc. ("Freedom Holdings") and Debtor Freedom Communications, Inc., ("Freedom Communications", and together with Freedom Holdings, the "Borrowers") to obtain postpetition financing consisting of a senior secured term loan credit facility in the aggregate principal amount not to exceed $3 million, plus the amount necessary to consummate the Refinancing in full in accordance with the terms of this Order and

---

[2] Capitalized terms utilized in this Final Order that are not otherwise defined, shall have the meanings ascribed to such terms in the Motion.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

the DIP Document (the "DIP Facility" and together with all agreements, documents, guarantees, certificates and instruments delivered or executed from time to time in connection therewith, as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "DIP Documents") from Silver Point Finance, LLC, as agent (in such capacity, the "DIP Agent"), and the lenders party thereto from time to time (the "DIP Lenders");

(II)    authorization for Debtor 2100 Freedom Holdings, Inc. ( "2100 Holdings") and the other Debtors (collectively with 2100 Holdings, the "Guarantors") to unconditionally guarantee on a joint and several basis the Borrowers' obligations arising under the DIP Facility;

(III)    authorization for the Debtors to execute and enter into the DIP Documents to which they are a party and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(IV)    authorization for the Borrowers to use proceeds of the DIP Facility (a) for working capital and general corporate purposes in accordance with the Approved Budget (as defined below) and (b) to refinance in full all obligations outstanding under the Prepetition Credit Agreement[3] (as defined below), including all principal, interest, fees, make-whole amounts, expenses and other charges accrued through the date of payment (the "Refinancing");

(V)    authorization for the Debtors to use Cash Collateral (as defined below) pursuant to sections 361, 362 and 363 of the Bankruptcy Code as provided herein;

(VI)    authorization for the Debtors to provide adequate protection to the Prepetition Secured Parties (as defined below) on the terms set forth herein;

_____

[3] A true and correct copy of the Prepetition Credit Agreement is attached hereto as Exhibit B.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

(VII)    authorization to grant first priority superpriority claims to the DIP Agent and the DIP Lenders and first priority liens in favor of the DIP Agent for the benefit of the DIP Lenders on all prepetition and postpetition property of the Debtors' estates and all proceeds thereof, excluding a lien on Avoidance Actions (as defined below) but including a lien on any Avoidance Proceeds (as defined below);

(VIII)    a waiver by the Debtors of any right to surcharge against the DIP Collateral or Prepetition Collateral (as each are defined below) pursuant to section 506(c) of the Bankruptcy Code or otherwise;

(IX)    modification of the automatic stay set forth in section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Documents and this Order;

(X)    a waiver of any applicable stay with respect to the effectiveness and enforceability of this Order (including under Bankruptcy Rule 6004);  and

(XI)    the granting of related relief.

The hearing on the Motion (the "Hearing") having been held by this Court on November [__], 2015, and based upon all of the pleadings filed with this Court in respect of the Motion; and based upon the record made by the Debtors at the Hearing; and it appearing that the relief granted in this Final Order is in the best interests of the Debtors and the Debtors' estates and creditors; the Debtors having given notice of the Motion and it appearing that no further notice need be given; and after due deliberation and consideration and sufficient cause appearing therefor;

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED**, that:

1.    Jurisdiction.  This Court has core jurisdiction over these chapter 11 cases, the Motion, and the parties and property affected hereby under 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    Notice.  The notice given by the Debtors of the Motion and the Hearing was given to: (a) the Office of the United States Trustee for the Central District of California –

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  Santa Ana Division, (b) counsel to the DIP Agent and the DIP Lenders; (c) counsel to the

2  Prepetition Lenders and the Prepetition Agent (as defined below); (d) the Pension Benefit

3  Guaranty Corporation; (e) United States Securities and Exchange Commission; (f) the

4  Internal Revenue Service; (g) the Office of the United States Attorney for the Central

5  District of California; (h) the parties included on the Debtors' consolidated list of thirty (30)

6  largest unsecured creditors; (i) all other known parties asserting a lien against the

7  Debtors' assets; and (j) any parties that have filed with the Court requests for notice of all

8  matters in accordance with Bankruptcy Rule 2002.  To the extent necessary, the Court

9  waives compliance with Local Bankruptcy Rule 9075-1 and approves service (in addition

10  to the means of service set forth in such Local Bankruptcy Rule) by overnight or electronic

11  delivery.  Such notice constitutes due and sufficient notice under the circumstances and

12  complies with Bankruptcy Rules 4001(b) and applicable Local Rules.  No further notice of

13  the relief sought at the Hearing is necessary or required.

14        3.    <u>Creditors' Committee Formation</u>.  No statutory committee of unsecured

15  creditors has yet been appointed in the chapter 11 cases (a "<u>Committee</u>").

16        4.    <u>Interim Order</u>.  On November **[__]**, 2015, the Court entered an *Interim Order*

17  *(A) Authorizing Debtors To (1) Utilize Cash Collateral Pursuant To 11 U.S.C. § 363, (2)*

18  *Provide Adequate Protection To Prepetition Secured Parties, And (3) Grant Related*

19  *Relief, And (B) Setting Final Hearing* (the "<u>Interim Order</u>").

20        5.    <u>The Debtors' Stipulations</u>.  Subject to the rights of other parties in interest as

21  set forth in paragraph 27 below, each of the stipulations made by the Debtors set forth in

22  Paragraph 5(A) through (T) of the Interim Order and the findings in Paragraph 9 thereof,

23  including the Debt Amount and the Make-Whole Amount (each as defined therein), are

24  hereby incorporated by reference into this Order, and the Debtors further admit, stipulate

25  and agree that:

26        a.    <u>The Prepetition Credit Agreement</u>.

27        i.    The Borrowers, the Guarantors, Silver Point Finance, LLC, as

28  administrative agent and collateral agent (in such capacity, the "<u>Prepetition Agent</u>"),

EXHIBIT "B"
Page 110

1  and the lenders party thereto (the "Prepetition Lenders" and, together with the

2  Prepetition Agent, the "Prepetition Loan Parties") are parties to that certain Credit

3  and Guaranty Agreement dated as of November 21, 2013 (as amended,

4  supplemented or otherwise modified from time to time, the "Prepetition Credit

5  Agreement", and together with all agreements, documents, certificates and

6  instruments delivered or executed from time to time in connection therewith, as

7  amended, restated, amended and restated, supplemented, or otherwise modified

8  from time to time in accordance with the terms thereof, collectively, the "Prepetition

9  Loan Documents"), pursuant to which the Prepetition Lenders made loans and

10  other extensions of credit available to the Borrowers.

11       ii.     As of the Petition Date, the outstanding aggregate principal amount

12  due by the Debtors under the Prepetition Credit Agreement was $12,007,790

13  (together with all other outstanding Obligations, as defined in the Prepetition Credit

14  Agreement, including interest, fees, expenses, make-whole amounts, and other

15  charges, the "Prepetition Debt").

16       iii.     To secure the Prepetition Debt, the Debtors entered into various

17  security and collateral documents, pursuant to which the Borrowers and the other

18  obligors thereunder, including the other Debtors, granted to the Prepetition Agent,

19  for the benefit of the Prepetition Lenders, valid, binding, perfected, first-priority liens

20  and security interests (the "Prepetition Senior  Liens") in substantially all of their

21  assets, including, without limitation, the following (each as defined in the Prepetition

22  Loan Documents): (a) Accounts; (b) Books; (c) Chattel Paper; (d) Commercial Tort

23  Claims; (e) Deposit Accounts; (f) Documents; (g) Equipment; (h) Farm Products; (i)

24  Fixtures; (j) General Intangibles; (k) Goods (including, without limitation, Inventory

25  and Equipment); (l) Inventory; (m) Instruments; (n) Insurance; (o) Intellectual

26  Property; (p) Investment Related Property; (q) Letter of Credit Rights; (r) Money; (s)

27  Receivables and Receivables Records; (t) Securities Accounts; (u) to the extent not

28  otherwise included above, all Collateral Records, Collateral Support and

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  Supporting Obligations relating to any of the foregoing; and (v) to the extent not

2  otherwise included above, all Proceeds, products, accessions, rents and profits of

3  or in respect of any of the foregoing.  In addition, to secure the Prepetition Debt, the

4  applicable Debtors executed and delivered to the Prepetition Agent, for the benefit

5  of the Prepetition Lenders, deeds of trust on certain real property assets owned by

6  them.  The foregoing is collectively referred to as the "Prepetition Collateral".

7  b.     The Prepetition Senior Liens are valid, binding, enforceable, non-avoidable

8  and perfected liens in the Prepetition Collateral and the Prepetition Debt constitutes the

9  legal, valid, binding, enforceable and non-avoidable obligations of the applicable Debtors,

10 enforceable against them in accordance with their respective terms (other than in respect

11 of the stay of enforcement arising from section 362 of the Bankruptcy Code).  No portion

12 of the Prepetition Senior Liens or Prepetition Debt is subject to any challenge or defense,

13 including avoidance, reduction, offset, attachment, disallowance, disgorgement,

14 recharacterization, surcharge, recovery or subordination pursuant to the Bankruptcy Code

15 or applicable nonbankruptcy law.

16 c.     The Prepetition Debt and the Prepetition Collateral are not and shall not be

17 subject to any attachment, contest, attack, rejection, recoupment, reduction, defense,

18 counterclaim, setoff, offset, recharacterization, avoidance or other claim (as "claim" is

19 defined by section 101(5) of the Bankruptcy Code), impairment, disallowance,

20 counterclaim, subordination (whether equitable, contractual, or otherwise), cause of action

21 or any other challenge of any nature under the Bankruptcy Code (including, without

22 limitation, under chapter 5 of the Bankruptcy Code), under applicable nonbankruptcy law

23 or otherwise (including, without limitation, any applicable state Uniform Fraudulent

24 Transfer Act or Uniform Fraudulent Conveyance Act).

25 d.     Subject to the reservation of rights set forth in paragraph 27 below, including

26 the expiration of the Challenge Period, the Debtors and their estates hereby absolutely

27 and unconditionally forever waive, discharge and release each of the Prepetition Loan

28 Parties and each of their respective present and former predecessors, successors,

1  assigns, affiliates, members, partners, managers, current and former equity holders,

2  agents, attorneys, financial advisors, consultants, officers, directors, employees and other

3  representatives thereof (all of the foregoing, solely in their respective capacities as such,

4  collectively, the "Prepetition Loan Party Releasees") of any and all "claims" (as defined in

5  the Bankruptcy Code), counterclaims, actions, causes of action (including, without

6  limitation, causes of action in the nature of "lender liability"), defenses, demands, debts,

7  accounts, contracts, liabilities, setoff, recoupment or other offset rights against any and all

8  of the Prepetition Loan Party Releasees, whether arising at law or in equity, relating to

9  and/or otherwise in connection with the Prepetition Debt, the Prepetition Senior Liens

10  and/or the Prepetition Collateral, from the beginning of time until immediately preceding

11  the entry of this Order, including, without limitation, (i) any recharacterization,

12  subordination, avoidance or other claim arising under or pursuant to section 105 or

13  chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state

14  law, federal law or municipal law and (ii) any right or basis to challenge or object to the

15  amount, validity or enforceability of the applicable Prepetition Debt or any payments made

16  on account of the applicable Prepetition Debt, or the validity, enforceability, priority or non-

17  avoidability of the applicable Prepetition Senior Liens or the Prepetition Collateral securing

18  the applicable Prepetition Debt.

19      e.    As of the Petition Date, the Debtors had obligations outstanding to each of

20  the creditors identified on Schedule 1 hereto (collectively, the "Other Prepetition Creditors"

21  and, together with the Prepetition Loan Parties, the "Prepetition Secured Parties") in the

22  amounts set forth therein (the "Other Secured Debt"), including the Pension Benefit

23  Guaranty Corporation (the "PBGC"), and such Other Secured Debt was secured by the

24  Prepetition Collateral as described on said schedule (the "Prepetition Junior Liens").  The

25  Debtors acknowledge and agree that the Prepetition Junior Liens and the Other Secured

26  Debt are junior and subordinate to the Prepetition Senior Liens and the Prepetition Debt to

27  the extent provided by applicable law and/or as reflected in certain intercreditor and

28  subordinate agreements executed by the applicable Other Prepetition Creditor in favor

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

28422342.6 1044353.1          9          FINAL ORDER

EXHIBIT "B"
Page 113

1  of the Prepetition Loan Parties prior to the Petition Date; provided that the liens of the

2  PBGC, if any, may have priority pursuant to 26 U.S.C. § 6321, et seq. and applicable law

3  (the "PBGC Prior Lien").

4       6.    Cash Collateral.  For purposes of this Order, the term "Cash Collateral,"

5  including, without limitation, all cash proceeds of Prepetition Collateral, shall have the

6  meaning ascribed to it in section 363(a) of the Bankruptcy Code.

7       7.    Use of Cash Collateral.  The Debtors are hereby authorized, subject to the

8  terms and conditions of the DIP Documents and this Order, and in accordance with the

9  Approved Budget (as defined below), to use Cash Collateral, during the period from the

10 entry of this Order until the Termination Date (as defined below) for working capital and

11 general corporate and other permitted purposes.  For the avoidance of doubt, from and

12 after the date of entry of this Order, the Debtors' use of Cash Collateral shall be governed

13 solely by the terms of this Order, and this Order shall supersede the terms of the Cash

14 Collateral Stipulation, except as expressly provided herein. The Debtors' right to use the

15 Cash Collateral shall terminate automatically on the earlier of:  (i) the Term Loan Maturity

16 Date, as defined in the DIP Credit Agreement; and (ii) the Termination Date.

17      8.    Findings Regarding the DIP Financing and Use of Cash Collateral.

18      a.    Good cause has been shown for the entry of this Order.

19      b.    The Debtors have a need to obtain the financing provided under the DIP

20 Facility and to have continuous access to Cash Collateral for the operation of their

21 businesses, to preserve their going concern value, to pay vendors, suppliers and

22 customers, to satisfy payroll obligations, to consummate the Refinancing, to pay for

23 certain costs and expenses related to the Chapter 11 Cases and to satisfy the Debtors'

24 other working capital and operational needs.  Access to sufficient working capital and

25 liquidity made available through the DIP Facility and the use of Cash Collateral as

26 provided hereunder is vital to the preservation and maintenance of the Debtors' going

27 concern value and to the Debtors' successful reorganization.

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1   c.   The Debtors are unable to obtain sufficient financing on more favorable

2   terms from sources other than the DIP Lenders under the DIP Documents and are unable

3   to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy

4   Code as an administrative expense.  The Debtors are also unable to obtain secured credit

5   allowable solely under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy

6   Code, without the Debtors (i) granting first priority priming liens on the DIP Collateral and

7   the Superpriority Claims (as defined below) and (ii) refinancing the Prepetition Debt in full

8   upon entry of this Order.

9   d.   The DIP Agent and the DIP Lenders are willing to provide the DIP Facility,

10   subject to the terms and conditions set forth in the DIP Documents and the provisions of

11   this Order, so long as the DIP Liens (as defined below), the Superpriority Claims and

12   other protections granted by this Order and the DIP Documents will not be affected by any

13   subsequent reversal or modification of this Order or any other order, as provided in

14   section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility approved by

15   this Order.  The DIP Agent and the DIP Lenders have acted in good faith in agreeing to

16   provide the DIP Facility approved by this Order and to be further evidenced by the DIP

17   Documents and their reliance on the assurances referred to above is in good faith.

18   e.   Among other things, entry of this Order will minimize disruption of the

19   Debtors' businesses and operations by enabling them to meet payroll and satisfy other

20   critical expenses, including vendor and professional fees.  The DIP Facility as set forth

21   herein is vital to avoid irreparable loss or harm to the Debtors' estates, which will

22   otherwise occur if access to the DIP Facility is not obtained.  Consummation of the DIP

23   Facility pursuant to the terms of this Order therefore is in the best interests of the Debtors'

24   estates.

25   f.   Based upon the record before the Bankruptcy Court, the DIP Documents,

26   the DIP Facility, the use of Cash Collateral and the Adequate Protection Provisions (as

27   defined below), each as authorized hereunder, have been negotiated at arm's length and

28   in good faith among the Debtors, the DIP Agent and the DIP Lenders, and the terms of the

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1  DIP Facility, the use of Cash Collateral and the Adequate Protection Provisions authorized

2  pursuant to this Order are fair and reasonable under the circumstances, reflect the

3  Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are

4  supported by reasonably equivalent value and fair consideration, and are in the best

5  interests of the Debtors, their estates and creditors.  All of the Debtors' obligations and

6  indebtedness arising under, in respect of or in connection with the DIP Facility and the

7  DIP Documents, including the Obligations (as defined in the DIP Documents, collectively,

8  the "DIP Obligations"), the use of Cash Collateral and the Adequate Protection Provisions,

9  shall be deemed to have been extended by the DIP Agent and the DIP Lenders and their

10  affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and

11  in express reliance upon the protections offered by section 364(e) of the Bankruptcy

12  Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code

13  in the event that this Order or any provision hereof is vacated, reversed or modified on

14  appeal or otherwise.

15      g.      This Court concludes that entry of this Order is in the best interests of the

16  Debtors and their estates and creditors as its implementation will, among other things,

17  allow the Debtors to facilitate their chapter 11 goals and maximize the value of their

18  assets.

19      9.      Authorization of the DIP Facility and the DIP Documents.

20      a.      The Borrowers are hereby authorized to borrow under the DIP Facility, and

21  the other Debtors are hereby authorized to guarantee such borrowings as well as the

22  other DIP Obligations, up to an aggregate principal amount of $3 million, plus the amount

23  necessary to consummate the Refinancing in full in accordance with the terms of this

24  Order and the DIP Documents.

25      b.      The Debtors are hereby authorized and directed to execute, issue, deliver,

26  enter into and adopt, as the case may be, the DIP Documents to be delivered pursuant

27  hereto or thereto or in connection herewith or therewith, including, without limitation, the

28  Approved Budget.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  c.    In furtherance of the foregoing and without further approval of this Court,

2 each Debtor is authorized and directed to perform all acts, to make, execute and deliver

3 all instruments and documents (including, without limitation, the execution or recordation

4 of security agreements, mortgages and financing statements), and, without further

5 application to the Court, to pay all fees and expenses required to be paid under this Order

6 and the DIP Documents, including, without limitation, the reasonable fees and out-of-

7 pocket expenses of the DIP Agent and the DIP Lenders, including professional fees.

8  d.    The Debtors are further hereby authorized to execute, deliver and perform

9 one or more amendments, waivers, consents or other modifications to and under the DIP

10 Documents, in such form as the Debtors and the DIP Agent may agree, and no further

11 approval of the Bankruptcy Court shall be required for amendments, waivers, consents or

12 other modifications to and under the DIP Documents (and any reasonable fees paid in

13 connection therewith) that do not (i) shorten the maturity or the scheduled termination date

14 thereunder, or (ii) increase the commitments or the rate of interest (other than invoking the

15 default rate upon an Event of Default) payable thereunder.

16  e.    The Debtors are further hereby authorized and directed to (i) make the non-

17 refundable payment to the DIP Agent or the DIP Lenders, as the case may be, of any fees

18 and other amounts due, including any reimbursement of indemnified obligations referred

19 to in the DIP Documents (and in any separate letter agreements between such applicable

20 parties and the Debtors in connection with the DIP Facility) and reasonable costs and

21 expenses as may be due from time to time, including, without limitation, the reasonable

22 fees and expenses of the professionals retained by the DIP Agent and the DIP Lenders as

23 provided for in the DIP Documents (whether incurred pre-or post-petition), without the

24 need to file retention motions or fee applications or to obtain Court approval; (ii) perform

25 all other acts required under or in connection with the DIP Documents, including the

26 granting and perfection of the DIP Liens and the Superpriority Claims as provided herein

27 and therein; and (iii) cause the execution and delivery of and performance under the DIP

28 Facility's guarantees.

f.    Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with the terms of the DIP Documents and this Order. No obligation, payment, transfer or grant of a security or other interest under the DIP Documents or this Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, set-off, recoupment or counterclaim.

g.    The Debtors' borrowings from the DIP Lenders under the DIP Facility and this Order will be used in a manner consistent with the terms and conditions of the applicable DIP Documents, this Order and in accordance with and to the extent set forth in the Approved Budget, solely (i) for working capital and other general corporate purposes, including the payment of fees and expenses of the Debtors, any statutory committee, the DIP Agent and the DIP Lenders, and the Prepetition Loan Parties, in connection with the Chapter 11 Cases and as provided herein and (ii) to consummate the Refinancing, except that (A) if any Prepetition Debt is subsequently reinstated after the payment thereof because such payment (or any portion thereof) is required to be returned or repaid to the Debtors or the DIP Lenders then such Prepetition Senior Liens shall be reinstated and (B) such reinstated Prepetition Senior Liens shall be junior and subordinate in all respects to the DIP Liens (such junior liens and security interests of the Prepetition Loan Parties are hereinafter referred to as the "Contingent Liens", and any such reinstated Prepetition Debt described in clause (A) of this sentence is hereinafter referred to as the "Contingent Prepetition Debt").  The Prepetition Loan Parties shall deliver or cause to be delivered, at the Debtors' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Agent and the DIP Lenders or other documents, in each case as reasonably requested by the Debtors or the DIP Agent in order to effectuate and/or evidence the repayment of the Prepetition Debt.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

14

FINAL ORDER

EXHIBIT "B"
Page 118

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1    h.    In the event that the Prepetition Loan Parties (in their capacities as such) are

2  ordered by the Bankruptcy Court, and such order is not stayed pending an appeal, to

3  disgorge, refund or in any manner repay to the Debtors or their estates any amounts (the

4  "Disgorged Amounts") leading to Contingent Prepetition Debt, the Disgorged Amounts

5  shall be placed in a segregated interest bearing account in which the Prepetition Loan

6  Parties shall have a first priority lien upon, pending a further final, non-appealable order of

7  a court of competent jurisdiction regarding the distribution of such Disgorged Amounts.

8    i.    Neither the proceeds from the DIP Loans nor any Cash Collateral shall be

9  loaned or advanced to, or invested in (in each case, directly or indirectly), any entity that is

10  not a Debtor, and any amounts loaned or advanced to, or invested in, any Guarantor shall

11  be evidenced by an intercompany note, in form and substance reasonably satisfactory to

12  the DIP Agent, for the full amount of the proceeds so loaned, advanced or invested, which

13  intercompany note shall be pledged to the DIP Agent for the benefit of the DIP Lenders, to

14  secure the DIP Obligations (as defined herein).

15    j.    In no event shall the DIP Lenders or the Prepetition Loan Parties be subject

16  to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP

17  Collateral or the Prepetition Collateral, as applicable.

18    10.    Superpriority Claims.

19    a.    Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP

20  Obligations shall constitute allowed superpriority senior administrative expense claims

21  against the Debtors with priority over any and all administrative expense claims, adequate

22  protection claims and all other claims against the Debtors, now existing or hereafter

23  arising, of any kind whatsoever, including, without limitation, all administrative expense

24  claims of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and

25  over any and all administrative expenses or other claims arising under sections 105, 326,

26  328, 330, 331, 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 726, 1113

27  or 1114 of the Bankruptcy Code (the "Superpriority Claims"), whether or not such

28  expenses or claims may become secured by a judgment lien or other non-consensual

1  lien, levy or attachment, which allowed claims shall be payable from and have recourse to

2  all pre-petition and post-petition property of the Debtors and their estates and all proceeds

3  thereof, subject only to the payment of the Carve-Out (as defined below) to the extent

4  specifically provided for herein.  Any payments, distributions or other proceeds received

5  on account of such Superpriority Claims shall be promptly delivered to the DIP Agent to

6  be applied or further distributed by the DIP Agent on account of the DIP Obligations in

7  such order as is specified in this Order and the DIP Documents.  The Superpriority Claims

8  shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event

9  that this Order or any provision hereof is vacated, reversed or modified, on appeal or

10 otherwise.

11        b.    For purposes hereof, the "Carve-Out" means (i) all fees required to be paid

12 to the Clerk of the Bankruptcy Court and to the U.S. Trustee under 28 U.S.C. § 1930(a)

13 and 31 U.S.C. § 3717 (as to the U.S. Trustee, in such amount as agreed to by the U.S.

14 Trustee or Order of the Court); (ii) all reasonable fees and expenses incurred by a trustee

15 appointed under section 701 of the Bankruptcy Code in an amount not to exceed $25,000;

16 and (iii) to the extent allowed at any time, but subject in all respects to the Approved

17 Budget and the terms of this Order, all accrued and unpaid fees, disbursements, costs

18 and expenses ("Professional Fees") (other than any monthly fee, restructuring fee, sale

19 fee or other success fee of any investment bankers or financial advisors of the Debtors),

20 incurred by professionals or professional firms retained by either the Debtors or the

21 Creditors' Committee, if any, whose retention has been approved by the Court during

22 these Cases pursuant to sections 327 and 1103 of the Bankruptcy Code (collectively,

23 "Professional Persons"), at any time before or on the first business day following delivery

24 by any DIP Agent of a Carve Out Trigger Notice (as defined below), to the extent such

25 Professional Fees are provided for in the Approved Budget and are allowed by the

26 Bankruptcy Court whether prior to or after delivery of a Carve Out Trigger Notice (the

27 foregoing being the "Carve-Out Cap").  For purposes of the foregoing, the term "Carve-

28 Out Trigger Notice" shall mean a written notice delivered by the DIP Agent to the Debtors

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1 and their lead counsel, the U.S. Trustee, counsel to the Prepetition Agent, and lead

2 counsel to the Creditors' Committee, if any, which notice may be delivered following the

3 occurrence and during the continuation of an Event of Default under the applicable DIP

4 Documents, expressly stating that the Carve-Out Cap is invoked and the Event of Default

5 that is alleged to have occurred and be continuing.  For the avoidance of doubt and

6 notwithstanding anything to the contrary herein or elsewhere, the Carve-Out shall be

7 senior to all DIP Obligations.  Nothing herein shall be construed to impair the ability of any

8 party to object to the allowance by the Court of any of the fees, expenses, reimbursement

9 or compensation described in clauses (i), (ii), and (iii) above.

10         c.      The DIP Agent and DIP Lenders shall not be responsible for the direct

11 payment or reimbursement of any fees or disbursements of any Professional Persons

12 incurred in connection with these Chapter 11 Cases or any successor cases under any

13 chapter of the Bankruptcy Code or to fund the Carve-Out.

14         11.     DIP Liens.  As security for the DIP Obligations, effective and perfected upon

15 the date of this Order and without the necessity of the execution, recordation of filings by

16 the Debtors of mortgages, security agreements, control agreements, pledge agreements,

17 financing statements or other similar documents, or the possession or control by the DIP

18 Agent or any DIP Lender of, or over, any DIP Collateral, the security interests and liens

19 identified below are granted to the DIP Agent for its own benefit and the benefit of the DIP

20 Lenders (all property identified in clauses (a), (b), (c), (d) and (e) below, together with all

21 other property to which the DIP Agent is granted a lien under the applicable DIP

22 Documents (other than as expressly excluded pursuant to this Order), being collectively

23 referred to as the "DIP Collateral"), subject to (i) the terms of the DIP Facility and (ii) the

24 Carve-Out as provided herein (all such liens and security interests granted to the DIP

25 Agent, for its benefits and for the benefit of the DIP Lenders, pursuant to this Order and

26 the DIP Documents, the "DIP Liens").  Notwithstanding the foregoing, the DIP Agent may

27 take any action (and is, to the extent necessary in connection therewith, hereby granted

28 relief from the automatic stay), to evidence, confirm, validate or perfect, or to ensure the

1  contemplated priority of, such liens, and the Debtors shall execute and deliver to the DIP

2  Agent all such financing statements, notices and other documents as the DIP Agent may

3  reasonably request in connection therewith, including account control agreements or other

4  documentation in respect of and evidencing perfection of all collection and deposit

5  accounts to the extent required by the DIP Documents.

6          a.    First Lien on Unencumbered Property.  Pursuant to section 364(c)(2) of the

7  Bankruptcy Code, the DIP Agent, for the benefit of the DIP Lenders, shall have a valid,

8  binding, continuing, enforceable, fully-perfected first priority senior security interest in and

9  lien upon all pre- and postpetition tangible and intangible property of the Debtors and the

10 Debtors' estates, whether now existing or hereafter acquired or arising, that, on or as of

11 the Petition Date, is not subject to valid, perfected and non-avoidable liens (or to valid

12 liens in existence as of the Petition Date that are subsequently perfected as permitted by

13 section 546(b) of the Bankruptcy Code) (collectively, "Unencumbered Property"), including

14 without limitation, all inventory, accounts, accounts receivable, general intangibles, chattel

15 paper, contracts, owned real estate, real and personal property leaseholds, property,

16 plants, fixtures, machinery, equipment, as-extracted collateral, vehicles, vessels, deposit

17 accounts, commercial tort claims, tax refunds, insurance proceeds, documents, equity

18 interests, books and records, cash and cash collateral of the Debtors (whether maintained

19 with the DIP Agent or otherwise) and any investment of such cash and cash collateral,

20 letter of credit rights, patents, copyrights, trademarks, trade names, rights under license

21 agreements and other intellectual property and stock of subsidiaries, and the proceeds,

22 products, offspring and profits of all of the foregoing.

23         b.    Priming Liens on Prepetition Collateral.  Pursuant to section 364(d)(1) of the

24 Bankruptcy Code, the DIP Agent, for the benefit of the DIP Lenders, shall have a valid,

25 binding, continuing, enforceable, fully-perfected first-priority senior priming lien on and

26 security interest upon all pre- and post-petition property of the Debtors, including, without

27 limitation, all Prepetition Collateral, all inventory, accounts, accounts receivable, general

28 intangibles, chattel paper, contracts, owned real estate, real and personal property

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

EXHIBIT "B"
Page 122

1  leaseholds, property, plants, fixtures, machinery, equipment, as-extracted collateral,

2  vehicles, vessels, deposit accounts, commercial tort claims, tax refunds, insurance

3  proceeds, documents, equity interests, books and records, cash and cash collateral of the

4  Debtors (whether maintained with the DIP Agent or otherwise) and any investment of such

5  cash and cash collateral, letter of credit rights, patents, copyrights, trademarks, trade

6  names, rights under license agreements and other intellectual property and stock of

7  subsidiaries, and the proceeds, products, offspring and profits of all of the foregoing,

8  whether now existing or hereafter acquired, that is subject to the existing liens (i) presently

9  securing the Prepetition Debt and/or the Other Secured Debt  or (ii) that will secure the

10  Contingent Prepetition Debt in accordance with this Order.  Such DIP Liens shall be

11  senior in all respects to the interests in such property of the Prepetition Secured Parties

12  arising from current and future liens of the Prepetition Secured Parties (including, without

13  limitation, the Contingent Liens, the Prepetition Senior Liens, the Prepetition Junior Liens,

14  the PBGC Prior Lien, and the Adequate Protection Liens (as defined below)).

15          c.      Liens Junior to Certain Other Liens.  Pursuant to section 364(c)(3) of the

16  Bankruptcy Code, the DIP Agent, for the benefit of the DIP Lenders, shall have a valid,

17  binding, continuing, enforceable, fully-perfected junior security interest in and lien upon all

18  pre- and postpetition tangible and intangible property of the Debtors and the Debtors'

19  estates (other than property described in clauses (a), (b), or (d) of this paragraph 11, as to

20  which the liens and security interests in favor of the DIP Agent will be as described in such

21  clauses), whether now existing or hereafter acquired, that is subject to valid, perfected

22  and unavoidable liens in existence immediately prior to the Petition Date, or to any valid

23  and unavoidable liens in existence immediately prior to the Petition Date that are

24  perfected subsequent to the Petition Date as permitted by section 546(b) of the

25  Bankruptcy Code (in each case, other than the Prepetition Senior Liens, the Prepetition

26  Junior Liens, the Contingent Liens, and the Adequate Protection Liens), to the extent such

27  liens were permitted to be incurred under the Prepetition Loan Documents on a senior

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  secured basis (in any event not including any PBGC Prior Lien) (collectively, the

2  "Permitted Priority Liens").

3        d.    Liens Senior to Certain Other Liens.  The DIP Liens shall not be subject or

4  subordinate to (i) any lien or security interest that is avoided and preserved for the benefit

5  of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) unless

6  otherwise expressly permitted under the DIP Documents, any liens arising after the

7  Petition Date including, without limitation, any liens or security interests granted in favor of

8  any federal, state, municipal or other domestic or foreign governmental unit (including any

9  regulatory body), commission, board or court for any liability of the Debtors.

10        e.    Notwithstanding the foregoing clauses (a), (b), (c) and (d), the DIP Collateral

11  shall exclude the Debtors' claims and causes of action under sections 502(d), 544, 545,

12  547, 548, 549, 550 and 553 of the Bankruptcy Code, or any other avoidance actions

13  under the Bankruptcy Code (collectively, "Avoidance Actions"), but shall include any

14  proceeds or property recovered, unencumbered or otherwise the subject of successful

15  Avoidance Actions, whether by judgment, settlement or otherwise ("Avoidance

16  Proceeds").

17        **ADEQUATE PROTECTION OF PREPETITON SECURED PARTIES**

18        12.    Adequate Protection of Prepetition Loan Parties.  Until (i) the Refinancing

19  has been consummated and (ii) the Challenge Period has expired with no challenge

20  having been brought or, if such a challenge is brought, upon the entry of a final judgment

21  resolving such challenge in favor of the Prepetition Loan Parties, the Prepetition Loan

22  Parties are entitled, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy

23  Code, to adequate protection of their interest in the Prepetition Collateral, including the

24  Cash Collateral, for the aggregate diminution in the value of the Prepetition Loan Parties'

25  interest in the Prepetition Collateral, whether on account of the Prepetition Debt or the

26  Contingent Prepetition Debt, or both, including, without limitation, any such diminution

27  resulting from the sale, lease or use by the Debtors (or other decline in value) of Cash

28  Collateral and any other Prepetition Collateral, the priming of the Prepetition Loan Parties'

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  security interests and liens in the Prepetition Collateral by the DIP Agent and the DIP

2  Lenders pursuant to the DIP Documents and this Order, and the imposition of the

3  automatic stay pursuant to section 362 of the Bankruptcy Code.  As adequate protection,

4  the Prepetition Loan Parties are hereby granted the following (collectively, the "Senior

5  Adequate Protection Provisions"):

6          a.       Senior Adequate Protection Liens.  The Prepetition Loan Parties are hereby

7  granted (effective and perfected as of the Petition Date and without the necessity of the

8  execution by the Debtors of mortgages, security agreements, pledge agreements,

9  financing statements or other agreements) (i) a replacement security interest in and lien

10 upon all the DIP Collateral (such liens, the "Senior Adequate Protection Liens") and (ii) the

11 Contingent Liens to secure any Contingent Prepetition Debt.  Without limiting the

12 generality of the foregoing, (A) the Senior Adequate Protection Liens and the Contingent

13 Prepetition Liens granted to the Prepetition Loan Parties hereunder shall be junior and

14 subordinate in all respects to the DIP Liens, the Permitted Priority Liens, the PBGC Prior

15 Lien and the Carve-Out; (B) the Contingent Prepetition Debt shall be junior and

16 subordinate in right of payment to all DIP Obligations and the Carve-Out; (C) until such

17 time as all of the DIP Obligations are indefeasibly paid in full in cash in accordance with

18 the DIP Documents and this Order, the Prepetition Loan Parties shall have no right to

19 seek or exercise any enforcement rights or remedies in connection with the Contingent

20 Prepetition Debt, the Contingent Liens or the Senior Adequate Protection Liens, including,

21 without limitation, in respect of the occurrence or continuance of any Event of Default (as

22 defined in the Prepetition Credit Agreement); (D) the Prepetition Loan Parties shall be

23 deemed to have consented to any sale or disposition of DIP Collateral permitted under the

24 DIP Facility or approved, arranged for or by the DIP Agent or the requisite DIP Lenders,

25 and shall terminate and release upon any such sale or disposition all of its liens on and

26 security interests in such DIP Collateral (where the DIP Agent also releases any DIP Liens

27 as necessary); (E) the Prepetition Loan Parties shall deliver or cause to be delivered, at

28 the Debtors' costs and expense (for which the Prepetition Loan Parties shall be

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1    reimbursed upon submission to the Debtors of invoices or billing statements), any

2    termination statements, releases or other documents necessary to effectuate and/or

3    evidence the release and termination of any Prepetition Loan Parties' liens on or security

4    interests in any portion of the DIP Collateral subject to any sale or disposition permitted

5    under the DIP Facility or approved or arranged for by the DIP Agent or any of the DIP

6    Lenders (where the DIP Agent also releases any DIP Liens as necessary); and (F) upon

7    (i) the consummation of the Refinancing and (ii) the expiration of the Challenge Period (as

8    defined below), so long as no challenge has been asserted or, if asserted, has been

9    resolved in favor of the Prepetition Loan Parties, and the payment to the Prepetition Loan

10   Parties of all amounts owed by the Debtors under the Prepetition Loan Documents and

11   this Order, the Contingent Liens and the Senior Adequate Protection Liens shall terminate

12   and be released (automatically and without further action of the parties), and the

13   Prepetition Loan Parties shall execute and deliver such agreements to evidence and

14   effectuate such termination and release as the Debtors or the DIP Agent may request,

15   and the Debtors and the DIP Agent shall be authorized to file on behalf of the Prepetition

16   Loan Parties such UCC termination statements or such other filings as may be applicable

17   to the extent such authorization is required under the Uniform Commercial Code of the

18   applicable jurisdiction.

19        b.    Sections 503(b) and 507(b) Claim.  The Prepetition Loan Parties are hereby

20   granted, subject to the Carve-Out, a superpriority claim (the "Senior Adequate Protection

21   Claim"), as provided for in sections 503(b) and 507(b) of the Bankruptcy Code,

22   immediately junior to the Superpriority Claims and any other claims under section

23   364(c)(1) of the Bankruptcy Code held by the DIP Agent and the DIP Lenders, and

24   payable from and having recourse to all DIP Collateral; provided, however, that the

25   Prepetition Loan Parties shall not receive or retain any payments, property or other

26   amounts in respect of the superpriority claims under sections 503(b) and 507(b) of the

27   Bankruptcy Code granted hereunder or under the Prepetition Loan Documents unless and

28   until the DIP Obligations have indefeasibly been paid in full in cash in accordance with the

1  DIP Documents; and provided further, that the Prepetition Loan Parties hereby irrevocably

2  waive the section 503(b) claim granted to them by this Order upon the expiration of the

3  Challenge Period with no challenge having been brought or, if such a challenge is

4  brought, upon the entry of a final judgment resolving such challenge in favor of the

5  Prepetition Loan Parties.

6      c.      Fees and Expenses.  The Debtors are authorized and directed under

7  sections 361, 363 and 364 of the Bankruptcy Code to pay all reasonable fees, costs,

8  expenses and disbursements (whether incurred pre-or post-petition) of the Prepetition

9  Loan Parties's legal and financial advisors, and any other consultants retained in

10 accordance with the Prepetition Loan Documents, promptly upon receipt of invoices

11 therefor without the need to file retention motions or fee applications (collectively, the

12 "Adequate Protection Payments").

