1  William N. Lobel, State Bar No. 93202
   wlobel@lwgfllp.com
2  Alan J. Friedman, State Bar No. 132580
   afriedman@lwgfllp.com
3  Beth E. Gaschen, State Bar No. 245894
   bgaschen@lwgfllp.com
4  Christopher J. Green, State Bar No. 295874
   cgreen@lwgfllp.com
5  **LOBEL WEILAND GOLDEN FRIEDMAN LLP**
   650 Town Center Drive, Suite 950
6  Costa Mesa, California 92626
   Telephone    714-966-1000
7  Facsimile    714-966-1002

8  Proposed Attorneys for
   Debtors and Debtors-in-Possession

9               **UNITED STATES BANKRUPTCY COURT**

10              **CENTRAL DISTRICT OF CALIFORNIA**

11              **SANTA ANA DIVISION**

12  In re                                    Case No. 8:15-bk-15311-MW

13  FREEDOM COMMUNICATIONS, INC., a           Chapter 11
    Delaware corporation; *et al.*,[1]
14                                            (Jointly Administered with Case Nos.
                      Debtors and            8:15-bk-15312-MW; 8:15-bk-15313-MW;
15                    Debtors-in-Possession.  8:15-bk-15315-MW; 8:15-bk-15316-MW;
                                             8:15-bk-15317-MW; 8:15-bk-15318-MW;
16  Affects:                                  8:15-bk-15319-MW; 8:15-bk-15320-MW;
                                             8:15-bk-15321-MW; 8:15-bk-15322-MW;
17  ☒ All Debtors                             8:15-bk-15323-MW; 8:15-bk-15324-MW;
                                             8:15-bk-15325-MW; 8:15-bk-15326-MW;
18  ☐ Freedom Communications, Inc., a         8:15-bk-15327-MW; 8:15-bk-15328-MW;
    Delaware corporation, ONLY                8:15-bk-15329-MW; 8:15-bk-15330-MW;
19                                            8:15-bk-15332-MW; 8:15-bk-15337-MW;
    ☐ Freedom Communications Holdings,        8:15-bk-15339-MW; 8:15-bk-15340-MW;
20  Inc., a Delaware corporation, ONLY        8:15-bk-15342-MW; 8:15-bk-15343-MW)

21  _____

22    [1] The last four digits of the Debtors' federal tax identification numbers are as follows: Freedom
    Communications, Inc. (0750); Freedom Communications Holdings, Inc. (2814); Freedom Services, Inc.
23  (3125); 2100 Freedom, Inc. (7300); OCR Community Publications, Inc. (9752); Daily Press, LLC (3610);
    Freedom California Mary Publishing, Inc. (4121); Freedom California Ville Publishing Company LP (7735);
24  Freedom Colorado Information, Inc. (7806); Freedom Interactive Newspapers, Inc. (9343); Freedom
    Interactive Newspapers of Texas, Inc. (8187); Freedom Newspaper Acquisitions, Inc. (4322); Freedom
25  Newspapers (7766); Freedom Newspapers, Inc. (3240); Freedom Newspapers of Southwestern Arizona,
    Inc. (5797); OCR Information Marketing, Inc. (7983); Odessa American (7714); Orange County Register
26  Communications, Inc. (7980); Victor Valley Publishing Company (6082); Victorville Publishing Company
    (7617); Freedom SPV II, LLC (8253); Freedom SPV VI, LLC (8434); Freedom SPV I, LLC (3293); Freedom
27  SPV IV, LLC (8500); and Freedom SPV V, LLC (9036).  The Debtors' mailing address is 625 N. Grand
    Avenue, Santa Ana, California 92701.

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

**LobeL Weiland Golden Friedman LLP**
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  ☐ Freedom Services, Inc., a Delaware corporation, ONLY

2

3  ☐ 2100 Freedom, Inc., a Delaware corporation, ONLY

4  ☐ OCR Community Publications, Inc., a California corporation, ONLY

5

6  ☐ Daily Press, LLC, a California limited liability company, ONLY

7  ☐ Freedom California Mary Publishing, Inc., a California corporation, ONLY

8

9  ☐ Freedom California Ville Publishing Company LP, a California limited partnership, ONLY

10

11  ☐ Freedom Colorado Information, Inc., a Delaware corporation, ONLY

12  ☐ Freedom Interactive Newspapers, Inc., a California corporation, ONLY

13

14  ☐ Freedom Interactive Newspapers of Texas, Inc., a Delaware corporation, ONLY

15  ☐ Freedom Newspaper Acquisitions, Inc., a Delaware corporation, ONLY

16

17  ☐ Freedom Newspapers, a Texas general partnership, ONLY

18  ☐ Freedom Newspapers, Inc., a Delaware corporation, ONLY

19

20  ☐ Freedom Newspapers of Southwestern Arizona, Inc., a California corporation, ONLY

21

22  ☐ OCR Information Marketing, Inc., a California corporation, ONLY

23  ☐ Odessa American, a Texas general partnership, ONLY

24

25  ☐ Orange County Register Communications, Inc., a California corporation, ONLY

26

27  ☐ Victor Valley Publishing Company, a California corporation, ONLY

28

**DECLARATION OF CHRIS D. DAHL, CHIEF FINANCIAL OFFICER, IN SUPPORT OF FIRST-DAY MOTIONS FILED CONCURRENTLY HEREWITH**

1041535.3

2

DECLARATION

**LobeL Weiland Golden Friedman LLP**
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  ☐  Victorville Publishing Company, a California limited partnership, ONLY

2  
3  ☐  Freedom SPV II, LLC, a Delaware limited liability company, ONLY

4  ☐  Freedom SPV VI, LLC, a Delaware limited liability company, ONLY

5  
6  ☐  Freedom SPV I, LLC, a Delaware limited liability company, ONLY

7  ☐  Freedom SPV IV, LLC, a Delaware limited liability company, ONLY

8  
9  ☐  Freedom SPV V, LLC, a Delaware limited liability company, ONLY

10

11      I, Chris D. Dahl, declare as follows:

12      1.      I am the Chief Financial Officer of the debtors and debtors-in-possession

13  (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Cases").  To

14  enable the Debtors to minimize the adverse effects of these Cases on their businesses,

15  the Debtors intend to request various types of relief in "first day" applications and motions

16  (collectively, the "First Day Motions").[2]  I submit this declaration in support of the Debtors'

17  (a) voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the

18  "Bankruptcy Code") and (b) First Day Motions.  I am authorized to submit this declaration

19  on behalf of the Debtors.

20      2.      I have been employed by the Debtors and have served as Chief Financial

21  Officer ("CFO") from March 2015 to the present.  Prior to my role as CFO, I acted as Vice

22  President of Finance from June 2014 through March 2015.  During the period of April

23  2012 to June 2014, I was the CFO of The Orange County Register.  I was the Director of

24  Internal Audit from October 2007 to 2012.  For the seven years before that, I acted as

25  Assistant Corporate Controller.  Finally, I was Manager, Internal Audit from September of

26  
27  ───────────────
    [2] Unless otherwise defined herein, capitalized terms used herein shall have the meaning ascribed to them in the relevant First Day Motion.

28

1041535.3                                    3                                    DECLARATION

1  1998 to June 2000.  In my role as CFO, I am responsible for the following: (i) financial

2  planning and analysis; (ii) budgeting and forecasting; (iii) treasury and cash management

3  (collections); (iv) payroll and accounts payable; and (v) general accounting.

4      3.    As a result of my tenure with the Debtors, my extensive day to day

5  experience with the financial matters impacting the Debtors' operations, my review of

6  relevant documents, and my discussions with other members of the Debtors' management

7  teams in the ordinary course of business, I am familiar with the Debtors' day-to-day

8  operations, business affairs, and books and records.  Except as otherwise noted, I have

9  personal knowledge of the matters set forth herein and, if called as a witness, could and

10  would testify competently thereto.  Except as otherwise stated, all facts set forth in this

11  declaration are based on my personal knowledge, my discussions with other members of

12  the Debtors' senior management, my review of relevant documents, or my opinion, based

13  on my experience and knowledge of the Debtors' operations and financial conditions.  In

14  making this declaration, I have relied in part on information and materials that the Debtors'

15  personnel and advisors have gathered, prepared, verified, and provided to me, in each

16  case under my ultimate supervision, at my direction, and for my use in preparing this

17  declaration.

18      4.    The Debtors' senior management team includes: Richard Mirman, President

19  and Chief Executive Officer, Eric Spitz, director and secretary, and myself.  The Debtors

20  also utilize the services of Rob Curley who is the editor and Senior Vice President of

21  content, Richard Sant, the Vice President of operations since 1975, Steve Churm, the

22  Chief Revenue Officer since January 2013, and Bruce Blair, the Vice President of

23  Circulation since 2007.

24      5.    The declaration is divided into three parts.  Part I of this declaration provides

25  background information about the Debtors, their business operations, their corporate and

26  capital structures, and the circumstances surrounding the commencement of the Cases.

27  Part II supplies specific information regarding the Debtors' proposed postpetition sale of

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1   the Debtors' assets and describes the pathway by which the Debtors intend to exit chapter

2   11.  Part III sets forth the relevant facts in support of the balance of the First Day Motions.

3   ## PART 1 - BACKGROUND

4   **A.     Chapter 11 Filings**

5   6.      On November 1, 2015 and November 2, 2015 (the "Petition Dates"), the

6   Debtors commenced the Cases under Chapter 11 of title 11 of the United States Code

7   (the "Bankruptcy Code") in the United States Bankruptcy Court for the Central District of

8   California - Santa Ana Division (the "Court").

9   7.      The Debtors continue to operate their businesses and manage their

10   properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of

11   the Bankruptcy Code.

12   8.      To date, no party has requested the appointment of a trustee or examiner

13   and no committees have been appointed or designated, although I expect that one or

14   more official committees of unsecured creditors may be appointed.

15   9.      On November 2, 2015, the Court entered an order authorizing the joint

16   administration of the Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy

17   Procedures ("Bankruptcy Rules").

18   10.     For the past 80 years, the Debtors' businesses have focused on the

19   distribution of print news media, generating their revenue from both the distribution of

20   newspapers and magazines and from related advertising revenue.  However, over the

21   past years, there has been an increase in internet-based advertising and news source

22   alternatives that has continued to erode traditional print media sources of revenue.

23   Despite the Debtors' taking affirmative steps to navigate the evolution of the print industry,

24   the Debtors still faced challenges.  The Debtors have filed the Cases in order to maximize

25   the value of the Debtors and their assets by selling their business operations as a going

26   concern under the supervision of the Bankruptcy Court.  The Debtors believe such a sale

27   will be supported by their two primary prepetition secured creditors, Silver Point Finance,

28   LLC ("Silver Point") and the Pension Benefit Guaranty Corporation ("PBGC") provided that

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  the sale results in the payment in full of their claims, allows the Debtors' operations to

2  continue as a going concern thus saving thousands of jobs, and provides a return to

3  unsecured creditors.

4      11.    The Debtors believe that a chapter 11 process and a sale consummated

5  pursuant to section 363 of the Bankruptcy Code will maximize value for the Debtors'

6  estates and creditors, and provide the most stability for the Debtors' employees,

7  customers, and vendors.

8      **B.    The Debtors' Corporate Structure**

9      12.    The Debtors are headquartered in Santa Ana, California.  The parent

10 company is 2100 Freedom, Inc. ("2100 Freedom"), a Delaware corporation.

11     13.    2100 Freedom is the 100% owner of Freedom Communications Holdings,

12 Inc. (aka The Press Enterprise) ("FCHI").  FCHI, a Delaware corporation, is the 100%

13 owner of both Freedom Communications, Inc. (aka The Orange County Register) ("FCI"),

14 a Delaware corporation, and Freedom SPV VI, LLC ("SPV VI" or "Freedom SPV VI"), a

15 Delaware limited liability company.

16     14.    FCI is, in turn, the 100% owner of Freedom Services, Inc. ("FSI"), a

17 Delaware corporation, 100% of Freedom Newspapers, Inc. ("FNI"), a Delaware

18 corporation, and a 79% owner of Freedom SPV I, LLC ("SPV I"), a Delaware limited

19 liability company.  The remaining interests of SPV I are held by Freedom Colorado

20 Information, Inc. ("Freedom Colorado"), a Delaware corporation (10%), Victorville

21 Publishing Company ("Victorville Publishing"), a California limited partnership (8%), and

22 Victor Valley Publishing Company ("Victor Valley"), a California corporation (3%).

23     15.    SPV I is the ultimate 100% owner of Freedom SPV II, LLC ("SPV II" or

24 "Freedom SPV II"), a Delaware limited liability company, Freedom SPV IV, LLC ("SPV

25 IV"), a Delaware limited liability company, and Freedom SPV V, LLC ("SPV V"), a

26 Delaware limited liability company.  SPV II owns real property utilized by the Debtors in

27 Santa Ana, California, including for the operation and publication of The Orange County

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1041535.3                6                DECLARATION

1  Register.  SPV V owns 100% of the Daily Press, LLC ("Daily Press"), a California limited

2  liability company.

3       16.    FNI owns 100% of (i) Freedom California Mary Publishing, Inc. ("Freedom

4  California"), a California corporation; (ii) Freedom Newspapers of Southwestern Arizona,

5  Inc., a California corporation ("FNSA"); (iii) Freedom Interactive Newspapers, Inc.

6  ("Freedom Interactive"), a California corporation; (iv) Orange County Register

7  Communications, Inc. ("OCRC"), a California corporation; (v) Freedom Colorado; (vi)

8  Victor Valley; and (vii) Freedom Newspaper Acquisitions, Inc. ("FNAI"), a Delaware

9  corporation.

10       17.    Freedom Interactive owns 100% of Freedom Interactive Newspapers of

11  Texas, Inc. ("FINT"), a Delaware corporation.

12       18.    OCRC owns 100% of OCR Community Publications, Inc. ("OCR

13  Publications"), a California corporation, and OCR Information Marketing, Inc. ("OCR

14  Marketing"), a California corporation.

15       19.    FNAI and FCI collectively own (i) Victorville Publishing[3]; (ii) Odessa

16  American ("Odessa"), a Texas general partnership (40% FNAI and 60% FCI); (iii)

17  Freedom Newspapers, a Texas general partnership (20% FNAI and 80% FCI); and (iv)

18  Freedom California Ville Publishing Company LP ("Freedom California Ville"), a California

19  limited partnership[4].

20       20.    There are other entities affiliated with the Debtors.  They are all inactive and

21  have minimal or no assets.  None of these affiliated entities will be filing chapter 11 at this

22  time.

23

24  _____

25  [3] FNAI owns approximately 93% of Victorville Publishing, FCI owns 4%, and outside minority
26  shareholders own approximately 3%

27  [4] FNAI owns approximately 25.7% of Freedom California Ville, FCI owns 72.7%, and outside minority
    shareholders own approximately 1.6%.

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1    21.    Attached hereto as Exhibit 1 is an organizational chart depicting the Debtors'

2    corporate structure.

3        **C.    The Debtors' Businesses**

4    22.    The Debtors, headquartered in Santa Ana, California, are collectively a

5    privately owned information and entertainment company consisting of print publications

6    and interactive businesses.  The Debtors' portfolio includes daily and weekly newspapers,

7    magazines, and other specialty publications.  In addition, the Debtors operate an

8    interactive business, which offers website complements, as well as digital and mobile

9    products, to their print publications.  The Debtors also have two real property holdings,

10   which are held in SPV II (the Santa Ana Property (defined below)) and SPV VI (the

11   Riverside Property (defined below)).

12   23.    The Orange County Register is the Debtors' flagship newspaper.  The

13   Debtors also operate the Press-Enterprise and Unidos.

14   24.    The Debtors' enterprise was founded in 1935 by R.C. Hoiles, with the

15   purchase of a newspaper now known as The Orange County Register ("The OC

16   Register"), and grew over time to be a national media conglomerate in the print and

17   television industries ("Old Freedom").  In 1950, Mr. Hoiles incorporated the business as

18   Freedom Newspapers, Inc. and, in 1993, renamed it "Freedom Communications."  Old

19   Freedom operated as a family-owned business until 2004, when private equity firms, The

20   Blackstone Group and Providence Equity Partners, Inc. and certain affiliates, acquired an

21   approximate 40% share in the company for approximately $460 million (which share

22   thereafter increased to approximately 48%), with the remaining shares being held by the

23   Hoiles family.  As part of this transaction, Old Freedom acquired significant debt.

24   25.    On September 1, 2009, Old Freedom (comprised of 50 related debtors) filed

25   chapter 11 bankruptcy cases in the United States Bankruptcy Court for the District of

26   Delaware.  Old Freedom exited bankruptcy on or about April 30, 2010.

27

28

**Lobel Weiland Golden Friedman LLP**
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

26.     Thereafter, in 2012, Old Freedom sold its entire broadcast television division to Sinclair Broadcast Group, Inc., leaving Old Freedom essentially free of debt. Commencing in 2012, Old Freedom began selling the majority of its newspaper portfolio.

27.     On July 25, 2012, FCHI completed a merger with 2100 Trust, LLC ("2100 Trust"), an entity established by investor Aaron Kushner, and 2100 Freedom Inc.  At the effective time of the merger, 2100 Freedom Inc. was merged into FCHI, with FCHI surviving the merger.  All outstanding shares of FCHI were cancelled and the outstanding shares of 2100 Freedom Inc. became the new outstanding shares of FCHI, with FCHI becoming a wholly-owned subsidiary of 2011 Trust.  After the merger, 2100 Trust changed its name to 2100 Freedom, Inc.  This transaction marked the final transaction by Old Freedom following its emergence from bankruptcy in 2010 and subsequent divestitures of all of its remaining business units.  Following the merger, the Debtors continued to operate under the umbrella name "Freedom Communications."

28.     As of the close of the transaction on July 25, 2012, the Debtors' businesses consisted of (i) its flagship newspaper, The OC Register, and (ii) a community newspaper portfolio.

29.     With a new focus on The OC Register and related newspaper portfolio, commencing in the last quarter of 2012, the Debtors began a period of expansion and redirection, including increasing newsroom and sales staffing, increasing customer realization and retention programs, acquiring magazine publications and launching new daily publications and expanding coverage to new sectors, including business, arts, academia, politics, fashion, philanthropy, faith, family, home, transportation and food. Since 2012, the Debtors have taken The OC Register from being the 20th largest newspaper in the United States to being the 8th largest as measured by circulation[5], and

---

[5] The Debtors' combined daily and Sunday circulate is 364,000 and 470,000, respectively.

1  have sought to strategically sell and acquire certain assets to allow the Debtors to focus

2  their efforts on strengthening their core business and managing cost efficiency.

3       30.    Starting at the end of 2012 and continuing through 2014, the Debtors began

4  to sell certain of their smaller community newspapers.  The Debtors also sold real property

5  holdings in Colorado and Irvine and Victorville, California

6       31.    As part of its targeted growth strategy, on November 21, 2013, the Debtors

7  acquired substantially all of the assets of the Press Enterprise newspaper group, including

8  the Press-Enterprise and La Prensa.  Subsequently, La Prensa was combined with

9  Excelsior and upgraded, to become Unidos.

10       32.    Currently, the Debtors operate The OC Register, the Press-Enterprise and

11  Unidos, along with the related print, digital, targeted and partner media.  The Debtors also

12  currently own real property (thorough SPV II and SPV VI) defined herein as the "Santa

13  Ana Property" (or, at times, the "Freedom SPV II Property") and the "Riverside Property"

14  (or, at times, the "Freedom SPV VI Property").

15      **D.**    **Capital Structure/Assets and Liabilities**

16          **(i) Revenue Streams**

17       33.    Revenue for the Debtors' newspaper publishing operations is derived

18  primarily from advertising (both print and online) and secondarily from paid circulation

19  (including single copy sales and subscription sales), commercial printing, and other

20  product offerings.  Advertising revenue consists of three basic categories: retail, classified,

21  and regional.  Newspaper revenue tends to follow a distinct and recurring seasonal

22  pattern, with higher advertising revenue in months containing significant events or

23  holidays.  Accordingly, the fourth quarter has historically been the strongest, followed by

24  the second quarter, and the third quarter.  The first quarter has historically been the

25  weakest.  The Debtors' newspapers seek to produce desirable results for advertisers by

26  targeting readers based on certain geographic and demographic characteristics.

