Jeremy E. Rosenthal, SBN 223199
jrosenthal@sidley.com
Helena G. Tseregounis, SBN 287422
htseregounis@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

Kenneth P. Kansa, (*pro hac vice* pending)
kkansa@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

*Attorneys for Tribune Publishing Company*

UNITED STATES BANKRUPTCY COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>FREEDOM COMMUNICATIONS, INC., a Delaware corporation, *et al.*[1]<br><br>Debtors and Debtors in Possession<br><br>Affects:<br>☒    All Debtors<br>☐    Freedom Communications, Inc., a Delaware corporation, ONLY | Case No. 8:15-bk-15311-MW<br><br>Chapter 11<br><br>(Jointly Administered with Case Nos. 8:15-bk-15312-MW; 8:15-bk-15313-MW; 8:15-bk-15315-MW; 8:15-bk-15316-MW; 8:15-bk-15317-MW; 8:15-bk-15318-MW; 8:15-bk-15319-MW; 8:15-bk-15320-MW; 8:15-bk-15321-MW; 8:15-bk-15322-MW; 8:15-bk-15323-MW; 8:15-bk-15324-MW; 8:15-bk-15325-MW; 8:15-bk-15326-MW; |

---

[1] The last four digits of the Debtors' federal tax identification numbers are as follows: Freedom Communications, Inc. (0750); Freedom Communications Holdings, Inc., (2814); Freedom Services, Inc. (3125); 2100 Freedom, Inc. (7300); OCR Community Publications, Inc. (9752); Daily Press, LLC (3610); Freedom California Mary Publishing, Inc. (4121); Freedom California Ville Publishing Company LP (7735); Freedom Colorado Information, Inc. (7806); Freedom Interactive Newspapers, Inc. (9343); Freedom Interactive Newspapers of Texas, Inc. (8187); Freedom Newspaper Acquisitions, Inc. (4322); Freedom Newspapers (7766); Freedom Newspapers, Inc. (3240); Freedom Newspapers of Southwestern Arizona, Inc. (5797); OCR Information Marketing, Inc. (7983); Odessa American (7714); Orange County Register Communications, Inc. (7980); Victor Valley Publishing Company (6082); Victorville Publishing Company (7617); Freedom SPV II, LLC (8253); Freedom SPV VI, LLC (8434); Freedom SPV I, LLC (3293); Freedom SPV IV, LLC (8500); and Freedom SPV V, LLC (9036). The Debtors' mailing address is 625 N. Grand Avenue, Santa Ana, California 92710.

| | | |
|---|---|---|
| 1 | ☐ Freedom Communications Holdings, Inc., a Delaware corporation, ONLY | 8:15-bk-15327-MW; 8:15-bk-15328-MW; 8:15-bk-15329-MW; 8:15-bk-15330-MW; 8:15-bk-15332-MW; 8:15-bk-15337-MW; 8:15-bk-15339-MW; 8:15-bk-15340-MW; 8:15-bk-15342-MW; 8:15-bk-15343-MW; |
| 2 | ☐ Freedom Services, Inc., a Delaware corporation, ONLY | |
| 3 | | |
| 4 | ☐ 2100 Freedom, Inc., a Delaware corporation, ONLY | |
| 5 | ☐ OCR Communication Publications, Inc., a California corporation, ONLY | **OBJECTION TO MOTION FOR APPROVAL OF STIPULATION BETWEEN DEBTORS, PREPETITION LOAN PARTIES, AND PBGC IN CONNECTION WITH THE DEBTORS' USE OF CASH COLLATERAL** |
| 6 | ☐ Daily Press, LLC, a California limited liability company, ONLY | |
| 7 | ☐ Freedom California Mary Publishing, Inc., a California corporation, ONLY | |
| 8 | | |
| 9 | ☐ Freedom California Ville Publishing Company LP, a California limited partnership, ONLY | |
| 10 | ☐ Freedom Colorado Information, Inc., a Delaware corporation, ONLY | |
| 11 | | |
| 12 | ☐ Freedom Interactive Newspapers, Inc., a California corporation, ONLY | |
| 13 | ☐ Freedom Interactive Newspapers of Texas, Inc., a Delaware corporation, ONLY | |
| 14 | | |
| 15 | ☐ Freedom Newspaper Acquisitions, Inc., a Delaware corporation, ONLY | |
| 16 | ☐ Freedom Newspapers, a Texas general partnership, ONLY | |
| 17 | ☐ Freedom Newspapers, Inc., a Delaware corporation, ONLY | |
| 18 | ☐ Freedom Newspapers of Southwestern Arizona, Inc. a California corporation, ONLY | |
| 19 | | |
| 20 | ☐ OCR Information Marketing, Inc., a California corporation, ONLY | |
| 21 | ☐ Odessa American, a Texas general partnership, ONLY | |
| 22 | | |
| 23 | ☐ Orange County Register Communications, Inc., a California corporation, ONLY | |
| 24 | ☐ Victor Valley Publishing Company, a California corporation, ONLY | |
| 25 | | |
| 26 | ☐ Victorville Publishing Company, a California limited partnership, ONLY | |
| 27 | | |
| 28 | | |

