Jeremy E. Rosenthal, SBN 223199
jrosenthal@sidley.com
Helena G. Tseregounis, SBN 287422
htseregounis@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California  90013
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600

Kenneth P. Kansa, (*pro hac vice*)
kkansa@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois  60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

*Attorneys for Tribune Publishing Company*

UNITED STATES BANKRUPTCY COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>FREEDOM COMMUNICATIONS, INC., a Delaware corporation, *et al.*[1]<br><br>Debtors and Debtors in Possession<br><br>Affects:<br><br>☒   All Debtors<br><br>☐   Freedom Communications, Inc., a Delaware corporation, ONLY | Case No. 8:15-bk-15311-MW<br><br>Chapter 11<br><br>(Jointly Administered with Case Nos. 8:15-bk-15312-MW; 8:15-bk-15313-MW; 8:15-bk-15315-MW; 8:15-bk-15316-MW; 8:15-bk-15317-MW; 8:15-bk-15318-MW; 8:15-bk-15319-MW; 8:15-bk-15320-MW; 8:15-bk-15321-MW; 8:15-bk-15322-MW; 8:15-bk-15323-MW; 8:15-bk-15324-MW; 8:15-bk-15325-MW; 8:15-bk-15326-MW; |

---

[1] The last four digits of the Debtors' federal tax identification numbers are as follows:  Freedom Communications, Inc. (0750); Freedom Communications Holdings, Inc., (2814); Freedom Services, Inc. (3125); 2100 Freedom, Inc. (7300); OCR Community Publications, Inc. (9752); Daily Press, LLC (3610); Freedom California Mary Publishing, Inc. (4121); Freedom California Ville Publishing Company LP (7735); Freedom Colorado Information, Inc. (7806); Freedom Interactive Newspapers, Inc. (9343); Freedom Interactive Newspapers of Texas, Inc. (8187); Freedom Newspaper Acquisitions, Inc. (4322); Freedom Newspapers (7766); Freedom Newspapers, Inc. (3240); Freedom Newspapers of Southwestern Arizona, Inc. (5797); OCR Information Marketing, Inc. (7983); Odessa American (7714); Orange County Register Communications, Inc. (7980); Victor Valley Publishing Company (6082); Victorville Publishing Company (7617); Freedom SPV II, LLC (8253); Freedom SPV VI, LLC (8434); Freedom SPV I, LLC (3293); Freedom SPV IV, LLC (8500); and Freedom SPV V, LLC (9036).  The Debtors' mailing address is 625 N. Grand Avenue, Santa Ana, California 92710.

MOTION TO (I) DENY STALKING HORSE BID PROTECTIONS, AND (II) CLARIFY NON-APPLICABILITY OF STALKING HORSE STATUS

| | | |
|---|---|---|
| 1 | ☐ Freedom Communications Holdings, Inc., a Delaware corporation, ONLY | 8:15-bk-15327-MW; 8:15-bk-15328-MW; 8:15-bk-15329-MW; 8:15-bk-15330-MW; 8:15-bk-15332-MW; 8:15-bk-15337-MW; 8:15-bk-15339-MW; 8:15-bk-15340-MW; 8:15-bk-15342-MW; 8:15-bk-15343-MW; |
| 2 | ☐ Freedom Services, Inc., a Delaware corporation, ONLY | |
| 3 | | |
| 4 | ☐ 2100 Freedom, Inc., a Delaware corporation, ONLY | **MOTION TO (I) DENY STALKING HORSE BID PROTECTIONS, AND (II) CLARIFY NON-APPLICABILITY OF STALKING HORSE STATUS** |
| 5 | ☐ OCR Communication Publications, Inc., a California corporation, ONLY | |
| 6 | ☐ Daily Press, LLC, a California limited liability company, ONLY | [Application for Order Shortening Time Filed Concurrently Herewith] |
| 7 | ☐ Freedom California Mary Publishing, Inc., a California corporation, ONLY | **Hearing:** |
| 8 | | Date: TBD *March 21, 2016 requested* |
| 9 | ☐ Freedom California Ville Publishing Company LP, a California limited partnership, ONLY | Time: TBD *9:00 a.m. requested* Courtroom: 6C 411 W 4th Street, Santa Ana, CA 92701 |
| 10 | ☐ Freedom Colorado Information, Inc., a Delaware corporation, ONLY | |
| 11 | | |
| 12 | ☐ Freedom Interactive Newspapers, Inc., a California corporation, ONLY | |
| 13 | ☐ Freedom Interactive Newspapers of Texas, Inc., a Delaware corporation, ONLY | |
| 14 | | |
| 15 | ☐ Freedom Newspaper Acquisitions, Inc., a Delaware corporation, ONLY | |
| 16 | ☐ Freedom Newspapers, a Texas general partnership, ONLY | |
| 17 | ☐ Freedom Newspapers, Inc., a Delaware corporation, ONLY | |
| 18 | ☐ Freedom Newspapers of Southwestern Arizona, Inc. a California corporation, ONLY | |
| 19 | | |
| 20 | ☐ OCR Information Marketing, Inc., a California corporation, ONLY | |
| 21 | ☐ Odessa American, a Texas general partnership, ONLY | |
| 22 | | |
| 23 | ☐ Orange County Register Communications, Inc., a California corporation, ONLY | |
| 24 | ☐ Victor Valley Publishing Company, a California corporation, ONLY | |
| 25 | | |
| 26 | ☐ Victorville Publishing Company, a California limited partnership, ONLY | |
| 27 | | |
| 28 | | |

