"Commencing on the date hereof: (i) all analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals made by or on behalf of either party before any Governmental Authority or the staff or regulators of any Governmental Authority, in connection with the transactions contemplated hereunder (but, for the avoidance of doubt, not including any interactions between Sellers with Governmental Authorities in the ordinary course of business, any disclosure which is not permitted by Law or any disclosure containing confidential information) shall be disclosed to the other party hereunder in advance of any filing, submission or attendance, it being the intent that the parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any such analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals and (ii) each party shall give notice to the other party with respect to any meeting, discussion, appearance or contact with any Governmental Authority or the staff or regulators of any Governmental Authority, with such notice being sufficient to provide the other party with the opportunity to attend and participate in such meeting, discussion, appearance or contact."

15.    **Books and Records**.

15.1    **Section 6.07(a)(ii)** of the Asset Purchase Agreement is hereby amended to read in full as follows:

"(ii)    upon reasonable notice, afford the Sellers' Representatives, and its successors, including a liquidating trustee appointed under a plan of liquidation, reasonable access (including the right to make, at Sellers' expense, photocopies), during normal business hours, to such Books and Records."

15.2    The first sentence of **Section 6.07(c)** of the Asset Purchase Agreement is hereby amended to read in full as follows:

"After the Closing, Buyer shall grant Sellers, the Seller Representative, and its successors, including a liquidating trustee appointed under a plan of liquidation, and their respective representatives, attorneys, financial advisors and other professionals reasonable and complete access to the Books and Records (including electronic access) for the sole purpose of gathering documents and information necessary to consummate a liquidating plan or structured dismissal in Sellers' Bankruptcy Case, and otherwise properly wind-up the business and affairs of each Seller."

16.    **Buyer's Designees**.

16.1    **Section 6.16** of the Asset Purchase Agreement is hereby amended to read in full as follows:

"**Section 6.16. Buyer's Designees.** Prior to the Closing, Buyer may, without Sellers' consent, assign all or any portion of its rights under this Agreement with respect to any of the Purchased Assets, including without limitation, the Owned Real Property, to one or more than one Affiliate of Buyer (each, a "**Buyer's**

Designee") by providing notice thereof to Seller's Representative, provided that: (a) such action will not release Buyer from any obligation or liability under this Agreement, (b) each Buyer's Designee assumes certain obligations and liabilities of Buyer under this Agreement with respect to the Purchased Assets assigned thereto, pursuant to a separate written assignment and assumption agreement executed by Buyer (as assignor) and Buyer's Designee (as assignee), (c) Buyer's Designee is not an Affiliate of Seller unless disclosed in the Sale Approval Motion or otherwise expressly approved by the Bankruptcy Court, and (d) Buyer and Buyer's Designee will provide Seller with all information regarding Buyer's Designee reasonably required by Seller."

16.2    The second sentence of **Section 10.07** of the Asset Purchase Agreement is hereby amended to read in full as follows:

"Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, provided, however, that on or prior to the Closing Date, Buyer may, without the prior written consent of Seller, assign all or any portion of its rights under this Agreement in accordance with **Section 6.16**."

17.    **Seller Representative**. The phrases "and attorney-in-fact" and "as attorney-in-fact and", respectively, are each hereby deleted from **Section 8.09(a)** of the Asset Purchase Agreement.

18.    **Effect of Termination**. The phrase ", except as provided in **Section 3.08**" is hereby added to the end of **Section 9.02(b)** of the Asset Purchase Agreement.

19.    **Release**. New **Section 10.13** is hereby added to the Asset Purchase Agreement immediately following **Section 10.12** thereof:

"**Section 10.13 Release**. Without limiting the generality of the foregoing, upon Closing, Sellers, their estates and any successor of Sellers shall be deemed to have unconditionally released Buyer and its officers, directors and affiliates, and Buyer and its officers, directors and affiliates shall be deemed to have unconditionally released Sellers, their estates and any successor of Sellers, from any and all claims, obligations, rights, suits, damages, causes of action, remedies, liabilities and Interests whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising in Law, equity or otherwise, arising from or relating to, or involving the Excluded Liabilities, Purchased Assets, the Sale thereof to Buyer or Buyer's quiet use and enjoyment of the Purchased Assets that arose prior to the date of the Closing of the Sale; provided, however, that the foregoing release shall not apply to any such claims, obligations, rights, suits, damages, causes of action, remedies, liabilities or Interests of Sellers, their estates and any successors of Sellers, or Buyer and its officers, directors and affiliates, arising from or relating to (i) a breach of this Agreement by any party or (ii) the distribution or printing relationships between any Seller, on the one hand, and Buyer or any Affiliate of Buyer, on the other hand."

20.    **Transaction Document**.  This Amendment constitutes one of the Transaction Documents under, and as defined in, the Asset Purchase Agreement.

21.    **Incorporation by Reference**.  **Article X** of the Asset Purchase Agreement is incorporated herein by this reference.

22.    **Reaffirmation**.    Except as expressly set forth herein, the Asset Purchase Agreement shall remain unmodified and is in full force and effect.

23.    **Time of the Essence**.  Time is of the essence with respect to the terms and conditions of this Amendment.

*[signature pages follow]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

"Sellers"

2100 FREEDOM, INC.
FREEDOM COMMUNICATIONS HOLDINGS, INC.
FREEDOM COMMUNICATIONS, INC.
FREEDOM NEWSPAPERS, INC.
FREEDOM SERVICES, INC.
OCR COMMUNITY PUBLICATIONS, INC.
FREEDOM SPV I, LLC
FREEDOM SPV II, LLC
FREEDOM SPV VI, LLC
DAILY PRESS, LLC
FREEDOM CALIFORNIA MARY PUBLISHING, INC.
FREEDOM CALIFORNIA VILLE PUBLISHING COMPANY LP
FREEDOM COLORADO INFORMATION, INC.
FREEDOM INTERACTIVE NEWSPAPERS, INC.
FREEDOM INTERACTIVE NEWSPAPERS OF TEXAS, INC.
FREEDOM NEWSPAPER ACQUISITIONS, INC.
FREEDOM NEWSPAPERS
FREEDOM NEWSPAPERS OF SOUTHWESTERN ARIZONA, INC.
OCR INFORMATION MARKETING, INC.
ODESSA AMERICAN
ORANGE COUNTY REGISTER COMMUNICATIONS, INC.
VICTOR VALLEY PUBLISHING COMPANY
VICTORVILLE PUBLISHING COMPANY
FREEDOM SPV IV, LLC
FREEDOM SPV V, LLC


By:    MOSIER & COMPANY, INC.,
       An Ohio corporation

Its:    Independent Sales Representative

By:    _____
       Robert P. Mosier

Its:    President

"Buyer"

MEDIANEWS GROUP INC. D/B/A DIGITAL FIRST
MEDIA, INC.

By: _____

Name:  Marshall W. Anstandig
Title:   Senior Vice President, General Counsel and
Secretary

## FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT

## FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT

This First Amendment to Asset Purchase Agreement (this "**Amendment**"), dated as of March __, 2016 is entered into by and among: (i) 2100 FREEDOM, INC., a Delaware corporation ("**Freedom**"); (ii) each of the subsidiaries of Freedom set forth on **Schedule A** (collectively, the "**Subsidiaries**," and together with Freedom, each a "**Seller**" and collectively the "**Sellers**") to the Asset Purchase Agreement (defined below); and (iii) MEDIANEWS GROUP, INC., d/b/a/ Digital First Media, a Delaware corporation ("**Buyer**").

### RECITALS

A.      Sellers and Buyers entered into that certain Asset Purchase Agreement dated as of March 13, 2016 (the "**Asset Purchase Agreement**"), pursuant to which, among other things, Sellers agreed to sell the Purchased Assets to Buyer, subject to, among other things, the Bidding Procedures Order.

B.      As set forth in the Bidding Procedures, the Auction was conducted on March 16, 2016.  At the Auction, Buyer increased the Base Purchase Price and certain amendments to the Asset Purchase Agreement were discussed in principle.  This Amendment memorializes such increase and such discussions.

### AGREEMENT

NOW, THEREFORE, in consideration of the above recitals and mutual agreements which follow and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Sellers agree as follows:

1.      **Defined Terms**.   Capitalized terms used but not otherwise defined in this Amendment (including without limitation in the Recitals to this Amendment) shall have the meanings given to such terms in the Asset Purchase Agreement, as amended hereby.

2.      **Incorporation of Recitals**.  The Recitals set forth above are incorporated herein by this reference.

3.      **Base Purchase Price**.  The definition of "Base Purchase Price" set forth in **Article I** of the Asset Purchase Agreement is hereby amended to read in full as follows:

"'**Base Purchase Price**' means Fifty-One Million Eight Hundred Thousand Dollars ($51,800,000)."

4.      **Cure Cost Defined Terms**.  The definitions of "Cure Cost Escrow Account" and "Cure Cost Escrow Amount" are deleted in their entirety.

5.      **Deposit**.  **Section 2.05(b)** of the Asset Purchase Agreement is hereby amended to read in full as follows:

"(b)      Buyer has deposited into the client trust account of Pachulski Stang Ziehl & Jones, LLP ('**PSZJ**') in accordance with the Bidding Procedures, in immediately available funds,

EXHIBIT "A"
Page 51

a deposit in the aggregate amount of Five Million One Hundred Eighty Thousand Dollars ($5,180,000) (the '**Initial Purchase Deposit**'). Pursuant to and in accordance with the Bidding Procedures, the Escrow Agreement and this Agreement, the Initial Purchase Deposit shall be: (a) applied to the Closing Date Payment Amount; (b) returned to Buyer; or (c) or forfeited by Buyer and released to a Seller in accordance with **Section 3.08**

6.      **Cure Costs**.

6.1      **Sections 2.05(c)(v), 2.05(d)(ii), 2.05(e), 2.05(f), 2.07(b)** and **8.02(c)** of the Asset Purchase Agreement are each hereby amended to read in full as follows:

"[intentionally omitted]"

6.2      **Section 3.06** of the Asset Purchase Agreement is hereby amended to read in full as follows:

"**Section 3.06  Cure Costs.**  Buyer shall pay all cure costs related to all Assigned Contracts and Subsequent Assigned Contracts."

6.3      The phrase "and the Cure Cost Escrow Amount" is hereby deleted from **Section 7.03(d)** of the Asset Purchase Agreement.

7.      **Evaluated Contracts**.

7.1      The definition of "Sale Approval Order" set forth in **Article I** of the Asset Purchase Agreement is hereby amended to read in full as follows:

"'**Sale Approval Order**' means an order of the Bankruptcy Court entered in the Bankruptcy Case, reasonably acceptable to Sellers and Buyer, approving this Agreement and the sale, assignment and conveyance of the Purchased Assets on the terms set forth in this Agreement, free and clear of Liens and Interests (other than the Permitted Encumbrances) pursuant to 11 U.S.C. §363(b) and (f), including obligations to Sellers' vendors, trade creditors, Employees, former Employees, taxing authorities, other government agencies, secured creditors, and other lien creditors, which order shall, among other things: (i) confirm the authority of the Seller Representative to act on behalf of Sellers as described in **Recital C**, and ratify any actions previously taken by the Seller Representative on behalf of Sellers in connection with the execution and performance of this Agreement, including with respect to the execution and delivery of any deeds, bills of sale, assignments, certificates, affidavits and other instruments and documentation required of Sellers pursuant to this Agreement or otherwise in connection with the Sale; (ii) approve the assumption by the appropriate Seller and assignment to Buyer of the Assigned Contracts, (iii) provide that Buyer shall enjoy Sellers' rights and benefits under the Evaluated Contracts from the date of the Evaluation Notice, provided that Buyer timely makes the payments thereunder described in **Section 6.14** of this Agreement, (iv) specifically approve each of **Section 3.03**, **Section 3.08**, **Section 6.04**, **Section 6.14**, and **Section 8.09(f)**, (v) establish the date of each Rejection Notice as the effective date of rejection for each of the Rejected Contracts identified therein, (vi)

set forth anything determined by the Title Insurer prior to the entry of the Sale Approval Order as necessary or desirable to enable the issuance of any title insurance required pursuant to this Agreement, (vii) contain a finding of good faith under 11 U.S.C. §363(m), (viii) order that Buyer is absolved of and immune from any and all successor liability, including successor liability for any and all Taxes, including payroll taxes, income taxes and sales taxes, and any and all obligations to Employees, including wages, vacation pay, severance, Liability under any Benefit Plan, health care liability, and any Actions against Seller, (ix) enjoin all Persons from asserting against Buyer any Liability or Encumbrance that may exist against Seller, including all Liabilities and Encumbrances referenced in the Sale Approval Order, (x) contain a waiver of the stays provided under Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure, and (xi) provide that any Person receiving notice of the motion seeking the Sale Approval Order who does not timely object to the relief requested in such motion shall be deemed to consent to the relief requested in such motion or in the Sale Approval Order and be bound thereby."