13      13.     Adequate Protection of Other Prepetition Creditors. On account of their

14 respective Other Secured Debt, the Other Prepetition Creditors are entitled, pursuant to

15 sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of

16 their respective interests in the Prepetition Collateral for the aggregate diminution in the

17 value thereof resulting from the sale, lease or use by the Debtors thereof, the priming of

18 their respective Prepetition Junior Liens pursuant to the DIP Facility, and the imposition of

19 the automatic stay pursuant to section 362 of the Bankruptcy Code.  As adequate

20 protection, the Other Prepetition Creditors are hereby granted the following (collectively,

21 the "Junior Adequate Protection Provisions" and, collectively with the Senior Adequate

22 Protection Provisions, the "Adequate Protection Provisions"):

23      a.      Junior Adequate Protection Liens.  The Other Prepetition Creditors are

24 hereby granted in the same order of priority as their Prepetition Junior Liens (effective and

25 perfected as of the Petition Date and without the necessity of the execution by the Debtors

26 of mortgages, security agreements, pledge agreements, financing statements or other

27 agreements), a replacement security interest in and lien upon all the DIP Collateral (such

28 liens, the "Junior Adequate Protection Liens" and, together with the Senior Adequate

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1 | Protection Liens, the "Adequate Protection Liens"), subject and subordinate to (v) the

2 | Prepetition Senior Liens and the Contingent Liens, if necessary, (w) the DIP Liens, (x) the

3 | Carve-Out, (y) any Permitted Priority Liens and the PBGC Prior Liens, and (z) the Senior

4 | Adequate Protection Liens.  Without limiting the generality of the foregoing, (A) until such

5 | time as all of the DIP Obligations are indefeasibly paid in full in cash in accordance with

6 | the DIP Documents and this Order and the Refinancing has occurred and is no longer

7 | subject to challenge, the Other Prepetition Creditors shall have no right to seek or

8 | exercise any enforcement rights or remedies in connection with the Junior Adequate

9 | Protection Liens or their Prepetition Junior Liens; (B) the Other Prepetition Creditors shall

10 | be deemed to have consented to any sale or disposition of DIP Collateral permitted under

11 | the DIP Facility or approved and shall terminate and release upon any such sale or

12 | disposition all of the Prepetition Junior Liens in any Prepetition Collateral or DIP Collateral

13 | (where the DIP Agent also releases any DIP Liens as necessary); and (C) the Other

14 | Prepetition Creditors shall deliver or cause to be delivered, any termination statements,

15 | releases or other documents necessary to effectuate and/or evidence the release and

16 | termination of any Prepetition Junior Liens in any portion of the Prepetition Collateral or

17 | the DIP Collateral subject to any sale or disposition permitted under the DIP Facility or

18 | approved or arranged for by the DIP Agent (where the DIP Agent also releases any DIP

19 | Liens as necessary).

20 |          b.          Sections 503(b) and 507(b) Claim.  In the same order of priority as the

21 | Junior Adequate Protection Liens, the Other Prepetition Creditors are hereby granted a

22 | superpriority claim (the "Junior Adequate Protection Claim" and, together with the Senior

23 | Adequate Protection Claim, the "Adequate Protection Claims"), as provided for in sections

24 | 503(b) and 507(b) of the Bankruptcy Code, that is subject to or subordinate to the

25 | Superiority Claims, the DIP Obligations, the Prepetition Debt, any other claims under

26 | section 364(c)(1) of the Bankruptcy Code held by the DIP Agent and the DIP Lenders, the

27 | Senior Adequate Protection Claim and the Contingent Debt; provided, however, that the

28 | Other Prepetition Creditors shall not receive or retain any payments, property or other

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1   amounts in respect of the superpriority claims under sections 503(b) and 507(b) of the

2   Bankruptcy Code granted hereunder unless and until the DIP Obligations have

3   indefeasibly been paid in full in cash in accordance with the DIP Documents and the

4   Refinancing has occurred and is no longer subject to challenge.

5        14.   <u>Sufficiency of Adequate Protection</u>.

6        a.   Under the circumstances and given that the Adequate Protection Provisions

7   are consistent with the Bankruptcy Code, the Bankruptcy Court finds that such adequate

8   protection is reasonable and sufficient to protect the interests of the Prepetition Secured

9   Parties.  Except as expressly provided herein, nothing contained in this Order (including,

10  without limitation, the authorization of the use of any Cash Collateral) shall impair or

11  modify any rights, claims or defenses available in law or equity to any Prepetition Loan

12  Party, the DIP Agent or any DIP Lenders.

13       b.   Except to the extent of the Carve Out, no expenses of administration of

14  these Chapter 11 Cases or any future proceeding that may result therefrom, including a

15  case under Chapter 7 of the Bankruptcy Code, shall be charged against or recovered from

16  the DIP Collateral or the Prepetition Collateral pursuant to section 506(c) of the

17  Bankruptcy Code, the enhancement of collateral provisions of section 552 of the

18  Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation,

19  unjust enrichment) or any similar principle of law, without the prior written consent of the

20  DIP Agent or the Prepetition Agent, as the case may be with respect to their respective

21  interests, and no consent shall be implied from any action, inaction or acquiescence by

22  the DIP Agent or the Prepetition Agent.  The Senior Adequate Protection Provisions (A)

23  shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code or, subject to

24  entry of the Final Order, section 506(c) of the Bankruptcy Code or the "equities of the

25  case" exception of section 552 of the Bankruptcy Code, (B) shall not be subordinate to, or

26  pari passu with, (x) any lien that is avoided and preserved for the benefit of the Debtors

27  and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any

28  intercompany or affiliate liens or claims of the Debtors, and (C) shall be valid and

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

EXHIBIT "B"
Page 129

1  enforceable against any trustee, any other estate representative or litigation trust

2  appointed in these Cases or any successor cases, and/or upon the dismissal of any of

3  these Cases.

4       15.  Proceeds of Subsequent Financing.  If the Debtors, any trustee, any

5  examiner with enlarged powers, any responsible officer or any other estate representative

6  subsequently appointed in these Chapter 11 Cases or any successor cases, shall obtain

7  credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) in

8  violation of the DIP Documents at any time prior to the indefeasible repayment in full in

9  cash of all DIP Obligations and the termination of the DIP Agent's and the DIP Lenders'

10  obligation to extend credit under the DIP Facility, including subsequent to the confirmation

11  of any plan with respect to the Debtors and the Debtors' estates, and such financing is

12  secured by any DIP Collateral, then all the cash proceeds derived from such credit or debt

13  shall immediately be turned over to the DIP Agent to be applied as set forth the DIP

14  Documents.

15       16.  Refinancing of the Prepetition Debt.  Following the entry of this Order and as

16  part of the borrowing under the DIP Facility, the Debtors shall use a portion of the

17  proceeds from the DIP Facility to consummate the Refinancing (which shall be deemed to

18  have occurred upon the expiration of the Challenge Period (as defined below) with no

19  challenge having been brought or, if such a challenge is brought, upon the entry of a final

20  judgment resolving such challenge in favor of the Prepetition Loan Parties).

21       17.  Disposition of DIP Collateral.

22       a.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of

23  any portion of the DIP Collateral without the prior written consent of the DIP Agent (and no

24  such consent shall be implied, from any other action, inaction or acquiescence), except as

25  expressly permitted in the DIP Documents.  The Debtors will consult with the DIP Agent in

26  good faith with respect to any material asset sales, including with respect to any bid and

27  sale procedures.

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1    b.    If the Termination Date occurs, the DIP Agent on behalf of the DIP Lenders

2  shall have the right (but not the obligation), as if it were a Debtor, to file a motion or

3  motions with the Court seeking approval of the sale(s) of any and all of the DIP Collateral,

4  including a motion under section 363 of the Bankruptcy Code, including a credit bid sale to

5  the DIP Agent or DIP Lenders under a stalking horse agreement, and any right of the

6  Debtors to object thereto are hereby waived.

7    18.    Protection of DIP Lenders' Rights.

8    a.    The automatic stay provisions of section 362 of the Bankruptcy Code shall

9  be vacated and modified (and any stay of such vacation or modification under Bankruptcy

10  Rule 4001(a)(3) is waived) without further order of the Bankruptcy Court to the extent

11  necessary to permit the DIP Agent and the DIP Lenders to exercise all rights and

12  remedies provided for in the DIP Documents and this Order without further order of or

13  application or motion to the Bankruptcy Court, provided that, such rights and remedies

14  that are exercisable only upon the occurrence of an Event of Default (as defined in the

15  DIP Documents and as set forth in this Order) and following the delivery by the DIP Agent

16  of five (5) days' prior written notice (following the expiration of such five days' notice

17  period, such date, the "Termination Date"), which notice period shall run concurrently with

18  any notice provided under the DIP Documents, to the U.S. Trustee, lead counsel to the

19  Debtors, and lead counsel to the Creditors' Committee, if any, of such DIP Agent's intent

20  to exercise such rights and remedies; provided that, the Debtors shall not have the right to

21  contest the enforcement of the remedies set forth in this Order and the DIP Documents on

22  any basis other than an assertion that an Event of Default has not occurred or has been

23  cured within the cure periods expressly set forth herein or in the applicable DIP

24  Documents.  Upon the Termination Date, the DIP Agent may terminate the DIP Facility,

25  declare the DIP Obligations to be immediately due and payable, and exercise all rights

26  and remedies available to it hereunder, under the DIP Documents, or under applicable

27  law.  In addition, the Debtors' authority to use Cash Collateral hereunder shall cease.  The

28  Debtors waive any right to seek relief under the Bankruptcy Code, including under section

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  105 thereof, to the extent such relief would restrict or impair the rights and remedies of the

2  DIP Agent and the DIP Lenders set forth in this Order and in the DIP Documents.

3       b.     The DIP Agent's or any DIP Lender's delay or failure to exercise rights and

4  remedies under the applicable DIP Documents or this Order shall not constitute a waiver

5  of such DIP Agent's or such DIP Lender's rights hereunder, thereunder or otherwise,

6  unless any such waiver is pursuant to a written instrument executed in accordance with

7  the terms of the applicable DIP Documents.

8       c.     Except as otherwise expressly set forth in this Order or in the DIP

9  Documents, the Debtors irrevocably waive any right, without the prior written consent of

10  the DIP Agent, (a) to grant or impose, under section 364 of the Bankruptcy Code or

11  otherwise, liens or security interests in any DIP Collateral, whether senior, equal or

12  subordinate to the DIP Agent's liens and security interests; or (b) to modify or affect any of

13  the rights of the DIP Agent or the DIP Lenders under this Order or the DIP Documents by

14  any plan of reorganization proposed or confirmed in these Chapter 11 Cases or

15  subsequent order entered in these Chapter 11 Cases.

16       19.    <u>Approved Budget</u>.

17       a.     For purposes of this Order, the term "<u>Approved Budget</u>" means the

18  following: (a) the budget, attached hereto as <u>Exhibit A</u>, the "<u>Initial Budget</u>," which is an

19  initial 13-week budget commencing with the week during which the Petition Date occurs,

20  containing line items of sufficient detail to reflect the Debtors' consolidated projected

21  receipts and disbursements for such 13-week period, including, without limitation, the

22  anticipated weekly uses of the DIP Facility and cash collateral for such period, and which

23  provides, among other things, for the payment of the fees and expenses, including

24  professional fees relating to the DIP Facility (whether incurred pre-or post-petition),

25  ordinary course expenses, fees and expenses related to the Chapter 11 Cases, and

26  working capital and other general corporate needs; and (b) on or before 5:00 p.m.

27  prevailing Eastern Time on the first Business Day (as defined in the DIP Facility) of the

28  second month following the Petition Date, and on or before the third business day of each

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

28422342.6 1044353.1               28                    FINAL ORDER

1  calendar month thereafter, the Debtors shall furnish a supplement to the Initial Budget (or

2  a previously supplemented Approved Budget, as the case may be), covering a 13-week

3  period that commences with the week such supplement is delivered, together with a

4  variance analysis from the Initial Budget (or the previously supplemented Approved

5  Budget, as the case may be).  Such monthly supplements shall become the Approved

6  Budget upon written acknowledgement from the DIP Agent that the proposed supplement

7  is in form and substance reasonably acceptable to the DIP Agent (any determination of

8  reasonable shall be by reference to the Initial Budget or then Approved Budget), provided

9  that if the DIP Agent has not provided a written acceptance or objection to the proposed

10  supplement, the Initial Budget (or the previously supplemented Approved Budget, as the

11  case may be) shall remain the Approved Budget until such time as the DIP Agent and the

12  Debtors reach agreement with respect to a proposed supplement.

13          b.       No later than 5:00 p.m. the third business day following the end of each

14  calendar month, the Debtors shall deliver to the DIP Agent a variance report (the

15  "Variance Report") setting forth (1) actual cash receipts and disbursements for the month

16  then ended and (2) all variances, on an individual line item basis and an aggregate basis,

17  as compared to the previously delivered Approved Budget on a monthly and cumulative

18  basis, and an explanation, in reasonable detail, for any material variance, certified by a

19  senior officer of the Borrowers, provided that (A) on a line-item by line-item basis

20  (including a line item for Lobel Weiland Golden Friedman, LLP, the Debtors' primary

21  counsel, and Glass Ratner, the Debtors' financial advisors, but excluding any line items

22  for the DIP Agent professionals) the Debtors' actual expenditures from the Petition Date

23  through the end of the calendar month just ended as set forth in the Budget Variance

24  Report shall not be greater than 15% of the amount specified in the corresponding

25  applicable Approved Budget through the end of such period; and (B) the Debtors'

26  aggregate expenditures (excluding expenditures for the DIP Agent professionals) from the

27  Petition Date through the end of the calendar month just ended as set forth in the Budget

28  Variance Report shall not be greater than 10% of the aggregate amount (excluding any

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

28422342.6 1044353.1                                29                                FINAL ORDER

1 amount provided for the DIP Agent professionals) specified in the corresponding

2 applicable Approved Budget through the end of such period.  Notwithstanding anything

3 herein to the contrary, DIP Agent professional fees shall not be capped by the amount set

4 forth in the Budget.

5       20.   <u>Limitation on Charging Expenses Against Collateral</u>.  Except to the extent of

6 the Carve-Out, no expenses of administration of the Chapter 11 Cases or any future

7 proceeding that may result therefrom, including a case under chapter 7 of the Bankruptcy

8 Code, shall be charged against or recovered from the Prepetition Collateral or the DIP

9 Collateral pursuant to section 506(c) of the Bankruptcy Code, the enhancement of

10 collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable

11 doctrine (including, without limitation, unjust enrichment) or any similar principle of law,

12 without the prior written consent of the DIP Agent and the DIP Lenders, as the case may

13 be with respect to their respective interests, and no consent shall be implied from any

14 action, inaction or acquiescence by the DIP Agent or the DIP Lenders.  In no event shall

15 the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders be

16 subject to (i) the "equities of the case" exception contained in section 552(b) of the

17 Bankruptcy Code or (ii) the equitable doctrine of "marshaling" or any other similar doctrine

18 with respect to the Prepetition Collateral or the DIP Collateral.

19       21.   <u>Payment of Fees and Expenses</u>.  No payments (including professional fees

20 and expenses) with respect to the DIP Obligations or the Senior Adequate Protection

21 Provisions shall be subject to further Bankruptcy Court approval, nor shall any such

22 professional fees and expenses be required to be maintained in accordance with the U.S.

23 Trustee Guidelines, and no recipient of any such payments shall be required to file any

24 interim or final fee applications with the Bankruptcy Court or otherwise seek Bankruptcy

25 Court's approval of any such payments.

26       22.   All amounts due to the DIP Agent, DIP Lenders, Prepetition Agent, or

27 Prepetition Lenders hereunder shall be distributed free and clear of any cost, claim,

28 charge, assessment or liability including, without limitation, any such cost, claim or charge

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  arising out of or based on, directly or indirectly, California Code of Civil Procedure

2  sections 726, 580(a) and/or 580(d). The receipt and application of any money or benefits

3  by the DIP Agent, DIP Lenders, Prepetition Agent, or Prepetition Lenders as a result of

4  this Order shall not be considered an "action" for purposes of California Code of Civil

5  Procedure sections 726, 580(a) and/or 580(d).

6      23.  Credit Bid. The DIP Agent and the DIP Lenders shall have the right to credit

7  bid all or a portion of their respective claims in connection with a sale of the Debtors'

8  assets under section 363 of the Bankruptcy Code or under a plan of reorganization. The

9  Prepetition Loan Parties shall also have the right to credit bid a portion of or all of their

10 respective claims in connection with a sale of the Debtors' assets under section 363 of the

11 Bankruptcy Code or under a plan of reorganization.

12     24.  Perfection of DIP Liens.

13     a.  The DIP Agent and the DIP Lenders are hereby authorized, but not required,

14 to file or record (and to execute in the name of the Debtors, as its true and lawful attorney,

15 with full power of substitution, to the maximum extent permitted by law) financing

16 statements, trademark filings, copyright filings, mortgages, notices of lien or similar

17 instruments in any jurisdiction, or take possession of or control over deposit accounts and

18 securities accounts or any other asset, in each case, to validate and perfect the liens and

19 security interests granted to them in the DIP Documents and this Order. Whether or not

20 the DIP Agent on behalf of the DIP Lenders, or the DIP Lenders, each in its discretion,

21 chooses to file such financing statements, trademark filings, copyright filings, mortgages,

22 notices of lien or similar instruments, or take possession of or control over deposit

23 accounts and securities accounts or any other assets, such liens and security interests

24 shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to

25 challenge dispute or subordination, at the time and on the date of entry of this Order.

26 Upon the reasonable request of the DIP Agent, without any further consent of any party,

27 the DIP Agent, the Debtors, each DIP Lender and the Prepetition Secured Parties are

28 authorized and directed to take, execute, deliver and file such instruments (in each case,

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  without representation or warranty of any kind) to enable the DIP Agent to further perfect

2  the DIP Liens.  The Adequate Protection Liens granted hereunder shall be automatically

3  perfected upon entry of this Order without further action by the Debtors or any Prepetition

4  Secured Party.

5      b.      A certified copy of this Order may, in the discretion of the DIP Agent, be filed

6  with or recorded in filing or recording offices in addition to or in lieu of such financing

7  statements, mortgages, notices of lien or similar instruments, and all filing offices are

8  hereby authorized to accept such certified copy of this Order for filing and recording.  For

9  the avoidance of doubt, the automatic stay provisions of section 362(a) of the Bankruptcy

10  Code shall be modified (and any stay of such modification under Bankruptcy Rule

11  4001(a)(3) is waived) to the extent necessary to permit the DIP Agent to take all actions,

12  as applicable, referenced in this subparagraph (b) and in the immediately preceding

13  subparagraph (a).

14      c.      Any provision of any lease or other license, contract or other agreement that

15  requires (i) the consent or approval of one or more landlords or other parties or (ii) the

16  payment of any fees or obligations to any governmental entity, in order for any Debtor to

17  pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the

18  proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent

19  with the applicable provisions of the Bankruptcy Code.  Any such provision shall have no

20  force and effect with respect to the granting of post-petition liens on such leasehold

21  interest or the proceeds of any assignment and/or sale thereof by any Debtor in favor of

22  the DIP Lenders in accordance with the terms of the DIP Documents or this Order.

23      25.  <u>Preservation of Rights Granted Under this Order</u>.

24      a.      Except as expressly provided herein or in the DIP Documents, no claim or

25  lien having a priority senior to or pari passu with those granted by this Order and the DIP

26  Documents to the DIP Agent, the DIP Lenders and the Prepetition Loan Parties shall be

27  granted or allowed while any portion of the DIP Obligations or the Senior Adequate

28  Protection Provisions (with respect to the Prepetition Debt, until the consummation of the

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  Refinancing and the expiration of the Challenge Period with no challenge having been

2  brought or, if such a challenge is brought, upon the entry of a final judgment resolving

3  such challenge in favor of the Prepetition Loan Parties) remain outstanding, and the DIP

4  Liens and the Senior Adequate Protection Liens (until the consummation of the

5  Refinancing and the expiration of the Challenge Period with no challenge having been

6  brought or, if such a challenge is brought, upon the entry of a final judgment resolving

7  such challenge in favor of the Prepetition Loan Parties) shall not (i) be subject to or junior

8  to (A) any lien or security interest that is avoided and preserved for the benefit of the

9  Debtors and their estates under section 551 of the Bankruptcy Code or (B) any liens

10  arising after the Petition Date, including, without limitation, any liens or security interests

11  granted in favor of any federal, state, municipal or other domestic or foreign governmental

12  unit (including any regulatory body), commission, board or court for any liability of the

13  Debtors, or (ii) subordinate to or made pari passu with any other lien or security interest,

14  whether under sections 363 or 364 of the Bankruptcy Code or otherwise.

15      b.      In addition to the Events of Default set forth in the DIP Documents, unless all

16  DIP Obligations and all Senior Adequate Protection Provisions shall have been

17  indefeasibly paid or satisfied in full in cash, the Debtors shall not seek, and it shall

18  constitute an Event of Default under the DIP Documents and terminate the right of the

19  Debtors to use Cash Collateral hereunder if any of the Debtors seek, or if there is entered,

20  unless the DIP Agent has otherwise consented: (i) any modification or extension of this

21  Order without the prior written consent of the DIP Agent and the Prepetition Agent, and no

22  such consent shall be implied by any other action, inaction or acquiescence by the DIP

23  Agent or the Prepetition Agent, (ii) an order converting or dismissing these Chapter 11

24  Cases; (iii) an order appointing a Chapter 11 trustee in these Chapter 11 Cases or any

25  other representative or other similar appointment, (iv) an order appointing an examiner

26  with enlarged powers in these Chapter 11 Cases, (v) an order providing for a change of

27  venue with respect to these Chapter 11 Cases and such order shall not have been

28  reversed or vacated within ten (10) days; (vi) an order approving a plan of reorganization

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1   or the sale of all or substantially all of the DIP Collateral or the Prepetition Collateral shall

2   have been entered which does not provide for the repayment in full in cash of all DIP

3   Obligations (other than any contingent obligations not yet due and payable) and all

4   Contingent Obligations and Senior Adequate Protection Provisions (until the expiration of

5   the Challenge Period with no challenge having been brought or, if such a challenge is

6   brought, upon the entry of a final judgment resolving such challenge in favor of the

7   Prepetition Loan Parties) upon the consummation thereof.  If an order dismissing these

8   Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time

9   entered, such order shall provide (in accordance with sections 105 and 349 of the

10  Bankruptcy Code) that (x) the Superpriority Claims, priming liens, security interests and

11  replacement security interests granted to the DIP Agent, the DIP Lenders and the

12  Prepetition Loan Parties, including, without limitation, the DIP Liens, the Senior Adequate

13  Protection Provisions, the 507(b) claims, and the other administrative expense claims

14  granted pursuant to this Order shall continue in full force and effect and shall maintain

15  their priorities as provided in this Order (and that such Superpriority Claims, priming liens,

16  security interests and replacement security interests granted to the DIP Agent, the DIP

17  Lenders and the Prepetition Loan Parties, including, without limitation, the DIP Liens, the

18  Senior Adequate Protection Provisions, the 507(b) claims, and the other administrative

19  expense claims, liens and security interests, shall, notwithstanding such dismissal, remain

20  binding on all parties in interest, including the priorities set forth herein and in the DIP

21  Documents) until all DIP Obligations and all Senior Adequate Protection Provisions (until

22  the consummation of the Refinancing and the expiration of the Challenge Period with no

23  challenge having been brought or, if such a challenge is brought, upon the entry of a final

24  judgment resolving such challenge in favor of the Prepetition Loan Parties) shall have

25  been paid and satisfied in full and (y) the Bankruptcy Court shall retain jurisdiction,

26  notwithstanding such dismissal, for the purposes of enforcing the claims, liens and

27  security interests referred to in clause (x) above; provided that, subject to consummation

28  of the Refinancing, the Prepetition Loan Parties shall not otherwise receive or retain any

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1    payments, property or other amounts in respect of the Prepetition Debt or under the

2    Prepetition Loan Documents (other than the Adequate Protection Payments) unless and

3    until the DIP Obligations have indefeasibly been paid in cash in full in accordance with the

4    DIP Documents.

5         c.       If any or all of the provisions of this Order are hereafter reversed, modified,

6    vacated or stayed, such reversal, modification, vacation or stay shall not affect (i) the

7    validity, priority or enforceability of any DIP Obligations or the Senior Adequate Protection

8    Provisions incurred prior to the actual receipt of written notice by the DIP Agent or the

9    Prepetition Agent, as applicable, of the effective date of such reversal, modification,

10   vacation or stay or (ii) the validity, priority or enforceability of any lien or priority authorized

11   or created hereby or pursuant to the DIP Documents with respect to any DIP Obligations

12   or the Senior Adequate Protection Provisions.  Notwithstanding any such reversal,

13   modification, vacation or stay, any use of Cash Collateral, the DIP Obligations or the

14   Senior Adequate Protection Provisions incurred by the Debtors to the DIP Agent, the DIP

15   Lenders, or the Prepetition Loan Parties, as the case may be, prior to the actual receipt of

16   written notice by the DIP Agent or the Prepetition Agent of the effective date of such

17   reversal, modification, vacation or stay shall be governed in all respects by the original

18   provisions of this Order, and the DIP Agent, the DIP Lenders, and the Prepetition Loan

19   Parties shall be entitled to all the rights, remedies, privileges and benefits granted in

20   section 364(e) of the Bankruptcy Code (including, without limitation, with respect to any

21   payments received in connection with the Refinancing), this Order and pursuant to the

22   DIP Documents.

23        d.       Except as expressly provided in this Order or in the DIP Documents, the DIP

24   Obligations and the Senior Adequate Protection Provisions, including the DIP Liens, the

25   Superpriority Claims, the 507(b) claims, the Adequate Protection Liens, the Adequate

26   Protection Claims, the Adequate Protection Payments and all other rights and remedies of

27   the DIP Agent, the DIP Lenders and the Prepetition Loan Parties granted by the

28   provisions of this Order and the DIP Documents shall survive, and shall not be modified,

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1   impaired or discharged by (i) the entry of an order converting any of these Chapter 11

2   Cases to a case under Chapter 7, dismissing these Chapter 11 Cases, approving the sale

3   of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the

4   extent permitted by the DIP Documents) or by any other act or omission or (ii) the entry of

5   an order confirming a plan of reorganization in these Chapter 11 Cases (except a plan

6   that is acceptable to the Required DIP Lenders (as defined in the DIP Credit Agreement))

7   and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any

8   discharge as to any remaining DIP Obligations or Senior Adequate Protection Provisions.

9   The terms and provisions of this Order and the DIP Documents shall continue in the

10  Chapter 11 Cases, in any successor cases, or in any superseding Chapter 7 cases under

11  the Bankruptcy Code, and the DIP Obligations, the Contingent Obligations, and the Senior

12  Adequate Protection Provisions, including the DIP Liens, the Superpriority Claims, the

13  Contingent Liens, the Senior Adequate Protection Liens, the Senior Adequate Protection

14  Claims, the Senior Adequate Protection Payments, the other administrative expense

15  claims granted pursuant to this Order and all other rights and remedies of the DIP Agent,

16  the DIP Lenders and the Prepetition Loan Parties granted under the DIP Documents and

17  this Order shall continue in full force and effect and shall be binding on any Chapter 7

18  trustee, Chapter 11 trustee, any litigation trust representative, other or similar party

19  hereinafter appointed or elected for the Debtors' estates until all DIP Obligations and all

20  Senior Adequate Protection Provisions are indefeasibly paid in full in cash as set forth

21  herein and in the DIP Documents.

22      26.   Exculpation.  Nothing in this Order, the DIP Documents, or any other

23  documents related to the transactions contemplated hereby shall in any way be construed

24  or interpreted to impose or allow the imposition upon the DIP Agent or any DIP Lender, or

25  upon the Prepetition Agent or any Prepetition Lender, of any liability for any claims arising

26  from the prepetition or postpetition activities of the Debtors in the operation of their

27  businesses, or in connection with their restructuring efforts.  In addition, (a) neither the

28  DIP Agent, any DIP Lender, nor any Prepetition Loan Party shall be, in any way or

EXHIBIT "B"
Page 140

1  manner, liable or responsible for (i) the safekeeping of the Collateral, (ii) any loss or

2  damage thereto occurring or arising in any manner or fashion from any cause, (iii) any

3  diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee,

4  custodian, forwarding agency, or other person, and (b) all risk of loss, damage, or

5  destruction of the Collateral shall be borne by the Debtors; <u>provided</u> <u>that</u> the foregoing

6  shall not apply to any act or omission by the DIP Agent, any DIP Lender, or any

7  Prepetition Loan Party that constitutes gross negligence or willful misconduct by such

8  party as finally determined by a court of competent jurisdiction.

9      27.    <u>Effect of Stipulations on Third Parties</u>.

10      a.    The stipulations and admissions contained in paragraph 5 of, and elsewhere

11  in, this Order shall be binding upon each Debtor and their subsidiaries and any of their

12  respective successors and assigns (including, without limitation, any Chapter 7 or Chapter

13  11 trustee appointed or elected for a Debtor), and each person or entity party to the DIP

14  Documents in accordance with their respective terms and the terms of this Order, in all

15  circumstances.

16      b.    The stipulations and admissions contained in this Order, including without

17  limitation, in paragraph 5 of this Order, shall be binding on a permanent basis upon all

18  other parties in interest, including any statutory or non-statutory committees appointed or

19  formed in the Chapter 11 Cases (including the Creditors' Committee, if any) and any other

20  person or entity acting on behalf of the Debtors' estates, unless (a) such committee or any

21  other party-in-interest, in each case, with requisite standing granted by the Bankruptcy

22  Court, has timely and properly filed an adversary proceeding or contested matter (subject

23  to the limitations contained herein, including, inter alia, in paragraph 28) by no later than

24  the date that is the later of (i) in the case of any such adversary proceeding or contested

25  matter filed by a party-in-interest with requisite standing other than the Creditors'

26  Committee, 60 days after the Petition Date, (ii) in the case of any such adversary

27  proceeding or contested matter filed by the Creditors' Committee, 60 days after the

28  appointment of the Creditors' Committee, or (iii) any such later date agreed to in writing by

Lobel Weiland Golden Friedman LLP

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1    the Prepetition Agent (the "Challenge Period"), (1) challenging the validity, enforceability,

2    priority, extent, or amount of the Prepetition Debt or the Prepetition Senior Liens, subject

3    to valuation under section 506 of the Bankruptcy Code, on the Prepetition Collateral

4    securing the Prepetition Debt or (2) otherwise asserting or prosecuting any avoidance

5    actions or any other claims, counterclaims or causes of action, objections, contests or

6    defenses (collectively, the "Claims and Defenses") against the Prepetition Loan Parties or

7    their respective agents, affiliates, subsidiaries, directors, officers, representatives,

8    attorneys or advisors in connection with any matter related to the Prepetition Debt, the

9    Prepetition Collateral, or the Prepetition Loan Documents, and (b) an order is entered by a

10    court of competent jurisdiction and becomes final and non-appealable in favor of the

11    plaintiff sustaining any such challenge or claim in any such duly filed adversary

12    proceeding or contested matter; provided that (i) as to the Debtors, all such Claims and

13    Defenses are hereby irrevocably waived and relinquished as of the Petition Date and (ii)

14    any challenge or claim shall set forth with specificity the basis for such challenge or claim

15    and any challenges or claims not so specified prior to the expiration of the Challenge

16    Period shall be forever deemed waived, released and barred.  If no such adversary

17    proceeding or contested matter is timely and properly filed in respect of the Prepetition

18    Debt, (x) the Prepetition Debt, to the extent not repaid pursuant to the Refinancing, and

19    the other Prepetition Debt shall constitute allowed claims, not subject to counterclaim,

20    setoff, subordination, recharacterization, subordination, defense or avoidance, for all

21    purposes in the Chapter 11 Cases and any subsequent Chapter 7 cases, (y) the liens on

22    the Prepetition Collateral securing the Prepetition Debt, as the case may be, shall be

23    deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected

24    and of the priority specified in paragraph 5, not subject to defense, counterclaim,

25    recharacterization, subordination or avoidance, and (z) the Prepetition Debt, the

26    Prepetition Loan Parties, and the Prepetition Senior Liens, as the case may be, shall not

27    be subject to any other or further challenge by any statutory or non-statutory committees

28    appointed or formed in the Chapter 11 Cases or any other party-in-interest, and such

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1   committees and parties-in-interest shall be enjoined from seeking to exercise the rights of

2   the Debtors' estates, including without limitation, any successor thereto (including, without

3   limitation, any estate representative or a Chapter 7 or 11 trustee appointed or elected for

4   any of the Debtors) with respect thereto.  If any such adversary proceeding or contested

5   matter is timely and properly filed, the stipulations and admissions contained in paragraph

6   5 of this Order shall nonetheless remain binding and preclusive (as provided in the second

7   sentence of this subparagraph) on any statutory or non-statutory committees appointed or

8   formed in the Chapter 11 Cases and any other party-in-interest, except as to any such

9   findings and admissions that were expressly and successfully challenged in such

10  adversary proceeding as set forth in a final, non-appealable order of a court of competent

11  jurisdiction.  In the event that there is a timely successful challenge, pursuant and subject

12  to the limitations contained in this paragraph 27, to the validity, enforceability, extent,

13  perfection or priority of the Prepetition Debt or the Prepetition Senior Liens that occurs

14  after the Refinancing, the Bankruptcy Court shall have the power to unwind or otherwise

15  modify the Refinancing or a portion thereof as the Bankruptcy Court shall determine.

16  Nothing in this Order vests or confers on any Person (as defined in the Bankruptcy Code),

17  including any statutory or non-statutory committees appointed or formed in the Chapter 11

18  Cases, standing or authority to pursue any cause of action belonging to the Debtors or

19  their estates, including, without limitation, Claims and Defenses with respect to the

20  Prepetition Loan Documents, the Prepetition Debt or the Prepetition Senior Liens.

21      28.    Limitation on Use of Financing Proceeds and Collateral.  Notwithstanding

22  anything herein or in any other order by this Court to the contrary, no party may use

23  borrowings under the DIP Facility, Prepetition Collateral, Cash Collateral, DIP Collateral,

24  the Carve-Out, the Carve-Out Cap or any portion or proceeds of the foregoing in

25  connection with (a) objecting to, contesting or raising any defense to, the validity,

26  perfection, priority, extent or enforceability of any amount due under the DIP Documents

27  or the Prepetition Loan Documents, or the liens or claims granted under this Order, the

28  DIP Documents or the Prepetition Loan Documents, (b) asserting any Claims and

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  Defenses or causes of action against the DIP Agent, the DIP Lenders, or the Prepetition

2  Loan Parties or their respective agents, affiliates, representatives, attorneys or advisors,

3  (c) preventing, hindering or otherwise delaying the DIP Agent's or the DIP Lenders'

4  assertion, enforcement or realization on the DIP Collateral once an Event of Default has

5  occurred and is continuing in accordance with the DIP Documents or this Order, provided

6  that the Debtors may contest or dispute whether an Event of Default has occurred as

7  provided for in paragraph 18(a) of this Order, (d) seeking to modify any of the rights

8  granted to the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Loan

9  Parties hereunder or under the DIP Documents or the Prepetition Loan Documents, in

10  each of the foregoing cases, without such parties' prior written consent, (e) paying any

11  amount on account of any claims arising prior to the Petition Date unless such payments

12  are (i) approved by an order of this Court and (ii) permitted to be paid under the DIP

13  Documents and the Approved Budget, (f) using or seeking to use Cash Collateral or the

14  DIP Liens except to the extent permitted under the DIP Documents and the Approved

15  Budget, (g) selling or otherwise disposing of the DIP Collateral except as permitted by the

16  DIP Documents or otherwise with the consent of the DIP Agent or the DIP Lenders, or (h)

17  using or seeking to use any insurance proceeds related to the DIP Collateral, except as

18  permitted by the DIP Documents or otherwise with the consent of the DIP Agent or the

19  DIP Lenders.  Notwithstanding the foregoing, advisors to the Creditors' Committee, if any,

20  may investigate claims and issues with respect to the liens granted pursuant to the

21  Prepetition Loan Documents during the Challenge Period at an aggregate expense for

22  such investigation, but not litigation, prosecution, objection or challenge thereto, not to

23  exceed $25,000.

24       29.   Payments Held in Trust.  Except as expressly permitted in this Order or the

25  DIP Documents, in the event that any person or entity receives any payment on account

26  of a security interest in DIP Collateral, receives any proceeds of DIP Collateral or receives

27  any other payment with respect thereto from any other source prior to indefeasible

28  satisfaction of all DIP Obligations under the DIP Documents, and termination of the Term

28422342.6 1044353.1                40                FINAL ORDER

1   Loan Commitments (as defined in the DIP Documents) in accordance with the DIP

2   Documents, such person or entity shall be deemed to have received, and shall hold, any

3   such payment or proceeds of Collateral in trust for the benefit of the DIP Agent and DIP

4   Lenders and shall immediately turn over such proceeds to the DIP Agent, or as otherwise

5   instructed by this Court, for application in accordance with the DIP Documents and this

6   Order.

7          30.    <u>Proofs of Claim</u>.  None of the DIP Agent, DIP Lenders, or the Prepetition

8   Loan Parties, in such respective capacities, will be required to file proofs of claim in any of

9   Chapter 11 Cases or any successor case.  Any order entered by the Bankruptcy Court in

10  connection with the establishment of a bar date for any claim (including without limitation

11  administrative claims) in the Chapter 11 Cases or any successor case shall not apply to

12  the DIP Agent, the DIP Lenders, or the Prepetition Loan Parties, in such respective

13  capacities.