27       34.    The Debtors anticipate that advertising revenue growth will increasingly

28  come from online advertising.  Thus, the Debtors have been committed to building and

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1  supporting a portfolio of online products and services that are uniquely tailored to each of

2  the local communities they serve.  The Debtors' online activities include websites

3  supporting each of their daily newspapers, as well as selected communities of interest,

4  such as local business, arts, academia, politics, fashion, philanthropy, faith, family, home,

5  transportation and food.

6      35.    There are two operating entities and a corporate group within the Debtors'

7  enterprises.  FCHI (100% owner of FCI and operator of The Press Enterprise) and FCI

8  (operator of The OC Register and related products).  FCI is the primary operating entity of

9  the Debtors' enterprise.  As of the Petition Dates, FCI's primary revenue was generated

10 from the operations of The OC Register and related newspaper and magazine

11 publications, OCR Publications (Coast Magazine) and related personal property assets,

12 including, among other things, equipment, inventory, accounts receivable and intangible

13 assets (newspaper mastheads, trademarks, domain names) related to the operations of

14 both The OC Register and Coast Magazine.  FCI is also a 79% owner of SPV I, which is

15 the 100% owner of SPV II (the owner of the Santa Ana Property).  FCI's revenue for 2014

16 was $154.7 million and its EBITDA loss was $21 million.  FCI projects that its revenue in

17 2015 will be approximately $135 million, with EBITDA of a positive $4 million.

18     36.    FCHI is the second most significant operating entity of the Debtors'

19 enterprise.  As of the Petition Dates, FCHI's primary assets consisted of the revenue

20 generated by the operations of The Riverside Press Enterprise and Unidos and related

21 personal property assets, including, among other things, equipment, inventory, accounts

22 receivable and intangible assets (newspaper mastheads, trademarks, domain names)

23 related to the operations of The Riverside Press Enterprise and Unidos.  FCHI is also the

24 100% owner of FCI and SPV VI (the owner of the Riverside Property).  FCHI's revenue for

25 2014 was $46.6 million and its EBITDA was $6.4 million.  FCHI projects that its revenue in

26 2015 will be approximately $43 million, with EBITDA of $7 million.

27

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-866-1000 · Fax 714-866-1002

1    37.    The Debtors project that total combined revenue from all operations in 2015

2    will be approximately $178 million, with EBITDA (including a loss of $10.9 million for the

3    corporate group) of $0.1 million.

4    38.    As of the month ended September, 2015, the Debtors had consolidated

5    assets with a book value of approximately $149 million and a fair market value of

6    substantially less than that amount.

7    **(ii) Real Property**

8    (A) <u>The Santa Ana Property</u>

9    39.    As of the Petition Dates, SPV II's major asset was real property consisting of

10   land, printing facilities and parking areas surrounding 625 N. Grand Avenue, Santa Ana,

11   California 92701, as more specifically described on Exhibit 2 hereto (the "Santa Ana

12   Property"). The Santa Ana Property consists of 14.32 acres and is located on 2 non-

13   contiguous parcels. The Santa Ana Property is partially improved with a 2-story single-

14   tenant industrial printing facility that contains 108,440 square feet of rentable area. These

15   improvements (the printing facility, specialized printing equipment and manufacturing

16   improvements that are unique to the printing industry) were completed in 1955 and are at

17   the end of their useful life. The building is occupied by The OC Register, which uses this

18   facility as a printing press for several local newspapers. The balance of the Santa Ana

19   Property is vacant land and surface parking areas. Prior to its transfer to SPV II in

20   November 2013 (in connection with the Silver Point loan transaction described below), the

21   Santa Ana Property was owned by FCI. FCI owned the Santa Ana Property for over 20

22   years.

23   40.    Adjacent to the Santa Ana Property is a 5-story office building that serves as

24   the Debtors' executive offices (the "Office Building"). On September 19, 2014, SPV II and

25   FCI entered into a sale-leaseback arrangement with OC Media Tower L.P. ("OC Media"),

26   pursuant to which SPV II sold the Office Building to OC Media for a net sales price of $24

27   million and FCI leased back the Office Building pursuant to a long-term lease with OC

28

**Lobel Weiland Golden Friedman LLP**
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1   Media and a facilities management agreement with its affiliate, Caribou Industries, Inc.

2   ("Caribou Industries").

3       41.    SPV II carries the amount of $22 million on its books and records as an

4   intercompany obligation owed to SPV II by FCHI and FCI (the "Intercompany Debt").  The

5   Intercompany Debt arose in connection with the sale of the Office Building.  The proceeds

6   from the sale of the Office Building flowed to FCHI which, in turn, utilized approximately

7   $18 million of the sale proceeds to pay down the obligations to Silver Point (described

8   more fully below).  The remaining $4 million was utilized by FCI as a deposit on the lease

9   back of the Office Building.

10      42.    In or about January 22, 2015, SPV II entered into an agreement to sell the

11  Santa Ana Property to Caribou Industries for a net sales price of $38.5 million, on a fully-

12  entitled basis.  The agreement with Caribou Industries contemplated having the requisite

13  entitlements in place by May 31, 2015.  Due to delays in obtaining the necessary

14  entitlements, Caribou Industries requested an extension of the due diligence period

15  through December 31, 2015.  After due consideration, SPV II determined not to grant the

16  requested extension, and Caribou Industries terminated the agreement and escrow was

17  closed on or about May 29, 2015.

18      43.    According to a recent appraisal by Cushman & Wakefield, dated June 24,

19  2015 (the "C&W Appraisal"), the Santa Ana Property, on an "as-is" basis and assuming a

20  12-month marketing period, has a fair market value of $13.8 million.  As set forth in the

21  C&W Appraisal, no value has been ascribed to the improvements to the Santa Ana

22  Property as they are at the end of their useful life.

23      44.    The Santa Ana Property generates cash collateral in the approximate

24  amount of $8,000 per month.  As agreed to in connection with the Interim Order

25  authorizing the use of Cash Collateral (discussed herein), these funds will not be utilized

26  by the Debtors and will be segregated and held in a separate bank account with any

27  Prepetition Liens (defined below) on such funds attaching thereto with the same validity,

28  priority and extent as existed as of the Petition Dates.

1041535.3                              13                              DECLARATION

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

(B) The Riverside Property/Freedom SPV VI Property

45.    As of the Petition Dates, SPV VI's primary asset is real property located at 3512 14th Street, Riverside, California 92501, as more specifically described on Exhibit 3 hereto (the "Riverside Property").  The Riverside Property consists of approximately six (6) acres comprised of a 230,000 square foot concrete block and brick press facility and a paved parking area.  At the time of the acquisition of the Riverside Property in November 2013 SPV VI was established (in connection with the Silver Point loan transaction described below), to hold the Riverside Property.

46.    According to a recent broker's opinion of value (the "Riverside Property BOV"), the Riverside Property has a fair market value of approximately $4 million.

47.    The Riverside Property does not generate any cash collateral.

**(iii)    The Debtors' Prepetition Indebtedness**

48.    As of the Petition Dates, as further set forth below, the Debtors have approximately $51.2 million of allegedly secured[6] debt asserted by the following entities (as defined herein): (a) the Prepetition Loan Parties in the amount of approximately $19.46 million; (b) the PBGC in the amount of approximately $15.46 million; (c) McEachen/Stern in the amount of approximately $4.15 million; (d) OC Media in the amount of approximately $2.145 million; and (e) Angelo, Gordon in the amount of approximately $10 million.  Substantially all of the Debtors' assets have been pledged to secure their obligations to creditors.

**(a)    The Prepetition Senior Liens**

---

[6] This is not intended as an admission nor should it be construed as such with respect to the fact that there is sufficient collateral value supporting any specific debt obligation.  The statement merely reflects the fact that certain creditors hold liens with respect to specific debt obligations.  To the contrary, the Debtors believe that notwithstanding the fact that certain creditors may hold liens, such liens are unsupported by value and as such, certain creditor may be partially or wholly unsecured.  The Debtors specifically reserve all rights to contest the nature of any obligation as secured, subject to the provisions of any order approving the Debtors' use of cash collateral.

49.    As of November 21, 2013, (i) FCHI and FCI, as borrowers, (ii) SPV II, SPV VI and others, as guarantors, (iii) SPCP Group, LLC and SPCP Group VI, LLC, as lenders (the "Prepetition Lenders"), and (iv) Silver Point, as administrative agent and collateral agent (the "Prepetition Agent" and, together with the Prepetition Lenders, the "Prepetition Loan Parties," also from time to time referred to herein as "Silver Point"), entered into that Credit Guaranty Agreement, dated as of November 21, 2013 (the "Original Credit Agreement") with respect to a $26,000,000 credit facility to FCHI and FCI.

50.    The Original Credit Agreement, and the terms thereof, were amended pursuant to: (i) *Amendment to Credit and Guaranty Agreement,* dated as of December 10, 2013, (ii) *Second Amendment and Waiver to Credit and Guaranty Agreement,* dated as of January 24, 2014, (iii) *Third Amendment and Waiver to Credit and Guaranty Agreement,* dated as of February 28, 2014, (iv) *Fourth Amendment and Waiver to Credit and Guaranty Agreement,* dated as of April 21, 2014, and (v) *Fifth Amendment and Waiver to Credit and Guaranty Agreement*, dated as of May 28, 2014.  The Original Credit Agreement, as amended by any and all of the foregoing amendments, is hereinafter referred to as the "Credit Agreement."

51.    Concurrently with the execution of the Original Credit Agreement, (i) FCHI, FCI, SPV II, SPV VI and other related and affiliated entities, as grantors, and (ii) the Prepetition Agent, as collateral agent of the Prepetition Lenders, entered into that *Pledge and Security Agreement*, dated as of November 21, 2013 (the "Security Agreement"). Pursuant to the Security Agreement, FCHI, FCI, SPV II, SPV VI and the other grantors set forth therein granted to the Prepetition Agent, as collateral agent of the Prepetition Lenders, a first priority security interest in all of FCHI's, FCI's, SPV II's, SPV VI's and the other grantor parties' personal property assets, itemized therein, including without limitation all of their equipment, inventory, accounts, contract rights, chattel paper, instruments, tax refunds, general intangibles and all proceeds of the foregoing, and the proceeds thereof, to secure all of the obligations of such parties to the Prepetition Loan Parties.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

52.     On November 22, 2013, in accordance with the Credit Agreement and the
Security Agreement, the Prepetition Agent, as (i) beneficiary and collateral agent of the
Prepetition Lenders and (ii) "Secured Party," recorded, in the Delaware Department of
State, UCC 1 Financing Statements against FCI, FCHI, SPV II and SPV VI, as debtors,
designated as filing numbers 2013 4616570, 2013 4616620, 2013 4617107 and 2013
4617271 (collectively, the "UCC 1"), which identified the collateral as "all assets, whether
now owned or hereafter acquired."  The UCC 1 was recorded as a first priority lien and is
superior to and has priority over all other UCC 1 financing statements and liens with
respect to the property identified in the UCC 1, except to the extent (and only to the
extent) that the statutory liens of The Retirement Plan of Freedom Communications, Inc.
(the "Pension Plan"), as perfected on the Pension Plan's behalf by the PBGC under 26
U.S.C. § 430(k), if any, have priority over the Prepetition Agent's liens pursuant to 26
U.S.C. § 6321, 6323, et. seq. and applicable law (to such extent, the "PBGC Prior Lien").[7]

53.     Concurrently with the execution of the Credit Agreement, SPV II, as trustor,
made, executed and delivered to the Prepetition Agent, as beneficiary and collateral agent
of the Prepetition Lenders, that *Deed of Trust, Security Agreement, Assignment of Rents
and Leases and Fixture Filing*, dated as of November 19, 2013 (as amended, the
"Freedom SPV II Deed of Trust"), with respect to the vacant real property of approximately
16 acres in Santa Ana, California described therein (the Santa Ana Property).  The
Freedom SPV II Deed of Trust was recorded on November 25, 2013, in the Orange
County Recorder's Office as document no. 2013000644091.  The Freedom SPV II Deed
of Trust is a first priority lien against the Santa Ana Property and secures all "obligations
and liabilities" of the borrowers and guarantors under the Credit Agreement and related

---

[7] As discussed herein, pursuant to § 430(k)(5), the PBGC filed lien notices against each Debtor on
August 13, 2014 perfecting statutory liens on behalf of The Retirement Plan of Freedom Communications,
Inc. (the "PBGC Liens").  As of September 15, 2015, the amount of the PBGC Liens against some but not all
of the Debtors totaled $15,458,715 (such amount, including all prepetition accruals after September 15,
2015, the "PBGC Lien Amount").

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  loan documents, including the obligations of FCHI, FCI, SPV II, SPV VI.  The Santa Ana

2  Property is the sole material asset of SPV II and generates the gross income of SPV II

3  (approximately $8,000 per month).

4       54.    As of May 28, 2014, SPV II and the Prepetition Agent, as beneficiary and

5  collateral agent of the Prepetition Lenders, entered into that *Modification Agreement to*

6  *Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing*

7  (the "Freedom SPV II Amendment to Deed of Trust").  The Freedom SPV II Amendment

8  to Deed of Trust was recorded on May 29, 2014, in the Orange County Recorder's Office

9  as document no. 2014000208267.

10       55.    Concurrently with the execution of the Credit Agreement, SPV VI, as trustor,

11  made, executed and delivered to the Prepetition Agent, as beneficiary and collateral agent

12  of the Prepetition Lenders, that *Deed of Trust, Security Agreement, Assignment of Rents*

13  *and Leases and Fixture Filing*, dated as of November 19, 2013 (as amended, the

14  "Freedom SPV VI Deed of Trust"), with respect to the Riverside Property.  The Freedom

15  SPV VI Deed of Trust was recorded on November 27, 2013, in the Riverside County

16  Recorder's Office as document no. 2013-0558068.  The Freedom SPV VI Deed of Trust is

17  a first priority lien against the Riverside Property and secures all "obligations and

18  liabilities" of the borrowers and guarantors under the Credit Agreement and related loan

19  documents, including the obligations of FCHI, FCI, SPV II, SPV VI.  The Riverside

20  Property is the sole material asset of SPV VI and generates the gross income of SPV VI.

21       56.    As of May 28, 2014, SPV VI and the Prepetition Agent, as beneficiary and

22  collateral agent of the Prepetition Lenders, entered into that *Modification Agreement to*

23  *Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing*

24  (the "Freedom SPV VI Amendment to Deed of Trust").  The Freedom SPV VI Amendment

25  to Deed of Trust was recorded on May 29, 2014, in the Riverside County Recorder's

26  Office as document no. 2014-0196911.

27       57.    The Credit Agreement, Security Agreement, the Freedom SPV II Deed of

28  Trust, the Freedom SPV VI Deed of Trust, the UCC 1 and all other agreements,

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  documents and opinions signed and/or delivered by the parties to such agreements in

2  connection or furtherance thereof shall be hereinafter referred to as the "Loan

3  Documents."

4      58.   The assets which are encumbered by the collateral and security interests

5  provided to the Prepetition Agent by Debtors, and each of them, whether pursuant to the

6  Security Agreement, Freedom SPV II Deed of Trust, the Freedom SPV VI Deed of Trust,

7  the UCC 1 or any other Loan Document with respect to any of Debtors' property and rights

8  are collectively be referred to as the "Pre-Petition Collateral."

9      59.   On July 11, 2014, the Prepetition Agent, as beneficiary and collateral agent

10  of the Prepetition Lenders, provided and delivered to FCHI and FCI a "Notice of Default"

11  which, among other things, set forth therein certain of the defaults of FCHI and FCI under

12  the Credit Agreement and Prepetition Lenders thereafter accelerated all sums outstanding

13  plus all fees, costs and charges due under the Credit Agreement.

14      60.   On September 16, 2014, as a result of the default of FCHI and FCI under

15  the Credit Agreement, the Prepetition Agent, as beneficiary and collateral agent of the

16  Prepetition Lenders, caused to be recorded in the Orange County Recorder's Office, with

17  respect to the Freedom SPV II Deed of Trust and the Santa Ana Property, that *Notice of*

18  *Default and Election to Sell Under Deed of Trust* (the "Freedom SPV II NOD") thereby

19  commencing a nonjudicial foreclosure proceeding against the Santa Ana Property.  The

20  Freedom SPV II NOD was recorded in the Orange County Recorder's Office as document

21  no. 2014000373433.

22      61.   On September 16, 2014, as a result of the default of FCHI and FCI under

23  the Credit Agreement, the Prepetition Agent, as beneficiary and collateral agent of the

24  Prepetition Lenders, caused to be recorded in the Riverside County Recorder's Office,

25  with respect to the Freedom SPV VI Deed of Trust and the Riverside Property, that *Notice*

26  *of Default and Election to Sell Under Deed of Trust* (the "Freedom SPV VI NOD") thereby

27  commencing a nonjudicial foreclosure proceeding against the Riverside Property.  The

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 • Fax 714-966-1002

1  Freedom SPV VI NOD was recorded in the Riverside County Recorder's Office as

2  document no. 2014-0349859.

3       62.    On April 16, 2015, the Prepetition Agent, as beneficiary and collateral agent

4  of the Prepetition Lenders, caused to be recorded in the Orange County Recorder's

5  Office, with respect to the Freedom SPV II Deed of Trust, Santa Ana Property, and

6  Freedom SPV II NOD, that *Notice of Trustee's Sale* ("Freedom SPV II NOS") setting and

7  scheduling the nonjudicial foreclosure sale of the Santa Ana Property for May 15, 2015.

8  The Freedom SPV II NOS was recorded in the Orange County Recorder's Office as

9  document no. 2015000194160.  The foreclosure sale of the Santa Ana Property has been

10  postponed to November 3, 2015.

11       63.    On April 16, 2015, the Prepetition Agent, as beneficiary and collateral agent

12  of the Prepetition Lenders, caused to be recorded in the Riverside County Recorder's

13  Office, with respect to the Freedom SPV VI Deed of Trust, Riverside Property, and

14  Freedom SPV VI NOD, that *Notice of Trustee's Sale* ("Freedom SPV VI NOS") setting and

15  scheduling the nonjudicial foreclosure sale of the Riverside Property for May 15, 2015.

16  The Freedom SPV VI NOS was recorded in the Riverside County Recorder's Office as

17  document no. 2015-0152616.  The foreclosure sale of the Riverside Property has been

18  postponed to November 3, 2015.

19       64.    On June 10, 2015, the Prepetition Agent, through counsel, and as

20  beneficiary and collateral agent of the Prepetition Lenders, sent a letter to the Debtors

21  advising the Debtors that various defaults still exist under the Credit Agreement and Loan

22  Documents, that all previous "notices of default" and/or "events of default" and/or

23  acceleration of the debts and obligations under and pursuant to the Credit Agreement and

24  Loan Documents were still in effect and effective, and that the debts and obligations of the

25  Debtors, and each of them, under the Credit Agreement and Loan Documents were

26  accelerated and immediately due and payable.

27       65.    As of the Petition Dates (except where otherwise noted), and pursuant to the

28  Credit Agreement and the Loan Documents, the Prepetition Loan Parties asserts a

1  secured claim against the Debtors in the principal sum of not less than $12,007,790, plus

2  accrued and accruing interest, charges, fees, including attorney's fees, and costs,

3  including protective advances/reimbursable expenses (such interest, charges, fees, costs,

4  and expenses, as of October 31, 2015, in the sum of $2,168,623 plus any accrued but

5  unbilled amounts) plus the "Make-Whole Amount" presently (as of October 31, 2015) in

6  the sum of $5,284,907 (the "Make-Whole Amount") due pursuant to Section 2.14(g) of the

7  Credit Agreement (collectively, the "Debt Amount").

8  **(b)    Pension Plan Liabilities and the PBGC Liens**

9      66.    The PBGC, on behalf of The Retirement Plan of Freedom Communications,

10  Inc. (the "Pension Plan"), has filed with the California Secretary of State various Notices of

11  Federal Lien Under I.R.C. § 412(n) and/or § 430(k) (together, the "PBGC Personal

12  Property Liens"), to secure obligations (the "PBGC Obligations") allegedly owed by the

13  Debtors to the PBGC based on missed Pension Plan contributions (including interest

14  thereon) in the total amount of $15,458,715, as of September 15, 2015 (such amount,

15  including all prepetition accruals after September 15, 2015 to the extent included by

16  applicable non-bankruptcy law), referred to herein as the "PBGC Lien Amount").  Pursuant

17  to 26 U.S.C. § 6321, et seq. and applicable law, certain PBGC Personal Property Liens

18  may take priority over the Prepetition Senior Liens on certain personal property, such as

19  cash collateral and, in such event (but only in such event and to such extent), would be

20  considered a PBGC Prior Lien.