- ☐ Freedom SPV II, LLC, a Delaware limited liability company, ONLY
- ☐ Freedom SPV VI, LLC, a Delaware limited liability company, ONLY
- ☐ Freedom SPV I, LLC, a Delaware limited liability company, ONLY
- ☐ Freedom SPV IV, LLC, a Delaware limited liability company, ONLY
- ☐ Freedom SPV V, LLC, a Delaware limited liability company, ONLY

## I. INTRODUCTION

Tribune Publishing Company ("Tribune") and Los Angeles Times Communications LLC ("LA Times" and collectively with Tribune, the "Objectors") hereby object to the Debtors' Motion (the "Motion") for Approval of the Stipulation between Debtors, Prepetition Loan Parties[2] and PBGC in Connection With the Debtors' Use of Cash Collateral [Doc. No. 55] and the Stipulation Between Debtors, Prepetition Loan Parties, and PBGC attached thereto as Exhibit A (the "Stipulation").

Entry into the Stipulation is not the exercise of the Debtors' sound business judgment. Instead, Debtors' entry into the Stipulation reflects an abdication of their fiduciary duties to seek the most advantageous financing available to their estates and to maximize the value of their estates for the benefit of their creditors. These cases, as evidenced by the Debtors' proposed $19.5 million roll-up in exchange for $3 million of new funding (half of which is allocated to interest and attorneys fees) and now the overreaching Stipulation, are an effort by the Debtors and the insider stalking-horse bidder to give away the proverbial store to quell opposition to their proposed insider transaction. The Stipulation prevents the Debtors from, among other things, (i) seeking alternative and better financing, (ii) seeking to surcharge the Prepetition Loan Parties and the PBGC to maintain the value of the Debtors' estates though a sale process, and (iii) challenging the Prepetition Loan Parties' alleged right to a "make-whole" premium. Not only is the requested relief inappropriate; it is premature. The Stipulation should not bind the Debtors until the entry of

---

[2] Capitalized terms not defined herein have the meaning ascribed to them in the Motion or the First Day Declaration (as defined in the Motion).

the final order on the proposed DIP Facility and it should not bind the Debtors' estates or the committee for unsecured creditors (the "Creditors Committee") until the expiration of the challenge period.

The thin justifications for entering into the Stipulation as part of a final DIP order articulated in Mr. Dahl's First Day Declaration [Doc. No. 27] are inadequate to support the Stipulation. The Stipulation prevents the Debtors and their estates from pursuing the offer made by Tribune to allow the Debtors to fund their operations using a refundable $3 million deposit (the "Deposit"). Accepting Tribune's offer would obviate the need for both the DIP Facility and the overreaching Stipulation. The terms of the Deposit proposed by Tribune to the Debtors are contained in a term sheet (the "Term Sheet"), attached hereto as Exhibit A. The Term Sheet was provided to the Debtors on Monday, November 9, 2015. As of the filing of this objection the Debtors have only engaged in preliminary discussions with Tribune over the terms of the Deposit.

The Debtors' formulaic recitation of the business judgment standard is not sufficient to support authorizing the Debtors to enter into the Stipulation in exchange for the mere use of Cash Collateral, as there is a ready source of financing for their estates that is far superior to the DIP Facility proposed by the Prepetition Loan Parties. There is no evidence in the record that "the Debtors' management and advisors determined that the terms of the DIP Facility [are] more favorable than" the no interest, no fee, no roll-up, no make-whole Deposit based financing proposal in the Term Sheet. First Day Declaration, ¶ 108. Similarly, there is no support for the continued assertion that "the Debtors' management determined that the DIP Facility represent[s] the best financing option available to the Debtors and their businesses because of its favorable terms." Id. at ¶ 109. The DIP Facility was never on "favorable terms" and to claim that it is now on more "favorable terms" than the Deposit is an abdication of the Debtors' fiduciary duties.