2

- ☐ Freedom SPV II, LLC, a Delaware limited liability company, ONLY
- ☐ Freedom SPV VI, LLC, a Delaware limited liability company, ONLY
- ☐ Freedom SPV I, LLC, a Delaware limited liability company, ONLY
- ☐ Freedom SPV IV, LLC, a Delaware limited liability company, ONLY
- ☐ Freedom SPV V, LLC, a Delaware limited liability company, ONLY

**I.**

**Factual Background**

Since the first days of these chapter 11 cases, Tribune Publishing has been open to all parties about its interest in acquiring the Debtors' operating business. In furtherance of that interest, Tribune Publishing has negotiated with representatives of the Debtors since the outset of these cases concerning the terms for an acquisition of the Debtors' operations, attempted to conduct diligence, and participated in discussions with potential bidders for the Debtors' real estate on terms that would not compromise the operations of the businesses now conducted by the Debtors if acquired by Tribune Publishing.

This Court entered its order approving bidding procedures (the "Bidding Procedures") in these cases on February 5, 2016 [Docket No. 371] (the "Bidding Procedures Order").[2] In accordance with the Bidding Procedures, stalking horse bids for the Debtors' assets were to be selected no later than February 12, 2016. See Bidding Procedures at II.A. Stalking horse bidders are entitled to a number of bid protections approved by this Court, including a break-up fee equal to 2.5% of the cash purchase price of the Debtors' assets, a $200,000 expense reimbursement, and a minimum overbid amount. See Bidding Procedures Order at ¶ 5. No stalking horse bid was selected by the February 12 deadline, nor at any time after the deadline to submit competing bids passed on March 11. Tribune Publishing accordingly submitted a bid for the Debtors' business operations and real estate on March 11, 2016, which was the Court-established deadline to submit such a bid in advance of the

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Bidding Procedures or the Bidding Procedures Order, as applicable.

3

MOTION TO (I) DENY STALKING HORSE BID PROTECTIONS, AND (II) CLARIFY NON-APPLICABILITY OF STALKING HORSE STATUS

auction scheduled for Wednesday, March 16.

During the afternoon on Sunday, March 13, an article in one of the Debtors' competitors' newspapers announced that that competitor, Digital First Media, Inc. ("DFM"), had been selected as a purported stalking horse bidder for the Debtors' business operations and real estate. See Digital First Media Bids $45.5M for Orange County Register, Riverside Press-Enterprise (Inland Valley Daily Bulletin, Mar. 13, 2016).  Only after that article appeared online was Tribune Publishing (and, presumably, other parties that submitted bids by the bidding deadline) notified of the selection.  No explanation was offered for why it was appropriate for a stalking horse bidder to be named after the deadline for all competing bids had passed, nor why the process focused on one bidder alone after that deadline rather than on an auction in which all bidders could participate on an equal and open footing.

If DFM succeeds in obtaining stalking horse status and the attendant bid protections, it will receive a break-up fee of approximately $1,140,000, plus expense reimbursement of up to $200,000. Stated another way, DFM will receive over $1.3 million of estate assets in exchange for submitting a bid after the deadline to do so had already passed, and after other bids – including Tribune Publishing's – had already been received by the Debtors.  In addition, the initial minimum overbid requirement at the auction would increase from $100,000 to $250,000 as a result of designating the DFM bid as a stalking horse bid.  In short, imposing the bid protections prejudices other bidders by requiring them to overbid by almost $1.6 million, rather than by $100,000 in the non-stalking horse scenario that prevailed at the bidding deadline.