7.2    The third sentence of **Section 6.14(b)** of the Asset Purchase Agreement is hereby amended to read in full as follows:

"From and after the date of each Assignment Notice, Buyer shall timely pay when due all monthly actual, incurred obligations payable under the Evaluated Contracts designated in each Assignment Notice at the regular, non-default rates provided for under such Evaluated Contracts (but shall not be obligated to pay any amounts in respect of any interest, prepayments, late payments, payments in respect of any demand or acceleration or any other non-ordinary course payments of any kind, including non-recurring expenses, tenant improvement expenses, and the like) until a Final Order assuming and assigning such Evaluated Contracts to Buyer is entered. Notwithstanding anything to the contrary set forth in this Agreement, the Subsequent Assigned Contracts shall constitute Assigned Contracts pursuant to, and as defined in, this Agreement."

7.3    The following new **Section 6.14(d)** is hereby added to the Asset Purchase Agreement immediately following **Section 6.14(c)** thereof:

"(d)    For the avoidance of doubt, from and after the date of the delivery of the Evaluation Notice until the date that the Evaluated Contracts identified therein become either Subsequent Assumed Contracts or Rejected Contracts in accordance with this **Section 6.14**, Buyer shall enjoy Sellers' rights and benefits under such Evaluated Contracts provided that Buyer timely makes the payments thereunder described in this **Section 6.14**."

8.    **Access to Information**.  The first sentence of **Section 6.02** of the Asset Purchase Agreement is hereby amended to read in full as follows:

"Commencing on the date hereof until the Closing, pursuant to the terms of the Bidding Procedures, Sellers shall (a) afford Buyer and its Representatives full and free access to

and the right to inspect all of the Real Property, properties, assets, premises, Books and Records, Contracts and other documents and data related to the Business; (b) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Business as Buyer or any of its Representatives may reasonably request; and (c) instruct the Representatives of Sellers to cooperate with Buyer in its investigation of the Business."

9.    **Notice of Certain Events**.  **Section 6.03(a)** of the Asset Purchase Agreement is hereby amended to read in full as follows:

"(a)    Commencing on the date hereof until the Closing, Sellers shall promptly notify Buyer in writing of any of the following within Sellers' Knowledge:"

10.    **Employees and Employee Benefits**.  Section 6.04(e) of the Asset Purchase Agreement is hereby amended to read in full as follows:

"(e)    Commencing on the date hereof, each Seller hereby authorizes (a) Buyer to communicate directly with Employees and (b) Buyer and each Benefit Provider to communicate directly and exchange information, in each case, regarding the Employees, the Benefit Plans, and the transition and enrollment of Employees into the benefit plans of Buyer."

11.    **Government Approvals and Consents**.  **Section 6.06(b)** of the Asset Purchase Agreement is hereby amended to read in full as follows:

"Commencing on the date hereof: (i) all analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals made by or on behalf of either party before any Governmental Authority or the staff or regulators of any Governmental Authority, in connection with the transactions contemplated hereunder (but, for the avoidance of doubt, not including any interactions between Sellers with Governmental Authorities in the ordinary course of business, any disclosure which is not permitted by Law or any disclosure containing confidential information) shall be disclosed to the other party hereunder in advance of any filing, submission or attendance, it being the intent that the parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any such analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals and (ii) each party shall give notice to the other party with respect to any meeting, discussion, appearance or contact with any Governmental Authority or the staff or regulators of any Governmental Authority, with such notice being sufficient to provide the other party with the opportunity to attend and participate in such meeting, discussion, appearance or contact."

12.    **Books and Records**.

12.1    **Section 6.07(a)(ii)** of the Asset Purchase Agreement is hereby amended to read in full as follows:

"(ii)    upon reasonable notice, afford the Sellers' Representatives, and its successors, including a liquidating trustee appointed under a plan of liquidation, reasonable access (including the right to make, at Sellers' expense, photocopies), during normal business hours, to such Books and Records."

12.2    The first sentence of **Section 6.07(c)** of the Asset Purchase Agreement is hereby amended to read in full as follows:

"After the Closing, Buyer shall grant Sellers, the Seller Representative, and its successors, including a liquidating trustee appointed under a plan of liquidation, and their respective representatives, attorneys, financial advisors and other professionals reasonable and complete access to the Books and Records (including electronic access) for the sole purpose of gathering documents and information necessary to consummate a liquidating plan or structured dismissal in Sellers' Bankruptcy Case, and otherwise properly wind-up the business and affairs of each Seller."

13.    **Seller Representative**. The phrases "and attorney-in-fact" and "as attorney-in-fact and", respectively, are each hereby deleted from **Section 8.09(a)** of the Asset Purchase Agreement.

14.    **Effect of Termination**. The phrase ", except as provided in **Section 3.08**" is hereby added to the end of **Section 9.02(b)** of the Asset Purchase Agreement.

15.    **Transaction Document**. This Amendment constitutes one of the Transaction Documents under, and as defined in, the Asset Purchase Agreement.

16.    **Incorporation by Reference**. **Article X** of the Asset Purchase Agreement is incorporated herein by this reference.

17.    **Reaffirmation**. Except as expressly set forth herein, the Asset Purchase Agreement shall remain unmodified and is in full force and effect.

18.    **Time of the Essence**. Time is of the essence with respect to the terms and conditions of this Amendment.

*[signature pages follow]*

EXHIBIT "A"
Page 55

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

### "Sellers"

2100 FREEDOM, INC.
FREEDOM COMMUNICATIONS HOLDINGS, INC.
FREEDOM COMMUNICATIONS, INC.
FREEDOM NEWSPAPERS, INC.
FREEDOM SERVICES, INC.
OCR COMMUNITY PUBLICATIONS, INC.
FREEDOM SPV I, LLC
FREEDOM SPV II, LLC
FREEDOM SPV VI, LLC
DAILY PRESS, LLC
FREEDOM CALIFORNIA MARY PUBLISHING, INC.
FREEDOM CALIFORNIA VILLE PUBLISHING COMPANY LP
FREEDOM COLORADO INFORMATION, INC.
FREEDOM INTERACTIVE NEWSPAPERS, INC.
FREEDOM INTERACTIVE NEWSPAPERS OF TEXAS, INC.
FREEDOM NEWSPAPER ACQUISITIONS, INC.
FREEDOM NEWSPAPERS
FREEDOM NEWSPAPERS OF SOUTHWESTERN ARIZONA, INC.
OCR INFORMATION MARKETING, INC.
ODESSA AMERICAN
ORANGE COUNTY REGISTER COMMUNICATIONS, INC.
VICTOR VALLEY PUBLISHING COMPANY
VICTORVILLE PUBLISHING COMPANY
FREEDOM SPV IV, LLC
FREEDOM SPV V, LLC


By:  MOSIER & COMPANY, INC.,
       its Independent Sales Representative


By:_____
Name:
Title:

EXHIBIT "A"
Page 56

**"Buyer"**

MEDIANEWS GROUP INC. D/B/A DIGITAL FIRST
MEDIA, INC.

By:_____
Name:  Marshall W. Anstandig
Title:   Senior Vice President, General Counsel and
Secretary

SMRH:476041115.3

# ASSET PURCHASE AGREEMENT

# ASSET PURCHASE AGREEMENT

among

## 2100 FREEDOM, INC.,

## THE OTHER SELLERS SET FORTH ON SCHEDULE A,

and

## MEDIANEWS GROUP, INC.,
## d/b/a/ DIGITAL FIRST MEDIA,

dated as of

## March 13, 2016

SMRH:474965963.17

# TABLE OF CONTENTS

**PAGE**

| | | |
|---|---|---|
| ARTICLE I | Definitions | 1 |
| ARTICLE II | Purchase and Sale | 12 |
| Section 2.01 | Purchase and Sale of Assets | 12 |
| Section 2.02 | Excluded Assets | 13 |
| Section 2.03 | Assumed Liabilities | 14 |
| Section 2.04 | Excluded Liabilities | 14 |
| Section 2.05 | Purchase Price; Escrow Accounts | 16 |
| Section 2.06 | Delivery of Estimated Closing Statement and Proposed Closing Statement. | 17 |
| Section 2.07 | Purchase Price Adjustments; Cure Costs for Assigned Contracts and Subsequent Assigned Contracts. | 19 |
| Section 2.08 | Allocation of Purchase Price | 20 |
| Section 2.09 | Third Party Consents | 20 |
| ARTICLE III | Closing | 21 |
| Section 3.01 | Closing | 21 |
| Section 3.02 | Closing Deliverables | 21 |
| Section 3.03 | Break-Up Fee and Expense Reimbursement | 22 |
| Section 3.04 | Bidding Procedures | 23 |
| Section 3.05 | Rejection of Contracts | 23 |
| Section 3.06 | Cure Costs | 23 |
| Section 3.07 | Default | 23 |
| Section 3.08 | Damages Upon Buyer Default | 23 |
| Section 3.09 | Stalking Horse APA | 24 |
| ARTICLE IV | Representations and warranties of seller | 24 |
| Section 4.01 | Organization and Qualification | 24 |
| Section 4.02 | Authority of Seller | 24 |
| Section 4.03 | No Conflicts | 24 |
| Section 4.04 | Financial Statements | 25 |
| Section 4.05 | Contracts | 25 |
| Section 4.06 | Title to Purchased Assets | 25 |
| Section 4.07 | Condition and Sufficiency of Assets | 25 |
| Section 4.08 | Real Property. | 25 |
| Section 4.09 | Intellectual Property | 26 |
| Section 4.10 | Inventory | 27 |
| Section 4.11 | Accounts Receivable | 27 |
| Section 4.12 | Customers and Suppliers | 27 |
| Section 4.13 | Insurance | 27 |
| Section 4.14 | Legal Proceedings | 27 |
| Section 4.15 | Permits | 27 |
| Section 4.16 | Employment Matters | 28 |

EXHIBIT "A"
Page 60

Section 4.17        Taxes ................................................................................28

ARTICLE V        Representations and warranties of buyer ....................................28
    Section 5.01        Organization of Buyer ..................................................28
    Section 5.02        Authority of Buyer ........................................................28
    Section 5.03        No Conflicts; Consents ..................................................28
    Section 5.04        Brokers ...........................................................................29
    Section 5.05        Sufficiency of Funds ....................................................29
    Section 5.06        Legal Proceedings .........................................................29