14         31.    <u>Right of Access and Information</u>.  Without limiting the rights of access and

15  information afforded the DIP Agent and DIP Lenders under the DIP Documents or the

16  Prepetition Loan Parties under the Prepetition Loan Documents, the Debtors shall be, and

17  hereby are, required to afford representatives, agents and/or employees of the Prepetition

18  Loan Parties reasonable access to the Debtors' premises and their books and records in

19  accordance with the DIP Documents and the Prepetition Loan Documents, as the case

20  may be, and shall reasonably cooperate, consult with, and provide to such persons all

21  such information as may be reasonably requested.  In addition, the Debtors authorize their

22  independent certified public accountants, financial advisors, restructuring advisers,

23  investment bankers and consultants to cooperate, consult with, and provide to the DIP

24  Agent and the Prepetition Agent all such information as may be reasonably requested with

25  respect to the business, results of operations and financial condition of the Debtors.

26         32.    <u>Retention of Jurisdiction</u>.  This Court has and will retain exclusive jurisdiction

27  with respect to any and all disputes or matters under, or arising out of or in connection

28  with, either the DIP Documents or this Order.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

33.  <u>Order Governs</u>.  In the event of any inconsistency between the provisions of this Order and the DIP Documents, the provisions of this Order shall govern.  Additionally, to the extent that there may be an inconsistency between the terms of this Order and any First Day Order or Second Day Order (each as defined in the DIP Credit Agreement), the terms of this Order shall govern.

34.  <u>Binding Effect; Successors and Assigns</u>.  The DIP Documents and the provisions of this Order, including all findings herein, shall be binding upon all parties-in-interest in the Chapter 11 Cases on a permanent basis, including without limitation, the DIP Agent, the DIP Lenders, the Prepetition Loan Parties, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors, or similar responsible person or similar designee or litigation trust hereinafter appointed or elected for the estates of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders and the Prepetition Loan Parties and their respective successors and assigns, including after conversion or dismissal of any of the Chapter 11 Cases; <u>provided</u> <u>that</u>, except to the extent expressly set forth in this Order, the DIP Agent, the DIP Lenders, and the Prepetition Loan Parties shall have no obligation to permit the use of Cash Collateral or extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person or similar designee or litigation trust hereunder appointed for the estates of the Debtors.

35.  <u>Limitation on Liability</u>.  In determining to make any loan under the DIP Documents, permitting the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Order or the DIP Documents, the DIP Agent, the DIP Lenders and the Prepetition Loan Parties shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

EXHIBIT "B"
Page 146

1 terms, are used in the United States Comprehensive Environmental Response,

2 Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar

3 federal or state statute).  Furthermore, nothing in this Order or in the DIP Documents shall

4 in any way be construed or interpreted to impose or allow the imposition upon the DIP

5 Agent, the DIP Lenders, or the Prepetition Loan Parties of any liability for any claims

6 arising from the prepetition or postpetition activities of any of the Debtors and their

7 affiliates (as defined in section 101(2) of the Bankruptcy Code).

8      36.   <u>Effectiveness</u>.  This Order shall constitute findings of fact and conclusions of

9 law and shall take effect immediately upon execution hereof, and there shall be no stay of

10 execution of effectiveness of this Order.

11                             ###

**Lobel Weiland Golden Friedman LLP**
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

SCHEDULE I

OTHER SECURED CREDITORS

| Debtor | Creditor | Amount |
|---|---|---|
| FCI | PBGC | $15,458,715 |
| FCHI | PBGC | $15,458,715 |
| FCHI | Stern/McEachen | $4,000,000 |
| SPV II | PBGC | $15,458,715 |
| SPV II | Stern/McEachen | $4,000,000 |
| SPV II | Caribou/OC Media | $2,145,239 |
| SPV II | Angelo Gordon | $10,000,000 |
| SPV VI | PBGC | $15,458,175 |
| 2100 Freedom | PBGC | $15,458,715 |
| Daily Press | PBGC | $15,458,715 |
| Freedom Colorado Information | PBGC | $15,458,715 |
| Freedom Newspaper Acquisition | PBGC | $15,458,715 |
| Freedom Newspapers | PBGC | $15,458,715 |
| Freedom Newspapers, Inc. | PBGC | $15,458,715 |
| Freedom Services, Inc. | PBGC | $15,458,715 |
| SPV I | PBGC | $15,458,715 |
| SPV IV | PBGC | $15,458,715 |
| SPV V | PBGC | $15,458,715 |
| OCR Community Publications, Inc | PBGC | $15,458,715 |
| Orange County Register Communications | PBGC | $15,458,715 |
| Victor Valley Publishing Company | PBGC | $15,458,715 |
| Victorville Publishing Company | PBGC | $15,458,715 |

EXHIBIT A

TO

FINAL ORDER (A) OBTAIN POSTPETITION FINANCING; (B) UTILIZE CASH
COLLATERAL; (C) PROVIDE ADEQUATE PROTECTION TO PREPETITION SECURED
PARTIES; (D) REPAY CERTAIN PREPETITION SECURED DEBT; AND (E) GRANT
RELATED RELIEF

**2100/Freedom Communications Holdings, Inc.**
**Weekly Cash Flows Projection - 2015**

Back To INDEX

>>> 2016 >>>

| | Fcst 11/06/15 | Fcst 11/13/15 | Fcst 11/20/15 | Fcst 11/27/15 | Fcst 12/04/15 | Fcst 12/11/15 | Fcst 12/18/15 | Fcst 12/25/15 | Fcst 01/01/16 | Fcst 01/08/16 | Fcst 01/15/16 | Fcst 01/22/16 | Fcst 01/29/16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Accounts** | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | |
| Operating | 3,395,554 | 3,316,414 | 3,341,414 | 3,393,054 | 3,519,976 | 3,427,596 | 3,285,217 | 3,285,217 | 3,537,476 | 3,522,712 | 3,361,724 | 3,361,724 | 3,465,212 |
| Other (including Inter Account Transfers In) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Receipts | 3,395,554 | 3,316,414 | 3,341,414 | 3,393,054 | 3,519,976 | 3,427,596 | 3,285,217 | 3,285,217 | 3,537,476 | 3,522,712 | 3,361,724 | 3,361,724 | 3,465,212 |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Payroll & Benefits | 340,200 | 2,035,000 | 305,700 | 2,520,000 | 655,200 | 2,035,000 | 305,700 | 2,520,000 | 655,200 | 2,075,700 | 555,000 | 2,325,700 | 272,500 |
| Paper & Ink | 574,500 | 582,500 | 574,500 | 642,500 | 574,500 | 582,500 | 574,500 | 642,500 | 642,000 | 526,000 | 531,000 | 526,000 | 541,000 |
| Purchased Content | 33,011 | 32,911 | 32,911 | 32,911 | 32,911 | 33,030 | 33,050 | 33,050 | 33,050 | 32,137 | 31,984 | 31,984 | 31,984 |
| Outside Services | 756,000 | 987,000 | 851,000 | 969,000 | 756,000 | 987,000 | 804,000 | 1,016,000 | 736,000 | 731,000 | 1,036,000 | 731,000 | 1,036,000 |
| Operating Supplies & Materials | 88,242 | 75,454 | 75,454 | 75,454 | 75,454 | 79,805 | 80,530 | 80,530 | 80,530 | 82,075 | 82,333 | 82,333 | 82,333 |
| Repairs & Maintenance | 51,982 | 49,188 | 49,188 | 49,188 | 49,188 | 51,543 | 51,936 | 51,936 | 51,936 | 49,977 | 49,651 | 49,651 | 49,651 |
| Promotion and Marketing | 42,291 | 46,206 | 46,206 | 46,206 | 46,206 | 41,317 | 40,502 | 40,502 | 40,502 | 40,376 | 40,355 | 40,355 | 40,355 |
| Postage, Office Supplies, Dues, and Subscriptions | 22,083 | 20,495 | 20,495 | 20,495 | 20,495 | 26,536 | 27,543 | 27,543 | 27,543 | 19,697 | 18,390 | 18,390 | 18,390 |
| Travel, Meals, and Entertainment | 13,198 | 14,187 | 14,187 | 14,187 | 14,187 | 18,719 | 19,475 | 19,475 | 19,475 | 31,138 | 31,416 | 31,416 | 31,416 |
| Training, Seminars, Events, and Communications | 1,514 | 1,441 | 1,441 | 1,441 | 1,441 | 1,288 | 1,263 | 1,263 | 1,263 | 1,131 | 1,109 | 1,109 | 1,109 |
| Insurance | 0 | 0 | 0 | 0 | 130,500 | 0 | 0 | 0 | 130,500 | 0 | 0 | 0 | 0 |
| Utilities, Rent, and Lease | 157,000 | 29,000 | 607,100 | 180,000 | 32,000 | 29,000 | 557,100 | 180,000 | 36,000 | 25,000 | 10,000 | 682,100 | 77,000 |
| Taxes (non-income) | 75,000 | 75,000 | 50,000 | 50,000 | 50,000 | 626,974 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| Total Operating Disbursements | 2,155,020 | 3,948,381 | 2,628,181 | 4,601,381 | 2,438,080 | 4,512,714 | 2,545,599 | 4,662,799 | 2,503,999 | 3,664,232 | 2,437,237 | 4,570,037 | 2,231,737 |
| **Capital Expenditures and Income Taxes** | | | | | | | | | | | | | |
| Capital Expenditures | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Income Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Capital Expeditures and Income Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Debt, Financing & Other Disbursements** | | | | | | | | | | | | | |
| Interest Payments | 0 | 0 | 0 | 193,750 | 0 | 0 | 0 | 0 | 193,750 | 0 | 0 | 0 | 187,500 |
| Principal Payments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bank Fees and Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Debt related disbursements | 0 | 0 | 0 | 193,750 | 0 | 0 | 0 | 0 | 193,750 | 0 | 0 | 0 | 187,500 |
| Other Misc Disbursements | 0 | 0 | 0 | 0 | 500,000 | 500,000 | 500,000 | 500,000 | 0 | 0 | 0 | 0 | 0 |
| Restructuring Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Lobel, Weiland & Golden, LLP | 0 | 0 | 0 | 0 | 300,000 | 0 | 0 | 0 | 275,000 | 0 | 0 | 0 | 375,000 |
| GlassRatner Advisory & Capital Group | 0 | 0 | 0 | 65,000 | 0 | 65,000 | 0 | 0 | 0 | 0 | 65,000 | 0 | 0 |
| Donlin Recano | 0 | 0 | 15,000 | 0 | 0 | 0 | 15,000 | 0 | 0 | 0 | 0 | 15,000 | 0 |
| Squar Milner | 0 | 0 | 10,000 | 0 | 0 | 0 | 10,000 | 0 | 0 | 0 | 0 | 10,000 | 0 |
| Silver Point Counsel | 0 | 0 | 0 | 250,000 | 0 | 0 | 0 | 0 | 250,000 | 0 | 0 | 0 | 250,000 |
| Rutan | 0 | 0 | 0 | 25,000 | 0 | 0 | 0 | 25,000 | 0 | 0 | 0 | 0 | 25,000 |
| US Trustee Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 48,000 |
| Counsel - Creditors Committee | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 50,000 | 0 | 0 | 50,000 | 0 | 0 |
| InterAccount Transfers Out | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Disbursements - Total** | 2,155,020 | 3,948,381 | 2,653,181 | 5,135,131 | 3,238,080 | 5,077,714 | 3,120,599 | 5,187,799 | 3,222,749 | 3,664,232 | 2,552,237 | 4,595,037 | 3,117,237 |
| Cash - Beginning | 1,043,733 | 2,284,267 | 1,652,301 | 598,457 | 2,340,535 | 3,880,353 | 2,230,236 | 2,394,853 | 492,271 | 806,998 | 665,478 | 1,474,965 | 241,651 |
| **DIP Facility (single draw)** | | | | | 3,000,000 | | | | | | | | |
| Change in Cash | 1,240,534 | (631,966) | 688,234 | (1,742,077) | 281,896 | (1,650,117) | 164,617 | (1,902,583) | 314,727 | (141,520) | 809,486 | (1,233,314) | 347,975 |
| **Operating Cash - Ending** | 2,284,267 | 1,652,301 | 2,340,535 | 598,457 | 3,880,353 | 2,230,236 | 2,394,853 | 492,271 | 806,998 | 665,478 | 1,474,965 | 241,651 | 589,626 |

EXHIBIT B

TO

FINAL ORDER (A) OBTAIN POSTPETITION FINANCING; (B) UTILIZE CASH
COLLATERAL; (C) PROVIDE ADEQUATE PROTECTION TO PREPETITION SECURED
PARTIES; (D) REPAY CERTAIN PREPETITION SECURED DEBT; AND (E) GRANT
RELATED RELIEF

**MTO DRAFT 10/30/15**

# SUPERPRIORITY
# DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT

### dated as of [_____] [    ], 2015

### among

## FREEDOM COMMUNICATIONS, INC.

### and

## FREEDOM COMMUNICATIONS HOLDINGS, INC.,
### as Borrowers,

2100 FREEDOM, INC.,

## CERTAIN SUBSIDIARIES OF FREEDOM COMMUNICATIONS, INC. AND
## FREEDOM COMMUNICATIONS HOLDINGS, INC.,
### as Guarantors,

### each of the foregoing, as Debtor and debtor-in-possession,

### the Lenders party hereto,

### and

## SILVER POINT FINANCE, LLC,
### as DIP Agent

28540330.4
Doc#: US1:10247675v15

# TABLE OF CONTENTS

SECTION 1.    DEFINITIONS AND INTERPRETATION ....................................... 1

    1.1    Definitions ................................................................................1
    1.2    Accounting Terms .....................................................................24
    1.3    Interpretation, etc .....................................................................25
    1.4    Administrative Borrower Agent for Borrowers ...............................25

SECTION 2.    TERM LOANS ................................................................... 26

    2.1    Term Loans. ..............................................................................26
    2.2    [Reserved] ................................................................................27
    2.3    [Reserved] ................................................................................27
    2.4    Pro Rata Shares; Availability of Funds; One Obligation. ..................27
    2.5    Use of Proceeds. .......................................................................27
    2.6    Evidence of Debt; Register; Lenders' Books and Records; Term Loan
        Notes. ......................................................................................28
    2.7    Interest on Term Loans ...............................................................28
    2.8    Default Interest. ........................................................................29
    2.9    Fees. .......................................................................................29
    2.10    [Reserved] ...............................................................................29
    2.11    Voluntary Prepayments. ..............................................................29
    2.12    Mandatory Prepayments. .............................................................30
    2.13    Application of Prepayments. .........................................................31
    2.14    General Provisions Regarding Payments .........................................31
    2.15    Ratable Sharing .........................................................................32
    2.16    Increased Costs; Capital Adequacy ...............................................33
    2.17    Taxes; Withholding, etc. .............................................................34
    2.18    Obligation to Mitigate. ...............................................................37
    2.19    [Reserved] ...............................................................................37
    2.20    Removal or Replacement of a Lender .............................................37
    2.21    Joint and Several Liability of Borrowers .........................................38

SECTION 3.    CONDITIONS PRECEDENT ................................................. 41

    3.1    Closing Date ..............................................................................41
    3.2    Additional Conditions to Credit Extension ......................................43

SECTION 4.    REPRESENTATIONS AND WARRANTIES .................................. 43

    4.1    Organization; Requisite Power and Authority; Qualification ...............44
    4.2    Capital Stock and Ownership. ......................................................44
    4.3    Due Authorization. .....................................................................44
    4.4    No Conflict. ..............................................................................44
    4.5    Governmental Consents ..............................................................44
    4.6    Binding Obligation. ....................................................................44
    4.7    Historical Financial Statements ....................................................45

| | | |
|---|---|---|
| 4.8 | No Material Adverse Change | 45 |
| 4.9 | Adverse Proceedings, etc | 45 |
| 4.10 | Payment of Taxes | 45 |
| 4.11 | Properties | 45 |
| 4.12 | Environmental Matters | 46 |
| 4.13 | No Defaults | 47 |
| 4.14 | Material Contracts | 47 |
| 4.15 | Governmental Regulation | 47 |
| 4.16 | Margin Stock | 47 |
| 4.17 | Employee Matters | 47 |
| 4.18 | Employee Benefit Plans | 48 |
| 4.19 | Certain Fees | 49 |
| 4.20 | Compliance with Statutes, etc | 49 |
| 4.21 | Disclosure | 49 |
| 4.22 | Terrorism Laws and FCPA | 49 |
| 4.23 | Insurance | 50 |
| 4.24 | Common Enterprise | 50 |
| 4.25 | Security Interest in Collateral | 50 |
| 4.26 | Affiliate Transactions | 50 |
| 4.27 | Intellectual Property | 51 |
| 4.28 | Permits, Etc | 51 |
| SECTION 5. | AFFIRMATIVE COVENANTS | 51 |
| 5.1 | Financial Statements and Other Reports | 51 |
| 5.2 | Existence | 55 |
| 5.3 | Payment of Taxes and Claims | 55 |
| 5.4 | Maintenance of Properties | 56 |
| 5.5 | Insurance | 56 |
| 5.6 | Books and Records; Inspections | 56 |
| 5.7 | Compliance with Laws | 57 |
| 5.8 | Environmental | 57 |
| 5.9 | Subsidiaries | 59 |
| 5.10 | Further Assurances | 60 |
| 5.11 | Miscellaneous Business Covenants | 60 |
| 5.12 | Use of Proceeds | 60 |
| 5.13 | SPV Agreement | 60 |
| 5.14 | Santa Ana Excess Land | 60 |
| 5.15 | Bankruptcy Related Matters | 61 |
| SECTION 6. | NEGATIVE COVENANTS | 61 |
| 6.1 | Indebtedness | 61 |
| 6.2 | Liens | 63 |
| 6.3 | No Further Negative Pledges | 65 |
| 6.4 | Prepetition or Restricted Payments | 65 |
| 6.5 | Restrictions on Subsidiary Distributions | 65 |
| 6.6 | Investments | 65 |

| | | |
|---|---|---|
| 6.7 | Budget Covenant. | 66 |
| 6.8 | Fundamental Changes; Disposition of Assets; Acquisitions | 66 |
| 6.9 | Disposal of Subsidiary Interests | 68 |
| 6.10 | Sales and Lease Backs | 68 |
| 6.11 | Transactions with Shareholders and Affiliates | 68 |
| 6.12 | Conduct of Business | 68 |
| 6.13 | Permitted Activities of Holdings | 68 |
| 6.14 | Deposit Accounts | 69 |
| 6.15 | Fiscal Year | 69 |
| 6.16 | Amendments to Organizational Agreements and Material Contracts | 69 |
| 6.17 | Issuance of Capital Stock | 69 |
| 6.18 | Terrorism Laws | 69 |
| 6.19 | [Reserved] | 69 |
| 6.20 | Leases of Real Property. | 69 |
| 6.21 | [Reserved] | 69 |

**SECTION 7.    GUARANTY .................................................................. 70**

| | | |
|---|---|---|
| 7.1 | Guaranty of the Obligations | 70 |
| 7.2 | Reserved | 70 |
| 7.3 | Payment by Guarantors | 70 |
| 7.4 | Liability of Guarantors Absolute | 70 |
| 7.5 | Waivers by Guarantors | 72 |
| 7.6 | Guarantors' Rights of Subrogation, Contribution, etc | 73 |
| 7.7 | Subordination of Other Obligations | 73 |
| 7.8 | Continuing Guaranty | 73 |
| 7.9 | Authority of Guarantors or Borrowers | 74 |
| 7.10 | Financial Condition of Borrowers | 74 |
| 7.11 | Taxes | 74 |

**SECTION 8.    EVENTS OF DEFAULT .................................................. 74**

| | | |
|---|---|---|
| 8.1 | Events of Default | 74 |

**SECTION 9.    AGENT ......................................................................... 78**

| | | |
|---|---|---|
| 9.1 | Appointment of the DIP Agent | 78 |
| 9.2 | Powers and Duties | 78 |
| 9.3 | General Immunity | 78 |
| 9.4 | Agent Entitled to Act as Lender | 79 |
| 9.5 | Lenders' Representations, Warranties and Acknowledgment. | 80 |
| 9.6 | Right to Indemnity | 80 |
| 9.7 | Successor DIP Agent | 81 |
| 9.8 | Collateral Documents and Guaranty. | 82 |
| 9.9 | Posting of Approved Electronic Communications. | 83 |
| 9.10 | Violations of Terrorism Laws | 84 |
| 9.11 | Agent | 84 |
| 9.12 | Credit Bid | 84 |

SECTION 10.    COLLATERAL ............................................................................ 85

    10.1    Grant of Security Interest ...............................................................85
    10.2    Lien Perfection; Further Assurances ..............................................86

SECTION 11.    MISCELLANEOUS ................................................................. 87

    11.1    Notices ............................................................................................87
    11.2    Expenses .........................................................................................87
    11.3    Indemnity ........................................................................................88
    11.4    Set Off ............................................................................................89
    11.5    Amendments and Waivers. .............................................................89
    11.6    Successors and Assigns; Participations .........................................90
    11.7    Special Purpose Funding Vehicles .................................................94
    11.8    Independence of Covenants ............................................................94
    11.9    Survival of Representations, Warranties and Agreements .............94
    11.10    No Waiver; Remedies Cumulative .................................................95
    11.11    Marshalling; Payments Set Aside ..................................................95
    11.12    Severability ....................................................................................95
    11.13    Obligations Several; Independent Nature of Lenders' Rights ........95
    11.14    Headings .........................................................................................95
    11.15    APPLICABLE LAW .......................................................................96
    11.16    CONSENT TO JURISDICTION....................................................96
    11.17    WAIVER OF JURY TRIAL............................................................97
    11.18    Confidentiality ...............................................................................97
    11.19    Usury Savings Clause .....................................................................98
    11.20    Counterparts ...................................................................................99
    11.21    Effectiveness ..................................................................................99
    11.22    Patriot Act ......................................................................................99
    11.23    Disclosure .......................................................................................99
    11.24    Appointment for Perfection ...........................................................99
    11.25    Advertising and Publicity. ..............................................................99
    11.26    Entire Agreement. ........................................................................100
    11.27    Conflicts with DIP Order .............................................................100

**APPENDICES:**    A     Term Loan Commitments
                       B     Notice Addresses

**SCHEDULES:**    4.1    Jurisdictions of Organization and Qualification

| | | |
|---|---|---|
| | 4.2 | Capital Stock and Ownership |
| | 4.10 | Payment of Taxes |
| | 4.11 | Real Estate Assets |
| | 4.18 | Employee Benefit Plans |
| | 4.19 | Broker's Fees |
| | 4.23 | Insurance |
| | 4.26 | Affiliate Transactions |
| | 4.27 | Intellectual Property |
| | 6.1 | Certain Indebtedness |
| | 6.2 | Certain Liens |
| | 6.6 | Certain Investments |

**EXHIBITS:**    A     Funding Notice

| | | |
|---|---|---|
| | B | Term Loan Note |
| | C | Compliance Certificate |
| | D | Assignment Agreement |
| | E | Certificate Regarding Non-bank Status |
| | F | Closing Date Certificate |
| | G | Counterpart Agreement |
| | H | Form of DIP Order |
| | I | Payoff Letter |
| | J | Santa Ana Excess Land |

## SUPERPRIORITY
## DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT

This **SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT**, dated as of [\_\_\_\_\_] [   ], 2015, is entered into by and among **FREEDOM COMMUNICATIONS, INC**., a Delaware corporation ("**Freedom Communications**"), **FREEDOM COMMUNICATIONS HOLDINGS, INC**., a Delaware corporation ("**Freedom Holdings**") (each of Freedom Communications and Freedom Holdings are referred to hereinafter each individually as a "**Borrower**" and individually and collectively, jointly and severally, as the "**Borrowers**"), **2100 FREEDOM, INC**., a Delaware corporation ("**Holdings**"), and certain subsidiaries of the Borrowers, as Guarantors, each of the foregoing being a debtor and debtor-in-possession under the Cases referred to below, the Lenders party hereto from time to time, **SILVER POINT FINANCE, LLC** ("**Silver Point**"), as DIP Agent (in such capacity, "**DIP Agent**").

## RECITALS:

WHEREAS, capitalized terms used but not defined in these Recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

WHEREAS, on November 1, 2015 (the "**Petition Date**"), the Borrowers and each of the Guarantors (each an "**Obligor**," and collectively, the "**Obligors**;" the Obligors in such capacity, each a "**Debtor**" and collectively, the "**Debtors**") filed voluntary petitions with the Bankruptcy Court (as defined below) initiating cases pending under Chapter 11 of the Bankruptcy Code (collectively, the "**Cases**" and each a "**Case**") and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrowers have requested that the Lenders make Term Loans available to them for working capital and general corporate purposes and to refinance the Prepetition Loan Facility;

WHEREAS, the Lenders are willing to make the Term Loans available to the Borrowers upon the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

SECTION 1.     DEFINITIONS AND INTERPRETATION

**1.1     Definitions**.  The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"**Administrative Borrower**" as defined in Section 1.4.

"**Adverse Proceeding**" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of Holdings or any of its Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims) or other regulatory body or any arbitrator whether pending or, to the best knowledge of Holdings or any of its Subsidiaries, threatened against or affecting Holdings or any of its Subsidiaries or any property of Holdings or any of its Subsidiaries.

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person.  For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power (i) to vote five percent (5%) or more of the Securities having ordinary voting power for the election of directors of such Person, or (ii) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

"**Aggregate Amounts Due**" as defined in Section 2.15.

"**Agreement**" means this Superpriority Debtor-In-Possession Credit and Security Agreement, dated as of [          ], 2015, as it may be amended, supplemented or otherwise modified from time to time and any annexes, exhibits, schedules to any of the foregoing.

"**Approved Budget**" shall have the meaning assigned to such term in the DIP Order.

"**Asset Sale**" means a sale, lease or sub lease (as lessor or sublessor), sale and leaseback, assignment, conveyance, license, transfer or other disposition to, or any exchange of property with, any Person, in one transaction or a series of transactions, of all or any part of Holdings' or any of its Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, including the Capital Stock of any of Holdings' Subsidiaries, other than inventory sold or leased in the ordinary course of business.

"**Assignment Agreement**" means an Assignment and Assumption Agreement substantially in the form of Exhibit D, with such amendments or modifications as may be approved by DIP Agent.

"**Attributable Debt**" means as of the date of determination thereof, without duplication, (i) in connection with a sale and leaseback transaction, the net present value (discounted according to GAAP at the cost of debt implied in the lease) of the obligations of the lessee for rental payments during the then-remaining term of any applicable lease, and (ii) the principal balance outstanding under any synthetic lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing product to which such Person is a party, where such transaction is considered borrowed money indebtedness for tax purposes but is classified as an operating lease in accordance with GAAP.

28540330.4
Doc#: US1:10247675v15

"**Authorized Officer**" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president, chief financial officer, secretary or treasurer, in each case, whose signatures and incumbency have been certified to DIP Agent.

"**Avoidance Action**" means a claim and cause of action that constitutes an avoidance action under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code.

"**Avoidance Proceeds**" means any proceeds or property recovered, unencumbered or otherwise the subject of an Avoidance Action, whether by judgment, settlement or otherwise.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Central District of California, Santa Ana Division, or any appellate court having jurisdiction over the Cases from time to time.

"**Beneficiary**" means the DIP Agent and each Lender.

"**Blocked Person**" as defined in Section 4.22(b).

"**Borrower**" or "**Borrowers**" as defined in the preamble hereto.

"**Budget Variance Report**" shall have the meaning assigned to such term in the DIP Order.

"**Business Day**" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or the State of California or is a day on which banking institutions located in either such state are authorized or required by law or other Governmental Action to close.

"**Business Trade Secrets**" as defined in Section 4.27.

"**Capital Lease**" means, as applied to any Person, any lease of (or other arrangement conveying the right to use) any property (whether real, personal or mixed) by that Person as lessee (or the equivalent) that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**Carve-Out**" shall have the meaning assigned to such term in the DIP Order.

"**Case**" or "**Cases**" has the meaning specified in the recitals to this Agreement.

"**Cash**" means money, currency or a credit balance in a Deposit Account.

"**Cash Collateral Order**" means [    ].

"**Cash Equivalents**" means, as at any date of determination, (i) marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government, or (b) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one year after such date; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iii) commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iv) certificates of deposit or bankers' acceptances maturing within one year after such date and issued or accepted by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (a) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator), and (b) has Tier 1 capital (as defined in such regulations) of not less than $100,000,000; and (v) shares of any money market mutual fund that (a) has at least ninety five percent (95%) of its assets invested continuously in the types of investments referred to in clauses (i) and (ii) above, (b) has net assets of not less than $500,000,000, and (c) has the highest rating obtainable from either S&P or Moody's.

"**Certificate Regarding Non-Bank Status**" means a certificate substantially in the form of Exhibit E.

"**Change in Law**" means, the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Chapter 11 Order**" means any order of the Bankruptcy Court entered in the Cases.

"**CIP Regulations**" as defined in Section 9.10.

"**Closing Date**" means the date on which the Term Loans are made.

"**Closing Date Certificate**" means a Closing Date Certificate substantially in the form of Exhibit F.

"**Collateral**" as defined in Section 10.1.

"**Collateral Account**" means an account subject to a Control Agreement in favor of the DIP Agent and which shall be under the exclusive control of the DIP Agent.

"**Collateral Documents**" means this Agreement, each Control Agreement, the Deeds of Trust, the DIP Orders and all other instruments, documents and agreements delivered by any Obligor pursuant to this Agreement or any of the other Credit Documents in order to grant to the DIP Agent, for the benefit of the Secured Parties, a Lien on any real, personal or mixed property of that Obligor as security for the Obligations.

"**Collateral Records**" means books, records, ledger cards, files, correspondence, customer lists, supplier lists, blueprints, technical specifications, manuals, computer software (whether in source code or object code) and related documentation, computer printouts, tapes, disks and other electronic storage media and related data processing software and similar items that at any time evidence or contain information relating to any of the Collateral or are otherwise necessary or helpful in the collection thereof or realization thereupon.

"**Collateral Support**" means all property (real or personal) assigned, hypothecated or otherwise securing any Collateral and Term Loans and shall include any security agreement or other agreement granting a Lien or security interest in such real or personal property.

"**Communications**" as defined in Section 9.9(a).

"**Compliance Certificate**" means a Compliance Certificate substantially in the form of Exhibit C.

"**Consolidated Adjusted EBITDA**" means, for any period, an amount determined for Holdings and its Subsidiaries on a consolidated basis equal to Consolidated Net Income:

plus    (i) the sum, without duplication, of the amounts for such period to the extent included in the calculation of Consolidated Net Income of:

    (a)    Consolidated Interest Expense (excluding any portion attributable to Capital Leases or Attributable Debt), plus

    (b)    provisions for taxes based on income, plus

    (c)    total depreciation expense, plus

    (d)    total amortization expense, plus

    (e)    total net periodic pension and benefit expense, plus

(f)     other non-Cash items reducing Consolidated Net Income (excluding any such non-Cash item to the extent that it represents an accrual or reserve for potential Cash items in any future period or amortization of a prepaid Cash item that was paid in a prior period);

minus   (ii) the sum, without duplication of the amounts for such period to the extent included in the calculation of Consolidated Net Income of:

(a)     other non-Cash items increasing Consolidated Net Income for such period (excluding any such non-Cash item to the extent it represents the reversal of an accrual or reserve for potential Cash item in any prior period), plus

(b)     interest income, plus

(c)     extraordinary gains and other extraordinary income (as determined in accordance with GAAP).

"**Consolidated Capital Expenditures**" means, for any period, the aggregate of all expenditures of Holdings and its Subsidiaries during such period determined on a consolidated basis that, in accordance with GAAP, are or should be included in "purchase of property and equipment (including the portion of liabilities under any Capital Lease that is or should be capitalized in accordance with GAAP) or which should otherwise be capitalized" or similar items reflected in the consolidated statement of cash flows of Holdings and its Subsidiaries.

"**Consolidated Interest Expense**" means, for any period, total interest expense (including that portion attributable to Capital Leases in accordance with GAAP and capitalized interest) of Holdings and its Subsidiaries on a consolidated basis with respect to all outstanding Consolidated Total Debt, including all commissions, discounts and other fees and charges owed with respect to letters of credit and net costs under Interest Rate Agreements, but excluding, however, any amounts referred to in Section 2.9(b) payable on or before the Closing Date.

"**Consolidated Net Income**" means, for any period:

(i)     the net income (or loss) of Holdings and its Subsidiaries on a consolidated basis for such period taken as a single accounting period determined in conformity with GAAP, minus

(ii)    the sum of:

(a)     the income (or loss) of any Person (other than a Subsidiary of Holdings) in which any other Person (other than Holdings or any of its Subsidiaries) has a joint interest, except to the extent of the amount of dividends or other distributions actually paid to

Holdings or any of its Subsidiaries by such Person during such period, <u>plus</u>

(b)     the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of Holdings or is merged into or consolidated with Holdings or any of its Subsidiaries or that Person's assets are acquired by Holdings or any of its Subsidiaries, <u>plus</u>

(c)     the income of any Subsidiary of Holdings to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary, <u>plus</u>

(d)     any after tax gains or losses attributable to Asset Sales or returned surplus assets of any Pension Plan.

"**Consolidated Total Debt**" means, as at any date of determination: (i) the aggregate stated balance sheet amount of all Indebtedness of Holdings and its Subsidiaries determined on a consolidated basis in accordance with GAAP and (ii) the aggregate outstanding amount, without duplication, of Attributable Debt of Holdings and its Subsidiaries determined on a consolidated basis.

"**Contractual Obligation**" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**Control Agreements**" means a control agreement, in form and substance satisfactory to DIP Agent, entered into with the bank or securities intermediary at which any Deposit Account or Securities Account is maintained by any Borrower or Guarantor.

"**Counterpart Agreement**" means a Counterpart Agreement substantially in the form of <u>Exhibit G</u> delivered by an Obligor pursuant to Section 5.9.

"**Credit Document**" means any of this Agreement, the Term Loan Notes, if any, the Collateral Documents, the DIP Order and all other certificates, documents, instruments or agreements executed and delivered by an Obligor for the benefit of the DIP Agent or any Lender in connection herewith.

"**Credit Extension**" means the making of a Term Loan.

"**Debtor**" or "**Debtors**" shall have the meaning specified in the recitals to this Agreement.

"**Deeds of Trust**" means, collectively, (x) that certain Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of November 19, 2013, made by Freedom SPV II, LLC, a Delaware limited liability company ("**SPV II**"), as Trustor, to First American Title Insurance Company ("**Trustee**"), as Trustee, for the benefit of DIP Agent, as Beneficiary, recorded in the Official Records of Orange County, California, as instrument number 2013000644091 on November 25, 2013, as amended by that certain Modification Agreement to Deed Of Trust, Security Agreement, Assignment Of Rents And Leases And Fixture Filing, dated as of May 28, 2014 and recorded in the Official Records of Orange County, California as instrument number 2014000208267, and (y) that certain Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of November 19, 2013, made by Freedom SPV VI, LLC, a Delaware limited liability company ("**SPV VI**"), as Trustor, to Trustee, as Trustee, for the benefit of DIP Agent, as Beneficiary, recorded in the Official Records of Riverside County, California, as instrument number 20130558068 on November 27, 2013.

"**Default**" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"**Default Rate**" means any interest payable pursuant to Section 2.8.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Disqualified Capital Stock**" means Capital Stock that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Capital Stock referred to in clause (a) above, (c) contains any repurchase obligation that may come into effect prior to the first anniversary date of the irrevocable payment in full of all Obligations, (d) requires cash dividend payments, (e) does not provide that any claims of any holder of such Capital Stock may have against any Borrower or any other Obligor (including any claims as judgment creditor or other creditor in respect of claims for the breach of any covenant contained therein) shall be fully subordinated (including a full remedy bar) to the Obligations in a manner satisfactory to DIP Agent, (f) provides the holders of such Capital Stock thereof with any rights to receive any cash upon the occurrence of a change of control, or (g) is prohibited by the terms of this Agreement.

"**DIP Agent**" as defined in the preamble hereto.

"**DIP Agent's Account**" means an account at a bank designated by DIP Agent from time to time as the account into which Obligors shall make all payments to DIP Agent for the benefit of the DIP Agent and the Lenders under this Agreement and the other Credit Documents.

"**DIP Liens**" means the Liens granted hereunder or under any other Credit Document to secure the Obligations.

"**DIP Order**" means the final order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof with the approval of the DIP Agent and the Requisite Lenders in their sole discretion) approving the DIP Term Loan Facility, substantially in the form set forth as <u>Exhibit H</u> with changes to such form as are satisfactory to DIP Agent and the Requisite Lenders in their sole discretion.

"**DIP Term Loan Facility**" means the credit facility contemplated by this Agreement.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**EBITDA Condition**" means a condition that shall be satisfied as of any date of determination following the Closing Date only if Consolidated Adjusted EBITDA for the twelve-month period ended the last day of the calendar month immediately preceding such date of determination shall be greater than or equal to $2,000,000.

"**Eligible Assignee**" means (a) any Lender, any Affiliate of any Lender and any Related Fund (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof), (b) any commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends credit or buys loans as one of its businesses, or (c) any other Person (other than a natural Person) approved by DIP Agent; <u>provided</u>, neither Holdings nor any Affiliate of Holdings shall, in any event, be an Eligible Assignee.

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was sponsored, maintained or contributed to by, or required to be contributed by, Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates.

"**Environmental Claim**" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"**Environmental Laws**" means any and all current or future foreign or domestic, federal, state or local (or any subdivision of any of them), statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other requirements of Governmental Authorities relating to (i) public health and safety, protection of the environment or other environmental matters, including those relating to any Hazardous Materials Activity; (ii) the generation, use, storage, transportation or disposal of Hazardous Materials; or (iii) occupational safety and health, industrial hygiene, land use or the protection of human, plant or animal health or welfare.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto, in each case together with the regulations thereunder.

"**ERISA Affiliate**" means, as applied to any Person, (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii) above is a member. Any former ERISA Affiliate of Holdings or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of Holdings or any such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of Holdings or such Subsidiary and with respect to liabilities arising after such period for which Holdings or such Subsidiary could be liable under the Internal Revenue Code or ERISA.