21      67.    In addition, the PBGC has filed various Notices of Federal Lien Under I.R.C.

22  § 412(n) and/or § 430(k) against real property owned by the Debtors (defined hereinabove

23  as the Santa Ana Property and the Riverside Property) to secure the PBGC Obligations

24  (the "PBGC Real Property Liens" and, together with the PBGC Personal Property Liens,

25  referred to herein as the "PBGC Liens").  The PBGC Real Property Liens against the

26  Santa Ana Property and the Riverside Property are junior in priority to the liens against

27  such real property asserted by the Prepetition Agent and, in the case of the Santa Ana

28  Property, as discussed directly below, are also junior to the McEachen/Stern Lien.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

68. The filings related to the PBGC Liens are as follows:

   a. On August 13, 2014, the PBGC recorded against certain of the Debtors a Notice of Federal Lien Under I.R.C. § 412(n) and/or § 430(k) in the Orange County Recorder's Office, as Instrument No. 2014000326855, in the amount of $2,354,907.

   b. On September 23, 2014, the PBGC recorded against certain of the Debtors a second Notice of Federal Lien Under I.R.C. § 412(n) and/or § 430(k) in the Orange County Recorder's Office, as Instrument No. 2014000385702, in the amount of $5,045,093.

   c. On December 2, 2014, the PBGC recorded against certain of the Debtors a third Notice of Federal Lien Under I.R.C. § 412(n) and/or § 430(k) in the Orange County Recorder's Office, as Instrument No. 2014000518702, in the amount of $2,285,360.

   d. On October 18, 2015, the PBGC recorded against Freedom SPV VI a Notice of Federal Lien Under I.R.C. § 412(n) and/or § 430(k) in the Riverside County Recorder's Office, as Instrument No. 2015-0445670, in the amount of $15,458,715.

   e. On September 9, 2014, the PBGC recorded a UCC-1 (Notice of Federal Lien Under I.R.C. § 412(n) and/or § 430(k)) with the California Secretary of State against the Daily Press, FNAI, Freedom Colorado, Victorville Publishing, Victor Valley, SPV I, SPV II, SPV IV, SPV V, OCRC, OCR Community Publications, Freedom Newspapers, FNI, FCHI, FCI, and 2100 Freedom in the amount of $1,554,395.

   f. On September 22, 2014, the PBGC recorded a UCC-1 (Notice of Federal Lien Under I.R.C. § 412(n) and/or § 430(k)) with the California Secretary of State against the Daily Press, FNAI, Freedom Colorado, Victorville Publishing, Victor Valley, SPV I, SPV II, SPV IV, SPV V, OCRC, OCR

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Community Publications, Freedom Newspapers, FNI, FCHI, FCI, and

2100 Freedom in the amount of $5,845,605.

g. On November 24, 2014, the PBGC recorded a UCC-1 (Notice of Federal

Lien Under I.R.C. § 412(n) and/or § 430(k)) with the California Secretary

of State against the Daily Press, FNAI, Freedom Colorado, Victorville

Publishing, Victor Valley, SPV I, SPV II, SPV IV, SPV V, OCRC, OCR

Community Publications, Freedom Newspapers, FNI, FCHI, FCI, and

2100 Freedom in the amount of $2,293,975.

h. On March 26, 2015, the PBGC recorded a UCC-1 (Notice of Federal Lien

Under I.R.C. § 412(n) and/or § 430(k)) with the California Secretary of

State against the Daily Press, FNAI, Freedom Colorado, Victorville

Publishing, Victor Valley, SPV I, SPV II, SPV IV, SPV V, OCRC, OCR

Community Publications, Freedom Newspapers, FNI, FCHI, FCI, and

2100 Freedom in the amount of $2,073,065.

i. On June 9, 2015, the PBGC recorded a UCC-1 (Notice of Federal Lien

Under I.R.C. § 412(n) and/or § 430(k)) with the California Secretary of

State against the Daily Press, FNAI, Freedom Colorado, Victorville

Publishing, Victor Valley, SPV I, SPV II, SPV IV, SPV V, OCRC, OCR

Community Publications, Freedom Newspapers, FNI, FCHI, FCI, and

2100 Freedom in the amount of $1,639,221.

j. On September 21, 2015, the PBGC recorded a UCC-1 (Notice of Federal

Lien Under I.R.C. § 412(n) and/or § 430(k)) with the California Secretary

of State against the Daily Press, FNAI, Freedom Colorado, Victorville

Publishing, Victor Valley, SPV I, SPV II, SPV IV, SPV V, OCRC, OCR

Community Publications, Freedom Newspapers, FNI, FCHI, FCI, and

2100 Freedom in the amount of $1,307,601.

69.    Based on these filings, the PBGC asserts a total claim against the Debtors

on behalf of the Pension Plan in the approximate amount of $15.46 million, representing

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  due, but unpaid contributions.  The IRS has also levied an additional excise tax against

2  the Debtors related to the aforementioned unpaid contributions, in the approximate

3  amount of $1.66 million.

4         **(c) The McEachen/Stern Lien**

5         70.    Mark McEachen and Mitchell Stern ("McEachen/Stern") and FCHI were

6  parties to an arbitration proceeding before JAMS in Los Angeles, entitled *Stern, et al. v.*

7  *Freedom Communications Holdings, Inc.* (JAMS Ref. No. 1210031089) (the "Arbitration").

8  On April 23, 2014, in an ancillary proceeding to the Arbitration, the Los Angeles Superior

9  Court issued a Right to Attach Order (the "RAO") in an action entitled *Stern, et al. v.*

10  *Freedom Communications Holdings, Inc.* (L.A. Super. Ct. No. BS144990).  On May 2,

11  2014, McEachen/Stern recorded a Writ of Attachment pursuant to the RAO, as well as

12  Notice(s) of Attachment in the Orange County Recorder's Office, as Instrument Nos.

13  2014000171656, 2014000171657, 2014000178276, 2014000242766 and

14  2014000263156, against the Santa Ana Property and certain personal property of FCHI.

15         71.    Pursuant to a settlement reached among the parties, on July 31, 2014, the

16  Los Angeles Superior Court entered a stipulated judgment in the amount of $4.150 million

17  in favor of McEachen/Stern, and jointly and severally against FCHI and SPV II, and

18  dismissing the counterclaims against McEachen/Stern (the "Stipulated Judgment").  On

19  August 4, 2014, McEachen/Stern recorded the Stipulated Judgment in the Orange County

20  Recorder's Office, as Instrument No. 2014000312355 (together with the Notice(s) of

21  Attachment, the "McEachen/Stern Lien").

22         72.    As provided therein, the Stipulated Judgment would only be enforced

23  according to the terms set forth in that certain Amended and Restated Standstill

24  Agreement dated July 28, 2014, by and among McEachen/Stern, FCHI, SPV II and the

25  Prepetition Agent (the "McEachen/Stern Standstill Agreement").  Pursuant to the

26  McEachen/Stern Standstill Agreement (and an earlier Subordination Agreement),

27  McEachen/Stern specifically acknowledged and agreed that, subject to certain caps as set

28  forth therein, the McEachen/Stern Lien was subordinate to the Prepetition Senior Liens

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  and agreed to forbear from exercising their enforcement rights and remedies as to the

2  Stipulated Judgment.

3      73.    The McEachen/Stern Standstill Agreement (Section 3(b)(iii)(A)) further

4  provided that collateral for the McEachen/Stern Lien consisted only of real property assets

5  of FCHI and/or SPV II upon which the McEachen/Stern Lien attached, and that "for the

6  avoidance of doubt, no personal property, deposit accounts, securities account(s),

7  account(s) receivable, or other personal property or liquid assets constitute

8  [McEachen/Stern's] [c]ollateral."  In addition, the McEachen/Stern Standstill Agreement

9  (Section 3(b)(iv)) provides that McEachen/Stern "shall not object to any debtor-in-

10  possession financing (or use of cash collateral) in connection with any proceedings

11  naming Freedom [Holdings], [Freedom] SPV II or any of their respective subsidiaries or

12  affiliates as a debtor under title 11 of the United States Code, the terms of which are

13  satisfactory to the [Prepetition] Agent, and shall consent (or be deemed to have

14  consented) to the priming of its liens in connection with such debtor-in-possession

15  financing or such use of cash collateral."  Based on these provisions, the Debtors

16  preliminarily do not believe that McEachen/Stern holds any enforceable security interest in

17  cash collateral and, in any event, to the extent the Prepetition Agent has agreed to the

18  Debtors' use of the cash collateral in these Cases and the terms of the DIP Facility (as

19  defined herein), McEachen/Stern are also deemed to consent thereto, including as to the

20  priming of the McEachen/Stern Lien.

21      74.    The McEachen/Stern Lien (in the amount of $4.150 million) remains against

22  the Santa Ana Property (or other property, if any), is junior in priority to the Senior

23  Prepetition Liens against such property asserted by the Prepetition Agent.

24          **(d)    The OC Media Lien**

25      75.    In connection with the sale and leaseback of the Office Building to OC

26  Media, FCI issued to OC Media a promissory note in the amount of $2,145,239.20,

27  reflecting a holdback for FCI's performance under the lease of the Office Building (the "OC

28  Media Note").  To secure repayment of the OC Media Note, SPV II granted to OC Media a

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  lien against the Santa Ana Property, which Deed of Trust with Assignment of Rents was

2  recorded by OC Media in the Orange County Recorder's Office on September 19, 2014,

3  as Instrument No. 2015000381741 (the "OC Media Lien").  While the Santa Ana Property

4  is subject to the OC Media Lien, SPV II itself is not an obligor on the amounts owed to OC

5  Media.  However, FCI is a named obligor (on an unsecured basis) for the amounts due on

6  account of the OC Media Note.

7      76.    In a Subordination Agreement dated September 19, 2014 between OC

8  Media and the Prepetition Agent (the "OC Media Subordination Agreement"), OC Media

9  acknowledged and agreed that, subject to certain caps as set forth therein, the OC Media

10 Lien was subordinate to the Senior Prepetition Liens and the McEachen/Stern Lien, and

11 OC Media agreed to forbear from exercising its enforcement rights and remedies as to the

12 OC Media Note and OC Media Lien until November 30, 2017, absent the Prepetition

13 Agent's consent, in accordance with the terms of the OC Media Subordination Agreement.

14     77.    Accordingly, while the Santa Ana Property is subject to the OC Media Lien,

15 such lien is contractually and otherwise subordinate to the liens of the Prepetition Agent,

16 McEachen/Stern and the PBGC.

17         **(e)    The Angelo, Gordon Lien**

18     78.    On or about June 9, 2012, FCI and certain former shareholders of FCI (the

19 "Selling Shareholders") entered into a merger agreement whereby the Selling

20 Shareholders effectuated the sale of their interests in FCI to 2100 Trust (which

21 subsequently converted into 2100 Freedom).  Angelo, Gordon Management, LLC

22 ("Angelo, Gordon") serves as stockholder representative for the Selling Shareholders.

23     79.    Thereafter, Angelo, Gordon, on behalf of the Selling Shareholders,

24 commenced litigation in Delaware against 2100 Freedom, in an action entitled *Angelo,*

25 *Gordon Management, LLC in its capacity as Stockholder Representative v. 2100 Trust,*

26 *LLC* (C.A. No. 9036-CB) (the "Shareholder Litigation").

27     80.    On or about February 5, 2015, SPV II executed documents granting the

28 Selling Shareholders a lien on the Santa Ana Property in the amount of $10 million for the

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 • Fax 714-966-1002

1  purpose of securing payment and performance of its obligations to be reflected in a

2  contemplated Debt Restructuring Agreement, which Deed of Trust with Assignment of

3  Rents was recorded by Angelo, Gordon in the Official Records of Orange County, on

4  February 6, 2015, as Instrument No. 2015000057706 (the "Angelo, Gordon Lien").

5      81.    On or about March 12, 2015, FCI, FCHI, and SPV II executed the

6  contemplated Debt Restructuring Agreement with Angelo, Gordon on behalf of the Selling

7  Shareholders and the Prepetition Agent.  Pursuant to the Debt Restructuring Agreement,

8  2100 Freedom executed confessions of judgment in the amount of $17.45 million in favor

9  of Angelo, Gordon, subject to reductions thereto as set forth in the Debt Restructuring

10  Agreement (the "Angelo, Gordon Judgment").  While the Santa Ana Property is subject to

11  the Angelo, Gordon Lien, SPV II itself is not an obligor on the amounts owed to Angelo,

12  Gordon.

13      **E.    Events Leading to the Cases**

14      82.    The advertising environment is influenced by the state of the overall

15  economy, including unemployment rates, inflation, energy prices, consumer interest rates,

16  and the availability of credit.  Historically, advertising revenue has increased in periods of

17  economic growth and declined during national, regional, and local economic downturns.

18  Thus, the Debtors' revenue and operating results since 2012 have been significantly

19  impacted by the ongoing recession.  The duration and depth of the recession in markets in

20  which the Debtors operate further reduced their future revenues, operating results, and

21  cash flows.  In addition, competition from internet-based advertising alternatives,

22  particularly in the classified employment advertising category, has continued to erode

23  traditional print media sources of revenue.  Newsprint prices have also had a significant

24  effect on the Debtors' operating results, as newsprint is their principal raw material.  The

25  newsprint industry is highly cyclical, and newsprint prices have historically experienced

26  significant volatility caused by supply and demand imbalances.

27      83.    In response to declining revenues, the Debtors have been actively engaged

28  in efforts to right-size their expenses.  In their newspaper publishing business, the Debtors

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1    have consolidated operational functions, introduced new business models, and

2    outsourced selected distribution, printing, and customer care activities.  With respect to

3    the operations of The OC Register, the Press-Enterprise and Unidos, the Debtors have

4    reduced headcount, cut back on unprofitable circulation, reduced newsprint consumption,

5    streamlined printing, and outsourced distribution functions.  In addition, the Debtors have

6    strengthened and reorganized their newspaper sales organization and have added sales

7    hunters to focus on online revenue.  Generally, the Debtors have, through the use of

8    outside staffing agencies, independent contractors, and outsourcing arrangements,

9    moved in the direction of a more variable cost structure to provide flexibility in responding

10   to changes in demand for products and services.

11        84.    Despite the Debtors' best efforts to increase revenues and decrease

12   expenses, while continuing to maintain the highest quality product, the Debtors have been

13   unable fully achieve their financial goals to such a degree that would enable them to

14   continue to operate under their current capital structure.  Accordingly, the Debtors have

15   made the decision to sell all of their assets and operations for the benefit of all parties (as

16   more fully discussed herein), as they believe that such a course of action will maximize

17   the potential return for creditors, while ensuring the ongoing viability of their

18   news/information products, and the ongoing employment of thousands of people.

19                    **PART II - SALE OF THE DEBTORS' ASSETS**

20        85.    The proposed foundation for the Debtors' chapter 11 process is a

21   contemplated sale of all of their assets pursuant to Section 363 of the Bankruptcy Code.

22   In that regard, the Debtors, with the assistance of their advisors, have been actively

23   engaged in negotiations and have reached preliminary agreement as to the terms of an

24   asset purchase agreement (the "APA").  As part of the 363 sales process, the Debtors will

25   shortly file a motion with the Court proposing that Buyco (an entity to be formed) be

26   deemed the "stalking horse" with respect to the purchase of the Debtors' assets.  In the

27   interest of full disclosure, two of the principals of Buyco are Richard Mirman ("Mirman")

28   and Eric Spitz ("Spitz").  Mirman is the current Chief Executive Officer and Publisher of the

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1   Debtors and Spitz is the director and secretary of many of the Debtors.  Given that Buyco

2   is comprised in part of insiders of the Debtors, the Debtors anticipate and expect that the

3   unsecured creditor committee(s) appointed in connection with the Cases will have active

4   and enhanced roles in the sale processes.  In addition, the sales process will be open and

5   rigorous and will be conducted by a nationally recognized financial advisor, experienced in

6   the conduct of section 363 sales to ensure that the maximum value for the Debtors' assets

7   is obtained.

8        86.    In addition, as discussed herein, to facilitate the chapter 11 process pending

9   the sale of substantially all of their assets, the Debtors have negotiated the terms of the

10  Interim Order with their senior secured creditors asserting an interest in cash collateral –

11  the Prepetition Loan Parties and the PBGC – and have also negotiated the terms of a

12  debtor-in-possession financing facility with Silver Point.

13                       **PART III - FIRST DAY MOTIONS**

14       87.    In furtherance of the Debtors' efforts to sell their assets and minimize

15  disruptions to their operations during that process, the Debtors have requested certain

16  relief in the First Day Motions filed with the Bankruptcy Court concurrently with this

17  Declaration and respectfully request that the Court consider entering the proposed orders

18  granting such First Day Motions.  The Debtors respectfully request that the relief

19  requested in each First Day Motion be granted because such relief is a critical element in

20  stabilizing and facilitating the Debtors' operations during the pendency of the Cases.  I

21  have reviewed each of the First Day Motions and proposed orders (including the exhibits

22  thereto) and the facts set forth therein are true and correct to the best of my knowledge,

23  information and belief.  Moreover, I believe the relief sought in each of the First Day

24  Motions (a) is vital to enable the transition into, and operations during the chapter 11's

25  with minimum interruption or disruption to the Debtors' businesses or loss of productivity

26  or value and (b) constitutes a critical element in maximizing value during the Cases.

27       88.    The First Day Motions, summarized below, seek, among other things, to (a)

28  ensure the continuation of the Debtors' cash management system and other business

LobeL Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  operations without interruption, (b) authorize the Debtors to continue using cash collateral

2  and enter into a postpetition financing arrangement, (c) preserve valuable relationships

3  with suppliers and customers, (d) maintain employee morale and confidence, and (e)

4  establish certain administrative procedures that will promote a seamless transition into

5  chapter 11.  The relief sought is critical to the Debtors' chapter 11 efforts.

6  **A.    Emergency Motion for an Order: (1) Limiting Scope of Notice; and (2)**

7  **Authorizing the Filing of a Consolidated Mailing Matrix and Consolidated List**

8  **of Creditors Holding the Thirty Largest Unsecured Claims Against the**

9  **Debtors**

10  89.    The Debtors are requesting authorization to limit notice of certain Limited

11  Notice Matters (discussed further below) to the following parties: (1) the Office of the

12  United States Trustee; (2) counsel for any official committee(s) of unsecured creditors in

13  the Cases, or until such time as counsel is named, the individual members of the

14  committee(s); (3) parties asserting secured claims and counsel, if any; (4) the

15  Consolidated 1007(d) List; (5) parties that file with the Court and serve upon the Debtors a

16  request for notices; and (6) any party with a pecuniary interest in the subject matter of the

17  particular Limited Notice Matter or its counsel.

18  90.    The creditor matrices filed by the Debtors contain approximately 5,000

19  parties and the Debtors anticipate that numerous additional creditors will assert claims

20  against the estates.  I believe that requiring notice to and service upon all of these

21  persons and entities will be impractical and will impose a significant administrative and

22  economic burden on the Debtors' estates if the Debtors were required to mail notice of

23  every matter in the Cases to all parties listed on the creditor matrices.  By limiting notice,

24  this cost will be avoided while still assuring that the interested parties in the Cases receive

25  proper and sufficient notice of the matters.

26  91.    As the Debtors anticipate filing various motions during the first days of the

27  Cases that may otherwise need to be filed on all creditors and parties in interest, this

28  matter cannot be heard on regular notice.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1041535.3                    29                    DECLARATION

92.   The Debtors propose to limit the scope of service of all notices, motions, or applications, including, but not limited to, the following matters:

a)   any proposed use, sale or lease of property of the estate pursuant to 11 U.S.C. § 363 and Bankruptcy Rules 2002(a), 4001(b) and 6004 (except a sale of substantially all of the Debtors' or any one Debtor);

b)   any proposed debtor-in-possession financing or use of cash collateral;

c)   any proposed extension of the Debtors' exclusive time to file a plan of reorganization and solicit acceptance thereof (including, without limitation, the time to file a disclosure statement) pursuant to 11 U.S.C. § 1121 and Bankruptcy Rule 3016;

d)   any proposed approval of a compromise or settlement of a controversy pursuant to 11 U.S.C. § 363 and Bankruptcy Rules 2002(a)(3) and 9019;

e)   any proposed abandonment or disposition of property of the estate pursuant to 11 U.S.C. § 554 and Bankruptcy Rules 6007(a) or (c);

f)   any proposed assumption or rejection of contracts or leases under 11 U.S.C. § 365 and Bankruptcy Rule 6006;

g)   any proposed application for compensation or reimbursement of expenses of professionals pursuant to 11 U.S.C. §§ 328, 329, 330 or 331 and Bankruptcy Rules 2002(a)(6), 2016, 2017, and 6005; and

h)   a hearing on any other contested matters in these Cases that requires notice to all creditors or equity holders pursuant to the Bankruptcy Code, Bankruptcy Rule 9014, or the Local Bankruptcy Rules.