## II.  OBJECTIONS TO THE STIPULATION

### A.  The Stipulation is Prohibited Pursuant to Local Rule 4001-2

Rule 4001-2(b) of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California (the "Local Rules") requires any cash collateral stipulation to

specifically identify certain particularly sensitive issues that potential DIP lenders like the Prepetition Loan Parties might seek when a debtor is the most vulnerable to pressure from prepetition secured lenders and before other estate representatives and parties in interest have an opportunity to meaningfully oppose the requested relief. The Stipulation expressly contains provisions referenced in Local Rule 4001-2(b)(2) and (3), and may impact other subsections as well. Local Rule 4001(2)(e) provides that "in the absence of extraordinary circumstances, the court will not approve an interim order that includes any of the provisions described in subsection (b)(1)-(7) of this rule." The Debtors have failed to establish any extraordinary circumstances that would justify any of the stipulated provisions and waivers being binding on the Debtors, let alone, their estates and any estate representative.

**B.     It is Premature for the Stipulation to Bind the Debtors or Their Estates**

The Stipulation is an effort to prematurely bind the estate to the will of the Prepetition Loan Parties and the PBGC. The Stipulation was part of the Debtors' proposed Interim Order, and if entered as such would have been subject to the challenge period. *See Proposed DIP Order*, p. 15, Ex. A to the DIP and Cash Collateral Motion [Doc. No. 12]. The Stipulation should not receive elevated protections merely because it was removed from the Interim Order. Not only should the Stipulation not be binding on the Debtors' estates, and thereby the Creditors Committee, until the expiration of the challenge period; the Stipulation should not be binding on the Debtors until the entry of the Final Order. See Local Rule 4001-2(e); In re Dynaco Corp., 158 B.R. 552, 554 (Bankr. D.N.H. 1993) (holding "[i]t is impossible for the reorganization court to determine immediately whether all the provisions included in a complex and extensive financing agreement . . . are fair and equitable to parties involved in the bankruptcy estate, and therefore should be 'locked into place' to establish the rights of the secured claimant and to establish restrictions upon the operations of the debtors in reorganization even before at least some minimal opportunity is given to the other parties in interest in the estate to get organized and respond"); In re Motors Liquidation Co., 460 B.R. 603, 624 (Bankr. S.D.N.Y. 2011) (recognizing the interim DIP order "was modified to deprive the DIP Lenders the recourse to avoidance action proceeds" and that "[s]uch a change was necessary based on [the court's] view that one shouldn't prejudice unsecured

creditors before they've even appeared in the case") vacated on other grounds sub nom. U.S. Dep't of the Treasury v. Official Comm. of Unsecured Creditors of Motors Liquidation Co., 475 B.R. 347 (S.D.N.Y. 2012). If the Stipulation is binding on the Debtors before they have had the opportunity to explore alternative funding arrangements, including the Tribune proposal, the Debtors and their estates will be unnecessarily and irrevocably damaged as the Debtors will have traded their independence and their fiduciary duties to maximize the value of the estates in exchange for the mere use of cash collateral.

### C. The Stipulation Improperly Restricts the Debtors' Ability to Maximize the Value of their Estates

Under the Stipulation, the Debtors are seeking to waive their rights to, among other things, (i) pursue alternative funding arrangements in violation of the requirements of section 364(c) and (d) of the Bankruptcy Code, (ii) surcharge their secured creditors for the preservation of their collateral—the going concern value of the Debtors pursuant to section 506(c) of the Bankruptcy Code, (iii) limit the Prepetition Loan Parties' and PBGC's ability to credit bid under section 363(k) of the Bankruptcy Code if their claims are subject to a "bona fide" dispute, see In re L.L. Murphrey Co., No. 12-03837-8-JRL, 2013 WL 2451368, at *5 (Bankr. E.D.N.C. June 6, 2013) (holding "cause" exists to deny a secured creditor the right to credit bid under section 363(k) when a "sufficient dispute exists regarding the validity of the lien forming the basis for the credit bid"), and (iv) pursue value maximizing sale transactions without the consent of either the Prepetition Loan Parties or the PBGC pursuant to section 363(f) of the Bankruptcy Code, even though their claims can fairly be described as disputed, see In re Kellogg-Taxe, Case No. 2:12-bk-51208-RN, 2014 WL 1016045, at *6 (Bankr. C.D. Cal. Mar. 17, 2014) (holding a trustee may sell estate property free and clear if there is a pending dispute over the scope or existence of a lien).[3] The