## II.

## Relief Requested and Basis Therefor

Tribune Publishing respectfully asks this Court for the following relief:

- Elimination of the bid protections purportedly afforded to DFM under the bid procedures and rejection of DFM's status as a purported "stalking horse" bidder, so that DFM's bid is on the same footing as the other bids for the Debtors' assets; and

- Clarification that approval of the sale by this Court will be considered as if no stalking horse bidder was designated.

4

1. <u>The Bid Protections Afforded to DFM are Unwarranted Here</u>

To quote the Debtors' motion seeking approval of the Bidding Procedures (the "<u>Bidding Procedures Motion</u>"), bid protections "encourage a potential purchaser to invest the requisite time, money, and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process." Bidding Procedures Motion at 33. The Debtors cited with approval the Third Circuit's observations that bidding incentives benefit a debtor's estate where they "promote more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited," and that they might induce a "minimum or floor bid on which other bidders can rely." Bidding Procedures Motion at 35; citing <u>Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),</u> 181 F.3d 527, 537 (3d Cir. 1999). The Debtors' quite correct conclusion from this case law was that the bid protections sought in this case would "induce a Stalking Horse Bidder to submit a bid . . . upon which other bidders may rely," "reasonably compensate a Stalking Horse Bidder for its diligence and . . . fees incurred in negotiating the terms of a stalking horse agreement on an expedited timeline," and would "permit other Qualified Bidders to rely on the diligence performed by the Stalking Horse Bidder." Bidding Procedures Motion at 35-36.

Not one of these things is true here. The bid protections here do not promote more bids, as the deadline to submit Qualified Bids had already passed by the time DFM purportedly became the stalking horse, and the Debtors already had multiple Qualified Bids in hand. The DFM bid was not announced until two days <u>after</u> the bid deadline, so no other bidders could know its contents, much less plausibly rely on them in formulating their own already-submitted bids. There was no negotiation on an "expedited timeline" here, as the DFM bid was apparently not signed for over a month after the original deadline to select a stalking horse bid had passed. Whatever diligence needed to be done by bidders had by definition to be completed before DFM was named the stalking horse, since the Bidding Procedures expressly provide that Qualified Bids had to be submitted by March 11 with no diligence conditions,[3] and the alleged "benefits" of DFM's diligence could not

---

[3] <u>See</u> Bidding Procedures Order at ¶ II.D(9).

have been realized until two days later at the earliest. None of the justifications for providing stalking horse protections to a bidder applies here.

The Third Circuit has noted in the context of bid protections that it is "permissible to offer a break-up fee and reimbursement for expenses to induce an initial bid, provided the allowance of the fee does not give an advantage to a favored purchaser over other bidders by increasing the cost of acquisition. We also indicated that a break-up fee is not necessary to preserve the value of the estate when the bidder would have bid even without the break-up fee." In re Reliant Energy Channelview LP, 594 F.3d 200, 206 (3d Cir. 2010) (citing In re O'Brien Envtl. Energy, 181 F.3d at 535). In Reliant Energy, the Third Circuit was faced with a situation similar to that here – an auction process occurred, a bid was selected after the bid deadline had passed, and only thereafter did the debtor seek to provide bid procedures and protections to that bidder. The Third Circuit properly found that process improper and backwards, affirming both the Bankruptcy Court and the District Court.

The Third Circuit posed two questions in its analysis: (1) were the bid protections necessary to induce a bid; and (2) were the bid protections needed to preserve a bid in the auction? Id. at 206-08. Relying on the standards it had articulated in In re O'Brien Envt'l. Energy, the Third Circuit found it 'inescapable' that the bidder made its bid without the assurance of a break-up fee, which 'destroyed' its argument that the fee was necessary to induce its bid. Id. at 207. The Court further concluded that "a retroactive grant of a break-up fee could not have induced a bid that [the bidder] already had made." Id. at 208. The Third Circuit also upheld the Bankruptcy Court's determination that granting bidding protections to the bidder would deter other potential purchasers, who had already submitted bids and were ready and willing to participate in an auction. Id.

The Court here is presented with a similar situation. The proposed bid protections relate to a bid that had to be timely made two days before it purportedly received stalking horse protections, so there is no way an after-the-fact benefit could legitimately have induced the bid. If DFM would not have submitted its bid absent these protections, then this Court is effectively being asked to approve an after-the-fact demand by one bidder for a preferential deal as a condition of its pre-existing participation in the bidding process. It is impossible for this to be proper. Moreover, if DFM's bid was conditioned on receiving the Break-Up Fee, then the DFM bid does not meet the condition set

forth in Section II.D(1)(b) of the Bidding Procedures, which requires that each Qualified Bid "specifically disclaim[] any right of the Potential Bidder to receive a breakup fee or termination fee . . . . " Regardless, there is accordingly no reason whatsoever to afford DFM stalking horse protections in this case.