ARTICLE VI        Covenants ...............................................................................29
    Section 6.01        Conduct of Business Prior to the Closing ..................29
    Section 6.02        Access to Information ...................................................30
    Section 6.03        Notice of Certain Events ...............................................30
    Section 6.04        Employees and Employee Benefits. ............................31
    Section 6.05        Confidentiality ...............................................................32
    Section 6.06        Governmental Approvals and Consents ......................33
    Section 6.07        Books and Records ........................................................34
    Section 6.08        Closing Conditions .........................................................35
    Section 6.09        Public Announcements ..................................................35
    Section 6.10        Bulk Sales Laws .............................................................35
    Section 6.11        Receivables .....................................................................35
    Section 6.12        Transfer Taxes ...............................................................36
    Section 6.13        Tax Clearance Certificates ..........................................36
    Section 6.14        Post-Closing Evaluation of Contracts ........................36
    Section 6.15        Further Assurances .......................................................37
    Section 6.16        Purchase of Real Estate ................................................37
    Section 6.17        Authorization re Insurers .............................................37

ARTICLE VII        Conditions to closing ...........................................................38
    Section 7.01        Conditions to Obligations of All Parties ....................38
    Section 7.02        Conditions to Obligations of Buyer ............................38
    Section 7.03        Conditions to Obligations of Sellers ..........................39

ARTICLE VIII        Indemnification .....................................................................40
    Section 8.01        Survival ...........................................................................40
    Section 8.02        Indemnification By Sellers ...........................................40
    Section 8.03        Indemnification By Buyer .............................................41
    Section 8.04        Indemnification Procedures .........................................41
    Section 8.05        Payments ........................................................................43
    Section 8.06        Tax Treatment of Indemnification Payments ............43
    Section 8.07        Effect of Investigation ..................................................43
    Section 8.08        Exclusive Remedies .......................................................43
    Section 8.09        Seller Representative ....................................................44

ARTICLE IX        Termination .............................................................................45
    Section 9.01        Termination .....................................................................45

Section 9.02     Effect of Termination................................................................46

ARTICLE X     Miscellaneous ................................................................46
    Section 10.01     Expenses ......................................................................46
    Section 10.02     Notices ........................................................................46
    Section 10.03     Interpretation................................................................47
    Section 10.04     Headings ......................................................................47
    Section 10.05     Severability ..................................................................48
    Section 10.06     Entire Agreement..........................................................48
    Section 10.07     Successors and Assigns..................................................48
    Section 10.08     No Third-party Beneficiaries .........................................48
    Section 10.09     Amendment and Modification; Waiver .............................48
    Section 10.10     Governing Law; Submission to Jurisdiction; Waiver of
                      Jury Trial.....................................................................49
    Section 10.11     Specific Performance ....................................................49
    Section 10.12     Counterparts ................................................................50

EXHIBIT "A"
Page 62

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of March 13, 2016, is made and entered into by and among: (i) 2100 FREEDOM, INC., a Delaware corporation ("**Freedom**"); (ii) each of the subsidiaries of Freedom set forth on **Schedule A** (collectively, the "**Subsidiaries**," and together with Freedom, each a "**Seller**" and collectively the "**Sellers**"); and (iii) MEDIANEWS GROUP, INC., d/b/a/ Digital First Media, a Delaware corporation ("**Buyer**").

## RECITALS

A.    Freedom is the debtor and debtor-in-possession in the bankruptcy case pending before Bankruptcy Court as Case No. 8:15-bk-15315-MW.  Sellers are engaged in the business of owning and operating print publications, websites and mobile applications (the "**Business**").

B.    Sellers wish to sell and assign to Buyer, and Buyer wishes to purchase and assume from Sellers, substantially all the assets, and certain specified liabilities, of the Business, subject to the terms and conditions set forth herein.

C.    Pursuant to an order of the Bankruptcy Court entered in the Bankruptcy Case on December 29, 2015, as Docket No. 276, Mosier & Company, Inc. (the "**Seller Representative**") is authorized to: (i) make, execute, enter into and deliver this Agreement on behalf of Sellers; (ii) make, on behalf of Sellers, all elections, decisions and determinations desired by, or required, of Sellers pursuant to this Agreement, and (iii) perform and cause to be performed on behalf of Sellers the obligations of Sellers pursuant to this Agreement.  In all such respects, Seller Representative is and will be acting solely in a representative capacity, and in no event will Seller Representative have any personal obligation or liability to Buyer by reason of serving in such capacity.

D.    Within five (5) Business Days of the date hereof, Buyer, Sellers, the Seller Representative and U.S. Bank National Association  (the "**Escrow Agent**") shall have entered into that certain Escrow Agreement substantially in the form attached hereto as **Exhibit A** (the "**Escrow Agreement**"), pursuant to which, among other things, (i) Buyer shall deposit all amounts comprising the Purchase Price, other than the Initial Purchase Deposit (as defined below) with the Escrow Agent and (ii) Escrow Agent shall deposit and hold such amount in a separate escrow account (the "**Purchase Price Escrow Account**").

NOW, THEREFORE, in consideration of the foregoing recitals, which are incorporated herein by reference, the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
### DEFINITIONS

The following terms have the meanings specified or referred to in this **Article I**:

"**Accounting Firm**" has the meaning set forth in **Section 2.06(e)**.

"**Accounts Receivable**" has the meaning set forth in **Section 2.01(b)**.

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"**Actual Cash**" has the meaning set forth in **Section 2.07(a)(i)**.

"**Actual Inventory**" has the meaning set forth in **Section 2.07(a)(ii)**.

"**Affiliate**" means, with respect to any Person, any other Person that: (a) owns or controls, or is owned or controlled by, or is under common ownership or control with, such Person, directly or indirectly, with ownership of five percent (5%) or more of the equity of the Person constituting "ownership", and the power to direct or cause the direction of the management and policies of a Person, whether through ownership, contract, order or otherwise, constituting "control"; (b) is an officer, director, manager, managing member, managing partner or general partner of the Person; (c) is, if the Person is an officer, director, manager, managing member, managing partner or general partner, the corporation, limited liability company, partnership or other entity for which the Person acts in such capacity; (d) is legally related to the person by birth, adoption or marriage; or (e) is an "affiliate" as defined in 11 U.S.C. §101(2).

"**Agreement**" has the meaning set forth in the preamble.

"**Appeal**" or "**appeal**" means, and will be construed broadly to include, any appeal of an entered order, any motion for reconsideration of an entered order, or any other motion seeking to modify, amend, reverse, vacate, set aside or remand for further action an entered order.

"**Assigned Contracts**" means all Contracts and Intellectual Property Licenses identified on **Section 2.01(d)** of the Disclosure Schedules.

"**Assignment and Assumption Agreement**" has the meaning set forth in **Section 3.02(a)(ii)**.

"**Assignment and Assumption of Lease**" has the meaning set forth in **Section 3.02(a)(v)**.

"**Assignment Notice**" has the meaning set forth in **Section 6.14(b)**.

"**Assumed Liabilities**" has the meaning set forth in **Section 2.03**.

"**Auction**" has the definition set forth in the Bidding Procedures.

"**Audited Financial Statements**" has the meaning set forth in **Section 4.04**.

"**Authorized Personnel**" has the meaning set forth in **Section 6.07(d)**.

"**Avoidance Actions**" means, collectively, all avoidance actions or similar causes of action arising under Sections 544 through 553, inclusive, of the Bankruptcy Code related to the Business brought against any Person that relate to any property other than the Purchased Assets.

"**Balance Sheet**" has the meaning set forth in **Section 4.04**.

"**Balance Sheet Date**" has the meaning set forth in **Section 4.04**.

"**Bankruptcy Case**" means the Sellers' bankruptcy cases identified in Recital A and Schedule A.

"**Bankruptcy Code**" means Title 11 of the United States Code.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Central District of California, Santa Ana Division.

"**Base Purchase Price**" means Forty-Five Million Five Hundred Thousand Dollars ($45,500,000).

"**Benefit Plan**" means each benefit, retirement, employment, compensation, incentive, stock option, restricted stock, stock appreciation right, phantom equity, change in control, severance, vacation, paid time off, fringe-benefit and other similar agreement, plan, policy, program and other arrangement (and any amendments thereto), whether or not reduced to writing, in effect and covering one or more Employees, former employees and the beneficiaries and dependents of any such Employee or former employee of the Business, and is maintained, sponsored, contributed to, or required to be contributed to by Sellers, or under which Sellers have or may have any liability for premiums or benefits.

"**Benefit Provider**" means each broker, provider, issuer, or administrator of a Benefit Plan of Seller, including Anthem Insurance Companies, Inc., Kaiser Permanente, Delta Dental Plans Association, Vision Service Plan and ADP, LLC, or any of their respective affiliates.

"**Bidding Procedures**" has the meaning set forth in **Section 3.04**.

"**Bidding Procedures Order**" means the order of the Bankruptcy Court entered in the Bankruptcy Case on February 5, 2016, as Docket No. 371.

"**Bill of Sale**" has the meaning set forth in **Section 3.02(a)(i)**.

"**Books and Records**" has the meaning set forth in **Section 2.01(m)**.

"**Breach**" has the meaning set forth in **Section 3.07**.

"**Break-Up Fee**" has the meaning set forth in **Section 3.03**.

"**Business**" has the meaning set forth in **Recital A**.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in California are expressly authorized or required by Law to be closed for business.

"**Buyer**" has the meaning set forth in the preamble.

"**Buyer Closing Certificate**" has the meaning set forth in **Section 7.03(e)**.

"**Buyer Indemnitees**" has the meaning set forth in **Section 8.02**.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.

"**Closing**" has the meaning set forth in **Section 3.01**.

"**Closing Date**" has the meaning set forth in **Section 3.01**.

"**Closing Date Payment Amount**" has the meaning set forth in **Section 2.05(c)**.

"**Closing Performance Date**" has the meaning set forth in **Section 9.01(b)(ii)**.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Contracts**" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"**Cure Cost Escrow Account**" has the meaning set forth in **Section 2.05(d)(ii)**.

"**Cure Cost Escrow Amount**" has the meaning set forth in **Section 2.05(d)(ii)**.

"**Data Room**" has the meaning set forth in the Bidding Procedures.

"**Deed**" has the meaning set forth in **Section 3.02(a)(iv)**.

"**Default**" has the meaning set forth in **Section 3.07**.

"**Direct Claim**" has the meaning set forth in **Section 8.04(c)**.

"**Disclosure Schedules**" means the Disclosure Schedules attached to this Agreement.

"**Dispute Resolution Procedure**" has the meaning set forth in **Section 2.06(d)**.

"**Dollars**" or "**$**" means the lawful currency of the United States.

"**Employees**" means those Persons employed by Sellers in connection with the Business immediately prior to the Closing.

"**Encumbrance**" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"**Environmental Claim**" means any Action, Governmental Order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"**Environmental Law**" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**ERISA Affiliate**" shall mean any Person (whether or not incorporated) that would have ever been considered a single employer with any Seller under Section 4001(b) of ERISA or part of the same "controlled group" as any Seller for purposes of Section 302(d)(3) of ERISA.

"**Escrow Agent**" has the meaning set forth in **Recital D**.

"**Escrow Agreement**" has the meaning set forth in **Recital D.**

"**Estimated Cash**" has the meaning set forth in **Section 2.06(a).**

"**Estimated Closing Statement**" has the meaning set forth in **Section 2.06(a).**

"**Estimated Inventory**" has the meaning set forth in **Section 2.06(a)**.

"**Evaluated Contracts**" has the meaning set forth in **Section 6.14(a)**.

"**Evaluation Notice**" has the meaning set forth in **Section 6.14(a)**.

"**Excess Cash**" means that amount of cash and cash equivalents that exceeds Target Cash.

"**Excluded Assets**" has the meaning set forth in **Section 2.02**.