"**ERISA Event**" means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (ii) the failure to meet the minimum funding standard of Sections 412 and 430 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 430(j) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (iii) any Pension Plan is or becomes subject to the limitations of Section 4.36 of the Internal Revenue Code; (iv) notice of intent to terminate a Pension Plan in a distress termination described in Section 4041(c) of ERISA; (v) the withdrawal by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more non-related contributing sponsors or the termination of any such Pension Plan resulting in liability to Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4063 or 4064 of ERISA; (vi) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might reasonably constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vii) the imposition of liability on Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (viii) the withdrawal of Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any liability or potential liability therefor, or the receipt by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (ix) the occurrence of an act or omission which could give rise to the imposition on Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates of fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA

in respect of any Employee Benefit Plan; (x) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan or the assets thereof, or against Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan; (xi) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (xii) the imposition of a Lien pursuant to Section 430(k) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

"**Event of Default**" means each of the conditions or events set forth in Section 8.1.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Excluded Taxes**" means, with respect to any Lender or any other recipient of any payment to be made by or on account of any obligation of Borrowers hereunder (a) Taxes that are imposed on such Lender or other recipient's overall net income (however denominated), franchise Taxes imposed in lieu thereof and branch profits Taxes (i) by the United States, (ii) by any other Government Authority under the laws of which such Lender or other recipient is organized or has its principal office or, in the case of any Lender, maintains its applicable lending office or (iii) by any Government Authority as a result of a present or former connection between such recipient and the jurisdiction of such Government Authority (other than any such connection arising from such recipient having executed, delivered become a party to, performed its obligations or received a payment under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced, any of the Credit Documents, or sold or assigned an interest in any Term Loan or Credit Document), (b) any withholding Tax that (i) is imposed on amounts payable to or for the account of such Non-U.S. Lender with respect to an applicable interest in a Term Loan or Term Loan Commitment at the time it acquires such interest in the Term Loan or Term Loan Commitment (or designates a new lending office), or (ii) is attributable to such Non-U.S. Lender's failure or inability (other than as a result of a Change in Law) to comply with its obligations under Sections 2.17(e), (f) or (g), except to the extent that such Non-U.S. Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts with respect to such withholding Tax pursuant to Section 2.17(b) and (c) any U.S. withholding Tax imposed under FATCA.

"**Extraordinary Receipts**" means any (i) foreign, United States, state or local tax refunds received by or paid to or for the account of Holdings or any of its Subsidiaries and (ii) cash received by or paid to or for the account of Holdings or any of its Subsidiaries not in the ordinary course of business, including any pension plan reversions, judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, condemnation awards (and payments in lieu thereof), indemnity payments, any funds released from collateral or escrow accounts, including in respect of letters of credit permitted under Section 6.1, and any purchase price adjustment received in connection with any purchase

agreement and proceeds of insurance (excluding, however, any Net Insurance/Condemnation Proceeds which are subject to Section 2.12(b)).

"**Facility**" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased, operated or used by Holdings or any of its Subsidiaries or any of their respective predecessors or Affiliates.

"**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code, as in effect as of the date hereof (or any amended or successor version thereof that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code.

"**FCPA**" as defined in Section 4.22.

"**Financial Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of the chief executive officer of Holdings that such financial statements fairly present, in all material respects, the financial condition of Holdings and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, in each case in conformity with GAAP applied on a consistent basis, subject, in the case of interim financial statements, to changes resulting from normal audit and year-end adjustments.

"**First Day Orders**" means all orders entered by the Bankruptcy Court on, or within five (5) days of, the Petition Date or based on motions filed on or about the Petition Date.

"**Fiscal Month**" means a fiscal month of any Fiscal Year.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of Holdings and its Subsidiaries ending on December 31 of each calendar year.

"**Flood Hazard Property**" means any Real Estate Asset subject to a mortgage in favor of DIP Agent, for the benefit of the Secured Parties, and located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"**Freedom Communications**" as defined in the preamble hereto.

"**Freedom Holdings**" as defined in the preamble hereto.

"**Funding Notice**" means a notice substantially in the form of <u>Exhibit A</u>.

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.2, United States generally accepted accounting principles in effect as of the date of determination thereof.

"**Governmental Action**" means any act or omission, whether rightful or wrongful, of any present or future de jure or de facto government or Governmental Authority.

"**Governmental Authority**" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government (including any supranational bodies such as the European Union or the European Central Bank).

"**Governmental Authorization**" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Granting Lender**" as defined in Section 11.7.

"**Guarantee**" means, with respect to any Person, any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, that is (a) an obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof; or (b) a liability of such Person for an obligation of another through any agreement (contingent or otherwise) (i) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (ii) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (i) or (ii) of this clause (b), the primary purpose or intent thereof is as described in clause (a) above.

"**Guaranteed Obligations**" as defined in Section 7.1.

"**Guarantor**" means each of Holdings and each Subsidiary of Holdings.

"**Guarantor Subsidiary**" means each Guarantor other than Holdings.

"**Guaranty**" means the guaranty of each Guarantor set forth in Section 7.

"**Hazardous Materials**" means any chemical, material or substance, exposure to which is prohibited, limited or regulated by any Environmental Law or Governmental Authority or which may or could pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any Facility or to the indoor or outdoor environment.

"**Hazardous Materials Activity**" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement,

removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Highest Lawful Rate**" means (a) the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender with respect to the DIP Term Loan Facility, which laws are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow, or  (b) for so long as the DIP Order preempts or otherwise renders inapplicable the effect of the laws described in clause (a) to the DIP Term Loan Facility, the interest rate applicable pursuant to the DIP Order.

"**Historical Financial Statements**" means as of the Closing Date, (i) the audited financial statements of Holdings and its Subsidiaries, for the Fiscal Year ended December 31, 2014, consisting of balance sheets and the related consolidated statements of income, stockholders' equity and cash flows for such Fiscal Year, and (ii) for the interim period from December 31, 2014 to the Closing Date, internally prepared, unaudited financial statements of Holdings and its Subsidiaries, consisting of a balance sheet and the related consolidated statements of income, stockholders' equity and cash flows for each quarterly period completed prior to forty-six (46) days before the Closing Date and for each monthly period completed prior to thirty-one (31) days prior to the Closing Date, in the case of clauses (i) and (ii), certified by the chief executive officer of Holdings that they fairly present, in all material respects, the financial condition of Holdings and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject, if applicable, to changes resulting from audit and normal year-end adjustments.

"**Holdco SPV**" means [    ].

"**Holdings**" as defined in the preamble hereto.

"**Increased Cost Lender**" as defined in Section 2.20.

"**Indebtedness**," as applied to any Person, means, without duplication, (i) all indebtedness for borrowed money; (ii) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP; (iii) all obligations of such Person evidenced by notes, bonds or similar instruments or upon which interest payments are customarily paid and all obligations in respect of drafts accepted representing extensions of credit whether or not representing obligations for borrowed money; (iv) any obligation owed for all or any part of the deferred purchase price of property or services (excluding trade payables incurred in the ordinary course of business) which purchase price is (a) due more than thirty (30) days from the date of incurrence of the obligation in respect thereof or (b) evidenced by a note or similar written instrument; (v) all obligations created or arising under any conditional sale or other title retention agreement with respect to property acquired by such person; (vi) all indebtedness of others secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; (vii) the face amount of any letter of credit or letter of guaranty issued, bankers' acceptances facilities, surety bond and

14

similar credit transactions for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings or drafts; (viii) the direct or indirect guaranty, endorsement (otherwise than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another; (ix) any obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof; (x) any liability of such Person for an obligation of another through any agreement (contingent or otherwise) (a) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (b) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (a) or (b) of this clause (x), the primary purpose or intent thereof is as described in clause (ix) above; (xi) all obligations of such Person in respect of any exchange traded or over the counter derivative transaction, including any Interest Rate Agreement and any other Rate Management Transaction, whether entered into for hedging or speculative purposes; (xii) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital  Stock of such Person and (xiii) all Attributable Debt of such Person.  Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or joint venturer, unless such Indebtedness is expressly non-recourse to such Person.

"**Indemnified Liabilities**" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby (including the Lenders' agreement to make Credit Extensions or the use or intended use of the proceeds thereof, or any enforcement of any of the Credit Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty)); (ii) the statements contained in any commitment letter or proposal letter delivered by any Lender to any Obligor with respect to the transactions contemplated by this Agreement (including the Proposal Letter); or (iii) any Environmental Claim against or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of Holdings or any of its Subsidiaries.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made hereunder by or on account of any obligation of the Borrowers and (b) to the extent not otherwise described in (a), Other Taxes.

"**Indemnitee**" as defined in Section 11.3(a).

"**Indemnitee Agent Party**" as defined in Section 9.6.

"**Initial Budget**" shall have the meaning assigned to such term in the DIP Order.

"**Insurance**" means (i) all insurance policies covering any or all of the Collateral (regardless of whether the DIP Agent is the loss payee thereof) and (ii) any key man life insurance or business interruption policies.

"**Intellectual Property**" as defined in Section 4.27.

"**Interest Payment Date**" means (a) the last day of each month, commencing on the first such date to occur after the Closing Date and (b) the Term Loan Maturity Date.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"**Investment**" means (i) any direct or indirect purchase or other acquisition by Holdings or any of its Subsidiaries of, or of a beneficial interest in, any of the Securities or Capital Stock of any other Person; (ii) any direct or indirect redemption, retirement, purchase or other acquisition for value, by any Subsidiary of Holdings from any Person, of any Capital Stock of such Person; (iii) any direct or indirect loan, advance or capital contributions by Holdings or any of its Subsidiaries to any other Person, including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the ordinary course of business; and (iv) any direct or indirect Guarantee of any obligations of any other Person.  The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"**Investment Accounts**" means the Collateral Account, Securities Accounts and Deposit Accounts.

"**Investment Related Property**" means and include:  (i) all "investment property" (as such term is defined in Article 9 of the UCC), (ii) all "financial assets" (as such term is defined in Article 8 of the UCC) and (iii) in any event, all of the following: all Capital Stock, the Investment Accounts and certificates of deposit.

"**Joint Venture**" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form; provided, in no event shall any corporate or limited liability company that is a Subsidiary of any Person be considered to be a Joint Venture to which such Person is a party.

"**Leasehold Property**" means any leasehold interest of any Obligor as lessee under any lease of real property, other than any such leasehold interest designated from time to time by DIP Agent in its sole discretion as not being required to be included in the Collateral.

"**Lender**" means each financial institution listed on the signature pages hereto as a Lender, and any other Person that becomes a party hereto pursuant to an Assignment Agreement other than any such Person that ceases to be a party hereto pursuant to an Assignment Agreement.

"**Lien**" means (i) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing, and (ii) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"**Margin Stock**" as defined in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"**Material Adverse Effect**" means a material adverse effect on and/or material adverse developments with respect to (i) the business operations, properties, assets, condition (financial or otherwise) or prospects of (x) Holdings and its Subsidiaries taken as a whole or (y) any Borrower; (ii) the ability of any Obligor to fully and timely perform its Obligations; (iii) the legality, validity, binding effect, or enforceability against an Obligor of a Credit Document to which it is a party; (iv) the Collateral or DIP Agent's Liens (on behalf of itself and the Secured Parties) on the Collateral or the priority of such Liens as set forth in the Credit Documents and any DIP Order; or (v) the rights, remedies and benefits available to, or conferred upon, the DIP Agent and any Lender or any Secured Party under any Credit Document.

"**Material Contract**" means, collectively, (i) any contract or agreement requiring payments to be made or providing for payments to be received, in each case in excess of $100,000 per annum or $250,000 over the term of such agreement, (ii) any other contract or other arrangement to which Holdings or any of its Subsidiaries is a party (other than the Credit Documents) for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect and (iii) any agreement or instrument evidencing, securing or governing Indebtedness.

"**Maturity Date Extension Conditions**" means, collectively, (i) the EBITDA Condition, (ii) the Santa Ana Property Condition and (iii) payment of $50,000 to the DIP Agent as an administration fee pursuant to Section 2.9(a).

"**Moody's**" means Moody's Investor Services, Inc.

"**Multiemployer Plan**" means any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA.

"**NAIC**" means The National Association of Insurance Commissioners, and any successor thereto.

"**Narrative Report**" means, with respect to the financial statements for which such narrative report is required, a narrative report describing the operations of Holdings and its Subsidiaries in the form prepared for presentation to senior management thereof for the applicable Fiscal Month, Fiscal Quarter or Fiscal Year and for the period from the beginning of the then current Fiscal Year to the end of such period to which such financial statements relate with comparison to and variances from the immediately preceding period and budget.

"**Net Asset Sale Proceeds**" means, with respect to any Asset Sale, an amount equal to: (i) the sum of Cash payments and Cash Equivalents received by Holdings or any of its Subsidiaries from such Asset Sale (including any Cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received), minus (ii) any bona fide direct costs incurred in connection with such Asset Sale, including a reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such Asset Sale undertaken by Holdings or any of its Subsidiaries in connection with such Asset Sale (as set forth in an officer's certificate of Holdings delivered to the DIP Agent (together with supporting calculations) and consented to by the DIP Agent, but excluding any income or gains taxes; provided that upon release of any such reserve, the amount released shall be considered additional Net Asset Sale Proceeds.

"**Net Insurance/Condemnation Proceeds**" means an amount equal to: (i) any Cash payments or proceeds received by Holdings or any of its Subsidiaries (a) under any casualty, business interruption or "key man" insurance policies in respect of any covered loss thereunder, or (b) as a result of the taking of any assets of Holdings or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, minus (ii) (a) any actual and reasonable costs incurred by Holdings or any of its Subsidiaries in connection with the adjustment or settlement of any claims of Holdings or such Subsidiary in respect thereof, and (b) any bona fide direct costs incurred in connection with any sale of such assets as referred to in clause (i)(b) of this definition, excluding income or gains taxes.

"**Non-Consenting Lender**" as defined in Section 2.20.

"**Non-U.S. Lender**" as defined in Section 2.17(e).

"**Obligations**" means all liabilities and obligations of every nature of each Obligor and its Subsidiaries from time to time owed to the DIP Agent (including any former DIP Agent), the Lenders or any of them under any Credit Document, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such Obligor, would have accrued on any Obligation, whether or not a claim is allowed against such Obligor for such interest in the related bankruptcy proceeding), fees, expenses, indemnification or otherwise and whether primary, secondary, direct, indirect, contingent, fixed or otherwise (including obligations of performance).

"**Obligee Guarantor**" as defined in Section 7.7.

"**Obligor**" or "**Obligors**" shall have the meaning specified in the recitals to this Agreement.

"**OFAC**" means the United States Department of the Treasury's Office of Foreign Assets Control.

"**OFAC Sanctions Programs**" means the laws, regulations and Executive Orders administered by OFAC, including but not limited to, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as it has been or shall thereafter be renewed, extended, amended or replaced, and the list of Specially Designated Nationals and Blocked Persons administered by OFAC, as such list may be amended from time to time.

"**Organizational Documents**" means (i) with respect to any corporation, its certificate or articles of incorporation or organization, as amended, and its bylaws, as amended, (ii) with respect to any limited partnership, its certificate of limited partnership, as amended, and its partnership agreement, as amended, (iii) with respect to any general partnership, its partnership agreement, as amended, and (iv) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended.  In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"**Other Taxes**" means any and all present or future stamp, court or documentary, registration, intangible, recording, filing, transfer, documentary, excise or property or similar Taxes arising from any payment made hereunder or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to or in connection with, any Credit Document.

"**Participant**" as defined in Section 11.6(h).

"**Participant Register**" as defined in Section 11.6(h).

"**Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (PATRIOT) Act of 2001 (Title III of Pub. L. 107-56, Oct. 26, 2001).

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Plan**" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Title IV of ERISA, Section 412 of the Internal Revenue Code or Section 302 of ERISA.

"**Permitted Liens**" means each of the Liens permitted pursuant to Section 6.2.

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock

companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"**Petition Date**" shall have the meaning specified in the recitals to this Agreement.

"**Platform**" as defined in Section 9.9(b).

"**Prepayment Date**" as defined in Section 2.13(c).

"**Prepetition Indebtedness**" means all Indebtedness and other obligations, including any "Obligations" (as defined in the Prepetition Loan Facility) owed to the lenders and the agents under the Prepetition Loan Facility, including all principal, interest, fees, make-whole amounts, protective advances and expenses, the aggregate amount of which shall be set forth in the payoff letter attached as <u>Exhibit I</u> hereto.

"**Prepetition Loan Facility**" means the financing facility evidenced by that certain Credit Guaranty Agreement, dated as of November 21, 2013, by and among the Borrowers, the Guarantors, the lenders identified on the signature pages thereof, and Silver Point Finance, LLC as the administrative agent and collateral agent for such lenders, as amended by that certain Amendment to Credit and Guaranty Agreement, dated as of December 10, 2013, that certain Second Amendment and Waiver to Credit and Guaranty Agreement, dated as of January 24, 2014, that certain Third Amendment and Waiver to Credit and Guaranty Agreement, dated as of February 28, 2014, that certain Fourth Amendment and Waiver to Credit and Guaranty Agreement, dated as of April 21, 2014 and that certain Fifth Amendment and Waiver to Credit and Guaranty Agreement, dated as of May 28, 2014, together with all security and ancillary documents related thereto (as further amended, supplemented or modified from time to time as permitted thereunder).

"**Principal Office**" means, for DIP Agent, such Person's "Principal Office" as set forth on Appendix B, or such other office as such Person may from time to time designate in writing to Administrative Borrower, DIP Agent and each Lender.

"**Pro Rata Share**" means with respect to all payments, computations and other matters relating to the Term Loan of any Lender, the percentage obtained by dividing (a) the Term Loan Exposure of that Lender, by (b) the aggregate Term Loan Exposure of all Lenders.

"**Proceeds**" means:   (i) all "proceeds" as defined in Article 9 of the UCC, (ii) payments or distributions made with respect to any other item of Collateral and (iii) whatever is receivable or received when Collateral or proceeds are sold, exchanged, collected or otherwise disposed of, whether such disposition is voluntary or involuntary.

"**Property SPV**" means each of SPV II and SPV VI.

"**Rate Management Transaction**" means any transaction (including an agreement with respect thereto) now existing or hereafter entered which is a rate swap, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index

swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, forward transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, whether linked to one or more interest rates, foreign currencies, commodity prices, equity prices or other financial measures.

"**Real Estate Asset**" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Obligor in any real property.

"**Register**" as defined in Section 2.6(b).

"**Regulation D**" means Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"**Related Fund**" means, with respect to any Lender that is an investment fund, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.  With respect to Silver Point, Related Fund shall also include any swap, special purpose vehicles purchasing or acquiring security interests in collateralized loan obligations or any other vehicle through which Silver Point may leverage its investments from time to time.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"**Reorganization Plan**" means a chapter 11 plan filed in any or all of the Cases.

"**Replacement Lender**" as defined in Section 2.20.

"**Requisite Lenders**" means one or more Lenders having or holding Term Loan Exposure and representing more than fifty percent (50%) of the aggregate Term Loan Exposure of all Lenders.

"**Restricted Payment**" shall mean (a) any dividend or other distribution, direct or indirect, on account of any share of any class of stock, equity or other ownership interest, (b) loans to any Affiliate by any Obligor, (c) any payment of management, consulting, investment banking or similar fees payable by any Obligor to any Affiliate, (d) any redemption, purchase, retirement, defeasance, sinking fund or similar payment, any claim of rescission or other acquisition or retirement of or with respect to any Securities of any Obligor and (e) any payment on or with respect to, or purchase, redemption, defeasance or other acquisition or retirement for value of any Indebtedness of the any Borrower or Guarantor that is contractually subordinated to the Term Loans.

"**Santa Ana Excess Land**" means those certain parcels of real estate (and the improvement located thereon) located in Santa Ana, California, as more particularly described on Exhibit J attached hereto.

"**Santa Ana Property Condition**" means a condition that shall be satisfied as of any date of determination only if (i) the Obligors shall have executed a binding contract, that is not subject to any termination rights in favor of the purchaser other than for a default by an Obligor or the failure of a customary condition to closing that is beyond the control of the Obligors (for the avoidance of doubt, closing conditions relating to zoning, entitlements or other land use classifications shall not be considered customary for purposes of this clause (i)), for the sale of the Santa Ana Excess Land, (ii) such contract shall be in form and substance acceptable to the DIP Agent and shall require the Obligors and the buyer thereunder to consummate the sale of the Santa Ana Excess Land prior to the Extended Stated Maturity Date (and shall not include any extension or other provision that may permit the sale to be consummated on or after the Extended Stated Maturity Date), (iii) the Obligors shall have received (directly or through a customary third-party escrow arrangement) a non-refundable cash deposit of not less than $500,000 from the buyer pursuant to such contract (and, subject to any third-party escrow arrangement, the entire amount of such deposit shall be held in the Collateral Account pending such sale) and (iv) the DIP Agent shall have received executed copies of such contract, evidence of such deposit and a written certification by the chief executive officer of the Borrowers that foregoing conditions have been satisfied.

"**Second Day Orders**" means all orders entered by the Bankruptcy Court after the Petition Date or based on motions filed after the Petition Date, other than the First Day Orders.

"**Secured Parties**" means the DIP Agent and the Lenders.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Account**" means a "securities account" as defined in Article 8 of the UCC.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Silver Point**" as defined in the preamble hereto.

"**SPC**" as defined in Section 11.7.

"**SPV**" means a Property SPV and/or a Holdco SPV, as applicable.

"**SPV Agreements**" means (i) the Limited Liability Company Agreement of Freedom SPV I, LLC, a Delaware limited liability company, dated as of November 21, 2013, (ii) the Limited Liability Company Agreement of Freedom SPV II, LLC, a Delaware limited liability company, dated as of November 21, 2013, (iii) the Limited Liability Company Agreement of Freedom SPV III, LLC, a Delaware limited liability company, dated as of November 21, 2013, (iv) the Limited Liability Company Agreement of Freedom SPV IV, LLC, a Delaware limited liability company, dated as of November 21, 2013, (v) the Limited Liability Company Agreement of Freedom SPV V, LLC, a Delaware limited liability company, dated as of November 21, 2013, and (vi) the Limited Liability Company Agreement of Freedom SPV VI, LLC, dated as of November 21, 2013.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity the accounts of which would be consolidated with those of such Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, partnership, limited liability company, association, joint venture or other business entity of which more than fifty percent (50%) of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; provided, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.  Unless the context otherwise requires, when used in this Agreement, the term "Subsidiary" shall refer to a Subsidiary of Holdings.

"**Superpriority Claim**" shall have such meaning as specified in the DIP Order.

"**Supporting Obligation**" means all "supporting obligations" as defined in Article 9 of the UCC.

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by any Governmental Authority, on whomsoever and wherever imposed, levied, collected, withheld or assessed, and any interest, penalties or additional amounts thereon.

"**Tax Related Person**" means, in the case of a Lender that is treated as fiscally transparent for income tax purposes (including, without limitation, partnership, simple or complex trust, grantor trust, or S corporation), a direct or indirect beneficial owner in such Lender who is taxable on an allocable share of income of the Lender.

"**Term Loan**" means a term loan made by a Lender to the Borrowers on the Closing Date pursuant to Section 2.1(a).

"**Term Loan Commitment**" means the commitment of a Lender to make or otherwise fund, subject to the terms and conditions set forth herein, a Term Loan and "**Term**

23

**Loan Commitments**" means such commitments of all Lenders in the aggregate.  The amount of each Lender's Term Loan Commitment is set forth on Appendix A or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof.  The aggregate amount of the Term Loan Commitments as of the date hereof is $[    ].

"**Term Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Term Loans of such Lender.

"**Term Loan Maturity Date**" means the earlier of (i) the date that is twelve (12) months following the Closing Date (the "**Initial Stated Maturity Date**") or if, as of the Initial Stated Maturity Date, the Maturity Date Extension Conditions are satisfied, the date that is eighteen (18) months following the Closing Date (the "**Extended Stated Maturity Date**"), (ii) the date that all Term Loans shall become due and payable in full hereunder, whether by acceleration or otherwise or (iii) the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of a Reorganization Plan that is confirmed pursuant to an order entered by the Bankruptcy Court.

"**Term Loan Note**" means, with respect to any Term Loans, a promissory note in the form of Exhibit B as it may be amended, supplemented or otherwise modified from time to time.

"**Terminated Lender**" as defined in Section 2.20.

"**Terrorism Laws**"  means any laws relating to terrorism or money laundering, including, without limitation, (i) the Money Laundering Control Act of 1986 (i.e., 18 U.S.C. §§ 1956 and 1957), (ii) the Bank Secrecy Act, as amended by the Patriot Act, (iii) the laws, regulations and Executive Orders administered by OFAC, (iv) the Comprehensive Iran Sanctions, Accountability, and Divestment Act, as amended, and any related executive orders and regulations, (v) any law prohibiting or directed against terrorist activities or the financing of terrorist activities (e.g., 18 U.S.C. §§ 2339A and 2339B) or (vi) any similar laws enacted in the United States or any other jurisdictions in which the parties to this agreement operate, as any of the foregoing laws may from time to time be amended, renewed, extended or replaced and  all other present and future legal requirements of any Governmental Authority governing, addressing, relating to, or attempting to eliminate, terrorist acts and acts of war and any regulations promulgated pursuant thereto.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"**Waivable Prepayment**" as defined in Section 2.13(c).

"**Withholding Agent**" means any Obligor and the DIP Agent.

**1.2    Accounting Terms**.    Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Credit Document, and Administrative

Borrower or DIP Agent shall so request, DIP Agent and Administrative Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of Requisite Lenders), provided that, until so amended, such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and Administrative Borrower shall provide to DIP Agent and Lenders reconciliation statements requested by DIP Agent (reconciling the computations of such financial ratios and requirements from the then-current GAAP computations to the computations under GAAP prior to such change) in connection therewith.  Financial statements and other information required to be delivered by Administrative Borrower to Lenders pursuant to Section 5.1(a), 5.1(b) and 5.1(c) shall be prepared in accordance with GAAP as in effect at the time of such preparation (and delivered together with the reconciliation statements provided for in Section 5.1(e), if applicable).  Subject to the foregoing, calculations in connection with the definitions, covenants and other provisions hereof shall utilize accounting principles and policies in conformity with those used to prepare the Historical Financial Statements.

      **1.3**    **Interpretation, etc**.  Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.  References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof, unless otherwise specifically provided.  The use herein of the word "include" or "including," when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not no limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  Unless otherwise indicated, any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein).  Reference to an Obligor's "knowledge" or similar concept means actual knowledge of a Person holding a position listed in the definition of "Authorized Officer", whether or not such Person's signature or incumbency has been certified to the DIP Agent, or a financial advisor to an Obligor, or a chief restructuring officer if any, or knowledge that such a Person would have obtained if he or she had engaged in good faith and diligent performance of his or her duties, including reasonably specific inquiries of employees or agents and a good faith attempt to ascertain the matter.

      **1.4**    **Administrative Borrower Agent for Borrowers**.  Each Borrower hereby irrevocably appoints Freedom Holdings as the borrowing agent and attorney-in-fact for all Borrowers (in such capacity, "**Administrative Borrower**") and authorizes Administrative Borrower (i) to provide the DIP Agent with all notices and instructions under this Agreement and the other Credit Documents and (ii) to take such action as Administrative Borrower deems appropriate on its behalf to obtain the Term Loans under this Agreement and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement. Each Borrower hereby jointly and severally agrees to indemnify the DIP Agent and each Lender and hold the DIP Agent and each Lender harmless against any and all liability, expense, loss or claim of damage or injury, made against the DIP Agent or any Lender by any Borrower or by

any third party whatsoever, arising from or incurred by reason on the Lenders relying on any instructions or other actions of Administrative Borrower.

SECTION 2.        TERM LOANS

**2.1    Term Loans**.

(a)    <u>Term Loan Commitments</u>.  Subject to the terms and conditions hereof, each Lender severally agrees to make, on the Closing Date (which shall be as soon as reasonably practicable following the satisfaction of the conditions set forth in Sections 3.1 and 3.2,  a Term Loan to the Borrowers in an amount equal to such Lender's Term Loan Commitment.  The borrowing on the Closing Date is the only borrowing the Borrowers may make the Term Loan Commitments.  Any amount borrowed under this Section 2.1(a) and subsequently repaid or prepaid may not be reborrowed.  Subject to Sections 2.11 and 2.12, all amounts owed hereunder with respect to the Term Loans shall be paid in full no later than the Term Loan Maturity Date. Each Lender's Term Loan Commitment shall terminate immediately and without further action on the Closing Date after giving effect to the funding of such Lender's Term Loan Commitment on such date.

(b)    <u>Borrowing Mechanics for the Term Loans</u>.

(i)    Administrative Borrower shall deliver to DIP Agent a fully executed Funding Notice no later than the Business Day preceding the Closing Date with respect to Term Loans. Promptly upon receipt by DIP Agent of such Funding Notice, DIP Agent shall notify each Lender of the proposed borrowing.  DIP Agent and Lenders may act without liability upon the basis of written, telecopied or telephonic notice believed by DIP Agent in good faith to be from Administrative Borrower (or from any Authorized Officer thereof designated in writing purportedly from Administrative Borrower to DIP Agent), it being understood that no Lender nor DIP Agent shall be obligated in any manner with respect to the funding of any Term Loan in the absence of the receipt by DIP Agent of a completed and executed Funding Notice.  DIP Agent and each Lender shall be entitled to rely conclusively on any Authorized Officer's authority to request a Term Loan on behalf of Administrative Borrower until DIP Agent receives written notice to the contrary.  DIP Agent and Lenders shall have no duty to verify the authenticity of the signature appearing on any written Funding Notice.

(ii)    Each Lender shall make its Term Loan available to DIP Agent not later than 12:00 p.m. (New York City time) on the Closing Date, by wire transfer of same day funds in Dollars, to DIP Agent's Account.  Upon satisfaction or waiver of the conditions precedent specified herein, DIP Agent shall make the proceeds of the Term Loans available to Borrowers on the Closing Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Term Loans received by DIP Agent from Lenders to be credited to the account of the Borrowers to DIP Agent's Account or to such other account as may be designated in writing to DIP Agent by Administrative Borrower.

(iii)    For the avoidance of doubt, the waiver of any condition precedent specified herein by the Requisite Lenders and the making of any Term Loan pursuant to such waiver, shall not be deemed to be (or deemed to be evidence of) a waiver of any underlying Default or Event of Default related to such condition precedent, which Default or Event of Default shall remain outstanding and with respect to which the DIP Agent and the Lenders shall reserve all rights unless otherwise expressly waived.

**2.2**    [**Reserved**].

**2.3**    [**Reserved**].

**2.4**    **Pro Rata Shares; Availability of Funds; One Obligation**.

(a)    <u>Pro Rata Shares</u>.    All Term Loans shall be made by Lenders simultaneously and proportionately to their respective Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Term Loan requested hereunder nor shall any Term Loan Commitment of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Term Loan requested hereunder.

(b)    <u>Availability of Funds</u>.    Unless DIP Agent shall have been notified by any Lender prior to the Closing Date that such Lender does not intend to make available to DIP Agent the amount of such Lender's Term Loan on the Closing Date, DIP Agent may assume that such Lender has made such amount available to DIP Agent on the Closing Date and DIP Agent may, in its sole discretion, but shall not be obligated to, make available to Borrowers a corresponding amount on the Closing Date.  If such corresponding amount is not in fact made available to DIP Agent by such Lender, DIP Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest thereon, for each day from the Closing Date until the date such amount is paid to DIP Agent, at the customary rate set by DIP Agent for the correction of errors among banks for three (3) Business Days and thereafter at a per annum rate equal to 10.0%.  If such Lender does not pay such corresponding amount forthwith upon DIP Agent's demand therefor, DIP Agent shall promptly notify Administrative Borrower and the Borrowers shall immediately pay such corresponding amount to DIP Agent together with interest thereon, for each day from the Closing Date until the date such amount is paid to DIP Agent, at a per annum rate equal to 10.0%.  Nothing in this Section 2.4(b) shall be deemed to relieve any Lender from its obligation to fulfill its Term Loan Commitments hereunder or to prejudice any rights that Borrowers may have against any Lender as a result of any default by such Lender hereunder.

(c)    <u>One Obligation</u>.    All Obligations shall constitute one general obligation of the Borrowers and the Guarantors and shall be secured by the DIP Agent's security interests and Liens upon all of the Collateral, and by all other security interests and Liens heretofore, now or at any time hereafter granted by any Obligor to the DIP Agent or the Lenders to the extent provided in the Credit Documents or DIP Order under which such Liens arise.

**2.5**    **Use of Proceeds**.  The proceeds of the Term Loans shall be used by the Debtors to repay the Prepetition Indebtedness in full on the Closing Date, and any remaining amounts

shall be used by the Debtors for working capital and other general corporate purposes during the pendency of the Cases, in accordance with the Approved Budget then in effect and Section 6.7.

**2.6    Evidence of Debt; Register; Lenders' Books and Records; Term Loan Notes**.

(a)    <u>Lenders' Evidence of Debt</u>.    Each Lender shall maintain on its internal records an account or accounts evidencing the Obligations of Borrowers to such Lender, including the amounts of the Term Loans made by it and each repayment and prepayment in respect thereof.    Any such recordation shall be conclusive and binding on Borrowers, absent manifest error; <u>provided</u>, that the failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Term Loan Commitments or Borrowers' Obligations in respect of any applicable Term Loans; and provided further, in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(b)    <u>Register</u>.    DIP Agent shall maintain at its Principal Office a register for the recordation of the names and addresses of Lenders and the Term Loan Commitments and Term Loans of each Lender from time to time (the "**Register**").    The Register shall be available for inspection by Borrowers, and a redacted version of the Register showing the entries with respect to any Lender shall be available for inspection by such Lender, at any reasonable time and from time to time upon reasonable prior notice.    DIP Agent shall record in the Register the Term Loan Commitments and the Term Loan, and each repayment or prepayment in respect of the principal amount of the Term Loan, and any such recordation shall be conclusive and binding on the Borrowers and each Lender, absent manifest error; <u>provided</u>, failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Term Loan Commitments or Borrowers' Obligations in respect of any Term Loan.    Each Borrower hereby designates the entity serving as DIP Agent to serve as such Borrower's agent solely for purposes of maintaining the Register as provided in this Section 2.6, and Borrowers hereby agree that, to the extent such entity serves in such capacity, the entity serving as DIP Agent and its officers, directors, employees, agents and affiliates shall constitute "Indemnitees."

(c)    <u>Term Loan Notes</u>.    If so requested by any Lender by written notice to Administrative Borrower (with a copy to DIP Agent) at least two (2) Business Days prior to the Closing Date, or at any time thereafter, each Borrower shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to Section 11.6) on the Closing Date (or, if such notice is delivered after the Closing Date, promptly, but in any event within two (2) Business Days, after Administrative Borrower's receipt of such notice) a Term Loan Note or Term Loan Notes to evidence such Lender's Term Loan to such Borrower.

**2.7    Interest on Term Loans**.

(a)    Except as otherwise set forth herein, Term Loans shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) at a rate per annum equal to ten percent (10.0%).

(b)    Interest payable pursuant to Section 2.7(a) shall be computed on the basis of a 360 day year for the actual number of days elapsed in the period during which it accrues.    In

computing interest on any Term Loan, the date of the making of such Term Loan shall be included, and the date of payment of such Term Loan shall be excluded; provided, if a Term Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Term Loan.

(c)    Except as otherwise set forth herein, interest on each Term Loan shall be payable in arrears (i) on each Interest Payment Date applicable to that Term Loan; (ii) upon any prepayment of that Term Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid; and (iii) at maturity, including final maturity.

**2.8    Default Interest**.  Upon the occurrence and during the continuance of an Event of Default, the principal amount of all Term Loans outstanding and, to the extent permitted by applicable law, any interest payments on the Term Loans or any fees or other amounts owed hereunder, shall thereafter bear interest (including post-petition interest in any proceeding under the Bankruptcy Code or other applicable bankruptcy laws, whether or not allowed in such a proceeding) payable on demand at a rate that is three percent (3.0%) per annum in excess of the interest rate otherwise payable hereunder with respect to the Term Loans.  Payment or acceptance of the increased rates of interest provided for in this Section 2.8 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of DIP Agent or any Lender.

**2.9    Fees**.

(a)    Borrower agrees to pay directly to DIP Agent, for its own account an administration fee in the amount of $50,000, payable in cash in advance (i) on the Closing Date and shall be netted against the proceeds of the Term Loans and (ii) at the time of the extension of the Initial Stated Maturity Date.

(b)    Borrower agrees to pay to DIP Agent, on behalf of the Lenders a non-refundable fee in the amount of $90,000, which fee shall be due to DIP Agent on the Closing Date and shall be netted out of the proceeds of the Term Loans.

(c)    In addition to the foregoing fees, the Borrowers agree to pay to the DIP Agent such other fees in the amounts and at the times separately agreed upon.

**2.10    [Reserved]**.

**2.11    Voluntary Prepayments**.  Any time and from time to time the Borrowers may prepay any Term Loans on any Business Day in whole or in part, in an aggregate minimum amount of $500,000 and integral multiples of $100,000 in excess of that amount.  All such prepayments shall be made upon not less than one Business Day's prior written or telephonic notice in each case given by Administrative Borrower to DIP Agent by 12:00 p.m. (New York City time) on the date required and, if given by telephone, promptly confirmed in writing to DIP Agent (and DIP Agent will promptly transmit such telephonic or original notice for Term Loans by telefacsimile or telephone to each Lender).  Upon the giving of any such notice, the principal amount of the Term Loans specified in such notice shall become due and payable on the prepayment date specified therein; _provided_ that if such payment is being made in connection with the closing of another transaction, the payment of such principal amount may be contingent

upon the closing of such other transaction, and the Borrowers shall in such prepayment notice provides a reasonable level of detail relating to such transaction.   Any such voluntary prepayment shall be applied as specified in Section 2.13(b) and shall be made together with all amounts owing in accordance with Section 2.14(b).

**2.12    Mandatory Prepayments.**

(a)    <u>Asset Sales</u>.  No later than the first Business Day following the date of receipt by Holdings or any of its Subsidiaries of Net Asset Sale Proceeds in an aggregate amount greater than $100,000 in respect of any Asset Sale (other than the sale of Inventory in the ordinary course of business), the Borrowers shall prepay the Term Loans, together with all amounts owing in accordance with Section 2.14(b), which amounts will be paid solely from such Net Asset Sale Proceeds, in an aggregate amount equal to 100% of the amount by which such Net Asset Sale Proceeds exceed $100,000.

(b)    <u>Insurance/Condemnation Proceeds</u>.  No later than the first Business Day following the date of receipt by Holdings or any of its Subsidiaries, or DIP Agent as loss payee, of any Net Insurance/Condemnation Proceeds, the Borrowers shall prepay the Term Loans together with all amounts owing in accordance with Section 2.14(b), which amounts will be paid solely from the Net Insurance/Condemnation Proceeds  in an aggregate amount equal to such Net Insurance/Condemnation Proceeds.