93.   The relief requested does not affect the rights of all creditors and parties in interest in the Cases to receive notice of the following matters or proceedings: (i) a hearing on the dismissal or conversion of the Cases; (ii) the time fixed for filing objections to any disclosure statement and any hearing to consider approval of any disclosure statement; (iii) the time fixed for accepting, rejecting, or objecting to confirmation of a plan or any modification thereof and the hearing thereon; (iv) the entry of an order confirming a

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1    plan; (v) the deadline fixed for filing proofs of claim; and (vi) the meeting of creditors

2    pursuant to section 341 of the Bankruptcy Code.

3        94.    Based upon the volume of creditors, the Debtors are also requesting

4    authorization to file one consolidated mailing matrix for all creditors of their estates and a

5    consolidated list of the creditors holding the thirty largest general unsecured claims

6    against the Debtors (the "Consolidated 1007(d) List").  This will increase the efficiency for

7    the Debtors and the Court in determining if proper notice has been provided to all

8    creditors for the matters that will still require notice to all creditors and it will eliminate the

9    duplication of creditors between the estates.

10        95.    The Debtors propose that notices regarding Limited Notice Matters that will

11    be heard on regular notice be served by first class mail upon only: (a) the Office of the

12    United States Trustee; (b) counsel for any official committee(s) appointed in the Cases,

13    and until such time as counsel is appointed, the individual members of the committee(s);

14    (c) creditors asserting secured claims against the Debtors and counsel, if any; (d) the

15    Consolidated 1007(d) List; (e) parties that file with the Court and serve upon the Debtors

16    requests for notice of all matters in accordance with Bankruptcy Rule 2002(i); and (f) any

17    party with a pecuniary interest in the subject matter of the particular Limited Notice Matter

18    or its counsel (collectively, the "Limited Service List").  The Debtors further propose that, in

19    addition to the service methods authorized by Local Rule 9075-1, service by overnight

20    delivery be authorized, if such notice will be delivered at least one (1) calendar day prior to

21    the scheduled hearing time.  Also, that service of an emergency or expedited Limited

22    Notice Matters be upon the Limited Service List only.

23        96.    I believe the above proposed limit notice procedures are necessary and

24    appropriate given that the creditor body is so large and many of the creditors would not be

25    interested in receiving copies of all the Limited Notice Matters and would find service of all

26    these motions wasteful.  Requiring notice to, and service upon, so many parties, would

27    substantially increase the cost and administrative burden on the Debtors, without

28    conferring any meaningful benefit to the Debtors' estates, and would thus diminish the

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  assets ultimately available for distribution to creditors.  Further allowing service of an

2  emergency motion by overnight delivery in the instances outlined above provide the other

3  parties notice of the matter and preserve the Debtors' ability to bring such matters on a

4  timely efficient basis.  Moreover, to the extent any creditors wishes to receive notices in

5  the Cases, that creditor may request to be included in the special notice list.  It is my

6  understanding that such notice constitutes due and sufficient notice of the Limited Notice

7  Matters.

8          97.    The consolidated mailing matrix and consolidated list of creditors, combined

9  with the limit notice procedure, will provide good and sufficient notice to all parties in

10  interest in an efficient manner.  It will also preserve estate assets for the benefit of

11  creditors rather than spending the money on expensive noticing procedures.

12      **B.      Ex Parte Motion for an Order Extending Time Within Which Debtors**

13      **Must File Schedules of Assets and Liabilities, Statements of Financial Affairs,**

14      **and Other Required Documents as Listed in the Court's Deficiency Notice**

15          98.    The Debtors are requesting an additional twenty-nine (29) days from

16  November 16, 2015, through and including December 15, 2015, by which they must file

17  their schedules of assets and liabilities, statements of financial affairs, and other

18  documents required to be filed pursuant to any case commencement deficiency notices or

19  other similar notice issued by the Court (collectively, the "Documents").  Due to the

20  demands on the Debtors created by: (i) filing of the Cases and the financial difficulties that

21  gave rise thereto, (ii) the need to maintain continuity of the Debtors' businesses, (iii) the

22  need to prepare and file the numerous First Day Pleadings, (iv) the immediate need to

23  comply with the filing requirements set forth in the "*Guidelines for Fulfilling the*

24  *Requirements of the United States Trustee*," and (v) the large number of creditors in the

25  Cases, I do not believe that the Debtors will be able to complete the Documents within the

26  statutory period.

27          99.    The Debtors request that the motion be considered on an ex-parte basis.

28  The Documents are currently due on November 16, 2015, and the Debtors are requesting

**LobeL Weiland Golden Friedman LLP**
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1  an extension of twenty-nine (29) days, through and including December 15, 2015, to file

2  the Documents.  If the Debtors were to set this matter on regular notice, the deadline for

3  filing the Documents will have passed prior to Court's consideration of the relief requested

4  by the Debtors.  The Debtors would then either have to file incomplete or insufficient

5  Documents by November 16, 2015, or violate the Bankruptcy Rules and Local Rules by

6  failing to file the Documents waiting for the hearing on the motion.

7       100.    The request of an additional twenty-nine (29) days is reasonable, and will

8  allow the Debtors time to file more accurate Documents.  It will not prejudice creditors, and

9  it will facilitate the efficient administration of the Cases.

10       101.    While Local Rule 1007-1(b)(2) provides that service of the motion must be

11  upon all creditors, the Debtors have approximately 5,000 creditors and requiring service of

12  this particular motion on every creditor would impose an undue administrative cost to the

13  estates.  The Debtors have also concurrently requested the ability to limit notice for certain

14  relief requested pursuant to the Bankruptcy Code and Bankruptcy Rules.

15      **C.**     **Motion For Entry Of: (I) Interim Order (A) Authorizing Debtors To (1)**

16  **Utilize Cash Collateral Pursuant To 11 U.S.C. § 363, (2) Provide Adequate**

17  **Protection To Prepetition Secured Parties, (3) And Grant Related Relief, And**

18  **(B) Setting Final Hearing; And (Ii) Final Order Authorizing Debtors To (A)**

19  **Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362 And**

20  **364, (B) Utilize Cash Collateral Pursuant To 11 U.S.C. § 363, (C) Provide**

21  **Adequate Protection To Prepetition Secured Parties, (D) Repay Certain**

22  **Prepetition Secured Debt, And (E) Grant Related Relief**

23       102.    In the course of preparing to commence the Cases, I, along with other

24  members of the Debtors' management and the Debtors' financial advisors, analyzed what

25  the Debtors' needs would be in terms of financial support to have adequate resources

26  available to embark upon and complete a sale process in the Cases, while maintaining

27  appropriate operational levels, so as to avoid any disruption to the businesses or damage

28  to the value of the businesses pending the contemplated sale.  That analysis included a

**Lobel Weiland Golden Friedman LLP**
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1   thorough review of all aspects of the Debtors' operations and resulted in the Budget which

2   is attached to the DIP and Cash Collateral Motion as Exhibit "A" to the Interim and Final

3   Cash Collateral Orders.

4          103.   As set forth in the Budget, the Debtors' revenue for the fourth quarter of

5   2015 and the first quarter of 2016 will be insufficient to address the cash needs of the

6   businesses, and the additional cash flow needs created by the chapter 11 process.  As a

7   result, the Debtors' management and advisors undertook an analysis of the incremental

8   liquidity that would be necessary to maintain operations in connection with the filing of

9   these Cases, including, among other things, paying employee wages and benefits,

10  procuring goods and services integral to the Debtors' ongoing business operations,

11  funding certain operational expenses, maintaining ordinary course relationships with

12  vendors, suppliers, and customers, and satisfying working capital needs in the ordinary

13  course.  Based on the Debtors' 26-week cash flow forecast, it was determined that the

14  Debtors, in addition to the continued use of Cash Collateral, will have additional net cash

15  needs of approximately $3 million in the first 26-weeks of these Cases.

16         104.   Recognizing the need to access cash, the Debtors and their advisors

17  engaged in discussions with the Debtors' primary secured creditor asserting an interest in

18  the Debtors' Cash Collateral – Silver Point, as Prepetition Agent of the Prepetition Lenders

19  – regarding the terms of the Debtors' consensual continued use of Cash Collateral.  In

20  addition, the Debtors engaged in discussions with Silver Point (and numerous other

21  potential financing sources, as more particularly described in the GlassRatner Declaration

22  annexed to the DIP and Cash Collateral Motion) regarding the terms of debtor-in-

23  possession financing to allow the Debtors to operate pending the contemplated sale of

24  their businesses.  The Debtors also engaged in discussions with the PBGC relative to its

25  interests in the Cash Collateral.  As detailed in the DIP and Cash Collateral Motion, the

26  Debtors, Silver Point, and the PBGC reached an agreement as to a short-term (30 days,

27  unless otherwise extended by agreement) "bridge" use of Cash Collateral, the terms of

28  which are set forth in the proposed Interim Order (Exhibit A to the DIP and Cash Collateral

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  Motion), and the Debtors and Silver Point reached an agreement regarding the terms of

2  debtor in possession financing and the continued use of Cash Collateral, the terms of

3  which are set forth in the proposed Final Order (Exhibit B to the DIP and Cash Collateral

4  Motion).

5       105.    I believe that the Debtors' access to Cash Collateral during the interim

6  period (and thereafter) is absolutely necessary to preserve and maximize value for the

7  Debtors' stakeholders.  The Debtors use Cash Collateral in the ordinary course of

8  business to procure goods and services from vendors, pay their employees, and satisfy

9  other working capital needs.  Absent approval of the Interim Order (and, thereafter, use of

10  Cash Collateral and, as discussed below, authority to obtain debtor-in-possession

11  financing pursuant to the Final Order), the Debtors will be effectively unable to generate

12  revenue, operate their businesses, or pay the hundreds of individuals who report to work

13  each day, in addition to funding their reorganization process.  These chapter 11 estates

14  will be immediately and irreparably harmed if this were to occur.  Creditors are provided

15  with adequate protection of their interests (as set forth in the DIP and Cash Collateral

16  Motion) in exchange for the Debtors' use of Cash Collateral and I believe that there is

17  good cause for approving such use in accordance with the Budget (subject to the carve-

18  out for professionals and related fees and permitted variances).

19       106.    With respect to the Debtor's additional liquidity needs and potential financing

20  options, prior to the commencement of the chapter 11 cases, the Debtors' management

21  and advisors identified the Prepetition Loan Parties as the most likely sources of

22  postpetition financing, given their liens on substantially all of the Debtors' assets,

23  involvement over the past several months with the Debtors' restructuring efforts.  In July

24  2015, the Debtors and GlassRatner initiated a dialogue with Silver Point (among other

25  potential lenders) regarding the possibility of providing debtor-in-possession financing to

26  the Debtors.  Silver Point expressed a willingness to provide the financing and advised the

27  Debtors that the Prepetition Loan Parties would not consent to being primed by a third-

28  party lender.  In the weeks that followed, the Debtors and Silver Point negotiated in good

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1   faith and at arm's-length with respect to the terms and conditions of the financing.  These

2   negotiations ultimately resulted in the DIP Facility for which the Debtors are seeking

3   approval pursuant to the DIP and Cash Collateral Motion.

4       107.   As set forth in further detail in the GlassRatner Declaration, before agreeing

5   to the terms of the DIP Facility, the Debtors engaged in a marketing process designed to

6   attract financing from other lenders.  Through discussions with the potential third-party

7   lenders, however, it became readily apparent that the Debtors' existing capital structure,

8   including the Debtors' level of secured debt (relative to asset value) and lack of

9   unencumbered assets, foreclosed any opportunities for the Debtors to access unsecured

10  or administrative credit.  Further, in the absence of a successful priming fight, any debtor-

11  in-possession loan provided by parties other than the Prepetition Lenders would have

12  required the consent of the Prepetition Lenders, which they indicated they would not be

13  willing to provide.

14      108.   Moreover, upon due consideration, the Debtors management and advisors

15  determined that the terms of the DIP Facility were more favorable than (or at least on par

16  with) all other proposals received by the Debtors, in terms of interest rate (10% under the

17  DIP Facility vs. 12% or higher under other proposals), fees (relatively modest upfront and

18  administrative fees under the DIP Facility vs. fees of 3% or higher under other proposals)

19  and maturity date (12 month, with 6-month extension subject to conditions under the DIP

20  Facility on par with most favorable other proposal having an 18 month maturity).

21      109.   As a result of the foregoing, the Debtors' management determined that the

22  DIP Facility represented the best financing option available to the Debtors and their

23  businesses because of its favorable terms, as well as allowing the Debtors to avoid the

24  need to engage in a costly and time-consuming priming fight at the outset of these chapter

25  11 cases, and avoiding the risk associated with a transaction with a new lender (including

26  any timing and due diligence constraints).

27      110.   As noted above, the Debtors' project that they will need an additional $3

28  million in liquidity in the first 26 weeks of these Cases, pending the contemplated sale.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

The DIP Facility negotiated by the Debtors with Silver Point consists of a senior secured term loan credit facility in the amount of $3 million of new funding, plus the amount necessary for the Refinancing, in the amount of approximately $19,461,205 (plus certain accrued but unbilled fees, costs, and expenses).

111.    After careful consideration of the terms of the DIP Facility, the Debtors determined that the refinancing aspect thereof was appropriate and necessary under the circumstances.  This feature was a critical component of the willingness of the DIP Lenders to commit to provide funding under the DIP Facility.  Indeed, the DIP Lenders advised the Debtors that they would not have agreed to provide the DIP Facility without a repayment of the Prepetition Debt of the Prepetition Lenders.  The financing contemplated under the DIP Credit Agreement will offer the Debtors much-needed funds to continue operating their business and effectuate the sale process during these chapter 11 cases. Therefore, I believe that the Refinancing is a necessary component to the DIP Facility and will ensure the Debtors' access to sufficient liquidity for working capital and general corporate purposes to fund day-to-day operations during these chapter 11 cases.

112.    I believe that the relief sought in the DIP and Cash Collateral Motion is the result of good faith, arms-length negotiations between and among the Debtors and their senior secured creditors.  All Secured Creditors (including the Other Secured Creditors, as such term is defined in the Interim Order and Final Order) have either consented to the relief sought in the Interim Order, are deemed to consent pursuant to applicable pre-petition agreements with the Prepetition Agent, and/or are provided with adequate protection of their respective interests as set forth in the DIP and Cash Collateral Motion.

113.    The Debtors require the financing provided under the DIP facility and access to Cash Collateral for the operation of their businesses, to preserve their going concern value, to pay vendors, suppliers and customers, to satisfy payroll obligations, to consummate the Refinancing, to pay for certain costs and expenses related to the Debtors' chapter 11 cases and to satisfy the Debtors' other working capital and operational needs.  Access to sufficient working capital and liquidity made available

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1 through the DIP Facility and the use of Cash Collateral as requested by the DIP and Cash

2 Collateral Motion is vital to the preservation and maintenance of the Debtors' going

3 concern value and to the Debtors' successful reorganization.

4     114.   Without access to liquidity, the Debtors' ability to operate and ultimately to

5 sell their businesses as a going concern or otherwise will be jeopardized, all to the

6 detriment of the Debtors' stakeholders.  As a result, the Debtors have an immediate need

7 to continue to access the Cash Collateral (and to utilize the proceeds of the DIP Facility)

8 to ensure sufficient liquidity throughout the pendency of these chapter 11 cases.  In my

9 reasoned and informed business judgment, the use of Cash Collateral and the Debtors'

10 entry into the DIP Facility, as requested by the DIP and Cash Collateral Motion, should be

11 approved.

12     **D.     Emergency Motion for an Order Authorizing the Debtors to Honor**

13     **Certain Prepetition Obligations for the Benefit of Subscribers and Advertisers**

14     **and to Otherwise Continue Customer Programs and Practices in the Ordinary**

15     **Course of Business**

16     115.   The Debtors have filed a motion (the "Customer Programs Motion")

17 requesting relief authorizing, but not directing the Debtors to honor, in their sole discretion,

18 certain prepetition obligations (collectively, the "Customer Programs") for the benefit of

19 their customers, advertisers and subscribers in the ordinary course of their businesses.[8]

20 In the ordinary course of the Debtors' businesses, the Debtors regularly (1) offer discount

21 programs to advertisers and subscribers; (2) take steps to facilitate payment by

22

23 _____

24     [8] These Customer Programs include prepetition obligations under ordinary course customer practices
and programs, including, among other things, prepayments, refunds, billing adjustments, credit card
25 programs, delivery services, contests, customer service, community partnerships and other practices and
programs, whether such obligations are owed to customers directly or to third parties whose goods or
26 services are integral to the ability of the Debtors to implement, or their customers to participate in, the
Customer Programs, and (b) to otherwise continue, and honor their postpetition obligations under the
27 Customer Programs in the ordinary course of business during the pendency of the Cases.

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1041535.3

DECLARATION

1 advertisers and subscribers; (3) continue programs designed to recruit new advertisers

2 and subscribers; and (4) provide customer service to subscribers and advertisers.

3 116.   In addition, the Customer Programs Motion requests entry of an order

4 authorizing all applicable banks and other financial institutions, when requested by the

5 Debtors in their sole discretion, to receive, process, honor and pay any and all checks,

6 drafts, electronic fund transfers, and other forms of payment on account of the Debtors'

7 prepetition and postpetition obligations under the Customer Programs, whether such

8 forms of payment were presented or submitted prior to or after the Petition Dates.

9 117.   Billing Adjustments.  From time to time in the Debtors' businesses,

10 subscribers, advertisers, and other customers are invoiced in error for amounts that they

11 did not actually incur.  These errors include improper invoicing (*e.g.*, when the invoice

12 created does not properly reflect the items ordered by a customer), duplicate payment

13 (*e.g.*, when a customer is charged or pays an incorrect price – either too high or too low

14 for the Debtors' products or services), adjustments for advertising errors, and various

15 other billing and payment errors (collectively, the "Invoicing Errors").  When a customer

16 pays the amounts invoiced in error, the Debtors correct the Invoicing Errors through billing

17 adjustments (the "Billing Adjustments"), which typically take the form of credits to a

18 customer's account.  The Debtors maintain a reserve for payment of these Billing

19 Adjustments.  As there is some delay from the time the invoice is first issued to the time

20 the Debtors discover the Invoicing Error, it is difficult to predict with certainty the amount

21 outstanding on account of the Invoicing Errors.  However, as of the Petition Dates, the

22 Debtors' reserve for payment of these Billing Adjustments totals approximately $171,000,

23 to cover known and unknown Billing Adjustments that have not been processed as of the

24 Petition Dates.

25 118.   Refunds.  From time to time in the Debtors' businesses, subscribers,

26 advertisers, and other customers are invoiced correctly for services that they do not

27 receive.  In these instances, the Debtors owe their customers refunds (the "Refunds") for

28 the services or products they did not receive.  The vast majority of these Refunds are

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

owed when customers report that their paper was not properly delivered, and the majority

of these Refunds are for amounts less than $10.  The Debtors process these refunds in

the ordinary course of business as the Debtors become aware of them.  As there is some

delay from the time the Refund is first discovered to when the Refund is processed, it is

difficult to predict with certainty the amount outstanding on account of such errors.   In

addition, some portion of these Refunds consist of Refund checks which the Debtors

mailed out but which have not yet been cashed, went stale, or were returned to the

Debtors as undeliverable.  As of the Petition Dates, the Debtors estimate they owe

Refunds to approximately 16,709 customers in the total amount of approximately

$565,683.

119.    Delivery Providers.  The Debtors contract with outside companies to deliver

newspapers to subscribers and retail locations (the "Delivery Providers").  The Delivery

Providers' services are critical to the Debtors' operation because without the Delivery

Providers, few of the Debtors' newspapers would get to customers, effectively ending the

Debtors' business.  The Debtors contract with third party contractors, who each employ

numerous individuals.  As of the Petition Date, the Debtors owe approximately $790,000

to all of the Delivery Providers.