---

[3] For example, the Debtors are seeking authority to waive their ability to challenge the Prepetition Loan Parties' questionable "make-whole" premium. Given current case law and the inability of any interested parties to examine the "make-whole" premium and related events, it appears that the "make-whole" premium can fairly be characterized as subject to a bona fide dispute. Further, the Debtors are stipulating to an allowed secured claim in favor of the PBGC of approximately $15 million even though it appears that the Debtors and the PBGC may be negotiating a reduction of the PBGC's claim to approximately $5 million. *See Stipulation*, p. 6 ("As of September 15, 2015, the amount of the PBGC Liens and each Debtor totaled $15,458,715.").

Debtors' attempt to enter into this Stipulation without, at a minimum, seeking to have if only bind the Debtors following the entry of the Final Order, is inexcusable. As a practical matter, if the Stipulation is permitted in its current form, it would preclude the Debtors from securing priming financing from the Prepetition Loan Parties. The Debtors would have bound themselves to not exploring alternative financing, which would prevent them from being able to demonstrate that there was no more favorable credit available as required by sections 364(c) and (d) of the Bankruptcy Court. In short, they would have to attempt to satisfy the requirements of the Bankruptcy Code by relying on the fact that they could only explore one possible loan after the bankruptcy petitions were filed. As demonstrated by the Deposit Term Sheet, there is clearly more favorable financing available in the form of Tribune's Deposit.

**D.    The Order Authorizing Entry into the Stipulation Should Expressly Provide that the Stipulation Is Not Binding on the Debtors' Estates.**

The Debtors acknowledge in the Notice of the Motion and the Motion that the Stipulation "will, be binding only as to the Debtors, the Prepetition Loan Parties and the PBGC. Third parties, including any statutory committee of unsecured creditors appointed in the Debtors' cases, will not be bound by the Stipulation unless and until the Court so orders pursuant to a final order approving the Debtors' use of cash collateral or otherwise." Notice of Motion, p. 4, and Motion, p. 1. The Creditors Committee is not a third party. It is the representative body for the estates' unsecured creditors. The Creditors Committee acts on behalf of the estates and it is limited to pursuing the estates' rights and interests as they exist. The Debtors' stipulations and waivers are expressly trying to eviscerate the estates' rights and interests even though the Notice of Motion and Motion claim otherwise. Paragraph 12 of the Stipulation is insufficient to protect the estates' interests, despite its statement that "[t]he rights of any statutory committee of unsecured creditors and any other party in-interest are reserved". Of course the rights of the Creditors Committee are reserved, it was formed a few hours before the filing of this Opposition and is not a party to the Stipulation. The issue is that the Stipulation purports to bind the Debtors' estates and the Creditors Committee's rights are derivative of the estates' rights. It is inappropriate for the Stipulation to bind the Debtors' estates in any way prior to the entry of a Final Order, if ever, and the expiration

of the challenge period.

Paragraph 6 of the Stipulation highlights the Debtors', Prepetition Loan Parties' and PBGC's overreaching ambitions. The Stipulation provides that, even though it is a stipulation between the Debtors, the Prepetition Loan Parties and the PBGC, and is not an order of the Bankruptcy Court, the provisions of the Stipulation survive the appointment of a chapter 11 trustee, the conversion of these cases to chapter 7 as well as the "priorities in payment, liens and security interests **granted** pursuant to this Stipulation shall continue in full force and effect notwithstanding the entry of such other order." Stipulation, ¶ 6 (emphasis added). The provisions of the Stipulation should not be binding on the estates in any way pending the hearing on the Final Order and the existence of the challenge period. Furthermore, the Stipulation cannot "grant" anything with respect to priorities, liens or security interests.