2. <u>The Sale Approval Must Proceed Without a Stalking Horse</u>

The Bidding Procedures contain extensive provisions that guide how the sale process should be conducted if there is and if there is not a stalking horse bidder. The selection of a stalking horse bidder after the deadline for submitting Qualified Bids unfairly prejudices bidders other than the purported stalking horse. Bidders in this case have justifiably relied on this Bidding Procedures and this Court's Bidding Procedures Order in submitting bids when they were due, with expectations as to how they would be evaluated and that they could bid for and seek to have their acquisition of the Debtors' assets governed accordingly. The selective, after-the-fact designation of a stalking horse bidder thwarts that reliance and prejudices all other bidders.

The Court should provide that the sale of the Debtors' assets must satisfy the requirements of the Bidding Procedures applied as if there is no Stalking Horse Bidder, so that the Court and all parties can be certain that no prejudice resulted from the after-the-last-minute efforts by DFM to become a stalking horse bidder. To be clear, the DFM bid must be disqualified as a purported stalking horse bid, and it should instead be considered for approval (if selected at the Auction as the Successful Bid) alongside other Qualified Bids submitted prior to the Bid Deadline. This allows bidders that followed the procedures approved by this Court to be treated honestly and fairly, as the Court no doubt intended when it approved the Bidding Procedures.

3. <u>Likely Objections to Relief Requested</u>

Tribune Publishing expects it to be argued in response to this Motion that the Bidding Procedures could be amended. <u>See</u> Bidding Procedures at ¶ M. The power to amend the Bidding Procedures, however, cannot extend to disregarding of the purposes of the procedures themselves. When this Court entered the Bidding Procedures Order and approved the Bidding Procedures, the Court found specifically that the bidding procedures were "fair, reasonable, and appropriate, and are designed to maximize the recovery from the sale of the assets." <u>See</u> Bidding Procedures at ¶ A. The

7

MOTION TO (I) DENY STALKING HORSE BID PROTECTIONS, AND (II) CLARIFY NON-APPLICABILITY OF STALKING HORSE STATUS

Court did not write a blank check.  Tribune Publishing does not believe that this Court would conclude that naming a stalking horse bidder after the deadline for competing bids has already passed is "fair, reasonable, and appropriate," and that this Court would not have approved the Bidding Procedures had the Court known that selection of the stalking horse bidder was to occur after the bidding deadline and after multiple competing bids had been submitted.

It may also be argued that the decision to name a stalking horse bidder, and to extend bid protections thereto, is protected by the business judgment rule.  This argument too is flawed.  Specifically, the case law cited in the Bidding Procedures Motion itself rejects the argument.  Principal among those cases In re O'Brien Envtl. Energy, in which the Third Circuit after lengthy analysis declined to apply the business judgment rule to the granting of a break-up fee in a bankruptcy case, saying "the allowability of break-up fees, like that of other administrative expenses, depends upon the negotiating party's ability to show that the fees are actually necessary to preserve the value of the estate.  Therefore, we conclude that the business judgment rule should not be applied as such in the bankruptcy context."  In re O'Brien Envtl. Energy, 181 F.3d at 585.  See also In re Hupp Indus., Inc., 140 B.R. 191 (Bankr. N.D. Ohio 1992) (break-up fees not subject to business judgment rule in bankruptcy context); In re America West Airlines, Inc., 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) ("[t]he standard is not whether a break-up fee is within the business judgment of the debtor, but whether the transaction will 'further the diverse interests of the debtor, creditors and equity holders, alike.").  The notion of one bidder demanding and receiving special protections after bidding has closed that are alleged to be approved by this Court is certainly a matter within this Court's ability to consider absent any benefits of the business judgment rule, in accordance with prevailing case law.

| | | |
|---|---|---|
| 1 | Dated: March 15, 2016 | SIDLEY AUSTIN LLP |
| 2 | | By: /s/ Helena G. Tseregounis |
| | | Jeremy E. Rosenthal, Esq. |
| 3 | | Helena G. Tseregounis, Esq. |
| | | SIDLEY AUSTIN LLP |
| 4 | | 555 West Fifth Street, Suite 4000 |
| | | Los Angeles, California  90013 |
| 5 | | |
| | | Kenneth P. Kansa, Esq. |
| 6 | | SIDLEY AUSTIN LLP |
| | | One South Dearborn Street |
| 7 | | Chicago, Illinois  60603 |
| 8 | | Counsel for Tribune Publishing Company |

9

MOTION TO (I) DENY STALKING HORSE BID PROTECTIONS, AND (II) CLARIFY NON-APPLICABILITY OF STALKING HORSE STATUS