"**Excluded Contracts**" has the meaning set forth in **Section 2.02(c)**.

"**Excluded Liabilities**" has the meaning set forth in **Section 2.04**.

"**Expense Reimbursement**" has the meaning set forth in **Section 3.03**.

"**Final Allocation**" has the meaning set forth in **Section 2.08**.

"**Final Closing Statement**" has the meaning set forth in **Section 2.06(f)**.

"**Final Determination Date**" has the meaning set forth in **Section 2.06(f)**.

"**Final Order**" means any Governmental Order that has not been vacated, reversed, remanded or stayed; provided further, however, that in order for the Sale Approval Order to constitute a Final Order, the Sale Approval Order must: (a) not be on appeal, subject to appeal, or vacated, reversed or remanded following appeal; or (b) if on appeal or subject to appeal, not be stayed and contain a finding that Buyer is a good faith purchaser within the meaning of 11 U.S.C.§ 363(m).

"**Financial Statements**" has the meaning set forth in **Section 4.04**.

"**Freedom**" has the meaning set forth in the Preamble.

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Hazardous Materials**" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally

occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls, arsenic at concentrations that exceed the background threshold value of 12 mg/kg, as established by the California Department of Toxic Substance Control and organochlorine pesticides.

"**Indemnified Party**" has the meaning set forth in **Section 8.04**.

"**Indemnifying Party**" has the meaning set forth in **Section 8.04**.

"**Initial Purchase Deposit**" has the meaning set forth in **Section 2.05(b)**.

"**Insurance Policies**" has the meaning set forth in **Section 4.13**.

"**Intellectual Property**" means all of the following and similar intangible property and related proprietary rights, interests and protections, however arising, pursuant to the Laws of any jurisdiction throughout the world: (a) trademarks, service marks, trade names, brand names, logos, trade dress and other proprietary indicia of goods and services, whether registered, unregistered or arising by Law, and all registrations and applications for registration of such trademarks, including intent-to-use applications, and all issuances, extensions and renewals of such registrations and applications; (b) internet domain names, whether or not trademarks, registered in any generic top level domain by any authorized private registrar or Governmental Authority; (c) original works of authorship in any medium of expression, whether or not published, all copyrights (whether registered, unregistered or arising by Law), all registrations and applications for registration of such copyrights, and all issuances, extensions and renewals of such registrations and applications; (d) confidential information, formulas, designs, devices, technology, know-how, research and development, inventions, methods, processes, compositions and other trade secrets, whether or not patentable; and (e) patented and patentable designs and inventions, all design, plant and utility patents, letters patent, utility models, pending patent applications and provisional applications and all issuances, divisions, continuations, continuations-in-part, reissues, extensions, reexaminations and renewals of such patents and applications.

"**Intellectual Property Assets**" means all Intellectual Property that is owned by Sellers and used in or necessary for the conduct of the Business as currently conducted.

"**Intellectual Property Assignments**" has the meaning set forth in **Section 3.02(a)(iii)**.

"**Intellectual Property Licenses**" means all licenses, sublicenses and other agreements by or through which other Persons, including Sellers' Affiliates, grant Sellers exclusive or non-exclusive rights or interests in or to any Intellectual Property that is used in or necessary for the conduct of the Business as currently conducted.

"**Intellectual Property Registrations**" means all Intellectual Property Assets that are subject to any issuance, registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction, including registered trademarks,

domain names and copyrights, issued and reissued patents and pending applications for any of the foregoing.

"**Interim Balance Sheet**" has the meaning set forth in **Section 4.04**.

"**Interim Balance Sheet Date**" has the meaning set forth in **Section 4.04**.

"**Interim Financial Statements**" has the meaning set forth in **Section 4.04**.

"**Inventory**" has the meaning set forth in **Section 2.01(c)**.

"**Joint Release Notice**" has the meaning ascribed to such term in the Escrow Agreement

"**Knowledge of Sellers or Sellers' Knowledge**" means the actual knowledge of the Seller Representative, after inquiry of (a) the executive officers of Sellers (without inquiry by the executive officers of Sellers), and (b) such other Persons as Seller Representative may elect in his discretion, in each case, without further inquiry by Seller Representative.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Leased Real Property**" has the meaning set forth in **Section 4.08(b)**.

"**Leases**" has the meaning set forth in **Section 4.08(b)**.

"**Liabilities**" means liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"**LIBOR Rate**" means, on any date of determination, the British Bankers' Association LIBOR Rate ("BBA LIBOR"), as published by Reuters (or other commercially available, generally recognized financial information source providing quotations of BBA LIBOR) at approximately 11:00 a.m., London time, on such day (or, if such day is not a Business Day, on the preceding Business Day) for dollar deposits in the amount of one million dollars ($1,000,000) with a maturity of one month.

"**Losses**" means losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers; *provided, however,* that "Losses" shall not include punitive damages, except in the case of fraud or to the extent actually awarded to a Governmental Authority or other third party.

"**Material Adverse Effect**" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, prospects, condition (financial or otherwise) or assets of the Business, (b) the value of the Purchased Assets, or (c) the ability of Sellers to

consummate the transactions contemplated hereby on a timely basis; *provided, however,* that "Material Adverse Effect" shall not include any event, occurrence, fact, condition, or change, directly or indirectly, arising out of or attributable to: (i) any changes, conditions or effects in the United States or foreign economies, or securities or financial markets in general; (ii) changes, conditions or effects that generally affect the industries in which the Business operates; (iii) any change, effect or circumstance resulting from an action required or permitted by this Agreement, except pursuant to **Section 4.03** and **Section 6.06**; or (iv) conditions caused by acts of terrorism or war (whether or not declared); *provided further, however,* that any event, occurrence, fact, condition, or change referred to in clauses (i), (ii) or (iv) immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or could reasonably be expected to occur to the extent that such event, occurrence, fact, condition, or change has a disproportionate effect on the Business compared to other participants in the industries in which the Business operates.

"**Multiemployer Plan**" has the meaning set forth in Section 3(37) or Section 4001(a)(3) of ERISA.

"**Owned Real Property**" has the meaning set forth in **Section 4.08(a)**.

"**Net Adjustment Amount**" has the meaning set forth in **Section 2.07(a)(iii)**.

"**Notice of Disagreement**" has the meaning set forth in **Section 2.06(c)**.

"**Permits**" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

"**Permitted Discretion**" means a determination made in good faith and in the exercise of reasonable business judgment from the perspective of a purchaser of real property assets pursuant to Section 363 of the Bankruptcy Code.

"**Permitted Encumbrances**" has the meaning set forth in **Section 4.06(a)**.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Post-Closing Tax Period**" means any taxable period beginning after the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period beginning after the Closing Date.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"**Proposed Closing Statement**" has the meaning set forth in **Section 2.06(b)**.

"**PSZJ**" has the meaning set forth in **Section 2.05(b)**.

"**Purchase Price**" has the meaning set forth in **Section 2.05(a)**.

"**Purchase Price Escrow Account**" has the meaning set forth in **Recital D.**

"**Purchased Assets**" has the meaning set forth in **Section 2.01**.

"**Real Property**" means, collectively, the Owned Real Property and the Leased Real Property.

"**Rejected Contracts**" has the meaning set forth in **Section 6.14(c)**.

"**Rejection Notice**" has the meaning set forth in **Section 6.14(c)**.

"**Release**" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment, including ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Retained Employee Notice**" has the meaning set forth in **Section 6.04(h)**.

"**Sale**" means the sale of the Purchased Assets pursuant to this Agreement.

"**Sale Approval Date**" means the date upon which the Sale Approval Order becomes a Final Order.

"**Sale Approval Order**" means an order of the Bankruptcy Court entered in the Bankruptcy Case, reasonably acceptable to Sellers and Buyer, approving this Agreement and the sale, assignment and conveyance of the Purchased Assets on the terms set forth in this Agreement, free and clear of Liens and Interests (other than the Permitted Encumbrances) pursuant to 11 U.S.C. §363(b) and (f), including obligations to Sellers' vendors, trade creditors, Employees, former Employees, taxing authorities, other government agencies, secured creditors, and other lien creditors, which order shall, among other things: (i) confirm the authority of the Seller Representative to act on behalf of Sellers as described in **Recital C**, and ratify any actions previously taken by the Seller Representative on behalf of Sellers in connection with the execution and performance of this Agreement, including with respect to the execution and delivery of any deeds, bills of sale, assignments, certificates, affidavits and other instruments and documentation required of Sellers pursuant to this Agreement or otherwise in connection with the Sale; (ii) approve the assumption by the appropriate Seller and assignment to Buyer of the Assigned Contracts, (iii) specifically approve each of **Section 3.03, Section 3.08, Section 6.04, Section 6.14, and Section 8.09(f)**, (iv) establish the date of each Rejection Notice as the effective date of rejection for each of the Rejected Contracts identified therein, (v) set forth anything determined by the Title Insurer prior to the entry of the Sale Approval Order as necessary or desirable to enable the issuance of any title insurance required pursuant to this Agreement, (vi) contain a finding of good faith under 11 U.S.C. §363(m), (vii) order that Buyer is absolved of

and immune from any and all successor liability, including successor liability for any and all Taxes, including payroll taxes, income taxes and sales taxes, and any and all obligations to Employees, including wages, vacation pay, severance, Liability under any Benefit Plan, health care liability, and any Actions against Seller, (viii) enjoin all Persons from asserting against Buyer any Liability or Encumbrance that may exist against Seller, including all Liabilities and Encumbrances referenced in the Sale Approval Order, (ix) contain a waiver of the stays provided under Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure, and (x) provide that any Person receiving notice of the motion seeking the Sale Approval Order who does not timely object to the relief requested in such motion shall be deemed to consent to the relief requested in such motion or in the Sale Approval Order and be bound thereby.

"**Seller**" has the meaning set forth in the Preamble.

"**Seller Indemnitees**" has the meaning set forth in **Section 8.03**.

"**Seller Representative**" has the meaning set forth in **Recital C**.

"**Subsidiaries**" has the meaning set forth in the Preamble.

"**Subsequent Assigned Contracts**" has the meaning set forth in **Section 6.14(b)**.

"**Tangible Personal Property**" has the meaning set forth in **Section 2.01(f)**.

"**Target Cash**" means Three Million Dollars ($3,000,000).

"**Target Inventory**" means Inventory with a current market value of Three Million Five Hundred Thousand Dollars ($3,500,000) as of the Closing.

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Territory**" means the United States of America and any other location where any Seller has conducted business prior to the Closing Date.

"**Title Insurer**" has the meaning set forth in **Section 7.02(f)**.

"**Third Party Claim**" has the meaning set forth in **Section 8.04(a)**.

"**Transaction Documents**" means this Agreement, the Escrow Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the Intellectual Property Assignments, the Deeds, the Assignment and Assumption of Leases and the other agreements, instruments and documents required to be delivered at the Closing.

"**WARN Act**" means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs and employment losses.