(c)    <u>Issuance of Debt</u>.   On the date of receipt by Holdings or any of its Subsidiaries of any Cash proceeds from the incurrence of any Indebtedness of Holdings or any of its Subsidiaries (other than with respect to any Indebtedness permitted to be incurred pursuant to Section 6.1(a)-(f) and (h)), the Borrowers shall prepay the Term Loans together with all amounts owing in accordance with Section 2.14(b), which amounts will be paid solely from the issuance of such Indebtedness in an aggregate amount equal to one hundred percent (100%) of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

(d)    <u>Extraordinary Receipts</u>.  No later than the first Business Day following the date of receipt by any Borrower or any of its Subsidiaries of any Extraordinary Receipts, the Borrowers shall prepay the Term Loans together with all amounts owing in accordance with Section 2.14(b), which amounts will be paid solely from such Extraordinary Receipts in an aggregate amount equal to such Extraordinary Receipts.

(e)    <u>Prepayment Certificate</u>.  Concurrently with any prepayment of the Term Loans pursuant to Sections 2.12(a)-(d),  Administrative Borrower shall deliver to the DIP Agent a certificate of an Authorized Officer demonstrating the calculation of the amount of the applicable proceeds giving rise to the prepayment, as the case may be.   In the event that the Borrowers shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, the Borrowers shall promptly make an additional prepayment of the Term Loans in an amount equal to such excess, and Administrative Borrower shall concurrently therewith deliver to DIP Agent a certificate of an Authorized Officer demonstrating the derivation of such excess.

**2.13    Application of Prepayments**.

(a)    [Reserved].

(b)    Application of All Prepayments.  Any prepayment of any Term Loan pursuant to Section 2.11 or Section 2.12 shall be applied as follows:

*first*, to the payment of all expenses and fees of the DIP Agent and the Lenders hereunder to the full extent thereof;

*second*, to the payment of any accrued interest thereon at the Default Rate, if any;

*third*, to the payment of any accrued interest thereon (other than that calculated at the Default Rate and paid in clause "*second*" above); and

*fourth*, to prepay Term Loans on a pro rata basis (in accordance with the respective outstanding principal amounts thereof).

With respect to any prepayment, the DIP Agent shall determine the amounts to be allocated hereunder, and in the case of a prepayment under Section 2.12, shall first determine the amounts to be paid under clause *first*, and then, with respect to the remainder, determine the amounts to be paid under clauses *second* through *fourth* as a function of principal.  Determinations by the DIP Agent hereunder shall be deemed conclusive absent manifest error.

(c)    Waiver of Certain Prepayments.  Anything contained herein to the contrary notwithstanding, in the event the Borrowers are required to make any mandatory prepayment (a "**Waivable Prepayment**"), not less than three (3) Business Days prior to the date (the "**Prepayment Date**") on which the Borrowers are required to make such Waivable Prepayment, Administrative Borrower shall notify DIP Agent of the amount of such prepayment, and DIP Agent will promptly thereafter notify each Lender holding an outstanding Term Loan of the amount of such Lender's Pro Rata Share of such Waivable Prepayment and such Lender's option to refuse such amount.  Each such Lender may exercise such option by giving written notice to Administrative Borrower and DIP Agent of its election to do so on or before the first Business Day prior to the Prepayment Date (it being understood that any Lender which does not notify Administrative Borrower and DIP Agent of its election to exercise such option on or before the first Business Day prior to the Prepayment Date shall be deemed to have elected, as of such date, not to exercise such option).  On the Prepayment Date, the Borrowers shall pay to DIP Agent the amount of the Waivable Prepayment, which amount shall be applied (i) in an amount equal to that portion of the Waivable Prepayment payable to those Lenders that have elected not to exercise such option, to prepay the Term Loans of such Lenders, and (ii) to the extent of any excess, pro rata to the Lenders that did not exercise their option to waive such prepayment.

**2.14    General Provisions Regarding Payments**.

(a)    All payments by the Borrowers of principal, interest, fees and other Obligations shall be made in Dollars in same day funds, without, recoupment, setoff, counterclaim or other defense free of any restriction or condition, and delivered to DIP Agent not

later than 12:00 p.m. (New York City time) on the date due to DIP Agent's Account for the account of Lenders; funds received by DIP Agent after that time on such due date shall be deemed to have been paid by the Borrowers on the next Business Day.

(b)      All payments in respect of the principal amount of any Term Loan shall be accompanied by payment of accrued interest on the principal amount being repaid or prepaid.

(c)      DIP Agent shall promptly distribute to each Lender at such address as such Lender shall indicate in writing, such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including all fees payable with respect thereto, to the extent received by DIP Agent.

(d)      Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder or of the commitment fees hereunder.

(e)      DIP Agent shall deem any payment by or on behalf of the Borrowers hereunder that is not made in same day funds prior to 12:00 p.m. (New York City time) to be a non-conforming payment.  Any such payment shall not be deemed to have been received by DIP Agent until the later of (i) the time such funds become available funds, and (ii) the applicable next Business Day.  Any non-conforming payment may constitute or become a Default or Event of Default in accordance with the terms of Section 8.1(a).  Interest fees shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the Default Rate determined pursuant to Section 2.8 from the date such amount was due and payable until the date such amount is paid in full.

(f)      If an Event of Default shall have occurred and not otherwise been waived and the maturity of the Obligations shall have been accelerated pursuant to Section 8.1 all payments or proceeds received by the DIP Agent hereunder in respect of any of the Obligations shall be applied *first*, to pay any costs and expenses then due DIP Agent in connection with the foreclosure or realization upon, the disposal, storage, maintenance or otherwise dealing with any of, the Collateral or otherwise, and indemnities and other amounts then due to DIP Agent under the Credit Documents until paid in full, *second*, to pay any costs, expenses, indemnities, fees or premiums then due to DIP Agent under the Credit Documents until paid in full, *third*, ratably to pay any expenses or indemnities then due to any of the Lenders under the Credit Documents, until paid in full, *fourth*, ratably to pay interest due in respect of the Term Loan until paid in full, *fifth*, ratably to pay the principal amount of all Term Loans then outstanding until paid in full, and *sixth*, to pay ratably any other Obligations then due and payable.

**2.15    Ratable Sharing**.  Lenders hereby agree among themselves that, except as otherwise provided in the Collateral Documents with respect to amounts realized from the exercise of rights with respect to Liens on the Collateral, if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Term Loans made and applied in accordance with the terms hereof), through the exercise of any right of set off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Credit Documents

or otherwise, receive payment or reduction of a proportion of the aggregate amount of principal, interest, fees and other amounts then due and owing to such Lender hereunder or under the other Credit Documents (collectively, the "**Aggregate Amounts Due**" to such Lender) which is greater than the proportion received by any other Lender in respect of the Aggregate Amounts Due to such other Lender, then the Lender receiving such proportionately greater payment shall (a) notify DIP Agent and each other Lender of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all Lenders in proportion to the Aggregate Amounts Due to them; provided, that the provisions of this section shall not apply to a non-pro rata payment to Lenders resulting from a Lender's election not to receive a Waivable Prepayment pursuant to Section 2.13(c).  The Borrowers expressly consent to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, set off or counterclaim with respect to any and all monies owing by the Borrowers to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder.

**2.16   Increased Costs; Capital Adequacy**.

(a)   <u>Compensation For Increased Costs and Taxes</u>.  Subject to the provisions of Section 2.17 (which shall be controlling with respect to the matters covered thereby), in the event that any Lender shall determine (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that any Change in Law, or any determination of a court or Governmental Authority that becomes effective after the date hereof, or compliance by such Lender with any guideline, request or directive issued or made after the date hereof by any central bank or other governmental or quasi-Governmental Authority (whether or not having the force of law): (i) subjects such Lender (or its applicable lending office) to any additional Tax (other than any Indemnified Taxes or Taxes described in clauses (a)(iii), (b) and (c) of the definition of Excluded Taxes) with respect to this Agreement or any of the other Credit Documents or any of its obligations hereunder or thereunder or any payments to such Lender (or its applicable lending office) of principal, interest, fees or any other amount payable hereunder; (ii) imposes, modifies or holds applicable any reserve (including any marginal, emergency, supplemental, special or other reserve), special deposit, compulsory loan, FDIC insurance or similar requirement against assets held by, or deposits or other liabilities in or for the account of, or advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of such Lender or (iii) imposes any other condition (other than with respect to a Tax matter) on or affecting such Lender (or its applicable lending office) or its obligations hereunder; and the result of any of the foregoing is to increase the cost to such Lender of agreeing to make, making or maintaining Term Loans hereunder or to reduce any amount received or receivable by such Lender (or its applicable lending office) with respect thereto; then, in any such case, the Borrowers shall promptly pay to such Lender, upon receipt of the statement referred to in the next sentence, such additional amount or amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall determine) as may be necessary to compensate such Lender for any such increased cost or reduction in amounts received or receivable hereunder.  Such Lender shall deliver to Administrative Borrower (with a copy to DIP Agent) a written statement, setting forth

in reasonable detail the basis for calculating the additional amounts owed to such Lender under this Section 2.16(a), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(b)    Capital Adequacy Adjustment.  In the event that any Lender shall have determined that the adoption, effectiveness, phase in or applicability after the Closing Date of any law, rule or regulation (or any provision thereof) regarding capital adequacy, or any Change in Law, or compliance by any Lender (or its applicable lending office) with any guideline, request or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the capital of such Lender or any corporation controlling such Lender as a consequence of, or with reference to, such Lender's Term Loans, or participations therein or other obligations hereunder with respect to the Term Loans to a level below that which such Lender or such controlling corporation could have achieved but for such adoption, effectiveness, phase in, applicability, change or compliance (taking into consideration the policies of such Lender or such controlling corporation with regard to capital adequacy), then from time to time, within five Business Days after receipt by Administrative Borrower from such Lender of the statement referred to in the next sentence, the Borrowers shall pay to such Lender such additional amount or amounts as will compensate such Lender or such controlling corporation on an after-tax basis for such reduction.  Such Lender shall deliver to Administrative Borrower (with a copy to DIP Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to Lender under this Section 2.16(b), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

**2.17    Taxes; Withholding, etc**.

(a)    Payments to Be Free and Clear.  All sums payable by any Obligor hereunder and under the other Credit Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax.

(b)    Withholding of Taxes.  If any Withholding Agent is required by law to make any deduction, withholding or payment on account of any Tax from any sum paid or payable under any of the Credit Documents: (i) Administrative Borrower shall notify DIP Agent if it becomes aware of any such requirement or any change in any such requirement as soon as any Borrower becomes aware of it; (ii) the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law; (iii) if such Tax is an Indemnified Tax, the sum payable by such Obligor in respect of which the relevant deduction, withholding or payment is required shall be increased to the extent necessary to ensure that, after the making of such deduction, withholding or payment, DIP Agent or such Lender, as the case may be, receives on the due date a net sum equal to what it would have received had no such deduction, withholding or payment been required or made; and (iv) as soon as practicable after making any such deduction, withholding or payment of any Tax which is required by clause (i) above to be paid, Administrative Borrower shall deliver to DIP Agent evidence satisfactory to DIP Agent of such payment and of the remittance thereof to the relevant taxing or other authority.

(c)    <u>Other Taxes</u>.  In addition, the Obligors shall pay all Other Taxes to the relevant Governmental Authorities in accordance with applicable law.  The Obligors shall deliver to DIP Agent official receipts or other evidence of such payment reasonably satisfactory to DIP Agent in respect of any Taxes or Other Taxes payable hereunder promptly after payment of such Taxes or Other Taxes.

(d)    <u>Indemnification</u>.  Without duplication of Section 2.17(b), the Obligors shall indemnify the DIP Agent and each Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by the DIP Agent or such Lender or their respective Tax Related Persons, as the case may be (or required to be withheld or deducted from a payment to such Person), relating to, arising out of, or in connection with any Credit Document or any payment or transaction contemplated hereby or thereby, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority, and all reasonable costs and expenses arising therefrom or with respect thereto or incurred in enforcing the provisions of this Section 2.17.  A certificate from the relevant Lender or the DIP Agent, setting forth in reasonable detail the basis and calculation of such Taxes shall be conclusive, absent manifest error.

(e)    <u>Evidence of Exemption From U.S. Withholding Tax</u>.  Each Lender that is not a "United States person" (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) for U.S. federal income tax purposes (a "**Non-U.S. Lender**") shall deliver to DIP Agent for its own account and for transmission to Administrative Borrower, on or prior to the Closing Date (in the case of each Lender listed on the signature pages hereof on the Closing Date) or on or prior to the date of the Assignment Agreement pursuant to which it becomes a Lender (in the case of each other Lender), and at such other times as may be necessary in the determination of Administrative Borrower or DIP Agent (each in the reasonable exercise of its discretion), (i) two original copies of Internal Revenue Service Form W-8BEN, W-8IMY or W-8ECI (or any successor forms), properly completed and duly executed by such Lender, together with any applicable attachments, and such other documentation required under the Internal Revenue Code and reasonably requested by DIP Agent or Administrative Borrower to establish that such Lender is not subject to deduction or withholding of United States federal income tax with respect to any payments to such Lender of principal, interest, fees or other amounts payable under any of the Credit Documents or is subject to deduction or withholding at a reduced rate, or (ii) if such Lender is not a "bank" or other Person described in Section 881(c)(3) of the Internal Revenue Code and cannot deliver Internal Revenue Service Form W-8ECI pursuant to clause (i) above, a Certificate Regarding Non-Bank Status together with two original copies of Internal Revenue Service Form W-8BEN (or any successor form), properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code and reasonably requested by DIP Agent or Administrative Borrower to establish that such Lender is not subject to deduction or withholding of United States federal income tax with respect to any payments to such Lender of interest payable under any of the Credit Documents.  Each Lender required to deliver any forms, certificates or other evidence with respect to United States federal income tax withholding matters pursuant to this Section 2.17(e) hereby agrees, from time to time after the initial delivery by such Lender of such forms, certificates or other evidence, whenever a lapse in time or change in circumstances renders such forms, certificates or other evidence obsolete or inaccurate in any material respect, that such Lender shall promptly deliver to DIP

Agent for its own account and for transmission to Administrative Borrower two new original copies of Internal Revenue Service Form W-8BEN, W-8IMY or W-8ECI, or a Certificate Regarding Non-Bank Status and two original copies of Internal Revenue Service Form W-8BEN (or any successor form), as the case may be, properly completed and duly executed by such Lender, together with any applicable attachments, and such other documentation required under the Internal Revenue Code and reasonably requested by DIP Agent or Administrative Borrower to confirm or establish that such Lender is not subject to deduction or withholding of United States federal income tax with respect to payments to such Lender under the Credit Documents or is subject to deduction or withholding at a reduced rate, or notify DIP Agent and Administrative Borrower of its inability to deliver any such forms, certificates or other evidence. Nothing in this Section 2.17 shall be construed to require a Lender, the DIP Agent or a Participant to provide any forms or documentation that it is not legally entitled to provide.

(f)     Each of the DIP Agent and any Lender that is not a Non-U.S. Lender shall deliver to DIP Agent for its own account and for transmission to Administrative Borrower (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Lender becomes an DIP Agent or a Lender under this Agreement (and from time to time thereafter as prescribed by applicable law or upon the request of DIP Agent or Administrative Borrower), duly executed and properly completed copies of Internal Revenue Service Form W-9 certifying that such DIP Agent or Lender is entitled to an exemption from U.S. backup withholding tax.

(g)     Each Lender shall deliver to DIP Agent for its own account and for transmission to Administrative Borrower, upon its reasonable request, such other tax forms or other documents as shall be prescribed by applicable law and such additional documentation reasonably requested by DIP Agent or Administrative Borrower as may be necessary for such Person to comply with its obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from payments under this Agreement and the Credit Documents to such Lender or to demonstrate, where applicable, that payments under this Agreement and the Credit Documents to such Lender are exempt from application of the U.S. withholding tax imposed pursuant to FATCA. Solely for purposes of this subsection (g), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(h)     If the Lender determines, in its sole discretion, that it has received a refund of or credit against any Taxes with respect to which Borrowers have paid additional amounts pursuant to this Section 2.17 it shall pay over such refund or credit to Borrowers (but only to the extent of amounts paid by Borrowers under this Section 2.17), net of all out-of-pocket expenses of the Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund or credit). Borrowers, upon the request of such Lender, shall repay to such Lender the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (h), in no event will the Lender be required to pay any amount to Borrowers pursuant to this paragraph (h) the payment of which would place the Lender in a less favorable net after-Tax position than the Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been

deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any Lender to make available its Tax returns (or any other information that it deems confidential or proprietary) to Borrowers or any other Person.

(i)      Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify DIP Agent and Administrative Borrower in writing of its legal inability to do so.

**2.18    Obligation to Mitigate**.  Each Lender agrees that, as promptly as practicable after the officer of such Lender responsible for administering its Term Loans becomes aware of the occurrence of an event or the existence of a condition that would entitle such Lender to receive payments under Section 2.16 or 2.17, it will, to the extent not inconsistent with the internal policies of such Lender and any applicable legal or regulatory restrictions, use reasonable efforts to (a) make, issue, fund or maintain its Credit Extensions through another office of such Lender, or (b) take such other measures as such Lender may deem reasonable, if as a result thereof the additional amounts which would otherwise be required to be paid to such Lender pursuant to Section 2.16 or 2.17 would be materially reduced and if, as determined by such Lender in its sole discretion, the making, issuing, funding or maintaining of such Term Loans through such other office or in accordance with such other measures, as the case may be, would not otherwise adversely affect such Term Loans or the interests of such Lender; provided, such Lender will not be obligated to utilize such other office pursuant to this Section 2.18 unless the Borrowers agree to pay all costs and expenses incurred by such Lender as a result of utilizing such other office as described above.  A certificate as to the amount of any such expenses payable by Borrowers pursuant to this Section 2.18 (setting forth in reasonable detail the basis for requesting such amount) submitted by such Lender to Administrative Borrower (with a copy to DIP Agent) shall be conclusive absent manifest error.

**2.19    [Reserved]**.

**2.20    Removal or Replacement of a Lender**.  Anything contained herein to the contrary notwithstanding, in the event that: (a) (i) any Lender (an "**Increased Cost Lender**") shall give notice to Administrative Borrower (with a copy to DIP Agent) that such Lender is entitled to receive payments under Section 2.16 or 2.17, (ii) the circumstances which entitle such Lender to receive such payments shall remain in effect, and (iii) such Lender shall fail to withdraw such notice within five Business Days after DIP Agent's notice of a removal pursuant to this Section 2.20; or (b) in connection with any proposed amendment, modification, termination, waiver or consent with respect to any of the provisions hereof as contemplated by Section 11.5(b), the consent of DIP Agent and Requisite Lenders shall have been obtained but the consent of one or more of such other Lenders (each a "**Non-Consenting Lender**") whose consent is required shall not have been obtained; then, with respect to each such Increased Cost Lender or Non-Consenting Lender (the "**Terminated Lender**"), DIP Agent may (which, in the case of an Increased-Cost Lender, only after receiving written request from Administrative Borrower to remove such Increased-Cost Lender (which notice may not be given by Administrative Borrower if any Default or Event of Default is then continuing)), by giving written notice to Administrative Borrower and any Terminated Lender of its election to do so,

37

elect to cause such Terminated Lender (and such Terminated Lender hereby irrevocably agrees) to assign its outstanding Term Loans in full to one or more Eligible Assignees (each a "**Replacement Lender**") in accordance with the provisions of Section 11.6 and Terminated Lender shall pay any fees payable thereunder in connection with such assignment; provided, (1) on the date of such assignment, the Replacement Lender shall pay to Terminated Lender an amount equal to the sum of (A) an amount equal to the principal of, and all accrued interest on, all outstanding Term Loans of the Terminated Lender, (B) an amount equal to all unreimbursed drawings that have been funded by such Terminated Lender, together with all then unpaid interest with respect thereto at such time and (C) an amount equal to all accrued, but theretofore unpaid fees owing to such Terminated Lender pursuant to Section 2.9; (2) on the date of such assignment, the Borrowers shall pay any amounts payable to such Terminated Lender pursuant to Section 2.16 or 2.17; and (3) in the event such Terminated Lender is a Non-Consenting Lender, each Replacement Lender shall consent, at the time of such assignment, to each matter in respect of which such Terminated Lender was a Non-Consenting Lender.  Upon the prepayment of all amounts owing to any Terminated Lender, such Terminated Lender shall no longer constitute a "Lender" for purposes hereof; provided, any rights of such Terminated Lender to indemnification hereunder shall survive as to such Terminated Lender.

**2.21    Joint and Several Liability of Borrowers**.

(a)    Each Borrower is accepting joint and several liability hereunder and under the other Credit Documents in consideration of the financial accommodations to be provided by the Lenders under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of the other Borrower to accept joint and several liability for the Obligations.

(b)    Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrower, with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this Section 2.21), it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them.

(c)    If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrower will make such payment with respect to, or perform, such Obligation.

(d)    Each of the Borrowers agrees that the Obligations of such Borrower under the provisions of this Section 2.21 constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against each Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or any other circumstances whatsoever.

(e)    Except as otherwise expressly provided in this Agreement or the DIP Order, each Borrower hereby waives notice of acceptance of its joint and several liability, notice of the occurrence of any Default, Event of Default, or of any demand for any payment under this

Agreement, notice of any action at any time taken or omitted by the DIP Agent or any Lender under or in respect of any of the Obligations, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement (except as otherwise expressly provided in this Agreement).  Other than as required by the DIP Order, each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by the DIP Agent or any Lender at any time or times in respect of any default by any Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by the DIP Agent or any Lender in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any Borrower.  Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or failure to act on the part of the DIP Agent or any Lender with respect to the failure by any Borrower to comply with any of its respective Obligations, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this Section 2.21, afford grounds for terminating, discharging or relieving any Borrower, in whole or in part, from any of its Obligations under this Section 2.21, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of each Borrower under this Section 2.21 shall not be discharged except by performance and then only to the extent of such performance.

(f)    Each Borrower represents and warrants to the DIP Agent and each Lender that such Borrower is currently informed of the financial condition of the other Borrowers and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations.  Each Borrower further represents and warrants to the DIP Agent and each Lender that such Borrower has read and understands the terms and conditions of the Credit Documents.  Each Borrower hereby covenants that such Borrower will continue to keep informed of the other Borrowers' financial condition, the financial condition of other guarantors, if any, and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

(g)    Each Borrower waives to the fullest extent permitted by law all rights and defenses arising out of an election of remedies by the DIP Agent or any Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed the DIP Agent's, the DIP Agent's or such Lender's rights of subrogation and reimbursement against such Borrower.

(h)    Each Borrower waives all rights and defenses that such Borrower may have because the Obligations are secured by the Collateral.  This means, among other things:

(i)    The DIP Agent, the DIP Agent and the Lenders may collect from such Borrower without first foreclosing on the Collateral pledged by the Borrowers.

(ii)    If either the DIP Agent or any Lender forecloses on any Collateral pledged by the Borrowers:

(A)    The amount of the Obligations may be reduced only by the price for which that Collateral is sold at the foreclosure sale, even if the Collateral is worth more than the sale price.

(B)    The DIP Agent, the DIP Agent and the Lenders may collect from such Borrower even if the DIP Agent or any Lender, by foreclosing on the Collateral, has destroyed any right such Borrower may have to collect from the other Borrower.

This is an unconditional and irrevocable waiver of any rights and defenses such Borrower may have because the Obligations are secured by Collateral

(i)    The provisions of this Section 2.21 are made for the benefit of the DIP Agent, the Lenders and their respective successors and assigns, and may be enforced by it or them from time to time against any or all Borrowers as often as occasion therefor may arise and without requirement on the part of the DIP Agent or any Lender, or any of their respective successors or assigns, first to marshal any of its or their claims or to exercise any of its or their rights against any Borrower or to exhaust any remedies available to it or them against any Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy.  The provisions of this Section 2.21 shall remain in effect until all of the Obligations (other than contingent indemnification obligations that by their terms survive termination of the Credit Documents) shall have been paid in full or otherwise fully satisfied.

(j)    Each Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against any other Borrower with respect to any liability incurred by it hereunder or under any of the other Credit Documents, any payments made by it to the DIP Agent or any Lender with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations (other than contingent indemnification obligations that by their terms survive termination of the Credit Documents) have been paid in full in cash.  Any claim which any Borrower may have against any other Borrower with respect to any payments to the DIP Agent or any Lender hereunder or under any other Credit Documents is hereby expressly made subordinate and junior in right of payment.

(k)    Each Borrower hereby agrees that the payment of any amounts due with respect to the indebtedness owing by any Borrower to any other Borrower is hereby subordinated to the prior payment in full in cash of the Obligations (other than contingent indemnification obligations that by their terms survive termination of the Credit Documents).  Each Borrower hereby agrees that it will not demand, sue for or otherwise attempt to collect any indebtedness of any other Borrower owing to such Borrower until the Obligations (other than contingent indemnification obligations that by their terms survive termination of the Credit Documents) shall have been paid in full in cash.  If, notwithstanding the foregoing sentence, such Borrower

shall collect, enforce or receive any amounts in respect of such indebtedness, such amounts shall be collected, enforced and received by such Borrower as trustee for the DIP Agent on behalf of the Lenders, and such Borrower shall deliver any such amounts to the DIP Agent for application to the Obligations in accordance with Section 2.11.

## SECTION 3.    CONDITIONS PRECEDENT

**3.1    Closing Date**.  The obligation of each Lender to make any Term Loan on the Closing Date is subject to the satisfaction, or waiver in accordance with Section 11.5, of the following conditions on or before the Closing Date:

(a)    Credit Documents.  DIP Agent shall have received sufficient copies of each of the following Credit Documents originally executed and delivered by each applicable Obligor for each Lender: (i) this Agreement, (ii) if requested by any Lender, a Term Loan Note for such Lender and (iii) the Collateral Documents.

(b)    Organizational Documents; Incumbency.  DIP Agent shall have received (i) a copy of each Organizational Document of each Obligor, as applicable, and, to the extent applicable, certified as of a recent date by the appropriate governmental official, each dated the Closing Date or a recent date prior thereto; (ii) signature and incumbency certificates of the officers of such Person executing the Credit Documents to which it is a party; (iii) resolutions of the Board of Directors or similar governing body of each Obligor approving and authorizing the execution, delivery and performance of this Agreement and the other Credit Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by its secretary or an assistant secretary as being in full force and effect without modification or amendment; (iv) a good standing certificate from the applicable Governmental Authority of each Obligor's jurisdiction of incorporation, organization or formation and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business, each dated a recent date prior to the Closing Date; and (v) such other documents as DIP Agent may reasonably request.

(c)    Organizational and Capital Structure.  As of the Closing Date, the organizational structure and capital structure of Holdings and its Subsidiaries shall be as set forth on Schedule 4.2.

(d)    Reserved.

(e)    Bankruptcy Case Matters.

(i)    The DIP Agent shall have received the Initial Budget, in form and substance acceptable to the DIP Agent and the Requisite Lenders in their sole discretion.

(ii)    The Petition Date shall have occurred and each Borrower and Guarantor shall be a debtor and debtor-in-possession in the Cases.

(iii)    The Obligors shall be in compliance with the Cash Collateral Order in all respects.

(iv)     The First Day Orders sought by the Debtors (including a cash management order) shall be satisfactory in form and substance to the DIP Agent and the Requisite Lenders in their sole discretion.

(v)     The DIP Order Entry Date shall have occurred concurrently with or prior to the Closing Date, but within thirty (30) days of the Petition Date (unless such period is extended by the DIP Agent at the direction of the Requisite Lenders), and the DIP Order shall approve the DIP Term Loan Facility on a final and non-appealable basis (including the prepayment in full of the Prepetition Indebtedness), shall be in full force and effect, shall not (in whole or in part) have been appealed, vacated or reversed, shall not have been modified or amended other than as acceptable to the DIP Agent and the Requisite Lenders in their sole discretion, shall not be subject to a stay and the Obligors shall be in compliance with the DIP Order in all respects.

(f)     <u>Fees and Expenses</u>.  The Lenders and the DIP Agent shall have received all fees and expenses required to be paid under the Credit Documents.

(g)     <u>Evidence of Insurance</u>.  DIP Agent shall have received a certificate from the Borrowers' insurance broker or other evidence satisfactory to it that all insurance required to be maintained pursuant to Section 5.5 is in full force and effect, together with endorsements naming DIP Agent, for the benefit of Secured Parties, as additional insured and loss payee thereunder to the extent required under Section 5.5.

(h)     <u>Closing Date Certificate</u>.   The Borrowers shall have delivered to DIP Agent an originally executed Closing Date Certificate, together with all attachments thereto.

(i)     <u>No Litigation</u>.   There shall not exist any action, suit, investigation, litigation or proceeding or other legal or regulatory developments, pending or threatened in any court or before any arbitrator or Governmental Authority that, in the reasonable opinion of DIP Agent, singly or in the aggregate, materially impairs any of the transactions contemplated by the Credit Documents, or that could reasonably be expected to have a Material Adverse Effect.

(j)     <u>Completion of Proceedings</u>.    All partnership, corporate and other proceedings taken or to be taken in connection with the transactions contemplated hereby and all documents incidental thereto not previously found acceptable by DIP Agent and its counsel shall be satisfactory in form and substance to DIP Agent and such counsel, and DIP Agent, and such counsel shall have received all such counterpart originals or certified copies of such documents as DIP Agent may reasonably request.

Each Lender, by delivering its signature page to this Agreement and funding a Term Loan on the Closing Date, shall be deemed to have acknowledged receipt of, and consented to and approved, each Credit Document and each other document required to be approved by the DIP Agent, Requisite Lenders or Lenders, as applicable on the Closing Date.

**3.2**      **Additional Conditions to Credit Extension**.

(a)      <u>Additional Conditions Precedent</u>.  The obligation of each Lender to make any Term Loan hereunder is subject to the satisfaction, or waiver in accordance with Section 11.5, of the following additional conditions precedent:

(i)      DIP Agent shall have received a fully executed and delivered Funding Notice;

(ii)      as of the Closing Date, the representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects (except such representations and warranties that by their terms are qualified by materiality or Material Adverse Effect, which representations and warranties shall be true and correct in all respects) on and as of the Closing Date to the same extent as though made on and as of that date (or, to the extent such representations and warranties specifically relate to an earlier date, on and as of such earlier date);

(iii)      as of the Closing Date, no event shall have occurred and be continuing or would result from the consummation of the Credit Extension that would constitute an Event of Default or a Default;

(iv)      the proceeds of such Term Loans shall be used solely in accordance with the requirements of Section 2.5; and

(v)      any of the DIP Agent or the Requisite Lenders shall be entitled, but not obligated, to request and receive, prior to the making of such Term Loans, additional information reasonably satisfactory to the requesting party confirming the satisfaction of any of the foregoing if, in the good faith judgment of the DIP Agent or the Requisite Lenders such request is warranted under the circumstances.

(b)      <u>Funding Notice</u>. The Funding Notice shall be executed by an Authorized Officer in a writing delivered to DIP Agent.  Neither DIP Agent nor any Lender shall incur any liability to the Borrowers in acting upon any telephonic notice that DIP Agent believes in good faith to have been given by a duly authorized officer or other person authorized on behalf of the Borrowers or for otherwise acting in good faith.

(c)      <u>DIP Order</u>. On and after the DIP Order Entry Date and prior to the Term Loan Maturity Date, the DIP Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the prior written consent of DIP Agent and the Requisite Lenders.

SECTION 4.      REPRESENTATIONS AND WARRANTIES

In order to induce Lenders  to enter into this Agreement and to make the Term Loans to be made hereby, each Obligor represents and warrants to each Lender, on the Closing Date, that the following statements are true and correct:

**4.1    Organization; Requisite Power and Authority; Qualification**.  Each Obligor (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization as identified in Schedule 4.1, (b) subject to entry of the DIP Order, has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Credit Documents to which it is a party and to carry out the transactions contemplated thereby and, in the case of the Borrowers, to make the borrowings hereunder, and (c) is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations.

**4.2    Capital Stock and Ownership**.  Except as set forth on Schedule 4.2, neither Holdings nor any of its Subsidiaries has any equity investments in any other corporation or entity.

**4.3    Due Authorization**.  Subject to the entry of the DIP Order, the execution, delivery and performance of the Credit Documents have been duly authorized by all necessary action on the part of each Obligor that is a party thereto.

**4.4    No Conflict**.  The execution, delivery and performance by each of the Obligors of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not (a) violate any provision of any law or any governmental rule or regulation applicable to Holdings or any of its Subsidiaries, any of the Organizational Documents of Holdings or any of its Subsidiaries, or any order, judgment or decree of any court or other agency of government binding on Holdings or any of its Subsidiaries; (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation of Holdings or any of its Subsidiaries; (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of Holdings or any of its Subsidiaries (other than any Liens created under any of the Credit Documents in favor of the DIP Agent, on behalf of Secured Parties); (d) result in any default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval applicable to its operations or any of its properties or (e) require any approval of stockholders, members or partners or any approval or consent of any Person under any Contractual Obligation of Holdings or any of its Subsidiaries, except for such approvals or consents which will be obtained on or before the Closing Date and disclosed in writing to Lenders or which are excused by operation of the Bankruptcy Code.

**4.5    Governmental Consents**.  Subject to entry of the DIP Order, the execution, delivery and performance by each of the Obligors of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority except for filings and recordings with respect to the Collateral to be made, or otherwise delivered to DIP Agent for filing and/or recordation on or prior to the Closing Date.

**4.6    Binding Obligation**.  Subject to entry of the DIP Order, each Credit Document has been duly executed and delivered by each Obligor that is a party thereto and is the legally

44

valid and binding obligation of such Obligor, enforceable against such Obligor in accordance with its respective terms.

**4.7    Historical Financial Statements**.  The Historical Financial Statements were prepared in conformity with GAAP and fairly present, in all material respects, the financial position, on a consolidated basis, of the Persons described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to changes resulting from audit and normal year-end adjustments. Neither Holdings nor any of its Subsidiaries has any contingent liability or liability for taxes, long term lease or unusual forward or long term commitment that is not reflected in the Historical Financial Statements or the notes thereto and which in any such case is material in relation to the business, operations, properties, assets, condition (financial or otherwise) or prospects of Holdings and any of its Subsidiaries taken as a whole.

**4.8    No Material Adverse Change**.  Since December 31, 2014, no event, circumstance or change has occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect, other than the filing of the Cases.

**4.9    Adverse Proceedings, etc**.  There are no Adverse Proceedings, individually or in the aggregate, other than in connection with the Cases, that (a) relate to the Prepetition Loan Facility or to this Agreement, any other Credit Document or the transactions contemplated hereby or thereby or (b) could reasonably be expected to have a Material Adverse Effect. Neither Holdings nor any of its Subsidiaries (a) is in violation of any applicable laws (including Environmental Laws) that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**4.10    Payment of Taxes**.  All Tax returns and reports of Holdings and its Subsidiaries required to be filed by any of them have been timely filed, and all such returns and reports are true, correct and complete.  Except as set forth on Schedule 4.10, all Taxes, assessments, fees and other governmental charges upon Holdings and its Subsidiaries and upon their respective properties, assets, income, businesses and franchises (i) which are due and payable have been paid when due and payable and (ii) which are not yet due and payable have been properly reflected in the Historical Financial Statements in conformity with GAAP.  There is no proposed Tax assessment against Holdings or any of its Subsidiaries, and, to the knowledge of the Borrower, there is no basis for such assessment.  Neither Holdings nor any of its Subsidiaries has given or been requested to give a waiver of the statute of limitations relating to the payment of any Tax, assessment, fee or other governmental charge.

**4.11    Properties**.

(a)    Title.  Each of Holdings and its Subsidiaries has (i) good, sufficient and legal title to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the

case of leasehold interests in real or personal property), and (iii) good title to (in the case of all other personal property), all of their respective properties and assets reflected in their respective Historical Financial Statements referred to in Section 4.7 and in the most recent financial statements delivered pursuant to Section 5.1, in each case except for assets disposed of since the date of such financial statements in the ordinary course of business or as otherwise permitted under Section 6.8.  All such properties and assets are in working order and condition, ordinary wear and tear excepted, and except as permitted by this Agreement or set forth on Schedule 4.11(a), all such properties and assets are free and clear of Liens.

(b)    Real Estate.  Schedule 4.11(b) contains a true, accurate and complete list of (i) all Real Estate Assets, (ii) all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting each Real Estate Asset of any Obligor, with respect to which such Obligor is the landlord (whether directly or as an assignee or successor in interest) under such lease, sublease or assignment, and the termination date and annual base rent under each of them, and (iii) all material leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting each Real Estate Asset of any Obligor, with respect to which such Obligor is the tenant (whether directly or as an assignee or successor in interest) under such lease, sublease or assignment, and the termination date and annual base rent under each of them.  Each agreement listed in clause (ii) or (iii) of the immediately preceding sentence is in full force and effect and no default has occurred and is continuing thereunder other than as a result of the commencement of the Cases.  Each such agreement constitutes the legally valid and binding obligation of each applicable Obligor, enforceable against such Obligor in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.   To the best knowledge of each Obligor, no other party to any such agreement is in default of its obligations thereunder, and no Obligor (or any other party to any such agreement) has at any time delivered or received any notice of default which remains uncured under any such lease and no event has occurred which, with the giving of notice or the passage of time or both, would constitute a default under any such agreement.

**4.12    Environmental Matters**.  Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) neither Holdings nor any of its Subsidiaries nor any of their respective Facilities or operations are subject to any outstanding written order, consent decree or settlement agreement with any Person relating to any Environmental Law, any Environmental Claim, or any Hazardous Materials Activity; (ii) neither Holdings nor any of its Subsidiaries has received any letter or request for information under Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C.  § 9604) or any comparable state law; (iii) there are and have been no conditions, occurrences, or Hazardous Materials Activities which could reasonably be expected to form the basis of an Environmental Claim against Holdings or any of its Subsidiaries; (iv) neither Holdings nor any of its Subsidiaries nor, to any Obligor's knowledge, any predecessor of Holdings or any of its Subsidiaries has filed any notice under any Environmental Law indicating past or present treatment of Hazardous Materials at any Facility, and none of Holdings' or any of its Subsidiaries' operations involves the generation, transportation, treatment, storage or disposal of hazardous waste, as defined under 40 C.F.R.  Parts 260-270 or any state equivalent; (v) compliance with all current or reasonably foreseeable future requirements pursuant to or under

Environmental Laws could not be reasonably expected to result in an increase in the cost of doing business or increased liability or obligations for Holdings or any of its Subsidiaries; and (vi) no event or condition has occurred or is occurring with respect to Holdings or any of its Subsidiaries relating to any Environmental Law, any Release of Hazardous Materials, or any Hazardous Materials Activity which could reasonably be expected to result in increased liability of obligations of Holdings or any of its Subsidiaries.