120.    Prepaid Newspaper Delivery and Advertising.  Much of the Debtors' revenue

comes from advertising, with the remainder coming from subscriptions and single copy

newspaper sale.  In the ordinary course of business, the Debtors receive payments from

their customers in advance of providing the newspaper delivery or advertising (the

"Prepayments").  For instance, all subscribers prepay for newspaper subscriptions in

advance of being provided the newspapers (the "Prepaid Subscriptions").  The Debtors

also receive payments from many advertisers in advance of providing advertising to the

customer (the "Prepaid Advertisements").  The Debtors generally do not incur actual cash

liability on account of the Prepaid Subscriptions and Prepaid Advertisements, but instead

incur the obligation to deliver the prepaid subscriptions and advertisements.  I believe it is

crucial to the Debtors' operations to perform their obligations to deliver Prepaid

Lobel  Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  Subscriptions to their subscribers and provide the Prepaid Advertisements.  The Debtors

2  operate newspapers - even a single day's interruption in newspaper delivery would

3  threaten the operations of the Debtors.  As of the Petition Dates, the Debtors are holding

4  approximately $7,454,000 on account of Prepayments, related to both subscriptions

5  ($5,521,000) and advertisements ($1,933,000).

6      121.  Postage Obligations.  In the ordinary course of business, the Debtors

7  maintain a Centralized Account Processing System ("CAPS") for the payment of postage

8  fees which are incurred when the Debtors use the United States Postal Service to mail

9  their newspapers and other newsprint to their customers.  As of the Petition Dates, the

10 Debtors have checks outstanding to the CAPS postage account in the amount of $11,500.

11 Payment of this postage is critical to the delivery of the Debtors' publications to the

12 Debtors' many customers.

13     122.  Advertising Programs.  Much of the Debtors' revenue comes from

14 advertising.  There are several types of Customer Programs related to the Debtors'

15 advertising services (the "Advertising Programs"), including: (a) the online advertisement

16 programs and (b) related infrastructure.

17     123.  Online Advertising Programs.  The Debtors' business operations include

18 numerous interactive web sites related to their daily newspapers, and other branded sites

19 targeting specific communities of interest.  Among other things, the Debtors' websites

20 provide online advertisements on behalf of various businesses.  The Debtors have two

21 online advertisement payment programs (the "Online Advertising Programs").  Advertisers

22 can choose to pay for their advertising by paying a flat fee per month regardless of views

23 (the "Flat Fee Package"), or pay a flat fee for a guaranteed number of views (the

24 "Minimum View Package").  Occasionally, advertisers who purchase a Minimum View

25 Package do not have their advertisement shown the guaranteed number of views per

26 month.  If the agreed upon number of views is not reached, the Debtors will offer to make

27 up the shortfall in views the next month or offer the advertisers a credit on their bill.  The

28 Debtors generally do not issue cash refunds to their advertisers in connection with either

1  plan offered by the Online Advertising Programs.  As a result, the Debtors do not believe

2  there is any cash liability owing to advertisers as of the Petition Dates on account of the

3  Online Advertising Programs.  Instead, the Debtors' obligations related to this program are

4  primarily to provide additional advertising views to advertisers until such time that the

5  originally contracted number of views has been delivered or as credits on the advertiser's

6  bill.

7      124.  <u>Online Advertising Infrastructure</u>.  The Debtors do have monetary obligations

8  connected with their online advertising infrastructure (the "Advertising Infrastructure") and

9  the brokered ad programs (the "Brokered Ad Programs").  The Debtors' liability for the

10  Advertising Infrastructure relates to the costs of operating the Online Advertising

11  Programs and associated payment systems, and conducting e-mail marketing for

12  advertisers.  The Brokered Ad Program allows ads solicited by third parties to be placed

13  on the Debtors' websites and for advertisements of the Debtors' advertisers to be placed

14  on other websites.  In conjunction with this program, the Debtors pay

15  intermediaries/brokers to facilitate the transactions.  The Debtors owe approximately

16  $1,247,000 in claims related to the Advertising Infrastructure and Brokered Ad Programs

17  as of the Petition Dates.  I believe that if the Debtors are not able to continue to pay the

18  claims related to the Advertising Infrastructure, they will quickly lose the benefits of the

19  Online Advertising Programs and may lose valuable advertising and e-mail marketing.

20      125.  <u>Subscription Partnership Programs</u>.  In an effort to increase their circulation

21  and visibility in the community, the Debtors regularly partner with local schools and

22  community groups.  Under these partnerships, the Debtors agree to pay commissions to

23  the school or community group based on the subscriptions generated by the school or

24  community group (the "Community Partners").  These partnerships are critical to the

25  Debtors in that they boost the Debtors' circulation and raise awareness of the Debtors'

26  brands in the communities that they serve.  If the Debtors are unable to honor their

27  preexisting obligations to their partners, it is likely that groups will not partner with the

28  Debtors in the future and the Debtors' reputations will be significantly diminished, leading

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1 to a reduction in subscribers and advertisers.  As of the Petition Dates, the Debtors

2 estimate that they owe approximately $236,000 in commissions to the Community

3 Partners.

4     126.  Credit Card Processing Fees.  The Debtors are parties to certain

5 agreements with credit card processors (the "Credit Card Processors") under which the

6 Credit Card Processors accept and process credit card payments made by the Debtors'

7 customers for subscription and advertising purchases, both by phone and online.  The

8 Credit Card Processors deduct a credit card processing fee from the initial charge on the

9 credit card and then remit the balance to the Debtors, subject to certain adjustments,

10 returns and refunds.  The Debtors desire to continue the processing arrangement in the

11 ordinary course, including honoring adjustments, returns, and refunds that may relate to

12 the prepetition period.

13     127.  I strongly believe that preserving the processing relationship is essential to

14 the Debtors' ability to allow their customers to continue to pay by credit card and thus to

15 the preservation of the customer relationship and the maximization of estate value for all

16 stakeholders.  Losing this ability would impose a significant burden on the Debtors'

17 customers who prefer the option of making their subscription and advertising payments by

18 credit card and would eliminate a major avenue for conducting sales transactions with

19 future customers.  As of the Petition Dates, the Debtors owe approximately $65,000 on

20 account of prepetition Credit Card Processing Fees.

21     128.  Customer Service and Collection Programs.  In order to best serve their

22 customers, the Debtors have engaged the services of certain third-party customer service

23 representatives to address inquiries and issues related to the Debtors' advertising

24 services and publications, including, but not limited to, newspaper subscription issues,

25 delivery issues, billing questions, advertising, customer accounting, online technical

26 issues, and debt collection services (the "Customer Service Providers").  The Customer

27 Service Providers are primarily through outsourced customer call centers.  The Customer

28 Services Providers function as a critical intermediary between the Debtors and their

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  customers.  Due to the direct level of contact between the Customer Service Providers

2  and the Debtors' customers, many customers perceive the Customer Service Providers as

3  direct employees of the Debtors.  As a result, the failure of the Customer Service

4  Providers to adequately perform their services could severely undermine customer loyalty.

5       129.  The Debtors estimate that they currently owe the Customer Service

6  Provider, RDI, approximately $112,000.  In addition, there is a Qchief who provides the

7  call routing software for the transfer of calls to the Customer Service Center.  The Debtors

8  estimate that they currently owe approximately $3,000 to Qchief.  The Debtors also retain

9  a separate outside contractor to place collection calls on behalf of the Debtors.  Collection

10  calls are a necessary to maintain income and ensure that customers and advertisers

11  continue to meet their obligations to the Debtors.  The Debtors currently owe the outside

12  contractor, Circulation Technicians Inc., approximately $49,000.

13       130.  <u>Staffing Companies</u>.  The Debtors have long standing relationships with

14  outside staffing agencies that enable the company's workforce to expand and contract

15  based on business need.  This results in a significant cost advantage to the Debtors

16  based on the ability to avoid employing this workforce on a full time basis.  This workforce

17  is integrated into the production operations as members of press crews, inserting and mail

18  room staff, inventory handlers, press maintenance crews, skilled office workers, and

19  subscription acquisition staff.  Over time other workforce providers might be able to

20  replace these workers however, not without significant transition delay, expense, and risk

21  (i.e. service disruptions and loss of productivity) and resultant increased cost and lost

22  subscription sales.  The Debtors estimate that they owe the Staffing Companies

23  approximately $500,000 as of the Petition Date.

24       131.  <u>Trade Programs</u>.  The Debtors have entered into agreement with certain

25  advertisers whereby the Debtors exchange advertising space in their newspapers in

26  return for services provided to the Debtors by the advertiser (the "Trade Agreements").

27  Thus, in some instances, instead of receiving a cash payment from the advertiser for the

28  running of a particular advertisement or series of advertisements, or related sales and

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

marketing services, the Debtors receive a service or good from the advertiser.  The Trade

Agreement are custom-negotiated by the Debtors and the advertisers.  For example,

these programs include an exchange of free newspaper advertising provided by the

Debtors for free advertising from local radio stations in the area.

132.    The Trade Agreements provide significant value to both the Debtors and the

Debtors' advertisers.  The Trade Agreements offer the advertisers additional options and

flexibility in making payments to the Debtors, which help to retain the long term business

of the advertiser.  The Debtors enjoy valuable opportunities to promote their newspapers

to potential subscribers and customers at no cash expense.  As of the Petition Date, the

Debtors estimate that there is $800,000 of notional liability in connection with the Trade

Agreements.  The Debtors do not anticipate having to make any payments on account of

the Trade Agreements because the Debtors will be able to satisfy any obligations under

the Trade Agreements by providing the counter parties with advertising in the publications

owned by the Debtors.

133.    I firmly believe that the success and ultimate viability of the Debtors'

businesses are dependent upon: (1) the Debtors' ability to attract new advertisers,

subscribers, and other customers; and (2) the Debtors' ability to maintain relationships

with their existing customers, subscribers, and other customers.  In order to attract new

customers, maintain such relationships, and ensure customer loyalty, the Debtors must

continue to honor the Customer Programs.  In the competitive industries in which the

Debtors operate, failure to honor the Customer Obligations arising from advertising,

subscription, delivery, and other relationships that are the same or similar to their

competitors is likely to have a material adverse impact on the Debtors' ability to attract

new customers and maintain existing customers.  The Debtors' failure to honor these

programs may also cause unrecoverable negative press which would undermine the

Debtors' ability to attract and retain customers and successfully reorganize.  I also believe

that if the Debtors are not authorized to continue the Customer Programs during the

pendency of the Cases, their valuable business relationships with their customers,

1  suppliers, and advertisers will be severely jeopardized.  Even a short delay by the Debtors

2  in continuing their Customer Programs could cause serious and irreparable harm to the

3  value of the Debtors' estates.

4      134.    I am also aware that many of the aforementioned parties to whom the

5  Debtors owe various obligations may have setoff or recoupment rights that would permit

6  them to offset the Debtors' obligations against prepetition amounts they owe the Debtors.

7  As such, the payments under the Customer Programs Motion will not reduce the Debtors'

8  assets available to other creditors.

9      135.    I believe that the total amount to be paid or credited to customers if the Court

10  grants the requested relief is small compared with the losses that the Debtors could suffer

11  if the patronage of their customers erodes at the outset of the Cases.  The maintenance of

12  the Customer Programs is essential to the continued vitality of the Debtors' businesses

13  and ultimately, to their prospects for a successful chapter 11 process.  For the foregoing

14  reasons, I believe that the relief sought in the Customer Programs Motion is necessary

15  and in the best interests of the Debtors and their estates.

16  **E.    Emergency Motion for an Order Pursuant to 11 U.S.C. §§ 105(a) and**

17  **366: (i) Prohibiting Utility Companies from Altering, Refusing, or**

18  **Discontinuing Service, (ii) Determining Adequate Assurance of Payment for**

19  **Future Utility Services, and (iii) Establishing Procedures for Determining**

20  **Adequate Assurance of Payment**

21      136.    In connection with the operation of their businesses and the management of

22  their properties, the Debtors obtain gas, water, trash, fuel, electricity, internet, and

23  telephone services and other similar services (collectively, the "Utility Services") from

24  various utility companies (the "Utility Companies").  The Debtors have filed a motion

25  requesting that the Court approve the Debtors' proposed form of adequate assurance of

26

27

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1  postpetition payment (the "Proposed Adequate Assurance") to the Utility Companies[9], as

2  that term is used in Bankruptcy Code section 366, approving procedures (the

3  "Procedures") by which a Utility Company may request adequate assurance of future

4  performance in the form of a Utility Deposit or object to the Procedures, and prohibiting

5  the Utility Companies from altering, refusing, or discontinuing service to, or discriminating

6  against, the Debtors.

7        137.    The Utility Services provided to the Debtors by the Utility Companies are

8  critical to the conduct of the Debtors' businesses, including their ability to operate their

9  newspaper companies and produce and deliver papers to their customers, a significant

10  source of revenue.  I believe that any interruptions in Utility Services, even for a brief

11  period of time, would disrupt the Debtors' ability to continue operations.  Such a result

12  could potentially jeopardize the Debtors' ability to operate their businesses and impair the

13  Debtors' efforts to maximize the value of their estates and, complete the sales process in

14  a successful manner.  Accordingly, preserving the Utility Services on an uninterrupted

15  basis is essential to the Debtors' ongoing operations and, therefore, to preserving and

16  maximizing the value of the estates.  In my opinion, it is critical that Utility Services

17  continue uninterrupted during the Cases.

18        138.    I believe that the Procedures the Debtors have proposed for the Utility

19  Companies adequately protect the rights that I have been advised are provided to the

20  Utility Companies under the Bankruptcy Code, while also protecting the Debtors' need to

21  continue to receive, for the benefit of their estates, the Utility Services upon which their

22  businesses depend.

23  _____

24      [9] The Debtor seeks a determination that (a) a deposit to each Utility Company in an amount equal to
    approximately two weeks of the estimated average monthly cost for services provided to the Debtor by such
25  Utility Company (less any pre-paid amounts and subject to a $2,000 minimum deposit (the "Utility Deposit"),
    (b) the ability of any Utility Company to obtain an initial hearing on the adequacy of the Utility Deposit, and
26  (c) the ability of any Utility Company to obtain an expedited hearing regarding further adequate assurance if
    there is a failure to cure a postpetition payment default within 21 days after written notice of such default,
27  constitutes adequate assurance of payment for future utility services.

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1    139.    Moreover, I believe that the Utility Deposit, coupled with the Debtors'

2    anticipated financial ability to pay for postpetition services provided by the Utility

3    Companies, constitutes adequate assurance to the Utility Companies.  Likewise, I believe

4    that the Debtors' proposed Procedures provide the Utility Companies with a fair and

5    orderly process for seeking modification of the Proposed Adequate Assurance while

6    protecting the Debtors from being required to address additional assurance requests in a

7    disorganized manner and at a time when the Debtors' efforts could be more productively

8    focused on the sale of the Debtors' assets for the benefit of creditors.

9    140.    Attached hereto as Exhibit 4 is a non-exhaustive list of the Utility Companies

10   and proposed Utility Deposit for each Utility Company.

11   **F.    Emergency Motion for an Order Authorizing (1) Maintenance of**

12   **Existing Bank Accounts, (2) Continued Use of Existing Cash Management**

13   **System, and (3) Continued Use of Business Forms Pursuant to 11 U.S.C.**

14   **§§ 105, 345, and 363 (the "Cash Management Motion")**

15   141.    The Debtors maintain a complex cash management system (the "Cash

16   Management System") consisting of ten (10) bank accounts (the "Bank Accounts")[10],

17   listed on Exhibit 5 attached hereto, maintained at financially stable FDIC insured banks

18   (the "Banks") that have standing agreements with the Office of the United States Trustee,

19   that facilitate the efficient flow and management of funds involved in the Debtors'

20   operations.  By the Cash Management Motion, the Debtors are moving for an order

21   authorizing the Debtors to maintain their Bank Accounts for a period of approximately

22   thirty (30) days pursuant to 11 U.S.C. §§ 105(a), 345, and 363.  The Debtors are also

23   seeking authorization to permanently maintain two of their main capital depository

24   accounts.

25

26   _____

27   [10] The Debtors maintain additional Bank Accounts that are not part of the Cash Management Motion as
described in more detail below.

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

142.   I believe that the Cash Management System is essential to enable the Debtors' to control and monitor funds, ensure cash availability and liquidity, comply with the requirements of their financing arrangements, and reduce administrative expenses by facilitating the movement of funds and enhancing the development of accurate account balance information.

143.   I strongly believe that given the size of the Cases and the complexity of the Cash Management System, requiring the Debtors to close the Bank Accounts and open new ones immediately upon the filing of the petitions will disrupt the Debtors' operations because (a) depositors will not respond quickly to the change and will likely continue to send deposits to the original deposit accounts, and (b) any changes to the disbursement accounts will slow down the payment to crucial vendors as they are paid through electronic fund transfers.  This would severely disrupt the Debtors' business operations.

144.   The additional thirty (30) days will allow the Debtors time to (i) redirect incoming receipts into a new cash concentration account, which will aggregate all incoming receipts and provide for cash outflows to disbursement accounts and a Voluntary Employee Benefits Association ("VEBA") trust, (ii) establish a new depository account for incoming ACH and credit card transactions and (iii) establish two (2) new disbursement accounts for accounts payable and payroll (collectively, the "DIP Accounts").[11]  Upon completion of this transition time frame, which would make the DIP Accounts fully functional, the Debtor will immediately close its prepetition Bank Accounts, except for the lockboxes maintained at Bank of New York Mellon ("BONY Mellon") and City National Bank ("CNB").

---

[11] Any and all liens on the Bank Accounts will attach to the DIP Accounts to the same extent, priority, and validity and the Debtors will agree to execute control agreements in connection therewith.  The Cash Management Order bars all parties from asserting that the liens of the Prepetition Loan Parties on the DIP Accounts are of a lesser priority than their liens in the Debtors' prepetition bank accounts, or that the PBGC Prior Lien or PBGC Lien Amount has any different or additional priority than it has in the prepetition accounts.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

145.    In connection with keeping the Bank Accounts open for an additional thirty (30) days, the Debtors seek an order authorizing and directing the Banks to honor postpetition checks drawn, if any, and transfers from the Bank Accounts.  Further, in the event that a Bank refuses to honor a check drawn or a transfer made on a Bank Account maintained by the Debtors (provided there are sufficient good funds in the Bank Account to complete the transfer), the Bank must immediately turn over the deposits held in the applicable Bank Account upon the Debtors' request.  In addition, the order will grant the Banks limited relief from the automatic stay to continue to offset standard monthly or periodic bank fees against the Bank Accounts in the same manner as such fees were offset prepetition.

146.    Accordingly, the Debtors are requesting authorization to continue to maintain existing Bank Accounts and the existing Cash Management System and to pay related prepetition and postpetition obligations for an additional thirty (30) days (subect to the provisions of the Interim Order approving the use of Cash Collateral).  I believe such relief is necessary to the successful operations and, thus, restructuring efforts, of the Debtors postpetition.

147.    <u>Cash Management System</u>.  The Cash Management System was implemented to facilitate the timely and efficient collection, management, and disbursement of funds used in the Debtors' day-to-day businesses.  The Cash Management System facilitates reporting, monitors collection, and disbursement of funds, reduces administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information, and administers the various Bank Accounts required to effectuate the collection, disbursement, and movement of cash.  Diagrams showing the flow of funds, into, through, and out of each Bank Account are attached as Exhibit 6 hereto.

148.    Prior to the commencement of the Cases, and in the ordinary course of their businesses, the Debtors maintained 10 bank accounts.  A description of each Bank Account appears in Exhibit 5 attached hereto and below.

149.  <u>Main Corporate Accounts</u>.  The Cash Management System consists of two depository accounts at City National Bank (#2465 (lockbox) and #2473) and one depository account at BNY Mellon (#6350 (lockbox)) (the "Depository Accounts") as well as a main concentration account (#9602) (the "Concentration Account") maintained at City National Bank.  In the ordinary course of business, the Debtors receive cash from advertisers, subscribers and other sources.  The cash from these sources is deposited in the Depository Accounts and transferred to the Concentration Account where it is used to fund the disbursement accounts noted below, as well as make disbursements to the Debtors' VEBA trust.  The Debtors are seeking to permanently maintain Depository Account #2465 (CNB) and #6350 (BONY Mellon).