### E. The Creditors Committee should be vested with standing to pursue all estate causes of action

The Motion and Stipulation make it clear that the Debtors are prepared to waive valuable potential rights and causes of action against the Prepetition Loan Parties and the PBGC to the detriment of their estates and their remaining creditors. In addition to the rights the Debtors are seeking to waive, the Debtors are also seeking to waive potential causes of action related to the Prepetition Loan Parties' pre-petition conduct and the "make-whole" premium, including all chapter 5 avoidance actions. Given the accelerated sale to insiders that the Debtors appear to be contemplating, the waiver of the Debtors' ability to investigate and pursue the rights and causes of action vested in it under the Bankruptcy Code should be conditioned on the Debtors simultaneously granting the Creditors Committee the authority to pursue all such rights and causes of action subject to the Bankruptcy Court approval. See e.g., In re Art & Architecture Books of the 21st Century, Case No. 2:13-bk-14135-RK, 2015 Bankr. LEXIS 731, at *2-3 (Bankr. C.D. Cal. Mar. 9, 2015) (recognizing the bankruptcy court may "authorize suit by creditors or the creditors' committee to litigate claims on behalf of the bankruptcy trustee or debtor-in-possession in Chapter 11" (citing In re Parmetex, Inc., 199 F.3d 1029 (9th Cir. 1999).

### III. CONCLUSION

For the foregoing reasons, Objectors respectfully request that the Bankruptcy Court deny the Motion in its entirety, decline to enter an order authorizing the Stipulation, and grant such other relief as may be appropriate under the circumstances.

Dated: November 10, 2015

SIDLEY AUSTIN LLP

By: /s/ *Helena G. Tseregounis*
Jeremy E. Rosenthal, Esq.
Helena G. Tseregounis, Esq.
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California  90013

Kenneth P. Kansa, Esq.
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois  60603

Counsel for Tribune Publishing Company

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A**

# DEPOSIT AND BIDDING PROCEDURES
# TERM SHEET

The terms and conditions summarized below are intended as a summary outline of the terms under which Tribune Publishing Company ("Tribune Publishing") or one of its corporate affiliates would make a refundable $3,000,000 deposit into the estate of Freedom Communications, Inc. ("Freedom") a debtor and debtor-in-possession in a chapter 11 proceeding in the United States Bankruptcy Court for the Central District of California ("Bankruptcy Court") (Case No. 8:15-bk-15311-MW), to fund the budgeted operations of Freedom and its affiliated debtors[1] (each, individually, a "Debtor" and collectively, "Debtors"). The terms and conditions summarized below will be developed in greater detail upon receipt of the Debtors' proposed bidding procedures order, and will ultimately be developed into a comprehensive document and proposed order consistent with this term sheet and in form and substance acceptable to Tribune Publishing and the Debtors (the "Approved Bidding Procedures") to be submitted to the Bankruptcy Court together with (i) a motion in form and substance acceptable to Tribune Publishing seeking Bankruptcy Court approval of the Approved Bidding Procedures (the "Bidding Procedures Motion"), and (ii) a proposed order in form and substance acceptable to Tribune Publishing approving the Bidding Procedures Motion (the "Bidding Procedures Order"). The Bidding Procedures Motion shall describe and the Bidding Procedures Order shall contain the required findings, conclusions and orders described or presupposed by the terms contained below.

THE TERMS CONTAINED HEREIN SHALL NOT CONSTITUTE AN AGREEMENT OF, OR BE BINDING UPON, EITHER TRIBUNE PUBLISHING, ANY OF TRIBUNE PUBLISHING'S AFFILIATES, OR THE DEBTORS UNLESS THERE IS A MUTUAL EXECUTION OF THIS TERM SHEET OR OTHER AGREEMENT CONTAINING THE TERMS HEREIN.

| | |
|---|---|
| **Deposit:** | Tribune Publishing shall fund a $3,000,000 refundable advance (the "Deposit") of funds with respect to any potential offer it or its designee might make to acquire some or all of the assets of the Debtors. |
| **Payment of Deposit:** | The Deposit shall be paid by Tribune Publishing, in readily available funds, into a third party escrow account (the "Escrow Account") subject to an escrow agreement mutually agreeable to Tribune Publishing and the Debtors (the "Escrow Agreement") within three (3) business days following the occurrence of the Deposit Event (as defined below). The Deposit shall accrue interest payable by the escrow agent (the "Escrow |