**ARTICLE II**
**PURCHASE AND SALE**

**Section 2.01   Purchase and Sale of Assets.**   Subject to the terms and conditions set forth herein, at the Closing, Sellers shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Sellers, free and clear of any Encumbrances other than Permitted Encumbrances, all of Sellers' right, title and interest in, to and under all of the assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), wherever located and whether now existing or hereafter acquired (other than the Excluded Assets), which relate to, or are used or held for use in connection with, the Business (collectively, the "**Purchased Assets**"), including the following:

     (a)    all cash and cash equivalents, other than Excess Cash;

     (b)    subject to **Section 6.11(c)**, all accounts or notes receivable held by Seller, and any security, claim, remedy or other right related to any of the foregoing ("**Accounts Receivable**");

     (c)    all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories ("**Inventory**");

     (d)    all Assigned Contracts and, subject to **Section 6.14**, all Subsequent Assumed Contracts;

     (e)    all Intellectual Property Assets;

     (f)    all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones and other tangible personal property (the "**Tangible Personal Property**");

     (g)    all Owned Real Property;

     (h)    all Permits, including Environmental Permits, held by Sellers and required for the conduct of the Business as currently conducted or for the ownership and use of the Purchased Assets, including those listed on **Section 4.15** of the Disclosure Schedules;

     (i)    all rights to any Actions of any nature available to or being pursued by Sellers to the extent related to the Business, the Purchased Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise, excluding, however, Avoidance Actions;

(j)      all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees (including any such item relating to the payment of Taxes) in respect of (i) the Assigned Contracts, (ii) any Subsequent Assigned Contract and (iii) the Evaluated Contracts (but, for any Evaluated Contract, solely for the time period until such Evaluated Contract becomes either a Subsequent Assigned Contract or a Rejected Contract pursuant to **Section 6.14**);

(k)      all of Sellers' rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

(l)      all insurance benefits, including rights and proceeds, arising from or relating to the Business, the Purchased Assets or the Assumed Liabilities;

(m)      originals, or where not available, copies, of all books and records, including, but not limited to, books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, internal financial statements, marketing and promotional surveys, material and research and intellectual property files relating to the Intellectual Property Assets and the Intellectual Property Licenses ("**Books and Records**");

(n)      the assets, properties and rights specifically set forth on **Section 2.01(n)** of the Disclosure Schedules; and

(o)      all goodwill and the going concern value of the Business.

**Section 2.02   Excluded Assets.** Notwithstanding the foregoing, the Purchased Assets shall not include the following assets (collectively, the "**Excluded Assets**"):

(a)      any shares, partnership interests, limited liability company interests or other equity interests in any Seller;

(b)      the Avoidance Actions;

(c)      subject to **Section 6.14**, any Contracts, including Intellectual Property Licenses, that are not Assigned Contracts (the "**Excluded Contracts**");

(d)      the assets, properties and rights specifically set forth on **Section 2.02(c)** of the Disclosure Schedules;

(e)      all Benefit Plans, including any assets available to pay or fund benefits under any Benefit Plans;

(f)      all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees (including

any such item relating to the payment of Taxes) in respect of any Contract other than (i) the Assigned Contracts, (ii) any Subsequent Assigned Contract or (iii) the Evaluated Contracts (but, for any Evaluated Contract, solely for the time period until such Evaluated Contract becomes either a Subsequent Assigned Contract or a Rejected Contract pursuant to **Section 6.14**);

(g)      Excess Cash; and

(h)      the rights which accrue or will accrue to Sellers under the Transaction Documents.

**Section 2.03    Assumed Liabilities.** As of the Closing Date, Sellers shall assign to Buyer and Buyer shall assume Sellers' obligations arising from events occurring on or after the Closing Date under the Assigned Contracts and, subject to **Section 6.14**, under the Subsequent Assumed Contracts, except to the extent that any such executory obligations result from, arise out of, relate to, or are caused by, any one or more of the following: (a) a breach of any of the Assigned Contracts or the Subsequent Assumed Contracts occurring prior to the Closing Date; (b) a breach of warranty, infringement or violation of Law occurring prior to the Closing Date; or (c) an event or condition occurring or existing prior to the Closing Date which, through the passage of time or the giving of notice or both, would constitute a breach or default by Sellers under any of the Assigned Contracts or, subject to **Section 6.14**, under the Subsequent Assumed Contracts (collectively, the "**Assumed Liabilities**").

**Section 2.04    Excluded Liabilities.** Notwithstanding the provisions of Section 2.01 or any other provision in this Agreement to the contrary, Buyer shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of a Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "**Excluded Liabilities**"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include the following:

(a)      any Liability relating to, arising out of, or in connection with any Benefit Plan, including any Liabilities to the Pension Benefit Guaranty Corporation;

(b)      any Liabilities of a Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby, including fees and expenses of counsel, accountants, consultants, advisers and others;

(c)      any Liability for (i) Taxes of a Seller (or any stockholder or Affiliate of Seller) or relating to the Business, the Purchased Assets or the Assumed Liabilities for any Pre-Closing Tax Period; (ii) Taxes that arise out of the consummation of the transactions contemplated hereby or that are the responsibility of Seller pursuant to Section 6.14; or (iii) other Taxes of Seller (or any stockholder or Affiliate of a Seller) of any kind or description (including any Liability for Taxes of a Seller (or any stockholder or Affiliate of Seller) that becomes a Liability of Buyer under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of contract or Law);

(d)      any Liabilities relating to or arising out of the Excluded Assets;

(e)      any Liabilities in respect of any pending or threatened Action arising out of, relating to or otherwise in respect of the operation of the Business or the Purchased Assets to the extent such Action relates to such operation on or prior to the Closing Date;

(f)      any product Liability or similar claim for injury to a Person or property which arises out of or is based upon any express or implied representation, warranty, agreement or guaranty made by Seller, or by reason of the improper performance or malfunctioning of a product, improper design or manufacture, failure to adequately package, label or warn of hazards or other related product defects of any products at any time manufactured or sold or any service performed by Seller;

(g)      any recall, design defect or similar claims of any products manufactured or sold or any service performed by Seller;

(h)      any Liabilities of a Seller arising under or in connection with any Benefit Plan providing benefits to any present or former employee of Seller;

(i)      any Liabilities of a Seller for any present or former employees, agents, independent contractors or subcontractors of a Seller, including any Liabilities associated with any claims for wages or other benefits, workers' compensation, severance, retention, termination or other payments;

(j)      any Environmental Claims, or Liabilities under Environmental Laws, to the extent arising out of or relating to facts, circumstances or conditions existing on or prior to the Closing or otherwise to the extent arising out of any actions or omissions of Seller;

(k)      any trade accounts payable of a Seller arising prior to the Closing;

(l)      any Liabilities of the Business relating or arising from unfulfilled commitments, quotations, purchase orders, customer orders or work orders that (i) do not constitute part of the Purchased Assets issued by the Business' customers to a Seller on or before the Closing; (ii) did not arise in the ordinary course of business; or (iii) are not validly and effectively assigned to Buyer pursuant to this Agreement;

(m)      any Liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, employee or agent of a Seller (including with respect to any breach of fiduciary obligations by same), except for indemnification of same pursuant to **Section 8.03** as Seller Indemnitees;

(n)      any Liabilities under any other Contracts, including Intellectual Property Licenses, (i) which are not validly and effectively assigned to Buyer pursuant to this Agreement; (ii) which do not conform to the representations and warranties with respect thereto contained in this Agreement; or (iii) to the extent such Liabilities arise out of or relate to a breach by a Seller of such Contracts prior to Closing;

(o)      any Liabilities associated with debt, loans or credit facilities of a Seller and/or the Business owing to financial institutions; and

(p)    any Liabilities arising out of, in respect of or in connection with the failure by a Seller or any of its Affiliates to comply with any Law or Governmental Order.

### Section 2.05  Purchase Price; Escrow Accounts.

(a)    Subject to the terms and conditions set forth herein, as consideration for the Purchased Assets, Buyer shall (i) pay to Sellers in immediately available funds an amount in the aggregate equal to Initial Purchase Deposit, as provided in **Section 2.05(b)** and **Section 2.05(d)**, (ii) pay to Sellers (via the Escrow Agent) in immediately available funds an amount in the aggregate equal to the Closing Date Payment Amount, as provided in **Section 2.05(c)** and **Section 2.05(d)**, (iii) pay or cause to be paid to Sellers, if applicable, any amount determined to be owed to Sellers pursuant to **Section 2.06**, and (iv) assume the Assumed Liabilities (such total consideration in subclauses (i) through (iv) above, the "**Purchase Price**").

(b)    Buyer shall deposit into the client trust account of Pachulski Stang Ziehl & Jones, LLP ("**PSZJ**") in accordance with the Bidding Procedures, in immediately available funds, a deposit in the amount of Four Million Five Hundred Fifty Thousand Dollars ($4,550,000) (the "**Initial Purchase Deposit**"); provided, however, that if Buyer increases the amount of the Base Purchase Price, including in response to the bidding process described in the Bidding Procedures, then Buyer shall deliver to PSZJ an additional amount equal to ten percent (10%) of the Base Purchase Price as so increased, less the Initial Purchase Deposit, such that the total aggregate amount of both such deposits equal ten percent (10%) of the increased Base Purchase Price, and, thereafter, the Initial Purchase Deposit shall mean and be construed to include both such deposits equaling ten percent (10%) of the Base Purchase Price as so increased.  Pursuant to and in accordance with the Bidding Procedures, the Escrow Agreement and this Agreement, the Initial Purchase Deposit (including any such increase thereto) shall be: (a) applied to the Closing Date Payment Amount; (b) returned to Buyer; or (c) or forfeited by Buyer and released to a Seller in accordance with **Section 3.08**.

(c)    No later than one (1) Business Day prior to the Closing, Buyer shall deposit with the Escrow Agent in accordance with the Escrow Agreement an amount equal to (such amount, the "**Closing Date Payment Amount**"):

(i)    the Base Purchase Price;

(ii)    less the amount, if any, by which Estimated Cash is less than Target Cash;

(iii)    plus the amount, if any, by which Estimated Inventory exceeds Target Inventory;

(iv)    less the amount, if any, by which Estimated Inventory is less than Target Inventory;

(v)    less the Cure Cost Escrow Amount;

(vi)    less the amount of the Initial Purchase Deposit.

(d)    At the Closing, PSZJ shall release to Sellers from its client trust account the Initial Purchase Deposit, and Buyer shall pay or cause to be paid:

(i)    to Sellers, an amount from the Purchase Price Escrow Account equal to the Closing Date Payment Amount by delivering to the Escrow Agent a Joint Release Notice in accordance with the Escrow Agreement, signed by the Buyer and the Seller Representative with instructions to that effect; and

(ii)    to the Escrow Agent, in immediately available funds, to the account designated by the Escrow Agent (the "**Cure Cost Escrow Account**"), Two Million Seven Hundred Thousand Dollars ($2,700,000) (the "**Cure Cost Escrow Amount**") in accordance with the terms of this Agreement and the Escrow Agreement.

(e)    For the avoidance of doubt, the Cure Cost Escrow Amount is not included in the Closing Date Payment Amount pursuant to, and as set forth in, **Section 2.05(c)(v)**, and shall be funded by Buyer to the Escrow Agent pursuant to, and as set forth in, **Section 2.05(d)(ii)**.

(f)    Pursuant to the Escrow Agreement, the Cure Cost Escrow Amount shall be utilized to fund the payment of cure costs for Assigned Contracts and Subsequent Assigned Contracts pursuant to **Section 2.07(b)**.

**Section 2.06    Delivery of Estimated Closing Statement and Proposed Closing Statement.**No less than three (3) but no more than five (5) Business Days prior to the Closing Date, Seller Representative shall deliver to Buyer, with reasonably detailed supporting information, a statement (the "**Estimated Closing Statement**") setting forth (A) a reasonable, good faith estimate of (i) cash held by Sellers as of immediately prior to the Closing (the "**Estimated Cash**"), and (ii) the current market value of the Inventory as of the Closing ("**Estimated Inventory**"), and (B) the calculation of the Closing Date Payment Amount.

(b)    As promptly as practicable, but not later than ten (10) days after the Closing, Buyer shall deliver to the Seller Representative, a statement (the "**Proposed Closing Statement**") setting forth a good faith determination of (i) cash held by Sellers as of immediately prior to the Closing and (ii) the value of the Inventory as of the Closing.