**4.13    No Defaults**.  No Default has occurred and is continuing.

**4.14    Material Contracts**.  All Material Contracts of any of the Obligors, together with any updates provided pursuant to Section 5.1(l), are in full force and effect and, other than those defaults under Material Contracts entered into prior to the Petition Date arising as a result of the commencement of the Cases and except as otherwise excused by the Bankruptcy Court or disclosed to the DIP Agent in writing prior to the Petition Date, no defaults by any Obligor currently exist thereunder.

**4.15    Governmental Regulation**.  Neither Holdings nor any of its Subsidiaries is subject to regulation under the Federal Power Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable. Neither Holdings nor any of its Subsidiaries is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

**4.16    Margin Stock**.  Neither Holdings nor any of its Subsidiaries is engaged in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No part of the proceeds of the Term Loans made to such Obligor will be used to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

**4.17    Employee Matters**.  Holdings and each of its Subsidiaries has good labor relations.  Holdings, its Subsidiaries, and their respective employees, agents and representatives have not committed any material unfair labor practice as defined in the National Labor Relations Act.  Neither Holdings nor any of its Subsidiaries has been or is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect.  There has been and is (a) no unfair labor practice charge or complaint pending against Holdings or any of its Subsidiaries, or to the best knowledge of Holdings and Borrowers, threatened against any of them before the National Labor Relations Board or any other Governmental Authority and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement or similar agreement that is so pending against Holdings or any of its Subsidiaries or to the best knowledge of Holdings and Borrowers, threatened against any of them, (b) no labor dispute, strike, lockout, slowdown or work stoppage in existence or threatened against, involving or affecting Holdings or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect, (c) no labor union, labor organization, trade union, works council, or group of employees of Holdings or any of its Subsidiaries has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a

representation proceeding presently pending or threatened to be brought or filed with the National Labor Relations Board or any other Governmental Authority, and (d) to the best knowledge of Holdings and Borrowers, no union representation question existing with respect to any of the employees of Holdings or any of its Subsidiaries and, to the best knowledge of Holdings and Borrowers, no labor union organizing activity with respect to any employees of Holdings or any of its Subsidiaries that is taking place, except (with respect to any matter specified in clause (a), (b), (c), or (d) above, either individually or in the aggregate) such as is not reasonably likely to have a Material Adverse Effect.

**4.18    Employee Benefit Plans**.    Schedule 4.18(a) contains a true, accurate and complete list of (i) each Pension Plan and (ii) each Employee Benefit Plan that provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates (other than to the extent required under Section 4980B of the Internal Revenue Code or similar state laws, or otherwise funded entirely by the participants thereof).    Except as set forth in Schedule 4.18(b), none of Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates (or the predecessors of any of them) has, or has had in the past six (6) years, any actual or contingent liability with respect to any employee benefit plan subject to Title IV of ERISA, Section 412 of the Internal Revenue Code or Section 302 of ERISA, other than the Pension Plan set forth on Schedule 4.18(a).    Except as set forth on Schedule 4.18(c), Holdings, each of its Subsidiaries and each of their respective ERISA Affiliates are in compliance with all applicable provisions and requirements of ERISA and the Internal Revenue Code with respect to each Employee Benefit Plan, and have performed all their obligations under each Employee Benefit Plan, except where any such non-compliance would be immaterial.    Except as set forth on Schedule 4.18(c), each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the Internal Revenue Service indicating that such Employee Benefit Plan is so qualified and nothing has occurred subsequent to the issuance of such determination letter which would reasonably be expected to cause such Employee Benefit Plan to lose its qualified status.    Except as set forth on Schedule 4.18(c), no liability to the PBGC (other than required premium payments) or the Internal Revenue Service has been or is expected to be incurred by Holdings, any of its Subsidiaries or any of their ERISA Affiliates with respect to any Employee Benefit Plan.    Except as set forth (in reasonable detail as to amount and materiality of any liability) on Schedule 4.18(c), no ERISA Event has occurred.    Except as set forth on Schedule 4.18(c), no ERISA Event is reasonably expected to occur.    The present value of the aggregate benefit liabilities under each Pension Plan sponsored, maintained or contributed to by Holdings, any of its Subsidiaries or any of their ERISA Affiliates (determined as of the end of the most recent plan year on the basis of the actuarial assumptions specified for funding purposes in the most recent actuarial valuation for such Pension Plan), did not exceed the aggregate current value of the assets of such Pension Plan by more than $[    ], which present value of aggregate benefit liabilities are specified on Schedule 4.18(c) in reasonable detail, including specification of (i) the counterparty to which such liabilities relate and (ii) the amounts of such liabilities which are unsecured and which are secured.    None of Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates has, or has ever had, any liability with respect to any Multiemployer Plan.

      **4.19**    **Certain Fees**.  No broker's or finder's fee or commission will be payable with respect hereto or any of the transactions contemplated hereby except as set forth on Schedule 4.19.

      **4.20**    **Compliance with Statutes, etc**.  Each of Holdings and its Subsidiaries is in compliance with its organizational documents and all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business and the ownership of its property (including compliance with all applicable Environmental Laws with respect to any Real Estate Asset or governing its business and the requirements of any permits issued under such Environmental Laws with respect to any such Real Estate Asset or the operations of Holdings or any of its Subsidiaries), except such non-compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

      **4.21**    **Disclosure**.  No representation or warranty of any Obligor contained in any Credit Document and none of the reports, financial statements or other documents, certificates or written statements furnished to Lenders by or on behalf of Holdings or any of its Subsidiaries for use in connection with the transactions contemplated hereby contains any untrue statement of a material fact or omits to state a material fact (known to Holdings or the Borrowers, in the case of any document not furnished by either of them) necessary in order to make the statements contained herein or therein not misleading in light of the circumstances in which the same were made.  Any projections and pro forma financial information contained in such materials are based upon good faith estimates and assumptions believed by Holdings or the Borrowers to be reasonable at the time made, it being recognized by Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results.

      **4.22**    **Terrorism Laws and FCPA**.

      (a)    None of the Obligors is in violation of any Terrorism Law or engages in any transaction that evades or avoids or attempts to violate any of the Terrorism Laws.

      (b)    None of the Obligors nor any of their Subsidiaries is any of the following (each, a "**Blocked Person**"):  (i) a Person that is prohibited pursuant to any of the OFAC Sanctions Programs, including a Person named on OFAC's list of Specially Designated Nationals and Blocked Persons; (ii) a Person that is owned or controlled by, or that owns and controls any Person described in (i) above; or (iii) a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Terrorism Law.

      (c)    None of the Obligors, nor any of their Subsidiaries deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to any OFAC Sanctions Programs.

      (d)    No part of the proceeds of the Term Loans will be used, directly or indirectly, in furtherance of any offer, payment, promise to pay, or authorization of the payment of money or anything else of value to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else in violation of the United

States Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**"), or any other anti-bribery law.  No Obligor, nor any of its Subsidiaries nor any of their respective officers, directors or employees, nor, to its knowledge, any of its agents or representatives, has:  (i) directly or indirectly, made an "unlawful payment" within the meaning of, and is not in any other way in violation of, the FCPA or similar laws in any jurisdiction; (ii) used any corporate funds for any unlawful contribution, gift, entertainment or unlawful expense relating to political activity; (iii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; or (iv) paid any bribe, rebate, pay-off, influence payment, kick-back or other unlawful payment.

**4.23    Insurance**.    The properties of Holdings and each of its Subsidiaries are adequately insured with financially sound and reputable insurers and in such amounts, with such deductibles and covering such risks and otherwise on terms and conditions as are customarily carried or maintained by Persons of established reputation of similar size and engaged in similar businesses and such insurance complies with the requirements of Section 5.5.  Schedule 4.23 sets forth a list of all insurance maintained by or on behalf of the Obligors and each of their Subsidiaries as of the Closing Date and, as of the Closing Date, all premiums in respect of such insurance required to be paid prior to the Closing Date have been paid.

**4.24    Common Enterprise**.    The successful operation and condition of each of the Obligors is dependent on the continued successful performance of the functions of the group of the Obligors as a whole and the successful operation of each of the Obligors is dependent on the successful performance and operation of each other Obligor.  Each Obligor expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (i) successful operations of each of the other Obligors and (ii) the credit extended by the Lenders to the Borrowers hereunder, both in their separate capacities and as members of the group of companies.  Each Obligor has determined that execution, delivery, and performance of this Agreement and any other Credit Documents to be executed by such Obligor is within its purpose, will be of direct and indirect benefit to such Obligor, and is in its best interest.

**4.25    Security Interest in Collateral**.  The provisions of this Agreement and the other Credit Documents create legal and valid Liens on all the Collateral in favor of DIP Agent, for the benefit of DIP Agent and the Lenders, and such Liens constitute perfected and continuing Liens on the Collateral, securing the Obligations, enforceable against the applicable Obligor and all third parties, and having priority over all other Liens on the Collateral except as otherwise provided in the DIP Order.

**4.26    Affiliate Transactions**.    Except as set forth on Schedule 4.26, there are no existing or proposed agreements, arrangements, understandings, or transactions between any Obligor and any of the officers, members, managers, directors, stockholders, parents, other interest holders, employees, or Affiliates (other than Subsidiaries) of any Obligor or any members of their respective immediate families, and none of the foregoing Persons are directly or indirectly indebted to or have any direct or indirect ownership, partnership, or voting interest in any Affiliate of any Obligor or any Person with which any Obligor has a business relationship or which competes with any Obligor.

28540330.4
Doc#: US1:10247675v15

**4.27    Intellectual Property**.  Each Obligor and its Subsidiaries owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property ("**Intellectual Property**") necessary to its business as currently conducted, a correct and complete list of which, as of the date of this Agreement, is set forth on Schedule 4.27, and the use thereof by the Obligors and its Subsidiaries does not infringe in any material respect upon the rights of any other Person, and the Obligors rights thereto are not subject to any licensing agreement or similar arrangement.  Each Obligor has taken reasonable measures to protect the secrecy, confidentiality and value of all trade secrets used in its business (collectively, the "**Business Trade Secrets**").  To the best knowledge of each Obligor, none of the Business Trade Secrets have been disclosed to any Person other than employees or contractors of the Obligors who had a need to know and use such Business Trade Secrets in the ordinary course of employment or contract performance and who executed appropriate confidentiality agreements prohibiting the unauthorized use or disclosure of such Business Trade Secrets and containing other terms reasonably necessary or appropriate for the protection and maintenance of such Business Trade Secrets.  To the best knowledge of each Obligor, no unauthorized disclosure of any Business Trade Secrets has been made.

**4.28    Permits, Etc**.  Each Obligor has, and is in compliance with, all permits, licenses, authorizations, approvals, entitlements and accreditations required for such Person lawfully to own, lease, manage or operate, or to acquire, each business currently owned, leased, managed or operated, or to be acquired, by such Person, which, if not obtained or complied with, could not reasonably be expected to have a Material Adverse Effect.  No condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any such permit, license, authorization, approval, entitlement or accreditation, and there is no claim that any thereof is not in full force and effect, except, to the extent any such condition, event or claim could not be reasonably be expected to have a Material Adverse Effect.

SECTION 5.    AFFIRMATIVE COVENANTS

Each Obligor covenants and agrees that so long as any Term Loan Commitment is in effect and until payment in full of all Obligations (other than contingent indemnification obligations that by their terms survive termination of the Credit Documents), each Obligor shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 5.

**5.1    Financial Statements and Other Reports**.

Unless otherwise provided below, Administrative Borrower will deliver to DIP Agent and Lenders:

(a)    <u>Monthly Reports</u>.  As soon as available, and in any event within twenty (20) days after the end of each month (including months which began prior to the Closing Date), the consolidated and consolidating balance sheet of Holdings and its Subsidiaries as at the end of such month and the related consolidated (and with respect to statements of income, consolidating) statements of income, stockholders' equity and cash flows of Holdings and its Subsidiaries for such month and for the period from the beginning of the then current Fiscal Year to the end of

such month, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year, all in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto and any other operating reports prepared by management for such period;

(b)    Quarterly Financial Statements.    As soon as available, and in any event within thirty (30) days after the end of each Fiscal Quarter of each Fiscal Year (including the fourth Fiscal Quarter), the consolidated and consolidating balance sheets of Holdings and its Subsidiaries as at the end of such Fiscal Quarter and the related consolidated (and with respect to statements of income, consolidating) statements of income, stockholders' equity and cash flows of Holdings and its Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year, all in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto;

(c)    Annual Financial Statements.    As soon as available, and in any event within ninety (90) days after the end of each Fiscal Year beginning with the Fiscal Year ended December 31, 2015, the consolidated and consolidating balance sheets of Holdings and its Subsidiaries as at the end of such Fiscal Year and the related consolidated (and with respect to statements of income, consolidating) statements of income, stockholders' equity and cash flows of Holdings and its Subsidiaries for such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the previous Fiscal Year covered by such financial statements, in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto;

(d)    Compliance Certificate.    Together with each delivery of financial statements of Holdings and its Subsidiaries pursuant to Sections 5.1(a), 5.1(b) and 5.1(c), a duly executed and completed Compliance Certificate;

(e)    Statements of Reconciliation after Change in Accounting Principles.    If, as a result of any change in accounting principles and policies (or the application thereof) from those used in the preparation of the Historical Financial Statements, the consolidated financial statements of Holdings and its Subsidiaries delivered pursuant to Section 5.1(b) or 5.1(c) will differ in any material respect from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then, together with the first delivery of such financial statements after such change, one or more statements of reconciliation for all such prior financial statements in form and substance satisfactory to DIP Agent;

(f)    Notice of Default.    Prompt written notice (but, in any event, within three (3) Business Days after any Authorized Officer of an Obligor has obtained knowledge) (i) of any condition or event that constitutes a Default or an Event of Default or that notice has been given to Holdings or any Borrower with respect thereto or (ii) of the occurrence of any event or change that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect, which notice shall be accompanied by a certificate of its Authorized Officers specifying the nature and period of existence of such condition, event or change, or specifying the notice given

and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action the Borrowers have taken, is taking and proposes to take with respect thereto;

(g)    Notice of Litigation.  Prompt written notice (but, in any event, within three (3) Business Days after any Authorized Officer of an Obligor has obtained knowledge) of (i) the institution of, or threat of, any Adverse Proceeding not previously disclosed in writing by Administrative Borrower to Lenders, or (ii) any development in any Adverse Proceeding, that, in the case of either clause (i) or (ii) if adversely determined, could be reasonably expected to have a Material Adverse Effect, or seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby, or which arises in respect of any material Indebtedness of Holdings or its Subsidiaries or alleges any criminal misconduct by any Obligor together in each case with such other information as may be reasonably available to Holdings or Borrowers to enable Lenders and their counsel to evaluate such matters;

(h)    ERISA.  (i) The occurrence of or forthcoming occurrence of any ERISA Event, a prompt written notice (but, in any event, within three (3) days) specifying the nature thereof, what action Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto; and (ii) with reasonable promptness (but, in any event, within three (3) Business Days), copies of (1) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates with the Internal Revenue Service with respect to each Pension Plan; (2) all notices received by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates from a Multiemployer Plan sponsor concerning an ERISA Event; (3) copies of all correspondence received by, or sent by, Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates from, or to, the PBGC, (4) copies of all documents, governmental reports or filings related to any Pension Plan; and (5) copies of such other documents or governmental reports or filings relating to any Employee Benefit Plan as DIP Agent shall reasonably request;

(i)    Budget.

(i)    On and as of the Closing Date, the Initial Budget of Holdings and its Subsidiaries for the 13-week period beginning with the week in which the Petition Date occurs, copies of which have heretofore been furnished to the DIP Agent and the Lenders;

(ii)    Following the Closing Date, the monthly supplements to the Approved Budget shall be delivered pursuant to the DIP Order;

(iii)    Following the Closing Date, Budget Variance Reports, in form and detail acceptable to the DIP Agent, shall be delivered on the dates and in the manner required under the DIP Order and shall compare and show on a line-item by line-item basis the Debtors' actual cash, revenue, receipts, income, expenditures and cash flow as

compared with the amounts for such cash, revenue, receipts, income, expenditures and cash flow projected by and in the Approved Budget.

(j)      Insurance Report.  As soon as practicable and in any event by the last day of each Fiscal Year, a report in form and substance satisfactory to DIP Agent outlining all material insurance coverage maintained as of the date of such report by Holdings and its Subsidiaries and all material insurance coverage planned to be maintained by Holdings and its Subsidiaries in the immediately succeeding Fiscal Year;

(k)      Notice of Change in Board of Directors.  With reasonable promptness, written notice of any change in the board of directors (or similar governing body) of Holdings or any Borrower;

(l)      Notice Regarding Material Contracts.  (i) Promptly, and in any event within three (3) Business Days after any Authorized Officer of any Obligor has obtained knowledge that any Material Contract of Holdings or any of its Subsidiaries is terminated or amended in a manner that is materially adverse to Holdings or such Subsidiary, as the case may be, or that any Obligor determines in good faith to be material to DIP Agent or the Lenders, and (ii) prior to entry into any new Material Contract; in each case, a written statement describing same, with copies of such material amendments or new contracts, as applicable, delivered to the DIP Agent;

(m)      Environmental Reports and Audits.  As soon as practicable (but, in any event, within three (3) Business Days) following receipt thereof, copies of all environmental audits and reports with respect to environmental matters at any Facility or which relate to any environmental liabilities of Holdings or its Subsidiaries which, in any such case, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(n)      Information Regarding Collateral.  Administrative Borrower will furnish to DIP Agent written notice at least ten (10) Business Days prior to the occurrence of any change (i) in any Obligor's corporate name, (ii) in any Obligor's identity or corporate structure, or (iii) in any Obligor's Federal Taxpayer Identification Number.  The Borrowers agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the Uniform Commercial Code or otherwise that are required in order for DIP Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral and for the Collateral at all times following such change to have a valid, legal and perfected security interest as contemplated in the Collateral Documents.  Administrative Borrower will furnish to DIP Agent prompt written notice of any Lien (other than Permitted Liens) or claims made or asserted against any Collateral or interest therein.  Administrative Borrower also agrees promptly to notify DIP Agent in writing if any material portion of the Collateral is lost, damaged or destroyed;

(o)      Aging Reports.  Together with each delivery of financial statements of Holdings and each other Obligor pursuant to Sections 5.1(a), 5.1(b), and 5.1(c), (i) a summary of the accounts receivable ageing report of each Obligor as of the end of such period, and (ii) a summary of accounts payable ageing report of each Obligor as of the end of such period, in each case in form and substance satisfactory to DIP Agent;

(p)     <u>Violations of Terrorism Laws</u>.   Promptly (i) if any Obligor obtains knowledge that any Obligor or any Person which owns, directly or indirectly, any Capital Stock of any Obligor, or any other holder at any time of any direct or indirect equitable, legal or beneficial interest therein is the subject of any of the Terrorism Laws, such Obligor will notify DIP Agent and (ii) upon the request of any Lender, such Obligor will provide any information such Lender believes is reasonably necessary to be delivered to comply with the Patriot Act;

(q)     <u>Tax Returns</u>.   If requested by DIP Agent, as soon as practicable and in any event within fifteen (15) days following the later of the DIP Agent's request and the filing thereof, copies of each federal income tax return filed by or on behalf of any Obligor;

(r)     <u>Other Information</u>.   (A) Promptly upon their becoming available, copies of (i) all financial statements, reports, notices and proxy statements sent or made available generally by Holdings to its security holders acting in such capacity or by any Subsidiary of Holdings to its security holders other than Holdings or another Subsidiary of Holdings, (ii) all regular and periodic reports and all registration statements and prospectuses, if any, filed by Holdings or any of its Subsidiaries with any securities exchange or with the Securities and Exchange Commission or any governmental or private regulatory authority, (iii) all press releases and other statements made available generally by Holdings or any of its Subsidiaries to the public concerning material developments in the business of Holdings or any of its Subsidiaries, (B) promptly after submission to any Governmental Authority, all documents and information furnished to such Governmental Authority in connection with any investigation of any Obligor (other than any routine inquiry), (C) promptly upon receipt thereof, copies of all financial reports submitted to any Obligor by its auditors in connection with any audit of the books thereof and (D) such other information and data with respect to Holdings or any of its Subsidiaries as from time to time may be reasonably requested by DIP Agent;

5.2    **Existence**.   Except as otherwise permitted under Section 6.8, each Obligor will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect its existence and all rights and governmental authorizations, qualifications, franchises, licenses and permits material to its business and to conduct its business in each jurisdiction in which its business is conducted.

5.3    **Payment of Taxes and Claims**.   Each Obligor will, and will cause each of its Subsidiaries, in accordance with the Approved Budget, to pay all Taxes imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any penalty or fine accrues thereon, and all post-petition administration claims (including claims for labor, services, materials and supplies) for sums that have become due and payable and/or that by law have or may become a Lien upon any of its properties or assets, prior to the time when any penalty or fine shall be incurred with respect thereto; <u>provided</u>, no such Tax or claim need be paid if it is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as (a) adequate reserve or other appropriate provision, as shall be required in conformity with GAAP shall have been made therefor, and (b) in the case of a Tax or claim which has or may become a Lien against any of the Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such Tax or claim. No Obligor will, nor will it permit any of its Subsidiaries to, file or consent to the filing of any consolidated income tax return with any Person (other than Holdings or any of its Subsidiaries).

**5.4    Maintenance of Properties**.  Each Obligor will, and will cause each of its Subsidiaries to, (a) maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all material assets used or useful in the business of Holdings and its Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof and (b) comply at all times and in all material respects with the provisions of all material leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder.

**5.5    Insurance**.  Each Obligor will maintain or cause to be maintained, with financially sound and reputable insurers, business interruption insurance, casualty insurance, such public liability insurance, third party property damage insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of Holdings and its Subsidiaries, in each case as are customarily carried or maintained under similar circumstances by Persons of established reputation of similar size and engaged in similar businesses, in each case in such amounts (giving effect to self insurance which comports with the requirements of this Section and provided that adequate reserves therefor are maintained in accordance with GAAP), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons.  Without limiting the generality of the foregoing, each Obligor will maintain or cause to be maintained (a) flood insurance with respect to each Flood Hazard Property that is located in a community that participates in the National Flood Insurance Program, in each case in compliance with any applicable regulations of the Board of Governors of the Federal Reserve System, and (b) replacement value casualty insurance on the Collateral under such policies of insurance, with such insurance companies, in such amounts, with such deductibles, and covering such risks as are at all times carried or maintained under similar circumstances by Persons of established reputation of similar size and engaged in similar businesses.  Each such policy of insurance shall (i) name DIP Agent, on behalf of Lenders as an additional insured thereunder as its interests may appear, and (ii) in the case of each casualty insurance policy, contain a loss payable clause or endorsement, satisfactory in form and substance to DIP Agent, that names DIP Agent, on behalf of Secured Parties, as the loss payee thereunder and provides for at least thirty (30) days' prior written notice to DIP Agent of any material modification or cancellation of such policy and that no act or default of Holdings or any other Person shall affect the right of DIP Agent to recover under such policy or policies in case of loss or damage.

**5.6    Books and Records; Inspections**.  Each Obligor will, and will cause each of its Subsidiaries to, (a) keep adequate books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (b) permit any representatives designated by DIP Agent or any Lender (including employees of DIP Agent, any Lender or any consultants, accountants, lawyers and appraisers retained by DIP Agent) to visit and inspect any of the properties of any Obligor and any of its respective Subsidiaries, to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers and independent accountants and as often as may be requested and by this provision the Obligors authorize such accountants to discuss with DIP Agent and Lender and such representatives the affairs, finances and accounts of Holdings and its Subsidiaries.  The Obligors acknowledge that DIP Agent, after exercising its rights of inspection, may prepare and distribute to the Lenders certain reports pertaining to the Obligors' assets for internal use by DIP Agent and the Lenders.

Each Obligor shall provide DIP Agent and each Lender with access to its customers and suppliers.

      **5.7**    **Compliance with Laws**.  Each Obligor will comply, and shall cause each of its Subsidiaries and all other Persons, if any, on or occupying any Facilities to comply, in all material respects, with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority (including all Environmental Laws).  Each Obligor shall take all reasonable and necessary actions to ensure that no portion of the Term Loans will be used, disbursed or distributed for any purpose, or to any Person, directly or indirectly, in violation of any of the Terrorism Laws and shall take all reasonable and necessary action to comply in all material respects with all Terrorism Laws with respect thereto.

      **5.8**    **Environmental**.

      (a)    <u>Environmental Disclosure</u>.  Administrative Borrower will deliver to DIP Agent and Lenders:

      (i)    as soon as practicable following receipt thereof, copies of all environmental audits, investigations, analyses and reports of any kind or character, whether prepared by personnel of Holdings or any of its Subsidiaries or by independent consultants, governmental authorities or any other Persons, with respect to significant environmental matters at any Facility or with respect to any Environmental Claims;

      (ii)    promptly upon any Authorized Officer of any Obligor obtaining knowledge of the occurrence thereof, written notice describing in reasonable detail (1) any Release required to be reported to any federal, state or local governmental or regulatory agency under any applicable Environmental Laws, (2) any remedial action taken by Holdings or any other Person in response to (A) any Hazardous Materials Activities the existence of which has a reasonable possibility of resulting in one or more Environmental Claims having, individually or in the aggregate, a Material Adverse Effect, or (B) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of resulting in a Material Adverse Effect, and (3) Holdings or the Borrowers' discovery of any occurrence or condition on any real property adjoining or in the vicinity of any Facility that could cause such Facility or any part thereof to be subject to any material restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws;

      (iii)    as soon as practicable following the sending or receipt thereof by Holdings or any of its Subsidiaries, a copy of any and all written communications with respect to (1) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of giving rise to a Material Adverse Effect, (2) any Release required to be reported to any federal, state or local governmental or regulatory agency, and (3) any request for information from any governmental agency that suggests such agency is investigating whether Holdings or any of its Subsidiaries may be potentially responsible for any Hazardous Materials Activity;

(iv)    prompt written notice describing in reasonable detail (1) any proposed acquisition of stock, assets, or property by Holdings or any of its Subsidiaries that could reasonably be expected to (A) expose Holdings or any of its Subsidiaries to, or result in, Environmental Claims that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (B) affect the ability of Holdings or any of its Subsidiaries to maintain in full force and effect all material Governmental Authorizations required under any Environmental Laws for their respective operations and (2) any proposed action to be taken by Holdings or any of its Subsidiaries to modify current operations in a manner that could reasonably be expected to subject Holdings or any of its Subsidiaries to any additional material obligations or requirements under any Environmental Laws; and

(v)    with reasonable promptness, such other documents and information as from time to time may be reasonably requested by DIP Agent in relation to any matters disclosed pursuant to this Section 5.8(a).

(b)    <u>Hazardous Materials Activities, Etc.</u>  Each Obligor shall promptly take, and shall cause each of its Subsidiaries promptly to take, any and all actions necessary to (i) cure any material violation of applicable Environmental Laws by such Obligor or its Subsidiaries, and (ii) make an appropriate response to any material Environmental Claim against such Obligor or any of its Subsidiaries and discharge any obligations it may have to any Person thereunder.

(c)    <u>Right of Access and Inspection</u>.  With respect to any event described in Section 5.8(a), (1) if an Event of Default has occurred and is continuing, (2) if DIP Agent reasonably believes that Holdings or any Subsidiary has breached any representation, warranty or covenant related to environmental matters (including those contained in Sections 4.9, 4.12, 5.7 or 5.8) or (3) otherwise in the discretion of the DIP Agent:

(i)    DIP Agent and its representatives shall have the right, but not the obligation or duty, to enter the Facilities at reasonable times for the purposes of observing the Facilities.  Such access shall include, at the reasonable request of DIP Agent, access to relevant documents and employees of Holdings and its Subsidiaries and to their outside representatives, to the extent necessary to obtain necessary information related to the event at issue.  If an Event of Default has occurred and is continuing, the Obligors shall conduct such tests and investigations on the Facilities or relevant portion thereof, as reasonably requested by DIP Agent, including the preparation of a Phase I Report, a Phase II report, including subsurface environmental sampling, or such other sampling or analysis as determined to be necessary under the circumstances by a qualified environmental engineer or consultant.  If an Event of Default has occurred and is continuing, and if an Obligor does not undertake such tests and investigations in a reasonably timely manner following the request of DIP Agent, or, in the absence of an Event of Default, in the discretion of the DIP Agent, without requesting that the Obligors undertake such investigation, DIP Agent may hire an independent engineer, at the Obligors' expense, to conduct such tests and investigations.  DIP Agent will make all reasonable efforts to conduct any such tests and investigations so as to avoid interfering with the operation of the Facility.

(ii)    Any observations, tests or investigations of the Facilities by or on behalf of DIP Agent shall be solely for the purpose of protecting the Lenders security interests and rights under the Credit Documents.  The exercise of DIP Agent's rights under this subsection (c) shall not constitute a waiver of any default of any Obligor or impose any liability on DIP Agent or any of the Lenders.  In no event will any observation, test or investigation by or on behalf of DIP Agent be a representation that Hazardous Materials are or are not present in, on or under any of the Facilities, or that there has been or will be compliance with any Environmental Law and DIP Agent shall not be deemed to have made any representation or warranty to any party regarding the truth, accuracy or completeness of any report or findings with regard thereto.  Neither any Obligor nor any other party is entitled to rely on any observation, test or investigation by or on behalf of DIP Agent.  DIP Agent and the Lenders owe no duty of care to protect any Obligor or any other party against, or to inform any Obligor or any other party of, any Hazardous Materials or any other adverse condition affecting any of the Facilities.  DIP Agent may, in its sole discretion, disclose to the applicable Obligor, or to any other party if so required by law, any report or findings made as a result of, or in connection with, its observations, tests or investigations.  If a request is made of DIP Agent to disclose any such report or finding to any third party, then DIP Agent shall endeavor to give the applicable Obligor prior notice of such disclosure and afford such Obligor the opportunity to object or defend against such disclosure at its own and sole cost; provided, that the failure of DIP Agent to give any such notice or afford such Obligor the opportunity to object or defend against such disclosure shall not result in any liability to DIP Agent.  Each Obligor acknowledges that it may be obligated to notify relevant Governmental Authorities regarding the results of any observation, test or investigation disclosed to such Obligor, and that such reporting requirements are site and fact-specific and are to be evaluated by such Obligor without advice or assistance from DIP Agent.

(d)    If counsel to Holdings or any of its Subsidiaries reasonably determines that provision to DIP Agent of a document otherwise required to be provided pursuant to this Section 5.8 (or any other provision of this Agreement or any other Credit Document relating to environmental matters) would jeopardize an applicable attorney-client or work product privilege pertaining to such document, then Holdings or its Subsidiary shall not be obligated to deliver such document to DIP Agent but shall provide DIP Agent with a notice identifying the author and recipient of such document and generally describing the contents of the document.  Upon request of DIP Agent, Holdings and its Subsidiaries shall take all reasonable steps necessary to provide DIP Agent with the factual information contained in any such privileged document.

**5.9    Subsidiaries**.  In the event that any Person becomes a Subsidiary of Holdings, the Borrowers shall (a) concurrently with such Person becoming a Subsidiary, cause such Subsidiary to become a Guarantor hereunder by executing and delivering to DIP Agent a Counterpart Agreement and (b) take all such actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates (x) as are similar to those described in Sections 3.1(b) and 3.1(g) and (y) necessary to grant, evidence and perfect the DIP Agent's Lien upon such Subsidiary's right, title and interest in, to and under the Collateral.  With respect to each such Subsidiary, Administrative Borrower shall promptly send to DIP Agent written notice setting forth with respect to such Person (i) the date on which such Person became a Subsidiary of any Borrower, and (ii) all of the data required to be set forth in Schedules

4.1 and 4.2 with respect to all Subsidiaries of Borrowers; <u>provided</u>, such written notice shall be deemed to supplement Schedule 4.1 and 4.2 for all purposes hereof.

**5.10    Further Assurances**.  At any time or from time to time upon the request of DIP Agent, each Obligor will, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as DIP Agent may reasonably request in order to effect fully the purposes of the Credit Documents, including providing Lenders with any information reasonably requested pursuant to Section 11.22.  In furtherance and not in limitation of the foregoing, each Obligor shall take such actions as DIP Agent may reasonably request from time to time to ensure that the Obligations are guarantied by the Guarantors and are secured by substantially all of the assets of the Borrowers and the Guarantors (including Capital Stock of the Borrowers and their Subsidiaries).

**5.11    Miscellaneous Business Covenants**.  Unless otherwise consented to by the DIP Agent and the Requisite Lenders:

(a)    <u>Non-Consolidation</u>.  Holdings will and will cause each of its Subsidiaries to:  (i) maintain entity records and books of account separate from those of any other entity which is an Affiliate of such entity; (ii) not commingle its funds or assets with those of any other entity which is an Affiliate of such entity; and (iii) provide that its board of directors or other analogous governing body will hold all appropriate meetings to authorize and approve such entity's actions, which meetings will be separate from those of other entities.

(b)    <u>Cash Management Systems and Policies</u>.  The Debtors and their Subsidiaries shall deposit all revenue, receipts, income and cash into their existing Deposit Accounts, pursuant to and in accordance with the DIP Order and the cash management order to be obtained by the Debtors in one or more First Day Orders, and shall otherwise maintain cash management systems reasonably acceptable to DIP Agent, including with respect to blocked account arrangements.  The DIP Agent acknowledges that the cash management systems and blocked account arrangements in effect on the Closing Date are acceptable as of the Closing Date and approved in First Day Orders.

**5.12    Use of Proceeds**.  The proceeds of the Term Loans will be used only for the purposes described in Section 2.5.  No part of the proceeds of any Term Loan will be used, whether directly or indirectly, for any purpose that entails a violation of any law, including Regulations T, U and X of the Board of Governors of the Federal Reserve System.

**5.13    SPV Agreement**.  Holdings and the Borrowers shall cause each SPV to, and each SPV shall, comply with all covenants and obligations contained in the applicable SPV Agreement, except where the same shall conflict with this Agreement and the DIP Order, in which case Holdings and the Borrowers shall promptly amend such SPV Agreement to be consistent herewith and therewith, such amendment to be in a form as approved by the DIP Agent.

**5.14    Santa Ana Excess Land**.  At all times from the date that is four (4) months after the Closing Date until the consummation of the sale of the Santa Ana Excess Land, the Obligors shall diligently pursue the sale of the Santa Ana Excess Land.

     **5.15**   **Bankruptcy Related Matters**.  Each Obligor will, and will cause each of the Guarantors to:

     (a)     Comply with the DIP Order.

     (b)     Comply in all material respects with each Chapter 11 Order (other than the DIP Order) except where failure to comply could not reasonably be expected to have a Material Adverse Effect.

     (c)     Provide the DIP Agent and the Lenders with reasonable access to non-privileged information (including historical information) and relevant personnel regarding strategic planning, cash and liquidity management, operational and restructuring activities, in each case subject to customary confidentiality restrictions.

     (d)     Use reasonable efforts to deliver to the DIP Agent (for distribution to the Lenders) and to counsel to the DIP Agent promptly as soon as available but no later than one (1) Business Day prior to filing, copies of all proposed pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of the Obligors or any other Obligor with the Bankruptcy Court in the Cases, or distributed by or on behalf of the Obligors or any other Obligor to any official or unofficial committee appointed or appearing in the Cases or any other party in interest.

     (e)     If not otherwise provided through the Bankruptcy Court's electronic docketing system, as soon as available, deliver to the DIP Agent (for distribution to the Lenders) and to counsel to the DIP Agent and Lenders promptly as soon as available, copies of all final pleadings, motions, applications, orders, financial information and other documents filed by or on behalf of the Obligors or any other Obligor with the Bankruptcy Court in the Cases, or distributed by or on behalf of the Obligors or any other Obligor to any official or unofficial committee appointed or appearing in the Cases.

     SECTION 6.     NEGATIVE COVENANTS

     Each Obligor covenants and agrees that, so long as any Term Loan Commitment is in effect and until payment in full of all Obligations (other than contingent indemnification obligations that by their terms survive termination of the Credit Documents), such Obligor shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 6.

     **6.1**   **Indebtedness**.  No Obligor shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

     (a)     the Obligations;

     (b)     Indebtedness of any Guarantor Subsidiary to any Borrower or to any other Guarantor Subsidiary, or of any Borrower to any Guarantor Subsidiary; <u>provided</u>, (i) all such Indebtedness shall be evidenced by promissory notes or on the books and records of the Company and all such notes shall be pledged as Collateral to the DIP Agent hereunder and

(ii) all such Indebtedness shall be unsecured and subordinated in right of payment to the payment in full of the Obligations pursuant to the terms of the applicable promissory notes or an intercompany subordination agreement that in any such case, is reasonably satisfactory to DIP Agent;

(c)        Indebtedness incurred by the Borrowers or any of their Subsidiaries arising from agreements providing for indemnification, adjustment of purchase price or similar obligations incurred in connection with dispositions of any business, assets or Subsidiary of the Borrowers or any of their Subsidiaries permitted hereunder; provided that with respect to any asset with a value in excess of $100,000, such Indebtedness shall be in an amount acceptable to DIP Agent;

(d)        Indebtedness which may be deemed to exist pursuant to any guaranties, performance, surety, statutory, appeal or similar obligations incurred in the ordinary course of business;

(e)        Indebtedness in respect of netting services, overdraft protections and otherwise in connection with customary Deposit Accounts maintained by an Obligor as part of its ordinary cash management program as in effect on the Closing Date;

(f)        to the extent in effect as of the Closing Date, guaranties by the Borrowers of Indebtedness of a Guarantor Subsidiary or guaranties by a Subsidiary of the Borrowers (other than an SPV) of Indebtedness of the Borrowers or a Guarantor Subsidiary;

(g)        Indebtedness described in Schedule 6.1, but not any extensions, renewals or replacements of such Indebtedness except, to the extent permitted by the DIP Order, (i) renewals and extensions expressly provided for in the agreements evidencing any such Indebtedness as the same are in effect on the date of this Agreement, and (ii) refinancings and extensions of any such Indebtedness if the terms and conditions thereof, including those relating to amortization, maturity, collateral and subordination, are not less favorable to the obligor thereon or to the Lenders than the Indebtedness being refinanced or extended and are otherwise on prevailing market terms and conditions, and the average life to maturity thereof is greater than or equal to that of the Indebtedness being refinanced or extended; provided, such Indebtedness permitted under the immediately preceding clause (i) or (ii) above shall not (A) include Indebtedness of an obligor that was not an obligor with respect to the Indebtedness being extended, renewed or refinanced, (B) exceed in a principal amount the Indebtedness being renewed, extended or refinanced plus customary and reasonable expenses incurred in connection therewith, or (C) be incurred, created or assumed if any Default or Event of Default has occurred and is continuing or would result therefrom;

(h)        unsecured Indebtedness incurred by the Borrowers or any of their Subsidiaries (other than an SPV) in the ordinary course of business in respect of credit cards, credit card processing services, debit cards, stored value cards, purchase cards (including so-called "procurement cards" or "-cards"); provided that the aggregate amount of all such Indebtedness outstanding shall not exceed at any time for all Obligors (i) $[   ] in the aggregate amount owing to American Express and its Affiliates and (ii) $[   ] in the aggregate amount owing to all other holders of such unsecured Indebtedness; and

(i)      Indebtedness incurred by the Borrowers or any Subsidiary (other than an SPV) in the ordinary course of business owed to any Person providing property, casualty, liability or other insurance to Holdings or any of its Subsidiaries, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the year in which such Indebtedness is incurred and such Indebtedness is outstanding only during such year, provided that the aggregate amount of all such Indebtedness outstanding shall not at any time exceed $100,000 in the aggregate for all Obligors.

provided, that no Indebtedness otherwise permitted by clauses (g) and (h) shall be assumed, created, or otherwise refinanced if a Default or Event of Default has occurred or would result therefrom.