150.  <u>Disbursement and Collateral Accounts</u>.  The Debtors use the Bank Accounts listed below as disbursement accounts to: (1) satisfy various obligations they incur in the ordinary course of business (the "Disbursement Accounts"), and (2) serve as collateral to secure certain of the Debtors' repayment obligations (the "Collateral Accounts").  The Debtors propose to continue using the Disbursement and Collateral Accounts for a period of thirty (30) days after the Petition Dates while they establish new DIP Accounts.  A brief description of the Disbursement and Collateral Accounts is provided below:

      (i)     <u>City National Bank (#5925)</u>: This Disbursement Account is the Debtors' main accounts payable disbursement account.  This Disbursement Account is funded by transfers from the Concentration Account.

      (ii)    <u>City National Bank (#5933)</u>: This Disbursement Account is the Debtors' EFT accounts payable disbursement account.  This Disbursement Account is funded by transfers from the Concentration Account.

      (iii)   <u>City National Bank (#5941)</u>: This Disbursement Account is used to fund payments to ADP, the Debtors' payroll processor, and payroll

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1    related disbursements.  This Disbursement Account is funded by

2    transfers from the Concentration Account.

3    (iv)   City National Bank (#0033): This Collateral Account is used to secure

4    the Debtors' obligations to Silver Point Finance, LLC. The Debtor

5    maintains a balance of approximately $300 in this account and it is

6    currently blocked.[12]

7    (v)    City National Bank (#7181): This Collateral Account is used to secure

8    the Debtors' obligations for potential credit card chargebacks.  The

9    Debtor maintains a balance of approximately $500,000.00 in this

10   account and it is currently blocked by CNB.

11   (vi)   City National Bank (#5151): This Collateral Account is used to secure

12   the Debtors' obligations to Silverpoint Finance, LLC. The Debtor

13   maintains a balance of approximately $300 in this account and it is

14   currently blocked.[13]

15   151.   Additional Bank Accounts:  The following additional Bank Accounts

16   maintained by the Debtors are not part of the Cash Management System (although the

17   Debtors seek authority to continue to maintain and operate these Bank Accounts in the

18   ordinary course of business for an additional thirty (30) days):  (a) Health and Welfare

19   Plan Trust Bank Account, (b) Workers Compensation Bank Accounts (CDs #2132, 2115,

20   2107 for Colorado Workers' compensation - these accounts hold $300,000), (c) Flexible

21   Spending Bank account, and (d) a deposit account maintained for the benefit of Southern

---

[12] In 2013, FCI and FCHI as borrowers, and SPV II and SPV VI (as well as 15 others), as guarantors, entered into a credit agreement with Silver Point. The Silver Point Loans are secured by, among other things, the Santa Ana Property and the Riverside Property.  This Collateral Account was established at the time of the Silver Point Loans.  If the Debtors sold any assets that were/are the collateral of the Silver Point Loans, the sale proceeds were/are to be placed into this Collateral Account and no disbursements may be made without Silver Point's authorization.  Certain amounts have been released from this Collateral Account overtime and it currently has a balance of $400.

[13] This Collateral Account was established prior to the time of the Silver Point Loans, but was used to hold the original reserves.  No disbursements can be made without Silver Point's authorization.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1   California Edison and worker's compensation (#2387), which account has an approximate

2   balance of $840,000.  In addition, the Bank Accounts do not include three Bank Accounts

3   at Wells Fargo Bank (#3721, #3734 and #3747) that are pending closure.

4       152.    The Debtors maintain blank check stock and will imprint a "Debtor-in-

5   Possession" designation as well as the lead bankruptcy case number on the checks until

6   such time as the DIP Accounts are opened.

7       153.    By the Cash Management Motion, the Debtors seek a waiver of the U.S.

8   Trustee's requirements that they close the existing Bank Accounts as of the Petition

9   Dates.  Instead, the Debtors request that they be allowed an additional thirty (30) days to

10  close the Bank Accounts, which are at depositories authorized by the U.S. Trustee, and

11  establish the DIP Accounts, during which time the Debtors can continue to utilize the Bank

12  Accounts as necessary to best serve their business needs under their current Cash

13  Management System.  The Bank Accounts are (a) covered by FDIC insurance or (b)

14  located at the Banks that have standing agreements with the Office of the United States

15  Trustee.  To protect against the unauthorized payment of prepetition obligations during the

16  thirty day period, the Debtors represent that, if they are authorized to continue to use the

17  Bank Accounts, they will not pay, and the Banks will be directed not to pay, any debts

18  incurred before the Petition Dates, other than as authorized by this Court.

19      154.    The Debtors further request that the Banks be restrained from honoring any

20  check, draft, wire, or electronic funds transfer presented, issued, or drawn on the Bank

21  Accounts on account of a prepetition claim unless (a) authorized in an order of this Court,

22  as represented to the Banks by the Debtors as set forth below; (b) not otherwise

23  prohibited by a "stop payment" request received by the Banks from the Debtors; and (c)

24  supported by sufficient funds in the Bank Account in question.[14]

25

26      [14] Both in this Motion and in other motions that have been concurrently filed, the Debtors are requesting
27  authority to pay, in their sole discretion, certain prepetition obligations.  With respect to some of these
    obligations, the Debtors issued checks prior to the Petition Date that have yet to clear the banking system.

28                                                                              (Continued...)

155. The Debtors are seeking to permanently maintain Depository Account #2465 (CNB) and #6350 (BONY Mellon). The CNB lockbox receives the Debtors' advertising receipts. The BONY Mellon lockbox receives the circulation revenue from subscribers. It would be nearly impossible and extremely disruptive to the Debtors' business operations to try and inform advertisers and customers of a new depository account. The funds in these accounts are transferred to the Disbursement Accounts listed below and are used to fund accounts payables and payroll. If there was a disruption in the monies being received by the Debtors then the Debtors would in turn not be able to pay their employees and vendors. There should be no risk of the Banks honoring unauthorized prepetition payments since the two accounts are deposit-only accounts and are not used for disbursements including checks, wire transfers, or ACH transfers. The only transfers out of the accounts are done at the direction of the Debtors and are made into other Bank Accounts held by the Debtors. The Debtors will sweep these accounts on a daily basis.

156. <u>Expenses Related to the Operation of the Cash Management System</u>: In the ordinary course of the operation and maintenance of the Cash Management System, the Debtors have and will continue to incur fees and other charges (collectively, all such fees and charges, the "Cash Management Claims") in connection with (a) Bank services (the "Service Charges"), (b) checks deposited with the Banks which have been dishonored or returned for insufficient funds in the applicable amount, (c) any reimbursement or other payment obligations, such as overdrafts, arising under agreements governing the Bank Accounts, including, without limitation, any prepetition

---

(...Continued)

In other instances, the Debtors will issue the relevant check once the Court enters an order permitting the Debtors to do so. The Debtors intend to inform the Banks which such checks should be so honored. Therefore, the Debtors request that the Banks be authorized and directed to rely on the representations of the Debtors with respect to whether any check or other payment order drawn or issued by the Debtors prior to the Petition Date should be honored. The Debtors further request that the Order specify that the Banks shall not have any liability to any party for relying on such representations. This relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular prepetition check may be honored in accordance with an order by the Court or otherwise.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1 cash management agreements or treasury services agreements (the "Bank Account

2 Agreements"), and (d) the collection and deposit of cash and check receipts by armored

3 car services.  The Debtors seek authority, in their sole discretion (subject to the provisions

4 of any order approving the Debtors' use of cash collateral), to pay: (a) all undisputed

5 prepetition Cash Management Claims; and (b) any such routine Cash Management

6 Claims that accrue to the Banks during the thirty (30) day period, not to exceed $45,000

7 (excluding merchant/credit card fees).

8     157.   I believe payment of the Cash Management Claims will minimize disruption

9 to the Debtors' operations and is therefore in the best interests of the estates.  I have been

10 advised that absent payment of the Cash Management Claims, the Banks might assert

11 setoff rights against the funds in the Bank Accounts on account of the Cash Management

12 Claims or freeze the Bank Accounts, and the Banks or armored car services may refuse to

13 provide services to the Debtors.  I have also been advised that the payment of Cash

14 Management Claims will not prejudice unsecured creditors given that the Banks may have

15 setoff rights with respect to the Cash Management Claims.  The Debtors further request

16 that the Cash Management Claims be granted administrative priority status pursuant to

17 section 503(b) of the Bankruptcy Code.

18     158.   The Cash Management Motion should be heard on an emergency basis

19 because the Debtors are otherwise required to close all of the Bank Accounts on the

20 Petition Dates, however, the Debtors require the uninterrupted use of the Bank Accounts

21 and cash management system for an addition thirty (30) days as it is essential to the

22 Debtors' ability to seamlessly operate under chapter 11.

23     **G.**     **Emergency Motion for an Order (i) Authorizing Payment of Prepetition**

24        **Obligations Including Wages, Compensation, Benefits, Expense**

25        **Reimbursements, and Related Obligations, (ii) Confirming Rights to Continue**

26        **Employee Programs Postpetition, (iii) Confirming Right to Pay Withholding**

27        **and Payroll-Related Taxes, (iv) Authorizing Payment of Prepetition Claims**

28        **Owing to Administrators of, or Third Party Providers Under, Employee**

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1  **Programs, (v) Directing Banks to Honor Postpetition Checks and Fund**

2  **Transfers for Payment of Prepetition Obligations Pursuant to 11 U.S.C.**

3  **§§ 105(a), 363(b), 363(c), 507(a), 541, 1107(a), and 1108, and Federal Rule of**

4  **Bankruptcy Procedure 6003**

5  159.   The Debtors have filed a motion (the "Employee Motion") requesting relief

6  authorizing, but not directing the Debtors to pay, continue, or otherwise honor various

7  prepetition employee-related obligations to or for the benefit of their current and former

8  employees and retirees (collectively, the "Employees"), for wages, compensation,

9  benefits, and expense reimbursements under all plans, programs, and policies maintained

10 or contributed to, and agreements entered into, by the Debtors prior to the Petition Dates

11 (the "Employee Programs").

12  160.   I believe that in order to minimize the personal hardship employees will

13 suffer if prepetition obligations are not honored, as well as the significant harm which

14 would result to the Debtors if employee morale is not maintained, it is of critical importance

15 that the Debtors pay prepetition wages, compensation, and amounts associated with

16 employee benefits programs and continue such programs in the ordinary course.  The

17 Company currently employs approximately 1,038 employees (the "Employees") of whom

18 46% (477) are salaried Employees and 54% (561) are hourly Employees.  Also, 84%

19 (872) of the Employees are full-time and 16% (166) are part-time.[15]  The average annual

20 salary for salaried Employees is $75,600 and for hourly Employees is $36,700.  The

21 Debtors' workforce of Employees is augmented by services received from 833

22 Independent Contractors, who provide content, technical and administrative support,

23 contract labor, and other services to the Debtors.  The Debtors' ability to preserve their

24

25

26 _____

27  [15] "Part-time" means working less than 80 hours bi-weekly.

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1   ability to preserve their businesses and successfully reorganize is dependent on the

2   continued enthusiasm, service, and expertise of their Employees and Independent

3   Contractors.

4       161.   Due to the disruption and uncertainty that typically accompanies a chapter

5   11 filing, I believe that the morale of the Debtors' Employees and Independent Contractors

6   may be adversely affected.  Moreover, if the Debtors fail to pay the Prepetition Obligations

7   and the Employee Programs in the ordinary course, their Employees and Independent

8   Contractors will suffer extreme personal hardship and, in some cases, may be unable to

9   pay their basic living expenses.  Such a result would have a highly negative impact on

10   workforce morale and would likely result in unmanageable turnover, thereby resulting in

11   immediate and irreparable harm to the Debtors and their estates.  In addition, the Debtors

12   have determined that continuation of the Employee Programs is vital to preserving and

13   rebuilding employee morale during the pendency of these Cases, and to reducing the

14   level of Employee attrition that might otherwise occur.

15       162.   Payroll and Payroll Deductions:  The Employees are paid bi-weekly,

16   approximately one week in arrears, with an average bi-weekly payroll of approximately

17   $2,500,000, including employer amounts.  The Debtors' payroll payments are made by

18   ADP, Inc. ("ADP") through a separate contractual arrangement, which requires the

19   Debtors to fund their obligations to ADP by way of reverse wires from the relevant

20   operating account or Disbursement Account two days prior to each pay date and one

21   business day prior for payroll taxes and garnishments.  As of the Petition Dates, the

22   Debtors, through ADP, made deductions from Employees' paychecks for payments on

23   behalf of Employees for various federal, state, and local income, FICA, and other taxes,

24   as well as for charitable contributions, garnishments, support payments and tax levies,

25   savings programs, benefit plans, flexible savings accounts, insurance programs, credit

26   unions, and other similar programs on account of which the Debtors deduct a sum of

27   money from an Employee's paycheck and pay that amount to a third party (collectively,

28

1  the "Deductions").  The Debtors' average bi-weekly Deductions for Employees aggregate

2  approximately $700,000.

3      163.  By virtue of the timing of the filing of the Cases, the Employees have not

4  been paid all their compensation earned through the Petition Dates.  In addition, the

5  applicable Deductions may not have yet been taken.  To the extent Deductions have been

6  taken, however, the Debtors may not yet have forwarded the payments that are

7  attributable to the Deductions.  The Debtors estimate that, as of the Petition Dates, they

8  are holding Deductions already taken aggregating approximately $222,000, which the

9  Debtors seek to pay to third parties in accordance with their prepetition practice.

10     164.  The Debtors estimate that, as of the Petition Dates, accrued but unpaid

11 compensation (excluding commissions and bonuses), including the Deductions, total

12 approximately $920,000.  The Debtors also estimate that as of the Petition Dates, they

13 have $60,000 of Accrued employer Payroll Taxes which the Debtors seek to pay to the

14 third party in accordance with their prepetition practices.

15     165.  The Debtors seek authority to continue with their payroll schedule in the

16 ordinary course of their business.  No Employee will be paid more than $12,475 in

17 prepetition wages on an individual basis.  The Debtors believe that the costs associated

18 with paying such amounts are relatively minimal compared with the damage to the

19 Debtors' estates that would follow if employee morale were harmed by the Debtors' failure

20 to meet their payroll obligations.

21     166.  <u>Vacation, Paid Sick and Personal Leave Days</u>:  As part of their overall

22 compensation, salaried and hourly Employees working at least 30 hours per week are

23 entitled to receive a certain number of vacation days each year.  Employees can earn up

24 to 20 paid vacation days per year, depending upon the amount of hours worked and their

25 length of service with the Debtors.  Employees can carry over a certain number of unused

26 vacation days from one year to the next, up to a maximum of 25 days.  Upon termination

27 or retirement, Employees receive "cash out" payments of any accrued unused vacation

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  days.  The Debtors estimate that, as of the Petition Dates, total accrued but unpaid

2  vacation liability is approximately $2,410,000.

3      167.    Employees working at least 30 hours per week are also provided paid sick

4  leave days.  Each Employee is provided up to six sick leave days per year.  Unused sick

5  time is accrued and carried over year to year, to a maximum of 50 days.  These hours are

6  used to provide pay in the event of illness.  Accrued and unused sick time is forfeited upon

7  termination.  The Debtors do not separately recognize unused sick leave in the Debtors'

8  financial statements.

9      168.    The Debtors also offer paid holidays, three paid personal floating holidays,

10  and certain other paid time off, including parental and bereavement leave (collectively,

11  "Personal Leave") each calendar year, all of which must be used within that year, or lost.

12  Personal Leave may not be cashed out if unused upon termination or retirement, subject

13  to certain exceptions in the State of California.  In California, Employees who have not

14  used their three personal paid holidays may be cashed out upon termination or retirement.

15  The Debtors estimate that, as of the Petition Dates, total accrued but unpaid Personal

16  Leave liability is approximately $220,000.

17      169.    <u>Commission, Bonus and Award Programs</u>:  In the ordinary course of

18  business, the Debtors offer certain Employees commissions for performance based on a

19  percentage of sales or other performance goals (the "Commission Programs").  The

20  Commission Programs are an integral component of compensation for sales and

21  marketing Employees.  The Commission Programs provide for (a) a percent of revenue

22  dollars achieved as a commission for acquiring business and (b) flat dollar payment for

23  achieving a specified sales goal typically related to a specific product, number of

24  accounts, or a line of business, for example interactive or online products, ads in special

25  sections, classified advertising, and local search advertising.  Certain Employees are

26  owed payments under the Commission Programs on account of prepetition sales or other

27  prepetition performance.  Currently, several ordinary course sales contests and special

28  sales commission programs are underway for which there is a defined dollar payment

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1  specifically related to achieving sales criteria for a particular product or new product roll

2  out.  Commissions are paid through payroll once a month.  The Debtors estimate that their

3  total prepetition liability on account of commissions is approximately $569,000.

4      170.   As an incentive to encourage and reward outstanding performance, the

5  Debtors also offer certain of their Employees the opportunity to earn bonuses under bonus

6  incentive programs.  Currently, several ordinary course projects and product roll outs are

7  underway for which there is a defined bonus incentive specifically related to completion

8  and meeting project performance criteria.  In addition, the Debtors offer a referral award

9  program whereby an Employee has an opportunity to earn $500 for a successful

10  employee referral, and the Debtors have a prepaid travel program whereby the winner of

11  a "publisher council" program sales award use a travel agency to book a company paid

12  vacation.  The Debtors estimate that the prepetition outstanding liability on account of

13  such project bonus and award programs is approximately $445,000.

14      171.   Employee Benefits:  Prior to the Petition Dates, the Debtors offered

15  Employees and their eligible spouses, domestic partners, and dependents various

16  standard employee benefits, including, without limitation: (a) medical, dental and vision

17  coverage, (b) coverage continuation under COBRA, (c) basic term life and supplemental

18  life insurance, (d) accidental death and dismemberment insurance, (e) long-term disability

19  insurance and benefits programs, (f) pre-tax contribution flexible spending accounts, (g) a

20  VEBA trust, (h) retirement savings benefits, (i) legal services program, (j) workers'

21  compensation, (k) ordinary course severance programs, and (l) miscellaneous other fringe

22  benefits provided in the ordinary course of business (collectively, the "Employee

23  Benefits").  The Employee Benefits represent an important component of an Employee's

24  compensation.

25      172.   The Debtors provide medical insurance to their Employees through two self-

26  insured medical preferred provider plans (administered by Health Now) and one insured

27  HMO (administered by Kaiser).  Employees pay a portion of the premium for their benefits

28  coverage through bi-weekly pre-tax contributions from their paychecks.  The Debtors

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

contribute from 0% to 82% of the cost of providing the benefits coverage for Employees and their spouses, domestic partners, and dependents depending on the benefit option elected.  The Debtors pay approximately $779,000 per month in medical plan premiums and claims costs.  The Debtors also offer eligible Employees (a) dental benefits through a self-insured dental plan option and one insured DHMO dental plan (both administered by Delta Dental) and (b) vision benefits through a self-insured plan (administered by VSP).  The Debtors pay approximately $52,000 per month in claims costs and premiums on account of the dental plans and approximately $10,000 per month for claims costs under the vision plan. The estimated monthly amount paid by the Debtors under all medical, dental and vision plans (including claims, administration, stop-loss insurance, etc.) is approximately $884,000.  The Debtors' prepetition obligation is estimated to be approximately $804,000 (employer $734,000 and employee $70,000), which amount includes an estimate of self-funded claims that have been incurred but not yet reported.

173.   The Debtors owe these $804,000 in funds to a VEBA trust, which is a tax-exempt trust under section 501(c)(9) of the Internal Revenue Code.  The VEBA trust is used to fund the benefits under the Debtors' self-funded medical, dental, and vision plans. Employee contributions and contributions by the Debtors under the self-funded medical, dental and vision plans are made to the VEBA trust.

174.   The Debtors seek to continue to perform any obligations under Section 4980B of the Internal Revenue Code to administer Continuation Health Coverage (26 U.S.C. § 4980B) ("COBRA") with respect to former Employees.  Currently, approximately 37 Employees and/or dependents whose coverage has ended have elected to enroll in COBRA.  The Debtors estimate that the service fee owed to third-party administrators for COBRA as of the Petition Dates is $1,600 relating to the period prior to the Petition Dates. To maintain employee morale and ensure the orderly administration of the estates, the Debtors request authority to pay in their discretion any such prepetition costs.

175.   The Debtors maintain a plan under section 125 of the Internal Revenue Code under which the Debtors provide Employees with the opportunity to contribute

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1    through pre-tax compensation deductions to flexible spending accounts ("FSAs") to be

2    used for healthcare related expenses and dependent care expenses.  FSA deductions are

3    made from Employees' paychecks.  Those funds are remitted on a bi-weekly basis to the

4    FSA bank account which is administered by Discovery Benefits.  Accordingly, as of the

5    Petition Dates, the Debtors estimate that they are holding FSA deductions to be remitted

6    of approximately $8,000.