---

[1] The Debtors in addition to Freedom are: Freedom Communications Holdings, Inc., Freedom Services, Inc., 2100 Freedom, Inc., OCR Community Publications, Inc., Daily Press, LLC., Freedom California Mary Publishing, Inc., Freedom California Ville Publishing Company LP, Freedom Colorado Information, Inc., Freedom Interactive Newspapers, Inc., Freedom Interactive Newspapers of Texas, Inc., Freedom Newspaper Acquisitions, Inc., Freedom Newspapers, Freedom Newspapers, Inc., Freedom Newspapers of Southwestern Arizona, Inc., OCR Information Marketing, Inc., Odessa American, Orange County Register Communications, Inc., Victor Valley Publishing Company, Victorville Publishing Company, Freedom SPV II, LLC, Freedom SPV VI, LLC, Freedom SPV I, LLC, Freedom SPV IV, LLC, and Freedom SPV V, LLC.

|  |  |
|---|---|
|  | Agent") in accordance with its customary escrow arrangements. All interest accruing on the Deposit shall be treated as the Deposit for purposes hereof. The costs and expenses of the escrow shall be borne by the Debtors as an operating expense. |
| **Interest and Fees:** | No interest or fees shall be charged by Tribune Publishing to the Debtors with respect to the making of the Deposit to fund the Debtors' operating shortfalls pursuant to the Approved Budget. |
|  | Except as provided in the Indemnification provision below, Tribune Publishing shall bear its own attorneys' fees and costs with respect to the Deposit and the Debtors' cases. |
| **Deposit Event:** | The Deposit Event shall occur upon the later to occur of: |

(i) the Debtors' filing of the Bidding Procedures Motion containing the Approved Bidding Procedures and the proposed Bidding Procedures Order; and

(ii) Tribune Publishing's, Freedom's and the Escrow Agent's entry into the Escrow Agreement.

**Payment Conditions:** Freedom shall be authorized pursuant to the Bidding Procedures Order and the Escrow Agreement to make its initial partial draw on the Deposit to fund the Permitted Uses upon the later to occur of:

(i) The occurrence of the Deposit Event;

(ii) The Bankruptcy Court's entry of the Bidding Procedures Order containing the Deposit Protections and other relevant terms hereof, and otherwise in form and substance acceptable to Tribune Publishing, and such Bidding Procedures Order remains in full force and effect and has not been modified, supplemented or superseded without the consent of Tribune Publishing;

(iii) The filing with the Bankruptcy Court of an executed asset purchase agreement entered into between the Debtors and their selected stalking-horse bidder (the "Stalking Horse APA") which provides that the deposit by the stalking-horse bidder ("Stalking Horse Deposit") is non-refundable unless and until the stalking-horse bidder is not selected by the Debtors and the committee of unsecured creditors appointed by the United States Trustee pursuant to the Bankruptcy Code (the "Creditors Committee") as the highest and/or best bid for all or a portion of the Debtors' assets pursuant to the Bidding Procedures Order, and such Stalking Horse APA remains in full force and effect and has not been modified, supplemented or superseded without the consent of Tribune Publishing (for the avoidance of doubt, in the event that Tribune Publishing or one of its affiliates is the stalking horse bidder described in this

2

|  |  |
|---|---|
|  | paragraph (iii), the Deposit shall constitute all or part of the Stalking Horse Deposit, as applicable); and |
|  | (iv) The Stalking Horse Deposit is in an amount of no less than the amount of the Deposit and has been funded into, and remains in, an escrow account with the Escrow Agent and is subject to an escrow agreement acceptable to Tribune Publishing. |
| **Draw Amounts:** | Once per calendar month Freedom may withdraw the portion of the Deposit held in escrow which it projects is sufficient to fund the following thirty-five (35) day period (each a "Draw Amount"). |

Such draws shall only be permitted upon the Escrow Agent's and Tribune Publishing's prior receipt of a draw request ("Draw Request") not less than five (5) business days prior to the date the Debtors anticipate drawing upon the escrow, in form acceptable to the Escrow Agent and Tribune Publishing, which shall include a certification in the form attached to the Escrow Agreement that:

(i) all expenditures from previous draws on the Deposit were utilized for Permitted Uses pursuant to the Approved Budget and within the permitted Variance Covenant (as defined below) or remain held by the Debtors to be so utilized;

(ii) the Debtors are not in default on any of their obligations under the Bidding Procedures Order, and with the passage of time the Debtors do not anticipate that they will be in default of any of their obligations under the Bidding Procedures Order;

(iii) each of the Payment Conditions remain satisfied;

(iv) none of the Debtors' cases have been dismissed or converted to cases under chapter 7 of the Bankruptcy Code;

(v) no person or entity has been granted a claim with administrative priority status senior to or *pari passu* with the Superpriority Claim or a lien senior to or *pari passu* with the Deposit Liens and the Superpriority Claim and Deposit Liens remain in full force and effect; and

(vi) the draw being requested shall, along with any previously drawn but unexpended portions of the Deposit, be used in accordance with the Approved Budget during the following thirty-five (35) day period.