(c)    In the event the Seller Representative disputes the correctness of the Proposed Closing Statement, the Seller Representative shall notify Buyer in writing of its objections within ten (10) days after receipt of the Proposed Closing Statement and shall set forth, in writing and in reasonable detail, the reasons for the Representative's objections (any such notice, a "**Notice of Disagreement**"). Any matter not set forth in any such Notice of Disagreement shall be final and binding on the Parties on the date of such Notice of Disagreement.

(d)    During the ten (10) days immediately following the delivery of any Notice of Disagreement, Buyer and the Seller Representative shall seek in good faith to resolve any differences that they may have with respect to any matter specified in the Notice of Disagreement. During such period, Buyer and the Seller Representative and their respective agents shall each have access to the other Party's working papers, trial balances and similar materials prepared in connection with the other Party's preparation of the Proposed Closing Statement and the Notice of Disagreement, as the case may be. The matters set forth in any such

written resolution executed by Buyer and the Seller Representative shall be final and binding on the Parties on the date of such written resolution.

(e)     If, at the end of such ten (10) day period specified in **Section 2.06(d)**, Buyer and the Seller Representative have not been able to resolve, in writing, all differences that they may have with respect to any matter specified in such Notice of Disagreement, Buyer and the Seller Representative shall submit to an internationally recognized, mutually agreed-upon accounting firm (the "**Accounting Firm**"), for review and resolution solely those matters specified in such Notice of Disagreement that remain in dispute (and as to no other matter), and the Accounting Firm shall reach a final, binding resolution of such matters, which final resolution shall not be subject to collateral attack for any reason (other than fraud or manifest error) and shall be (i) in writing and signed by the Accounting Firm, (ii) within the range of the amount of each item in dispute contested by the Seller Representative and Buyer on an item by item basis, (iii) furnished to Buyer and the Seller Representative as soon as practicable after the items in dispute have been referred to the Accounting Firm, which shall not be more than thirty (30) days after such referral, (iv) made in accordance with this Agreement and (v) conclusive and binding upon the Parties on the date of delivery of such written resolution.  Buyer and the Seller Representative agree to execute, if requested by the Accounting Firm, a reasonable engagement letter in customary form. Buyer and the Seller Representative agree to cooperate fully with the Accounting Firm and promptly provide all documents and information requested by the Accounting Firm so as to enable it to make such determination as quickly and as accurately as practicable.  The procedure outlined in this **Section 2.06(e)** is referred to as the "**Dispute Resolution Procedure.**"

(f)     The Proposed Closing Statement shall become the "**Final Closing Statement**" (i) on the earlier of (A) the eleventh (11th) day following the delivery of the Proposed Closing Statement if a Notice of Disagreement has not been delivered to Buyer by the Seller Representative, (B) the date upon which the Seller Representative acknowledges in writing that it has no objections to the Proposed Closing Statement, (C) the date on which a written resolution with respect to all differences has been executed pursuant to **Section 2.06(d)**, and (D) the date upon which the Accounting Firm reaches a final, binding resolution of those matters submitted to the Accounting Firm pursuant to **Section 2.06(e)**, (ii) with such changes as are necessary to reflect matters resolved pursuant to any written resolution executed pursuant to **Section 2.06(d)**, and (iii) with such changes as are necessary to reflect the Accounting Firm's resolution of matters in dispute pursuant to **Section 2.06(e)**.  The date on which the Proposed Closing Statement shall become the Final Closing Statement pursuant to the immediately foregoing sentence is referred to as the "**Final Determination Date**".

(g)     Buyer and the Sellers shall each pay or cause to be paid their own costs and expenses incurred in connection with the Dispute Resolution Procedure; provided, that the fees and expenses of the Accounting Firm shall be borne in the same proportion that Buyer's position, on the one hand, and the Sellers' position, on the other hand, initially presented to the Accounting Firm (based on the aggregate of all differences taken as a whole) bear to the final resolution as determined by the Accounting Firm.

EXHIBIT "A"
Page 80

**Section 2.07    Purchase Price Adjustments; Cure Costs for Assigned Contracts and Subsequent Assigned Contracts.Cash and Inventory**.

(i)    If the cash held by Sellers as of immediately prior to the Closing as set forth in the Final Closing Statement ("**Actual Cash**") is greater than Estimated Cash, then an amount equal to the excess of Actual Cash over Estimated Cash shall be due to Sellers and payable by Buyer in accordance with, and subject to, **Section 2.07(a)(iii)**. If Actual Cash is less than Estimated Cash, then an amount equal to such shortfall shall be due to Buyer and payable by Sellers in accordance with, and subject to, **Section 2.07(a)(iii)**.

(ii)    If the current market value of the Inventory as of the Closing as set forth in the Final Closing Statement ("**Actual Inventory**") is greater than Estimated Inventory, an amount equal to such excess shall be due to Sellers and payable by Buyer in accordance with, and subject to, **Section 2.07(a)(iii)**. If Actual Inventory is less than Estimated Inventory, then an amount equal to such shortfall shall be due to Buyer and payable by Sellers in accordance with, and subject to, **Section 2.07(a)(iii)**.

(iii)    Any amounts owing and payable between the Buyer and Sellers pursuant to **Section 2.07(a)(i)** and **Section 2.07(a)(ii)** shall be set-off against any other amount or amounts owing and payable between such Parties pursuant to such sections, such that only a net amount (the "**Net Adjustment Amount**") shall be paid, which set-off amounts shall be set forth on the Final Closing Statement, as follows:

(A)    In the event that the Net Adjustment Amount is payable to Buyer, within two (2) Business Days of the Final Determination Date, Sellers shall pay to Buyer, by wire transfer of immediately available funds, an amount equal to the Net Adjustment Amount, to an account designated by Buyer; and

(B)    In the event that the Net Adjustment Amount is payable to Sellers, within two (2) Business Days of the Final Determination Date, Buyer shall pay to the Seller Representative (for the benefit of Sellers), by wire transfer of immediately available funds, an amount equal to the Net Adjustment Amount, to an account designated by the Seller Representative.

(b)    **Cure Costs for Assigned Contracts and Subsequent Assigned Contracts.** As provided in **Section 3.06**, Sellers shall pay the cure costs related to all Assigned Contracts and Subsequent Assigned Contracts up to Two Million Seven Hundred Thousand Dollars ($2,700,000) in the aggregate. For cure costs related to Assigned Contracts and Subsequent Assigned Contracts, if and to the extent there are sufficient funds remaining in the Cure Cost Escrow Account, Buyer and the Seller Representative shall cause the Escrow Agent to pay all such costs from the Cure Cost Escrow Account in accordance with the terms of the Escrow Agreement. After such time as all Evaluated Contracts have become either Subsequent Assigned Contracts or Rejected Contracts, Buyer and the Seller Representative shall cause the Escrow Agent, in accordance with the Escrow Agreement, to distribute the balance of the Cure Cost Escrow Account, if any, to the Seller Representative, for the benefit of Sellers, to an account designated by the Seller Representative. For the avoidance of doubt, and notwithstanding anything to the contrary set forth in this Agreement or in the Escrow Agreement, Sellers shall not

have any liability for cure costs related to Assigned Contracts and Subsequent Assigned Contracts, collectively, in excess of the Cure Cost Escrow Amount.

    **Section 2.08    Allocation of Purchase Price.** Within 120 days following the Closing, Buyer shall deliver to Seller Representative a proposed allocation of the Purchase Price (including the Assumed Liabilities and any other amounts properly included therein) among the Purchased Assets in accordance with Section 1060 of the Code and Treasury Regulations thereunder (and any similar provision of state, local or foreign law, as applicable).  Seller Representative shall have thirty (30) days following receipt of Buyer's proposed allocation to review and comment on such proposed allocation and Buyer shall consider such comments in good faith.  Thereafter, Buyer shall provide Seller Representative with Buyer's final allocation schedule (the "**Final Allocation**"). Seller Representative and Buyer shall cooperate with each other in preparing IRS Form 8594 (including any subsequent adjustments required thereto) in a manner consistent with such Final Allocation, and furnish the other with a copy of such form prepared in draft form within a reasonable period before its filing due date.  If such Final Allocation is disputed by any Tax authority or other Governmental Body, Buyer or any Seller Representative receiving notice of such dispute will promptly notify the other Party and the Parties will use their commercially reasonable efforts to sustain the Final Allocation.  Neither Buyer nor Seller Representative shall take any position (including in any Tax Returns, reports, audits or otherwise) that is inconsistent with such allocation, unless otherwise required pursuant to a final determination by a court of competent jurisdiction or pursuant to a closing agreement with the IRS entered into pursuant to Section 7121 of the Code.  The Purchase Price allocation determined in connection with this **Section 2.08** shall be utilized for Tax reporting purposes only.  For the avoidance of doubt, such allocation shall not be binding upon any Party for purposes other than Tax reporting or used as evidence, or for any other purpose, in connection with any dispute regarding valuation or allocation of the Purchase Price and/or Assumed Liabilities.

    **Section 2.09    Third Party Consents**. To the extent that any Seller's rights under any Contract or Permit constituting a Purchased Asset, or any other Purchased Asset, may not be assigned to Buyer without the consent of another Person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and such Seller, at its expense, shall use its reasonable best efforts to obtain any such required consent(s) as promptly as possible.  If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the Purchased Asset in question so that Buyer would not in effect acquire the benefit of all such rights, such Seller, to the maximum extent permitted by law and the Purchased Asset, shall act after the Closing as Buyer's agent and exercise such Seller's reasonable best efforts to obtain for Buyer the benefits thereunder and shall cooperate, to the maximum extent permitted by Law and the Purchased Asset, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer.  Notwithstanding any provision in this **Section 2.09** to the contrary, Buyer shall not be deemed to have waived its rights under **Section 7.02** unless and until Buyer either provides written waivers thereof or elects to proceed to consummate the transactions contemplated by this Agreement at Closing.

## ARTICLE III
### CLOSING

**Section 3.01    Closing.** Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Sheppard Mullin, 650 Town Center Drive, Fourth Floor, Costa Mesa, California 92626, at 11:59 p.m., Pacific Standard Time, on or before March 31, 2016; provided, that the conditions to Closing set forth in **Article VII** are either satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), or at such other time, date or place as Seller and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**".

**Section 3.02    Closing Deliverables.**

(a)    At the Closing, Sellers shall deliver to Buyer the following:

(i)    a bill of sale substantially in the form of **Exhibit C** hereto (the "**Bill of Sale**") and duly executed by each Seller, transferring the tangible personal property included in the Purchased Assets to Buyer;

(ii)    an assignment and assumption agreement substantially in the form of **Exhibit D** hereto (the "**Assignment and Assumption Agreement**") and duly executed by each Seller, effecting the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities;

(iii)    assignments substantially in the form of **Exhibit E** hereto (the "**Intellectual Property Assignments**") and duly executed by each Seller, transferring all of Sellers' right, title and interest in and to the Intellectual Property Assets and the Intellectual Property Licenses to Buyer;

(iv)    with respect to each parcel of Owned Real Property, a quitclaim deed substantially in the form of **Exhibit H** hereto (each, a "**Deed**") and duly executed and notarized by each applicable Seller;

(v)    with respect to each Lease that is an Assigned Contract, an Assignment and Assumption of Lease substantially in the form of **Exhibit F** hereto (each, an "**Assignment and Assumption of Lease**") and duly executed by each applicable Seller;

(vi)    a power of attorney substantially in the form of **Exhibit G** hereto and duly executed by each Seller;

(vii)    a certificate pursuant to Treasury Regulations Section 1.1445-2(b) duly executed by each Seller;

(viii)    the Sale Approval Order; and

(ix)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give

effect to this Agreement, including letters to any Seller's insurers requesting the assignment of any insurance policies that constitute Assigned Contracts to Buyer.