   **6.2    Liens**.  No Obligor shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable and any Security) of Holdings or any of its Subsidiaries, whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any Lien with respect to any such property, asset, income or profits under the UCC of any State or under any similar recording or notice statute, except, but in all respects subject to the DIP Order:

   (a)      Liens in favor of DIP Agent for the benefit of Secured Parties granted pursuant to any Credit Document;

   (b)      Liens for Taxes that do not have priority (except with respect to property tax liens on Real Estate Assets) over the Liens securing the Obligations if obligations with respect to such Taxes are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts, or for Taxes that will not become delinquent within 30 days;

   (c)      Rights of setoff or bankers' liens upon deposits of funds in favor of banks or other depositary institutions, solely to the extent of fees and expenses incurred in connection with the maintenance of Deposit Accounts or Securities in the ordinary course of business; statutory Liens of landlords, of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401 (a)(29) or 412(n) of the Internal Revenue Code or by ERISA), in each case incurred in the ordinary course of business (i) for amounts not yet overdue, or (ii) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of five (5) days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

   (d)      Liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases,

government contracts, trade contracts, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money or other Indebtedness), in each case, in existence as of the Closing Date or provided for in the Approved Budget, so long as no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Collateral on account thereof;

(e)      easements, rights of way, covenants, conditions, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not and will not interfere in any material respect with the value or use of the property to which such Lien is attached or with the ordinary conduct of the business of Holdings or any of its Subsidiaries;

(f)      any interest or title of a lessor or sublessor under any lease of real estate to an Obligor as lessee or sublessee as permitted hereunder, and any Liens encumbering or affecting the interest of title of such lessor or sublessor;

(g)      purported Liens evidenced by the filing of precautionary UCC financing statements relating solely to operating leases of personal property entered into in the ordinary course of business;

(h)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(i)      any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property, in each case which do not and will not interfere with or affect in any material respect the use, value or operations of any Real Estate Asset or the ordinary conduct of the business of Holdings or such Subsidiary;

(j)      licenses of patents, trademarks and other intellectual property rights granted by Holdings or any of its Subsidiaries in the ordinary course of business and not interfering in any respect with the ordinary conduct of the business of Holdings or such Subsidiary;

(k)      Liens described in Schedule 6.2 (and Liens securing refinancings of Indebtedness secured by such Liens to the extent such refinancing is permitted under this Agreement);

(l)      judgment and attachment Liens that do not have priority over the Liens securing the Obligations arising solely as a result of the existence of judgments, attachments, orders or awards that do not constitute an Event of Default under Section 8.1(g);

(m)      Liens granted in the ordinary course of business on the unearned portion of insurance premiums securing the financing of insurance premiums to the extent the financing is permitted under Section 6.1; and

(n)      Liens permitted under the DIP Order.

**6.3    No Further Negative Pledges**.  Except with respect to  restrictions by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses and similar agreements entered into in the ordinary course of business (<u>provided</u> that such restrictions are limited to the property or assets secured by such Liens or the property or assets subject to such leases, licenses or similar agreements, as the case may be) no Obligor shall, nor shall it permit any of its Subsidiaries to, enter into any agreement prohibiting the creation or assumption of any Lien upon any of its properties or assets to secure the Obligations, whether now owned or hereafter acquired.

**6.4    Prepetition or Restricted Payments**.

(a)    No Obligor shall, or shall permit any of its Subsidiaries to, directly or indirectly, make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Indebtedness or payables arising prior to the Petition Date, other than the Prepetition Indebtedness or to the extent authorized by one or more First Day Orders or Second Day Orders and consistent with the Approved Budget.

(b)    No Obligor shall, or shall permit any of its Subsidiaries to, directly or indirectly declare or make any Restricted Payment, or set aside any funds for any such purpose; <u>provided</u>, however, that the Subsidiaries of Holdings may make Restricted Payments to any of the Obligors to the extent authorized by one or more First Day Orders or Second Day Orders and consistent with the Approved Budget.

**6.5    Restrictions on Subsidiary Distributions**.  Except as provided herein or in any First Day Order, no Obligor shall, nor shall it permit any of its Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of the Borrowers to (a) pay dividends or make any other distributions on any of such Subsidiary's Capital Stock, (b) repay or prepay any Indebtedness owed by such Subsidiary to the Borrowers or any other Subsidiary of the Borrowers, (c) make loans or advances to the Borrowers or any other Subsidiary of the Borrowers, or (d) transfer any of its property or assets to the Borrowers or any other Subsidiary of the Borrowers other than restrictions (i) by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses, joint venture agreements and similar agreements entered into prior to the Closing Date in the ordinary course of business and (ii) on the disposition of assets contained in agreements relating to the sale of assets, <u>provided</u> such restrictions and conditions apply only to the assets that are to be sold and such sale is permitted hereunder.  No Obligor shall, nor shall it permit its Subsidiaries to, enter into any Contractual Obligation which would prohibit a Subsidiary of Holdings from becoming an Obligor.

**6.6    Investments**.  No Obligor shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, make or own any Investment in any Person, including without limitation any Joint Venture, except:

(a)    Investments in Cash and Cash Equivalents;

(b)    equity Investments owned as of the Closing Date in any Subsidiary and Investments made after the Closing Date in any wholly owned Guarantor Subsidiaries of the Borrowers in conformity with the DIP Order and the Approved Budget;

(c)    Investments (i) in any Securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors, and (ii) constituting deposits, prepayments and other credits to suppliers made in the ordinary course of business consistent with the past practices of Holdings and its Subsidiaries;

(d)    intercompany loans to the extent permitted under Section 6.1(b);

(e)    Consolidated Capital Expenditures permitted by Section 6.7(b); and

(f)    Investments described in Schedule 6.6.

Notwithstanding the foregoing, in no event shall any Obligor make any Investment which results in or facilitates in any manner any Restricted Payment not otherwise permitted under the terms of Section 6.4.  Notwithstanding the foregoing, no Investment otherwise permitted by clause(d) or (f) shall be permitted if any Default or Event of Default has occurred and is continuing or would result therefrom.

**6.7    Budget Covenant**.

(a)    <u>Variance from Approved Budget</u>.   The Debtors' collective actual expenditures shall not exceed, on a line-item by line-item basis, the specific dollar amounts set forth in the Approved Budget for such line-item (and shall not be used for purposes other than the categories set forth in the Approved Budget); <u>provided</u> that Debtors shall only be in violation of this Section 6.7(a) if, at the end of any given month, (i) on a line-item by line-item basis, Debtors' actual expenditures from the Petition Date to the end of such month exceed the budgeted expenditures set forth in the Approved Budget for such line-item through the end of such month by fifteen percent (15%) or more or (ii) the entire Approved Budget total through the end of such month is exceeded by ten percent (10%) or more.

(b)    <u>Maximum Consolidated Capital Expenditures</u>.  Holdings shall not  make or incur any Consolidated Capital Expenditures, and Holdings shall not permit its Subsidiaries to, make or incur Consolidated Capital Expenditures, in any Fiscal Quarter in an aggregate amount for all of its Subsidiaries in excess of that provided for in the Approved Budget.

**6.8    Fundamental Changes; Disposition of Assets; Acquisitions**.  No Obligor shall, nor shall it permit any of its Subsidiaries to, enter into any transaction of merger or consolidation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease or sub lease (as lessor or sublessor), exchange, transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, assets or property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, or acquire by purchase or otherwise (other than purchases or other acquisitions of inventory, materials and equipment and capital expenditures permitted hereunder in the ordinary course of business) the business, property or fixed assets of,

or stock or other evidence of beneficial ownership of, any Person or any division or line of business or other business unit of any Person, except:

(a)      other than any SPV, any Subsidiary of Holdings may be merged with or into Borrowers or any Guarantor Subsidiary, or be liquidated, wound up or dissolved, or all or any part of its business, property or assets may be conveyed, sold, leased, transferred or otherwise disposed of, in one transaction or a series of transactions, to the Borrowers or any Guarantor Subsidiary; provided, in the case of such a merger, the Borrowers or such Guarantor Subsidiary, as applicable, shall be the continuing or surviving Person;

(b)      sales or other dispositions of assets (i) that do not constitute Asset Sales or (ii) that are made to the Borrowers or any Guarantor Subsidiary (other than sales or dispositions of assets to or from an SPV, except as explicitly permitted elsewhere hereunder);

(c)      any Asset Sale, the net proceeds of which are sufficient to pay the Obligations in cash in full upon the consummation of such Asset Sale, and such net proceeds are so applied;

(d)      Asset Sales, the proceeds of which, when aggregated with the proceeds of all other Asset Sales, are less than $100,000 in the aggregate during the term of this Agreement; provided (1) the consideration received for such assets shall be in an amount at least equal to the fair market value thereof (determined in good faith by the board of directors of the Administrative Borrower (or similar governing body)), (2) no less than one hundred percent (100%) thereof shall be paid in Cash, and (3) the Net Asset Sale Proceeds thereof shall be applied as required by Section 2.12(a);

(e)      disposals of obsolete or worn out property, the proceeds of which are less than $25,000 when aggregated with all other dispositions made pursuant to this clause (e); provided that the consideration received for such assets shall be in an amount at least equal to the fair market value thereof (determined in good faith by the board of directors of the Administrative Borrower (or similar governing body));

(f)      sales of Inventory to buyers in the ordinary course of business;

(g)      the use or transfer of Cash or Cash Equivalents in a manner that is permitted by the terms of this Agreement and the other Credit Documents;

(h)      the licensing, on a non-exclusive basis (and for purposes of this clause, geographically exclusive licenses shall not be exclusive) of patents, trademarks, copyrights and other intellectual property rights in the ordinary course of business;

(i)      the sale or discount, in each case without recourse, of accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection of delinquent or defaulted accounts receivable in the ordinary course of business;

(j)      any loss, damage or destruction of property resulting from a casualty event;

Exhibit B to Final Order
Page 222

(k)     any involuntary condemnation, seizure or taking, by exercise by a governmental authority or eminent domain, confiscation or requisition of use of property;

(l)     (i) the expiration or lapse of patents, trademarks, copyrights and other intellectual property of Holdings and its Subsidiaries to the extent not economically desirable in the conduct of their business or (ii) the abandonment of patents, trademarks, copyrights, or other intellectual property rights in the ordinary course of business so long as (in each case under clauses (i) and (ii), (A) with respect to copyrights, such copyrights are not material revenue generating copyrights, and (B) such lapse is not materially adverse to the interests of the Lenders; and

(m)     Investments made in accordance with Section 6.6.

**6.9     Disposal of Subsidiary Interests**.  Except for any sale of all of its interests in the Capital Stock of any of its Subsidiaries in compliance with the provisions of Section 6.8, no Obligor shall, nor shall it permit any of its Subsidiaries to, (a) directly or indirectly sell, assign, pledge or otherwise encumber or dispose of any Capital Stock of any of its Subsidiaries, except to qualified directors if required by applicable law; or (b) directly or indirectly to sell, assign, pledge or otherwise encumber or dispose of any Capital Stock of any of its Subsidiaries, except to another Obligor (subject to the restrictions on such disposition otherwise imposed hereunder), or to qualified directors if required by applicable law; provided that in no event shall any interest in any SPV be sold pursuant to Section 6.8.

**6.10     Sales and Lease Backs**.  No Obligor shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which such Obligor (a) has sold or transferred or is to sell or to transfer to any other Person (other than Holdings or any of its Subsidiaries) or (b) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by such Obligor to any Person (other than Holdings or any of its Subsidiaries) in connection with such lease.

**6.11     Transactions with Shareholders and Affiliates**.  No Obligor shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any holder of five percent (5%) or more of any class of Capital Stock of Holdings or any of its Subsidiaries or with any Affiliate of Holdings or of any such holder, except for Restricted Payments to the Borrowers permitted by Section 6.4(b).

**6.12     Conduct of Business**.  From and after the Closing Date, no Obligor shall, nor shall it permit any of its Subsidiaries to, engage in any business other than the businesses engaged in by such Obligor on the Closing Date.

**6.13     Permitted Activities of Holdings**.  Holdings shall not (a) incur, directly or indirectly, any Indebtedness or any other obligation or liability whatsoever other than the Indebtedness; (b) create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it other than the Liens created under the Collateral Documents to which it

is a party or permitted pursuant to Section 6.2; (c) engage in any business or activity or own any assets other than (i) holding one hundred percent (100%) of the Capital Stock of Freedom Holdings and (ii) performing its obligations and activities incidental thereto under the Credit Documents; (d) consolidate with or merge with or into, or convey, transfer or lease all or substantially all its assets to, any Person; (e) sell or otherwise dispose of any Capital Stock of any of its Subsidiaries; (f) create or acquire any Subsidiary or make or own any Investment in any Person other than Freedom Holdings; or (g) fail to hold itself out to the public as a legal entity separate and distinct from all other Persons.

**6.14    Deposit Accounts**.  No Obligor shall establish or maintain a Deposit Account or Securities Account that is not subject to a Control Agreement and no Obligor will deposit Collateral (including the proceeds thereof) or the proceeds of Term Loans in a Deposit Account or Securities Account that is not subject to a Control Agreement.

**6.15    Fiscal Year**.  No Obligor shall, nor shall it permit any of its Subsidiaries to change its Fiscal Year end from December 31.

**6.16    Amendments to Organizational Agreements and Material Contracts**.  No Obligor shall (a) amend or permit any amendments to any Obligor's Organizational Documents; or (b) amend or permit any amendments to, or terminate, waive, assume or reject any provision of, any Material Contract if such amendment, termination, waiver, assumption or rejection could reasonably be expected to be adverse to DIP Agent or the Lenders or have an adverse effect on the Term Loans, the Collateral or the DIP Term Loan Facility..

**6.17    Issuance of Capital Stock**.  No Obligor (other than Holdings) shall, nor shall it permit any of its Subsidiaries to, issue or sell or enter into any agreement or arrangement for the issuance and sale of any shares of its Capital Stock, any securities convertible into or exchangeable for its Capital Stock, or any warrants, options or other rights for the purchase or acquisition of shares of its Capital Stock.  Holdings shall not issue or sell any Disqualified Capital Stock.

**6.18    Terrorism Laws**.  No Obligor shall engage in any transaction relating to any property or interests in property blocked pursuant to the OFAC Sanctions Programs, engage in any transaction that evades or avoids or attempts to violate any of the prohibitions set forth in the OFAC Sanctions Programs, the Patriot Act or any other Terrorism Law, or permit any of their Subsidiaries to do any of the foregoing.

**6.19    [Reserved]**.

**6.20    Leases of Real Property**.  None of Holdings or any Subsidiaries shall enter into, modify, amend, extend, assume, reject or terminate any lease of real property with respect to which such Person is lessor, without the prior written consent of the DIP Agent.

**6.21    [Reserved]**.

SECTION 7.        GUARANTY

**7.1        Guaranty of the Obligations**.        Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to DIP Agent for the ratable benefit of the Beneficiaries the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a)) (collectively, the "**Guaranteed Obligations**").

**7.2        Reserved**.

**7.3        Payment by Guarantors**.        Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of any Borrower to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, Guarantors will upon demand pay, or cause to be paid, in Cash, to DIP Agent for the ratable benefit of Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for any Borrower's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against any Borrower for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to Beneficiaries as aforesaid.

**7.4        Liability of Guarantors Absolute**.        Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)        this Guaranty is a guaranty of payment when due and not of collectability. This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b)        DIP Agent may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between any Borrower and any Beneficiary with respect to the existence of such Event of Default;

(c)        the obligations of each Guarantor hereunder are independent of the obligations of Borrowers and the obligations of any other guarantor (including any other Guarantor) of the obligations of Borrowers, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against any Borrower or any of such other Guarantors and whether or not any Borrower is joined in any such action or actions;

(d)        payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid; and without limiting the

generality of the foregoing, if DIP Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)    any Beneficiary, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Beneficiary in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Beneficiary may have against any such security, in each case as such Beneficiary in its discretion may determine consistent herewith and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any Borrower or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Credit Documents; and

(f)    this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Credit Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Credit Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Credit Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal,

invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Credit Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Beneficiary might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Beneficiary's consent to the change, reorganization or termination of the corporate structure or existence of Holdings or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set offs or counterclaims which any Borrower may allege or assert against any Beneficiary in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

7.5    **Waivers by Guarantors**.    Subject in all respects to the DIP Order, each Guarantor hereby waives, for the benefit of Beneficiaries: (a) any right to require any Beneficiary, as a condition of payment or performance by such Guarantor, to (i) proceed against any Borrower, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from any Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account or credit on the books of any Beneficiary in favor of any Borrower or any other Person, or (iv) pursue any other remedy in the power of any Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of any Borrower or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of any Borrower or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Beneficiary protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to any Borrower and notices of any of the matters referred to in Section 7.4 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

**7.6     Guarantors' Rights of Subrogation, Contribution, etc**. Until the Guaranteed Obligations shall have been paid in full (other than contingent indemnification obligations that by their terms survive termination of the Credit Documents), each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against any Borrower or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including without limitation (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against any Borrower with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Beneficiary now has or may hereafter have against any Borrower, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Beneficiary. In addition, until the Guaranteed Obligations (other than contingent indemnification obligations that by their terms survive termination of the Credit Documents) shall have been paid in full, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations. Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against any Borrower or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Beneficiary may have against any Borrower, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor. If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations (other than contingent indemnification obligations that by their terms survive termination of the Credit Documents) shall not have been finally paid in full, such amount shall be held in trust for DIP Agent on behalf of Beneficiaries and shall forthwith be paid over to DIP Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

**7.7     Subordination of Other Obligations**. Any Indebtedness of any Borrower or any Guarantor now or hereafter held by any Guarantor (the "**Obligee Guarantor**") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Guarantor shall be held in trust for DIP Agent on behalf of Beneficiaries and shall forthwith be paid over to DIP Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

**7.8     Continuing Guaranty**. This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations (other than contingent indemnification obligations that by their terms survive termination of the Credit Documents) shall have been paid in full. Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

**7.9** **Authority of Guarantors or Borrowers**.  It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or Borrower or the officers, directors or any agents acting or purporting to act on behalf of any of them.

**7.10** **Financial Condition of Borrowers**.  Any Credit Extension may be made to any Borrower or continued from time to time, without notice to or authorization from any Guarantor regardless of the financial or other condition of any Borrower at the time of any such grant or continuation.  No Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of any Borrower.  Each Guarantor has adequate means to obtain information from Borrowers on a continuing basis concerning the financial condition of Borrowers and their ability to perform its obligations under the Credit Documents and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of Borrowers and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.  Each Guarantor hereby waives and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of Borrowers now known or hereafter known by any Beneficiary.

**7.11** **Taxes**.  All sums payable by any Guarantor hereunder pursuant to this Section 7 and under the other Credit Documents shall be paid free and clear of, and without any deduction or withholding on account of, any Tax, in accordance with Section 2.17.

SECTION 8.    EVENTS OF DEFAULT

**8.1** **Events of Default**.  If any one or more of the following conditions or events shall occur:

(a)    Failure to Make Payments When Due.  Failure by any Borrower to pay (i) when due the principal of and premium on, if any, with respect to, any Term Loan whether at stated maturity, by acceleration or otherwise; (ii) when due any installment of principal of any Term Loan, by notice of voluntary prepayment, by mandatory prepayment or otherwise; or (iii) when due any interest on any Term Loan or any fee or any other amount due hereunder;

(b)    Breach of Certain Covenants.  Failure of any Obligor to perform or comply with any term or condition contained in Section 2.5, Section 5.1, Section 5.2, Section 5.12 or Section 6; or

(c)    Breach of Representations, etc.  Any representation, warranty, certification or other statement made or deemed made by any Obligor in any Credit Document or in any statement or certificate at any time given by any Obligor or any of its Subsidiaries in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or

(d)    Other Defaults Under Credit Documents.  Any Obligor shall default in the performance of or compliance with any term contained herein or any of the other Credit Documents, other than any such term referred to in any other Section of this Section 8.1, and such default shall not have been remedied or waived within ten (10) days after the earlier to

occur of (i) knowledge by an Authorized Officer of any Borrower of such default or (ii) notice from the DIP Agent to any Borrower of such default; or

       (e)     [Reserved].

       (f)     [Reserved].

       (g)     <u>Claims, Judgments and Attachments</u>.  (a) Any money judgment, writ or warrant of attachment or similar process involving (i) in any individual case an amount in excess of $100,000 or (ii) in the aggregate at any time an amount in excess of $100,000 (in either case to the extent not fully covered by insurance (less any deductible) as to which a solvent and unaffiliated insurance company with a rating of "A-1" or better by A.M. Best has acknowledged coverage) shall be entered or filed against Holdings or any of its Subsidiaries or any of their respective assets or (b) Holdings or any of its Subsidiaries shall enter into a settlement in respect of any actual or threatened action, suit, investigation, litigation or proceeding or other regulatory or legal development involving (i) in any individual case an amount in excess of $100,000 or (ii) in the aggregate at any time an amount in excess of $100,000; or

       (h)     <u>Dissolution</u>.  Any order, judgment or decree shall be entered against any Obligor decreeing the dissolution or split up of such Obligor and such order shall remain undischarged or unstayed for a period in excess of thirty (30) consecutive days; or

       (i)     [<u>Employee Benefit Plans</u>.  (i) There shall occur one or more ERISA Events which individually or in the aggregate results in or might reasonably be expected to result in liability of Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates in excess of $100,000 during the term hereof; or (ii) there exists any fact or circumstance that reasonably could be expected to result in the imposition of a Lien or security interest under Section 430(k) of the Internal Revenue Code or under ERISA; or]

       (j)     <u>Guaranties, Collateral Documents and other Credit Documents</u>.  At any time after the execution and delivery thereof, (i) the Guaranty for any reason, other than the satisfaction in full of all Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder, (ii) this Agreement or any Collateral Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof) or shall be declared null and void, or DIP Agent shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than the failure of DIP Agent or any Secured Party to take any action within its control, or (iii) any Obligor shall contest the validity or enforceability of any Credit Document in writing or deny in writing that it has any further liability, including with respect to future advances by Lenders, under any Credit Document to which it is a party; or

       (k)     <u>Material Contracts</u>.  Any party thereto shall default in the performance of any of its material obligations under any Material Contract, or any Material Contract shall be terminated or not renewed by any party thereto, other than, with respect to Material Contracts

entered into prior to the Petition Date, a default or termination that is a result of the commencement of the Cases; or

      (l)    <u>Certain Bankruptcy Matters</u>.

      (i)    Any of the Cases shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

      (ii)    A trustee or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases; or

      (iii)    any Obligor shall (i) assume any executory contract or unexpired lease or reject any executory contract or unexpired lease, (ii) pursue a sale of all or substantially all of the Obligors' assets, (iii) consent to termination or reduction of the Obligors' exclusive plan filing and plan solicitation periods under section 1121 of the Bankruptcy Code (the "**Exclusivity Periods**") or fail to object to any motion by a party-in-interest (other than a Lender or the DIP Agent) seeking to terminate or reduce the Exclusivity Periods, in each case other than with the consent of DIP Agent and the Requisite Lenders.

      (m)    <u>Superpriority Claims</u>.  Other than as permitted under or provided for in the DIP Order, the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than in respect of the Obligations and the Carve-Out, entitled to superpriority administrative expense claim status in any of the Cases pursuant to Section 364(c)(1) of the Bankruptcy Code or otherwise that are pari passu with or senior to the Obligations or the existence of any Lien on the Collateral having a priority senior to or pari passu with the DIP Liens, except, in each case, as expressly permitted under the Credit Documents or the DIP Order; or

      (n)    <u>Relief from Stay</u>.  The Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Obligors which have a value in excess of $100,000 in the aggregate or (ii) permit other actions that would have a Material Adverse Effect on the Obligors or their estates (taken as a whole); or

      (o)    <u>Certain Orders</u>.

      (i)    An order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the DIP Order, without the prior written consent of the DIP Agent and the Requisite Lenders;

      (ii)    The DIP Order shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, or shall have been reversed, modified,

amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of the DIP Agent and the Requisite Lenders;

(iii)    Any of the Obligors shall fail to comply with the DIP Order;

(iv)    An order providing for a change of venue with respect to any of the Cases shall have been entered, and shall not have been reversed or vacated within ten (10) days;

(v)    An order in any of the Cases shall be entered charging any of the Collateral under Section 506(c) of the Bankruptcy Code; or

(p)    Reorganization Plan.  A Reorganization Plan shall be filed in any of the Cases, or any order shall be entered which dismisses any of the Cases, in either case, which does not provide for payment in full in cash of the Obligations (other than Obligations constituting contingent indemnification obligations not then due and payable) on the effective date of the Reorganization Plan, or any of the Obligors and their Subsidiaries shall seek, support or fail to contest in good faith the filing or confirmation of any such Reorganization Plan or entry of any such order; or

(q)    Other Actions.  Any Obligor shall commence, join in, assist or otherwise participate in any suit or other proceeding seeking (i) to invalidate, subordinate or otherwise challenge the Obligations or the Prepetition Indebtedness or (ii) any relief under section 506(c) of the Bankruptcy Code with respect to any Collateral; or

(r)    Adequate Protection Motion.  Without the consent of the DIP Agent and the Requisite Lenders, the filing of any motion by the Obligors seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any prepetition agent, trustee or lender that is inconsistent with the DIP Order; or

(s)    Section 364 Financing.  Without the Requisite Lenders' consent, the entry of any order by the Bankruptcy Court granting, or the filing by any Obligor or any of its Subsidiaries of any motion or other request with the Bankruptcy Court (in each case, other than the DIP Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the Collateral or to obtain any financing under section 364 of the Bankruptcy Code unless such motion or order contemplates payment in full in cash of the Term Loans and other Obligations (other than contingent indemnification and reimbursement obligations) immediately upon consummation of the transactions contemplated thereby; or

(t)    Asset Sale Motion.  Without the Requisite Lenders' consent, any Obligor shall file any motion seeking authority to consummate a sale of assets of the Obligors or the Collateral having a value in excess of $100,000 outside the ordinary course of business, other than an Asset Sale permitted under Section 6.8(c) or as otherwise permitted hereunder; or

**THEN**, upon the occurrence of any Event of Default, upon notice to Administrative Borrower by the DIP Agent (which may be given at its election or at the direction of the Requisite Lenders) to

the extent required by the DIP Order, (A) each of the following shall immediately become due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by each Obligor: (I) the unpaid principal amount of and accrued interest on the Term Loans and (II) all other Obligations; and (B) DIP Agent may cause DIP Agent to enforce any and all Liens and security interests created pursuant to Collateral Documents.

## SECTION 9.    AGENT

**9.1    Appointment of the DIP Agent**.  Silver Point is hereby appointed DIP Agent hereunder and under the other Credit Documents and each Lender hereby authorizes Silver Point, in such capacity, to act as its agent in accordance with the terms hereof and the other Credit Documents. The DIP Agent hereby agrees to act upon the express conditions contained herein and the other Credit Documents, as applicable.  The provisions of this Section 9 are solely for the benefit of the DIP Agent and Lenders and no Obligor shall have any rights as a third party beneficiary of any of the provisions thereof other than provisions which provide specific rights for the Obligors.  In performing its functions and duties hereunder, the DIP Agent shall act solely as an agent of the Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for Holdings or any of its Subsidiaries.

**9.2    Powers and Duties**.  Each Lender irrevocably authorizes the DIP Agent to take such action on such Lender's behalf and to exercise such powers, rights and remedies and perform such duties hereunder and under the other Credit Documents as are specifically delegated or granted to the DIP Agent by the terms hereof and thereof, together with such actions, powers, rights and remedies as are reasonably incidental thereto.  The DIP Agent shall have only those duties and responsibilities that are expressly specified herein and the other Credit Documents.  The DIP Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees.  The DIP Agent shall not have or be deemed to have, by reason hereof or any of the other Credit Documents, a fiduciary relationship in respect of any Lender; and nothing herein or any of the other Credit Documents, expressed or implied, is intended to or shall be so construed as to impose upon the DIP Agent any obligations in respect hereof or any of the other Credit Documents except as expressly set forth herein or therein.

**9.3    General Immunity**.

(a)    No Responsibility for Certain Matters.  The DIP Agent shall not be responsible to any Lender for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Credit Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by the DIP Agent to the Lenders or by or on behalf of any Obligor to the DIP Agent or any Lender in connection with the Credit Documents and the transactions contemplated thereby or for the financial condition or business affairs of any Obligor or any other Person liable for the payment of any Obligations, nor shall the DIP Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions,

provisions, covenants or agreements contained in any of the Credit Documents or as to the use of the proceeds of the Term Loans or as to the existence or possible existence of any Event of Default or Default or to make any disclosures with respect to the foregoing. Anything contained herein to the contrary notwithstanding, DIP Agent shall not have any liability arising from confirmations of the amount of outstanding Term Loans.

(b)      Exculpatory Provisions. Neither the DIP Agent nor any of its officers, partners, directors, employees or agents shall be liable to Lenders for any action taken or omitted by the DIP Agent under or in connection with any of the Credit Documents except to the extent caused by the DIP Agent's gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, nonappealable order. The DIP Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Credit Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until the DIP Agent shall have received instructions in respect thereof from Requisite Lenders (or such other Lenders as may be required to give such instructions under Section 11.5) or, in the case of DIP Agent, in accordance with the applicable Collateral Document, but subject to the DIP Order, and, upon receipt of such instructions from Requisite Lenders (or such other Lenders, as the case may be), or in accordance with the applicable Collateral Document, but subject to the DIP Order, the DIP Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions. Without prejudice to the generality of the foregoing, (i) the DIP Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and shall be entitled to rely and shall be protected and free from liability in relying on opinions and judgments of attorneys (who may be attorneys for the Obligors), accountants, experts and other professional advisors selected by it; and (ii) no Lender shall have any right of action whatsoever against the DIP Agent as a result of the DIP Agent acting or (where so instructed) refraining from acting hereunder or any of the other Credit Documents in accordance with the instructions of Requisite Lenders (or such other Lenders as may be required to give such instructions under Section 11.5) or, in the case of DIP Agent, in accordance with the applicable Collateral Document, but subject to the DIP Order.

(c)      Notice of Default. DIP Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to Events of Default in the payment of principal, interest and fees required to be paid to DIP Agent for the account of the Lenders, unless DIP Agent shall have received written notice from a Lender or a Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." DIP Agent will notify the Lenders of its receipt of any such notice. DIP Agent shall take such action with respect to any such Default or Event of Default as may be directed by the Requisite Lenders in accordance with Section 8; provided, however, that unless and until DIP Agent has received any such direction, DIP Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable or in the best interest of the Lenders.

**9.4      Agent Entitled to Act as Lender**. The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, the

DIP Agent in its individual capacity as a Lender hereunder.  With respect to its participation in the Term Loans, the DIP Agent shall have the same rights and powers hereunder as any other Lender and may exercise the same as if it were not performing the duties and functions delegated to it hereunder, and the term "Lender" shall, unless the context clearly otherwise indicates, include the DIP Agent in its individual capacity.  The DIP Agent and its Affiliates may accept deposits from, lend money to, own securities of, and generally engage in any kind of banking, trust, financial advisory or other business with Holdings or any of its Affiliates as if it were not performing the duties specified herein, and may accept fees and other consideration from the Borrowers for services in connection herewith and otherwise without having to account for the same to Lenders.

### 9.5    Lenders' Representations, Warranties and Acknowledgment.

(a)    Each Lender represents and warrants to the DIP Agent that it has made its own independent investigation of the financial condition and affairs of Holdings and its Subsidiaries, without reliance upon the DIP Agent or any other Lender and based on such documents and information as it has deemed appropriate, in connection with Credit Extensions hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of Holdings and its Subsidiaries.  The DIP Agent shall not have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Term Loans or at any time or times thereafter, and the DIP Agent shall not have any responsibility with respect to the accuracy of or the completeness of any information provided to Lenders.

(b)    Each Lender, by delivering its signature page to this Agreement and funding its Term Loan, shall be deemed to have acknowledged receipt of, and consented to and approved, each Credit Document and each other document required to be approved by the DIP Agent, Requisite Lenders or Lenders, as applicable on the Closing Date.

### 9.6    Right to Indemnity.  Each Lender, in proportion to its Pro Rata Share, severally agrees to indemnify the DIP Agent, its Affiliates and their respective officers, partners, directors, trustees, employees, representatives and agents (each, an "**Indemnitee Agent Party**"), to the extent that such Indemnitee Agent Party shall not have been reimbursed by any Obligor, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Indemnitee Agent Party in exercising its powers, rights and remedies or performing its duties hereunder or under the other Credit Documents or otherwise in its capacity as such Indemnitee Agent Party in any way relating to or arising out of this Agreement or the other Credit Documents, **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY, OR SOLE NEGLIGENCE OF SUCH AGENT**; provided, no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Indemnitee Agent Party's gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, nonappealable order.  If

any indemnity furnished to any Indemnitee Agent Party for any purpose shall, in the opinion of such Indemnitee Agent Party, be insufficient or become impaired, such Indemnitee Agent Party may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, in no event shall this sentence require any Lender to indemnify any Indemnitee Agent Party against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's Pro Rata Share thereof; and provided further, this sentence shall not be deemed to require any Lender to indemnify any Indemnitee Agent Party against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.

### 9.7    Successor DIP Agent.

(a)    DIP Agent may resign at any time by giving thirty (30) days' prior written notice thereof to Lenders and Administrative Borrower.  Upon any such notice of resignation, Requisite Lenders shall have the right, upon five Business Days' notice to Administrative Borrower, to appoint a successor DIP Agent.  If no successor shall have been so appointed by the Requisite Lenders and shall have accepted such appointment within thirty (30) days after the retiring DIP Agent gives notice of its resignation, then the retiring DIP Agent may, on behalf of the Lenders, appoint a successor DIP Agent from among the Lenders.  Upon the acceptance of any appointment as DIP Agent hereunder by a successor DIP Agent, that successor DIP Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring DIP Agent and the retiring DIP Agent shall promptly (i) transfer to such successor DIP Agent all sums, Securities and other items of Collateral held under the Collateral Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor DIP Agent under the Credit Documents, and (ii) execute and deliver to such successor DIP Agent such amendments to financing statements, and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor DIP Agent of the security interests created under the Collateral Documents, whereupon such retiring DIP Agent shall be discharged from its duties and obligations hereunder.  After any retiring DIP Agent's and DIP Agent's resignation hereunder as DIP Agent, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was DIP Agent hereunder.

(b)    Notwithstanding anything herein to the contrary, DIP Agent may assign its rights and duties as DIP Agent hereunder to an Affiliate of Silver Point, any other financing source of Silver Point or Affiliate of Silver Point or to any Lender without the prior written consent of, or prior written notice to, Administrative Borrower or the Lenders; provided that the Borrowers and the Lenders may deem and treat such assigning DIP Agent as DIP Agent for all purposes hereof, unless and until such assigning DIP Agent provides written notice to Administrative Borrower and the Lenders of such assignment.  Upon such assignment such Affiliate shall succeed to and become vested with all rights, powers, privileges and duties as DIP Agent hereunder and under the other Credit Documents.

(c)    Delegation of Duties.  DIP Agent may perform any and all of its duties and exercise its rights and powers under this Agreement or under any other Credit Document by or through any one or more sub-agents appointed by DIP Agent.  DIP Agent and any such sub-

agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates.  The exculpatory, indemnification and other provisions of Section 9.3 and Section 9.6 shall apply to any the Affiliates of DIP Agent and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as DIP Agent.  All of the rights, benefits and privileges (including the exculpatory and indemnification provisions) of Section 9.3 and of Section 9.6 shall apply to any such sub-agent and to the Affiliates of any such sub-agent, and shall apply to their respective activities as sub-agent as if such sub-agent and Affiliates were named herein.  Notwithstanding anything herein to the contrary, with respect to each sub-agent appointed by DIP Agent, (i) such sub-agent shall be a third party beneficiary under this Agreement with respect to all such rights, benefits and privileges (including exculpatory and rights to indemnification) and shall have all of the rights, benefits and privileges of a third party beneficiary, including an independent right of action to enforce such rights, benefits and privileges (including exculpatory rights and rights to indemnification) directly, without the consent or joinder of any other Person, against any or all of the Obligors and the Lenders, (ii) such rights, benefits and privileges (including exculpatory rights and rights to indemnification) shall not be modified or amended without the consent of such sub-agent, and (iii) such sub-agent shall only have obligations to DIP Agent and not to any Obligor, Lender or any other Person and no Obligor, Lender or any other Person shall have the rights, directly or indirectly, as a third party beneficiary or otherwise, against such sub-agent.

**9.8     Collateral Documents and Guaranty**.

(a)     _DIP Agent under Collateral Documents and Guaranty_.  Each Lender hereby further irrevocably authorizes the DIP Agent, on behalf of and for the benefit of Lenders, to be the agent for and representative of Lenders with respect to the Guaranty, the Collateral and the Collateral Documents.  Subject to Section 11.5, without further written consent or authorization from Lenders, DIP Agent, may execute any documents or instruments necessary to (i) release any Lien encumbering any item of Collateral that is the subject of a sale or other disposition of assets permitted hereby or to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 11.5) have otherwise consented, or (ii) release any Guarantor from the Guaranty to the extent permitted hereunder or with respect to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 11.5) have otherwise consented.