7        176.    Life Insurance, Accidental Death and Dismemberment and Long-Term

8    Disability Programs: The Debtors also provide Employees with basic life insurance and

9    accidental death and dismemberment ("AD&D") insurance in an amount equal to their

10   annual salary.[16]  The Debtors' average monthly expense attributable to all life insurance

11   programs and AD&D insurance is approximately $4,000 per month.  The Debtors owe, as

12   of the Petition Dates, approximately $22,300, which includes $3,400 of employer and

13   $18,900 of Employee withholdings.

14       177.    The Debtors also provide Employees with long-term disability ("LTD")

15   coverage.  Employees who work a minimum of 30 hours per week and have been

16   employed for 12 months are eligible for LTD coverage equal to 50% of their annual salary

17   up to a maximum of $5,000 per month.[17]  The average monthly expense for LTD coverage

18   is $4,000.  The Debtors owe as of the Petition Dates approximately $5,200, which

19   includes $4,000 of Employer and $1,200 of Employee withholdings.

20       178.    Worker's Compensation:  Under the laws of California[18] the Debtors are

21   required to maintain workers' compensation policies and programs, or participate in

22   workers' compensation programs administered by the state government, to provide their

23   Employees with workers' compensation coverage for claims arising from or related to their

24   _____

25   [16] Employees may purchase supplemental life insurance at their own cost.

26   [17] Employees may purchase additional LTD coverage at their own cost.

27   [18] As of the Petition Date, the Debtors operated only in California.

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1   employment with the Debtors.  The Debtors' annual obligations for the state program in

2   which they currently participate is approximately $1.2 million for such self-insured

3   programs.[19]  The Debtors pay amounts owed on workers' compensation claims on a

4   monthly basis.[20]  In addition, the Debtors' obligations include approximately $100,000 per

5   year (paid quarterly at approximately $25,000 per quarter) for services rendered by the

6   third party administrator of their workers' compensation programs.  The Debtors currently

7   maintain, as required under applicable law, approximately $5,136,000 in collateral

8   deposits for potential workers' compensation claims in various states.  The Debtors

9   Workers' Compensation obligation is approximately $3,450,000.

10       179.   It is critical that the Debtors be permitted to continue their workers'

11   compensation programs and to pay outstanding prepetition claims, taxes, charges,

12   assessments, premiums, and third party administrator fees in the ordinary course of

13   business because alternative arrangements for workers' compensation coverage would

14   most certainly be more costly, and the Debtors cannot fail to provide coverage.  To

15   facilitate the ordinary course handling of workers' compensation claims, the Debtors

16   further request authority, in their sole discretion, to lift the automatic stay of Bankruptcy

17   Code section 362, to allow workers' compensation claimants to proceed with their claims

18   under the applicable insurance policy or program and to allow the Debtors or their

19   insurance providers and/or third party administrators to negotiate, settle, and/or litigate

20   workers' compensation claims, and pay resulting amounts, whether such claims arose

21   before or after the Petition Dates.

22       180.   <u>Severance</u>:  The Debtors have a severance policy in place for non-executive

23   Employees who are considered associates (the "Associate Severance Plan").  Under the

24   Associate Severance Plan, the Debtors provide a severance benefit to associates who are

25   _____

26   [19] The Debtors are self-insured in California.

27

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  involuntarily terminated for reasons that are unrelated to their performance or conduct.

2  Under the Associate Severance Plan, the Debtors provide the severance benefit in the

3  form of salary continuance, based on the associate's years of service.  The Associate

4  Severance Plan provides one week of base pay per year of service, with a minimum of

5  two and a maximum of six weeks, and an option to continue coverage under COBRA.  As

6  of the Petition Dates, there are no unpaid severance payments owed under the Associate

7  Severance (which excludes executive team members and officers).  The Debtors seek

8  authorization to continue to provide ordinary course severance benefits under the

9  Associate Severance Plan to applicable associates who may be subject to postpetition

10  terminations during the pendency of the Cases, if any.

11      181.    As described above, certain of the Employee Benefits remained unpaid or

12  unprovided for as of the Petition Dates because certain obligations of the Debtors under

13  the applicable plan, program, or policy accrued either in whole or in part prior to the

14  commencement of the Cases, but will not be required to be paid or provided in the

15  ordinary course of the Debtors' businesses until a later date.  The Debtors seek authority

16  to pay or provide, as they become due, all prepetition Employee Benefits that have

17  already accrued and that are described above.

18      182.    The Debtors also request confirmation of their right to continue to perform

19  their obligations with respect to these Employee Benefits on a postpetition basis.  I firmly

20  believe that the Employee Benefits are an important component of the total compensation

21  offered to the Employees, and are essential to the Debtors' efforts to maintain Employee

22  morale and minimize attrition.  I believe that the expenses associated with the Employee

23  Benefits are reasonable and cost-efficient in light of the potential attrition, loss of morale,

24  and loss of productivity that would occur if the Employee Benefits were discontinued.

25      183.    The Debtors do reserve the right to evaluate all Employee Benefits and to

26  make such modifications, including terminating any particular plan, program, or policy, as

27  may be necessary or appropriate during the pendency of the Cases.  The Debtors do not,

28

Lobel  Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1041535.3

DECLARATION

1    intend to assume any plan, program, policy or related agreement under Bankruptcy Code

2    section 365(a) and reserve all rejection and termination rights.

3        184.    With respect to the Employee compensation and benefits described above,

4    the Debtors contract with several vendors to administer and deliver payments or other

5    benefits to their Employees (the "Administrators").  In certain cases, disbursements made

6    in the ordinary course are paid by the Administrators, which, in turn, invoice the Debtors

7    for reimbursement of payments made.  For example, the Debtors, in the ordinary course

8    of business, pay various third-party administrator expenses in connection with two self-

9    funded medical, dental and vision plans and flexible spending account administration,

10    which total approximately $28,000 per month.  Further, the Debtors, in the ordinary course

11    of business, contract with a third party to administer the COBRA continuation benefits for

12    terminated Employees, which fees total approximately $1600 per month.  The Debtors

13    may also from time to time incur obligations for actuarial, accounting, trustee, or

14    administrative fees in connection with special projects related to the Savings Plan or the

15    Retirement Plan, when the costs of such projects are not payable out of plan assets.

16        185.    In conjunction with the Debtors' payment of compensation and other

17    benefits, the Debtors believe that it is necessary to obtain specific authorization to pay any

18    claims of the Administrators on a postpetition basis, including prepetition claims to the

19    extent necessary to ensure uninterrupted delivery of certain benefits to Employees.  The

20    Debtors believe that the Administrators may terminate their services to the Debtors unless

21    the Debtors pay the Administrators' prepetition claims for administrative services

22    rendered.  A need to engage replacement Administrators postpetition likely would cause

23    significant disruption to the payment of benefits and other obligations to the Employees.  I

24    believe that the payment of claims owed to the Administrators is in the best interest of the

25    Debtors' estates.

26        186.    <u>Compensation Owed to Independent Contractors:</u> The Debtors rely on the

27    services of 833 Independent Contractors who are not Employees of the Debtors, but who

28    have been retained and have rendered services on behalf of the Debtors, including,

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1    without limitation, content, technical and administrative support, and contract labor

2    workers.[21]  The Independent Contractors perform essential functions on a cost-effective

3    basis and are critical to the Debtors' ongoing businesses.  In addition, the technical,

4    administrative, and contract office workers provide support that is critical to the Debtors'

5    operations.  The services of the Independent Contractors cannot be replaced in a cost-

6    effective manner or, in certain circumstances, at all.  The compensation and other

7    essential terms and conditions of the relationship of each of the Independent Contractors

8    are typically governed by agreements between the Debtors and the Independent.

9    Generally, the Independent Contractors utilized by the Debtors are paid through the

10   Debtors' centralized cash management system on a weekly, bi-weekly or monthly basis

11   depending on the arrangement with the Independent Contractor.  Independent

12   Contractors are paid on an hourly basis based on the services provided by the Debtors.

13        187.   Due to the nature of their work, many of the Independent Contractors rely on

14   their paychecks from the Debtors for their livelihood.  Thus, any delay or failure in the

15   Debtors' ability to meet their prepetition obligations to the Independent Contractors may

16   cause a great hardship in the lives of the Independent Contractors.  In addition, if even

17   one payment is missed, the Debtors believe the Independent Contractors may refuse to

18   continue to do business with the Debtors.  The Independent Contractors are each

19   individually owed between $25 and $11,250 for compensation earned within 180 days of

20   the Petition Dates.  As of the Petition Dates, the Debtors estimate that approximately

21   $226,855 in Independent Contractor obligations are outstanding as of the Petition Dates

22   which were earned with 180 days of the Petition Dates (the "Prepetition Contractor

23   Obligations").

24

25   _____

26   [21] The Debtors, by this Motion, are not acknowledging or admitting to an employer/employee
relationship with their Independent Contractors.  Moreover, none of the Independent Contractors is a
27   "professional person" as that term is used in Bankruptcy Code sections 327 and 328.

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1041535.3                                    66                                    DECLARATION

188.    Approximately two dozen Independent Contractors are owed a total of approximately $7,399 which was earned more than 180 days prior to the Petition Date. The Debtors have previously mailed checks and otherwise attempted to pay these amounts, but these checks were either not deposited or were returned.  The Debtors are not seeking authorization to pay these or any other amounts earned by the Independent Contractors more than 180 days prior to the Petition Date.

189.    Prior to the Petition Dates, the Debtors paid certain of their Prepetition Obligations and Prepetition Contractor Obligations with checks that had not been presented for payment as of the Petition Dates.  In order to ensure the orderly payment of the Prepetition Obligations and Prepetition Contractor Obligations, the Debtors request that the Court enter an order requiring the Debtors' banks to honor any such checks which are drawn on the Debtors' accounts, and authorizing the banks to rely on the representations of the Debtors as to which checks are subject to the Motion.  To the extent that any such checks are refused payment, the Debtors additionally request authority to issue replacement checks and to reimburse their Employees and Independent Contractors for any loss resulting from the dishonoring.

190.    With respect to the Debtors' Employees' salaries, vacation, and sick pay only, as of the Petition Date, no Employee is owed more than $12,475 on an individual basis.  As to Employee Commissions, the Debtors have not yet calculated the Employee Commissions for October, 2015, but the Debtors do not anticipate that any Employee will exceed the aggregate amount of $12,475.  The Debtors seek authorization to pay the Debtors' Employees up to the $12,475.

191.    Further, the average total compensation and benefits owed to each individual Employee is $8,610.89, well below the aggregate amount of $12,475.

192.    With respect to Independent Contractors, no individual Independent Contractor is owed more than $12,475 which was earned within 180 days of the Petition Date.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

193.    Further, to the extent the Employees hold valid claims arising under the Workers' Compensation Program, the Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit, in their discretion, these Employees to proceed with their claims in the appropriate judicial or administrative forum.  I believe cause exists to modify the automatic stay because prohibiting the Employees from proceeding with their claims could have a detrimental effect on the financial well-being and morale of such Employees and lead to their departure.  Such departures could cause a severe disruption in the Debtors' businesses and reorganization efforts thereby harming the estate to the detriment of all parties in interest.

194.    The Debtors seek to modify the automatic stay solely as it relates to valid workers' compensation claims; provided, that such claims are pursued in accordance with the Workers' Compensation Program and recoveries, if any, are limited to the proceeds from the applicable policy.  Any claims relating to any of the other insurance programs will remain subject to the automatic stay.  To effectuate the aforementioned modification of the automatic stay, the Debtors request that the Court waive the stay of judgment under Bankruptcy Rule 7062 and the requirements under Bankruptcy Rule 9014 relating to contested matters with respect to claims under the Workers' Compensation Programs. The Debtors do not seek a waiver, termination, or modification of the automatic stay with respect to any other claims or matter subject to section 362 of the Bankruptcy Code.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 3rd day of November, 2015, at _Santa Ana_, California.

_Chris D. Dahl_

Chris D. Dahl

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

EXHIBIT "1"

# Organization Chart

**2100 Freedom, Inc.**

100%

**Freedom Communications Holdings, Inc.**
*aka The Press Enterprise*

100%

**Freedom SPV VI, LLC**

100%

**Freedom Communications, Inc.**
*aka The Orange County Register*

100%

**Freedom Newspapers, Inc.**

100%

**Freedom Services, Inc.**









Freedom Newspaper Acquisitions, Inc.
Freedom Communications, Inc. aka The Orange County Register
Minority shareholders
93%
4%
3%
Victorville Publishing Company
Freedom Newspaper Acquisitions, Inc.
Freedom Communications, Inc. aka The Orange County Register
Minority shareholders
25.7%
72.7%
1.6%
Freedom California Ville Publishing Company LP
Freedom Newspaper Acquisitions, Inc.
Freedom Communications, Inc. aka The Orange County Register
20%
80%
Freedom Newspapers
Freedom Newspaper Acquisitions, Inc.
Freedom Communications, Inc. aka The Orange County Register
40%
60%
Odessa American

EXHIBIT "2"

Order Number:  **O-SA-5020425**

Page Number:  22

## LEGAL DESCRIPTION

Real property in the City of Santa Ana, County of Orange, State of California, described as follows:

PARCELS 1, 2 AND 3, AS SHOWN ON EXHIBIT "B" ATTACHED TO LOT LINE ADJUSTMENT NO. LL 2014-02 RECORDED SEPTEMBER 18, 2014 AS INSTRUMENT NO. 2014-379109 OF OFFICIAL RECORDS OF ORANGE COUNTY, CALIFORNIA.

EXCEPTING THEREFROM OIL AND MINERAL RIGHTS BY DEED RECORDED IN BOOK 3833 AT PAGE 264 OF OFFICIAL RECORDS.

APN:  398-061-01 (Portion of Parcel 2)
     398-061-02 (Portion of Parcel 2)
     398-061-03 (Portion of Parcels 2 and 3)
     398-061-04 (Portion of Parcels 1 and 3)
     398-061-05 (Portion of Parcels 1 and 3)
     398-061-06 (Portion of Parcels 1 and 3)
     398-061-07 (Portion of Parcel 1)
     398-061-08 (Portion of Parcels 1 and 3)
     398-111-03 (Portion of Parcel 1)
     398-111-04 (Portion of Parcel 1)
     398-111-05 (Portion of Parcel 1)
     398-111-06 (Portion of Parcel 1)
     398-111-13 (Portion of Parcel 1)
     398-111-15 (Portion of Parcel 1)
     398-111-17 (Portion of Parcel 1)
     398-111-19 (Portion of Parcel 1)
     398-111-21 (Portion of Parcel 1)
     398-111-23 (Portion of Parcel 1)
     398-391-18 (Portion of Parcel 3)
     398-391-25 (Portion of Parcels 1 and 3)
     398-391-26 (Portion of Parcel 1)

EXHIBIT "3"

Order Number:  O-SA-5020482

Page Number:  9

## LEGAL DESCRIPTION

Real property in the City of Riverside, County of Riverside, State of California, described as follows:

PARCEL 1: (APN: 219-330-037-2)

PARCEL A, AS SHOWN ON CERTIFICATE OF COMPLIANCE FOR LOT CONSOLIDATION AND LOT LINE ADJUSTMENT NO. P13-0430, AS EVIDENCED BY DOCUMENT RECORDED JULY 09, 2013 AS INSTRUMENT NO. 2013-0331666 OF OFFICIAL RECORDS, BEING DESCRIBED AS FOLLOWS:

THAT PORTION OF PARCEL 1 OF CERTIFICATE OF COMPLIANCE FOR A WAIVER OF PARCEL MAP FOR LOT LINE ADJUSTMENT PER DOCUMENT RECORDED MARCH 17, 1989 AS INSTRUMENT NO. 083685 OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, CALIFORNIA, TOGETHER WITH PORTIONS OF LOTS 2 THROUGH 4, INCLUSIVE AND LOT 10, IN BLOCK 2 OF D.C. TWOGOOD'S ORANGE GROVE TRACT AS SHOWN BY MAP ON FILE IN BOOK 7 OF MAPS AT PAGE 42 THEREOF, RECORDS OF SAN BERNARDINO COUNTY, CALIFORNIA, LYING WITHIN SECTION 26, TOWNSHIP 2 SOUTH, RANGE 5 WEST, SAN BERNARDINO MERIDIAN, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST NORTHERLY CORNER OF SAID PARCEL 1, SAID CORNER ALSO BEING ON A LINE PARALLEL WITH AND DISTANT SOUTHWESTERLY 50.00 FEET, MEASURED AT A RIGHT ANGLE, FROM THE CENTERLINE OF FOURTEENTH STREET, AS SHOWN ON RECORD OF SURVEY ON FILE IN BOOK 127 OF RECORD OF SURVEYS AT PAGE 8 THEREOF, RECORDS OF RIVERSIDE COUNTY, CALIFORNIA;

THENCE SOUTH 61° 00' 00" EAST ALONG THE NORTHEASTERLY LINE OF SAID PARCEL 1, A DISTANCE OF 210.08 FEET TO A POINT THEREON;

THENCE LEAVING SAID PARALLEL LINE, SOUTH 29° 01' 27" WEST, A DISTANCE OF 93.50 FEET;

THENCE SOUTH 61° 00' 00" EAST, A DISTANCE OF 71.21 FEET;

THENCE SOUTH 29° 01' 27" WEST, A DISTANCE OF 99.95 FEET;

THENCE NORTH 61° 06' 57" WEST, A DISTANCE OF 7.98 FEET;

THENCE SOUTH 29° 01' 27" WEST, A DISTANCE OF 151.54 FEET;

THENCE SOUTH 61° 06' 57" EAST, A DISTANCE OF 41.30 FEET;

THENCE SOUTH 29° 19' 34" WEST, A DISTANCE OF 50.69 FEET TO A THE BEGINNING OF A NON-TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 4.75 FEET, THE RADIAL LINE TO SAID POINT BEARS NORTH 00° 32' 53" EAST;

THENCE WESTERLY AND SOUTHWESTERLY ALONG SAID CURVE, TO THE LEFT, THROUGH A CENTRAL ANGLE OF 70° 03' 15", AN ARC DISTANCE OF 5.81 FEET;

THENCE SOUTH 20° 29' 38" WEST, A DISTANCE OF 5.61 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE EASTERLY, HAVING A RADIUS OF 22.50 FEET;

THENCE SOUTHERLY AND SOUTHEASTERLY ALONG SAID CURVE, TO THE LEFT, THROUGH A CENTRAL ANGLE OF 71° 14' 15", AN ARC DISTANCE OF 27.97 FEET;

Order Number: O-SA-5020482

Page Number: 10

THENCE SOUTH 29° 00' 26" WEST, A DISTANCE OF 353.49 FEET TO A POINT ON THE NORTHWESTERLY PROLONGATION OF THAT CERTAIN COURSE DESCRIBED AS "NORTH 61° 08' 35" WEST, A DISTANCE OF 132.13 FEET" IN THE SOUTHEASTERLY BOUNDARY LINE OF SAID PARCEL 1;

THENCE SOUTH 61° 09' 20" EAST ALONG SAID NORTHWESTERLY PROLONGATION, A DISTANCE OF 8.39 FEET TO AN ANGLE POINT ON SAID SOUTHEASTERLY BOUNDARY LINE OF SAID PARCEL 1, SAID POINT BEING THE MOST NORTHERLY CORNER OF PARCEL 1 AS DESCRIBED IN THAT CERTAIN PARCEL OF LAND DESCRIBED IN CERTIFICATE OF COMPLIANCE FOR A WAIVER OF PARCEL MAP FOR LOT LINE ADJUSTMENT PER DOCUMENT RECORDED MARCH 17, 1989 AS INSTRUMENT NO. 083684 OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, CALIFORNIA;

THENCE ALONG THE SOUTHEASTERLY, SOUTHERLY AND SOUTHWESTERLY BOUNDARY LINES OF SAID PARCEL 1 OF INSTRUMENT NO. 083685 OF OFFICIAL RECORDS, THE FOLLOWING THREE (3) BEARINGS AND DISTANCES:

1.) SOUTH 29° 01' 27" WEST, A DISTANCE OF 143.38 FEET;

2.) NORTH 28° 00' 18" WEST, A DISTANCE OF 27.56 FEET;

3.) NORTH 54° 18' 28" WEST, A DISTANCE OF 176.30 FEET TO A POINT ON THE SOUTHEASTERLY LINE OF SAID LOT 10, SAID POINT ALSO BEING AN ANGLE POINT IN SAID SOUTHWESTERLY BOUNDARY LINE;