**Permitted Uses:** The Deposit may not be used for, and the Approved Budget (as defined below) may not contain line items for: (i) the payment of any amounts with respect to any pre-petition indebtedness, including, without limitation, any adequate protection payments, any interest, any fees or any attorney's fees or costs, and (ii) the investigation or litigation of any claims against Tribune Publishing or its affiliates (other than to the extent of an investigation budget to be provided to the Creditors

3

210863165v.2

|  |  |
|---|---|
|  | Committee). |
|  | Subject to the preceding paragraph and in each case, solely in accordance with the Approved Budget, the Deposit may be utilized to fund: (i) the working capital needs of the Debtors; and (ii) the allowed administrative costs and expenses of the Debtors' chapter 11 cases. |
| **Approved Budget:** | The Debtors shall prepare for Tribune Publishing's review and written consent a twenty-six (26) week detailed rolling cash budget which shall be updated no less than once every four weeks (each a "Proposed Budget"). Upon the Debtors' receipt of Tribune Publishing's written consent to a Proposed Budget, such budget shall become an "Approved Budget" and shall replace the then-operative Approved Budget for all purposes. The Debtors shall operate in accordance with the Approved Budget and all disbursements of the Debtors shall be consistent with the provisions of the Approved Budget. The Debtors may submit additional Proposed Budgets to Tribune Publishing, but until Tribune Publishing consents to such Proposed Budget it shall not become an Approved Budget and the Debtors shall continue to comply with the then-operative Approved Budget. The Bidding Procedures Order shall provide that the then-current Approved Budget may be replaced with another Approved Budget pursuant to the above procedures without the need for further approval from the Bankruptcy Court. |
|  | Accompanying each Draw Request submitted to Tribune Publishing, the Debtors shall include a report detailing the actual disbursements and receipts for the preceding period versus the line items contained in the Approved Budget for such period and an explanation of any variances for each line item (a "Variance Report"). |
|  | The Debtors shall comply with the following "Variance Covenant": For any four-week rolling period, (i) the Debtors' actual net cash flow (aggregate receipts minus aggregate disbursements) shall not negatively deviate by more than ten percent (10%) from the projected net cash flow for such period as set forth in the Approved Budget, and (ii) the Debtors' actual line-item disbursements shall not exceed the corresponding budgeted line-item disbursements in the Approved Budget by more than fifteen percent (15%). The Debtors may carry-forward positive variances and balances within line items in the Approved Budget and reallocate such variances and balances to other periods for such line items. |
| **Deposit Protections:** | Tribune Publishing, on account of the Deposit, shall receive the following protections, which shall be set forth in the Bidding Procedures Order entered by the Bankruptcy Court. |
|  | (i) Tribune Publishing shall receive a claim against each of the Debtors' estates with superpriority administrative claim status under section 364(c)(1) of the Bankruptcy Code with priority |

4

210863165v.2

    over all administrative expense claims and unsecured claims now existing or hereafter arising under the Bankruptcy Code in the full amount of the Deposit, including, without limitation, the pre-petition claims and adequate protection claims of all pre-petition secured creditors (the "<u>Superpriority Claim</u>"), subject only to a carve-out in favor the Creditors Committee to be negotiated with the Creditors Committee after its formation;

(ii) Tribune Publishing shall receive valid, enforceable, first priority, fully perfected security interests in and liens upon each of the deposits of each bidder for any of the Marketed Assets (as defined below), including the Stalking Horse Deposit, pursuant to section 364(c)(2) of the Bankruptcy Code ("<u>Deposit Liens</u>"), as of the date each deposit is made;

(iii) Tribune Publishing, directly or through a designee, shall have the unqualified right to apply the full amount of the Deposit to any bid it or its designee might make for any lots of Marketed Assets in any sale of all or any portion of the Marketed Assets, whether pursuant to an auction under section 363 of the Bankruptcy Code or a plan of reorganization under sections 1123 and 1129 of the Bankruptcy Code;

(iv) If (a) an entity other than Tribune Publishing or its designee is selected as the leading bidder for any lot of Marketed Assets, and (b) Tribune Publishing or its designee is not, as of such time, selected as the leading bidder for the lot(s) subject to its bid (collectively, a "<u>Deposit Repayment Event</u>"); then, within one (1) business day of the satisfaction of the preceding clause, the Debtors shall cause the Escrow Agent to distribute (x) the full amount of the remaining portion of the Deposit to Tribune Publishing out of the Escrow Account, and (y) to the extent necessary to return the full amount of the Deposit to Tribune Publishing (and in satisfaction of its Superpriority Claim and Deposit Liens), all or part of the deposits paid into escrow by the entity or entities selected as leading bidder(s) pursuant to clause (a) above.