(b)    At the Closing, Buyer shall deliver to Seller Representative the following:

(i)    the Assignment and Assumption Agreement duly executed by Buyer;

(ii)    with respect to each Lease that is an Assigned Contract, an Assignment and Assumption of Lease duly executed by Buyer; and

(iii)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Seller Representative, as may be required to give effect to this Agreement.

(c)    At the Closing, the Escrow Agent shall deliver the Closing Date Payment Amount to the Seller Representative, for the benefit of Sellers, in immediately available funds to an account specified by Seller Representative.

**Section 3.03    Break-Up Fee and Expense Reimbursement**. In the event that: (a) Buyer is not in Default of this Agreement, (b) Buyer is not the Successful Bidder (as defined in the Bidding Procedures), and (c) all or substantially all of the Purchased Assets are sold to one or more than one other Person determined to be the Successful Bidder (including one or more than one other Person determined to be the successor Successful Bidder if the initially declared Successful Bidder fails to close on the purchase of such assets) then, Sellers will, simultaneously with the close of the sale of the Purchased Assets and solely from the proceeds of such sale, pay to Buyer in immediately available funds, an amount equal to (x) two and a half percent (2.5%) of the Base Purchase Price (the "**Break-Up Fee**"), plus (y) the reasonable and documented out-of-pocket costs incurred by or on behalf of Buyer (including by its equity holders) in connection with this Agreement, the Bidding Procedures, the Auction and the transactions contemplated herein, including, but not limited to, the fees and expenses of Buyer's and its shareholders' counsel and other advisors and the fees and expenses incurred in connection with Buyer's negotiations with ADP, LLC (or its Affiliates) related to the transactions contemplated in this Agreement, up to a maximum amount of $200,000 (the "**Expense Reimbursement**"). Buyer shall provide Seller Representative with documentary evidence of such reasonable and documented out-of-pocket costs incurred in connection with the Expense Reimbursement prior to payment thereof. The Break-Up Fee and the Expense Reimbursement each shall be entitled to allowed administrative expense status pursuant to sections 105(a), 364 and 503(b) of the Bankruptcy Code with priority over any and all administrative expenses of the kind specified in sections 503(b) and 507 of the Bankruptcy Code and shall be senior to all other super priority administrative expenses in the Bankruptcy Cases, subject to payment of the secured claims of any secured creditors with a valid lien against the Purchase Price. For the avoidance of doubt, the Buyer is entitled to the full Break-Up Fee and the Expense Reimbursement otherwise payable pursuant to the first sentence of this **Section 3.03** if a Person or Persons other than the Buyer is the Successful Bidder (or the successor Successful Bidder if the initially declared Successful Bidder fails to close on the purchase of such assets) with respect to any of the Purchased Assets.

**Section 3.04    Bidding Procedures**.  The bidding procedures (the "**Bidding Procedures**") to be employed with respect to this Agreement shall be those reflected in the Bidding Procedures Order, a true and correct copy of which is attached hereto as **Exhibit B**, and is incorporated herein by this reference.  A hearing to approve the Sale in front of the Bankruptcy Court shall be scheduled in accordance with the Bidding Procedures.

**Section 3.05    Rejection of Contracts**. Sellers shall not reject any Contracts, including any Assigned Contracts, pursuant to the Bankruptcy Case without the prior written consent of Buyer, such consent to not be unreasonably withheld, conditioned or delayed, other than Contracts not appearing on the notice to be delivered to Seller Representative under **Section 6.14(a)** and Rejected Contracts.

**Section 3.06    Cure Costs**.  As a condition to the assumption and assignment of the Assigned Contracts set forth on **Section 2.01(d)** of the Disclosure Schedule, on or before Closing, or for Subsequent Assigned Contracts, prior to such subsequent assignment, all cure costs associated with any Assigned Contract or Subsequent Assigned Contract shall be paid by Sellers up to the Cure Cost Escrow Amount, as set forth in **Section 2.07(b)**.

**Section 3.07    Default**.  A party hereto will be in breach of this Agreement ("**Breach**") if such party fails to: (a) make any payment or deposit when due; (b) fails at any time on or before the time of the Closing to cause any representation or warranty by such party to be true and accurate in all material respects; or (c) perform any other act required of such party pursuant to this Agreement on or before the time such performance is required pursuant to this Agreement, including performing all acts required of such party to allow the Closing to occur on or before the Closing Performance Date.  A party hereto will be in default of this Agreement ("**Default**") if another party hereto gives Notice to the party declaring the Breach, and the Breach continues uncured for more than five (5) Business Days following the receipt of written notice of such Breach, provided, however, that if the Breach is not of a type that can be cured by the payment of money and more than five (5) Business Days are reasonably required to cure the Breach, then there will be no Default by reason of the Breach if the party in Breach: (1) commences a cure of the Breach within five (5) Business Days of the receipt of written notice of such Breach; (2) promptly, diligently and in good faith prosecutes the cure to completion, and (3) completes the cure by no later than five (5) Business Days following the Closing Performance Date.

**Section 3.08    Damages Upon Buyer Default**. As set forth in the Bidding Procedures, if the Closing fails to occur as the result of any breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **Article VII** and such breach, inaccuracy or failure has not been cured by Buyer within ten days of Buyer's receipt of written notice of such breach from Seller Representative, then in addition to any other remedies available to Sellers described in this Agreement, Escrow Agent will release to Sellers, and Sellers will keep and retain, the entire Initial Purchase Deposit.  For the avoidance of doubt, any Governmental Order enjoining or otherwise preventing the Closing, the Sale, or any assignment or conveyance contemplated pursuant to this Agreement, resulting from an alleged violation of the Hart Scott Rodino Antitrust Improvements Act of 1976, as amended, or any similar Law, shall result in a forfeiture by Buyer and release to Seller of the entire Initial Purchase Deposit.

**Section 3.09  Stalking Horse APA.** This Agreement is the Stalking Horse APA under, and as defined in, the Bidding Procedures.

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as otherwise set forth in this Agreement, the Purchased Assets shall be sold, transferred, assigned and conveyed strictly "AS IS", "WHERE IS" and "WITH ALL FAULTS", in their condition existing as of the time of the Closing, without any warranty or representation by Sellers except those expressly set forth herein, with all implied warranties expressly disavowed by Sellers and waived by Buyers.  Except as set forth set forth in the correspondingly numbered Section of the Disclosure Schedules, Sellers jointly and severally represent and warrant to Buyer that the statements contained in this **Article IV** are true and correct as of the Closing Date.

**Section 4.01  Organization and Qualification.** Each Seller is a corporation or limited liability company organized, validly existing and in good standing under the Laws of the State indicated in the Introductory Paragraph of this Agreement, and has full corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Business as currently conducted.  **Recital A** and **Schedule A** of the Disclosure Schedules sets forth each jurisdiction in which each Seller is licensed or qualified to do business, and each Seller is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership of the Purchased Assets or the operation of the Business as currently conducted makes such licensing or qualification necessary.

**Section 4.02  Authority of Seller.** Subject to the Sale Approval Order being entered and becoming a Final Order, each Seller has full corporate power and authority to enter into this Agreement and the other Transaction Documents to the Seller is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. Subject to the Sale Approval Order being entered and becoming a Final Order, the execution and delivery by each Seller and any other Transaction Document to which such Seller is a party, the performance by such Seller of its obligations hereunder and thereunder and the consummation by such Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of each Seller. Subject to the Sale Approval Order being entered and becoming a Final Order, this Agreement has been duly executed and delivered by each Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes a legal, valid and binding obligation of such Seller enforceable against such Seller in accordance with its terms.  When each other Transaction Document to which a Seller is or will be a party has been duly executed and delivered by such Seller (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of such Seller enforceable against it in accordance with its terms.

**Section 4.03  No Conflicts.** The execution, delivery and performance by each Seller of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not conflict with or result in a material violation or material breach of, or material default under, any

provision of the certificate of incorporation, by-laws or other organizational documents of such Seller.

**Section 4.04   Financial Statements.**  Complete copies of the audited financial statements consisting of the balance sheet of the Business as of December 31 in each of the years 2012, 2013 and a draft version for 2014 and the related statements of income and retained earnings, stockholders' equity and cash flow for the years then ended (the "**Audited Financial Statements**"), and unaudited financial statements consisting of the balance sheet of the Business as of December 31, 2015 and the related statements of income and cash flow for the twelve month period then ended (the "**Interim Financial Statements**" and together with the Audited Financial Statements, the "**Financial Statements**") attached as part of **Section 4.04** of the Disclosure Schedules/have been delivered to Buyer.  The Financial Statements have been materially prepared in accordance with GAAP applied on a consistent basis throughout the period involved, subject, in the case of the Interim Financial Statements, to normal and recurring year-end adjustments (the effect of which will not be materially adverse) and the absence of notes (that, if presented, would not differ materially from those presented in the Audited Financial Statements).  The Financial Statements are based on the books and records of the Business, and fairly present the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated.  The balance sheet of the Business as of December 31, 2015 is referred to herein as the "**Balance Sheet**" and the date thereof as the "**Balance Sheet Date**".  Each Seller maintains a standard system of accounting for the Business established and materially administered in accordance with GAAP.

**Section 4.05   Contracts.**  All of the Contracts set forth in the schedules filed in the Sellers' Bankruptcy Case, which bind or affect the Purchased Assets, were included in the Data Room and thereby made available to Buyer, except such Contracts that were restricted therefrom due to confidentiality provisions.

**Section 4.06   Title to Purchased Assets.**  Pursuant to the Sale Approval Order, the Purchased Assets (including leasehold interests) will be assigned and conveyed to Buyer upon the Closing free and clear of all Encumbrances pursuant to 11 U.S.C. Section 363(b) and (f), except for those items set forth in **Section 4.06** of the Disclosure Schedules (collectively, the "**Permitted Encumbrances**").

**Section 4.07   Condition and Sufficiency of Assets.**  To Seller's Knowledge, as of the date of this Agreement, the buildings, plants and structures are structurally sound in all material respects, the furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property included in the Purchased Assets and used in the Business as conducted by Sellers are in operating condition and adequate for the uses to which they are being put in all material respects.  None of the Excluded Assets described in **Sections 2.02(a), (b), (d), (g)** or **(h)** are necessary for the conduct of the Business.

**Section 4.08   Real Property.**

(a)      **Section 4.08(a)** of the Disclosure Schedules sets forth each parcel of real property owned by Sellers (together with all buildings, fixtures, structures and improvements situated

thereon and all easements, rights-of-way and other rights and privileges appurtenant thereto, collectively, the "**Owned Real Property**"), including with respect to each property, the address location and use. With respect to each parcel of Owned Real Property:

(i)    to Seller's Knowledge, except as set forth on **Section 4.08(a)(i)** of the Disclosure Schedules, the applicable Seller(s) has/have not leased or otherwise granted to any Person the right to use or occupy such Owned Real Property or any portion thereof; and

(ii)    to Seller's Knowledge, there are no unrecorded outstanding options, rights of first offer or rights of first refusal to purchase such Owned Real Property or any portion thereof or interest therein.