(b)     _Right to Realize on Collateral and Enforce Guaranty_.  Anything contained in any of the Credit Documents to the contrary notwithstanding, the Borrowers, DIP Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by DIP Agent, on behalf of Lenders in accordance with the terms hereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by DIP Agent, and (ii) in the event of a foreclosure by DIP Agent on any of the Collateral pursuant to a public or private sale, DIP Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and DIP Agent, as agent for and representative of Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless Requisite Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any

portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by DIP Agent at such sale.

**9.9    Posting of Approved Electronic Communications**.

(a)    <u>Delivery of Communications</u>.  Each Obligor hereby agrees, unless directed otherwise by DIP Agent or unless the electronic mail address referred to below has not been provided by DIP Agent to such Obligor that it will, or will cause its Subsidiaries to, provide to DIP Agent all information, documents and other materials that it is obligated to furnish to DIP Agent or to the Lenders pursuant to the Credit Documents, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) is or relates to a Funding Notice, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default or Event of Default under this Agreement or any other Credit Document or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Term Loan or other extension of credit hereunder (all such non-excluded communications being referred to herein collectively as "**Communications**"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to DIP Agent to an electronic mail address as directed by DIP Agent.  In addition, each Obligor agrees, and agrees to cause its Subsidiaries, to continue to provide the Communications to DIP Agent or the Lenders, as the case may be, in the manner specified in the Credit Documents but only to the extent requested by DIP Agent.

(b)    <u>Platform</u>.  Each Obligor further agrees that DIP Agent may make the Communications available to the Lenders by posting the Communications on Intralinks or a substantially similar electronic transmission system (the "**Platform**").

(c)    <u>No Warranties as to Platform</u>.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE".  THE INDEMNITEES DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE INDEMNITEES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. IN NO EVENT SHALL THE INDEMNITEES HAVE ANY LIABILITY TO ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF DIP AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY INDEMNITEES IS FOUND IN A FINAL, NONAPPEALABLE ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH INDEMNITEE'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)    <u>Delivery Via Platform</u>.    DIP Agent agrees that the receipt of the Communications by DIP Agent at its electronic mail address set forth above shall constitute effective delivery of the Communications to DIP Agent for purposes of the Credit Documents. Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Credit Documents. Each Lender agrees to notify DIP Agent in writing (including by electronic communication) from time to time of such Lender's electronic mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such electronic mail address.

(e)    <u>No Prejudice to Notice Rights</u>.    Nothing herein shall prejudice the right of DIP Agent or any Lender to give any notice or other communication pursuant to any Credit Document in any other manner specified in such Credit Document.

**9.10    Violations of Terrorism Laws**.    Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on the DIP Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other requirements imposed by the Patriot Act or the regulations issued thereunder, including the regulations set forth in 31 C.F.R. §§ 1010.100(yy), (iii), 1020.100, and 1020.220 (formerly 31 C.F.R. § 103.121), as hereafter amended or replaced ("**CIP Regulations**"), or any other Anti-Terrorism Laws, including any programs involving any of the following items relating to or in connection with any of the Obligors, their Affiliates or their agents, the Credit Documents or the transactions hereunder or contemplated hereby:   (1) any identity verification procedures, (2) any recordkeeping, (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations or other regulations issued under the Patriot Act.    Each Lender, Affiliate, participant or assignee subject to Section 326 of the Patriot Act will perform the measures necessary to satisfy its own responsibilities under the CIP Regulations.

**9.11    Agent**.    Except as otherwise set forth herein, DIP Agent and any arrangers shall not have any right, power, obligation, liability, responsibility or duty under this Agreement (or any other Credit Document) other than those applicable to all Lenders as such.    Without limiting the foregoing, DIP Agent and any such arrangers shall not have or be deemed to have any fiduciary relationship with any other Lender.    Each Lender acknowledges that it has not relied, and will not rely, on DIP Agent or any arranger in deciding to enter into this Agreement and each other Credit Document to which it is a party or in taking or not taking action hereunder or thereunder.

**9.12    Credit Bid**.    The Obligors and the Secured Parties hereby irrevocably authorize DIP Agent, based upon the instruction of the Requisite Lenders, to (a) credit bid and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Section 363 of the Bankruptcy Code or any similar laws in any other jurisdictions to which an Obligor is subject, or (b) credit bid and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any other sale or foreclosure conducted by (or with the consent or at the direction of) DIP Agent (whether by judicial action or otherwise) in accordance with applicable law. In connection with

any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not unduly delay the ability of DIP Agent to credit bid and purchase at such sale or other disposition of the Collateral and, if such claims cannot be estimated without unduly delaying the ability of DIP Agent to credit bid, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the asset or assets purchased by means of such credit bid) and the Secured Parties whose Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) in the asset or assets so purchased (or in the equity interests of the acquisition vehicle or vehicles that are used to consummate such purchase).

SECTION 10.    COLLATERAL

**10.1    Grant of Security Interest**.    To secure payment and performance of all Obligations, each Obligor hereby grants to the DIP Agent, for itself and the benefit of the Secured Parties, a first priority and continuing Lien on and security interest in all of such Obligor's right, title and interest in, to and under all tangible and intangible property of such Obligor, including, but not limited to the following, in each case whether now owned or existing or hereafter acquired or arising and wherever located (collectively, the "**Collateral**"):

   (a)    all Accounts (as defined in Article 9 of the UCC),

   (b)    all Chattel Paper (as defined in Article 9 of the UCC),

   (c)    all Commercial Tort Claims (as defined in Article 9 of the UCC),

   (d)    all Deposit Accounts and money and all cash, checks, other negotiable instruments, funds and other evidences of payments held therein, (y) Securities Accounts and Security Entitlements (as defined in Article 8 of the the UCC) and securities credited thereto and, in each case, all cash, checks and other property held therein or credited thereto

   (e)    all Documents (as defined in Article 9 of the UCC),

   (f)    all Equipment (as defined in Article 9 of the UCC),

   (g)    all Farm products (as defined in Article 9 of the UCC),

   (h)    all Fixtures (as defined in Article 9 of the UCC),

   (i)    all General Intangibles (as defined in Article 9 of the UCC),

   (j)    all Goods (as defined in Article 9 of the UCC) (but in any case including, without limitation, all Inventory and Equipment),

   (k)    all Instruments (as defined in Article 9 of the UCC),

(l)    all Insurance,

(m)    all Intellectual Property,

(n)    all Inventory (as defined in Article 9 of the UCC),

(o)    all Investment Related Property,

(p)    all Letter-of-credit rights (as defined in Article 9 of the UCC),

(q)    all machinery,

(r)    all Money (as defined in Article 9 of the UCC),

(s)    all Real Estate Assets,

(t)    all Payment intangibles (as defined in Article 9 of the UCC),

(u)    all Records (as defined in Article 9 of the UCC),

(v)    all Securities,

(w)    all Securities Accounts,

(x)    all motor vehicles,

(y)    to the extent not otherwise included above, all other personal property of any kind and all Collateral Records, Collateral Support and Supporting Obligations relating to any of the foregoing; and

(z)    to the extent not covered by clauses (a) through (y) of this sentence, all other personal property and interest in property of such Obligor whether or not subject to the UCC, whether tangible or intangible, and all Proceeds (as defined in Article 9 of the UCC) and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, including any and all Proceeds (as defined in Article 9 of the UCC) of any insurance, indemnity, warranty or guaranty payable to such Obligor from time to time with respect to any of the foregoing; provided, that upon entry of the DIP Order to the extent approved by the Bankruptcy Court, "Collateral" shall include and a Lien shall attach to any Avoidance Proceeds.

Anything herein to the contrary notwithstanding, in no event shall the security interest granted under this Section 10.1 attach to Avoidance Actions, but Avoidance Proceeds shall be included as Collateral.

**10.2    Lien Perfection; Further Assurances**.  Obligors shall deliver such instruments, financing statements, mortgages, deeds of trust, assignments or documents as are reasonably requested by the DIP Agent to evidence or perfect the DIP Agent's Lien upon any of the Collateral and shall take such other action as may be required to perfect or to continue the perfection of DIP Agent's Lien upon the Collateral.  Each Obligor hereby authorizes DIP Agent

to file (but DIP Agent shall not be obligated to so file) any such financing statement in any filing office in any UCC jurisdiction.   At DIP Agent's request, each Obligor shall also promptly execute or cause to be executed and shall deliver to DIP Agent any information, and all documents, instruments and agreements as are necessary or as reasonably requested by DIP Agent, to give effect to or carry out the terms or intent of this Section 10.

## SECTION 11.   MISCELLANEOUS

**11.1   Notices**.   Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given to an Obligor or the DIP Agent, shall be sent to such Person's address as set forth on Appendix B or in the other relevant Credit Document, and in the case of any Lender, the address as indicated on Appendix B or otherwise indicated to DIP Agent in writing.   Each notice hereunder shall be in writing and may be personally served, telexed or sent by telefacsimile or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of telefacsimile or telex, or three Business Days after depositing it in the United States mail with postage prepaid and properly addressed; provided, no notice to the DIP Agent shall be effective until received by the DIP Agent.

**11.2   Expenses**.   Whether or not the transactions contemplated hereby shall be consummated, the Borrowers agrees to pay promptly, and in any event within three (3) Business Days after written demand therefore, (a) all the actual and reasonable costs and expenses of DIP Agent (including allocated costs of internal counsel) and the Lenders in connection with the Cases and the preparation and administration of the Credit Documents and any consents, amendments, waivers or other modifications thereto; (b) the fees, expenses and disbursements of counsel to the DIP Agent and/or the Lenders (including local counsel, consultants and the allocated costs of internal counsel) in connection with the negotiation, preparation, execution and administration of the Credit Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by Administrative Borrower; (c) all the actual costs and expenses of creating and perfecting Liens in favor of DIP Agent, for the benefit of Secured Parties pursuant hereto, including filing and recording fees, expenses and amounts owed pursuant to Section 2.17(c) and (d), search fees, title insurance premiums and fees, expenses and disbursements of counsel to the DIP Agent and of counsel providing any opinions that the DIP Agent or Requisite Lenders may request in respect of the Collateral or the Liens created pursuant to the Collateral Documents; (d) all the actual costs and fees, expenses and disbursements of any auditors, accountants, consultants or appraisers whether internal or external; (e) all the actual costs and expenses (including the fees, expenses and disbursements of counsel (including allocated costs of internal counsel) and of any appraisers, consultants, advisors and agents employed or retained by DIP Agent and its counsel) in connection with the custody or preservation of any of the Collateral (including, without limitation, any such Persons employed to conduct appraisals or inspections as provided herein); (f) all other actual and costs and expenses incurred by the DIP Agent in connection with the syndication of the Term Loans and Term Loan Commitments and the negotiation, preparation, execution and administration of the Credit Documents and any consents, amendments, waivers or other modifications thereto and the transactions contemplated thereby; and (g) after the occurrence of a Default or an Event of Default, all costs and expenses, including attorneys' fees

(including local counsel, accountants and allocated costs of internal counsel) and costs of settlement, incurred by the DIP Agent and Lenders in enforcing any Obligations of or in collecting any payments due from any Obligor hereunder or under the other Credit Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty) including a sale pursuant to section 363 of the Bankruptcy Code.

**11.3    Indemnity**.

(a)    In addition to the payment of expenses pursuant to Section 11.2, whether or not the transactions contemplated hereby shall be consummated, each Obligor agrees to defend (subject to Indemnitees' selection of counsel), indemnify, pay and hold harmless, the DIP Agent, each Lender, the Affiliates of the DIP Agent and each Lender, and the officers, partners, directors, trustees, employees, representatives and agents of the DIP Agent, each Lender and each such Affiliate (each, an "**Indemnitee**"), from and against any and all Indemnified Liabilities, **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY, OR SOLE NEGLIGENCE OF SUCH AGENT**; provided, no Obligor shall have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities to the extent such Indemnified Liabilities arise solely from the gross negligence or willful misconduct of that Indemnitee as determined by a court of competent jurisdiction in a final, nonappealable order. To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 11.3 may be unenforceable in whole or in part because they are violative of any law or public policy, the applicable Obligor shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.

(b)    To the extent permitted by applicable law, no Obligor shall assert, and each Obligor hereby waives, any claim against Lenders, the DIP Agent and their respective Affiliates, directors, employees, attorneys or agents, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Term Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each Obligor hereby waives, releases and agrees not to sue upon any such claim or any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(c)    To the extent required by any applicable law, DIP Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If any payment has been made to any Lender by DIP Agent without the applicable withholding Tax being withheld from such payment and DIP Agent has paid over the applicable withholding Tax to the Internal Revenue Service or any other Governmental Authority, or the Internal Revenue Service or any other Governmental Authority asserts a claim that DIP Agent did not properly withhold Tax from amounts paid to or for the account of any Lender because the appropriate

form was not delivered or was not properly executed or because such Lender failed to notify DIP Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason, such Lender shall indemnify DIP Agent fully for all amounts paid, directly or indirectly, by DIP Agent as Tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred. DIP Agent may offset against any payment to any Lender under a Credit Document, any applicable withholding Tax that was required to be withheld from any prior payment to such Lender but which was not so withheld, as well as any other amounts for which DIP Agent is entitled to indemnification from such Lender under this Section 11.3(c).

**11.4    Set Off**. In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence of any Event of Default each Lender and its respective Affiliates is hereby authorized by each Obligor at any time or from time to time subject to the consent of DIP Agent (such consent not to be unreasonably withheld or delayed), without notice to any Obligor or to any other Person (other than DIP Agent or as required under the DIP Order), any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts (in whatever currency)) and any other Indebtedness at any time held or owing by such Lender to or for the credit or the account of any Obligor (in whatever currency) against and on account of the obligations and liabilities of any Obligor to such Lender hereunder and under the other Credit Documents, including all claims of any nature or description arising out of or connected hereto, or with any other Credit Document, irrespective of whether or not (a) such Lender shall have made any demand hereunder, (b) the principal of or the interest on the Term Loans or any other amounts due hereunder shall have become due and payable pursuant to Section 2 and although such obligations and liabilities, or any of them, may be contingent or unmatured or (c) such obligation or liability is owed to a branch or office of such Lender different from the branch or office holding such deposit or obligation or such Indebtedness.

**11.5    Amendments and Waivers**.

(a)    Requisite Lenders' Consent. Subject to Sections 11.5(b) and 11.5(c), no amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Obligor therefrom, shall in any event be effective without the written concurrence of (i) in the case of this Agreement, DIP Agent and the Requisite Lenders, (ii) in the case of any other Credit Document, DIP Agent and, if party thereto, DIP Agent, with the consent of the Requisite Lenders and (iii) the approval of the Bankruptcy Court to the extent required by the DIP Order.

(b)    Affected Lenders' Consent. Without the written consent of each Lender that would be affected thereby, no amendment, modification, termination, or consent shall be effective if the effect thereof would:

(i)    extend the scheduled final maturity of any Term Loan or Term Loan Note of such Lender;

(ii)    reduce the rate of interest on any Term Loan of such Lender (other than any amendment to the definition of "Default Rate" (which may be affected by consent of the Requisite Lenders) and any waiver of any increase in the interest rate applicable to any Term Loan pursuant to Section 2.8) or any fee payable hereunder;

(iii)    extend the time for payment of any such interest or fees to such Lender;

(iv)    reduce the principal amount of any Term Loan of such Lender;

(v)    amend, modify, terminate or waive any provision of this Section 11.5(b) or Section 11.5(c);

(vi)    amend the definition of "Requisite Lenders" or "Pro Rata Share"; provided, with the consent of DIP Agent and the Requisite Lenders, additional extensions of credit pursuant hereto may be included in the determination of "Requisite Lenders" or "Pro Rata Share" on substantially the same basis as the Term Loan Commitments and the Term Loans are included on the Closing Date;

(vii)    release all or substantially all of the Collateral or all or substantially all of the Guarantors from the Guaranty except as expressly provided in the Credit Documents; or

(viii)    consent to the assignment or transfer by any Obligor of any of its rights and obligations under any Credit Document.

(c)    _Other Consents_.  No amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Obligor therefrom, shall amend, modify, terminate or waive any provision of Section 9 as the same applies to the DIP Agent, or any other provision hereof as the same applies to the rights or obligations of the DIP Agent, in each case without the consent of the DIP Agent.

(d)    _Execution of Amendments, etc_.  DIP Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on any Obligor in any case shall entitle any Obligor to any other or further notice or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with this Section 11.5 shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by an Obligor, on such Obligor.

**11.6    Successors and Assigns; Participations**.

(a)    _Generally_.  This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Lenders.  No Obligor's rights or obligations hereunder nor any interest therein may be assigned or delegated by any Obligor without the prior written consent of all Lenders (and any attempted assignment or transfer by any Obligor without such consent shall be

null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, Affiliates of each of the DIP Agent and Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Register.  The Borrowers, DIP Agent and Lenders shall deem and treat the Persons listed as Lenders in the Register as the holders and owners of the corresponding Term Loans listed therein for all purposes hereof, and no assignment or transfer of any such Term Loan shall be effective, in each case, unless and until an Assignment Agreement effecting the assignment or transfer thereof shall have been delivered to and accepted by DIP Agent and recorded in the Register as provided in Section 11.6(e).  Prior to such recordation, all amounts owed with respect to the applicable Term Loan shall be owed to the Lender listed in the Register as the owner thereof, and any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Lender shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Term Loans.  Solely for the purposes of maintaining the Register and for tax purposes only DIP Agent shall be deemed to be acting on behalf of the Obligors.

(c)     Right to Assign.  Each Lender shall have the right at any time to sell, assign or transfer all or a portion of its rights and obligations under this Agreement, including all or a portion of its Term Loans owing to it or other Obligations (provided, however, that each such assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any Term Loan):

(i)     to any Person meeting the criteria of clause (a) of the definition of the term of "Eligible Assignee" upon the giving of notice to Administrative Borrower and DIP Agent; or

(ii)     to any Person otherwise constituting an Eligible Assignee with the consent of DIP Agent; provided, each such assignment pursuant to this Section 11.6(c)(ii) shall be in an aggregate amount of not less than $1,000,000 (or such lesser amount as may be agreed to by Administrative Borrower and DIP Agent or as shall constitute the aggregate amount of the Term Loans of the assigning Lender), provided that the foregoing minimum assignment amounts shall not apply (x) to any assignment of all or any portion of a Term Loan to a Lender, an Affiliate of a Lender or a Related Fund of the assignor or (y) if any Event of Default shall have occurred and is continuing.

(d)     Mechanics.  The assigning Lender and the assignee thereof shall execute and deliver to DIP Agent an Assignment Agreement, together with such forms, certificates or other evidence, if any, with respect to United States federal income tax withholding matters as the assignee under such Assignment Agreement may be required to deliver to DIP Agent pursuant to Section 2.17(e).

(e)     Notice of Assignment.  Upon its receipt and acceptance of a duly executed and completed Assignment Agreement, any forms, certificates or other evidence required by this Agreement in connection therewith, DIP Agent shall record the information contained in such

Assignment Agreement in the Register, shall give prompt notice thereof to Administrative Borrower and shall maintain a copy of such Assignment Agreement.

(f)    Representations and Warranties of Assignee.    Each Lender, upon execution and delivery hereof or upon executing and delivering an Assignment Agreement, as the case may be, represents and warrants as of the Closing Date or as of the applicable Effective Date (as defined in the applicable Assignment Agreement) that (i) it is an Eligible Assignee; (ii) it has experience and expertise in the making of or investing in commitments or loans such as the applicable Term Loans, as the case may be; and (iii) it will make or invest in its Term Loans for its own account in the ordinary course of its business and without a view to distribution of such Term Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this Section 11.6, the disposition of such Term Loans or any interests therein shall at all times remain within its exclusive control).

(g)    Effect of Assignment.    Subject to the terms and conditions of this Section 11.6, as of the "Effective Date" specified in the applicable Assignment Agreement: (i) the assignee thereunder shall have the rights and obligations of a "Lender" hereunder to the extent such rights and obligations hereunder have been assigned to it pursuant to such Assignment Agreement and shall thereafter be a party hereto and a "Lender" for all purposes hereof; (ii) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned thereby pursuant to such Assignment Agreement, relinquish its rights (other than any rights which survive the termination hereof under Section 11.9) and be released from its obligations hereunder (and, in the case of an Assignment Agreement covering all or the remaining portion of an assigning Lender's rights and obligations hereunder, such Lender shall cease to be a party hereto; provided, anything contained in any of the Credit Documents to the contrary notwithstanding, such assigning Lender shall continue to be entitled to the benefit of all indemnities hereunder as specified herein with respect to matters arising out of the prior involvement of such assigning Lender as a Lender hereunder) and (iii) if any such assignment occurs after the issuance of any Term Loan Note hereunder, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender its applicable Term Loan Notes to DIP Agent for cancellation, and thereupon the Borrowers shall issue and deliver new Term Loan Notes, if so requested by the assignee and/or assigning Lender, to such assignee and/or to such assigning Lender, with appropriate insertions, to reflect outstanding Term Loans of the assignee and/or the assigning Lender.

(h)    Participations.    Each Lender shall have the right at any time to sell one or more participations to any Person (other than Holdings, any of its Subsidiaries or any of its Affiliates) in all or any part of its Term Loans or in any other Obligation.  The holder of any such participation (a "**Participant**"), other than an Affiliate of the Lender granting such participation, shall not be entitled to require such Lender to take or omit to take any action hereunder except with respect to any amendment, modification or waiver that would (i) extend the final scheduled maturity of any Term Loan or Term Loan Note in which such Participant is participating, or reduce the rate or extend the time of payment of interest or fees thereon (except any amendment to the definition of "Default Rate" or in connection with a waiver of applicability of any post default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the Participant's participation over the amount thereof then in effect (it being understood that

a waiver of any Default or Event of Default shall not constitute a change in the terms of such participation, and that an increase in any Term Loan shall be permitted without the consent of any Participant if the Participant's participation is not increased as a result thereof), (ii) consent to the assignment or transfer by any Obligor of any of its rights and obligations under this Agreement, or (iii) release all or substantially all of the Collateral under the Collateral Documents or all or substantially all of the Guarantors from the Guaranty (in each case, except as expressly provided in the Credit Documents) supporting the Term Loans hereunder in which such Participant is participating.  The Borrowers agree that each Participant shall be entitled, through the participating Lender, to the benefits of Sections 2.16 and 2.17 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 11.6(c); provided, (i) a Participant shall not be entitled to receive any greater payment under Section 2.16 or 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with Administrative Borrower's prior written consent or such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation, and (ii) a Participant that would be a Non-U.S. Lender if it were a Lender shall not be entitled to the benefits of Section 2.17 unless Administrative Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrowers, to comply with Section 2.17 as though it were a Lender.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 11.4 as though it were a Lender, provided such Participant agrees to be subject to Section 2.15 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrowers, maintain a register in the United States on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Term Loans or other obligations under the Credit Documents (the "**Participant Register**"); provided, that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or other obligations under any Credit Document) except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive, absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(i)      Certain Other Assignments.  In addition to any other assignment permitted pursuant to this Section 11.6, any Lender may assign, pledge and/or grant a security interest in, all or any portion of its Term Loans, the other Obligations owed by or to such Lender, and its Term Loan Notes, if any, to secure obligations of such Lender including any Federal Reserve Bank as collateral security pursuant to Regulation A of the Board of Governors of the Federal Reserve System and any operating circular issued by such Federal Reserve Bank; provided, no Lender, as between the Borrowers and such Lender, shall be relieved of any of its obligations hereunder as a result of any such assignment and pledge, and provided further, in no event shall the applicable Federal Reserve Bank, pledgee or trustee be considered to be a "Lender" or be entitled to require the assigning Lender to take or omit to take any action hereunder.

**11.7    Special Purpose Funding Vehicles**.  Notwithstanding anything to the contrary contained herein, any Lender ("**Granting Lender**") may grant to a special purpose funding vehicle (an "**SPC**"), identified as such in writing from time to time by the Granting Lender to DIP Agent and Administrative Borrower, the option to provide to the Borrowers all or any part of any Term Loan that such Granting Lender would otherwise be obligated to make to the Borrowers pursuant to this Agreement; provided that (x) nothing herein shall constitute a commitment by any SPC to make any Term Loans and (y) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Term Loan, the Granting Lender shall be obligated to make such Term Loan pursuant to the terms hereof.  The making of a Term Loan by an SPC hereunder shall utilize the Term Loan Commitment of the Granting Lender to the same extent, and as if, such Term Loan were made by such Granting Lender.  Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender).  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof.  In addition, notwithstanding anything to the contrary contained in this clause, any SPC may (i) with notice to, but without the prior written consent of, Administrative Borrower or DIP Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Term Loans to the Granting Lender or to any financial institutions (consented to by Administrative Borrower and DIP Agent) providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Term Loans and (ii) disclose on a confidential basis any non-public information relating to its Term Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC.  This Section may not be amended without the written consent of the SPC.  The Borrowers acknowledge and agree, subject to the next sentence, that, to the fullest extent permitted under applicable law, each SPC, for purposes of Sections 2.15, 2.16, 2.17, 11.2, 11.3 and 11.4, shall be considered a Lender.  Borrowers shall not be required to pay any amount under Sections 2.15, 2.16, 2.17, 11.2, 11.3 and 11.4 that is greater than the amount which they would have been required to pay had no grant been made by a Granting Lender to a SPC.

**11.8    Independence of Covenants**.    All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

**11.9    Survival of Representations, Warranties and Agreements**.    All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of any Credit Extension.  Notwithstanding anything herein or implied by law to the contrary, the agreements of each Obligor set forth in Sections 2.16, 2.17, 11.2, 11.3 and 11.4 and the agreements of Lenders set forth in Sections 2.15, 9.3(b) and 9.6 shall survive the payment of the Term Loans and the termination hereof.

**11.10   No Waiver; Remedies Cumulative**.  No failure or delay on the part of the DIP Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.  The rights, powers and remedies given to the DIP Agent and each Lender hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Credit Documents or any of the Interest Rate Agreements.  Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

**11.11   Marshalling; Payments Set Aside**.  Neither the DIP Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Obligor or any other Person or against or in payment of any or all of the Obligations.  To the extent that any Obligor makes a payment or payments to DIP Agent or Lenders (or to DIP Agent, on behalf of Lenders), or DIP Agent or Lenders enforce any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**11.12   Severability**.  In case any provision in or obligation hereunder or any Term Loan Note or other Credit Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**11.13   Obligations Several; Independent Nature of Lenders' Rights**.  The obligations of Lenders hereunder are several and no Lender shall be responsible for the obligations or Term Loan Commitment of any other Lender hereunder.  Nothing contained herein or in any other Credit Document, and no action taken by Lenders pursuant hereto or thereto, shall be deemed to constitute Lenders as a partnership, an association, a joint venture or any other kind of entity. The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

**11.14   Headings**.  Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

**11.15  APPLICABLE LAW.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, EXCEPT TO THE EXTENT GOVERNED BY THE BANKRUPTCY CODE.**

**11.16  CONSENT TO JURISDICTION.**

(a)  **ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY OBLIGOR ARISING OUT OF OR RELATING HERETO OR ANY OTHER CREDIT DOCUMENT, OR ANY OF THE OBLIGATIONS, MAY BE BROUGHT IN THE UNITED STATES BANKRUPTCY COURT, CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION.  BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH OBLIGOR, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (i) ACCEPTS GENERALLY AND UNCONDITIONALLY THE NONEXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (ii) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (iii) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE OBLIGOR AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 11.1 ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE OBLIGOR IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (iv) AGREES THAT DIP AGENT AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY OBLIGOR IN THE COURTS OF ANY OTHER JURISDICTION.**

(b)  **EACH OBLIGOR HEREBY AGREES THAT PROCESS MAY BE SERVED ON IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE ADDRESSES PERTAINING TO IT AS SPECIFIED IN SECTION 11.1 OR ON C T CORPORATION SYSTEM, LOCATED AT 111 EIGHTH AVENUE, NEW YORK, NEW YORK 10011, AND HEREBY APPOINTS C T CORPORATION SYSTEM AS ITS AGENT TO RECEIVE AND FORWARD SUCH SERVICE OF PROCESS.  ANY AND ALL SERVICE OF PROCESS AND ANY OTHER NOTICE IN ANY SUCH ACTION, SUIT OR PROCEEDING SHALL BE EFFECTIVE AGAINST ANY OBLIGOR IF GIVEN BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OR BY ANY OTHER MEANS OR MAIL WHICH REQUIRES A SIGNED RECEIPT, POSTAGE PREPAID, MAILED AS PROVIDED ABOVE.  IN THE EVENT C T CORPORATION SYSTEM SHALL NOT BE ABLE TO ACCEPT SERVICE OF PROCESS AS AFORESAID AND IF ANY OBLIGOR SHALL NOT MAINTAIN AN OFFICE IN NEW YORK CITY, SUCH OBLIGOR SHALL PROMPTLY APPOINT AND MAINTAIN AN AGENT QUALIFIED TO ACT AS AN AGENT FOR SERVICE OF PROCESS WITH RESPECT TO THE COURTS SPECIFIED IN THIS SECTION 11.16 ABOVE, AND ACCEPTABLE TO DIP AGENT, AS EACH OBLIGOR'S AUTHORIZED AGENT TO RECEIVE AND FORWARD ON EACH OBLIGOR'S BEHALF SERVICE**

Exhibit B to Final Order
Page 251

**OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH ACTION, SUIT OR PROCEEDING.**

**11.17   WAIVER OF JURY TRIAL.   EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER CREDIT DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED.   THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.   EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.   THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 11.17 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER CREDIT DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER.   IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

**11.18   Confidentiality**.  Each Lender shall hold all non-public information regarding the Borrowers and their Subsidiaries and their businesses clearly identified as such by Administrative Borrower and obtained by such Lender pursuant to the requirements hereof  in accordance with such Lender's customary procedures for handling confidential information of such nature, it being understood and agreed by the Borrowers that, in any event, a Lender may make (i) disclosures of such information to Affiliates of such Lender and to their directors, officers, employees, agents and advisors (and to other persons authorized by a Lender or the DIP Agent to organize, present or disseminate such information in connection with disclosures otherwise made in accordance with this Section 11.18), (ii) disclosures of such information reasonably required by any bona fide or potential assignee, transferee or participant in connection with the contemplated assignment, transfer or participation by such Lender of any Term Loans or any participations therein or by any direct or indirect contractual counterparties (or the professional advisors thereto) in Interest Rate Agreements (<u>provided</u>, such counterparties and advisors are advised of and agree to be bound by the provisions of this Section 11.18), (iii) disclosure to any rating agency when required by it, <u>provided</u> that, prior to any disclosure,

such rating agency shall undertake in writing to preserve the confidentiality of any confidential information relating to the Obligors received by it from the DIP Agent or any Lender, (iv) disclosures to any Lender's financing sources, provided that prior to any disclosure, such financing source is informed of the confidential nature of the information, (v) disclosure of information which (A) becomes publicly available other than as a result of a breach of this Section 11.18 or (B) becomes available to DIP Agent or any Lender on a non-confidential basis from a source other than the Borrowers, (vi) in connection with the exercise of any remedy hereunder or the enforcement of any rights hereunder or in connection with any suit or proceeding related hereto; (vii) disclosures required or requested by any governmental agency, regulatory or banking authority or any representative thereof or by the NAIC or pursuant to legal or judicial process, including the Cases; and (viii) disclosures made by the Lenders or the DIP Agent in the Cases, disclosures of information filed by the Obligors or others in the Cases, and disclosures necessary or relevant to the conduct of the Cases; provided, unless specifically prohibited by applicable law or court order, each Lender shall make reasonable efforts to notify Administrative Borrower of any request by any governmental agency or representative thereof (other than any such request in connection with any examination of the financial condition or other routine examination of such Lender by such governmental agency) for disclosure of any such non-public information prior to disclosure of such information.  Notwithstanding the foregoing, on or after the Closing Date, DIP Agent may, at its own expense, issue news releases and publish "tombstone" advertisements and other announcements relating to this transaction in newspapers, trade journals and other appropriate media.  Notwithstanding any other provision of this Section 11.18, the parties (and each employee, representative, or other agent of the parties) may disclose to any and all Persons, without limitation of any kind, the Tax treatment and any facts that may be relevant to the Tax structure of the transactions contemplated by this Agreement and the other Credit Documents; provided, however, that no party (and no employee, representative, or other agent thereof) shall disclose any other information that is not relevant to an understanding of the Tax treatment and Tax structure of the transaction (including the identity of any party and any information that could lead another to determine the identity of any party), or any other information to the extent that such disclosure could reasonably result in a violation of any applicable securities law.

**11.19  Usury Savings Clause**.  Notwithstanding any other provision herein, the aggregate interest rate charged or agreed to be paid with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate.  If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Term Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect.  In addition, if when the Term Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, the Borrowers shall pay to DIP Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect.  Notwithstanding the foregoing, it is the intention of Lenders and the Borrowers to conform strictly to any applicable usury laws.

Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Term Loans made hereunder or be refunded to the Borrowers. In determining whether the interest contracted for, charged, or received by DIP Agent or a Lender exceeds the Highest Lawful Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest, throughout the contemplated term of the Obligations hereunder.

**11.20   Counterparts**.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

**11.21   Effectiveness**.  Subject to entry of the DIP Order, this Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by Administrative Borrower and DIP Agent of written or telephonic notification of such execution and authorization of delivery thereof.  Delivery of an executed counterpart to this Agreement by telecopy transmission (or other electronic transmission pursuant to procedures approved by the DIP Agent) shall be as effective as delivery of a manually signed original.

**11.22   Patriot Act**.  Each Lender and DIP Agent (for itself and not on behalf of any Lender) hereby notifies the Borrowers that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrowers, which information includes the name and address of the Borrowers and other information that will allow such Lender or DIP Agent, as applicable, to identify the Borrowers in accordance with the Patriot Act.

**11.23   Disclosure**.  Each Obligor and each Lender hereby acknowledges and agrees that DIP Agent and/or its Affiliates and their respective Related Funds from time to time may hold investments in, and make other loans to, or have other relationships with any of the Obligors and their respective Affiliates, including the ownership, purchase and sale of equity interests in Holdings, and each Obligor and each Lender hereby expressly consents to such relationships.

**11.24   Appointment for Perfection**.  Each Lender hereby appoints each other Lender as its agent for the purpose of perfecting Liens, for the benefit of DIP Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable law can be perfected only by possession.  Should any Lender (other than DIP Agent) obtain possession of any such Collateral, such Lender shall notify DIP Agent thereof, and, promptly upon DIP Agent's request therefore shall deliver such Collateral to DIP Agent or otherwise deal with such Collateral in accordance with DIP Agent's instructions.

**11.25   Advertising and Publicity**.  No Obligor shall issue or disseminate to the public (by advertisement, including without limitation any "tombstone" advertisement, press release or otherwise), submit for publication or otherwise cause or seek to publish any information describing the credit or other financial accommodations made available by Lenders pursuant to

this Agreement and the other Credit Documents without the prior written consent of DIP Agent. Nothing in the foregoing shall be construed to prohibit any Obligor from making any submission or filing which it is required to make by applicable law or pursuant to judicial process; provided, that, (i) such filing or submission shall contain only such information as is necessary to comply with applicable law or judicial process and (ii) unless specifically prohibited by applicable law or court order, Administrative Borrower shall promptly notify DIP Agent of the requirement to make such submission or filing and provide DIP Agent with a copy thereof.

**11.26  Entire Agreement**.  This Agreement and the other Credit Documents represent the final agreement among the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements among the parties.

**11.27  Conflicts with DIP Order**.  To the extent one or more Credit Documents are inconsistent with the DIP Order, the terms of the DIP Order shall supersede the terms of such Credit Documents.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**FREEDOM COMMUNICATIONS, INC**.

By:  _____
     Name:
     Title:

**FREEDOM COMMUNICATIONS HOLDINGS, INC**.

By:  _____
     Name:
     Title:

2100 FREEDOM, INC.

By:  _____
     Name:
     Title:

**FREEDOM SERVICES, INC**.

**FREEDOM NEWSPAPERS, INC**.

**ORANGE COUNTY REGISTER COMMUNICATIONS, INC**.

**OCR COMMUNITY PUBLICATIONS, INC**.

**OCR INFORMATION MARKETING, INC**.

**FREEDOM NEWSPAPERS OF SOUTHWESTERN ARIZONA, INC**.

**FREEDOM COLORADO INFORMATION, INC**.

**FREEDOM INTERACTIVE NEWSPAPERS, INC**.

**VICTOR VALLEY PUBLISHING COMPANY**

**FREEDOM NEWSPAPER ACQUISITIONS, INC**.

**FREEDOM CALIFORNIA VILLE PUBLISHING COMPANY LP**

**NEWSPAPER NATIONAL NETWORK, L.P.**

**DAILY PRESS, LLC**,

**FREEDOM SPV I, LLC**

**FREEDOM SPV II, LLC**

**FREEDOM SPV IV, LLC**

**FREEDOM SPV V, LLC**

**FREEDOM SPV VI, LLC**

By: _____

      Name:
      Title:

**VICTORVILLE PUBLISHING COMPANY**,

By: Freedom Communications, Inc.,  its managing general partner

By:_____
Name:
Title:

**FREEDOM CALIFORNIA MARY PUBLISHING, INC**.,

By: Freedom Communications, Inc.,
its managing general partner


By: _____
Name:
Title:

**SILVER POINT FINANCE, LLC,** as DIP Agent

By: _____
       Name:
       Title:


**SPCP GROUP, LLC**, as Lender

By: _____
       Name:
       Title:


**SPCP GROUP VI, LLC**, as Lender

By: _____
       Name:
       Title:

**APPENDIX A**

**Term Loan Commitments**

| Lender | Term Loan Commitment | Pro Rata Share |
|---|---|---|
| SPCP Group, LLC | | |
| SPCP Group VI, LLC | | |
| **Total** | | **100%** |

APPENDIX B

## Notice Addresses

**FREEDOM COMMUNICATIONS HOLDINGS, INC.**, as Borrower
**FREEDOM COMMUNICATIONS, INC.**, as Borrower

625 Grand Avenue
Santa Ana, CA 92701
Attn: [    ]
Fax: [    ]

in each case, with a copy to:

[


                            ]

**SILVER POINT FINANCE, LLC**,
as DIP Agent

Silver Point Finance, LLC
2 Greenwich Plaza
Greenwich, Connecticut 06830
Attention: [    ]
Telephone: [    ]
Fax: [    ]
Email: [    ]

With a copy to:

Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071
Attention. Judith Kitano
Email: Judith.Kitano@mto.com