THENCE LEAVING SAID SOUTHWESTERLY BOUNDARY LINE OF PARCEL 1 OF INSTRUMENT NO. 083685 OF OFFICIAL RECORDS, SOUTH 28° 57' 33" WEST ALONG SAID SOUTHEASTERLY LINE, A DISTANCE OF 6.00 FEET TO A POINT ON A LINE PARALLEL WITH AND DISTANT NORTHEASTERLY 33.00 FEET, MEASURED AT A RIGHT ANGLE, FROM THE CENTERLINE OF PROSPECT AVENUE, AS SHOWN ON SAID RECORD OF SURVEY;

THENCE NORTH 60° 55' 57" WEST ALONG SAID PARALLEL LINE, A DISTANCE OF 119.91 FEET TO A POINT THEREON, SAID POINT BEING DISTANT THEREON SOUTHEASTERLY 11.97 FEET FROM THE INTERSECTION OF SAID PARALLEL LINE WITH A LINE PARALLEL WITH AND DISTANT SOUTHEASTERLY 33.00 FEET, MEASURED AT A RIGHT ANGLE, FROM THE CENTERLINE OF ORANGE GROVE AVENUE, AS SHOWN BY SAID RECORD OF SURVEY;

THENCE NORTH 15° 59' 57" WEST, A DISTANCE OF 16.95 FEET A POINT ON SAID LINE PARALLEL WITH THE CENTERLINE OF ORANGE GROVE AVENUE, SAID POINT ALSO BEING DISTANT THEREON NORTHEASTERLY 11.97 FEET FROM THE INTERSECTION OF SAID PARALLEL LINES;

THENCE NORTH 28° 56' 04" EAST ALONG SAID LINE PARALLEL WITH AND DISTANT 33.00 FEET, MEASURED AT A RIGHT ANGLE, FROM THE CENTERLINE OF ORANGE GROVE AVENUE AND ALONG THE NORTHWESTERLY BOUNDARY OF SAID PARCEL 1 OF INSTRUMENT NO. 083685 OF OFFICIAL RECORDS, A DISTANCE OF 565.08 FEET TO THE MOST EASTERLY CORNER OF PARCEL 1 OF THOSE CERTAIN PARCELS OF LAND DESCRIBED IN GRANT DEED TO THE CITY OF RIVERSIDE BY DOCUMENT RECORDED SEPTEMBER 18, 1981, AS INSTRUMENT NO. 176759 OF OFFICIAL RECORDS OF SAID RIVERSIDE COUNTY;

THENCE NORTH 61° 03' 56" WEST, ALONG THE NORTHEASTERLY LINE OF SAID PARCEL 1 OF INSTRUMENT NO. 176759 OF OFFICIAL RECORDS AND CONTINUING ALONG SAID NORTHWESTERLY BOUNDARY, A DISTANCE OF 8.00 FEET TO THE MOST NORTHERLY CORNER OF SAID PARCEL 1 OF SAID INSTRUMENT NO. 176759 OF OFFICIAL RECORDS;

Order Number:  O-SA-5020482
Page Number:   11

THENCE NORTH 28° 56' 04" EAST, CONTINUING ALONG SAID NORTHWESTERLY BOUNDARY, A DISTANCE OF 314.96 FEET TO THE POINT OF BEGINNING.

PARCEL 2: (APN: 219-023-025-2)

LOTS 41, 42 AND 43 OF SCOTIA PLACE, AS SHOWN BY MAP ON FILE IN BOOK 4, PAGE 14 OF MAPS, SAN BERNARDINO COUNTY RECORDS.

EXCEPTING THEREFROM THAT PORTION OF LOTS 41, 42 AND 43 AS DESCRIBED IN THE DEED TO THE CITY OF RIVERSIDE RECORDED APRIL 09, 1982 AS INSTRUMENT NO. 61391 OF OFFICIAL RECORDS.

Order Number:  O-SA-5027629
Page Number:  6

## LEGAL DESCRIPTION

Real property in the City of Riverside, County of Riverside, State of California, described as follows:

LOTS 41, 42 AND 43 OF SCOTIA PLACE, AS SHOWN BY MAP ON FILE IN BOOK 4, PAGE 14 OF MAPS, SAN BERNARDINO COUNTY RECORDS.

EXCEPTING THEREFROM THAT PORTION OF LOTS 41, 42 AND 43 AS DESCRIBED IN THE DEED TO THE CITY OF RIVERSIDE RECORDED APRIL 09, 1982 AS INSTRUMENT NO. 61391 OF OFFICIAL RECORDS.

APN: 219-023-025-2

EXHIBIT "4"

## Utility Deposit Schedule

| Type | Vendor Name | Final Address | Account # | 2-week Average | Proposed Deposit |
|---|---|---|---|---|---|
| Electric (1) | Southern California Edison (1) | PO BOX 300 ROSEMEAD CA 91772-0001 | 2-32-020-8739 | $84,963.25 | $0.00 |
| Telecom | TELEPACIFIC - 526015 | PO BOX 509013 SAN DIEGO CA 92150-9013 | 105854 | $32,591.47 | $32,591.47 |
| Electric | CITY OF ANAHEIM | PO BOX 3069 ANAHEIM CA 92803-3069 | 0144025000 | $23,058.60 | $23,058.60 |
| Telecom | AT&T MOBILITY - BOX 6463 | PO BOX 6463 CAROL STREAM IL 60197-6463 | 287253354535 | $9,948.51 | $9,948.51 |
| Electric | RIVERSIDE PUBLIC UTILITIES | 3900 MAIN ST RIVERSIDE CA 92522-0144 | 0101687000 | $7,290.24 | $7,290.24 |
| Water/Waste | CITY OF ANAHEIM | PO BOX 3069 ANAHEIM CA 92803-3069 | 0124981001 | $5,979.45 | $5,979.45 |
| Electric/Water/Waste | CITY OF ANAHEIM | PO BOX 3069 ANAHEIM CA 92803-3069 | 0124984001 | $5,322.02 | $5,322.02 |
| Fuel/Trucks | MANSFIELD OIL COMPANY | PO BOX 638544 CINCINNATI OH 45263-8544 | 19978-02-645791 | $5,006.97 | $5,006.97 |
| Fuel/Trucks | MANSFIELD OIL COMPANY | PO BOX 638544 CINCINNATI OH 45263-8544 | 19978-01-630953 | $4,357.34 | $4,357.34 |
| Telecom | AVAYA INC | PO BOX 5332 NEW YORK NY 10087-5332 | 0102299863 | $3,999.83 | $3,999.83 |
| Water | CITY OF SANTA ANA | PO BOX 1964 SANTA ANA CA 92702-1964 | 1-0448.301 | $3,022.45 | $3,022.45 |
| Telecom | GRANITE TELECOMMUNICATIONS | CLIENT CODE 311 BOSTON MA 02298 | 01661562 | $1,862.24 | $0.00 |
| Telecom | SUNESYS LLC | 14968 COLLECTIONS CENTER DR CHICAGO IL 60693 | Press Enterprise | $1,829.05 | $0.00 |
| Telecom | BLACK BOX NETWORK SERVICES | PO BOX 86 MINNEAPOLIS MN 55486-3079 | 1046903 | $1,680.88 | $0.00 |
| Gas | The Gas Company | PO BOX C MONTEREY PARK CA 91756-5111 | 131-289-0944 0 | $1,670.87 | $0.00 |
| Gas | The Gas Company | PO BOX C MONTEREY PARK CA 91756-5111 | 009 812 8156 1 | $1,369.31 | $0.00 |
| Telecom | CENTURY LINK - 52187 | PO BOX 52187 PHOENIX AZ 85072-2187 | 86239288 | $1,194.62 | $0.00 |
| Telecom | INVOCA | 1025 CHAPALA ST, 1ST FLR SANTA BARBARA CA 93101 | Freedom Communications | $1,193.00 | $0.00 |
| Telecom | WINDSTREAM dba PAETEC - BOX 9001013 | PO BOX 9001013 LOUISVILLE KY 40290-1013 | 5462764 | $1,017.16 | $0.00 |
| Water | CITY OF SANTA ANA | 3900 MAIN ST RIVERSIDE CA 92522-0144 | 0172415000 | $786.15 | $0.00 |
| Water | CITY OF SANTA ANA | PO BOX 1964 SANTA ANA CA 92702-1964 | 4-6730.301 | $718.71 | $0.00 |
| Telecom | TIME WARNER | PO BOX 60074 CITY OF INDUSTRY CA 91716-0074 | 8448 20 899 0005748 | $588.02 | $0.00 |
| Waste | WASTE MANAGEMENT - BOX 541065 | PO BOX 541065 LOS ANGELES CA 9054-1065 | 313-1131018-2515-7 | $575.36 | $0.00 |
| Electric | Southern California Edison | PO BOX 300 ROSEMEAD CA 91772-0001 | 2-32-019-5795 | $321.04 | $0.00 |
| Telecom | AT&T - 5025 | PO BOX 5025 CAROL STREAM IL 60197-5025 | 960 550-2950 555 8 | $320.38 | $0.00 |
| Waste | BURRTEC WASTE INDUSTRIES INC dba TRICO DISPOSAL | PO BOX 7166 BUENA PARK CA 90622-7166 | 01-OC490611 | $246.68 | $0.00 |
| Telecom | STRATUS NETWORK | 4700 N PROSPECT RD STE 8 PEORIA HEIGHTS IL 61616-6496 | 6863 | $221.39 | $0.00 |
| Telecom | INTERCALL INC | FILE 51089 LOS ANGELES CA 90074-1089 | 789306 | $220.98 | $0.00 |
| Telecom | CENTURY LINK - 52187 | PO BOX 52187 PHOENIX AZ 85072-2187 | 30372840 | $200.77 | $0.00 |
| Waste | RIVERSIDE PUBLIC UTILITIES | 3900 MAIN ST RIVERSIDE CA 92522-0144 | 0205638000 | $196.09 | $0.00 |
| Waste | WASTE MANAGEMENT - BOX 541065 | PO BOX 541065 LOS ANGELES CA 90054-1065 | 114-6337985-2515-8 | $175.09 | $0.00 |
| Electric | Southern California Edison | PO BOX 300 ROSEMEAD CA 91772-0001 | 2-32-021-1394 | $171.87 | $0.00 |
| Gas | The Gas Company | PO BOX C MONTEREY PARK CA 91756-5111 | 120 223 6600 7 | $167.96 | $0.00 |
| Telecom | VERIZON | PO BOX 660108 DALLAS TX 91716-0074 | 842016017-00001 | $156.50 | $0.00 |
| Water | CITY OF SANTA ANA | PO BOX 1964 SANTA ANA CA 92702-1964 | 1-0447.301 | $151.52 | $0.00 |
| Electric | Southern California Edison | PO BOX 300 ROSEMEAD CA 91772-0001 | 2-34-144-3406 | $114.80 | $0.00 |
| Water | RIVERSIDE PUBLIC UTILITIES | 3900 MAIN ST RIVERSIDE CA 92522-0144 | 0101688000 | $102.16 | $0.00 |
| Electric | Southern California Edison | PO BOX 300 ROSEMEAD CA 91772-0001 | 2-34-144-3422 | $86.84 | $0.00 |
| Water | RIVERSIDE PUBLIC UTILITIES | 3900 MAIN ST RIVERSIDE CA 92522-0144 | 0172423000 | $73.62 | $0.00 |
| Water Electric | RIVERSIDE PUBLIC UTILITIES | 3900 MAIN ST RIVERSIDE CA 92522-0144 | 0172414000 | $72.93 | $0.00 |
| Telecom | AT&T | PO BOX 5025 CAROL STREAM IL 60197-5025 | 714 634-8159 320 4 | $68.65 | $0.00 |
| Telecom | DIRECTV | PO BOX 60036 LOS ANGELES CA 90060-0036 | 03426 7092 | $62.06 | $0.00 |
| Gas | San Diego Gas & Electric | PO BOX 25111 SANTA ANA CA 92799-5111 | 051981880 | $60.76 | $0.00 |
| Telecom | DIRECTV | PO BOX 60036 LOS ANGELES CA 90060-0036 | 8730 888 372 0 | $57.42 | $0.00 |
| Telecom | DIRECTV | PO BOX 60036 LOS ANGELES CA 90060-0036 | 01146 6711 | $54.73 | $0.00 |
| Telecom | CHARTER - 60229 | PO BOX 60229 LOS ANGELES CA 90060-0229 | 08249 3227 | $54.36 | $0.00 |
| Telecom | INTERCALL INC | FILE 51089 LOS ANGELES CA 90074-1089 | 8245 10 061 1728078 | $52.99 | $0.00 |
| Telecom | INTERCALL INC | PO BOX C MONTEREY PARK CA 91756-5111 | 788765 | $46.76 | $0.00 |
| Gas | The Gas Company | PO BOX 53280 PHOENIX AZ 85072 | 197 736 0258 6 | $41.95 | $0.00 |
| Telecom | COX - 53280 | PO BOX 53280 PHOENIX AZ 85072 | 001 7601 04406 3901 | $38.28 | $0.00 |

**Utility Deposit Schedule**

| Type | Vendor Name | Final Address | Account # | 2-week Average | Proposed Deposit |
|---|---|---|---|---|---|
| Water | RIVERSIDE PUBLIC UTILITIES | 3900 MAIN ST RIVERSIDE CA 92522-0144 | 0101686000 | $36.46 | $0.00 |
| Gas | The Gas Company | PO BOX C MONTEREY PARK CA 91756-5111 | 040 297 6329 1 | $28.46 | $0.00 |
| Waste | WASTE MANAGEMENT - BOX 541065 | PO BOX 541065 LOS ANGELES CA 90054-1065 | 313-2743112-2515-6 | $22.98 | $0.00 |
| Telecom | CENTURY LINK - 52187 | PO BOX 52187 PHOENIX AZ 85072-2187 | 35429318 | $19.87 | $0.00 |
| Water | CITY OF SANTA ANA | PO BOX 1964 SANTA ANA CA 92702-1964 | 4-6731.302 | $16.77 | $0.00 |
| Water | CITY OF SANTA ANA | PO BOX 1964 SANTA ANA CA 92702-1964 | 1-0446.301 | $16.10 | $0.00 |
| Electric | Southern California Edison | PO BOX 300 ROSEMEAD CA 91772-0001 | 2-32-019-5050 | $15.43 | $0.00 |
| Gas | The Gas Company | PO BOX C MONTEREY PARK CA 91756-5111 | 194 210 4571 7 | $11.87 | $0.00 |
| Water | CITY OF SANTA ANA | PO BOX 1964 SANTA ANA CA 92702-1964 | 4-6732.302 | $11.64 | $0.00 |
| Telecom | CENTURY LINK - 52187 | PO BOX 52187 PHOENIX AZ 85072-2187 | 70180836 | $0.02 | $0.00 |

(1) Southern California Edison currently holds deposits in the amount of $360,000 representing $60,000 in cash and $300,000 in pre-funded letters of credit with City National Bank.

EXHIBIT "5"

| Bank | Account No. | Description |
|---|---|---|
| CNB | 0033 | This Collateral Account is used to secure the Debtors' obligations to Silver Point. In 2013, FCI and FCHI as borrowers, and SPV II and SPV VI (as well as 15 others), as guarantors, entered into a credit agreement with Silver Point. The Silver Point Loans are secured by, among other things, the Santa Ana Property and the Riverside Property.  This Collateral Account was established at the time of the Silver Point Loans.  If the Debtors sold any assets that were/are the collateral of the Silver Point Loans, the sale proceeds were/are to be placed into this Collateral Account and no disbursements may be made without Silver Point's authorization.  Certain amounts have been released from this Collateral Account overtime and it currently has a balance of $300. |
| CNB | 9602 | The cash the Debtors receive from advertisers, subscribers, and other sources is deposited into the Depository Accounts and then transferred to this account where it is used to fund the Debtors' other Disbursement Accounts. |
| CNB | 2465 | Lockbox Depository Account - The CNB lockbox receives the Debtors' advertising receipts. |
| CNB | 2473 | This Depository Account receives advertiser and subscriber receipts |
| CNB | 7181 | This Collateral Account is used to secure the Debtors' obligations for potential credit card chargebacks.  The Debtor maintains a balance of approximately $500,000.00 in this account and it is currently blocked by CNB. |
| CNB | 5151 | This Collateral Account is used to secure the Debtors' obligations to Silver Point. The Debtor maintains a balance of approximately $300 in this account and it is currently blocked. |
| CNB | 5925 | This Disbursement Account is the Debtors' main accounts payable disbursement account.  This Disbursement Account is funded by transfers from the Concentration Account. |
| CNB | 5933 | This Disbursement Account is the Debtors' EFT accounts payable disbursement account.  This Disbursement Account is funded by transfers from the Concentration Account. |
| CNB | 5941 | This Disbursement Account is used to fund payments to ADP, the Debtors' payroll processor, and payroll related disbursements.  This Disbursement Account is funded by transfers from the Concentration Account. |

| BONY Mellon | 6350 | Lockbox Depository Account - The BONY Mellon lockbox receives the circulation revenue from subscribers. |
|---|---|---|
| Wells Fargo | 3721 | Pending closure |
| Wells Fargo | 3734 | Pending closure |
| Wells Fargo | 3747 | Pending closure |
| CNB | 7165 | VEBA - employee and employer funded medical, dental, and vision benefits trust account |
| CNB | 7173 | VEBA - employee flexible spending account |
| CNB | 2387 | CD - deposit account maintained for the benefit of Southern California Edison and worker's compensation |
| CNB | 2123 | Certificate of deposit as collateral for State of Colorado Workers Compensation SIR |
| CNB | 2115 | Certificate of deposit as collateral for State of Colorado Workers Compensation SIR |
| CNB | 2107 | Certificate of deposit as collateral for State of Colorado Workers Compensation SIR |

EXHIBIT "6"

**2100 FREEDOM INC.**
**FREEDOM COMMUNICATIONS HOLDINGS INC.**
**BANKING SCHEMATIC/CASH MANAGEMENT SYSTEM**
As Of 06.01.2015



**City National Bank**
**Freedom Communications, Inc.**
Main Corp Operating/Concentration Account
Acct # XXXXX9602

Cash Sweeps, Transfer Out

**City National Bank**
**Orange County Register**

Acct # XXXXX2465
Lockbox Receipts /Deposits

Acct # XXXXX2473
Credit Card, ACH, Wire Receipts/Deposits

Fund Disbursement Accounts, Transfer In

**City National Bank**
**Freedom Services**

Acct # XXXXX5925
AP Checks, Wires, & ACH Payments

Acct # XXXXX5933
AP EFT Payments

Acct # XXXXX5941
Payroll Net Deposits , PR Checks, & Taxes

Fund VEBA & FSA Payments, Transfer In

**City National Bank**
**VEBA Medical Plan & Trust**
Acct # XXXXX7165
VEBA & Medical Reimbursements Account

**City National Bank**
VEBA FLEX FSA
Acct # XXXXX7173

ACH Auto Cash Sweeps, Transfer Out

**BNY Mellon**
**Lockbox Accounts**

Acct # XXX-XXX6350    OC Register

Blocked Account, City National Bank

**City National Bank**
**Freedom Communications, Inc.**
Acct # XXXXX7181
Collateral Account - City National Controlled

Blocked Account, Silver Point Financing

**City National Bank**
**Freedom SPV 1, LLC**
Acct # XXXXX0033
Collateral Account - Silver Point Financing

Legacy Control/Blocked  Account

**City National Bank**
**Freedom Holdings, Inc.**
Acct # XXXXX5151
Legacy Escrow/Tax Account

Legacy Dormant Accounts, Pending Closure

**Wells Fargo Bank**
Acct # XXXXXXXXX3721    Victorville Daily Press
Acct # XXXXXXXXX3734    Victorville Daily Press
Acct # XXXXXXXXX3747    Victorville Daily Press

Certificate of Deposit to back Revolving Note
which backs Letter of Credit

**City National Bank**
**Freedom Communications, Inc.**
Acct # XXXXX2387
Certificate of Deposit - Revolving Note/LOC

Certificates of Deposit as Collateral for
State of Colorado Workers Compensation SIR

**City National Bank**
**Freedom Communications, Inc.**
Acct # XXXXX2123
Certificate of Deposit - State of CO WC

Acct # XXXXX2115
Certificate of Deposit - State of CO WC

Acct # XXXXX2107
Certificate of Deposit - State of CO WC