(v) The Debtors shall not seek, support or otherwise consent to the grant of (a) any claims with administrative priority status senior to or *pari passu* with the Superpriority Claim or (b) a lien senior to or *pari passu* with the Deposit Liens.

**Marketed Assets:** The Debtors shall market the sale of all or substantially all of their assets, including, without limitation, real estate interests, operating assets, accounts receivable, executory contracts, leases, and causes of action, free and clear of any and all claims and liens for sale in one or more lots.

5

| | |
|---|---|
| **Stalking Horse Bidder:** | If the Debtors and/or the contemplated pre-petition stalking-horse bidder elect not to proceed to file a Stalking Horse APA, then Tribune Publishing or its designee requests that it be offered the opportunity to negotiate a stalking horse bid for all or part of the Marketed Assets. |
| **Bidding Procedures:** | The Approved Bidding Procedures shall be negotiated following receipt of the Debtors' proposed bidding procedures. However, the Approved Bidding Procedures shall include, among other terms, that: |

    (i) the deadline to submit bids for all or a portion of the Marketed Assets (the "Bidding Deadline") shall be no later than the date six (6) months following the entry of the Bidding Procedures Order;

    (ii) if a bidder seeks to acquire: (a) any of the Debtors' real estate in Santa Ana, California, and/or (b) any of the Debtors' publishing assets, then such bidder's bid shall be accompanied by a cash deposit in an amount no less than the Deposit and each such bidder shall be deemed to have agreed that by submitting its bid and deposit that (x) its deposit secures the repayment of the Deposit pursuant to the Deposit Liens, (y) the necessary portion of such deposit shall be distributed to Tribune Publishing upon the occurrence of a Deposit Repayment Event if such bidder is selected as the leading bidder for a lot of Marketed Assets, and (z) its deposit has been funded into escrow to reimburse Tribune Publishing, as necessary, for its agreement to fund the shortfalls in the Approved Budget through its Deposit in an effort to preserve the going concern value of the Debtors' assets ahead of a sale of the Marketed Assets;

    (iii) the Debtors, in consultation with their financial advisor and investment banker as well as the Creditors Committee and its financial advisor, shall specify two or more lots for the Marketed Assets no less than thirty (30) days prior to the Bidding Deadline. The lots specified by the Debtors shall include, at a minimum, one lot comprised of all of the Debtors' real estate, and one lot comprised of all of the Debtors' non-real estate assets; and

    (iv) if any affiliates or insiders of any of the Debtors holds a direct or indirect interest in any bidder, then before the bid of such bidder can be determined to be the highest and/or best bid for the lot of assets to which the bid relates, the Debtors' financial advisor and the Creditors Committee must jointly select such bidder as the highest and/or best bid for such lot.

6

| | |
|---|---|
| **Indemnification:** | Debtors agree to indemnify and hold harmless Tribune Publishing and each of its affiliates and each of their respective officers, directors, employees, agents, advisors, attorneys and representatives (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), arising out of or in connection with or by reason of the transactions contemplated hereby (other than the sale of any of the Marketed Assets to Tribune Publishing or its designee), except to the extent arising from an Indemnified Party's gross negligence or willful misconduct. |
| | In the case of an investigation, litigation or other proceeding to which the indemnity in the above paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any of the Debtors, any of their respective directors, security holders or creditors, or any other person, or an Indemnified Party is otherwise a party thereto, and whether or not the transactions contemplated hereby are consummated. |
| **Prosecution by the Debtors:** | The Debtors agree to use their best efforts to:<br>(i) seek the Bankruptcy Court's entry of the Bidding Procedures Order; and<br>(ii) secure authorization to use the cash collateral of their pre-petition lenders from such lenders or the Bankruptcy Court for purposes of funding the Permitted Uses along with the Deposit. |

7

210863165v.2