(b)    **Section 4.08(b)** of the Disclosure Schedules sets forth each parcel of real property leased by Sellers (together with all rights, title and interest of Sellers in and to leasehold improvements relating thereto, including, but not limited to, security deposits, reserves or prepaid rents paid in connection therewith, collectively, the "**Leased Real Property**"), and to Seller's Knowledge, a true and complete list of all leases, subleases, licenses, concessions and other agreements (whether written or oral), including all amendments, extensions renewals, guaranties and other agreements with respect thereto, pursuant to which any Seller holds any Leased Real Property (collectively, the "**Leases**"). With respect to each Lease:

(i)    to Seller's Knowledge, the applicable Seller(s) is/are not in breach or default under such Lease, and no event has occurred or circumstance exists which, with the delivery of notice, passage of time or both, would constitute such a breach or default, and such Seller(s) has/have paid all rent due and payable under such Lease;

(ii)    to Seller's Knowledge, Sellers have not received nor given any notice of any default or event that with notice or lapse of time, or both, would constitute a default by any Seller under any of the Leases and no other party is in default thereof, and no party to any Lease has exercised any termination rights with respect thereto; and

(iii)    except as set forth on **Section 4.08(b)(iii)** of the Disclosure Schedules, to Seller's Knowledge, Sellers have not subleased, assigned or otherwise granted to any Person the right to use or occupy such Leased Real Property or any portion thereof.

(c)    To Sellers' Knowledge, Sellers have not received any written notice of (i) material violations of building codes and/or zoning ordinances or other governmental or regulatory Laws affecting the Real Property, (ii) existing, pending or threatened condemnation proceedings affecting the Real Property, or (iii) existing, pending or threatened zoning, building code or other moratorium proceedings, or similar matters which could reasonably be expected to materially and adversely affect the ability to operate the Real Property as currently operated. Neither the whole nor any material portion of any Real Property has been damaged or destroyed by fire or other casualty.

**Section 4.09    Intellectual Property.**

(a)    **Section 4.09(a)** of the Disclosure Schedules lists all Intellectual Property Registrations, which were included in the Data Room.

(b)     To Sellers' Knowledge, the Data Room files made available for review by Buyer prior to the execution of this Agreement contain true and accurate copies of all Intellectual Property Licenses to which Seller is a party in effect as of the date of this Agreement.

(c)     To Sellers' Knowledge, the Data Room files made available for review by Buyer prior to the execution of this Agreement contain true and accurate copies of all licenses, sublicenses and other agreements pursuant to which any Seller grants rights or authority to any Person with respect to any Intellectual Property Assets or Intellectual Property Licenses.

**Section 4.10    Inventory.** All Inventory, whether or not reflected in the Balance Sheet, consists of a quality and quantity usable and saleable in the ordinary course of business consistent with past practice, except for obsolete, damaged, defective or slow-moving items that have been written off or written down to fair market value or for which adequate reserves have been established. To Seller's Knowledge, the quantities of each item of Inventory (whether raw materials, work-in-process or finished goods), except for such obsolete, damaged, defective or slow-moving items, are not excessive, but are reasonable in the present circumstances of Sellers.

**Section 4.11    Accounts Receivable.** The Accounts Receivable reflected on the Interim Balance Sheet and the Accounts Receivable arising after the date thereof (a) have arisen from bona fide transactions entered into by Sellers involving the sale of goods or the rendering of services in the ordinary course of business consistent with past practice; (b) constitute only valid, undisputed claims of Sellers not subject to claims of set-off or other defenses or counterclaims other than normal cash discounts accrued in the ordinary course of business consistent with past practice; and (c) subject to a reserve for bad debts shown on the Interim Balance Sheet or, with respect to Accounts Receivable arising after the Interim Balance Sheet Date, subject to a reserve calculated consistently with the reserve shown on the Interim Balance Sheet. The reserve for bad debts shown on the Interim Balance Sheet or, with respect to Accounts Receivable arising after the Interim Balance Sheet Date, on the accounting records of the Business have been determined in accordance with GAAP, consistently applied, subject to normal year-end adjustments and the absence of disclosures normally made in footnotes.

**Section 4.12    Customers and Suppliers.** To Seller's Knowledge, the Data Room files made available for review by Buyer prior to the execution of this Agreement contain true and accurate copies of all material Contracts with customers or suppliers in effect as of the date of this Agreement.

**Section 4.13    Insurance.** To Sellers' Knowledge, the Data Room files made available for review by Buyer prior to the execution of this Agreement contain true and accurate copies of all insurance policies (collectively, the "**Insurance Policies**") to which any Seller is a party in effect as of the date of this Agreement.

**Section 4.14    Legal Proceedings.** To Sellers' Knowledge, the Data Room files made available for review by Buyer prior to the execution of this Agreement identify all Actions pending against Sellers as of the date of this Agreement.

**Section 4.15    Permits.** Section 4.15 of the Disclosure Schedules lists certain current Permits issued to Seller which are related to the conduct of the Business as currently conducted

or the ownership and use of the Purchased Assets, including the names of the Permits and their respective dates of issuance and expiration.

**Section 4.16    Employment Matters.**  No Seller is a party to, or bound by, any collective bargaining or other Contract with a labor organization representing any of its Employees, and there are no labor organizations representing, purporting to represent or, to Sellers' Knowledge, attempting to represent any Employee.

**Section 4.17    Taxes.**  To Sellers' Knowledge, the Data Room files made available for review by Buyer prior to the execution of this Agreement contain true and accurate copies of the 2014 income tax returns and 2014 sales tax returns filed on behalf of Sellers.

## ARTICLE V
### REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Buyer represents and warrants to Sellers that the statements contained in this **Article V** are true and correct as of the date hereof.

**Section 5.01    Organization of Buyer.**  Buyer is a corporation duly organized, validly existing and in good standing under the Laws of the state of Delaware.

**Section 5.02    Authority of Buyer.**  Subject to the Sale Approval Order being entered and becoming a Final Order, Buyer has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  Subject to the Sale Approval Order being entered and becoming a Final Order, the execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Buyer.  Subject to the Sale Approval Order being entered and becoming a Final Order, this Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms.  When each other Transaction Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms.

**Section 5.03    No Conflicts; Consents.**  The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, by-laws or other organizational documents of Buyer; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice or other action by any Person under any Contract to which

EXHIBIT "A"
Page 90

Buyer is a party. Subject to the Sale Approval Order being entered and becoming a Final Order, no consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

**Section 5.04    Brokers**. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer.

**Section 5.05    Sufficiency of Funds**. Buyer has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

**Section 5.06    Legal Proceedings**. There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise or serve as a basis for any such Action.

## ARTICLE VI
### COVENANTS

**Section 6.01    Conduct of Business Prior to the Closing**. From the date hereof until the Closing, except as otherwise provided in this Agreement or consented to in writing by Buyer (which consent shall not be unreasonably withheld or delayed), each Seller shall, if and to the extent such Seller is authorized pursuant to Final Orders entered in the Bankruptcy Case of such Seller and has sufficient funds available for such use with which to do so: (x) conduct the Business in the ordinary course of business consistent with past practice; (y) use reasonable best efforts to maintain and preserve intact its current Business organization, operations and franchise and to preserve the rights, franchises, goodwill and relationships of its Employees, customers, lenders, suppliers, regulators and others having relationships with the Business; and (z) Sellers shall not use or otherwise dispose of any inventory except in the ordinary course of business. Without limiting the foregoing, from the date hereof until the Closing Date, if and to the extent any Seller is authorized pursuant to Final Orders entered in the Bankruptcy Case of such Seller and has sufficient funds available for such use with which to do so, such Seller shall:

(a)      preserve and maintain all Permits required for the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets;

(b)      pay the debts, Taxes and other obligations of the Business when due;

(c)      continue to collect Accounts Receivable in a manner consistent with past practice, without discounting such Accounts Receivable;

(d)      maintain the properties and assets included in the Purchased Assets in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

(e)    continue in full force and effect without modification all Insurance Policies, except as required by applicable Law;

(f)    defend and protect the properties and assets included in the Purchased Assets from infringement or usurpation;

(g)    perform all of its obligations under all Assigned Contracts;

(h)    maintain the Books and Records in accordance with past practice; and

(i)    comply in all material respects with all Laws applicable to the conduct of the Business or the ownership and use of the Purchased Assets.

**Section 6.02    Access to Information.**    Commencing upon a determination pursuant to the Bidding Procedures or Sale Approval Order that Buyer is the Successful Bidder (either as the Person initially determined to be the Successful Bidder, or as the Person determined to be the Successful Bidder following a failure of the sale of the Purchased Assets to any other Person previously declared to be the Successful Bidder), until the Closing, pursuant to the terms of the Bidding Procedures, Sellers shall (a) afford Buyer and its Representatives full and free access to and the right to inspect all of the Real Property, properties, assets, premises, Books and Records, Contracts and other documents and data related to the Business; (b) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Business as Buyer or any of its Representatives may reasonably request; and (c) instruct the Representatives of Sellers to cooperate with Buyer in its investigation of the Business.  Without limiting the foregoing, Sellers shall permit Buyer and its Representatives to conduct environmental due diligence of the Real Property, including the collecting and analysis of samples of indoor or outdoor air, surface water, groundwater or surface or subsurface land on, at, in, under or from the Real Property.  Any investigation pursuant to this **Section 6.02** shall be conducted in such manner as not to interfere unreasonably with the conduct of the Business or any other businesses of Sellers, and Buyer will indemnify, defend and hold harmless each Seller from any claim, loss or liability of any kind arising by reason of, or in connection with, any damage or injury to person or property occurring during, or in connection with, or as the result of, any such collecting, analysis or investigation.  No investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Sellers in this Agreement.

**Section 6.03    Notice of Certain Events.**

(a)    Commencing upon a determination pursuant to the Bidding Procedures or Sale Approval Order that Buyer is the Successful Bidder (either as the Person initially determined to be the Successful Bidder, or as the Person determined to be the Successful Bidder following a failure of the sale of the Purchased Assets to any other Person previously declared to be the Successful Bidder), until the Closing, Sellers shall promptly notify Buyer in writing of any of the following within Sellers' Knowledge:

(i)    any fact, circumstance, event or action the existence, occurrence or taking of which (A) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (B) has resulted in, or could reasonably be expected to result in, any

representation or warranty made by Sellers hereunder not being true and correct or (C) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions set forth in **Section 7.02** to be satisfied;

(ii)    any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(iii)    any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; and

(iv)    any Actions commenced or threatened against, relating to or involving or otherwise affecting the Business, the Purchased Assets or the Assumed Liabilities that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to **Section 4.14** or that relates to the consummation of the transactions contemplated by this Agreement.

(b)    Buyer's receipt of information pursuant to this **Section 6.03** shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by a Seller in this Agreement (including **Section 8.02** and **Section 9.01(b)**) and shall not be deemed to amend or supplement the Disclosure Schedules.

**Section 6.04    Employees and Employee Benefits.**

(a)    On the Closing Date, Sellers shall terminate all Employees of the Business except those Employees identified in the Retained Employee Notice, and, at Buyer's sole discretion, Buyer may, but shall not be required to, offer employment, on an "at will" basis, to any terminated Employee with terms and conditions (including compensation) established in the sole discretion of Buyer, which terms and conditions may be different from those governing Sellers' relationship with employees. Nothing in this Agreement shall confer upon any employee or former employee of any Seller any rights or remedies of any nature whatsoever against Buyer.

(b)    Buyer shall have no obligations whatsoever for, any compensation or other amounts payable to any Employee (or former Employee) of any Seller, including hourly pay, commission, bonus, salary, accrued vacations, fringe, pension or profit sharing benefits, employee expenses, change in control payment, deferred compensation or severance pay payable to any Employee (or former Employee) of any Seller for any period relating to the service with such Seller at any time prior to the Closing Date.

(c)    For the avoidance of doubt, the parties hereto acknowledge and agree that there will be no transfer by Sellers or their Affiliates, or assumption by Buyer or its Affiliates of any of the Benefit Plans, including any assets or Liabilities of Sellers thereunder, and Buyers shall have no responsibility or liability for any worker's compensation claims of any Employees (or former Employees) or agents of Sellers which relate to events occurring prior to the Closing Date.

(d)    Buyers shall have no responsibility or liability with respect to giving any notices required under the WARN Act in connection with the termination of Sellers' Employees.